UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FORT PIERCE DIVISION


CASE NO. 23-80101-CRIMINAL-CANNON


UNITED STATES OF AMERICA,

           Plaintiff,                  FORT PIERCE, FLORIDA

    vs.

                                NOVEMBER 1, 2023

DONALD J. TRUMP, WALTINE NAUTA
 and CARLOS DE OLIVEIRA,          PAGES 1 – 78

           Defendants.
_____/


TRANSCRIPT OF MOTIONS HEARING

BEFORE THE HONORABLE AILEEN M. CANNON

UNITED STATES DISTRICT JUDGE

<u>APPEARANCES:</u>

FOR THE GOVERNMENT:  JAY BRATT, ESQ.
         DAVID HARBACH, ESQ.
         JOHN PELLETTIERI, ESQ.
         MICHAEL THAKUR, ESQ.
         U.S. Department of Justice
         Office of Special Counsel
         Washington, D.C.  20530


FOR DEFENDANT TRUMP:  CHRISTOPHER KISE, ESQ.
         Chris Kise & Associates
         Tallahassee, FL  32301

         TODD BLANCHE, ESQ.
         EMIL BOVE, ESQ.
         Blanche Law
         New York, NY  10005


FOR DEFENDANT NAUTA:  STANLEY WOODWARD, ESQ.
         Brand Woodward Law
         Washington, D.C.  20001

         SASHA DADAN, ESQ.
         Dadan Law Firm, PLLC
         Fort Pierce, FL  34950


FOR DEFENDANT DE OLIVEIRA:  JOHN IRVING, ESQ.
         E & W Law
         Washington, D.C.  20004


         DONNIE MURELL, ESQ.
         L.D. Murrell, P.A.
         West Palm Beach, FL  33401

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2          THE COURT:  Good afternoon.  Please be seated unless
 3   you are addressing the Court.
 4          All right.  This is case number 23-80101, United
 5   States of America versus Donald J. Trump, Waltine Nauta, and
 6   Carlos De Oliveira.
 7          Let's start with appearances, members of the Office
 8   of the Special Counsel first and then I'll go one by one with
 9   the Defense team.
10          MR. BRATT:  Good afternoon, Your Honor; Jay Bratt,
11   David Harbach, Michael Thakur, and John Pellettieri from the
12   Special Counsel's Office on behalf of the United States.
13          THE COURT:  Good afternoon to all of you.
14          All right.  Let's hear first from counsel for former
15   President Trump.
16          MR. BLANCHE:  Good afternoon, Your Honor, Todd
17   Blanche, and I'm joined at counsel table for the first time
18   with my parter, Emil Bove, for President Trump; and my
19   understanding is Christopher Kise is dialed into the conference
20   as well.  Good afternoon.
21          MR. KISE:  Good afternoon, Your Honor.
22          THE COURT:  Good afternoon, Mr. Blanche and Mr. Kise.
23          Mr. Kise, can you hear us okay?
24          MR. KISE:  I can, Your Honor; and I'm going to leave
25   my phone on mute because it's fairly noisy here at the UN
```

```
 1    Courthouse; but thank you for letting me appear by phone.

 2              THE COURT:  Okay.  All right.

 3              Then counsel for Waltine Nauta.

 4              MS. DADAN:  Good afternoon, Sasha Dadan and Stanley

 5    Woodward on behalf of Waltine Nauta.

 6              THE COURT:  Good afternoon.

 7              And finally, counsel for Carlos De Oliveira.

 8              MR. IRVING:  Good afternoon, Your Honor, John Irving

 9    and Donnie Murrell.

10              THE COURT:  Good afternoon.

11              All right.  This is a hearing to discuss Defense

12    motions for a revised pretrial and trial schedule.  As usual,

13    there shall be no possession of cell phones or other electronic

14    devices, no recording or broadcasting of any kind using such

15    devices.  We have set up, as we normally do, the overflow room

16    on the second floor along with the contemporaneous Zoom feed,

17    so this is a public hearing.

18              As brief background, on July 22nd of 2023, following

19    a hearing held prior to the return of the pending superseding

20    indictment in this case, the Court entered an order granting in

21    part the Government's motion for a continuance and reset

22    pretrial and trial deadlines pursuant to a detailed schedule

23    laid out in docket entry 83, taking into account specific

24    deadlines under the Classified Information Procedures Act which

25    I will reference as "CIPA," and other deadlines under the
```

1    criminal rules and the Court's standard scheduling order.

2              Now pending before the Court are docket entries 160

3    and 183 along with the numerous related filings to those

4    motions.  Those motions, as I have indicated, they move in

5    combination.  All defendants join in these motions for a

6    revised schedule as relates to Section 4 litigation under CIPA,

7    Defense motions to compel discovery and also as supplemented

8    with respect to additional pretrial and trial deadlines.  Of

9    course, the current trial is set for the two-week period

10   starting on May 20th of next year.  So this is a hearing to

11   discuss those motions.  And because they are Defense motions, I

12   will hear first from counsel for the Defense.

13             But before I turn to you, let me first ask Mr.

14   Blanche:  Have you all come up with a format in terms of

15   presentation for today's hearing?

16             MR. BLANCHE:  Your Honor, I will be presenting, on

17   behalf of President Trump, the motion in its most significant

18   manner; and then to the extent that counsel for Mr. Nauta or

19   Mr. De Oliveira wants to supplement, I expect they will do so.

20             THE COURT:  Okay.  All right.

21             Okay.  All right.

22             Well, then, let's start with you, Mr. Blanche.  I see

23   the issues raised in these motions falling in a number of

24   different categories, big picture, specific discovery issues

25   and all the granular details that go along with that, so I

1    would like to use this hearing to try to assist the Court in

2    fully understanding the scope of discovery both in an

3    unclassified manner as well as classified.

4           The next sort of big bucket I would say concerns the

5    scope of any defense motions to compel.  That segues or is

6    considered alongside the Section 4 discussion which I think is

7    illuminated in part following the Court's order entered today

8    on the subject of Section 3 and Section 4.  And then finally,

9    there is the category of logistical concerns; and under that

10   category, I'm thinking the complex and numerous issues

11   associated with the classified discovery in this case, the

12   logistical issues associated with that, the facilities and the

13   concerns associated with the establishment of those facilities

14   along with the various schedules that have been referenced in

15   the papers.  So that's kind of the overview, as I see these

16   motions in their current form.

17          So let's start with the discovery issues in detail.

18          MR. BLANCHE:  Thank you, Your Honor.

19          So just first addressing the unclassified discovery,

20   as we discussed and as Your Honor is aware from both parties'

21   briefing this past summer, it is extraordinarily voluminous.

22   The most -- and the Special Counsel, as they have represented

23   to the Court accurately, have provided a lot of material that

24   in many cases the Defense wouldn't get so early, including the

25   grand jury transcripts and traditional *Jencks* and 3500 material

1    for the most part; and that is certainly helpful for President

2    Trump and for all of the defendants in preparing a defense and

3    preparing and going through discovery.  But the discovery

4    itself remains extraordinarily complicated and voluminous

5    especially as it relates to the CCTV footage.  It is very

6    cumbersome, if not impossible -- and I can certainly let

7    co-counsel speak to this, as well, who have been challenged

8    with these issues as well.  We simply can't load it in an

9    effective way to review it.

10           And the Special Counsel has directed us to certain

11   portions of the CCTV footage that they view as the most

12   relevant, but there is -- from what we know and from our

13   defense, there is a tremendous amount of CCTV footage that we

14   believe has been produced that is not what they have identified

15   that is extremely relevant to us.  For example, to the extent

16   that boxes were moved on occasions other than what is

17   delineated in the indictment, that is certainly something that

18   matters to us.

19           THE COURT:  Okay, so hold on.

20           On the CCTV, how much exactly, because all these

21   numbers are flying around in terms of terabytes, disks,

22   documents, records, and that's kind of what I'm struggling

23   with.  I would like to get some particular details on the

24   subject.  So focusing in on the CCTV footage, how much is it?

25           MR. BLANCHE:  There are differences of views on that.

 1   My -- our understanding, on behalf of President Trump, is it's

 2   comprised of multiple cameras, some of which show the same

 3   location just from different angles that span approximately a

 4   nine-month period of time, but the way that it was subpoenaed

 5   and produced to us, it comprises several years.  And depending

 6   on -- and depending on the format, apparently, that you view it

 7   in, it can be reviewed more quickly so you can accelerate the

 8   view.  However, up to this point, we don't have -- or we are

 9   having challenges getting that done.  The Special Counsel, as

10   recently as this week, has been working with Defense to figure

11   out a computer that is able to do that.  But when we had our

12   vendor, our external vendor just try to load it, I believe it

13   took almost a month, three weeks just to load it into the

14   system just so we could view one video which isn't obviously

15   practical.  And we are not asking -- you know, we are not

16   assuming that that's practical.

17        So the amount -- the amount, if you just play it out

18   in minutes, is years.  But putting that aside, because there

19   are some cameras that are of the same location, so in theory,

20   you can watch that, you know, at a similar time, then we have

21   the problem with just being able to view it and just having the

22   programs that allow us to view not only the parts identified by

23   the Special Counsel but the parts that matter to us as well.

24        In addition -- in addition to those materials,

25   there -- the rest of the discovery which we are working our way

```
 1    through that includes cell phone evidence, it includes a

 2    significant number of narrow-related correspondence, it

 3    includes a significant amount of other evidence gathered in the

 4    course of interviewing witnesses that we are still going

 5    through.  And we have continued to get discovery from the

 6    Special Counsel which is not unusual and I'm not saying that it

 7    is, but we have continued to get discovery from the Special

 8    Counsel regularly since the initial production, and we have

 9    been working our way through it, and we are steadfastly trying

10    to do that.

11          But now turning to the classified discovery, it's

12    very related and the challenge with the classified discovery to

13    this date is that until a week ago, a week-and-a-half ago, we

14    were in a location that is very difficult to work in.  It was a

15    temporary location.  It was very small, and it was very

16    challenging to study the classified materials but then be able

17    to look at the unclassified discovery in connection with that.

18    And there is a lot of it that is obviously very related given

19    the nature of the charges, the fact that there were, you know,

20    allegedly classified materials found in connection with a lot

21    of unclassified materials, right?  And we have requested from

22    the Special Counsel some assistance with that.

23          So for example, there was a picture that was provided

24    in classified discovery -- or a couple pictures and -- but the

25    bulk of the data from that phone was unclassified discovery,
```

1    and so we requested that we receive the full contents inside of

2    the SCIF to allow us to review it more efficiently just to help

3    us review it.

4            It has been extremely difficult, as Your Honor knows

5    from the various briefs that we have submitted to the Court and

6    to have even access to the documents.  We now do, so all of --

7            THE COURT:  Let's understand that.  As of what date

8    did you have -- or was, I should say.  As of what date was all

9    of the classified discovery produced in this case made

10   available to the Defense in this district minus -- I know there

11   is a category, a small subset of special measures material that

12   cannot be permanently stored, but that's my question in terms

13   of timing, as of what date?

14           I have seen the date October 6th floated around, and

15   I'm just trying to get some definition on that.

16           MR. BLANCHE:  Let me just confirm I'm right.

17           It's the 17th?

18           October 17th.

19           And by the way, you know, the Special Counsel

20   criticized us for the fact that there was an 11-day window

21   between the day that it was apparently available in D.C. and

22   available to be delivered to the SCIF and the time we showed up

23   there.  We found out on a Friday night -- Friday afternoon that

24   it was available.  Monday was Columbus Day.  We had CIPA

25   filings, as the Special Counsel knows, in the D.C. case that

```
 1    week.  We had a conference before Your Honor that week, and

 2    the -- and we had a Section 4 CIPA hearing in D.C. the

 3    following Monday that we had to prepare for, all information

 4    that Special Counsel knows.  We flew directly from D.C. down

 5    here on the 17th to be able to receive this material.

 6              So it is not as if we found out that we had

 7    additional discovery that we could finally look at and said, we

 8    will just wait 11 days and take our time.  We left on a

 9    Thursday night, found out on -- we were down in the SCIF that

10    week, found out on Friday there was additional materials

11    available and ended up meeting the folks on the 17th to

12    actually review and receive the material.

13              THE COURT:  So at this point, have you had access to

14    all of the classified discovery associated with the underlying

15    counts 1 through 32?

16              MR. BLANCHE:  We have -- yes, Your Honor.

17              THE COURT:  And that happened, you're saying, on the

18    17th of October when you were able to be here locally; is that

19    correct?

20              MR. BLANCHE:  There was one -- there was a series

21    of documents that I believe were flown down the next day that

22    we -- but yes, Your Honor, yes.

23              THE COURT:  Okay.

24              MR. BLANCHE:  We do understand there was some

25    additional classified discovery placed in the SCIF last week,
```

1   and we were in the SCIF yesterday.  We didn't -- because of

2   miscommunication, which is totally understandable, we didn't --

3   we didn't know was there, so we know there is some more

4   discovery in the SCIF as of last Tuesday that we haven't

5   reviewed yet.  We understand that we will get a discovery

6   letter today with respect -- or tomorrow with respect to those

7   materials and then have to return at some point soon to take a

8   look.  But as to the charged documents, we now have had

9   opportunity to visually review every one.

10          THE COURT:  And that happened October 17th and

11   beyond?

12          MR. BLANCHE:  Correct.

13          THE COURT:  Okay.

14          MR. BLANCHE:  And, you know, Your Honor, not to

15   belabor the point, but we spent a tremendous amount of time in

16   that SCIF since we received discovery.  We are not -- you know,

17   when we talk about asking for additional time or needing more

18   opportunity to consider and review the materials, it's not

19   because we are not going down to Miami regularly -- almost

20   weekly -- and spending a significant amount of time there.

21          There was a meaningful -- as Your Honor knows from

22   our submission, we put a letter to the Special Counsel asking

23   for a tremendous amount of different documents that we continue

24   to believe we are entitled to.  In response to that, we

25   received -- we received some additional documents.  The

 1   additional several thousand pages that we received a few weeks

 2   ago are extraordinarily dense, very -- you know, they are

 3   memos, and they are very challenging materials to get through

 4   in a SCIF that Special Counsel, when we found out about it and

 5   we asked if they would agree to more time, literally said in an

 6   e-mail to us that two days was plenty of time for us to review

 7   the new material, get them whatever requests we had by the end

 8   of that week, and then, you know, potentially have one extra

 9   week before Your Honor to actually make motions to compel.  And

10   you know, I don't say this lightly, that is just not true.  I

11   mean, we are talking about several -- over a thousand pages and

12   we are not talking -- for the most part, we are not talking

13   about grand jury transcripts or inventory that you can flip

14   through.  We are talking about very dense review materials,

15   Prudential Review Materials that we had requested and that will

16   lead to motions to compel and that will lead -- and they have

17   led to additional discovery.

18         We submitted another demand last night, a classified

19   letter to the Special Counsel, an unclassified letter today,

20   and we expect that it will work.  I mean, we have gotten some

21   more materials from Special Counsel, we are willing to and we

22   are prepared to engage in meet and confer after we get answers

23   to the most recent ones because we now have what I will say is,

24   for the most part, a fuller volume of classified discovery.

25   But we just really got that and we just have been able to go

```
 1    through it.  And we did -- we put two or three letters to the

 2    Special Counsel asking for clarification, more materials; they

 3    responded and they put their position -- made their position.

 4    We followed up.  They had some questions about some of our

 5    requests, we followed up.  We intend to follow up; and we are

 6    optimistic that after a meet and confer, we will find common

 7    ground for at least some of the demands that we have.  But we

 8    are sure we are going to need to file motions to compel.  There

 9    is a meaningful disagreement --

10              THE COURT:  Okay, hold on.

11              On the -- you said you have gotten some answers to

12    your questions.  Have you gotten yet an answer to whether the

13    agency's -- or the Government -- excuse me -- conducted

14    Prudential Search Reviews?

15              MR. BLANCHE:  Vague answer, we received some.  We

16    were told, as I think was also told to the Court, something

17    vague about what they believe they were required to do under

18    the law, what the Department of Justice requires them to do.

19    We still don't know what they did.  They haven't affirmatively

20    said "here is what we did, here is what we didn't do" to allow

21    us to then react to that and possibly make a motion.

22              THE COURT:  What about classification reviews, have

23    you received all of those?

24              MR. BLANCHE:  No, Your Honor, we have not received

25    all of them.  That is one of the things that we are continuing
```

1  to ask about.  We have received them for -- I believe for the

2  charge documents; but as what should be obvious from the volume

3  compared to the 32 counts, there is a tremendous number of

4  documents that are extraordinarily important to our defense

5  that are purportedly classified that we don't have any

6  information about at this time.

7        THE COURT:  Okay.  What about the *Jencks* Act or

8  *Giglio* material by law enforcement witnesses?  There was some

9  discussion of that.

10       MR. BLANCHE:  We have some, but we know from the

11 review of what we have been provided that there is a lot more.

12 I mean, maybe it is obvious, but there will be references in

13 the communications to other e-mails or other communications

14 that are potentially classified -- we don't know because we

15 don't have them -- that we haven't received.

16       So we understand -- there has to be more *Jencks* and

17 3500 that we -- that we are entitled to and that we don't have

18 yet.  And we have, of course, demanded that.  We have -- we do

19 have some though, it is not that -- we have some.

20       THE COURT:  And then what about -- there was also

21 some reference to the Special Counsel's definition of its

22 prosecution team?  Have you gotten any more clarity on that

23 front?

24       MR. BLANCHE:  Well, yes, Your Honor.  They, quite

25 surprisingly, are taking the position that NARA is not part of

1   their prosecution team and that many of the intelligence

2   agencies are not part of the prosecution team.  We are going

3   through evidence, both classified and unclassified, that will

4   be part of -- assuming they don't change their mind will be

5   part of a motion to compel.  The big question for Your Honor

6   will be whether NARA is, in fact, part of the prosecution team.

7          We have seen communications between NARA and the

8   Department of Justice and the White House and the Special

9   Counsel that started way before what has been publicly

10  disclosed and extensive meetings, extensive communications; and

11  so we feel very strongly and expect that we will win on that,

12  when we file the motion that NARA is absolutely part of this

13  prosecution team and that the intelligence communities that

14  they worked very closely with in determining the -- well, from

15  what we can tell, the particular documents that they chose to

16  charge.  So there is purportedly a tranche of documents that

17  have classified headings on them and then 32 that they decided

18  to charge.  That wasn't just done in a vacuum.  They didn't

19  just, you know, pick 32 documents out of a hat and say "we will

20  go with these."  There was a lot of coordination that we can

21  tell from the materials we do have with the intelligence

22  community that ultimately led them to proceed the way they did.

23          So yes, we have an answer with them.  They say very

24  strongly that they view the prosecution team as being limited

25  to the Special Counsel's Office and the FBI, and we very

1    strongly believe that's wrong.

2         THE COURT:  Okay.

3         All right.  You hinted at this a little bit, but on

4    the subject of motions to compel, what sort of categories at

5    this point do you anticipate seeking to compel?  I know this is

6    somewhat in flux, but if you can shed some more light on that.

7    And then also answer why, in your view, the defense motions to

8    compel need to come before Section 4 litigation.

9         MR. BLANCHE:  Of course.  So there is a broad range

10   of discovery we believe we are entitled to that if we are not

11   able to meet and confer and reach agreement will be part of the

12   motion to compel.  The most significant, for sure, has to do

13   with NARA and has to do with communications of Special Counsel

14   and the D.C. U.S. Attorney's Office before the Special Counsel

15   was appointed had with NARA, the White House, and other

16   intelligence agencies, and we know we don't have it all.  We

17   can tell from what we do have that there is a lot more out

18   there.

19        There is also all Prudential Review for sure.  The

20   way that the intelligence community decided why certain

21   documents have the classification and continue to be closely

22   held, there is a lot more information that we don't have about

23   that process and the back and forth that went into the

24   decisions that were ultimately apparently made.

25        There is a category of documents that it -- actually

```
 1   in unclassified discovery.  We learned a week or two ago that
 2   there is a certain category of documents that require what is
 3   called a "Q clearance" and it includes one of the charged
 4   documents, and we learned that it's a Department of Energy
 5   program.  We learned that President Trump continued to have an
 6   active security clearance even after he was indicted in this
 7   case with the Department of Energy.  Now that, in our view, is
 8   the definition of Brady.  It was -- I'm not going to say it was
 9   buried, but it was provided to us in discovery as part of
10   miscellaneous materials at some point in the third or fourth
11   production.  I mean, it is literally a memo from the Department
12   of Energy dated June -- dated late June of this year, June 28th
13   of this year, saying that, oh, we should remove Donald J. Trump
14   from the person who has an active security clearance.  He has
15   been charged with possessing a document, in violation of
16   federal law, when he has an active security clearance with the
17   holder of that document.
18            So anyway, there is a category of materials such as
19   that that we don't believe we have in discovery that we are
20   going to -- that we are going to -- be part of our motion to
21   compel.
22            THE COURT:  So why wouldn't -- turning now to the
23   sequencing, why not go through the Section 4 process in a
24   reasoned way with enough time and then set a deadline for a
25   motion to compel that is after the Section 4 submissions?
```

1          MR. BLANCHE:  Well --

2          THE COURT:  Assuming there is only one which it

3    appears there may need to be at least more than one.

4          MR. BLANCHE:  Correct.  Well, certainly, if the goal

5    of the Court is to only have one, it, in our view, is

6    extraordinarily inefficient to have a Section 4 submission

7    tomorrow, for example, because we could certainly put something

8    together relatively quickly and say what our defenses are

9    today.  We have reviewed all the discovery that we have.  Like

10   I said, there is unclassed discovery that plays into our

11   Section 4 motion.  But we have asked for a huge tranche of

12   discovery from the Government that will most certainly go to

13   our defense in this case.  This is a very unique case when it

14   comes to the retention of purportedly, you know, closely-held

15   information.  And the information we are requesting from the

16   Special Counsel, from NARA will for sure counsel our defense in

17   this case which is really what a Section 4 is about is

18   educating you about what we expect our defense to be.

19          So if we file a Section 4 next week --

20          THE COURT:  So your view is that it would be

21   incomplete, necessarily preliminary and setting us on a path of

22   inefficient multiple rounds of Section 4; is that basically

23   your point?

24          MR. BLANCHE:  Yes.

25          And if just I can put a finer point on that, a

1    Section 4 is a big deal for the Government.  They are saying to

2    the Court, there is discoverable information that we don't

3    think the Defense gets and they should get affirmations from

4    the Attorney General, they should get affirmations from the

5    intelligence community, and so it is a big deal.  So going

6    through that process now and then filing motions to compel --

7    and let's assume some of them are granted -- we are then going

8    to have to do it over again after we review the additional

9    materials that we were entitled to in the first place.

10            As of -- Your Honor, if you consider our proposed

11   schedule in our initial brief, we are basically on track with

12   that schedule.  So we are a little behind because of the delays

13   in having access to some of the materials.  But the original

14   schedule compels the Government to answer our various discovery

15   demands.  We gave one last night and one this morning.

16   Assuming they don't agree, we then meaningfully meet and confer

17   over the next week or two.  And "meaningfully" because I do

18   think that -- I don't expect they are going to be unreasonable.

19   And then once they have determined and we are at a dead end, we

20   can put together a motion to compel rather efficiently and

21   quickly.  We are talking about doing that at the -- we would be

22   able to do that at the end of the month, Your Honor.  There

23   would be opposition briefs and replies, and then we are putting

24   a substantive Section 4 litigation in early January on that

25   schedule which is not inefficient at all, when you consider the

1  alternative which is to put a Section 4 in in the next week,

2  and then we file motions to compel under the same schedule that

3  I just described, and then we are stuck in January with all

4  kinds of potentially additional discovery filing another

5  Section 4.

6         So I don't know at this point how it's more efficient

7  to proceed the way the Special Counsel wants to as opposed to

8  the way that we asked for in our papers.

9         THE COURT:  Do you have any sense for how long it

10  would take to complete the motion to compel process not

11  including Court review?

12         MR. BLANCHE:  Your Honor, we can commit to filing a

13  motion to compel within two weeks of the meet and confer being

14  over, even sooner if the Court desires, and we have another --

15  we have multiple deadlines in the D.C. case that we are running

16  interference on a little bit, but that's -- if we meet -- if we

17  wait a week or so for the Special Counsel to respond to our

18  latest discovery demands, have a week -- you know, four or five

19  days to get together and meet and confer with them, we can be

20  prepared to file a motion to compel in short order.

21         THE COURT:  Okay.

22         Let's shift gears briefly just -- I have some -- a

23  question.  There is some briefing -- references in the briefing

24  to the ex parte nature of the Section 4.  Obviously, the

25  statute permits the Section 4 process to occur on an ex parte

1    basis, but there is the Eleventh Circuit decision in *Campa*, so

2    I wondered if you could address that at all and your view as to

3    whether the Section 4 process, at least with respect to your

4    client only, would need to be ex parte and by that I mean

5    attorneys' eyes only.

6          MR. BLANCHE:  Correct, thank you.

7          So we believe that the circumstances of this case,

8    and Your Honor certainly has the discretion to conduct it ex

9    parte, but in the circumstances of this case, the nature of the

10    materials that we expect will be the issue of the Section 4

11    motion by the Government, there is no national security

12    interest reason that cleared counsel cannot be part of that

13    process.  And by "cleared counsel," we are talking about we

14    have been read into, obviously, extremely sensitive programs

15    and so maybe we would need to be read into an additional

16    program, I don't know because I don't know the nature of the

17    motion.  But it seems like there is, given the circumstances,

18    it's by far the best way to educate Your Honor about our

19    defenses instead of asking you to step in our shoes and think,

20    well, what would the defense be to this -- to this document or

21    this series of documents or this information.  We would be able

22    to say whether there was one and what it would be, if any.

23          THE COURT:  Does the Eleventh Circuit's decision in

24    *Campa*, though, foreclose your position that Section 4 would --

25    could be done on a non-ex parte basis or an attorneys' eyes

1    only basis?  In other words, is there any limitation in that

2    decision to your position?

3         MR. BLANCHE:  I don't think there is -- no, Your

4    Honor, I don't think there is a limitation in the decision to

5    our position.  I think there is a tremendous amount of

6    discretion that *Campa* affirms, when it comes to this type of

7    decision.  Your Honor can fashion it under *Campa* and other laws

8    however you believe appropriate.  And that includes ex parte,

9    but it includes ex parte plus attorneys' eyes only.  It

10   includes maybe not -- I mean, honestly, Your Honor, you can do

11   whatever makes the most sense.  You can limit what we get and

12   what we receive and just share some of the position.

13        The whole point of Section 4 is for Your Honor to be

14   educated about what our defenses will be so that Your Honor

15   makes the right decision and whether to grant it.

16        THE COURT:  Okay.  And then on the subject of

17   logistical issues, Special Counsel's Office, I think it says at

18   one point that nothing material has changed since the Court set

19   the trial date.  I'm curious what your thoughts are on that in

20   terms of just operational logistical concerns.

21        MR. BLANCHE:  Yes; thank you, Your Honor.

22        Everything has changed, and I'm not trying to be

23   flippant with the Court.  I mean, since Your Honor considered

24   the motions last summer, putting aside the superseding

25   indictment filed in this case, the indictment filed against

```
 1    President Trump by the same office, by the same office,

 2    completely disrupted everything about the schedule Your Honor

 3    set.  There is not a single part of Your Honor's schedule that

 4    is not adversely affected by the D.C. schedule that was

 5    ultimately set by the judge but also by the schedule that was

 6    demanded by the Special Counsel in D.C., all of this done, to

 7    the best that we are aware, without any regard to Your Honor's

 8    schedule which, you know, we put a notice in and we have

 9    alerted Your Honor to this.  But it is troubling that even as

10    late as last week, the Government accuses us of being sinister,

11    sinister because we are bringing to the Court's attention to

12    the fact that President Trump now has -- putting aside his

13    counsel, President Trump now has what amounts to probably a

14    two-and-a-half month trial starting in March in advance of a

15    May 20th --

16              THE COURT:  Can you tell me when is that trial set to

17    begin?

18              MR. BLANCHE:  March 4th.

19              THE COURT:  And where are you getting the

20    two-and-a-half month estimate from?

21              MR. BLANCHE:  So there is a little bit of speculation

22    here, but the Government estimates a four- to six-week trial.

23    We estimate, at this point, at least a two-week defense case,

24    although we are still, frankly, about 20 percent through the

25    discovery.  And then our understanding from the voir dire
```

1    process is that it will be very complicated to select a jury

2    and that doesn't start until the 4th, and then we are building

3    in time for deliberations.  And so when you add -- when you put

4    that together, you're at least at two months and really

5    potentially more than that if anything lasts longer.

6              THE COURT:  Okay.

7              All right.  Anything further?  And then I'll give the

8    other defense lawyers an opportunity to be heard, and then I'll

9    turn to the Special Counsel's Office.

10             Oh, no, no, no; I said anything further.

11             MR. BLANCHE:  Oh.

12             No, I mean -- look, I don't want to belabor the point

13   with the scheduling but -- and it's in our position papers, but

14   the real pressure on President Trump and on us, his counsel, is

15   a combination of a compressed schedule by the case in

16   Washington, D.C., and by this case as originally set which we

17   all agreed was a very aggressive schedule.  And so even with

18   things like pretrial motions that are due in this case, we were

19   required to file substantive pretrial motions in D.C. last

20   week.  Those were extraordinarily voluminous, took a tremendous

21   amount of time, time away from what we have been working on in

22   this case, Your Honor.  We have a series of deadlines between

23   now and early January in the D.C. case:  Motions in limine,

24   expert notice, identification of exhibits, opposition to all of

25   that.  We have current motions pending, seven of them.  We

```
 1    have -- we have motions due this week and next week on various

 2    issues that have been briefed.  On top of all of that, there is

 3    CIPA litigation in the D.C. case, and we have already filed

 4    a -- it is not as voluminous, we filed a Section 4 and a

 5    Section 5 motion already and this --

 6            THE COURT:  Okay, I think I get the point that there

 7    is a lot of work and clearly a lot of moving parts.

 8            All right, thank you.

 9            MR. BLANCHE:  Yes, Your Honor.

10            MR. WOODWARD:  Good afternoon, Your Honor.

11            THE COURT:  Good afternoon.

12            MR. WOODWARD:  I appreciate the Court's assistance in

13    helping me be here today.  I'll just make a few quick points

14    echoing --

15            THE COURT:  Before you begin, let me make sure

16    Mr. Kise is still with us.

17            Mr. Kise, are you there?

18            MR. KISE:  I am, Your Honor.  I had one minor point

19    to add, but I will wait until everyone is done because they may

20    cover it, in the interest of efficiency.

21            Thank you, Your Honor.

22            THE COURT:  Okay.  All right.  Please make sure to

23    chime in, in case we forget about you since you are not here.

24            MR. KISE:  Okay.  Thank you.

25            THE COURT:  All right.  Mr. Woodward.
```

```
1              MR. WOODWARD:  We will never forget Mr. Kise.

2              So I'll make a few quick points on top of what

3    Mr. Blanche shared.

4              I think, for us, we still don't have access to the

5    classified documents.  I still don't have the final security

6    clearance.  I was read in last Wednesday and I was told that it

7    would be at least two more weeks before I could have access to

8    the documents.  Ms. Dadan has been read in and I believe is

9    being given access to the documents or most of the documents

10   tomorrow.  But for our purposes, we think it is incredibly

11   important that we understand what the classified records are

12   and we don't have access to the documents.  So we have a hard

13   time making a representation to you, whether it is CIPA 4

14   litigation or general discovery, because we haven't seen the

15   things that Mr. Blanche and his team have seen; obviously have

16   not had an opportunity to discuss with him or his team what is

17   in -- the totality of what is in the SCIF, and so we are

18   just -- we are just in a position where that hasn't been

19   possible.

20             THE COURT:  Okay.  Well, then, where are you

21   specifically with the unclassified discovery, and can you shed

22   some light on the quantity of the data involved and --

23             MR. WOODWARD:  I can.

24             Let me make one more point, if you would indulge me,

25   on the classified discovery is that the logistics of the
```

```
 1    classified discovery have also been incredibly troubling.

 2             I think as the Court is aware, we were first given

 3    temporary access to I believe it is actually the judge's SCIF.

 4    That's now been moved, so I don't even have access to the

 5    documents that had been provided to us.  I have to get read in

 6    or trained on how to get access to this new SCIF.

 7             There is some discussion between my co-counsel and

 8    the CISO about whether -- whether and where the documents are

 9    to be housed given that I don't have full access.  And you

10    know, put quite frankly, Your Honor, there is not a SCIF here;

11    and so as we begin to bring issues to the Court that we have --

12    and I have identified several already, but of course my notes

13    are in Miami and not here.  But there, as -- obviously, the

14    Court's ruling today sheds light on how we are going to move

15    forward, but there are records, including my client's cell

16    phone, that I would like to discuss with my client that I can't

17    now do.  So the only --

18             THE COURT:  And you can't because?

19             MR. WOODWARD:  It is in the SCIF.  The only full copy

20    forensic extraction of my client's cell phone that I have

21    access to is in the SCIF; and under the Court's Section 3

22    order, I can't discuss that with my client.  So we --

23             THE COURT:  Why, because the phone itself contains

24    classified information?

25             MR. WOODWARD:  I haven't been able to get to the SCIF
```

1  to see exactly why the copy has been placed there, but that's

2  my assumption.

3       THE COURT:  So if the forensic copy of the phone is

4  unclassified, then presumably this restriction would not be a

5  restriction.

6       MR. WOODWARD:  And I have to go down to Miami and

7  write a motion in Miami that is then brought to you here, in

8  Fort Pierce.  I don't candidly know how it is that you are

9  presented with that information, given that there is not a SCIF

10  in this courthouse.  But yes, that's what I'll be doing next

11  week because it is obviously of critical importance to us to

12  discuss with Mr. Nauta the contents of his phone as they relate

13  to the allegations in this indictment.

14       Now, I want to be clear, we have been provided an

15  unclassified copy of his phone, but I don't know what is

16  missing, and I can't look at the phone let alone have an expert

17  forensically consider what is on the phone because I don't have

18  access to it yet in the SCIF.

19       THE COURT:  That is true that there are a number of

20  challenges logistically given the volume and nature of the

21  classified discovery in this case.  One of the issues is the

22  establishment of the SCIF in this division which was not done

23  until the Court, in consultation with the litigation security

24  group, initiated those efforts after the indictment, and so

25  that has necessarily complicated and introduced some

1    unpredictability in the mix.  Hopefully, if the estimates prove

2    out, we will have a suitable facility come early next year, but

3    that's with optimistic estimates.  And so there are certain

4    realities that I think you're touching upon that do affect the

5    work in this case and certainly impact the Court's ability to

6    do its work as well.  So I acknowledge your concerns.

7              What else would you like to say about discovery?

8              MR. WOODWARD:  I'll turn then to the nonclassified

9    discovery and, in particular, I can shed some light on the

10   video CCTV footage that we are working on.

11             So the order of operations is as follows, because I

12   do want to be clear about timing of things as I expect my

13   colleagues across the aisle will come up here and tell the

14   Court that in July of this year, they wrote Ms. Dadan and

15   myself and they provided us with the very first tranche of

16   discovery that was made available to President Trump and his

17   counsel, after President Trump and his counsel were arraigned.

18   You will recall that Mr. Nauta was arraigned some weeks later.

19             We have -- President Trump and his counsel are

20   utilizing a vendor to process e-discovery.  That is all hosted

21   on a platform called "Relativity."  We have our own separate

22   log-ins to Relativity that President Trump and his counsel do

23   not have access to, so we can go in and review the documents,

24   tag the documents, write notes about the documents, and that's

25   all separated.  But for obvious reasons, the vendor is not

1    hosting two copies of every document.  So when the Special

2    Counsel's office provided us with discovery, we asked and

3    received confirmation that it was the same discovery that had

4    been provided to President Trump and his defense counsel.

5         As Mr. Blanche touched upon, what the Special

6    Counsel's office noted is that there is certain video, CCTV

7    footage of Mar-A-Lago that they had identified as being the

8    pertinent sections of video that they thought we should watch.

9    Fine, that's a great place to start.  We watched that video,

10   and as the Court won't be surprised to hear, concluded that we

11   needed to look at additional video ourselves.

12        We have, of course, the benefit of consultation with

13   our clients and are able to talk about what video we should be

14   looking at and what video we should not be looking at.  And the

15   entire nature of the allegations of the charges in this case

16   are about missing boxes, right?  The indictment is charging

17   Mr. Nauta -- and I'll just stick with my client, with

18   Mr. Nauta -- with having moved boxes.  Some number of boxes

19   come out of a storage room, a lesser number of boxes go into

20   the storage room, and Mr. Nauta is charged with hiding those

21   boxes from whether it is Trump's then counsel or whether it is

22   the Government.  And obviously, we are interested in knowing

23   where those boxes are if they are, in fact, missing.  The CCTV

24   footage is what is going to help us understand that riddle.

25        Now, the Government does not know where those boxes

1    went.  As far as I can tell, to this day, the Government does

2    not know where the boxes they allege were hidden ended up.  So

3    we then reached out to the Government in October and said

4    "Government" -- oh, sorry, one other important fact for the

5    Court.  It turns out that the raw video footage that the

6    Government provided to the vendor cannot be loaded into

7    Relativity and viewed in Relativity.  Relativity is a platform

8    that is designed for reviewing static documents, PDFs, Words,

9    even Excels, but it doesn't do well with video.

10           I have had to deal with this issue in Washington on

11   the Capital siege cases, and I will tell you that the databases

12   made available by the Government are different for documents

13   than they are for video.  Relativity just doesn't handle video

14   very well.

15           So the vendor that President Trump is using does not

16   have for us a way to review the video that was produced by the

17   Special Counsel's Office back in July.  So in October, I wrote

18   the Special Counsel's Office and I said, "You all had promised

19   me an array" -- and I'll come back to what that means -- "in

20   July, I never followed up, I own that, but now I understand the

21   need for the array, could you please send it to me?"  They did

22   promptly; I think I got it the next day.

23           What is this "array"?  This array --

24           THE COURT:  How do you spell that?

25           MR. WOODWARD:  A-R-R-A-Y.

1          THE COURT:  Okay.

2          MR. WOODWARD:  And this is a -- if you have ever

3    heard the term "raid," R-A-I-D, it is an external device that

4    has multiple hard drives in it that when you plug into your

5    computer, makes it look like one drive; and the reason for that

6    is because this array contains roughly 60 terabytes of data

7    that is CCTV footage.

8          Just to give the Court an example, I looked on Amazon

9    here a few minutes ago, and the largest drive that you can buy

10   for a Western Digital external hard drive that you plug in and

11   then plug into your computer is 22 terabytes.  So this is at

12   least three times as large as sort of the standard hard drives

13   that we non-tech people are buying to put our pictures and our

14   things on, so 60 terabytes.

15         In addition, the files on the drive are all zipped or

16   archived, and you have to use a proprietary software called

17   "7-Zip" which is available for free -- I have used it before --

18   it is not a hardship, but you have to use a proprietary

19   software to unzip every single file that contains video on the

20   drive, and there are thousands of these files that have to be

21   unzipped.

22         And so to give the Court an example, the files are

23   organized in evidence folders, and so as the Court is familiar,

24   when the FBI gathers evidence and collects it, they store it in

25   folders 1B1, 1B2, 1B10.  So they are all evidence, they are all

         1   stored in separate folders.  As best I can tell, it will have
         2   one or two angles of CCTV footage in each folder.  1B6 is what
         3   I am most recently working on extracting.  It has 23 separate
         4   zip files.  When I started the extraction, the 7-Zip program
         5   told me that it was going to take me 24 hours to extract.
         6   That's one of the -- Court's indulgence -- that's one of the
         7   dozens of such folders, two, four, six, eight, 10, 12, 14, 16,
         8   18 -- roughly 21, 22 folders.

         9          Moreover, in the Government's -- excuse me, the
        10   Special Counsel's Office discovery letter to us, the only label
        11   that we are given with respect to the video is, and I quote,
        12   MAL space CCTV.  So now I have to go in and extract all of
        13   these folders, roughly 20, each of which is taking me 24 hours
        14   of computer processing time.  I have a whole separate computer
        15   that I'm using just to do these extractions so that I can go in
        16   and start watching this days of video so that we can make an
        17   assessment of what this case is all about and whether it is
        18   about missing boxes or about boxes that just weren't found when
        19   the FBI conducted its search of the property.

        20          Now the Government -- excuse me, the Special
        21   Counsel's Office has brought me, I think, a laptop that they
        22   say that will make this process better.  They are going to give
        23   it to me today, and I will take it home and I will dutifully
        24   use that instead of the one that I'm using.  I don't think that
        25   it's going to make any difference.  I think it is just a lot of

1    data, sixty terabytes of CCTV video footage.  And so, Your

2    Honor, I'm sorry for taking so much of the Court's time, but I

3    just wanted the Court to have an understanding of just the real

4    person power that has to go in before we can even start looking

5    at video and assessing its understanding.  This is -- Mr. Nauta

6    and I not even having sat down yet to watch one minute of the

7    video, and I still have to do that.  So --

8             THE COURT:  Do you anticipate any motions to compel

9    from your end?

10            MR. WOODWARD:  I don't know.  The answer is -- is

11   yes, but I can't tell the Court definitively.  We are not as

12   well along in our review of the other discovery as President

13   Trump and his counsel are.  I certainly don't intend to

14   duplicate efforts, and so we are processing.  They wrote a

15   letter this morning that is voluminous.  Now, I have to go

16   through that and check off all our boxes and see if there is

17   anything left outstanding.  I say yes, because in every case,

18   there is a disagreement.

19            I mean, we brought to the Special Counsel's Office

20   attention the idea of prosecution team now months ago.  I

21   think, in addition to NARA, we are going to add the Secret

22   Service to the list of people we think should be part of the

23   prosecution team.  The Secret Service clearly play a

24   significant role in this case by virtue of the fact that they

25   have their own security system at Mar-A-Lago with their own

1    cameras that President Trump and his staff did not have access

2    to.

3            So we think, yes, there will be litigation on what

4    was produced to us in discovery, but I don't want to make a

5    misrepresentation to the Court about the scope of that.

6            THE COURT:  Okay.  Anything further, Mr. Woodward?

7            MR. WOODWARD:  No, Your Honor.  Thank you.

8            THE COURT:  All right.

9            Counsel for Mr. De Oliveira?

10           MR. IRVING:  Good afternoon, Your Honor.

11           THE COURT:  Good afternoon.

12           MR. IRVING:  I suppose -- and I'll keep this brief.

13   My reaction to hearing my colleagues over the last hour or so,

14   speaking on behalf of a defendant who was indicted on July 23rd

15   and not arraigned until the 15th in a discovery letter from the

16   Government -- initial discovery letter is dated August 11th, so

17   my reaction to hearing what we have heard so far is just -- and

18   how, I mean even more so for us, to be able to get through a

19   lot of this material.

20           You know, I'm not even close to getting through

21   classified or unclassified material in order to know whether or

22   not there is a need to file a motion to compel.

23           I will say that, you know, the Government has been

24   very responsive and, you know, courteous and, you know, it just

25   is what it is.  They are providing us with a laptop as well

```
 1    today that is hopefully going to help with this video thing

 2    which is, as Mr. Woodward noted, I mean, really a huge problem.

 3    And I counted 21 folders in discovery on this, you know, extra

 4    drive with 211 zipped folders, and that's not including the

 5    viewer, so I think I'm accurate on that.  But each one -- I

 6    mean, you know, the one that I was looking at the other day

 7    told me it was going to take nine hours and 30 minutes to

 8    unzip.  And then half the ones that I have unzipped don't work

 9    and, you know.  So I have had those discussions with the

10    Government.  You know, they have been very helpful in trying to

11    solve the problem, but it hasn't been solved yet.  And really,

12    I'm not making any -- casting any aspersions on the Government,

13    I'm just saying we are not there and, you know, there are very

14    legitimate reasons why I need to look at, you know, far more

15    video than what they think is significant.

16            In terms of classified, just status, I believe --

17    well, I received notice that I have clearance for I think

18    everything on October 11th, and we received notice this morning

19    that Mr. Murrell does as well, so we are hoping to resolve at

20    least the access to the classified side tomorrow.

21            THE COURT:  With the additional read-ins?

22            MR. IRVING:  Yes, Judge.  So that's really all I

23    have.

24            THE COURT:  Okay.  Thank you very much.

25            Let me now hear from Mr. Kise.
```

```
 1              MR. KISE:  Thank you, Your Honor.  I'll just be very

 2    brief.

 3              I just want to amplify slightly from the front lines

 4    of experience what Mr. Blanche was saying about the potential

 5    overlapping trials and the challenge that is going to present

 6    really for the client, for President Trump, setting aside the

 7    lawyers.  I mean, I can assure you it's presenting significant

 8    challenges for the lawyers; but for the client himself, I think

 9    the Court -- I would ask the Court to at least just consider

10    that because I know from my experience here, in this trial,

11    that it's very difficult to be trying to work with a client in

12    one trial and then be simultaneously trying to prepare for

13    another trial that, at least right now based on the current

14    schedule, is going to come very, very close in time based on

15    the timeline which Mr. Blanche laid out which I think is

16    realistic, and so I would ask the Court to be sensitive to that

17    because it has been extraordinarily challenging.

18              The timeline here, as you may have observed, has

19    extended considerably when we originally came to Your Honor --

20              THE COURT:  Slow down.

21              Can you slow down, Mr. Kise?

22              MR. KISE:  Yes, Your Honor, certainly.

23              THE COURT:  Rewind a little bit.

24              MR. KISE:  So I was just talking about, first, the

25    schedule for preparing President Trump that Mr. Blanche
```

1    referenced and the challenges just presented to the client by

2    having these very close in time or even overlapping trial

3    scenarios.  And I know from experience in this trial that it

4    has been extraordinarily challenging to be preparing for one

5    case and then having to manage issues in the other litigation

6    that is going on, just on an ongoing basis not even considering

7    preparing for trial.  That has been challenging for the client

8    because there is only so many hours in the day for him to be

9    focused on all of these various issues.  So the overlap does

10   present significant challenges for the client not to mention

11   the lawyers.

12        The lawyers overlap in all of these cases, Mr.

13   Blanche and I anticipate -- well, Mr. Blanche is already

14   involved in the D.C. case, and I anticipate having some

15   involvement in that case as well, so that's in addition to Your

16   Honor's case, and then in addition to the trial that we are

17   engaged in now on behalf of the same client.  And so that's

18   presenting logistical challenges for the lawyers which I think

19   or at least some consideration, none of us are indispensable

20   but certainly some consideration.

21        This trial was scheduled to conclude originally by

22   the second week in November; and frankly, at this point, I

23   think it would be -- it would be fortunate if we are out of

24   here by the end of this year, based on the schedule that we are

25   on, the trajectory we are on right now.  As a result, I haven't

```
 1    even been able to talk with Mr. Blanche about anything
 2    associated with classified discovery because, as Your Honor
 3    knows, those conversations can only take place in the SCIF
 4    which I'm unable to get to.
 5         So it's just, the schedule has presented a lot of
 6    challenges for Counsel, and I just wanted to point out not only
 7    the additional challenges for Counsel, but also to emphasize
 8    the point that Mr. Blanche made about the challenges to the
 9    client himself trying to prepare for these series of trials and
10    particularly with the potential overlap of the D.C. trial
11    either overlapping with this Court's current trial date or
12    coming right, you know, on the heels of it could be -- could
13    prove very difficult and very challenged.
14         Thank you, Judge.
15         THE COURT:  All right.  Thank you, Mr. Kise.
16         All right.  Now I'll hear from the Government,
17    Mr. Bratt or Mr. Harbach.
18         MR. BRATT:  Thank you, Your Honor.
19         I think one starting point is to look at this from
20    the perspective of what has been the Defense position from the
21    outset of this case, and since they have raised the D.C. case,
22    also what their position has been in that case which is to
23    delay it as long as they can.
24         It's not surprising given that, back in July, they
25    were asking for a trial date after the November election.  It's
```

1    not surprising that their motion to change the CIPA dates

2    morphed into a motion for adjournment, and the very date that

3    they are again recommending is mid-November 2024 or afterwards.

4         The Court really cannot let or should not let the

5    D.C. trial drive the schedule here.  In the D.C. case, they are

6    making many of the same arguments, though they have not yet

7    filed a motion for adjournment.  They have already said that

8    they likely will.  They have talked about --

9         THE COURT:  Do you know of any other case where the

10   same defendant is facing indictment in multiple jurisdictions

11   and DOJ has taken the position that there should be no

12   consideration to the fact that, of course, the defendant needs

13   to be able to assist in his defense and there becomes an

14   unavoidable reality that the schedules collide?

15        MR. BRATT:  So they could collide.  We don't know

16   that that's going to happen.  You know, in the D.C. --

17        THE COURT:  Can you elaborate on how you don't know

18   that because --

19        MR. BRATT:  Because --

20        THE COURT:  -- from what I'm hearing, the schedule is

21   looking like it is going to consume March and April possibly

22   going into May, and that's to say nothing of trial prep in this

23   case and all the many other steps we haven't even embarked

24   upon, and I'm just having a hard time seeing how -- how

25   realistically this work can be accomplished in this compressed

1    period of time, given the realities of what we are facing and

2    the multiple material developments that have come to light

3    since the initial schedule was put into place in mid to late

4    July including, of course, the return of a superseding

5    indictment which introduced a new defendant into the case, not

6    to mention the multiple logistical issues that I have indicated

7    with the SCIF and with the security procedures required to

8    review this information.  So I'm not quite seeing, in your

9    position, a level of understanding to these realities.

10            MR. BRATT:  So -- and I understand everything that

11   the Court is saying.

12            A lot of this, though, is in the realm of the -- I

13   don't want to say hypothetical, but it is in the realm of we

14   don't know what is going to happen.  We don't know what is

15   going to happen in this case.  We don't know what is going to

16   happen in the D.C. case.  Among the things that the Defense has

17   raised in the D.C. case is that if there are adverse rulings on

18   any of the pending motions to dismiss, that they would seek an

19   appeal and seek to stay the proceedings.  That could happen.

20   We don't know.  Obviously, there are arguments both ways,

21   arguments both before the trial court before the D.C. Circuit,

22   but that could happen.  That trial date could disappear.

23   What -- so we understand that.

24            We understand the competing demands on the former

25   President, and I think he stands apart from his counsel.  It

```
 1    was -- he has the right to counsel of his choice.  He did
 2    choose Mr. Blanche and his firm knowing that they were already
 3    involved in this case.  Mr. Blanche and his firm took this
 4    representation knowing that they were involved in this case.
 5    And really, my argument to the Court is that we should keep --
 6    I mean, obviously, there have to be some -- some modifications,
 7    particularly in the CIPA schedule, but we should keep on track
 8    toward the date that is present.
 9              Things could happen, things could happen with the
10    D.C. case that would make going forward on May 20th, 2024, in
11    this case not feasible.  That may happen and we can address
12    that, at that time, but we should be moving forward in this
13    case.
14              THE COURT:  Oh, certainly I think we should be moving
15    forward, and I think -- and I share that view.
16              Can you drill down on the discovery particulars that
17    I was mentioning in the beginning so that I can get a better
18    understanding?
19              We have had hearings where we have discussed numbers,
20    quantity, data, disks, et cetera, and I know there are a bunch
21    of responses to the SDO; but what I would like to get, if you
22    can, is just a rundown of unclassified and the quantity in the
23    data associated with that, plus then shifting over to the
24    classified, as best you can, with the various categories of
25    information that I have identified.
```

```
 1                MR. BRATT:  I would be happy to, Your Honor.

 2                First, on the unclassified side, we have produced

 3      approximately 1.3 million pages of classified discovery.  That

 4      includes -- as we have set out in our various pleadings, that

 5      includes almost 200 witness transcripts of grand jury

 6      testimony, of interviews, all the 302s related to that, all the

 7      agent notes related to that.

 8                THE COURT:  This is classified discovery?

 9                MR. BRATT:  This is unclassified.

10                THE COURT:  Unclassified, to be clear.

11                MR. BRATT:  There are some -- there are some

12      classified transcripts; and actually, Mr. Blanche --

13                THE COURT:  Sorry, let's try to stay organized here.

14                MR. BRATT:  Sure, sure.

15                THE COURT:  So on the unclassified piece only, you

16      said 1.3 million pages?

17                MR. BRATT:  That's correct.

18                THE COURT:  Okay.  Does this 1.3 million pages, does

19      that include the CCTV footage or any other multimedia?

20                MR. BRATT:  So it is -- those are the documents, the

21      digital documents that somebody can look at and read.  The

22      CCTV is --

23                THE COURT:  Separate.

24                MR. BRATT:  Right.  You can't put pages on it.

25                THE COURT:  Correct.
```

```
 1              MR. BRATT:  Right so -- but there is all the CCTV.
 2              THE COURT:  Would you agree with Mr. Woodward's
 3    estimate that it is 60 terabytes, I think?
 4              MR. BRATT:  That sounds about correct, yes.
 5              THE COURT:  Okay.  And it's, from what I heard,
 6    approximately -- from a pure temporal perspective,
 7    approximately nine months, but because of the multiple cameras,
 8    it turns into almost two years of watching unless you can
 9    collapse it into one screen maybe.
10              MR. BRATT:  I think we disagree with them on the
11    math.  It is a lot.  It is several years' worth of materials --
12    of video footage.  I think their number is ten years.  I think
13    it is less than half of that, but it is a lot; but it's
14    important to look at it in context.  So the key dates for this
15    case are May 11th, 2022, which is when the grand jury subpoena
16    was served; and August 8th, 2022, which is when the search at
17    Mar-A-Lago occurred.  Those are the key dates for viewing
18    testimony.  The key location is Mar-A-Lago.  I mean, we did get
19    stuff from Bedminster, we did get things from -- but the key
20    location is Mar-A-Lago during that time frame.
21              There are cameras that are on 24 hours a day.  There
22    are cameras that are motion-activated.  Some of the cameras
23    that are on 24 hours a day.  For one example, there is a camera
24    that looks at a retaining wall, that's all you see.  You may
25    see birds come through, but it is looking at a retaining wall.
```

```
 1    I think it is a security camera.  It's possible somebody might
 2    be able to go over that wall, but it is just looking at that
 3    wall.  And I don't dispute that they have the right to view
 4    these things, but there is a key time period to be looking at,
 5    and that's May 11th, 2022, through August 8th, 2022.
 6           We have pulled for them what we believe are the key
 7    periods of time and the key footage.  Again, they have every
 8    right to look for other things.  I won't get into a debate with
 9    Mr. Woodward about his theory of the case.  I think we have our
10    theory about where things are and where things went; but
11    certainly, they have that opportunity.
12           And look, I appreciate the kind things they have said
13    to us about our responsiveness on this.  And I also appreciate
14    Mr. Woodward, you know, owning the fact that he waited three
15    months to ask us for the array; but they have had this material
16    for a very long time.  It was actually the first I have heard
17    today that President Trump's counsel have been having issues
18    viewing the footage.  And, you know, we have enlisted technical
19    experts to assist, and we will continue to do that; but, they
20    have the key periods and they should know where to be looking.
21           THE COURT:  All right.
22           So is that the full scope of the unclassified?
23           MR. BRATT:  That is the full scope of the
24    unclassified.  The one --
25           THE COURT:  So just to be clear, the 1.3 million
```

```
 1    pages, that's a top line number.
 2              MR. BRATT:  Yes.  That's a top line number of all the
 3    unclassified essentially documents that are --
 4              THE COURT:  Okay.  And all of this information has
 5    been produced.
 6              MR. BRATT:  It has been produced, yes.
 7              THE COURT:  Okay.
 8              MR. BRATT:  Yes.  And the bulk of it was produced in
 9    July.
10              THE COURT:  When was the last production?
11              MR. BRATT:  So our last production, a very small
12    production we gave them was I think last week.  It was like 138
13    pages.  This was in response to their discovery letter.
14              THE COURT:  Okay.
15              Okay.  So then shifting gears to the classified.
16              MR. BRATT:  Correct.
17              THE COURT:  Is it 3,500 pages or what exactly?
18              I know there are some disks that have been added to
19    the mix or perhaps they were always there; but in any case,
20    some details would be --
21              MR. BRATT:  Sure.
22              THE COURT:  -- useful.
23              MR. BRATT:  In our first tranche that we produced was
24    approximately 2,500 pages.
25              THE COURT:  Twenty-five hundred, okay.
```

```
 1              MR. BRATT:  That was produced on September 13th.

 2              Over the following three weeks or so, we have

 3    produced an additional approximately 3,000 pages.  So there was

 4    approximately 5500 pages of classified discovery in the SCIF.

 5              THE COURT:  Does that include the disks?

 6              MR. BRATT:  So the disks are separate, but it is

 7    important to understand what is on the disks.  The disks

 8    include photographs of both unclassified documents and the very

 9    same classified documents, hard copies of which they now have

10    in the SCIF.  There is nothing unique about what is on -- of

11    any of the photographs that is on the disk.

12              THE COURT:  So you are saying there is nothing in the

13    disks that is not in the 5,500 pages?

14              MR. BRATT:  Correct, correct.

15              THE COURT:  So then why do you need the disks?

16              MR. BRATT:  Well, we gave them -- so the disks do --

17    they have the transcripts of the classified interviews.  The

18    disks include the audio for the classified interviews.  We --

19              THE COURT:  Okay.

20              MR. BRATT:  We provided -- you know, I think

21    technically under Rule 16, since the photographs were taken

22    during the execution of the search warrant, that's something

23    that's Rule 16 materials, so we have given them --

24              THE COURT:  But in any case, you still need to go

25    through all of the disks and all of the paper and do the
```

1  cross-reference to ensure that you have actually reviewed all

2  of this; and so even if there is duplication, it still takes

3  time to determine that it is duplicate.

4      MR. BRATT:  So good thing you mentioned that, Your

5  Honor, because we have done the cross-referencing for them.  In

6  our response to their classified discovery letter, we gave them

7  the cross-referencing by Bates -- picture by Bates number.

8      THE COURT:  Okay.  And when was that cross-reference

9  done?

10     MR. BRATT:  That was Monday night?

11     Yeah, Monday evening.

12     THE COURT:  October 30th maybe?

13     MR. IRVING:  Thirtieth.

14     THE COURT:  Okay.

15     Okay.  So in terms of size of data in the disks,

16  because there was also some back and forth on that, how much

17  data are we talking in the disks?

18     MR. BRATT:  I don't dispute -- I don't have the

19  number in front of me, but I don't dispute that, you know, the

20  audio files and the photographs equal whatever the data is

21  that's on it.

22     THE COURT:  Okay.  All right.

23     Now, I went through some of these categories with

24  Mr. Blanche, but classification reviews, are those included in

25  the 5,500 and/or the disks?

1          MR. BRATT:  Yes.  And just to respond to something

2    Mr. Blanche said, and it may have been oversight, it is not

3    just for the 32 documents.  It is for all 340-some documents

4    that were at Mar-A-Lago.

5          THE COURT:  So there are no outstanding materials

6    related to classification reviews that need to be turned over;

7    is that correct?

8          MR. BRATT:  Not from hour perspective.  You know,

9    they are going to be arguing, we believe, that maybe there is

10   some communications related to those that we should turn over

11   or there may be internal, you know, different agencies did the

12   classification reviews, that some of their internal materials

13   need to be turned over, we can address that; but we have turned

14   over what we believe our discovery obligations require us to

15   turn over with respect to the classification review of the

16   documents.

17         THE COURT:  Okay.  How about the Prudential Search

18   Reviews?

19         MR. BRATT:  So, Your Honor, in our -- in ECF-173, we

20   acknowledge that we did PSRs.  One thing that is --

21         THE COURT:  Can you show me where that is, please.

22         MR. BRATT:  It's on page 10.

23         It begins -- the paragraph begins on the bottom of

24   page 10.

25         THE COURT:  Okay.  So here, of course, you are making

1   the original point that you are not required to conduct these,

2   but then -- but then there is a statement that there have been,

3   quote, appropriate Prudential Search Requests made and

4   produced, so --

5           MR. BRATT:  Correct.

6           THE COURT:  -- first to follow up with what you have

7   indicated, I guess the answer is, "Yes, we have conducted the

8   Prudential Search Requests that we believe are appropriate and

9   we have indicated as much to the Defense," and fill in any

10  blanks I might have missed.

11          MR. BRATT:  That's correct.

12          I would just state another sort of bedrock principle

13  of criminal procedure is that the Defense doesn't get discovery

14  on how we did discovery.  And we believe we have done -- taken

15  the steps that are necessary to comply with our Rule 16 and

16  *Brady* obligations and --

17          THE COURT:  Okay.

18          MR. BRATT:  -- we can attest to that, I'm attesting

19  to that.

20          THE COURT:  Okay.  All right.

21          So what about the *Jencks* and *Giglio* material for law

22  enforcement witnesses?  Has that been produced; and if so, as

23  of when?

24          MR. BRATT:  So in our production of classified --

25  unclassified discovery, we have produced all, again, agent

1    notes; 302s; there were agents who testified as summary

2    witnesses before the grand jury here, those transcripts have

3    all been turned over.  We have provided all of that *Jencks*

4    material.  There is -- we provided -- we use the term "FBI

5    forms," it is more than just FBI forms, but things from the

6    case files which also include communications from some of the

7    agencies.  I can address the prosecution team issue in a

8    moment; but I think it should not be surprising that in any

9    case, that there is communications between agents and

10   prosecutors and the victims of the case, and some of that has

11   been produced.

12          The one subsect of agent *Jencks* that we have not

13   produced -- and again, I think we have been transparent about

14   that -- is we have not produced substantive agent

15   communications on text messages or emails, and we will produce

16   it.  But, you know, there have been a lot of agents that have

17   worked on this case.  We have already begun working on what

18   I'll call "order of proof for trial;" and once we decide which

19   the agents we will call as trial witnesses, we will produce

20   their agent *Jencks*.  It will be -- again, even though the

21   Court's order says "day of trial," it will be well in advance

22   of the day of trial.

23          THE COURT:  So in terms of the date by which all of

24   the classified discovery to date was made available to the

25   Defense in the SCIF, in this district, when was that?

```
 1              MR. BRATT:  It was -- again, won't get into a dispute
 2      about when they could have come here, it was brought down on
 3      the 17th, last week.
 4              THE COURT:  Of October, okay.
 5              All right.  Now, I would like to hear from you on the
 6      sequencing, the order vis-a-vis motions to compel on Section 4.
 7              MR. BRATT:  Yes, so in some ways, Your Honor, Your
 8      Honor's order this morning is I know going to change part of
 9      the CIPA 4 schedule; and I think in some ways, some of the
10      motions to compel are going to line up right around the same
11      time.  I don't know.  I haven't seen what the Court is planning
12      but -- so that as sort of a practical matter, they may sort of
13      happen --
14              THE COURT:  What do you mean "what the Court is
15      planning"?
16              MR. BRATT:  In terms of the order if --
17              THE COURT:  That's why I'm having this hearing.
18              MR. BRATT:  No, no -- yes, Your Honor, I'm sorry; but
19      the opinion that you issued this morning, and maybe I thought
20      it was that the Court already had an order in mind as to what
21      we would have to file with respect to the materials that we
22      want to keep from Defendants Nauta and De Oliveira.  And if I
23      misread it, I apologize.
24              THE COURT:  That order was designed to flesh out the
25      Court's view of the scope of Section 3.  This hearing is
```

1   designed to understand what sort of reasonable adjustments

2   should be made given the needs of this particular case and, of

3   course, that includes Section 4.

4         MR. BRATT:  In any event, we are going -- I

5   anticipate that we now have another Section 4 to file and so --

6   and we will probably combine what we have already drafted with

7   that and present it to the Court, and that the timing on that

8   and I'm not sure, and as we stand here now, I don't know how

9   long it will take us to get that ready because there are a lot

10  of declarants that we are going to have to get declarations

11  from to assert the classified information privilege for all of

12  the materials that we have.

13        But the point I was trying to make is that some of

14  what they are talking about in terms of their motion to compel

15  may run in tandem with what the schedule ends up being for the

16  CIPA 4.  I do not -- we do not believe that the motion to

17  compel litigation needs to be complete before they can file

18  with the Court their theory of defense with respect to the 793

19  charges, and it kind of strains credulity that they say they

20  can't do that.  You know, the elements of 793 are unauthorized

21  possession of a document containing national defense

22  information, possessing it willfully, that is with knowledge

23  that what you are doing is unlawful in failing to return it to

24  a proper person.  All that information they can flesh that out

25  for the Court, and there is really -- they may have legal --

1    separate legal challenges to the 793 charges, but if you look

2    at the elements, those are the defenses:  Either he didn't

3    possess it, or he was authorized to possess it, or the

4    information doesn't contain national defense information, or he

5    wasn't acting willfully, or he returned it before he was being

6    asked to return it.  Those are the defenses, and they may have

7    other color they want --

8         THE COURT:  But to some extent, of course, one would

9    have to review the relevant classified discovery in order to

10   formulate a meaningful response, even if maybe not entirely

11   complete, it would be difficult to just sketch out a skeleton,

12   so to speak, of your theory without really doing so rooted in

13   the documents themselves.

14        MR. BRATT:  So I'm not sure that you do need to be

15   able to say, no, we know this doesn't contain NDI for the Court

16   to rule on whether or not what we are presenting in Section 4

17   is relevant and helpful to the Defense, I don't think so.

18        I understand that, you know, they have said in their

19   pleadings that they are going to strongly contest whether or

20   not the information was national defense information, strongly

21   contest whether it was closely held.  Our burden is to prove

22   that it was, and we embrace that burden; but these documents,

23   you know, I --

24        THE COURT:  That's fine.  We don't need to talk about

25   the actual contents of the documents, obviously, given this is

1    a public hearing.

2            All right.  Anything further on the motions to

3    compel?

4            MR. BRATT:  Yeah, one other -- I want to sort of lay

5    down a marker on them because there are about three different

6    points in their pleadings that they say they need the discovery

7    for a selective prosecution motion.  And I think, as the Court

8    is aware, both the Supreme Court in *Armstrong versus -- United*

9    *States v. Armstrong* and a number of decisions in the Eleventh

10   Circuit, there is no constitutional right to discovery for --

11   to set out a selective prosecution defense.  And the Eleventh

12   Circuit has said that is a demanding bar that the defendant

13   must clear before it can get discovery related to selective

14   prosecution.

15           And so to the extent that they may see some of these

16   motions to compel as kind of a back door to get information to

17   support a selective prosecution defense, we are going to want

18   to brief to the Court whether or not they can get discovery on

19   a selective prosecution defense.

20           THE COURT:  Okay, that's fair.  I think briefing

21   would be in order if it is an issue that Defense raises.

22           All right.  Now, in terms of the ex parte nature of

23   the Section 4, at least with respect to the former President,

24   what is your view on whether that would necessarily need to be

25   conducted ex parte, and I should be more specific.  What is

1    your view, if you have one, on the suggestion that at least

2    with respect to that Defendant, it could be done on an

3    attorneys' eyes only basis, given the permissive language in

4    Section 4?

5            MR. BRATT:  So acknowledge that the language in

6    Section 4 is permissive and that the Eleventh Circuit in *Campa*

7    said that a Court has discretion.  But I think there is also a

8    very strong admonition in *Campa* that it stands CIPA 4 on its

9    head to give the defense, whether it is defendant or their

10   lawyers, the very information that the Government is seeking

11   either to delete, substitute, or come up with -- delete,

12   redact, or substitute.  And it is hard to see how consistent

13   with that admonition in *Campa* and also in all the other

14   circuits that have faced the issue, in the *Farekh* case that

15   they cite in their brief, Second Circuit case where the very

16   argument was made, okay, it is one thing if counsel don't have

17   clearances, but it is something else if counsel was cleared

18   that they can see it.  I just don't see how the Court can

19   overcome that admonition.

20           THE COURT:  Okay.

21           All right.  Now, on the issue of logistical concerns,

22   I did note in your opposition that, quote, nothing material has

23   changed since the Court set the trial date, and I was a little

24   bit you puzzled by that statement, so what are your thoughts?

25           MR. BRATT:  I have to -- sorry, Your Honor, which of

```
1   our --

2           THE COURT:  It's docket 165.

3           MR. BRATT:  Hold on for a moment.

4           Thank you, Your Honor.  Which page?

5           THE COURT:  That, I don't know.

6           MR. BRATT:  I just want to make sure that I

7   understand the context in which we said that.

8           And, look, I will acknowledge to the Court that there

9   have been some unforeseen difficulties with the SCIF that we

10  thought were cleared up earlier in time, and we may have had a

11  different understanding of that at the end of September from

12  what then transpired over the coming weeks.  So, you know, I'm

13  not going to say things didn't change, when there are issues

14  with the SCIFs, we know that; and that's certainly -- and I

15  think as we have said, that certainly does require an

16  adjustment to the CIPA schedule like, right now, de facto,

17  there has to be because there has been a stay and some of the

18  dates have already passed.

19          So you know, again, when we wrote this, we had I

20  think one understanding of what was going to happen, not all

21  that played out on the timeline that we thought it was going to

22  play out.

23          THE COURT:  Okay.  All right.

24          Anything further before I turn back to Defense

25  Counsel, Mr. Bratt?
```

 1              MR. BRATT:  Just one other clarification for

 2     Mr. Woodward.

 3              There is not a forensic image of Mr. Nauta's phone in

 4     the SCIF.  What is there is the image that was extracted from

 5     the phone and --

 6              THE COURT:  So if he wants to review the contents of

 7     the phone, can he do so outside of the SCIF?

 8              MR. BRATT:  He was provided a digital version of the

 9     phone in unclassified discovery with that image extracted.  The

10     extracted image which he is permitted to discuss and show

11     Mr. Nauta per the protective order that is in place, that is in

12     the SCIF.

13              THE COURT:  But what you are saying is that there is

14     nothing different between the unclassified and classified

15     version with the exception of that one document?

16              MR. BRATT:  So here's just the rub in it and so

17     the -- what Mr. Blanche was describing, the scanned pages that

18     they asked for where there were about five classified

19     documents, it was multiplied, 15 classified images.  We were

20     able to produce that to them because that was not something

21     that had to go through filter, and so, like, we don't have --

22     what we gave Mr. Woodward in unclassified discovery was the

23     scoped -- the scoped review of Mr. Nauta's phone.  So I

24     can't -- so we weren't able to do the same thing for Mr.

25     Nauta's phone as we were able to do with the other digital

1     images that we were able to provide that Mr. Blanche was

2     talking about.

3              THE COURT:  Is there anything that could be done to

4     arrive at that clarity, maybe a conferral with Mr. Woodward so

5     that he can better understand what he needs to do in order to

6     view the full contents of the phone?

7              MR. BRATT:  I think we should -- we will talk with

8     Mr. Woodward offline, but because Mr. Nauta's phones were

9     filtered, what was given to us is not like the original image.

10    So we will talk with him --

11             THE COURT:  Okay, I think that would be helpful.

12             MR. BRATT:  But there is nothing precluding him from

13    seeing that image in the SCIF nor is there anything precluding

14    him from showing that image to Mr. Nauta under the protective

15    order.

16             THE COURT:  Okay.

17             All right.  Thank you, Mr. Bratt.

18             Okay.  Any final thoughts from Mr. Blanche, then

19    Mr. Woodward, and then any other defense lawyers who wish to

20    chime in will be given a brief opportunity.

21             MR. BLANCHE:  Briefly, Your Honor, just to clarify a

22    few things that were said.

23             This is described more fully, Your Honor, in our

24    classified October 19th supplement to Your Honor, but the disks

25    that are in the SCIF include three gigabytes of e-mail accounts

1  as well.  It is not just, as Mr. Bratt just described,

2  photographs and the like.  There are -- there are substantive

3  communications that have been produced to us on those disks,

4  the total which is three gigabytes.  Mr. Bratt is correct that

5  some of the contents of the disks were as he described, but he

6  is not correct that it didn't include communications such as

7  emails.

8          Very briefly on the CCTV footage, our vendor says

9  there are ten years; the Government says there are five years

10  or so, I believe; I'm not sure that that -- I mean, that's --

11  it's still an extraordinary amount.  We have sent numerous

12  requests in writing to the Special Counsel about how the FBI

13  reviewed the CCTV footage, what program they used, how they

14  used Deloitte to do the work.  They have refused to give us

15  that information.  So we will follow up with them later today

16  or tomorrow to meet and confer, but the idea that we haven't

17  asked the Special Counsel for more assistance with the CCTV

18  footage is just not true.

19          As it relates to the Section 4 discussions, Your

20  Honor, no matter what the Court decides about ex parte or not

21  ex parte, the Defense and President Trump would ask for a

22  hearing with Your Honor on the Section 4.  We are certainly

23  prepared to put something in writing, and we anticipate doing

24  so, but we believe and the cases support that as part of that

25  process, that the Court would hold an ex parte hearing with the

1    Defense to allow us to talk about our defenses and whatnot.

2         You know -- and again, I don't want to belabor this

3    hearing, but Mr. Bratt suggested that they had limitations in

4    their obligations on a Rule 16.  For example, he cited a

5    selective prosecution motion; but, as I'm sure the Special

6    Counsel is aware, whether they find that motion meritorious or

7    not, if they have documents in their possession that support

8    such a motion under Rule 16, they have an obligation to provide

9    that which is one set of documents that we have asked them to

10   provide.

11        A little bit about the classified *Jencks* material, as

12   was discussed.  The issue of whether a particular document is

13   classified or not is something for the jury.  And what we are

14   looking for in discovery and what we don't have is that has to

15   be from a witness.  There has to be a witness that is

16   testifying about why a particular document is classified; and

17   as part of that, like any witness, we are entitled to 3500 and

18   *Jencks* material and we don't have that.  We don't have that for

19   all the witnesses, and our concern is that there is this class

20   or category of *Giglio* and *Jencks* material that we are going to

21   get at some later date which we are then going to -- it's

22   another Section 4 litigation, at that point, because we are

23   going to then ask the Court what we can use to impeach the

24   witness, what information we are allowed to cross-examine him

25   or her on.

1          And in our letter -- in the letter from the Special

2    Counsel that we received on October 17th, they indicated to us

3    that there are, in fact, witnesses that undercut their national

4    defense information theory with at least respect to some of the

5    documents, but they haven't told us who the witnesses are and

6    they won't.

7          So just to give Your Honor a flavor of what we expect

8    to file in a motion to compel, it's not some expansive demand

9    under Rule 16.  It's pretty consistent information that is

10   consistent with what we expect the Government will have to

11   prove at trial in this case.  We don't -- we do have, Your

12   Honor, class review memos where the intelligence community has

13   concluded that a particular document is classified, and so we

14   have a memo.  We have none of the underlying correspondence

15   that led to that conclusion.  And we can tell from the -- from

16   the correspondence that we do have that that exists.  And

17   again, that's the type of information that even under a narrow

18   view of *Jencks*, 3500, and that sort of production, we are going

19   to need, and so that is part of a motion to compel and

20   shouldn't surprise the Special Counsel.  And we have already

21   asked for that and to this point haven't received it.  So

22   that's about all I would add.

23         The final thing, one comment Mr. Bratt made about me

24   being associated with both this case and the case in

25   Washington, D.C., is extraordinarily unfair.  We were and I

have been and President Trump has been completely transparent
with every court we are appearing in front of, what the
schedules are, why the schedules that we are asking for exist,
and my role in both cases and Mr. Kise's role in both cases.
It is the Special Counsel that made the decision they did
knowing this and knowing Your Honor's schedule.

I mean, to ask for a jury trial to start the day that
Your Honor has a scheduled hearing in this courtroom, there has
been no reaction from the prosecutors about that decision.
Instead, what Mr. Bratt says is, "Well, President Trump has a
right to counsel of his choice," I should have made different
decisions about choosing to take that matter on, that's
completely backwards.  I mean, the Special Counsel knew from
the day of the arraignment in D.C. that Your Honor had
scheduled a very aggressive schedule for trial starting with
before the arraignment all the way through trial in May.
Notwithstanding that, they put a letter into the judge asking
for a trial to start the day of the hearing.

I will add one more point, although I don't think it
moves the needle, but there is a third trial that is scheduled
for March 25th, and it's a state trial in New York.  That
judge, as to this point, refused to move the trial date so and
will not -- we are hoping to have a conference with the judge,
but won't even have a conference about moving the trial date
until late February.  So when the Special Counsel suggests to

the Court that we should just assume the May date will go

because all kinds of things that can happen, that's very unfair

to President Trump given what Mr. Kise mentioned about his

current schedule, but imagine what that means for President

Trump even when the AG trial is over.  He starts January 1st

having three criminal trials between March 4th and May 20th

knowing they can't all go, but you can't play a guessing game.

I can't play a guessing game assuming the D.C. trial is going

to get adjourned or be on some sort of stay because the D.C.

Circuit, I can't assume that if that happened, that the trial

in New York isn't going to go forward, so there has to be some

preparation for that.

          The question that was not answered is the question

you started out with was:  Is there another case where one --

it's not just the Department of Justice that brings two

separate cases against the same defendant in different

districts, it is the same office.  It's the same Special

Counsel.  The same office has brought these cases, their

choice, and put the schedule in flux.

          We were proceeding apace and continued to; and we are

here, regrettably, not because of the conduct of President

Trump, not because of the conduct of anybody on this side of

the room but the Special Counsel; and they still stand up and

say to Your Honor, "Yeah, we are okay, we will figure it out

closer to May; we are okay."  It is just not appropriate.

```
 1              THE COURT:  All right.  Thank you, Mr. Blanche.
 2         Mr. Kise, anything further?
 3              MR. KISE:  No, Your Honor.  Thank you.
 4              THE COURT:  Okay.
 5         Mr. Woodward?
 6              MR. WOODWARD:  Unless the Court has questions --
 7              THE COURT:  No.
 8              MR. WOODWARD:  -- for me.  There is clearly some
 9    talking we need to do about Mr. Nauta's cell phone but --
10              THE COURT:  Yes, a conferral is in order.
11         Anything further from the Defense side?
12              MR. IRVING:  No, Your Honor.  Thank you.
13              THE COURT:  Okay.  All right.
14         Well, I will take the two motions under advisement,
15    assess as best I can the adjustments to be made to the
16    schedule, and enter an order as soon as possible to address
17    these multiple moving parts.
18         I want to thank the parties for their assistance
19    today and wish you all a safe trip back to wherever it is you
20    are going.
21              The Court is in recess.  Thank you.
22              THE COURTROOM DEPUTY:  All rise.
23         (PROCEEDINGS ADJOURNED AT 2:39 P.M.)
24
25
```

1          **C‑E‑R‑T‑I‑F‑I‑C‑A‑T‑E**

2              I hereby certify that the foregoing is

3          an accurate transcription and proceedings in the

4          above‑entitled matter.

5

   **11/12/2023**                    **/s/DIANE MILLER**
6    DATE                     DIANE MILLER, RMR, CRR, CRC
                              Official Court Reporter
7                             United States District Court
                              101 South U.S. Highway 1
8                             Fort Pierce, FL  34950
                              772‑467‑2337
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 68

UNITED STATES vs. DONALD J. TRUMP, et al.

Case 9:23-cr-80101-AMC   Document 218   Entered on FLSD Docket 11/14/2023   Page 68 of 78

**MR. BLANCHE:**
**[27]**  3/16 5/16
6/18 7/25 10/16
11/16 11/20 11/24
12/12 12/14 14/15
14/24 15/10 15/24
17/9 19/1 19/4
19/24 21/12 22/6
23/3 23/21 24/18
24/21 25/11 26/9
60/21
**MR. BRATT: [55]**
3/10 40/18 41/15
41/19 42/10 44/1
44/9 44/11 44/14
44/17 44/20 44/24
45/1 45/4 45/10
46/23 47/2 47/6
47/8 47/11 47/16
47/21 47/23 48/1
48/6 48/14 48/16
48/20 49/4 49/10
49/18 50/1 50/8
50/19 50/22 51/5
51/11 51/18 51/24
53/1 53/7 53/16
53/18 54/4 55/14
56/4 57/5 57/25
58/3 58/6 59/1
59/8 59/16 60/7
60/12
**MR. IRVING: [6]**
4/8 36/10 36/12
37/22 49/13 66/12
**MR. KISE: [4]**
3/21 3/24 38/22
66/3
**MR.
WOODWARD:**
**[14]**  26/10 26/12
27/1 27/23 28/19
28/25 29/6 30/8
32/25 33/2 35/10
36/7 66/6 66/8
**MS. DADAN: [1]**
4/4
**THE COURT:**
**[110]**
**THE
COURTROOM
DEPUTY: [1]**

66/22

/

**/s/DIANE [1]**  67/5

**1**

**1.3 million [4]**
44/3 44/16 44/18
46/25
**10 [3]**  34/7 50/22
50/24
**10005 [1]**  2/10
**101 [1]**  67/7
**11 [1]**  11/8
**11-day [1]**  10/20
**11/12/2023 [1]**
67/5
**11th [4]**  36/16
37/18 45/15 46/5
**12 [1]**  34/7
**138 [1]**  47/12
**13th [1]**  48/1
**14 [1]**  34/7
**15 [1]**  59/19
**15th [1]**  36/15
**16 [7]**  34/7 48/21
48/23 51/15 62/4
62/8 63/9
**160 [1]**  5/2
**165 [1]**  58/2
**173 [1]**  50/19
**17th [8]**  10/17
10/18 11/5 11/11
11/18 12/10 53/3
63/2
**18 [1]**  34/8
**183 [1]**  5/3
**19th [1]**  60/24
**1B1 [1]**  33/25
**1B10 [1]**  33/25
**1B2 [1]**  33/25
**1B6 [1]**  34/2
**1st [1]**  65/5

**2**

**2,500 [1]**  47/24
**20 [1]**  34/13
**20 percent [1]**
24/24
**200 [1]**  44/5
**20001 [1]**  2/12
**20004 [1]**  2/17
**2022 [4]**  45/15

45/16 46/5 46/5
**2023 [3]**  1/9 4/18
67/5
**2024 [2]**  41/3
43/10
**20530 [1]**  2/5
**20th [4]**  5/10
24/15 43/10 65/6
**21 [2]**  34/8 37/3
**211 [1]**  37/4
**22 [2]**  33/11 34/8
**22nd [1]**  4/18
**23 [1]**  34/3
**23-80101 [1]**  3/4
**23-80101-CRIMIN
AL-CANNON [1]**
1/5
**2337 [1]**  67/8
**23rd [1]**  36/14
**24 [4]**  34/5 34/13
45/21 45/23
**25th [1]**  64/21
**28th [1]**  18/12
**2:39 [1]**  66/23

**3**

**3,000 [1]**  48/3
**3,500 [1]**  47/17
**30 [1]**  37/7
**302s [2]**  44/6 52/1
**30th [1]**  49/12
**32 [5]**  11/15 15/3
16/17 16/19 50/3
**32301 [1]**  2/7
**33401 [1]**  2/19
**340-some [1]**
50/3
**34950 [2]**  2/14
67/8
**3500 [4]**  6/25
15/17 62/17 63/18

**4**

**4th [3]**  24/18 25/2
65/6

**5**

**5,500 [2]**  48/13
49/25
**5500 [1]**  48/4

**6**

**60 [3]**  33/6 33/14
45/3

**6th [1]**  10/14

**7**

**7-Zip [2]**  33/17
34/4
**772-467-2337 [1]**
67/8
**78 [1]**  1/10
**793 [3]**  54/18
54/20 55/1

**8**

**80101 [1]**  3/4
**83 [1]**  4/23
**8th [2]**  45/16 46/5

**A**

**ability [1]**  30/5
**above [1]**  67/4
**above-entitled [1]**
67/4
**absolutely [1]**
16/12
**accelerate [1]**  8/7
**access [16]**  10/6
11/13 20/13 27/4
27/7 27/9 27/12
28/3 28/4 28/6
28/9 28/21 29/18
30/23 36/1 37/20
**accomplished [1]**
41/25
**account [1]**  4/23
**accounts [1]**
60/25
**accurately [1]**
6/23
**accuses [1]**  24/10
**acknowledge [4]**
30/6 50/20 57/5
58/8
**across [1]**  30/13
**Act [2]**  4/24 15/7
**acting [1]**  55/5
**activated [1]**
45/22
**add [5]**  25/3
26/19 35/21 63/22
64/19
**added [1]**  47/18
**addition [6]**  8/24
8/24 33/15 35/21
39/15 39/16

**address [5]**  22/2
43/11 50/13 52/7
66/16
**adjourned [2]**
65/9 66/23
**adjournment [2]**
41/2 41/7
**adjustment [1]**
58/16
**adjustments [2]**
54/1 66/15
**admonition [3]**
57/8 57/13 57/19
**advance [2]**  24/14
52/21
**adverse [1]**  42/17
**adversely [1]**
24/4
**advisement [1]**
66/14
**affirmations [2]**
20/3 20/4
**affirmatively [1]**
14/19
**affirms [1]**  23/6
**afternoon [16]**
3/2 3/10 3/13 3/16
3/20 3/21 3/22 4/4
4/6 4/8 4/10 10/23
26/10 26/11 36/10
36/11
**afterwards [1]**
41/3
**AG [1]**  65/5
**agencies [4]**  16/2
17/16 50/11 52/7
**agency's [1]**
14/13
**agent [5]**  44/7
51/25 52/12 52/14
52/20
**agents [4]**  52/1
52/9 52/16 52/19
**aggressive [2]**
25/17 64/15
**agreement [1]**
17/11
**AILEEN [1]**  1/18
**aisle [1]**  30/13
**alerted [1]**  24/9
**allegations [2]**
29/13 31/15
**allege [1]**  32/2

Page 69
UNITED STATES vs. DONALD J. TRUMP, et al.
Case 9:23-cr-80101-AMC   Document 218   Entered on FLSD Docket 11/14/2023   Page 69 of 78

## A

**allegedly** [1]  9/20
**allow** [4]  8/22
10/2 14/20 62/1
**allowed** [1]  62/24
**almost** [4]  8/13
12/19 44/5 45/8
**alone** [1]  29/16
**alongside** [1]  6/6
**alternative** [1]
21/1
**although** [2]
24/24 64/19
**Amazon** [1]  33/8
**AMERICA** [2]  1/7
3/5
**amount** [10]  7/13
8/17 8/17 9/3
12/15 12/20 12/23
23/5 25/21 61/11
**amounts** [1]
24/13
**amplify** [1]  38/3
**angles** [2]  8/3
34/2
**answer** [7]  14/12
14/15 16/23 17/7
20/14 35/10 51/7
**answers** [2]
13/22 14/11
**anticipate** [6]
17/5 35/8 39/13
39/14 54/5 61/23
**apace** [1]  65/20
**apologize** [1]
53/23
**appeal** [1]  42/19
**appearances** [2]
2/1 3/7
**appointed** [1]
17/15
**appreciate** [3]
26/12 46/12 46/13
**archived** [1]
33/16
**arguing** [1]  50/9
**argument** [2]
43/5 57/16
**arguments** [3]
41/6 42/20 42/21
**Armstrong** [2]
56/8 56/9

**arraigned** [3]
30/17 30/18 36/15
**arraignment** [2]
64/14 64/16
**array** [6]  32/19
32/21 32/23 32/23
33/6 46/15
**arrive** [1]  60/4
**aspersions** [1]
37/12
**assert** [1]  54/11
**assess** [1]  66/15
**assessing** [1]
35/5
**assessment** [1]
34/17
**assist** [3]  6/1
41/13 46/19
**assistance** [4]
9/22 26/12 61/17
66/18
**associated** [7]
6/11 6/12 6/13
11/14 40/2 43/23
63/24
**Associates** [1]
2/7
**assume** [3]  20/7
65/1 65/10
**assuming** [5]
8/16 16/4 19/2
20/16 65/8
**assumption** [1]
29/2
**assure** [1]  38/7
**attest** [1]  51/18
**attesting** [1]
51/18
**Attorney** [1]  20/4
**Attorney's** [1]
17/14
**attorneys'** [4]
22/5 22/25 23/9
57/3
**audio** [2]  48/18
49/20
**August 11th** [1]
36/16
**August 8th** [2]
45/16 46/5
**authorized** [1]
55/3

## B

**background** [1]
4/18
**backwards** [1]
64/13
**bar** [1]  56/12
**basis** [5]  22/1
22/25 23/1 39/6
57/3
**Bates** [2]  49/7
49/7
**Beach** [1]  2/19
**becomes** [1]
41/13
**Bedminster** [1]
45/19
**bedrock** [1]  51/12
**behind** [1]  20/12
**belabor** [3]  12/15
25/12 62/2
**benefit** [1]  31/12
**beyond** [1]  12/11
**birds** [1]  45/25
**BLANCHE** [25]
2/8 2/9 3/17 3/22
5/14 5/22 27/3
27/15 31/5 38/4
38/15 38/25 39/13
39/13 40/1 40/8
43/2 43/3 44/12
49/24 50/2 59/17
60/1 60/18 66/1
**blanks** [1]  51/10
**bottom** [1]  50/23
**BOVE** [2]  2/9 3/18
**boxes** [12]  7/16
31/16 31/18 31/18
31/19 31/21 31/23
31/25 32/2 34/18
34/18 35/16
**Brady** [2]  18/8
51/16
**Brand** [1]  2/12
**BRATT** [10]  2/2
3/10 40/17 58/25
60/17 61/1 61/4
62/3 63/23 64/10
**brief** [7]  4/18
20/11 36/12 38/2
56/18 57/15 60/20
**briefed** [1]  26/2
**briefing** [4]  6/21

21/23 21/23 56/20
**briefs** [2]  10/5
20/23
**broad** [1]  17/9
**broadcasting** [1]
4/14
**bucket** [1]  6/4
**building** [1]  25/2
**bulk** [2]  9/25 47/8
**bunch** [1]  43/20
**burden** [2]  55/21
55/22
**buried** [1]  18/9

## C

**C-E-R-T-I-F-I-C-A-
T-E** [1]  66/24
**camera** [2]  45/23
46/1
**cameras** [7]  8/2
8/19 36/1 45/7
45/21 45/22 45/22
**Campa** [7]  22/1
22/24 23/6 23/7
57/6 57/8 57/13
**candidly** [1]  29/8
**CANNON** [2]  1/5
1/18
**Capital** [1]  32/11
**CARLOS** [3]  1/10
3/6 4/7
**casting** [1]  37/12
**categories** [4]
5/24 17/4 43/24
49/23
**category** [7]  6/9
6/10 10/11 17/25
18/2 18/18 62/20
**CCTV** [18]  7/5
7/11 7/13 7/20
7/24 30/10 31/6
31/23 33/7 34/2
34/12 35/1 44/19
44/22 45/1 61/8
61/13 61/17
**cell** [5]  4/13 9/1
28/15 28/20 66/9
**certify** [1]  67/2
**cetera** [1]  43/20
**challenge** [2]
9/12 38/5
**challenged** [2]
7/7 40/13

**challenges** [10]
8/9 29/20 38/8
39/1 39/10 39/18
40/6 40/7 40/8
55/1
**challenging** [5]
9/16 13/3 38/17
39/4 39/7
**charge** [3]  15/2
16/16 16/18
**charged** [4]  12/8
18/3 18/15 31/20
**charges** [4]  9/19
31/15 54/19 55/1
**chime** [2]  26/23
60/20
**choice** [3]  43/1
64/11 65/19
**choose** [1]  43/2
**choosing** [1]
64/12
**chose** [1]  16/15
**Chris** [1]  2/7
**CHRISTOPHER**
[2]  2/6 3/19
**CIPA** [4]  4/25
5/6 10/24 11/2
26/3 27/13 41/1
43/7 53/9 54/16
57/8 58/16
**Circuit** [7]  22/1
42/21 56/10 56/12
57/6 57/15 65/10
**Circuit's** [1]  22/23
**circuits** [1]  57/14
**circumstances** [3]
22/7 22/9 22/17
**CISO** [1]  28/8
**cite** [1]  57/15
**cited** [1]  62/4
**clarification** [2]
14/2 59/1
**clarify** [1]  60/21
**clarity** [2]  15/22
60/4
**class** [2]  62/19
63/12
**classification** [6]
14/22 17/21 49/24
50/6 50/12 50/15
**classified** [49]
4/24 6/3 6/11 9/11
9/12 9/16 9/20

UNITED STATES vs. DONALD J. TRUMP, et al.
Page 70
Case 9:23-cr-80101-AMC   Document 218   Entered on FLSD Docket 11/14/2023   Page 70 of 78

**C**

**classified... [42]**
9/24 10/9 11/14
11/25 13/18 13/24
15/5 15/14 16/3
16/17 27/5 27/11
27/25 28/1 28/24
29/21 36/21 37/16
37/20 40/2 43/24
44/3 44/8 44/12
47/15 48/4 48/9
48/17 48/18 49/6
51/24 52/24 54/11
55/9 59/14 59/18
59/19 60/24 62/11
62/13 62/16 63/13
**clear [5]** 29/14
30/12 44/10 46/25
56/13
**clearance [6]**
18/3 18/6 18/14
18/16 27/6 37/17
**clearances [1]**
57/17
**cleared [4]** 22/12
22/13 57/17 58/10
**client [12]** 22/4
28/16 28/22 31/17
38/6 38/8 38/11
39/1 39/7 39/10
39/17 40/9
**client's [2]** 28/15
28/20
**clients [1]** 31/13
**close [3]** 36/20
38/14 39/2
**closely [4]** 16/14
17/21 19/14 55/21
**closely-held [1]**
19/14
**closer [1]** 65/25
**co [2]** 7/7 28/7
**co-counsel [2]**
7/7 28/7
**collapse [1]** 45/9
**colleagues [2]**
30/13 36/13
**collects [1]** 33/24
**collide [2]** 41/14
41/15
**color [1]** 55/7
**Columbus [1]**

10/24
**combination [2]**
5/5 25/15
**combine [1]** 54/6
**comment [1]**
63/23
**commit [1]** 21/12
**common [1]** 14/6
**communications**
**[11]** 15/13 15/13
16/7 16/10 17/13
50/10 52/6 52/9
52/15 61/3 61/6
**communities [1]**
16/13
**community [4]**
16/22 17/20 20/5
63/12
**compared [1]**
15/3
**compel [28]** 5/7
6/5 13/9 13/16
14/8 16/5 17/4
17/5 17/8 17/12
18/21 18/25 20/6
20/20 21/2 21/10
21/13 21/20 35/8
36/22 53/6 53/10
54/14 54/17 56/3
56/16 63/8 63/19
**compels [1]**
20/14
**competing [1]**
42/24
**complete [3]**
21/10 54/17 55/11
**complex [1]** 6/10
**complicated [3]**
7/4 25/1 29/25
**comply [1]** 51/15
**compressed [2]**
25/15 41/25
**comprised [1]** 8/2
**comprises [1]** 8/5
**computer [5]**
8/11 33/5 33/11
34/14 34/14
**concern [1]** 62/19
**concerns [6]** 6/4
6/9 6/13 23/20
30/6 57/21
**conclude [1]**
39/21

**concluded [2]**
31/10 63/13
**conclusion [1]**
63/15
**conduct [4]** 22/8
51/1 65/21 65/22
**conducted [4]**
14/13 34/19 51/7
56/25
**confer [7]** 13/22
14/6 17/11 20/16
21/13 21/19 61/16
**conference [4]**
3/19 11/1 64/23
64/24
**conferral [2]** 60/4
66/10
**confirm [1]** 10/16
**confirmation [1]**
31/3
**connection [2]**
9/17 9/20
**considerably [1]**
38/19
**consideration [3]**
39/19 39/20 41/12
**consistent [3]**
57/12 63/9 63/10
**constitutional [1]**
56/10
**consultation [2]**
29/23 31/12
**consume [1]**
41/21
**contain [2]** 55/4
55/15
**containing [1]**
54/21
**contains [3]**
28/23 33/6 33/19
**contemporaneou**
**s [1]** 4/16
**contents [6]** 10/1
29/12 55/25 59/6
60/6 61/5
**contest [2]** 55/19
55/21
**context [2]** 45/14
58/7
**continuance [1]**
4/21
**continued [4]** 9/5
9/7 18/5 65/20

**continuing [1]**
14/25
**coordination [1]**
16/20
**correspondence**
**[3]** 9/2 63/14
63/16
**Counsel's [12]**
3/12 15/21 16/25
23/17 25/9 31/2
31/6 32/17 32/18
34/10 34/21 35/19
**counted [1]** 37/3
**counts [2]** 11/15
15/3
**court [58]** 1/1
2/24 2/25 3/3 4/20
5/2 6/1 6/23 10/5
14/16 19/5 20/2
21/11 21/14 23/18
23/23 28/2 28/11
29/23 30/14 31/10
32/5 33/8 33/22
33/23 35/3 35/11
36/5 38/9 38/9
38/16 41/4 42/11
42/21 43/5 53/11
53/14 53/20 54/7
54/18 54/25 55/15
56/7 56/8 56/18
57/7 57/18 57/23
58/8 61/20 61/25
62/23 64/2 65/1
66/6 66/21 67/6
67/7
**Court's [12]** 5/1
6/7 24/11 26/12
28/14 28/21 30/5
34/6 35/2 40/11
52/21 53/25
**courteous [1]**
36/24
**courthouse [2]**
4/1 29/10
**courtroom [1]**
64/8
**cover [1]** 26/20
**CRC [2]** 2/24 67/6
**credulity [1]**
54/19
**criminal [4]** 1/5
5/1 51/13 65/6
**critical [1]** 29/11

**criticized [1]**
10/20
**cross [5]** 49/1
49/5 49/7 49/8
62/24
**cross-examine [1]**
62/24
**cross-reference**
**[2]** 49/1 49/8
**cross-referencing**
**[2]** 49/5 49/7
**CRR [2]** 2/24 67/6
**cumbersome [1]**
7/6
**curious [1]** 23/19

**D**

**D.C [29]** 2/5 2/12
2/17 10/21 10/25
11/2 11/4 17/14
21/15 24/4 24/6
25/16 25/19 25/23
26/3 39/14 40/10
40/21 41/5 41/5
41/16 42/16 42/17
42/21 43/10 63/25
64/14 65/8 65/9
**DADAN [5]** 2/13
2/14 4/4 27/8
30/14
**data [9]** 9/25
27/22 33/6 35/1
43/20 43/23 49/15
49/17 49/20
**databases [1]**
32/11
**DAVID [2]** 2/2
3/11
**de [8]** 1/10 2/16
3/6 4/7 5/19 36/9
53/22 58/16
**dead [1]** 20/19
**deadline [1]**
18/24
**deadlines [6]**
4/22 4/24 4/25 5/8
21/15 25/22
**debate [1]** 46/8
**decide [1]** 52/18
**decided [2]** 16/17
17/20
**decides [1]** 61/20
**decision [8]** 22/1

Page 71
UNITED STATES vs. DONALD J. TRUMP, et al.
Case 9:23-cr-80101-AMC   Document 218   Entered on FLSD Docket 11/14/2023   Page 71 of 78

## D

**decision... [7]**
22/23 23/2 23/4
23/7 23/15 64/5
64/9

**decisions [3]**
17/24 56/9 64/12

**declarants [1]**
54/10

**declarations [1]**
54/10

**defendant [11]**
2/6 2/11 2/16
36/14 41/10 41/12
42/5 56/12 57/2
57/9 65/16

**defendants [4]**
1/11 5/5 7/2 53/22

**defense [43]** 3/9
4/11 5/7 5/11 5/12
6/5 6/24 7/2 7/13
8/10 10/10 15/4
17/7 19/13 19/16
19/18 20/3 22/20
24/23 25/8 31/4
40/20 41/13 42/16
51/9 51/13 52/25
54/18 54/21 55/4
55/17 55/20 56/11
56/17 56/19 56/21
57/9 58/24 60/19
61/21 62/1 63/4
66/11

**defenses [6]** 19/8
22/19 23/14 55/2
55/6 62/1

**definition [3]**
10/15 15/21 18/8

**definitively [1]**
35/11

**delay [1]** 40/23

**delays [1]** 20/12

**delete [2]** 57/11
57/11

**deliberations [1]**
25/3

**delineated [1]**
7/17

**delivered [1]**
10/22

**Deloitte [1]** 61/14

**demand [2]** 13/18

63/8

**demanded [2]**
15/18 24/6

**demanding [1]**
56/12

**demands [4]** 14/7
20/15 21/18 42/24

**dense [2]** 13/2
13/14

**Department [7]**
2/4 14/18 16/8
18/4 18/7 18/11
65/15

**depending [2]** 8/5
8/6

**desires [1]** 21/14

**detail [1]** 6/17

**detailed [1]** 4/22

**details [3]** 5/25
7/23 47/20

**determined [1]**
20/19

**developments [1]**
42/2

**device [1]** 33/3

**devices [2]** 4/14
4/15

**dialed [1]** 3/19

**diane [4]** 2/24
2/25 67/5 67/6

**difference [1]**
34/25

**differences [1]**
7/25

**difficult [5]** 9/14
10/4 38/11 40/13
55/11

**difficulties [1]**
58/9

**digital [4]** 33/10
44/21 59/8 59/25

**dire [1]** 24/25

**directed [1]** 7/10

**disagree [1]**
45/10

**disagreement [2]**
14/9 35/18

**disclosed [1]**
16/10

**discoverable [1]**
20/2

**discovery [73]**

**discretion [3]**

22/8 23/6 57/7

**discussion [3]**
6/6 15/9 28/7

**discussions [2]**
37/9 61/19

**disk [1]** 48/11

**disks [18]** 7/21
43/20 47/18 48/5
48/6 48/7 48/7
48/13 48/15 48/16
48/18 48/25 49/15
49/17 49/25 60/24
61/3 61/5

**dismiss [1]** 42/18

**dispute [4]** 46/3
49/18 49/19 53/1

**disrupted [1]**
24/2

**district [7]** 1/1 1/2
1/19 2/25 10/10
52/25 67/7

**districts [1]** 65/17

**division [1]** 1/3
29/22

**docket [3]** 4/23
5/2 58/2

**document [9]**
18/15 18/17 22/20
31/1 54/21 59/15
62/12 62/16 63/13

**documents [43]**
7/22 10/6 11/21
12/8 12/23 12/25
15/2 15/4 16/15
16/16 16/19 17/21
17/25 18/2 18/4
22/21 27/5 27/8
27/9 27/9 27/12
28/5 28/8 30/23
30/24 30/24 32/8
32/12 44/20 44/21
47/3 48/8 48/9
50/3 50/3 50/16
55/13 55/22 55/25
59/19 62/7 62/9
63/5

**DOJ [1]** 41/11

**DONALD [3]** 1/10
3/5 18/13

**DONNIE [2]** 2/18
4/9

**dozens [1]** 34/7

**drafted [1]** 54/6

drill [1] 43/16

**duplicate [2]**
35/14 49/3

**duplication [1]**
49/2

**dutifully [1]** 34/23

## E

**e-discovery [1]**
30/20

**e-mail [2]** 13/6
60/25

**e-mails [1]** 15/13

**early [4]** 6/24
20/24 25/23 30/2

**ECF [1]** 50/19

**ECF-173 [1]**
50/19

**echoing [1]** 26/14

**educate [1]** 22/18

**educated [1]**
23/14

**educating [1]**
19/18

**effective [1]** 7/9

**efficiency [1]**
26/20

**efficient [1]** 21/6

**efficiently [2]**
10/2 20/20

**efforts [2]** 29/24
35/14

**eight [1]** 34/7

**elaborate [1]**
41/17

**election [1]** 40/25

**electronic [1]**
4/13

**elements [2]**
54/20 55/2

**Eleventh [5]** 22/1
22/23 56/9 56/11
57/6

**emails [2]** 52/15
61/7

**embarked [1]**
41/23

**embrace [1]**
55/22

**EMIL [2]** 2/9 3/18

**emphasize [1]**
40/7

**Energy [3]** 18/4

18/7 18/12

**enforcement [2]**
15/8 51/22

**engage [1]** 13/22

**engaged [1]**
39/17

**enlisted [1]** 46/18

**ensure [1]** 49/1

**enter [1]** 66/16

**entirely [1]** 55/10

**entitled [6]** 12/24
15/17 17/10 20/9
62/17 67/4

**entries [1]** 5/2

**entry [1]** 4/23

**equal [1]** 49/20

**especially [1]** 7/5

**ESQ [11]** 2/2 2/2
2/3 2/3 2/6 2/8 2/9
2/11 2/13 2/16
2/18

**essentially [1]**
47/3

**establishment [2]**
6/13 29/22

**estimate [3]**
24/20 24/23 45/3

**estimates [3]**
24/22 30/1 30/3

**et [1]** 43/20

**evening [1]** 49/11

**event [1]** 54/4

**everyone [1]**
26/19

**evidence [6]** 9/1
9/3 16/3 33/23
33/24 33/25

**ex [12]** 21/24
21/25 22/4 22/8
22/25 23/8 23/9
56/22 56/25 61/20
61/21 61/25

**examine [1]**
62/24

**Excels [1]** 32/9

**exception [1]**
59/15

**excuse [3]** 14/13
34/9 34/20

**execution [1]**
48/22

**exist [1]** 64/3

**exists [1]** 63/16

**E**

**expansive [1]** 63/8
**experience [3]** 38/4 38/10 39/3
**expert [2]** 25/24 29/16
**experts [1]** 46/19
**extended [1]** 38/19
**extensive [2]** 16/10 16/10
**extent [4]** 5/18 7/15 55/8 56/15
**external [3]** 8/12 33/3 33/10
**extra [2]** 13/8 37/3
**extract [2]** 34/5 34/12
**extracted [3]** 59/4 59/9 59/10
**extracting [1]** 34/3
**extraction [2]** 28/20 34/4
**extractions [1]** 34/15
**extraordinarily [9]** 6/21 7/4 13/2 15/4 19/6 25/20 38/17 39/4 63/25
**extraordinary [1]** 61/11
**extremely [3]** 7/15 10/4 22/14
**eyes [4]** 22/5 22/25 23/9 57/3

**F**

**faced [1]** 57/14
**facilities [2]** 6/12 6/13
**facility [1]** 30/2
**facing [2]** 41/10 42/1
**fact [10]** 9/19 10/20 16/6 24/12 31/23 32/4 35/24 41/12 46/14 63/3
**facto [1]** 58/16
**failing [1]** 54/23
**falling [1]** 5/23

**Farekh [1]** 57/14
**fashion [1]** 23/7
**FBI [6]** 16/25 33/24 34/19 52/4 52/5 61/12
**feasible [1]** 43/11
**federal [1]** 18/16
**feed [1]** 4/16
**figure [2]** 8/10 65/24
**file [12]** 14/8 16/12 19/19 21/2 21/20 25/19 33/19 36/22 53/21 54/5 54/17 63/8
**files [6]** 33/15 33/20 33/22 34/4 49/20 52/6
**filings [2]** 5/3 10/25
**fill [1]** 51/9
**filter [1]** 59/21
**filtered [1]** 60/9
**final [3]** 27/5 60/18 63/23
**finally [3]** 4/7 6/8 11/7
**finer [1]** 19/25
**FL [4]** 2/7 2/14 2/19 67/8
**flavor [1]** 63/7
**flesh [2]** 53/24 54/24
**flew [1]** 11/4
**flip [1]** 13/13
**flippant [1]** 23/23
**floated [1]** 10/14
**floor [1]** 4/16
**FLORIDA [2]** 1/2 1/8
**flown [1]** 11/21
**flsd.uscourts.gov [1]** 2/25
**flux [2]** 17/6 65/19
**flying [1]** 7/21
**focused [1]** 39/9
**focusing [1]** 7/24
**folder [1]** 34/2
**folders [8]** 33/23 33/25 34/1 34/7 34/8 34/13 37/3 37/4

**folks [1]** 11/11
**footage [18]** 7/5 7/11 7/13 7/24 30/10 31/7 31/24 32/5 33/7 34/2 35/1 44/19 45/12 46/7 46/18 61/8 61/13 61/18
**foreclose [1]** 22/24
**foregoing [1]** 67/2
**forensic [3]** 28/20 29/3 59/3
**forensically [1]** 29/17
**forget [2]** 26/23 27/1
**form [1]** 6/16
**format [2]** 5/14 8/6
**former [3]** 3/14 42/24 56/23
**forms [2]** 52/5 52/5
**formulate [1]** 55/10
**FORT [5]** 1/3 1/8 2/14 29/8 67/8
**fortunate [1]** 39/23
**fourth [1]** 18/10
**frame [1]** 45/20
**frankly [3]** 24/24 28/10 39/22
**free [1]** 33/17
**Friday [3]** 10/23 10/23 11/10
**front [4]** 15/23 38/3 49/19 64/2
**fuller [1]** 13/24

**G**

**game [2]** 65/7 65/8
**gathered [1]** 9/3
**gathers [1]** 33/24
**gears [2]** 21/22 47/15
**general [2]** 20/4 27/14
**gets [1]** 20/3
**gigabytes [2]**

60/25 61/4
**Giglio [3]** 15/8 51/21 62/20
**goal [1]** 19/4
**gotten [4]** 13/20 14/11 14/12 15/22
**GOVERNMENT [24]** 2/2 14/13 19/12 20/1 20/14 22/11 24/10 24/22 31/22 31/25 32/1 32/3 32/4 32/6 32/12 34/20 36/16 36/23 37/10 37/12 40/16 57/10 61/9 63/10
**Government's [2]** 4/21 34/9
**grand [5]** 6/25 13/13 44/5 45/15 52/2
**grant [1]** 23/15
**granted [1]** 20/7
**granting [1]** 4/20
**granular [1]** 5/25
**great [1]** 31/9
**ground [1]** 14/7
**group [1]** 29/24

**H**

**handle [1]** 32/13
**happy [1]** 44/1
**HARBACH [3]** 2/2 3/11 40/17
**hardship [1]** 33/18
**hat [1]** 16/19
**headings [1]** 16/17
**hearing [19]** 1/17 4/11 4/17 4/19 5/10 5/15 6/1 11/2 36/13 36/17 41/20 53/17 53/25 56/1 61/22 61/25 62/3 64/8 64/18
**hearings [1]** 43/19
**heels [1]** 40/12
**helpful [4]** 7/1 37/10 55/17 60/11
**here's [1]** 59/16
**hereby [1]** 67/2

**hidden [1]** 32/2
**hiding [1]** 31/20
**Highway [1]** 67/7
**hinted [1]** 17/3
**hold [4]** 7/19 14/10 58/3 61/25
**holder [1]** 18/17
**home [1]** 34/23
**honestly [1]** 23/10
**Honor [65]** 3/10 3/16 3/21 3/24 4/8 5/16 6/18 6/20 10/4 11/1 11/16 11/22 12/14 12/21 13/9 14/24 15/24 16/5 20/10 20/22 21/12 22/8 22/18 23/4 23/7 23/10 23/13 23/14 23/21 23/23 24/2 24/9 25/22 26/9 26/10 26/18 26/21 28/10 35/2 36/7 36/10 38/1 38/19 38/22 40/2 40/18 44/1 49/5 50/19 53/7 53/18 57/25 58/4 60/21 60/23 60/24 61/20 61/22 63/7 63/12 64/8 64/14 65/24 66/3 66/12
**Honor's [5]** 24/3 24/7 39/16 53/8 64/6
**HONORABLE [1]** 1/18
**hopefully [2]** 30/1 37/1
**hoping [2]** 37/19 64/23
**hosted [1]** 30/20
**hosting [1]** 31/1
**hour [2]** 36/13 50/8
**hours [6]** 34/5 34/13 37/7 39/8 45/21 45/23
**House [2]** 16/8 17/15
**housed [1]** 28/9
**huge [2]** 19/11 37/2

Page 73

UNITED STATES vs. DONALD J. TRUMP, et al.

Case 9:23-cr-80101-AMC   Document 218   Entered on FLSD Docket 11/14/2023   Page 73 of 78

**H**

**hundred [1]**
47/25

**hypothetical [1]**
42/13

**I**

**identification [1]**
25/24

**illuminated [1]**
6/7

**image [7]** 59/3
59/4 59/9 59/10
60/9 60/13 60/14

**images [2]** 59/19
60/1

**imagine [1]** 65/4

**impact [1]** 30/5

**impeach [1]**
62/23

**importance [1]**
29/11

**impossible [1]**
7/6

**incomplete [1]**
19/21

**incredibly [2]**
27/10 28/1

**indicted [2]** 18/6
36/14

**indictment [9]**
4/20 7/17 23/25
23/25 29/13 29/24
31/16 41/10 42/5

**indispensable [1]**
39/19

**indulge [1]** 27/24

**indulgence [1]**
34/6

**inefficient [3]**
19/6 19/22 20/25

**information [27]**
4/24 11/3 15/6
17/22 19/15 19/15
20/2 22/21 28/24
29/9 42/8 43/25
47/4 54/11 54/22
54/24 55/4 55/4
55/20 55/20 56/16
57/10 61/15 62/24
63/4 63/9 63/17

**initial [4]** 9/8
20/11 36/16 42/3

**initiated [1]** 29/24

**ins [2]** 30/22
37/21

**instead [3]** 22/19
34/24 64/10

**intelligence [7]**
16/1 16/13 16/21
17/16 17/20 20/5
63/12

**intend [2]** 14/5
35/13

**interest [2]** 22/12
26/20

**interested [1]**
31/22

**interference [1]**
21/16

**internal [2]** 50/11
50/12

**interviewing [1]**
9/4

**interviews [3]**
44/6 48/17 48/18

**introduced [2]**
29/25 42/5

**inventory [1]**
13/13

**involvement [1]**
39/15

**IRVING [2]** 2/16
4/8

**issue [7]** 22/10
32/10 52/7 56/21
57/14 57/21 62/12

**issued [1]** 53/19

**issues [15]** 5/23
5/24 6/10 6/12
6/17 7/8 23/17
26/2 28/11 29/21
39/5 39/9 42/6
46/17 58/13

**J**

**January 1st [1]**
65/5

**JAY [2]** 2/2 3/10

**Jencks [11]** 6/25
15/7 15/16 51/21
52/3 52/12 52/20
62/11 62/18 62/20
63/18

**JOHN [4]** 2/3 2/16
3/11 4/8

**join [1]** 5/5

**joined [1]** 3/17

**judge [7]** 1/19
24/5 37/22 40/14
64/17 64/22 64/23

**judge's [1]** 28/3

**July 22nd [1]**
4/18

**July 23rd [1]**
36/14

**June 28th [1]**
18/12

**jurisdictions [1]**
41/10

**jury [8]** 6/25
13/13 25/1 44/5
45/15 52/2 62/13
64/7

**Justice [4]** 2/4
14/18 16/8 65/15

**K**

**key [8]** 45/14
45/17 45/18 45/19
46/4 46/6 46/7
46/20

**kinds [2]** 21/4
65/2

**KISE [17]** 2/6 2/7
3/19 3/22 3/23
26/16 26/17 26/18
26/24 27/1 37/25
38/1 38/21 38/24
40/15 65/3 66/2

**Kise's [1]** 64/4

**knowing [6]**
31/22 43/2 43/4
64/6 64/6 65/7

**knows [5]** 10/4
10/25 11/4 12/21
40/3

**L**

**L.D [1]** 2/19

**label [1]** 34/10

**Lago [6]** 31/7
35/25 45/17 45/18
45/20 50/4

**laid [2]** 4/23 38/15

**language [2]** 57/3
57/5

**laptop [2]** 34/21
36/25

**large [1]** 33/12

**largest [1]** 33/9

**lasts [1]** 25/5

**late [4]** 18/12
24/10 42/3 64/25

**latest [1]** 21/18

**law [8]** 2/9 2/12
2/14 2/16 14/18
15/8 18/16 51/21

**laws [1]** 23/7

**lay [1]** 56/4

**lead [2]** 13/16
13/16

**learned [3]** 18/1
18/4 18/5

**led [3]** 13/17
16/22 63/15

**legal [2]** 54/25
55/1

**legitimate [1]**
37/14

**lesser [1]** 31/19

**letter [13]** 12/6
12/22 13/19 13/19
34/10 35/15 36/15
36/16 47/13 49/6
63/1 63/1 64/17

**letters [1]** 14/1

**letting [1]** 4/1

**light [5]** 17/6
27/22 28/14 30/9
42/2

**lightly [1]** 13/10

**limine [1]** 25/23

**limit [1]** 23/11

**limitation [2]** 23/1
23/4

**limitations [1]**
62/3

**limited [1]** 16/24

**lines [1]** 38/3

**list [1]** 35/22

**literally [2]** 13/5
18/11

**litigation [10]** 5/6
17/8 20/24 26/3
27/14 29/23 36/3
39/5 54/17 62/22

**load [3]** 7/8 8/12
8/13

**loaded [1]** 32/6

**locally [1]** 11/18

**location [6]** 8/3

8/19 9/14 9/15
45/18 45/20

**log [1]** 30/22

**log-ins [1]** 30/22

**logistical [7]** 6/9
6/12 23/17 23/20
39/18 42/6 57/21

**logistically [1]**
29/20

**logistics [1]**
27/25

**M**

**mail [2]** 13/6
60/25

**mails [1]** 15/13

**MAL [1]** 34/12

**manage [1]** 39/5

**manner [2]** 5/18
6/3

**Mar [6]** 31/7 35/25
45/17 45/18 45/20
50/4

**March 25th [1]**
64/21

**March 4th [2]**
24/18 65/6

**marker [1]** 56/5

**material [18]** 6/23
6/25 10/11 11/5
11/12 13/7 15/8
23/18 36/19 36/21
42/2 46/15 51/21
52/4 57/22 62/11
62/18 62/20

**materials [24]**
8/24 9/16 9/20
9/21 11/10 12/7
12/18 13/3 13/14
13/15 13/21 14/2
16/21 18/10 18/18
20/9 20/13 22/10
45/11 48/23 50/5
50/12 53/21 54/12

**materials that [1]**
20/9

**math [1]** 45/11

**matter [5]** 8/23
53/12 61/20 64/12
67/4

**matters [1]** 7/18

**May 11th [2]**
45/15 46/5

UNITED STATES vs. DONALD J. TRUMP, et al.

Page 74

Case 9:23-cr-80101-AMC   Document 218   Entered on FLSD Docket 11/14/2023   Page 74 of 78

**M**

**May 20th [4]** 5/10 24/15 43/10 65/6

**meaningful [3]** 12/21 14/9 55/10

**meaningfully [2]** 20/16 20/17

**measures [1]** 10/11

**meeting [1]** 11/11

**meetings [1]** 16/10

**members [1]** 3/7

**memo [2]** 18/11 63/14

**memos [2]** 13/3 63/12

**meritorious [1]** 62/6

**messages [1]** 52/15

**Miami [4]** 12/19 28/13 29/6 29/7

**MICHAEL [2]** 2/3 3/11

**mid [2]** 41/3 42/3

**mid-November 2024 [1]** 41/3

**miller [4]** 2/24 2/25 67/5 67/6

**million [4]** 44/3 44/16 44/18 46/25

**minor [1]** 26/18

**minus [1]** 10/10

**miscellaneous [1]** 18/10

**miscommunication [1]** 12/2

**misread [1]** 53/23

**misrepresentation [1]** 36/5

**missed [1]** 51/10

**missing [4]** 29/16 31/16 31/23 34/18

**mix [2]** 30/1 47/19

**modifications [1]** 43/6

**moment [2]** 52/8 58/3

**Monday [4]** 10/24 11/3 49/10 49/11

**month [5]** 8/4

8/13 20/22 24/14 24/20

**months [4]** 25/4 35/20 45/7 46/15

**morphed [1]** 41/2

**motion [30]** 4/21 5/17 14/21 16/5 16/12 17/12 18/20 18/25 19/11 20/20 21/10 21/13 21/20 22/11 22/17 26/5 29/7 36/22 41/1 41/2 41/7 45/22 54/14 54/16 56/7 62/5 62/6 62/8 63/8 63/19

**motion-activated [1]** 45/22

**motions [31]** 1/17 4/12 5/4 5/4 5/5 5/7 5/11 5/11 5/23 6/5 6/16 13/9 13/16 14/8 17/4 17/7 20/6 21/2 23/24 25/18 25/19 25/23 25/25 26/1 35/8 42/18 53/6 53/10 56/2 56/16 66/14

**Mr [27]** 3/22 5/13 5/22 26/18 26/24 27/3 38/1 38/4 38/21 38/24 38/25 39/12 39/13 40/1 40/8 43/2 43/3 44/12 49/24 50/2 59/17 59/24 60/1 60/18 66/1 66/2 66/5

**Mr. [48]** 3/22 3/23 5/18 5/19 26/16 26/17 26/25 27/1 27/15 29/12 30/18 31/5 31/17 31/18 31/20 30/5 36/6 36/9 37/2 37/19 37/25 38/15 40/15 40/17 40/17 45/2 46/9 46/14 58/25 59/2 59/3 59/11 59/22 59/23 60/4 60/8 60/8 60/14 60/17 60/19 61/1

61/4 62/3 63/23 64/4 64/10 65/3 66/9

**Mr. Blanche [3]** 27/15 31/5 38/15

**Mr. Bratt [8]** 40/17 58/25 60/17 61/1 61/4 62/3 63/23 64/10

**Mr. De [2]** 5/19 36/9

**Mr. Harbach [1]** 40/17

**Mr. Kise [8]** 3/22 3/23 26/16 26/17 27/1 37/25 40/15 65/3

**Mr. Kise's [1]** 64/4

**Mr. Murrell [1]** 37/19

**Mr. Nauta [9]** 5/18 29/12 30/18 31/17 31/18 31/20 30/5 59/11 60/14

**Mr. Nauta's [4]** 59/3 59/23 60/8 66/9

**Mr. Woodward [10]** 26/25 36/6 37/2 46/9 46/14 59/2 59/22 60/4 60/8 60/19

**Mr. Woodward's [1]** 45/2

**Ms. [2]** 27/8 30/14

**Ms. Dadan [2]** 27/8 30/14

**multimedia [1]** 44/19

**multiple [9]** 8/2 19/22 21/15 33/4 41/10 42/2 42/6 45/7 66/17

**multiplied [1]** 59/19

**MURELL [1]** 2/18

**Murrell [3]** 2/19 4/9 37/19

**mute [1]** 3/25

**N**

**NARA [8]** 15/25

16/6 16/7 16/12 17/13 17/15 19/16 35/21

**narrow [2]** 9/2 63/17

**narrow-related [1]** 9/2

**national [5]** 22/11 54/21 55/4 55/20 63/3

**nature [7]** 9/19 21/24 22/9 22/16 29/20 31/15 56/22

**NAUTA [15]** 1/10 2/11 3/5 4/3 4/5 5/18 29/12 30/18 31/17 31/18 31/20 35/5 53/22 59/11 60/14

**Nauta's [5]** 59/3 59/23 59/25 60/8 66/9

**NDI [1]** 55/15

**necessary [1]** 51/15

**needle [1]** 64/20

**nine [3]** 8/4 37/7 45/7

**nine-month [1]** 8/4

**noisy [1]** 3/25

**non [2]** 22/25 33/13

**non-ex [1]** 22/25

**non-tech [1]** 33/13

**nonclassified [1]** 30/8

**none [2]** 39/19 63/14

**notice [4]** 24/8 25/24 37/17 37/18

**Notwithstanding [1]** 64/17

**number [13]** 3/4 5/23 9/2 15/3 29/19 31/18 31/19 45/12 47/1 47/2 49/7 49/19 56/9

**numbers [2]** 7/21 43/19

**numerous [3]** 5/3 6/10 61/11

**NY [1]** 2/10

**O**

**obligation [1]** 62/8

**obligations [3]** 50/14 51/16 62/4

**observed [1]** 38/18

**obvious [3]** 15/2 15/12 30/25

**occasions [1]** 7/16

**October 11th [1]** 37/18

**October 17th [3]** 10/18 12/10 63/2

**October 19th [1]** 60/24

**October 30th [1]** 49/12

**office [18]** 2/4 3/7 3/12 16/25 17/14 23/17 24/1 24/1 25/9 31/2 31/6 32/17 32/18 34/10 34/21 35/19 65/17 65/18

**Official [2]** 2/24 67/6

**offline [1]** 60/8

**oh [5]** 18/13 25/10 25/11 32/4 43/14

**OLIVEIRA [7]** 1/10 2/16 3/6 4/7 5/19 36/9 53/22

**ongoing [1]** 39/6

**operational [1]** 23/20

**operations [1]** 30/11

**opinion [1]** 53/19

**opportunity [6]** 12/9 12/18 25/8 27/16 46/11 60/20

**opposed [1]** 21/7

**opposition [3]** 20/23 25/24 57/22

**optimistic [2]** 14/6 30/3

**order [21]** 4/20 5/1 6/7 21/20

Page 75

UNITED STATES vs. DONALD J. TRUMP, et al.

Case 9:23-cr-80101-AMC   Document 218   Entered on FLSD Docket 11/14/2023   Page 75 of 78

**O**

order... [17]  28/22 30/11 36/21 52/18 52/21 53/6 53/8 53/16 53/20 53/24 55/9 56/21 59/11 60/5 60/15 66/10 66/16
order if [1]  53/16
organized [2] 33/23 44/13
original [3]  20/13 51/1 60/9
originally [3] 25/16 38/19 39/21
outset [1]  40/21
outstanding [2] 35/17 50/5
overcome [1] 57/19
overflow [1]  4/15
overlap [3]  39/9 39/12 40/10
overlapping [3] 38/5 39/2 40/11
oversight [1]  50/2
overview [1]  6/15
owning [1]  46/14

**P**

P-R-O-C-E-E-D-I-N-G-S [1]  3/1
P.A [1]  2/19
P.M [1]  66/23
page [3]  50/22 50/24 58/4
pages [15]  1/10 13/1 13/11 44/3 44/16 44/18 44/24 47/1 47/13 47/17 47/24 48/3 48/4 48/13 59/17
Palm [1]  2/19
paper [1]  48/25
papers [3]  6/15 21/8 25/13
paragraph [1] 50/23
part [21]  4/21 6/7 7/1 13/12 13/24 15/25 16/2 16/4 16/5 16/6 16/12 17/11 18/9 18/20

22/12 24/3 35/22 53/8 61/24 62/17 63/19
parte [12]  21/24 21/25 22/4 22/9 22/25 23/8 23/9 56/22 56/25 61/20 61/21 61/25
parter [1]  3/18
particulars [1] 43/16
parties [1]  66/18
parties' [1]  6/20
passed [1]  58/18
path [1]  19/21
PDFs [1]  32/8
PELLETTIERI [2] 2/3 3/11
pending [4]  4/19 5/2 25/25 42/18
people [2]  33/13 35/22
perhaps [1]  47/19
period [4]  5/9 8/4 42/1 46/4
periods [2]  46/7 46/20
permanently [1] 10/12
permissive [2] 57/3 57/6
permits [1]  21/25
permitted [1] 59/10
person [3]  18/14 35/4 54/24
perspective [3] 40/20 45/6 50/8
pertinent [1]  31/8
phone [20]  3/25 4/1 9/1 9/25 28/16 28/20 28/23 29/3 29/12 29/15 29/16 29/17 59/3 59/5 59/7 59/9 59/23 59/25 60/6 66/9
phones [2]  4/13 60/8
photographs [5] 48/8 48/11 48/21 49/20 61/2
pick [1]  16/19
picture [3]  5/24

9/23 49/7
pictures [2]  9/24 33/13
piece [1]  44/15
PIERCE [5]  1/3 1/8 2/14 29/8 67/8
place [5]  20/9 31/9 40/3 42/3 59/11
Plaintiff [1]  1/8
planning [2] 53/11 53/15
platform [2] 30/21 32/7
play [5]  8/17 35/23 58/22 65/7 65/8
played [1]  58/21
plays [1]  19/10
pleadings [3] 44/4 55/19 56/6
plenty [1]  13/6
PLLC [1]  2/14
plug [3]  33/4 33/10 33/11
plus [2]  23/9 43/23
point [26]  8/8 11/13 12/7 12/15 17/5 18/10 19/23 19/25 21/6 23/13 23/18 24/23 25/12 26/6 26/18 27/24 39/22 40/6 40/8 40/19 51/1 54/13 62/22 63/21 64/19 64/22
points [3]  26/13 27/2 56/6
position [13]  14/3 14/3 15/25 22/24 23/2 23/5 23/12 25/13 27/18 40/20 40/22 41/11 42/9
possess [2]  55/3 55/3
possessing [2] 18/15 54/22
possession [3] 4/13 54/21 62/7
potential [2]  38/4 40/10
potentially [4]

13/8 15/14 21/4 25/5
power [1]  35/4
practical [3]  8/15 8/16 53/12
precluding [2] 60/12 60/13
preliminary [1] 19/21
prep [1]  41/22
preparation [1] 65/12
prepared [3] 13/22 21/20 61/23
present [4]  38/5 39/10 43/8 54/7
presentation [1] 5/15
President [29] 3/15 3/18 5/17 7/1 8/1 18/5 24/1 24/12 24/13 25/14 30/16 30/17 30/19 30/22 31/4 32/15 35/12 36/1 38/6 38/25 42/25 46/17 56/23 61/21 64/1 64/10 65/3 65/4 65/21
pressure [1] 25/14
pretrial [5]  4/12 4/22 5/8 25/18 25/19
principle [1] 51/12
privilege [1] 54/11
problem [3]  8/21 37/2 37/11
procedure [1] 51/13
procedures [2] 4/24 42/7
proceed [2]  16/22 21/7
proceeding [1] 65/20
proceedings [3] 42/19 66/23 67/3
process [11] 17/23 18/23 20/6 21/10 21/25 22/3

22/13 25/1 30/20 34/22 61/25
processing [2] 34/14 35/14
produce [3]  52/15 52/19 59/20
production [7] 9/8 18/11 47/10 47/11 47/12 51/24 63/18
program [4]  18/5 22/16 34/4 61/13
programs [2] 8/22 22/14
promised [1] 32/18
promptly [1] 32/22
proof [1]  52/18
proper [1]  54/24
property [1] 34/19
proposed [1] 20/10
proprietary [2] 33/16 33/18
prosecution [15] 15/22 16/1 16/2 16/6 16/13 16/24 35/20 35/23 52/7 56/7 56/11 56/14 56/17 56/19 62/5
prosecutors [2] 52/10 64/9
protective [2] 59/11 60/14
prove [4]  30/1 40/13 55/21 63/11
Prudential [6] 13/15 14/14 17/19 50/17 51/3 51/8
PSRs [1]  50/20
public [2]  4/17 56/1
publicly [1]  16/9
pulled [1]  46/6
pure [1]  45/6
purportedly [3] 15/5 16/16 19/14
purposes [1] 27/10
pursuant [1]  4/22
puzzled [1]  57/24

Page 76

UNITED STATES vs. DONALD J. TRUMP, et al.
Case 9:23-cr-80101-AMC   Document 218   Entered on FLSD Docket 11/14/2023   Page 76 of 78

**Q**

**quantity [3]** 27/22
43/20 43/22
**question [5]**
10/12 16/5 21/23
65/13 65/13
**questions [3]**
14/4 14/12 66/6
**quick [2]** 26/13
27/2
**quickly [3]** 8/7
19/8 20/21
**quote [3]** 34/11
51/3 57/22

**R**

**R-A-I-D [1]** 33/3
**raid [1]** 33/3
**raised [3]** 5/23
40/21 42/17
**raises [1]** 56/21
**range [1]** 17/9
**raw [1]** 32/5
**reach [1]** 17/11
**reached [1]** 32/3
**react [1]** 14/21
**reaction [3]** 36/13
36/17 64/9
**read-ins [1]** 37/21
**ready [1]** 54/9
**realistic [1]** 38/16
**realistically [1]**
41/25
**realities [3]** 30/4
42/1 42/9
**reality [1]** 41/14
**realm [2]** 42/12
42/13
**reasoned [1]**
18/24
**recent [1]** 13/23
**recently [2]** 8/10
34/3
**recess [1]** 66/21
**recommending
[1]** 41/3
**recording [1]**
4/14
**records [3]** 7/22
27/11 28/15
**redact [1]** 57/12
**reference [4]** 4/25
15/21 49/1 49/8

referenced [2]
6/14 39/1
**references [2]**
15/12 21/23
**referencing [2]**
49/5 49/7
**refused [2]** 61/14
64/22
**regrettably [1]**
65/21
**regularly [2]** 9/8
12/19
**relatively [1]** 19/8
**Relativity [6]**
30/21 30/22 32/7
32/7 32/7 32/13
**remains [1]** 7/4
**remove [1]** 18/13
**replies [1]** 20/23
**Reporter [2]** 2/24
67/6
**representation [2]**
27/13 43/4
**requested [3]**
9/21 10/1 13/15
**requests [5]** 13/7
14/5 51/3 51/8
61/12
**required [4]**
14/17 25/19 42/7
51/1
**reset [1]** 4/21
**resolve [1]** 37/19
**response [4]**
12/24 47/13 49/6
55/10
**responses [1]**
43/21
**responsive [1]**
36/24
**responsiveness
[1]** 46/13
**rest [1]** 8/25
**restriction [2]**
29/4 29/5
**result [1]** 39/25
**retaining [2]**
45/24 45/25
**retention [1]**
19/14
**return [5]** 4/19
12/7 42/4 54/23
55/6

**review [22]** 7/9
10/2 10/3 11/12
12/9 12/18 13/6
13/14 13/15 15/11
17/19 20/8 21/11
30/23 32/16 35/12
42/8 50/15 55/9
59/6 59/23 63/12
**reviews [6]** 14/14
14/22 49/24 50/6
50/12 50/18
**revised [2]** 4/12
5/6
**Rewind [1]** 38/23
**riddle [1]** 31/24
**rise [1]** 66/22
**RMR [2]** 2/24 67/6
**role [3]** 35/24
64/4 64/4
**room [4]** 4/15
31/19 31/20 65/23
**rooted [1]** 55/12
**rounds [1]** 19/22
**rub [1]** 59/16
**rule [7]** 48/21
48/23 51/15 55/16
62/4 62/8 63/9
**rules [1]** 5/1
**ruling [1]** 28/14
**rulings [1]** 42/17
**rundown [1]**
43/22

**S**

**safe [1]** 66/19
**SASHA [2]** 2/13
4/4
**sat [1]** 35/6
**scanned [1]**
59/17
**scenarios [1]**
39/3
**schedule [31]**
4/12 4/22 5/6
20/11 20/12 20/14
20/25 21/2 24/2
24/3 24/4 24/5
24/8 25/15 25/17
38/14 38/25 39/24
40/5 41/5 41/20
42/3 43/7 53/9
54/15 58/16 64/6
64/15 65/4 65/19

66/16
**scheduled [4]**
39/21 64/8 64/15
64/20
**schedules [4]**
6/14 41/14 64/3
64/3
**scheduling [2]**
5/1 25/13
**SCIF [29]** 10/2
10/22 11/9 11/25
12/1 12/4 12/16
13/4 27/17 28/3
28/6 28/10 28/19
28/21 28/25 29/9
29/18 29/22 40/3
42/7 48/4 48/10
52/25 58/9 59/4
59/7 59/12 60/13
60/25
**SCIFs [1]** 58/14
**scope [6]** 6/2 6/5
36/5 46/22 46/23
53/25
**scoped [2]** 59/23
59/23
**screen [1]** 45/9
**SDO [1]** 43/21
**search [7]** 14/14
34/19 45/16 48/22
50/17 51/3 51/8
**second [3]** 4/16
39/22 57/15
**Secret [2]** 35/21
35/23
**Section [37]** 5/6
6/6 6/8 6/8 11/2
17/8 18/23 18/25
19/6 19/11 19/17
19/19 19/22 20/1
20/24 21/1 21/5
21/24 21/25 22/3
22/10 22/24 23/13
26/4 26/5 28/21
53/6 53/25 54/3
54/5 55/16 56/23
57/4 57/6 61/19
61/22 62/22
**sections [1]** 31/8
**security [9]** 18/6
18/14 18/16 22/11
27/5 29/23 35/25
42/7 46/1

**seek [2]** 42/18
42/19
**seeking [2]** 17/5
57/10
**segues [1]** 6/5
**select [1]** 25/1
**selective [6]** 56/7
56/11 56/13 56/17
56/19 62/5
**sense [2]** 21/9
23/11
**sensitive [2]**
22/14 38/16
**separated [1]**
30/25
**September 13th
[1]** 48/1
**sequencing [2]**
18/23 53/6
**series [4]** 11/20
22/21 25/22 40/9
**served [1]** 45/16
**Service [2]** 35/22
35/23
**setting [2]** 19/21
38/6
**seven [1]** 25/25
**shall [1]** 4/13
**share [2]** 23/12
43/15
**shared [1]** 27/3
**shed [3]** 17/6
27/21 30/9
**sheds [1]** 28/14
**shift [1]** 21/22
**shifting [2]** 43/23
47/15
**shoes [1]** 22/19
**short [1]** 21/20
**side [4]** 37/20
44/2 65/22 66/11
**siege [1]** 32/11
**simultaneously
[1]** 38/12
**single [2]** 24/3
33/19
**sinister [2]** 24/10
24/11
**six-week [1]**
24/22
**sixty [1]** 35/1
**size [1]** 49/15
**skeleton [1]**

Page 77

UNITED STATES vs. DONALD J. TRUMP, et al.

Case 9:23-cr-80101-AMC   Document 218   Entered on FLSD Docket 11/14/2023   Page 77 of 78

**S**

skeleton... [1]
55/11
sketch [1] 55/11
slightly [1] 38/3
slow [2] 38/20
38/21
small [3] 9/15
10/11 47/11
software [2]
33/16 33/19
solve [1] 37/11
solved [1] 37/11
soon [2] 12/7
66/16
sooner [1] 21/14
sounds [1] 45/4
South [1] 67/7
SOUTHERN [1]
1/2
space [1] 34/12
span [1] 8/3
special [47] 2/4
3/8 3/12 6/22 7/10
8/9 8/23 9/6 9/7
9/22 10/11 10/19
10/25 11/4 12/22
13/4 13/19 13/21
14/2 15/21 16/8
16/25 17/13 17/14
19/16 21/7 21/17
23/17 24/6 25/9
31/1 31/5 32/17
32/18 34/10 34/20
35/19 61/12 61/17
62/5 63/1 63/20
64/5 64/13 64/25
65/17 65/23
specific [3] 4/23
5/24 56/25
speculation [1]
24/21
spell [1] 32/24
spending [1]
12/20
spent [1] 12/15
staff [1] 36/1
stand [2] 54/8
65/23
standard [2] 5/1
33/12
stands [2] 42/25

57/8
STANLEY [2]
2/11 4/4
starting [4] 5/10
24/14 40/19 64/15
starts [1] 65/5
state [2] 51/12
64/21
statement [2]
51/2 57/24
STATES [7] 1/1
1/7 1/19 3/5 3/12
56/9 67/7
static [1] 32/8
status [1] 37/16
statute [1] 21/25
stay [4] 42/19
44/13 58/17 65/9
steadfastly [1]
9/9
step [1] 22/19
steps [2] 41/23
51/15
stick [1] 31/17
storage [2] 31/19
31/20
store [1] 33/24
stored [2] 10/12
34/1
strains [1] 54/19
strong [1] 57/8
strongly [5] 16/11
16/24 17/1 55/19
55/20
struggling [1]
7/22
stuck [1] 21/3
study [1] 9/16
submission [2]
12/22 19/6
submissions [1]
18/25
submitted [2]
10/5 13/18
subpoena [1]
45/15
subpoenaed [1]
8/4
subsect [1] 52/12
subset [1] 10/11
substantive [4]
20/24 25/19 52/14
61/2

substitute [2]
57/11 57/12
suggested [1]
62/3
suggestion [1]
57/1
suggests [1]
64/25
suitable [1] 30/2
summary [1] 52/1
summer [2] 6/21
23/24
superseding [3]
4/19 23/24 42/4
supplement [2]
5/19 60/24
supplemented [1]
5/7
support [3] 56/17
61/24 62/7
Supreme [1] 56/8
surprise [1] 63/20
surprised [1]
31/10
surprising [3]
40/24 41/1 52/8
surprisingly [1]
15/25
system [2] 8/14
35/25

**T**

table [1] 3/17
tag [1] 30/24
Tallahassee [1]
2/7
tandem [1] 54/15
team [12] 3/9
15/22 16/1 16/2
16/6 16/13 16/24
27/15 27/16 35/20
35/23 52/7
tech [1] 33/13
technical [1]
46/18
technically [1]
48/21
temporal [1] 45/6
temporary [2]
9/15 28/3
terabytes [6] 7/21
33/6 33/11 33/14
35/1 45/3

term [2] 33/3 52/4
terms [10] 5/14
7/21 10/12 23/20
37/16 49/15 52/23
53/16 54/14 56/22
testimony [2]
44/6 45/18
text [1] 52/15
THAKUR [2] 2/3
3/11
thank [20] 4/1
6/18 22/6 23/21
26/8 26/21 26/24
36/7 37/24 38/1
40/14 40/15 40/18
58/4 60/17 66/1
66/3 66/12 66/18
66/21
that it [1] 17/25
theory [6] 8/19
46/9 46/10 54/18
52/13 63/4
thinking [1] 6/10
Thirtieth [1]
49/13
thought [4] 31/8
53/19 58/10 58/21
thoughts [3]
23/19 57/24 60/18
thousand [2] 13/1
13/11
thousands [1]
33/20
Thursday [1] 11/9
time [30] 3/17 8/4
8/20 10/22 11/8
12/15 12/17 12/20
13/5 13/6 15/6
18/24 25/3 25/21
25/21 27/13 34/14
35/2 38/14 39/2
41/24 42/1 43/12
45/20 46/4 46/7
46/16 49/3 53/11
58/10
timeline [3] 38/15
38/18 58/21
times [1] 33/12
timing [3] 10/13
30/12 54/7
today's [1] 5/15
TODD [2] 2/8 3/16
total [1] 61/4

totality [1] 27/17
totally [1] 12/2
touched [1] 31/5
touching [1] 30/4
toward [1] 43/8
track [2] 20/11
43/7
traditional [1]
6/25
trajectory [1]
39/25
tranche [4] 16/16
19/11 30/15 47/23
TRANSCRIPT [1]
1/17
transcription [1]
67/3
transcripts [6]
6/25 13/13 44/5
44/12 48/17 52/2
transparent [2]
52/13 64/1
transpired [1]
58/12
tremendous [6]
7/13 12/15 12/23
15/3 23/5 25/20
trial [40] 4/12
4/22 5/8 5/9 23/19
24/14 24/16 24/22
38/10 38/12 38/13
39/2 39/3 39/7
39/16 39/21 40/10
40/11 40/25 41/5
41/22 42/21 42/22
52/18 52/19 52/21
52/22 57/23 63/11
64/7 64/15 64/16
64/18 64/20 64/21
64/22 64/24 65/5
65/8 65/10
trials [3] 38/5
40/9 65/6
trip [1] 66/19
troubling [2] 24/9
28/1
TRUMP [30] 1/10
2/6 3/5 3/15 3/18
5/17 7/2 8/1 18/5
18/13 24/1 24/12
24/13 25/14 30/16
30/17 30/19 30/22
31/4 32/15 35/13

Page 78

UNITED STATES vs. DONALD J. TRUMP, et al.
Case 9:23-cr-80101-AMC   Document 218   Entered on FLSD Docket 11/14/2023   Page 78 of 78

**T**

**TRUMP... [9]** 36/1
38/6 38/25 61/21
64/1 64/10 65/3
65/5 65/22
**Trump's [2]** 31/21
46/17
**Tuesday [1]** 12/4
**turning [2]** 9/11
18/22
**Twenty [1]** 47/25
**Twenty-five [1]**
47/25
**two-week [2]** 5/9
24/23

**U**

**U.S [4]** 2/4 2/25
17/14 67/7
**ultimately [3]**
16/22 17/24 24/5
**UN [1]** 3/25
**unable [1]** 40/4
**unauthorized [1]**
54/20
**unavoidable [1]**
41/14
**unclassed [1]**
19/10
**unclassified [25]**
6/3 6/19 9/17 9/21
9/25 13/19 16/3
18/1 27/21 29/4
29/15 36/21 43/22
44/2 44/9 44/10
44/15 46/22 46/24
47/3 48/8 51/25
59/9 59/14 59/22
**undercut [1]** 63/3
**underlying [2]**
11/14 63/14
**understandable
[1]** 12/2
**understanding
[10]** 3/19 6/2 8/1
24/25 35/3 35/5
42/9 43/18 58/11
58/20
**unfair [2]** 63/25
65/2
**unforeseen [1]**
58/9
**unique [2]** 19/13

48/10
**UNITED [7]** 1/1
1/7 1/19 3/4 3/12
56/8 67/7
**unlawful [1]**
54/23
**unless [3]** 3/2
45/8 66/6
**unpredictability
[1]** 30/1
**unreasonable [1]**
20/18
**unusual [1]** 9/6
**unzip [2]** 33/19
37/8
**unzipped [2]**
33/21 37/8
**us [40]** 3/23 7/10
7/15 7/18 8/5 8/22
8/23 10/2 10/3
10/20 13/6 13/6
14/21 18/9 19/21
24/10 25/14 26/16
27/4 28/5 29/11
30/15 31/2 31/24
32/16 34/10 36/4
36/18 36/25 39/19
46/13 46/15 50/14
54/9 60/9 61/3
61/14 62/1 62/2
63/5
**useful [1]** 47/22
**usual [1]** 4/12
**utilizing [1]** 30/20

**V**

**vacuum [1]** 16/18
**vague [2]** 14/15
14/17
**vendor [7]** 8/12
8/12 30/20 30/25
32/6 32/15 61/8
**version [2]** 59/8
59/15
**versus [2]** 3/5
56/8
**victims [1]** 52/10
**video [22]** 8/14
30/10 31/6 31/8
31/9 31/11 31/13
31/14 32/5 32/9
32/13 32/13 32/16
33/19 34/11 34/16

35/1 35/5 35/7
37/1 37/15 45/12
**viewer [1]** 37/5
**violation [1]**
18/15
**virtue [1]** 35/24
**vis [2]** 53/6 53/6
**visually [1]** 12/9
**voir [1]** 24/25
**volume [3]** 13/24
15/2 29/20
**voluminous [5]**
6/21 7/4 25/20
26/4 35/15
**vs [1]** 1/9

**W**

**wall [4]** 45/24
45/25 46/2 46/3
**WALTINE [4]** 1/10
3/5 4/3 4/5
**warrant [1]** 48/22
**Washington [6]**
2/5 2/12 2/17
25/16 32/10 63/25
**watch [3]** 8/20
31/8 35/6
**watched [1]** 31/9
**watching [2]**
34/16 45/8
**Wednesday [1]**
27/6
**weekly [1]** 12/20
**West [1]** 2/19
**Western [1]** 33/10
**wherever [1]**
66/19
**White [2]** 16/8
17/15
**willfully [2]** 54/22
55/5
**willing [1]** 13/21
**win [1]** 16/11
**window [1]** 10/20
**wish [2]** 60/19
66/19
**witnesses [8]** 9/4
15/8 51/22 52/2
52/19 62/19 63/3
63/5
**wondered [1]**
22/2
**WOODWARD [14]**
2/11 2/12 4/5

26/25 36/6 37/2
46/9 46/14 59/2
59/22 60/4 60/8
60/19 66/5
**Woodward's [1]**
45/2
**worth [1]** 45/11

**Y**

**years' [1]** 45/11
**York [3]** 2/10
64/21 65/11

**Z**

**zip [3]** 33/17 34/4
34/4
**zipped [2]** 33/15
37/4
**Zoom [1]** 4/16