**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CR-CANNON(s)**

**UNITED STATES OF AMERICA**,

      Plaintiff,

v.

**DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVEIRA,**

      Defendants.

_____/

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
<u>DEFENDANTS' MOTION TO COMPEL DISCOVERY</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

ARGUMENT ..................................................................................................................... 17

   I.   Applicable Law ....................................................................................................... 19

      A.  Defendants seeking to compel discovery must show that the evidence they
          seek is material to their defense. ................................................................... 19

          1.  A showing of materiality requires a specific request for an item,
               accompanied by an explanation of how that item will be helpful to the
               defense at trial. ................................................................................... 20

          2.  Requests for information pertaining to an allegation of selective
               prosecution or political bias do not satisfy the materiality requirements of
               Rule 16 or Brady. ............................................................................... 21

      B.  Defendants are not entitled to discovery of items that are not within the
          Government's possession, custody, or control. ............................................. 23

      C.  Defendants are not entitled to discovery of internal government
          correspondence and memoranda, or to documents that are otherwise
          privileged. ................................................................................................. 27

   II.  Discussion ............................................................................................................. 29

      A.  The Court Should Deny Defendants' Requests for Evidence of "Improper
          Coordination with NARA" and of "Bias and Investigative Misconduct." ................. 30

          1.  These selective-prosecution claims are not material to the defense for
               purposes of Rule 16 and Brady. .......................................................... 31

          2.  Some of these requests seek evidence that does not exist or is not within
               the Government's possession, custody, or control. .............................. 38

              a.  Communications between the prosecution team and "members,
                 relatives, or associates of the Biden Administration." ..................... 38

              b.  NARA ............................................................................................ 38

              c.  The White House ........................................................................... 41

              d.  The Intelligence Community .......................................................... 42

i

3.  The defendants' request for internal communications by members of the prosecution team seeks items not subject to disclosure. ........................................ 46

B.  The Court Should Deny Defendants' Requests for Evidence Related to Trump's Security Clearance With The Department of Energy ................................... 48

C.  The Court Should Deny Defendants' Requests for Evidence Related to Secure Facilities at President Trump's Residences. ................................................................. 51

D.  The Court Should Deny Defendants' Requests for Production of Materials Concerning the Search of Mar-a-Lago........................................................................ 53

E.  The Court Should Deny Defendants' Requests for "Production of CCTV Footage."................................................................................................................................. 54

F.  Defendants' Request for Unredacted Discovery of Materials Should Be Denied ..................................................................................................................................... 57

G.  Defendants Nauta and De Oliveira's Requests for Disclosure of Non-classified Discovery Should be Denied as Moot ....................................................... 58

CONCLUSION ............................................................................................................................... 60

APPENDIX ....................................................................................................................................... 62

CERTIFICATE OF SERVICE ................................................................................................... 64

## INTRODUCTION

The defendants have received substantial, timely, and thorough discovery in this case.  By early September 2023, the Government had provided the defendants with over 1.28 million pages of unclassified discovery and all of the CCTV footage obtained in the investigation; since then, the Government has supplemented its production as necessary.  This production not only complies with the Government's constitutional and rule-based discovery obligations; it goes far beyond. The Government recognizes its discovery obligations, has complied with them, and will continue to do so.

The defendants have nevertheless filed a lengthy motion to compel in which they seek abstract rulings on the scope of the prosecution team and various directives that the Government provide them with a range of additional materials.  ECF No. 262.  The motion should be denied as legally and factually flawed.  Discovery requests must be based on specific demands, tied to the case, for items material to preparing the defense.  Instead of meeting those standards, the defendants' motion seeks non-discoverable materials based on speculative, unsupported, and false theories of political bias and animus.  Many of the requests are so generalized that it is difficult to decipher what they seek.  Others reflect pure conjecture detached from the facts surrounding this prosecution.  For still others, the Government has already furnished the defendants with what they seek to the extent that the law requires.

The Government will explain below why the defendants' showings fall short of applicable legal requirements.  But before turning to those arguments, it is necessary to set the record straight on the underlying facts that led to this prosecution, because the defendants' motion paints an inaccurate and distorted picture of events.  The Government will clear the air on those issues not because the Court needs to resolve factual disputes before denying the motion (it need not resolve the facts), but because the defendants' misstatements, if unanswered, leave a highly misleading

1

impression on a number of matters.  After that discussion, the Government will turn to the underlying legal principles and their application to defendants' requests, all of which should be denied.  A word at the outset about those requests:  the defendants have scattered their requests throughout the motion.  For the Court's convenience, the Government includes as an appendix to this response a chart enumerating what the defendants appear to seek.

The defendants also have filed a classified supplement in which they ask the Court to compel production of various categories of classified information.  This opposition responds to the defendants' classified supplement with unclassified arguments to the extent possible; additional responses are in the Government's classified supplement.

## BACKGROUND

The defendants rely on a pervasively false narrative of the investigation's origins.  ECF No. 262 at 5-6.  Their apparent aim is to cast a cloud of suspicion over responsible actions by government officials diligently doing their jobs.  The defendants' insinuations have scant factual or legal relevance to their discovery requests, but they should not stand uncorrected.  Put simply, the Government here confronted an extraordinary situation: a former President engaging in calculated and persistent obstruction of the collection of Presidential records, which, as a matter of law, belong to the United States for the benefit of history and posterity, and, as a matter of fact, here included a trove of highly classified documents containing some of the nation's most sensitive information.  The law required that those documents be collected.  And the record establishes that the relevant government officials performed their tasks with professionalism and patience in the face of unprecedented defiance.

To develop its counternarrative, the defendants cherry-pick exhibits and selectively quote from documents that the Government itself produced in discovery, putting a nefarious gloss on innocuous events.  But selective quotations from documents, coupled with speculative leaps, do

not make for genuine factual disputes—much less, contrary to the defendants' claim (ECF No. 262 at 5), the necessity for an evidentiary hearing. The storyline that the defendants seek to develop is contradicted by the full text of the documents they cite and by documents they ignore. The account that follows—which relies entirely on documents produced in discovery—corrects the misimpressions that the defendants create.[1]

*   *   *

***The removal of Presidential records.*** The genesis of this case dates not to May 2021, where the defendants' account begins (ECF No. 262 at 5), but to the tail end of the Trump Administration itself, at the conclusion of which the Archivist of the United States was to assume custody of all Presidential records from the administration.  44 U.S.C. § 2203(g)(1). █████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████  *See* Exhibit 2 at USA-00813153.  Based on discussions during the Administration with Trump's White House Staff Secretary, WHORM Official 1 believed there to have been approximately 24 boxes of documents in the White House residence.  *See* Exhibit 1 at USA-00383564, Exhibit A at USA-00815669, 00815672. ████████████████

---

[1]   To minimize confusion, the Government will refer to the exhibits to the defendants' motion by number, and to the additional Government exhibits by letters.  Of the 22 documents the defendants cite in support of their narrative with respect to NARA, 14 were produced in discovery, two are publicly filed documents from the election-fraud prosecution, *United States v. Trump*, No. 1:23-cr-00257 (D.D.C.), and six are documents that appear to have been obtained via the Freedom of Information Act ("FOIA").  One of the heavily redacted FOIA exhibits (Exhibit 17) was produced by the Government in unredacted form and appears as Exhibit 18 to the defendants' motion.

[2]   WHORM Official 1 is a career public servant ████████████████████████████ ████████████████████████████████████████████████ ████████████████

███████████████████████████████████████

██████████████████████████████████████   Exhibit A at USA-00815670.

These records belonged to the people of the United States.  *See* 44 U.S.C. § 2202 ("The United

States shall reserve and retain complete ownership, possession, and control of Presidential Records

. . .").  Under the law, NARA's task was to retrieve them.

>       ***NARA engages in retrieval efforts.***  NARA therefore communicated about the missing

records with Trump's Presidential Records Act ("PRA") representatives.[3]  After circulating a draft

letter within NARA about records required to be transferred to NARA, *see* Exhibit 1, NARA wrote

to Trump's PRA representatives on May 6, 2021, Exhibit 3 at USA-00383596.  The letter expressed

concern about significant records that NARA "cannot account for" and requested the PRA

representatives' "immediate assistance."  *Id.*  These missing records included several prominent

documents, such as the letter that former President Obama had left for President Trump in the

Resolute Desk; the letters Trump received from North Korean President Kim Jong-Un; and a poster

board showing the path of Hurricane Dorian that Trump had used during a televised briefing.  *Id.*

The letter also noted that NARA understood there to be "roughly two dozen boxes" that had been

stored in the White House residence and never transferred to NARA.  *Id.*

>       ***Delays and continued NARA efforts.***  A month elapsed without progress on the missing

boxes, leading the Archivist to email his colleagues on June 9, 2021, that he was "out of patience."

*Id.* at USA-00383594.  Given the PRA representatives' delay, and their vague assurances of

"expect[ing] to be able to get to a resolution relatively soon," *id.*, that was an understandable

---

[3]       The PRA permits a President to designate representatives to have access to his records and to handle inquiries concerning access to the records by others.  44 U.S.C. § 2205(3).  Trump appointed six PRA representatives at the end of his term.  Five of them were attorneys in his administration; the sixth was his White House Chief of Staff.

reaction to foot dragging that prevented NARA from fulfilling its statutory duties.  As NARA attempted to carry out its responsibilities, it was unaware that scores of boxes remained unsecured at Trump's Mar-a-Lago Club ("Mar-a-Lago") and that those boxes contained hundreds of classified documents.

A succession of Trump PRA representatives corresponded with NARA without ever resolving any of NARA's concerns about the boxes of Presidential records that had been identified as missing in January 2021.  By the end of June 2021, NARA had still received no update on the boxes, despite repeated inquiries, and it informed the PRA representatives that the Archivist had directed NARA personnel to seek assistance from the Department of Justice ("DOJ"), "which is the necessary recourse when we are unable to obtain the return of improperly removed government records that belong in our custody."  Exhibit B at USA-00383980; *see* 44 U.S.C. § 2905(a) (providing for the Archivist to request the Attorney General to institute an action for the recovery of records).  That message precipitated the involvement of Trump's former White House Chief of Staff, who engaged the Archivist directly at the end of July.  *See* Exhibit 4.  Additional weeks passed with no results, and by the end of August 2021, NARA still had received nothing from Trump or his PRA representatives.  *Id.*  Independently, the House of Representatives had requested Presidential records from NARA, further heightening the urgency of NARA obtaining access to the missing boxes.  *Id.*  On August 30, the Archivist notified Trump's former Chief of Staff that he would assume the boxes had been destroyed and would be obligated to report that fact to Congress, DOJ, and the White House.  *Id.*  The former Chief of Staff promptly requested a phone call with the Archivist.  *Id.*

***Formal and limited involvement of the White House Counsel's Office.*** ███████

████████████████████████████████████████

████████████████████████████████████████████████

Exhibit A at USA-00815670. ██████████████████████

████████████████████████████████████████████████

████████████ *Id.* ███████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ *Id.*

Su was subsequently included in correspondence with PRA representatives and NARA, Exhibit 6, but not for any nefarious reason, as the defendants appear to contend.  ECF No. 262 at 5-6.  Rather, before his call with Trump's former Chief of Staff, WHORM Official 1 wanted to review notes he took during the Trump Administration on the subject of missing Presidential records.  Exhibit 6 at USA-00383679.  These notes had become PRA records and, in NARA's view, required notification to Trump or one of his representatives before WHORM Official 1 could see them.  *See* 44 U.S.C. § 2205.

Any doubt about the reason for Su's involvement is resolved by an email that appears in Exhibit 7 but is not mentioned in the text of the defendants' motion.  In early September 2021, a Trump PRA representative—who had served as Deputy White House Counsel during the Trump administration—proposed to a NARA official the idea of a conference call including WHORM Official 1, Trump's former White House Chief of Staff, and others regarding the missing boxes.[4] Exhibit 7 at USA-00383684.  As the NARA official wrote at the time, he and the Trump PRA representative "both understood that we would have to coordinate with WH Counsel concerning any involvement by [WHORM Official 1]."  *Id.*  Accordingly, the NARA official "then spoke with Jonathan Su, Deputy Counsel to the President, to let him know about [Trump's PRA

---

[4]     The call eventually took place on October 19, 2021, and is discussed below.

representative's] proposal." *Id.*  Su accordingly reached out to the Trump PRA representative directly to set up the call. Exhibit 6 at USA-00383676, USA-00383680.  At no point in the correspondence did Trump's PRA representative suggest that Su's participation in these discussions was in any way improper.

The defendants also misleadingly suggest (ECF No. 262 at 6) that there was something improper about Su's involvement in the discussion of whether WHORM Official 1 could review his own notes before the call.  In fact, the Trump PRA representative not only knew of the request, but expressly told Su and the NARA official that he approved it: "[I]n connection with our call yesterday, fine for [WHORM Official 1] to get his own documents from NARA so that he can check his notes for a call with me and [the former Chief of Staff] re the boxes that were in the residence."  Exhibit 6 at USA-00383679.  Su then asked NARA if they could "discuss process," in the event that the Trump PRA representative asked to see the notes himself.  *Id.* at USA-00383678.  The NARA official responded that "normally, we would have to provide the records to him per the notification/review process, before we could provide anything to you."  *Id.*  Su responded, "Ok thanks."  *Id.*  Far from alerting "Su that the request was atypical," ECF No. 262 at 6, the NARA official's use of "normally" simply informed Su of the typical NARA practice, and Su's acceptance of this process point without objection—"Ok thanks"—in no way supports the defendants' overarching claim that the White House was somehow exercising undue influence.

The defendants also point to an October 5, 2021, internal NARA email chain that it characterizes as "describing a strategy to 'time' NARA's public communications with Congress in order to prejudice President Trump."  ECF No. 262 at 6.  But that description wholly mischaracterizes the email chain, and the defendants' unfounded interpretation is undercut by the NARA official's statement that he intended to "let the Trump reps know that this is what we plan

to do." Exhibit 7 at USA-00383681.  Moreover, an earlier email in the same chain dated September 15, 2021—also internal to NARA but again, unmentioned in the defendants' motion—completely guts their claims of NARA's biased eagerness to involve DOJ: "[W]e cannot go to DOJ while we are engaged in ongoing discussions with the White House and the Trump reps, which could help to clarify, if not actually resolve, the issue."  *Id.* at USA-00383682.  Again, the record shows that NARA was taking a cautious, incremental approach that aimed to achieve legal compliance without litigation.

***Fall passes with little progress in retrieving the missing records.***  In September 2021, one of Trump's PRA representatives expressed puzzlement over the suggestion that there were 24 boxes missing, asserting that only 12 boxes had been found in Florida.  Exhibit 7 at USA-00383682, USA-00383684.  In an effort to resolve "the dispute over whether there are 12 or 24 boxes," NARA officials discussed with Su the possibility of convening a meeting with two of Trump's PRA representatives—the former Chief of Staff and the former Deputy White House Counsel—and "possibly" Trump's former White House Staff Secretary.  *Id.* at USA-00383682.  On ▮▮▮▮▮▮▮▮, a call took place among WHORM Official 1, another WHORM employee, Trump's former Chief of Staff, the former Deputy White House Counsel, and Su about the continued failure to produce Presidential records, but the call did not lead to a resolution.  *See* Exhibit A at USA-00815672.  Again, there was no complaint from either of Trump's PRA representatives about Su's participation in the call.  ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Exhibit C at USA-00820510.  ▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████   Exhibit D at USA-00818227–USA-00818228.  ████████████████████████

████████████████████████████████████████████████████████████   *Id.*

Some two months after that, on January 17, 2022, nearly a year after he left office and more than six months after NARA requested them, Trump released 15 boxes to be delivered to NARA by truck.  ECF No. 85 ¶ 47.  Although Trump knew there were dozens of boxes remaining at Mar-a-Lago (*id.* ¶ 40), he provided no more to NARA.

**Finally, 15 boxes arrive at NARA.**  The truck from Mar-a-Lago completed its journey to NARA the following day, January 18, 2022.  A NARA official was on hand to receive the delivery.  Exhibit 10 at USA-00383792–USA-00383793.  Upon NARA's review of the boxes' contents, they discovered documents with classification markings.  ECF No. 85 ¶ 49.  ████████████████████

████████████████████████████████████████████████████   *Id.*  His review of the boxes revealed at least one document that was SAP, Exhibit 20 at USA-00940472, referring to a special access program whose distribution within the government is highly restricted.

The shifting accounts of the number of missing boxes—████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████—raised concerns about whether any comprehensive search for Presidential records had yet been done.  Exhibit 2 at USA-00813156.  ████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████   *Id.*  ████████████████████

████████████████████████████████████████████████████████████   *id.*, which was entirely consistent with the statutory role of the Attorney General to bring court actions to retrieve missing records, 44 U.S.C. § 2905(a), and appropriate given the self-evident national

security threat of classified records existing outside government custody or safe storage in the hands of a former President with no authority to possess them.

For their part, the ODAG officials instructed NARA on January 24, 2022, to notify its Inspector General and the Inspector General for the Intelligence Community; one of the ODAG officials also provided the names of two DOJ officials responsible for overseeing investigations of potential offenses involving public officials or arising from the discovery of classified materials. Exhibit 18 at USA-00309424; Exhibit 2 at USA-00813156.  Referrals to offices with authority to consider the security concerns prompted by the revelation that Trump possessed classified records at Mar-a-Lago was, again, entirely appropriate and in no way indicative of political bias.  And the investigation that followed confirmed that the concerns were more than justified, as dozens more boxes were discovered and hundreds more classified documents were recovered.

*Referral to DOJ.*  On February 9, 2022, NARA made its formal referral to DOJ.  That referral was entirely consistent with the Government's longstanding interest in enforcing laws safeguarding national defense information.  As Trump has stated, "[s]ervice members . . . have risked their lives to acquire classified intelligence to protect our country," and "[i]n my administration I'm going to enforce all laws concerning the protection of classified information. No one will be above the law."  ECF No. 85 ¶¶ 23(a), (e).

The defendants nonetheless label the referral a "sham."  ECF No. 262 at 8-10.  The defendants do not explain what a "sham" referral might be, much less what legal significance it might have, but their contention is grounded in a timeline of events on February 9, 2022, which shows communications between NARA and DOJ about a congressional inquiry, followed later in the day by the formal referral by NARA's inspector general to DOJ.  *Id.* at 9.  It remains a mystery why the conjunction of those events is suspicious:  the concerns about Trump's retention of

government records and dilatory responses had mounted for months; DOJ had responsibilities and authorities that NARA did not have; and NARA OIG had an ample factual basis to make a referral. Far from being a "sham," the referral became necessary after months of efforts—including several rounds of communications with Trump PRA representatives—failed to confirm that Trump had returned any and all classified information that he removed from the White House.

*PRA compliance, not circumvention.* Finally, the defendants suggest that a NARA official initially sought to evade, and later violated, the PRA when the FBI interviewed him on February 11, two days after the referral. ECF No. 262 at 10 (citing to Exhibits 2 and 19-21). The full text of the interview report dispels the defendants' nefarious account of selected excerpts. In full, the relevant portion of Exhibit 2 states:

> Prior to the [FBI] interview, [NARA official] consulted with [NARA general counsel] about the parameters for discussing the materials NARA received recently . . . , which included likely classified documents, without triggering the obligation to notify the record holder and the incumbent United States President of the inquiry. [NARA official] was advised and agreed not to disclose content of the classified documents to the interviewing agents.

Exhibit 2 at USA-00813151–USA-00813152.

Rather than evidencing an effort to circumvent the PRA by the NARA official, the NARA general counsel, the FBI, or anyone else, the complete picture reflects a careful effort to comply with the PRA, while also providing accurate information to the FBI without alerting the subject of the nascent federal investigation to its status, as is standard in any case. The NARA official complied with these objectives by refraining from describing to the agents what any of the documents said. The inventories he provided to the FBI were likewise an exercise in caution. As the defense exhibits show, the inventories contain only generic titles for the documents, their dates (if available), the number of pages, and their classification level. *See* Exhibit 21. It was entirely

consistent with the PRA for the NARA official to provide these general descriptions and documents to the FBI without going through the statute's notice provisions.

***Investigation leads to indictment.*** From the moment of referral, this investigation adopted a measured, graduated approach. Each investigative step revealed facts confirming the suspicions or concerns that prompted it. In light of NARA's discovery of more than 180 documents with classification markings that had been stored at Mar-a-Lago prior to their transfer to NARA, the Department of Justice understandably sought to ensure that no additional classified material was being kept there. On May 11, 2022, a federal grand jury issued a subpoena to the Office of Donald J. Trump, seeking the production of all documents with classification markings in the possession of that office or Trump himself.

Trump responded to that subpoena on June 3, 2022, via his attorneys. They turned over to the FBI and DOJ 38 additional documents marked classified from Mar-a-Lago, confirming what the earlier evidence suggested: that, even after the production of documents to NARA, Trump continued to retain not only Presidential records that belonged to the United States, but highly sensitive classified documents relating to the national defense.

During their visit to Mar-a-Lago, FBI agents noticed surveillance cameras, including in the vicinity of the storage room where Trump's attorney had found classified documents. In June 2022, the grand jury issued a subpoena for camera footage from Mar-a-Lago. A review of that footage, combined with other information obtained during the investigation, revealed that between May 23, 2022, and June 2, 2022, Waltine Nauta—acting at Trump's direction—moved approximately 64 boxes from the storage room to Trump's residence, with Nauta and Carlos De Oliveira later moving approximately 30 boxes back to the storage room before Trump's attorney's review, as described in the Superseding Indictment. ECF No. 85 ¶¶ 54-63.

At that point, the Government had evidence strongly suggesting a deliberate effort to conceal boxes from Trump's lawyer's search, in effect thwarting compliance with the subpoena—leaving the Government with no choice but to seek a search warrant.  Execution of the August 2022 search warrant included the use of filter personnel to avoid the investigative team's exposure to any privileged materials, and resulted in the seizure of 102 documents bearing classification markings, again confirming what the earlier evidence suggested: there were still more classified documents being secreted at Mar-a-Lago.

Even then, no indictment immediately followed.  Instead, the Government undertook a careful and thorough investigation, obtaining numerous documents, executing search warrants on various electronic devices, and interviewing dozens of witnesses to shed light on the nature of the classified documents, Trump's document-handling practices, the documents' journey from the White House to Mar-a-Lago, and the various places they were improperly stored there, including in the basement storage room.

Unsurprisingly, much of that investigation required the Government to obtain evidence and information from various federal agencies and employees.  For example, because the classified documents seized during the execution of the search warrant derived from various entities within the Intelligence Community, the Government sought information from those entities, as it would from any victim in a criminal case, and further sought information about the current classification status of each document.  The Government also sought information and documents from NARA, including by issuing a subpoena for the originals contained within the 15 boxes of documents that Trump returned to NARA in January 2022.[5]  The Government additionally sought information

---

[5]     The Government sought the entirety of the contents of the 15 boxes that Trump returned to NARA in January 2022, including both classified and unclassified documents, in original form.

from the Secret Service and the White House Communications Agency about secure facilities at Mar-a-Lago, both during and after Trump's presidency.  In each case, the Government followed DOJ communications protocols, including, where appropriate, by routing communications with White House employees through ODAG.  At no point did any of these entities participate in the investigation (other than as witnesses), help present the case to the grand jury, accompany any prosecutors to court proceedings, or help develop prosecutorial strategy.

The investigation, once completed, uncovered evidence substantiating that Trump (1) admitted in July 2021 at his home in New Jersey that he had secret military invasion plans and showed them to others; (2) was well aware of what was in his boxes; (3) had directed the movement of boxes to conceal them from his lawyer's review on June 2, 2022; (4) had suggested to his lawyer after the review that the lawyer remove damaging documents and not turn them over to investigators; and (5) had sought to have surveillance camera footage of the box movement deleted before it could be turned over.  The investigation also revealed the involvement of defendants Nauta and De Oliveira in the scheme to conceal the boxes and delete the footage, as well as their lies to investigators.  On the basis of these facts, a grand jury returned a 38-count indictment against Trump and Nauta on June 8, 2023, ECF No. 3, followed by a 42-count superseding indictment against Trump, Nauta, and De Oliveira on July 27, 2023, ECF No. 85.

Following indictment, the Government began producing discovery that exceeded in scope and timing that to which the defendants were entitled under law.  The Government has produced

---

When NARA resisted this request, the Government agreed to "narrow" it "to require production only of the original documents with classification markings," while agreeing that NARA would retain the documents without classification markings.  *See* Exhibit 56 at USA-00950536.  While the defendants attempt to treat this exchange as an example of "[i]mproper [c]oordination" between the Government and NARA, ECF No. 262 at 34-35, it in fact shows that the Government was dealing with NARA at arm's length, that NARA was not under the authority of DOJ, and that each agency focused on carrying out its own unique responsibilities.

all oral, written, or recorded statements of the defendants, all documents and objects obtained from the defendants,[6] all documents and objects that the Government intends to use in its case-in-chief,[7] and the expected testimony of its intended expert witnesses.  *See* Fed. R. Crim. P. 16(a)(1).  The Government has also produced much more.  For example, during the investigation, the FBI recorded nearly all of its witness interviews, to ensure complete and accurate accounts and to minimize any disputes about what was said, and the associated recordings—along with transcripts—have been produced well in advance of what the Jencks Act requires.  In addition, the Government has produced transcripts and reports from interviews stemming from a separate investigation into the aftermath of the 2020 presidential election, undertaken by the Special Counsel's Office, in *United States v. Trump*, No. 1:23-cr-00257 (D.D.C.), where those transcripts and interviews were with witnesses who are expected to testify in this case.[8]  In total, the Government has provided more than 1.28 million pages of unclassified discovery.

---

[6]      In a footnote, the defendants inaccurately claim that the "Special Counsel has yet to produce to defense counsel forensic images of the devices it obtained during the course of its investigation."  ECF No. 262 at 12 n.7.  The Government's filter attorney provided the full forensic images of Nauta's phones and Apple iCloud accounts to Nauta's counsel on August 14, 2023; the full forensic image of Nauta's Microsoft email account to Nauta's counsel on August 29, 2023; and the full forensic image of De Oliveira's phone to De Oliveira's counsel on August 14, 2023.  Because defense counsel are not entitled to privileged material for anyone other than their own client, the Government provided Trump's counsel the filtered, scoped content of Nauta's and De Oliveira's electronic devices and accounts.  And the Government provided all defense counsel the filtered, scoped content of non-defendant electronic devices or accounts obtained during the investigation.

[7]      As discussed in more detail below, *see infra* at 54-58, the defendants' claim (ECF No. 262 at 56-63) that the Government has failed to produce CCTV footage in usable form stems largely from user error by defense counsel, has since been addressed, and is moot.

[8]      The defendants misleadingly claim (ECF No. 262 at 26) that these productions reveal that one of the trial attorneys in the election case "participated in approximately 29 of the interviews described in discovery in this case," while Jay Bratt, a trial attorney in this case, "participated in 10 of the interviews that have been produced in discovery in the D.C. Case."  The defense would have the Court believe that the trial attorney in the election case participated in witness interviews related to this case, while Bratt participated in witness interviews related to the election case.  As

***Summing up.***  As the exhibits and an accurate timeline attest, the defendants' narrative overlooks the fact that various federal agencies confronted, and appropriately responded to, an extraordinary situation resulting entirely from the defendants' conduct.  NARA first sought over a protracted period to retrieve documents from Trump's PRA representatives, whose responses were dilatory, shifting, and incomplete.  As NARA attempted to carry out its statutory responsibilities from 2021 into 2022, highly classified documents sat in a ballroom, bathroom, office space, and a basement storage room at a social club traversed by thousands of members, employees, and guests.  NARA rightly involved other government agencies that had equities and authorities that it did not, as necessary to navigate an unprecedented situation.  The White House Counsel's office became involved because of the need to consult its personnel about missing Trump Administration Presidential records.  DOJ became involved because of the Attorney General's authority to retrieve records through court action and later to assess whether a criminal inquiry was warranted—all well outside of NARA's archival function.  And the Intelligence Community became relevant once the alarming fact emerged that Trump's boxes contained classified records that he had no authority to keep, let alone store in boxes at his residence.   Where the defendants perceive "bias," "weaponize[d]" use of authorities, and a "sham referral," all attributed to an undifferentiated "Biden Administration," ECF No. 262 at 5-9, the record shows only different government agencies, with specific portfolios and responsibilities, at work to solve an increasingly vexing and concerning problem.  That is hardly surprising, and it in no way, shape, or form supports the

---

the defendants well know, that is false.  Rather, the fact that the two cases have overlapping witnesses has resulted in some degree of overlapping discovery production, out of an abundance of caution.  But, in any event, the defendants' mischaracterization has no bearing on the motion to compel, since the Government has considered all of the prosecutors in the Special Counsel's Office part of the prosecution team, as it has stated in its correspondence with defense counsel.  *See* Exhibit 27.

hyperbolic claim of "politically motivated operatives" launching a "crusade against President Trump." *Id.* at 1.  The defendants' legal problems are solely of their own making.

## ARGUMENT

"There is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).  Instead, a defendant's right to discovery is prescribed principally by Rule 16(a) of the Federal Rules of Criminal Procedure, the Due Process Clause of the Fifth Amendment, as construed by *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, and the Jencks Act, 18 U.S.C. § 3500.  *See United States v. Jordan*, 316 F.3d 1215, 1249-53 (11th Cir. 2003).  Relying on Rule 16(a)(1)(E)(i) and the *Brady* doctrine, the defendants move to compel the disclosure of various items, which they group into six main categories, plus two additional uncategorized claims, listed the appendix below.

To prevail on that motion, the defendants must make three showings.  First, they must describe the information they seek with sufficient particularity to demonstrate that the evidence is "material to preparing the defense" under Rule 16 or "material to guilt or punishment" under *Brady*.  Second, they must demonstrate that the information they seek is within the Government's possession, custody, or control.  Third, the information they seek must not be protected from disclosure by an applicable privilege.

Each of the defendants' discovery requests fails to satisfy one or more of these requirements.  Many fail to seek evidence material to preparing their defense because they are not specific, are not accompanied by an explanation of how the item sought will significantly alter the proof in the defense's favor, or are grounded in speculation and conjecture.  Other requests seek evidence that, even if it existed, would fall outside the scope of Rule 16 and *Brady* because it has nothing to do with factual guilt or innocence.  Indeed, most of the motion to compel is devoted to the defendants' request for discovery to support their unfounded allegation that the investigation

17

and prosecution of this case have been tainted by political bias, *see, e.g.*, ECF No. 262 at 3 (describing purported "evidence of bias and political animus" as "central to the defense of this case"), which is a straightforward claim of selective prosecution governed by rigorous discovery standards.   In other instances, the defendants seek information held by non-investigatory government entities without providing any sufficient basis for concluding that the information is within the prosecution team's possession, custody, or control (and it is not).   Finally, some of what the defendants seek is protected from disclosure by the work-product and deliberative-process doctrines.

The extensive discovery that the Government has provided exceeds in both scope and timing that to which the defendants are entitled under law.   But the defendants are not permitted to the wide-ranging, irrelevant, and often non-existent discovery that they now request.   The Court should deny the motion to compel in its entirety.

One additional point:  the defendants begin the argument section of their motion with a broad and abstract request that the Court define the prosecution team for discovery purposes.  *See* ECF No. 262 at 12-27.  The defendants cite no authority for conducting that inquiry detached from any specific request.  The Government has explained to the defendants that the prosecution team consists of "the prosecutors of the Special Counsel['s] Office and law enforcement officers of the Federal Bureau of Investigation (FBI) who are working on this case, including members of the FBI's Washington Field Office and Miami Field Division."   Exhibit 27 at 1.   That definition accords with the law and standard practice.   In contrast, the defendants' broad-brush and undifferentiated approach would sweep into the *prosecution* team a variety of independent agencies and entities—despite the fact that those entities did not participate in the investigation or prosecution except as victimized governmental entities, sources of evidence, or the like.  *See* ECF

No. 262 at 17-27 (arguing that seven government components—many with major and obvious non-law-enforcement responsibilities such as the White House or the Intelligence Community—should be deemed part of prosecution team). The defendants' expansive view of the prosecution team is wrong factually and legally.

Moreover, this Court should reject the defendants' request to define the prosecution team in the abstract. Discovery requests should be evaluated through the lens of specific requests for materials so that the Court can apply in logical fashion the legal requirements that govern discovery: *e.g.*, whether a specific request seeks discoverable material in the first place, and, in certain instances, whether the Government has already furnished all responsive materials. The resolution of those standard discovery inquiries makes nearly all of the defendants' prosecution-team arguments irrelevant. If instances arise in which the Court still needs to determine whether a particular "item is within the government's possession, custody, or control," Fed. R. Crim. P. 16(a)(1)(E), focusing on what items are at issue will help narrow the zone of dispute. The Government therefore responds, where appropriate, to the defendants' expansive and unfounded definition of the prosecution team in the context of its responses to the specific requests below.

## I. Applicable Law

### A. Defendants seeking to compel discovery must show that the evidence they seek is material to their defense.

Rule 16 requires the Government to disclose documents and objects that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). The *Brady* doctrine likewise requires the Government to disclose evidence that is "material either to guilt or to punishment." *Kyles v. Whitley*, 514 U.S. 419, 432 (1995). Under either standard, a defendant must identify a specific item and explain how that item will aid in the defendant's defense at trial, and neither Rule 16 nor *Brady* permits discovery on matters unrelated to a defendant's guilt or innocence. Instead, to the

19

extent a defendant seeks (as defendants here do) to attack the investigation and prosecution as biased or politically motivated as the basis for a pre-trial legal challenge to the indictment, the defendant must make a "rigorous" multi-part factual showing of the basis for their claim before courts may entertain discovery. *See United States v. Armstrong*, 517 U.S. 456, 468 (1996).

> ### 1. A showing of materiality requires a specific request for an item, accompanied by an explanation of how that item will be helpful to the defense at trial.

To demonstrate that evidence is "material to preparing the defense" within the meaning of Rule 16, a defendant "must make a specific request for the item together with an explanation of how it will be 'helpful to the defense.'" *Jordan*, 316 F.3d at 1250 (quoting *United States v. Marshall*, 132 F.3d 63, 67-68 (D.C. Cir. 1998)). "[T]he defendant must show more than that the item bears some abstract logical relationship to the issues in the case." *Id.* at 1251 (quotation marks and brackets omitted). Instead, "[t]here must be some indication that the pretrial disclosure of the item would enable the defendant significantly to alter the quantum of proof in his favor." *Id.* (quotation marks and punctuation omitted). This standard cannot be satisfied by a "general description of the item" being sought nor by "a conclusory argument that the requested item is material to the defense." *Id.* at 1250.

*Brady* likewise imposes an obligation on the prosecutor to produce material, exculpatory evidence within the prosecution's control, *Strickler v. Greene*, 527 U.S. 263, 280 (1999)*,* and the Government has satisfied, and will continue to satisfy, that obligation here. If a defendant "is aware of specific [*Brady*] information contained in the government's file, 'he is free to request it directly from the court, and argue in favor of its materiality.'" *Jordan*, 316 F.3d at 1252 n.81 (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987)). "However, mere speculation or allegations that the prosecution possesses exculpatory information will not suffice to prove 'materiality,'" and "a

general request for 'all' *Brady* material" does not entitle a defendant to any additional discovery.
*Id.*

### 2. Requests for information pertaining to an allegation of selective prosecution or political bias do not satisfy the materiality requirements of Rule 16 or Brady.

Rule 16's reference to documents and objects that are "material to preparing *the defense*," Fed. R. Crim. P. 16(a)(1)(E)(i) (emphasis added), "means the defendant's response to the Government's case in chief." *Armstrong*, 517 U.S. at 462. It encompasses claims that serve as a "'shield'" used to "refute the Government's arguments that the defendant committed the crime charged," but excludes claims that serve as a "'sword'" used to "challeng[e] the prosecution's conduct of the case." *Id.* Rule 16 is therefore "inapplicable" when information sought by a defendant "relates not to refutation of the government's case in chief but to establishment of an independent constitutional bar to the prosecution." *United States v. Rashed*, 234 F.3d 1280, 1285 (D.C. Cir. 2000) (citing *Armstrong*, 517 U.S. at 462-63); 5 Wayne R. LaFave, et al., *Criminal Procedure* § 20.3(g) (4th ed. 2023) (Rule 16 does not apply to discovery of documents "desired to establish a defense of discriminatory prosecution" or that may be "helpful in raising the broad range of other objections that are not 'substantive' in nature, but challenge the institution of the prosecution").

The *Brady* doctrine is likewise focused on questions of factual guilt or innocence—that is, on whether the evidence is "favorable to the accused, either because it is exculpatory, or because it is impeaching," and whether the suppression of that evidence tainted the fairness of the trial and "'undermine[d] confidence in the verdict.'" *Strickler*, 527 U.S. at 281-82, 290; *see United States v. Jeri*, 869 F.3d 1247, 1260 (11th Cir. 2017) (*Brady* violation requires a defendant to show that the suppressed evidence "was material to the establishment of his guilt or innocence" (quotation marks omitted)).

A constitutional challenge to the motive behind the prosecution, such as a selective-prosecution claim, however, "is not a defense on the merits to the criminal charge itself," *Armstrong*, 517 U.S. at 463, and "has no bearing on the determination of factual guilt," *United States v. Jones*, 52 F.3d 924, 927 (11th Cir. 1995); *see United States v. Scrushy*, 721 F.3d 1288, 1305 (11th Cir. 2013) ("Whether the decision to prosecute [the defendant] was motivated by improper reasons has no bearing on the integrity of the trial or the verdict . . . ."). As such, discovery requests that seek to compel disclosure of information related to a selective-prosecution claim—or a similar legal claim alleging a defect in instituting the prosecution—fail to seek information "material to the defense" for purposes of Rule 16, *see Armstrong*, 517 U.S. at 463, or information that is material to guilt or punishment under *Brady*, *see United States v. Brock*, 628 F. Supp. 3d 85, 101 & n.5 (D.D.C. 2022).

A request to discover such material is, instead, "governed by well-settled and binding precedent in [*Armstrong*] and *United States v. Jordan*, 635 F.3d 1181 (11th Cir. 2011)." *United States v. Cannon*, 987 F.3d 924, 936 (11th Cir. 2021). That precedent imposes a "rigorous standard" requiring "a defendant to produce some evidence tending to show the existence of the essential elements of a selective prosecution claim—discriminatory effect and discriminatory purpose." *Id.* at 937 (quotation marks omitted); *accord United States v. Hastings*, 126 F.3d 310, 311-12 (4th Cir. 1997) (applying *Armstrong* and reversing order that "the government [] produce discovery related to [the defendant's] claim that he was selectively prosecuted because he is a Republican"); *United States v. Navarro*, 627 F. Supp. 3d 1, 7 (D.D.C. 2022) (denying discovery request for evidence to support his claim that "the decision to charge him was tainted with

'unlawful political interference,'" since that defense "'relates not to refutation of the government's case in chief but to establishment of an independent constitutional bar to the prosecution'").[9]

### B. Defendants are not entitled to discovery of items that are not within the Government's possession, custody, or control.

Rule 16 requires the Government to produce only those records that are "within the government's possession, custody, or control." Fed. R. Crim. P. 16(a)(1)(E). The Government's *Brady* obligations likewise extend only to materially favorable evidence within "its possession or control." *Jordan*, 316 F.3d at 1226 nn.15-16. These discovery obligations include materials possessed by prosecutors as well as those possessed by the "prosecution team." *United States v. Antone*, 603 F.2d 566, 569-70 (5th Cir. 1979).[10] There is "no per se rule to determine whether information possessed by one government entity should be imputed to" prosecutors. *Moon v. Head*, 285 F.3d 1301, 1309 (11th Cir. 2002). A court must instead conduct "'a case-by-case analysis of the extent of interaction and cooperation between'" prosecutors and the other entity. *Id.* (quoting *Antone*, 603 F.2d at 570).

Courts typically confront the prosecution-team question when resolving discovery disputes involving "materials in the hands of a governmental *investigatory* agency closely connected to the prosecutor," *Jordan*, 316 F.3d at 1249 (emphasis added), as a prosecution team

---

[9]     Despite *Armstrong*'s "conclu[sion]" that "in the context of Rule 16," the term "defense" "means the defendant's response to the Government's case in chief," 517 U.S. at 462, the Ninth Circuit "do[es] not read *Armstrong* to preclude Rule 16(a)(1)(E) discovery related to the constitutionality of a search or seizure." *United States v. Soto-Zuniga*, 837 F.3d 992, 1000-01 (9th Cir. 2016); *see* ECF No. 262 at 33 (citing *Soto-Zuniga*). But that reading of *Armstrong*, which no other circuit has adopted, would not change the result here. The defendants' claims are grounded in selective-prosecution theories—or, at a minimum, closely related challenges to the decision to bring the case—and do not implicate any sort of Fourth Amendment challenge.

[10]     *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (Fifth Circuit decisions issued before close of business on September 30, 1981, are binding precedent in the Eleventh Circuit).

consists of "*investigative* and *prosecutorial* personnel," *Antone*, 603 F.2d at 569 (emphasis added);

*see* Wayne Lafave et al., Criminal Procedure § 20.3(a) (4th ed. 2023) ("Courts generally agree,

moreover, that the prosecutor's obligations do not extend to agencies that are not 'law enforcement

agencies,' even though they may furnish some information to the prosecution."). The cases thus

focus largely on whether another investigatory entity is part of the prosecution team. *See, e.g.*,

*Antone*, 603 F.2d at 568-70 (considering whether information held by the Florida Department of

Criminal Law Enforcement was in the possession of federal prosecutors); *United States v. Naranjo*,

634 F.3d 1198, 1212 (11th Cir. 2011) (considering whether investigation report by Special Agent

from the Alabama Securities Commission was in the possession of federal prosecutors); *Moon*,

285 F.3d at 1308 (considering whether personnel from the Tennessee Bureau of Investigation was

part of prosecution team headed by a Georgia prosecutor); *see also United States v. Trevino*, 556

F.2d 1265, 1272 (5th Cir. 1977) (holding that probation officers are not part of the prosecution

team, and observing that "[w]ere we considering some type of report held by an arm of the

government other than the probation office—an investigative agency, for example—different

questions would be presented"); *United States v. Stein*, No. 11-CR-80205, 2012 WL 12946757, at

*1 (S.D. Fla. Sept. 26, 2012) (considering whether Securities and Exchange Commission

investigators were part of the prosecution team). Those cases illustrate the sensible proposition

that the prosecution team does not include the entirety of the government or even all agencies that

might have some role in the case (for example, as victims or witnesses), but instead includes

entities that have investigative powers and deploy those powers in investigating or prosecuting the

case. *See United States v. Saab Moran*, No. 19-cr-20450, 2022 WL 4291417, at *4-5 (S.D. Fla.

Sept. 15, 2022) (concluding, for purposes of Rule 16, that agencies including the Department of

Defense, the State Department, the Department of the Treasury, the Office of International Affairs,

the DOJ National Security Division, and the U.S. Coast Guard, although connected in some way

to the case, were not "involved in the underlying investigation leading to th[e] charges" and

therefore were not part of the prosecution team).

In assessing on a case-by-case basis whether an investigatory entity is part of the

prosecution team, the principal consideration under Eleventh Circuit law is whether the prosecutor

has authority over the entity.[11]  *Moon*, 285 F.3d at 1309 (citing *United States v. Meros*, 866 F.3d

1304, 1309 (11th Cir. 1989) (per curiam)); *see Saab Moran*, 2022 WL 4291417, at *4 (entities not

part of the prosecution team where the court was "not convinced that the prosecutors in this case

had 'any authority' over" them).  The authority question, the Eleventh Circuit has explained, may

be viewed through the lens of agency principles: an investigatory entity may fall outside the

prosecution team when it was not "acting as an agent of the" prosecutor or "under the direction or

supervision" of the prosecutor.  *Moon*, 285 F.3d at 1310.  Under governing law, several factors are

relevant to determine whether another investigatory entity distinct from the prosecutors

nonetheless acted as the prosecutors' agent and thus as part of the prosecution team: whether

prosecutors and the separate entity "pooled their investigative energies to a considerable extent,"

*Antone*, 603 F.2d at 569; "collaborate[d] extensively," *Naranjo*, 634 F.3d 1198, 1212 (11th Cir.

---

[11]      The defendants' brief reliance (ECF No. 262 at 29) on the out-of-circuit district court decision on *United States v. Libby*, 429 F. Supp. 2d 1, 6 (D.D.C. 2006), is misplaced.  *Libby* involved a prosecution of a former assistant to the Vice President for obstruction, false statements, and perjury in connection with the unauthorized disclosure of classified information to journalists. *Id.* at 4.  Applying the less demanding D.C. Circuit standard—whether entities are "'closely aligned with the prosecution,'" *see id.* at 6 (quoting *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992))—the district court concluded that specifically requested information from the Office of the Vice President ("OVP") and the Central Intelligence Agency ("CIA") was within the government's control and possession, *id.* at 9-11.  Whatever the merits of that conclusion under the particular facts in *Libby* and the law in the D.C. Circuit, the facts of this case and the applicable Eleventh Circuit law (addressed in the main text of this section) warrant a different conclusion. *See infra* at 41-47 (addressing White House and Intelligence Community).

2011); "engaged in a joint investigation," *Moon*, 285 F.3d at 1310; or whether the separate entity, had it "chosen to do so, could have refused to share any information with the" prosecutors. *Moon*, 285 F.3d at 1310; *see Calley v. Callaway*, 519 F.2d 184, 223-24 (5th Cir. 1975) (en banc) (material not in possession of prosecution team where prosecutors attempted to obtain the material from Congress but were refused access)[12]; *see also United States v. Alexandre*, No. 22-CR-326, 2023 WL 416405, at *5 (S.D.N.Y. Jan. 26, 2023) (considering "the extent to which the other agency (1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings") (quotation marks omitted).  Those factors are consistent with the approach set forth in Department of Justice policy.  *See* David W. Ogden, *Memorandum for Department Prosecutors: Guidance for Prosecutors Regarding Criminal Discovery*, at 3 (Jan. 4, 2010) ("Ogden Memorandum") (identifying the following factors to determine whether another agency may contain potentially discoverable information: (1) "[w]hether the prosecutor and the agency conducted a joint investigation or shared resources related to investigating the case"; (2) "[w]hether the agency played an active role in the prosecution, including conducting arrests or searches, interviewing witnesses, developing prosecutorial strategy, participating in targeting discussions, or otherwise acting as part of the prosecution team"; (3) "[w]hether the prosecutor

---

[12]    By contrast, information held by another entity but "readily available" to prosecutors falls within the Government's custody or control for discovery purposes.  *See United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980); *Trevino*, 556 F.2d at 1272; *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973) (prosecution had ready "access," even if not "present possession"), *overruled on other grounds by United States v. Henry*, 749 F.2d 203, 206 n.2 (5th Cir. 1984).  And as explained in the classified supplement, classified holdings of a member of the Intelligence Community (of the CIA, for example), are not "readily available" to the Government.  *See* Gov't Classified Supp. at 9, 42-43.

knows of and has access to discoverable information held by the agency"; (4) "[w]hether the

prosecutor has obtained other information and/or evidence from the agency"; (5) "[t]he degree to

which information gathered by the prosecutor has been shared with the agency"; (6) "[w]hether a

member of an agency has been made a Special Assistant United States Attorney"; (7) "[t]he degree

to which decisions have been made jointly regarding civil, criminal, or administrative charges";

and (8) "[t]he degree to which the interests of the parties in parallel proceedings diverge such that

information gathered by one party is not relevant to the other party")[13]; *accord* Justice Manual,

§ 9-5.002 (listing same factors).

### C. Defendants are not entitled to discovery of internal government correspondence and memoranda, or to documents that are otherwise privileged.

Not all information that is material and within the "possession, custody, or control" of the

Government within the meaning of Rule 16 is discoverable.  As relevant here, two other doctrines

shield certain materials from disclosure: work product and deliberative process.

The work-product doctrine both "shelters the mental processes of the attorney" and

recognizes that "attorneys often must rely on the assistance of investigators and other agents in the

compilation of materials in preparation for trial."  *United States v. Nobles*, 422 U.S. 225, 238

(1975).  The doctrine thus "reflects the strong 'public policy underlying the orderly prosecution

and defense of legal claims.'"  *United Kingdom v. United States*, 238 F.3d 1312, 1321 (11th Cir.

2001) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510 (1947)); *see Nobles*, 422 U.S. at 238

---

[13]     The Ogden Memorandum "is not intended to have the force of law or create or confer any rights, privileges, or benefits, *see Memorandum for Department Prosecutors*, at 1 (citing *United States v. Caceres*, 440 U.S. 741 (1979)), and no authority supports the proposition that courts "can or should impose . . . specific requirements on a question governed by the district court's discretion, especially based on a document only meant to provide policy guidance."  *United States v. Mazzarella*, 784 F.3d 532, 541 (9th Cir. 2015).

(describing the "work-product doctrine" as "vital" to the "proper functioning of the criminal justice system").  Rule 16, which incorporates the work-product doctrine, "does not authorize" the "discovery or inspection" of "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." Fed. R. Crim. P. 16(a)(2); *see* Rules Committee, 1974 Amendment (noting that reference to "'reports, memoranda, or other internal government documents made by the attorney for the government'" was "included to make clear that the work product of the government attorney is protected"); *see also Armstrong*, 517 U.S. at 463 ("[U]nder Rule 16(a)(2), [a defendant] may not examine Government work product in connection with his case.").  Rule 16(a)(2) thus supplies "unwavering protection" to "all work product in criminal matters," with special focus on "'opinion' work product, such as internal memoranda." *United Kingdom*, 238 F.3d at 1322.

Complementing the work-product doctrine is the deliberative-process privilege.  The deliberative-process privilege applies to "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (quotation marks omitted).  That privilege shields from public disclosure "memoranda and discussions within the Executive Branch leading up to the formulation of an official position." *United States v. Zingsheim*, 384 F.3d 867, 872 (7th Cir. 2004).  For example, courts have relied on the deliberative-process privilege to reject defendants' efforts to obtain discovery on the Department of Justice's internal procedures to determine whether to recommend the death penalty. *See, e.g.*, *United States v. Fernandez*, 231 F.3d 1240, 1247 (9th Cir. 2000); *United States v. Taylor*, 608 F. Supp. 2d 1263, 1269 (D.N.M. 2009).  By shielding such materials from discovery, the

deliberative-process privilege "encourages forthright and candid discussions of ideas and, therefore, improves the decisionmaking process." *Fernandez*, 231 F.3d at 1246. And other, more specific governmental privileges may also apply in particular contexts, including the attorney-client privilege or various executive or national security privileges. *See United States v. Zubaydah*, 595 U.S. 195, 199 (2022); *Zingsheim*, 384 F.3d at 871-72.

## II. Discussion

Applying these principles to the defendants' discovery requests shows that their motion to compel should be denied in full. The defendants group their requests into six main categories, in which they seek: (1) evidence of "improper coordination with NARA to abuse the grand jury process" (ECF No. 262 at 34-38); (2) evidence relating to "the attempt to retroactively terminate President Trump's security clearance and related disclosures" (ECF No. 262 at 38-42); (3) evidence relating to the "use of secure facilities at President Trump's residences" (ECF No. 262 at 42-43); (4) "evidence of bias and investigative misconduct" (ECF No. 262 at 43-52); (5) "all correspondence and/or communications concerning the search of Mar-a-Lago (ECF No. 262 at 55-56); and (6) "CCTV footage" (ECF No. 262 at 56-63) (capitalization altered throughout). These also include two additional uncategorized requests seeking (7) the removal of redactions (ECF No. 262 at 63 n.24); and (8) the production in unclassified discovery of certain materials produced in classified discovery (Classified Supp. at 37-46). Each request (to the extent it seeks evidence that has not already been turned over) fails to establish one or more of the requirements for a motion to compel—namely, that the evidence sought must be material to the defense; must be within the Government's possession, custody, or control; and must not be protected from disclosure by an applicable privilege.

**A. The Court Should Deny Defendants' Requests for Evidence of "Improper Coordination with NARA" and of "Bias and Investigative Misconduct."**

Two of the categories of information sought in the motion to compel can be considered, and rejected, in tandem. Specifically, the requests for evidence purportedly showing "improper coordination with NARA to abuse the grand jury process," ECF No. 262 at 34-38,[14] and evidence of purported "bias and investigative misconduct," ECF No. 262 at 43-55,[15] are both grounded in a request for information that is neither material to the defense, for purposes of Rule 16, nor material to guilt or punishment, for purposes of *Brady*, and should therefore be denied in toto. Moreover, many of the specific requests within these two categories seek evidence from agencies—including NARA, the White House, and the Intelligence Community—that are not part of the prosecution team. And any items that may, in fact, be within the possession, custody, or control of the Government, are privileged and not subject to disclosure. To be clear, the defendants' requests are predicated on a false narrative. The investigation and prosecution of this case have been appropriately driven by the facts and the law, not by any form of political bias. But the question

---

[14]    Within this category, the defendants specifically request: (a) "all reports, notes, and communications concerning the production of documents by NARA to DOJ, FBI, or the Special Counsel's Office and the decision to issue grand jury subpoenas to NARA during the course of those events" (ECF No. 262 at 36); and (b) "the '81' documents referenced in Exhibits 57 and 58, as well as the subset of '19 docs already in DOJ/FBI possession' and the '15/81 flagged for use/ NARA GJ production'" (ECF No. 262 at 38).

[15]    Within this category, the defendants specifically request: (a) "[c]ommunications with prosecution team members regarding the underlying investigation by members, relatives, or associates of the Biden Administration" (ECF No. 262 at 45); (b) "communications between the Biden Administration and prosecutors in Georgia regarding any of the pending prosecutions of President Trump" (ECF No. 262 at 47); (c) "classified materials and supporting documentation relating to the January 6, 2021 submission to the Senate Select Committee on Intelligence by the Intelligence Community Analytic Ombudsman, Dr. Barry Zulauf" (ECF No. 262 at 49); (d) "documents and communications [within NARA] relating to" nine listed topics (ECF No. 262 at 51); (e) "documents and communications reflecting bias and/or political animus toward President Trump by members of the prosecution team" (ECF No. 262 at 51-52); and (f) "additional communications concerning Mr. Woodward, including communications about Mr. Woodward's August 24, 2022, interaction with Mr. Bratt" (ECF No. 262 at 55).

at this juncture is whether the defendants have met the legal standard to compel discovery in support of these false claims. As explained below, they have not.

> 1. ***These selective-prosecution claims are not material to the defense for purposes of Rule 16 and Brady.***

At trial, the jury will be asked to decide whether Trump willfully retained documents containing highly sensitive national defense information at a time when he was not authorized to possess them; whether the defendants conspired to and did obstruct justice; and whether they made false statements to, or engaged in a scheme of concealment toward, the grand jury and the FBI. The jury will not be asked to decide whether the investigation and prosecution of the case were "politically motivated and biased," ECF No. 262 at 43; whether there was "an abuse of the grand jury process," ECF No. 262 at 37; or whether there was some other "defect in instituting the prosecution," Fed. R. Crim. P. 12(b)(3)(A). *See Jones*, 52 F.3d at 927 ("The selective prosecution defense is an issue for the court to decide, not an issue for the jury.").

Ignoring this black letter law, defendants plan to make these precise issues "central" to their defense at trial, ECF No. 262 at 3, and they say as much in their motion to compel. *See, e.g.*, ECF No. 262 at 7 (asserting "evidence of biased participation in the investigation"); *id.* at 38 (referring to "President Trump's bias defense"); *id.* at 40 (referring to "President Trump's bias and due process defenses"); *id.* at 41 (referring to Trump's "defense relating to Intelligence Community bias"); *id.* at 43 (referring to "his defense relating to the politically motivated and biased nature of the investigation that led to the pending charges"); *id.* at 45 (referring to "President Trump's defense regarding the politically motivated nature of the prosecution"); *id.* at 46 (referring to "President Trump's defense that the charges against him are politically motivated"); *id.* at 47 (referring to "President Trump's defense that this prosecution is improper and politically motivated"); *id.* at 47 (referring to "President Trump's political bias defense"); *id.* at 51-52

(seeking evidence "reflecting bias and/or political animus toward President Trump by members of the prosecution team"); *id.* at 52 (asserting "the bias reflected" in an ODAG attorney's "work for a partisan advocacy group"); *id.* at 52 n.22 (referring to "biased posts" on social media from a former attorney at DOJ's Office of Legal Counsel).

Although the motion studiously avoids using the term "selective prosecution," all of the requests seeking evidence of purported bias, coordination, and misconduct are, at bottom, attempts to "challeng[e] the prosecution's conduct of the case," *Armstrong*, 517 U.S. at 462, by alleging that the decision to investigate and prosecute Trump was infected by political bias—a paradigmatic claim of selective prosecution. *See, e.g.*, *United States v. Smith*, 231 F.3d 800, 807-08 (11th Cir. 2000); *Hastings*, 126 F.3d at 313-14; *United States v. Mullins*, 22 F.3d 1365, 1373-74 (6th Cir. 1994); *United States v. Diggs*, 613 F.2d 988, 1003-04 (D.C. Cir. 1979); *United States v. Berrigan*, 482 F.2d 171, 173-74 (3d Cir. 1973); *United States v. Judd*, 579 F. Supp. 3d 1, 4-5 (D.D.C. 2021).

The defendants' discovery requests are therefore governed by *Armstrong*'s rigorous standards. And this would be true even if the defendants could plausibly contend that their claims are grounded in a challenge to the prosecution's conduct of the case *other* than a claim of selective prosecution. *See, e.g.*, *Rashed*, 234 F.3d at 1285-86 (applying *Armstrong* to a request for discovery related to a "'sham prosecution' allegation"); *United States v. Oseguera Gonzalez*, 507 F. Supp. 3d 137, 175 (D.D.C. 2020) (applying *Armstrong* to a request for discovery related to a vindictive-prosecution claim); *United States v. Collins*, No. 5:23-cr-9, 2023 WL 5013053, at *3 (N.D. Fla. Aug. 4, 2023) (applying *Armstrong* to a request for discovery related to a claim of "outrageous government conduct").

The defendants pointedly fail to address, let alone satisfy, the *Armstrong* standard.[16] Instead, they seek to evade it entirely by characterizing their bias claims as part of a "trial defense," ECF No. 262 at 44-45, 50, thereby purporting to trigger the Government's obligations under Rule 16 and *Brady*. These efforts fail.

Their argument rests on a misunderstanding of the "proper division of responsibility between judge and jury in a federal criminal proceeding." *Berrigan*, 482 F.2d at 175. "By both tradition and constitutional mandate the jury is given the responsibility of determining guilt or innocence according to instructions of law delivered by the court." *Id.* But because a selective-prosecution claim "has no bearing on the determination of factual guilt," it presents "an issue for the court to decide, not an issue for the jury." *Jones*, 52 F.3d at 927; *see United States v. Clay*, 618 F.3d 946, 956 (8th Cir. 2010) (per curiam); *United States v. Abboud*, 438 F.3d 554, 579-80 (6th Cir. 2006); *United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983) (per curiam); *Berrigan*, 482 F.2d at 175.

Consistent with that principle, courts in this District and elsewhere routinely preclude defendants from presenting such evidence and argument to the jury. *See, e.g.*, *Abboud*, 438 F.3d at 579-80 (affirming the exclusion of such evidence); *Washington*, 705 F.2d at 495 (same); *Clay*, 618 F.3d at 956 (same); *see also United States v. Grenon*, No. 21-CR-20242, 2023 WL 3947712, at *6 (S.D. Fla. June 12, 2023) (excluding such evidence and explaining, "[t]o the extent

---

[16]     To make such a showing, the defendants would have to identify a similarly situated comparator "who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant—so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan—and against whom the evidence was as strong or stronger than that against the defendant." *Smith*, 231 F.3d at 810. If the defendants attempt to make such a showing in a future motion—as they have forecasted they intend to, *see* ECF No. 242 at 3 (listing "selective prosecution" as an issue they intend to raise)— the Government will address that meritless claim at the appropriate time.

Defendants might suggest to the jury that they should be acquitted based on a theory of selective prosecution, that would plainly be inappropriate," given the "well-settled proposition that '[s]elective prosecution is a defect that has no bearing on the determination of a defendant's factual guilt, and, thus, is an issue for the district court to decide, not the jury" (quoting *United States v. Medina*, 631 F. App'x 682, 686 (11th Cir. 2015)); *United States v. Chugay*, No. 21-CR-10008, 2022 WL 1782583, at \*2 (S.D. Fla. June 1, 2022) (similar); *United States v. Maxwell*, No. 05-CR-20571, 2006 WL 8439795, at \*1 (S.D. Fla. Oct. 4, 2006) (similar).  Presenting such evidence and argument would merely encourage the jury to render a "lawless" verdict, since its "only relevance" would be "to inspire a jury to exercise its power of nullification." *United States v. Funches*, 135 F.3d 1405, 1408-09 (11th Cir. 1998) (quotation marks omitted); *see United States v. Sutton*, 636 F. Supp. 3d 179, 209-10 (D.D.C. 2022) (explaining that "allegations of selective prosecution and alleged [*Brady*] violations," along with "assertions that this is an unprecedented criminal case" are "irrelevant, inappropriate for consideration by the jury, invite jury nullification, and distract from the issues at trial"); *United States v. Sutton*, No. 21-CR-598, 2023 WL 5827718, at \*9 (D.D.C. Sep. 8, 2023) (reiterating "that the 'unprecedented' nature of this prosecution does not justify compelled discovery about the U.S. Attorney's Office's compliance with Justice Manual policies under Rule 16 or any other standard," since the defendants would not be "permitted to argue to the jury or present evidence about the U.S. Attorney's Office charging decisions at trial").

The defendants invoke the principle that the *Brady* doctrine encompasses "'[e]vidence that the defense might have used to impeach the Government's witnesses by showing bias or interest.'" ECF No. 262 at 49 (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)).  To be sure, "the ability to show bias, motive, or prejudice on the part of a witness is an integral part of cross-examination." *Abboud*, 438 F.3d at 580.  But the defendants go to great lengths "to conflate the

concepts of witness bias and selective prosecution." *Id.* "Witness bias speaks to the reliability of the witness," and is properly used to "call[] into question the credibility of that witness'[s] testimony." *Id.* (quotation marks omitted). "Selective prosecution is a separate and distinct claim that the defendant has been unconstitutionally selected for prosecution." *Id.* Here, the Government has produced and will continue to produce evidence that could be used to impeach the testimony of its trial witnesses, including on the basis of bias, motive, or prejudice. But evidence of that nature properly falls within the ambit of Rule 16(a) and *Brady* precisely because it bears on factual guilt or innocence; the defendants' claims that they were improperly targeted for prosecution do not.

The defendants similarly assert that "[a]ttacking the politically motivated nature of a case is one permissible form of impeachment at trial." ECF No. 262 at 44-45 (citing *United States v. Eley*, 723 F.2d 1522 (11th Cir. 1984); *United States v. Cole*, 41 F.3d 303 (7th Cir. 1994); *United States v. Chavez-Vernaza*, 844 F.2d 1368 (9th Cir. 1987)). But the cases on which they rely address a very different issue—namely, whether the government engaged in misconduct during rebuttal closing argument when replying to defense counsel's arguments that impugned the investigation. *See Eley*, 723 F.2d at 1526 ("We find the government's comment a fair response to defendant's attack on the government . . . ."); *Cole*, 41 F.3d at 310-11 ("The prosecutor's response was an appropriate reply to defense's inference of politically motivated investigation and charges."); *Chavez-Vernaza*, 844 F.2d at 1370-71, 1377 (prosecutor's response to accusation "of racism and bigotry" did not constitute reversible error). None of these cases undermines the well-settled proposition that selective-prosecution claims have no place at trial.

Finally, the defendants contend that the *Brady* doctrine allows defendants to "'attack[] the reliability of the investigation' and argue that it was 'shoddy.'" ECF No. 262 at 44 (quoting *Kyles*,

35

514 U.S. at 442 n.13, 446).  But the cases on which they rely stand for the proposition that if evidence regarding the quality or shoddiness of an investigation could shed light at trial on the factual guilt or innocence of the defendant, the failure to disclose such evidence can be a *Brady* violation.  *See Kyles*, 514 U.S. at 445-47 (suppressed evidence showing that the police failed to investigate the key informant, despite ample reason to think that the informant in fact perpetrated the crime and planted evidence on the defendant, was material for *Brady* purposes, since it could have been used at trial to "attack[] the reliability of the investigation").  When this principle is implicated, it is almost universally in cases where the main issue at trial is the perpetrator's identity.[17]  Occasionally, this principle is also implicated when the government's case-in-chief turns largely on the credibility of a particular fact witness.[18]  Neither of those situations is presented here.  Indeed, the defendants' claim is not that the investigation was shoddy, incomplete, or unreliable, but rather that it should not have been undertaken in the first place.  Nothing in *Kyles*,

---

[17]    *See Bowen v. Maynard*, 799 F.2d 593, 610-13 (10th Cir. 1986) (suppressed evidence showing that police failed to adequately investigate a known alternative suspect, and presented the eyewitnesses with a photo array making it more likely they would identify the defendant and less likely that would identify the alternative suspect, was material for *Brady* purposes, since it could have been used at trial "to discredit the caliber of the investigation or the decision to charge the defendant"); *Lindsey v. King*, 769 F.2d 1034, 1042-43 (5th Cir. 1985) (suppressed evidence showing that police failed to investigate a known alternative suspect and that a crucial identification witness initially said that "he did not see the perpetrator's face," was material for *Brady* purposes, since it could have been used at trial to "discredit[] . . . the police methods employed in assembling the case against" the defendant).

[18]    *See United States v. Bagcho*, 151 F. Supp. 3d 60, 67-70 (D.D.C. 2015) (suppressed evidence showing that "a U.S. government agency characterized the most prominent witness against [the defendant] as a fabricator after that witness made non-credible statements about an individual who was a subject of his testimony at trial, and then proceeded to notify the DEA of that assessment," was material for *Brady* purposes, since it could have been used at trial "to attack the reliability of [the] investigation"); *United States v. Quinn*, 537 F. Supp. 2d 99, 115-16 (D.D.C. 2008) (when the government concluded immediately before trial that an anticipated key witness may have lied when he implicated the defendant, the government "was obliged by principles of fairness to inform [the defendant] in a timely manner," since the defendant could have used that information at trial "to conduct a pointed attack on the government's investigation, with its uncritical reliance on" the key witness).

or in any of the other cases on which the defendants rely, suggests that attempts to broadly attack the investigation as politically motivated are admissible at trial or subject to disclosure under *Brady*. *See United States v. McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998) ("[T]he quality or bias of a criminal investigation occasionally may affect the reliability of particular evidence in a trial, and hence, the facts surrounding the government's investigation may become relevant," but otherwise the jury is not "normally asked to render a verdict on the government's investigation."); *United States v. Patrick*, 248 F.3d 11, 22 (1st Cir. 2001) ("[T]he phrase 'inadequacy of the police investigation' is too broad and itself says nothing about the relevance of the proffered evidence. Merely showing that an investigation is sloppy does not establish relevance."); *United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 1994) (per curiam) (affirming exclusion of evidence about the purportedly "sloppy" investigation, since "the jury would not be called upon to determine whether the government's investigation had been good or bad").

Where, as here, there is no "connection between the allegedly 'shoddy' and 'slanted' investigation and any evidence [to be] introduced at trial," a defendant's attempt to attack the investigation would only serve to "divert the jury's attention from the issues of the trial." *McVeigh*, 153 F.3d at 1192; *see United States v. Guzman Loera*, 24 F.4th 144, 160-61 (2d Cir. 2022) (explaining that while "*Kyles* concerned the use of police negligence or misconduct to question the quality of the investigation," the defendant's "arguments concerning prosecutorial bias amount to claims of selective prosecution and outrageous Government conduct, both of which must be decided by the trial court, not the jury"); *United States v. Cousins*, No. 12-CR-865, 2014 WL 5023485, at *6 (N.D. Ill. Oct. 7, 2014) (rejecting discovery request under *Brady* where ordering the discovery "would allow [the defendant] to engage in the type of fishing expedition rejected by the Supreme Court in *Armstrong*" (quotation marks and brackets omitted)).

37

Because the defendants fail to show that any of their requests for evidence of "improper coordination with NARA to abuse the grand jury process," ECF No. 262 at 34-38, or of "bias and investigative misconduct," ECF No. 262 at 43-55, are material to their defense, or material to guilt or punishment, the Court should deny the motion as it relates to the requests falling within these two categories.

> **2.  *Some of these requests seek evidence that does not exist or is not within the Government's possession, custody, or control.***

Some of the requests within these two categories independently fail for a separate reason, since they seek evidence that either does not exist or is not within the Government's possession, custody, or control.

> **a.  *Communications between the prosecution team and "members, relatives, or associates of the Biden Administration."***

The defendants seek the disclosure of "[c]ommunications with prosecution team members regarding the underlying investigation by members, relatives, or associates of the Biden Administration."  ECF No. 262 at 45.  The defendants make no effort to define the term "Biden Administration."  To the extent that term refers to the President, the Vice President, and senior White House political officials, no communications between prosecutors and those individuals (or their family members) exist, let alone communications about the investigation.  To the extent that the defendants request information from specific components within the Executive Branch, that contention is addressed below.

> **b.  *NARA***

The Government has produced to the defendants all discoverable material from NARA within its possession.  The defendants nevertheless ask the Government to "collect from NARA and produce documents and communications relating to" nine specific topics.  ECF No. 262 at 51. The defendants also seek to compel the disclosure of "all reports, notes, and communications

concerning the production of documents by NARA to DOJ, FBI, or the Special Counsel's Office and the decision to issue grand jury subpoenas to NARA during the course of those events." ECF No. 262 at 36. While not entirely clear, it appears that the defendants are referring to "reports, notes, and communications" within NARA's possession, since the Government has already produced non-privileged "reports, notes, and communications" within the possession of the Special Counsel's Office or the FBI.

These requests should be denied for the reasons discussed above, but also because NARA is not part of the prosecution team. The prosecutors do not and did not exert authority over NARA, NARA does not work under the direction or supervision of prosecutors, and NARA does not and did not function as an agent of prosecutors. *See Moon*, 285 F.3d at 1309-10. In January 2022, NARA collected and reviewed 15 boxes from Trump—before any criminal referral had occurred— in furtherance of its core function, which is to serve as the "nation's record keeper." https://www.archives.gov/about. Once NARA made the criminal referral in February 2022, it did not "pool[]" its "investigative energies," *Antone*, 603 F.2d at 569, or undertake a "'joint investigation,'" *Moon*, 285 F.3d at 1310, with prosecutors. Instead, DOJ commenced a separate criminal investigation, and NARA's involvement in the investigation consisted entirely of providing documents and information. For some requests, NARA provided the documents voluntarily; when the Government sought PRA records, however, NARA required a grand jury subpoena, consistent with regulations under the PRA. *See* 44 U.S.C. § 2205(2)(B); 36 C.F.R. § 1270.44(a)(1).[19] No NARA personnel participated in interviews (other than as witnesses),

---

[19]     The defendants appear to suggest (ECF No. 262 at 36) that the Government could have obtained documents from NARA without a subpoena, and therefore the Government was "'forbidden,'" *id.* (quoting *United States v. (Under Seal)*, 714 F.2d 347, 349 (4th Cir. 1983)), from issuing a subpoena. That suggestion is legally and factually flawed. NARA would not produce

Case 9:23-cr-80101-AMC   Document 277   Entered on FLSD Docket 02/02/2024   Page 43 of 67

presented the case to the grand jury, accompanied prosecutors to any court proceedings, or played any role in the development of prosecutorial strategy.[20]  These facts amply demonstrate that NARA was not part of the prosecution team.  *See Moon*, 285 F.3d at 1310.

One of the defendants' specific requests regarding NARA warrants additional discussion: the request to compel disclosure of a group of 81 documents collected by NARA for possible production to DOJ in response to a subpoena.  ECF No. 262 at 37-38.  The basis for the request is the defendants' claim that a report the FBI prepared regarding a May 4, 2023 meeting at NARA "suggest[s] that the Special Counsel's Office instructed NARA not to provide" certain of the 81 documents.  *Id.*  But neither the FBI report nor the notes of a NARA official who attended the meeting (both of which the Government produced) says or even "suggests" any such thing.  They both merely reflect that, upon receipt of a subpoena, NARA initially identified 81 documents that were potentially responsive.  The Government reviewed those documents and determined that only 15 were actually responsive, and NARA "flagged" those 15 for production.  Exhibits 57, 58.  Neither the FBI 302 at Exhibit 57 nor the notes at Exhibit 58 indicate any direction, tasking, or guidance about what NARA should do with the remaining documents, let alone any "instruction

---

PRA-protected material without a subpoena, and even if they had been willing to do so, there is nothing remotely unusual, much less improper, about issuing formal process to a witness who might comply voluntarily.

[20]     The Government's acknowledgement in *United States v. Trump*, No. 23-CR-00257 (D.D.C.) that NARA's Office of the Inspector General ("NARA OIG") participated in the investigation in that case, *see* ECF No. 262 at 17 & n.8, does not mean that NARA is part of the prosecution team here.  NARA OIG's involvement in the election case included participating in witness interviews of individuals outside NARA and coordinating those activities with the FBI, functioning essentially as investigating agents.  None of that occurred here.  In other words, NARA OIG—which is authorized to conduct investigations and make criminal referrals, *see* 5 U.S.C. §§ 401-406—participated in joint investigative activity and pooled investigative resources with prosecutors and investigators on the election case.  That is entirely distinct from the archival and administrative staff at NARA providing information consistent with its status as a victim agency in this case.

to withhold certain of the documents." ECF No. 262 at 38. That mistaken claim distorts an innocuous event by seeing it through the prism of a nonexistent government-wide scheme to target Trump.

c. *The White House*

The defendants' contention (ECF No. 262 at 21) that certain White House Components—including the National Security Council, the White House Counsel's Office, and the White House Office of Records Management—are part of the prosecution team is mistaken for multiple reasons. None of those entities plays an *investigatory* role. *See Jordan*, 316 F.3d at 1249. Prosecutors have no authority over the White House or its constituent parts, which in turn have never served as the prosecutors' agents. *See Moon*, 285 F.3d at 1309-10. None of these entities pooled investigative resources or "collaborate[d] extensively" with prosecutors. *Antone*, 603 F.2d at 569; *Naranjo*, 634 F.3d at 1212. No personnel from the National Security Council, the White House Counsel's Office, the Office of Records Management, or any other White House component participated in any interviews (except as witnesses), presented the case to the grand jury, accompanied prosecutors to any court proceedings, or played any role in the development of prosecutorial strategy. [21] And DOJ's associated contacts with the White House occurred in compliance with the Department's White House Contacts policy, facilitated through the Office of the Deputy Attorney General. *See* Attorney General Memorandum, *Department of Justice Communications with the White House*, at 1 (July 21, 2021) (noting that the Department of Justice has "issued policies governing communication between the Justice Department and the White House" for "more than four

---

[21]     As defendants are already aware, attorneys from the White House Counsel's Office were present during voluntary interviews with four current White House employees who were not represented by outside counsel at the time they were interviewed. *See, e.g.*, Exhibit 61 at USA-00819429.

decades" that were and are "designed to protect our criminal and civil law enforcement decisions, and our legal judgments, from partisan or other inappropriate influences, whether real or perceived, direct or indirect"); *accord* Justice Manual, § 1-8.600. The White House was not and is not part of the prosecution team.

The defendants' contrary arguments lack merit. They contend, for example, that the "National Security Council is part of the prosecution team" because the Government "will be required to rely on personnel from the National Security Council at trial to demonstrate that the documents it authored are classified and constitute information 'relating to the national defense' ('NDI') under 18 U.S.C. § 793(e)." ECF No. 262 at 21. But that simplistic causal argument finds no basis in legal precedent, and would wrongly imply that every government trial witness, or at least every victim, was automatically part of the prosecution team. *See United States v. Burger*, 964 F.2d 1065, 1071 (10th Cir. 1992) (rejecting as "specious" the argument that government entities, the Federal Deposit Insurance Corporation and the Resolution Trust Corporation, that were victims of the offenses were also part of the prosecution team). The defendants likewise contend that "[t]he White House Counsel's Office and WH-ORM are part of the prosecution team because they repeatedly supported the investigative activities of DOJ, FBI, and NARA." ECF No. 262 at 21-22. But that contention wrongly conflates communication and coordination, on the one hand, with the sort of authority-based relationship and joint participation required by prosecution-team analysis in the Eleventh Circuit, on the other.

d. *The Intelligence Community*

The defendants seek (ECF No. 262 at 49) the disclosure of "classified materials and supporting documentation relating to the January 6, 2021 submission to the Senate Select Committee on Intelligence by the Intelligence Community Analytic Ombudsman, Dr. Barry Zulauf." And they appear to seek these materials from an array of entities making up the

Intelligence Community, which, as identified in the Superseding Indictment in this case, encompasses six intelligence agencies and the Department of Defense.  ECF No. 85 ¶ 22.  These entities[22] are not part of the prosecution team for several reasons.

First, like the White House, the members of the Intelligence Community identified in the Superseding Indictment are the victims of Trump's alleged unlawful possession and retention of national defense information.  *See Burger*, 964 F.2d at 1071.  The defendants cite no case to support the far-reaching proposition that any government agency victimized by criminal conduct becomes a part of the prosecution team simply by virtue of providing information to separate entities that carry out the investigation and prosecution.

Second, the Intelligence Community entities at issue here played no investigatory role in this case.  *See Jordan*, 316 F.3d at 1249.  Whatever intelligence-gathering functions the various entities in the Intelligence Community may otherwise possess, they were not issuing subpoenas, formulating investigative strategy, collecting evidence, and interviewing witnesses to further a criminal investigation.  It follows that Intelligence Community members neither "pooled their investigative energies," *Antone*, 603 F.2d at 569, nor "engaged in a joint investigation," *Moon*, 285 F.3d at 1310, with prosecutors.  *See United States v. Saab Moran*, No. 19-cr-20450, 2022 WL 4291417, at *5 (S.D. Fla. Sept. 15, 2022) (finding the CIA not to be part of the prosecution team).

Third, the prosecutors do not exert authority over entities within the Intelligence Community.  *See United States v. Ahmed Alahmedalabdaloklah*, 76 F.4th 1183, 1246-47 (9th Cir. 2023) (concluding that Department of Defense not part of prosecution team where it "did not affirmatively grant the prosecution team access to the many databases and sources of information

---

[22]     This section's references to the "Intelligence Community" include the defendants' claims related to Dr. Zulauf and to all intelligence agencies referenced in the Superseding Indictment.

that [the defendant] wanted the Government to search, and that the prosecution team was relegated to requesting CENTCOM's [a branch of the Department of Defense] assistance to obtain any responsive materials"); *United States v. Chalmers*, 410 F. Supp. 2d 278, 289-90 (S.D.N.Y. 2006) (finding that the Department of Defense, CIA, and certain other federal agencies were not made part of the prosecution team even though they "either conducted their own investigations or made documents available to the prosecution").  As Congress has observed, prosecutors cannot issue directives to Intelligence Community entities, from whom prosecutors must secure permission before presenting any intelligence-community information or documents in court proceedings.  *See* H.R. Rep. No. 96-931 Pt. 1 at 7 (1980) (noting that "pre-indictment or pre-trial talks between the Justice Department and the affected intelligence agency as to what classified information will be released for trial have tended to resemble hostile negotiations between warring parties rather than discussions among those on the same side").

Relatedly, none of the factors on which courts have relied supports a finding that the Intelligence Community was a member of the prosecution team.  No one from any intelligence agency or military component participated in any witness interviews (except as witnesses or counsel to witnesses), was involved in the presentation of the case to the grand jury, played any role in developing prosecutorial or investigative strategy, or accompanied the prosecution to any court proceedings.  Nor were Intelligence Community members under any obligation to share information with prosecutors.  *See Moon*, 285 F.3d at 1310 (considering as a factor tending to show that an agency is not part of the prosecution where the agency had it "chosen to do so, could have refused to share any information with the" prosecutors).

The defendants' counterargument lacks merit.  They contend (ECF No. 262 at 20-21) that the Office of the Director of National Intelligence ("ODNI")'s role in coordinating a classification

review of documents retrieved from Mar-a-Lago renders ODNI and related intelligence components part of the prosecution team.  But that role did not make ODNI part of the prosecution team, for the reasons stated above.  Moreover, the defendants' blanket suggestion that any agency conducting a classification review becomes part of the prosecution team would fashion a per-se rule inconsistent with the "'case by-case analysis of the extent of interaction and cooperation between'" the prosecutors and the relevant entity.  *Moon*, 285 F.3d at 1309 (quoting *Antone*, 603 F.2d at 570).

Nor are the defendants correct (ECF No. 262 at 20-21) that prior Government filings conceded that the Intelligence Community played such a critical role in the criminal investigation so as to become part of the prosecution team.  In opposing a requested civil injunction that would have prevented FBI counterintelligence agents from reviewing seized materials, the declaration filed by FBI Assistant Director for Counterintelligence Alan Kohler simply underscored the importance of coordination between the FBI and other components in the Intelligence Community at that stage of the process.  *See Trump v. United States*, 22-CV-81294, ECF No. 69-1 at ¶¶ 8-9 (S.D. Fla.).  Specifically, the declaration explained that the FBI (with assistance from ODNI, as described above) had to obtain and deliver copies of the documents recovered from Mar-a-Lago to the "appropriate agency or agencies" with "equities in those documents" so those agencies "could assess the potential harms to national security resulting from any improper retention and storage of classified information."  *Id.* at ¶ 7.  Although the FBI's coordination with affected agencies was integral to determining whether "a classified document in the seized materials might have been compromised," those agencies largely had to rely on the FBI's "full suite of authorities and tools to investigate and recover any improperly retained and stored classified information."  *Id.* at ¶ 9.  Moreover, the Intelligence Community agencies were required to conduct this

assessment regardless of whether there was any related criminal investigation, in keeping with their separate and distinct legal obligations and the mission of their agencies.  Just as "extradition proceedings and criminal prosecutions are legally distinct events," *Saab Moran*, 2022 WL 4291417, at *4, so too the Intelligence Community's classification review and risk-assessment process differ from the FBI's criminal investigation.  The role that the Intelligence Community played at the outset in determining the nature and scope of the potential national-security risk did not render them part of the prosecution team that conducted the criminal investigation.

Related to the claim that the Intelligence Community is part of the prosecution team is the defendants' request (ECF No. 262 at 26-27) that the Court deem "personnel from the Counterintelligence Division of the FBI's headquarters" part of the prosecution team.  But the already-produced documents from the FBI case file constitute all discoverable material stemming from the investigating agents' contacts with FBI Headquarters, rendering that request moot.  To the extent that the defendants' request encompasses materials from the Counterintelligence Division beyond those contained in the case file for this case, such as internal correspondence among senior FBI officials, those materials are protected from disclosure under Rule 16(a)(2) for the reasons given in the following section.

### 3.   *The defendants' request for internal communications by members of the prosecution team seeks items not subject to disclosure.*

Finally, to the extent any request seeks material information within the Government's custody and control that takes the form of an internal communications within the Department of Justice or the Special Counsel's Office, such information is privileged from disclosure.  With respect to the Department of Justice generally, the defendants suggest (*see* ECF No. 262 at 22-25, 52) that they are entitled to internal correspondence and other materials from senior Department officials about the August 2022 search and other "key decisions during the investigation."  *Id.* at

25.  Putting aside the defendants' failure to cite a single case to support their broad assertion that high-level officials within the Department of Justice function as part of the prosecution team, any internal discussions about prosecutorial strategy or key decisions fall well within the ambit of the work-product and deliberative-process privileges.  *See United Kingdom*, 238 F.3d at 1322 (work product); *Zingsheim*, 384 F.3d at 872 (deliberative process).  Rule 16 clearly forecloses the defendants' access to any "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case."  Fed. R. Crim. P. 16(a)(2).  Just as the internal communications of a U.S. Attorney are not discoverable—even if he or she, for example, reviewed and approved a warrant application—the defendants here are not entitled to the internal communications of DOJ officials.

Rule 16(a)(2) likewise bars the defendants from accessing the internal files of the Special Counsel's Office.[23]   For example, the defendants seek (ECF No. 262 at 55) to compel "communications concerning Mr. Woodward, including communications about Mr. Woodward's August 24, 2022, interaction with Mr. Bratt."  They justify this request with the conclusory assertion that "such communications would be material to the defense of this action," *id.*, but they make no effort to explain what communications they seek or why they would be discoverable.  In any event, even if such communications existed, they would just as plainly fall within the scope of Rule 16(a)(2) and therefore be undiscoverable.

---

[23] The defendants urge the Court (ECF No. 262 at 25-26) to find that the prosecution team is "not limited to attorneys . . . who consider themselves to be 'working on this case.'"  *Id.* at 25 (citing Exhibit 27 at 1).  But as noted above, *see supra* at 16 n.8, the Government has acknowledged that the prosecution team includes all the prosecutors in the Special Counsel's Office and has fulfilled (and, indeed, exceeded) its discovery obligation on that assumption.

**B. The Court Should Deny Defendants' Requests for Evidence Related to Trump's Security Clearance With The Department of Energy**

The defendants next request evidence related to the "attempt to retroactively terminate President Trump's security clearance and related disclosures." ECF No. 262 at 38-42. This request includes any information concerning "President Trump's security clearances, read-ins, and related training," as well as, "where applicable, the failure to maintain formal documentation and training that is typically required." ECF No. 262 at 40-41. The defendants specifically assert (ECF No. 262 at 41) that the Government must search the Scattered Castles database (a database of security clearances maintained by the Intelligence Community) and a similar database maintained by the Department of Defense (the Defense Information System for Security, which replaced the Joint Personnel Adjudication System). The Government has produced the results of a search in Scattered Castles, which yielded no past or present security clearances for Trump. Exhibit 60. The Government also made a records request to the Department of Defense, which likewise confirmed that neither the Defense Information System for Security nor the Central Verification System reflects a past or present security clearance for Trump. These requests are therefore moot.

The defendants also request (ECF No. 262 at 38-40) information from the Department of Energy ("DOE") about Trump's inclusion in a DOE database of those with a Q clearance (a specific type of security clearance granted by DOE for access to sensitive DOE information) and DOE's determination, reflected in a memorandum already produced to defendants, that the Q clearance granted to Trump at the beginning of his presidency had terminated at the end of his presidency and that DOE databases should be updated to reflect that termination. The defendants specifically request that the Government obtain from DOE: (1) "documents and communications relating to that decision, the drafting of the memorandum, any coordination with other members of the prosecution team on this issue, and the transmission of the memorandum to the prosecution team,"

48

ECF No. 262 at 41; (2) "records relating to President Trump" from DOE's Central Personnel Clearance Index and Clearance Action Tracking System, ECF No. 262 at 42; and (3) information about "how the Energy Department has handled and documented the clearances of prior presidents, ECF No. 262 at 41. The defendants contend (ECF No. 262 at 38, 40, 42) that the requested information about security clearances, read-ins, and training is material to preparing their defense because the evidence is pertinent to Trump's unauthorized possession and willful retention of national defense information under 18 U.S.C. § 793(e).[24] They also contend that the information is "discoverable in light of [his] bias and due process defenses." ECF No. 262 at 40; *see id.* at 41 (claiming evidence is relevant to demonstrating bias in the Intelligence Community). The defendants' requests should be denied for three reasons.

First, the Government has already produced all non-privileged, responsive materials. The Government produced to the defendants through discovery a memorandum authored by an assistant general counsel in DOE, dated June 28, 2023. Exhibit 59. The memorandum stated that DOE had granted a Q clearance to Trump on February 9, 2017, "in connection with his current duties" as President, *see id.*, pursuant to a statutory provision that permits DOE to grant clearances without a background check if doing so is in the national interest, *see* 42 U.S.C. § 2165(b).[25] The

---

[24] The document charged in Count 19 may be viewed by someone holding an active and valid Q clearance. Trump's Q clearance ended when his term in office ended, even though the database was only belatedly updated to reflect that reality. But even if Trump's Q clearance had remained active, that fact would not give him the right to take any documents containing information subject to the clearance to his home and store it in his basement or anywhere else at Mar-a-Lago. No Q clearance holder has authorization to remove documents from a proper place of storage and keep them for himself. And a Q clearance would not even permit access to, much less offsite possession of, the documents charged in Counts 1-18 and 20-32.

[25] The authority to classify and control access to national defense information rests with the President, *see Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988), and accordingly, during their terms in office, Presidents are not required to obtain security clearances before accessing classified information, *see* 50 U.S.C. § 3163 ("Except as otherwise specifically provided, the provisions of

memorandum further stated that when DOE officials learned that Trump remained listed in DOE databases (its Central Personnel Clearance Index and Clearance Action Tracking System) as possessing a Q clearance after his term ended, they determined that Trump's clearance had terminated upon the end of his presidency and that the DOE databases should be updated to reflect that termination. Exhibit 59. In response to the defendants' motion, the Government made a second request for documents to DOE on January 24, 2024, and included the categories of information in Trump's request described above. The Government is now producing approximately 30 pages of responsive materials, while withholding eight emails under the deliberative-process privilege.

Second, to the extent the defendants seek to compel discovery to try to substantiate their so-called bias and due-process defenses, that rationale does not support discovery under Rule 16 or *Brady* for the reasons explained above. *See supra* at 21-23. Similarly, the defendants' request that the Court compel the Government to obtain information from DOE about how it handled security clearances for prior presidents is meritless, as the only possible justifications for seeking that information would be to support a pretrial motion to dismiss for selective prosecution. Rule 16 and *Brady* do not permit that type of fishing expedition.

Finally, the DOE is not part of the prosecution team. Prosecutors do not have authority over DOE or any individuals within DOE, none of whom act under the direction or supervision of

---

this subchapter [dealing with access to classified information] shall not apply to the President and Vice President, Members of the Congress, Justices of the Supreme Court, and Federal judges appointed by the President."). Those exceptions for the President and other high-ranking officials apply only during their terms of office. *See, e.g.*, Executive Order 13526, § 4.4(a) (authorizing access to classified information by former officials, including former Presidents, only under limited and enumerated circumstances).

prosecutors.  Nor has DOE conducted a criminal investigation, let alone pooled its investigative energies with prosecutors to conduct a joint investigation.

### C. The Court Should Deny Defendants' Requests for Evidence Related to Secure Facilities at President Trump's Residences.

The defendants next request that the Court compel the Government to produce evidence related to the "use of secure facilities at President Trump's residences."  ECF No. 262 at 42-43. Specifically, the defendants contend that they are entitled to discovery about the installation by the Secret Service and the White House Communications Agency ("WHCA") of "temporary secure locations" at several of Trump's residences during his presidency, and to "evidence regarding steps the Secret Service took to secure the residences."  ECF No. 262 at 43.  The defendants' claim that the Secret Service is part of the prosecution team apparently underlies these requests.  ECF No. 262 at 27.

The Court should deny defendants' requests for two reasons.  First, as defendants' citation to discovery already provided to them illustrates, *see* ECF No. 262 at 42, the Government has already produced thorough information about the use of secure facilities at Trump's residential locations and steps the Secret Service took to protect Trump and his family.  In response to grand jury subpoenas, the Secret Service provided materials to the Government which have been produced in discovery, including, among other things:

- information for planned or performed work to enhance security at Mar-a-Lago;
- information related to Secret Service vehicles used at Mar-a-Lago;
- records and reports of security breaches at Mar-a-Lago;
- names of Secret Service personnel working at Mar-a-Lago or with Trump's detail;
- Mar-a-Lago guest access procedures;
- Command Post entry log books, diagrams, maps, and other schematics for Mar-a-Lago;
- the fact that, of the approximately 48,000 guests who visited Mar-a-Lago between January 2021 and May 2022, while classified documents were at the property, only 2,200 had their names checked and only 2,900 passed through magnetometers; and

51

- testimony from multiple Secret Service agents stating that they were unaware that classified documents were being stored at Mar-a-Lago, and would not be responsible for safeguarding such documents in any event.

The Government also obtained via subpoena email accounts of three Secret Service agents, disclosed the emails it reviewed, and asked the defense to let the Government know whether they believed they were entitled to additional materials, which they did not do. In addition, the Government produced all information it obtained concerning permanent or semi-permanent secured facilities that could be used to accommodate access to classified information at properties associated with Trump during his presidency, including an FBI 302 from an interview with an individual who served as an officer in the WHCA. Exhibit 61. In short, the Government has produced to the defendants all information it obtained during the investigation relating to temporary secure facilities for review of classified information at any of Trump's properties, or the steps that the Secret Service took relating to security of those properties. To the extent defendants seek to compel the Government to obtain and produce additional information beyond what has been provided, their requests are nonspecific fishing expeditions. *See Jordan*, 316 F.3d at 1250.

In addition, even were the defendants' requests appropriately specific and justified (and they are not), neither the Secret Service nor the WHCA, *see supra* at 41-43 (discussing the White House), is part of the prosecution team. Prosecutors have no authority over the Secret Service or the WHCA, and no Secret Service or WHCA personnel participated in interviews (other than as witnesses), presented the case to the grand jury, accompanied prosecutors to any court proceedings, or played any role in the development of prosecutorial strategy. That Secret Service agents cooperated with the FBI in setting up a meeting or providing access to and escort during the August 2022 search of Mar-a-Lago (ECF No. 262 at 27) is wholly insufficient to make the Secret Service part of the prosecution team.

### D. The Court Should Deny Defendants' Requests for Production of Materials Concerning the Search of Mar-a-Lago.

The defendants argue (ECF No. 262 at 56) that the Government "should be compelled to search for and produce all correspondence about the search of Mar-a-Lago on August 8, 2022." They appear to be focused on the FBI's not having searched a portion of Trump's residence at Mar-a-Lago, but their request also uses some of the same broad, unjustified phrasing that they use in many of their other requests for materials to which they are not entitled under Rule 16.

The Government has already provided considerable materials relating to the August 8, 2022 execution of the search warrant, including the FBI operations plan for the search, the roster of personnel who participated in the search, chain of custody reports and information relating to the transport of evidence seized, detailed information relating to the location of where items were found, CCTV footage from the day of the search, communications obtained from Trump Organization and Mar-a-Lago employees from the day of the search, photographs taken during the search, electronic communications involving FBI management about the planned logistics of the search, witness interviews and grand jury transcripts of various individuals who were present for or involved in the search, detailed inventories of the documents found during the search, and the documents seized. *See, e.g.*, Exhibits 51, 69, 70. To the extent that there are any additional agent communications producible under the Jencks Act that have not already been produced, the Government will produce them before trial. To the extent that the defendants seek additional non-substantive "correspondence about the search" from non-witnesses, that material is not discoverable and their request should be denied. *See United States v. Amlani*, 111 F.3d 705, 713 (9th Cir. 1997) ("Rule 16(a)(2) clarifies that a defendant has an interest in the actual evidence in the government's control, not the government's records of that evidence.").

### E. The Court Should Deny Defendants' Requests for "Production of CCTV Footage."

The defendants ask the Court (ECF No. 262 at 63) to "compel the production of CCTV footage in a manner that is readily accessible to defense counsel." The Government has met and exceeded its discovery obligations for production of CCTV footage, and their request is currently based on easily rectifiable user error, which has now been addressed, rendering the request moot.

The Government made two productions of CCTV footage to counsel for each defendant.[26] These consisted of surveillance footage the Government obtained during the investigation from the Trump Organization, the U.S. Secret Service, and two other entities. The Government provided this third-party CCTV footage via electronic links and offered as a courtesy to deliver to the defense hard drive arrays containing replicas of the CCTV productions.[27] The Government also provided an index of the produced CCTV footage, and specific clips of CCTV footage referenced in the Superseding Indictment or otherwise identified as pertinent to the case. To further facilitate ease of review, the Government later created and distributed to defense counsel an additional detailed index of footage obtained during the investigation, that included camera names, locations, camera type, date range of footage received, and production/source log details.

In correspondence accompanying each discovery production, the Government offered to help defense counsel if they had any questions about how to access the production sets, or any

---

[26] The Government provided counsel for Trump a link to the first CCTV production on June 21, 2023, and a link to the second CCTV production on July 31, 2023. ECF Nos. 30, 80. Counsel for Nauta received a link to the first CCTV production on July 6, 2023, and a link to the second CCTV production on July 31, 2023. ECF Nos. 59, 80. Counsel for De Oliveira received a link to both CCTV productions on August 11, 2023. ECF No. 113.

[27] Counsel for Trump accepted the Government's offer of a hard drive array within days of each production, and the Government produced it promptly. The Government made the same offer to counsel for Nauta on July 6 and to counsel for De Oliveira on August 11, but neither responded until October 2, 2023. The Government sent them each a hard drive array via FedEx that same day.

difficulty doing so.  Counsel for Trump has never reported to the Government being unable to view the footage as produced, and as detailed below, whenever the Government has received notice from the other defendants that they were having difficulty, it has responded quickly.

In an email on October 24, 2023, months after the materials were made available to the defense, counsel for De Oliveira for the first time mentioned problems that he had encountered when attempting to access specific CCTV files that the Government had obtained from the Trump Organization and produced in discovery.  The Government immediately arranged a call with counsel and technical personnel from the FBI to help resolve the reported issues.  Exhibit E at 2-3.  During the call, counsel for De Oliveira explained that he did not own or have access to a laptop or desktop computer and was instead attempting to review the entirety of the Government's discovery on a handheld tablet.  *Id.*  The Government then offered to lend him a laptop computer to facilitate his review.  *Id.*  Counsel for De Oliveira accepted the offer, and on November 1, 2023, the Government hand-delivered a computer to him.  Since then, whenever De Oliveira's counsel has raised technical issues with viewing specific Trump Organization CCTV files, the Government has promptly assisted with resolving these inquiries, providing tips and examples, and offering to set up calls as needed.  *See* ECF No. 252 at 2 n.1.

Counsel for Nauta was copied on the October 24, 2023 email and reported "having the same issues" as counsel for De Oliveira.  Exhibit E at 3.  The Government extended the same laptop offer to Nauta's counsel, who accepted the offer but noted that he planned to "return it promptly assuming I have the same issues."  *Id.* at 2.  The Government also emailed defense counsel with additional suggestions to facilitate expedited review of CCTV footage, and counsel for Nauta responded within minutes, explaining that he planned to "run a test to extract data" to a separate drive, "and report back" about how it went.  *Id.* at 1.  The computer was delivered to

Nauta's counsel on November 1, and has not been returned.  The Government heard nothing from Nauta's counsel about CCTV for more than two months and thus reasonably believed that defense counsel had watched and was continuing to review the footage.

Then, on January 11, 2024, Nauta's counsel confirmed that he was able to extract all of the files but had encountered difficulty attempting "to launch the [M]ilestone video application." Exhibit F.  Counsel's reference to "Milestone" was to a proprietary media player and camera system vendor platform used by the Trump Organization to record, archive, and play video footage. In response, the Government worked with counsel to identify his misstep in attempting to launch the player and provided detailed instructions and screenshots about how to do so.  Exhibit G.  This most recent problem—the apparent basis for the statement in defendants' brief that "[d]efense counsel for Mr. Nauta was not able to launch the proprietary video player at all" (ECF No. 262 at 61)—omits that for over two months he did not even attempt to launch the player the Government provided (on the laptop that the Government also provided), and did not do so until days before the motion to compel was due.  In any event, once notified of the problem, the Government provided prompt assistance in diagnosing the simple and easily correctable user error that has now been resolved.[28]

Defendants' contention that the Government "first alter[ed] the raw data it received and then knowingly produc[ed] it in a way that rendered [it] unviewable," ECF No. 262 at 63, is false. First, a majority of the CCTV footage was provided by the Trump Organization, which, as noted, utilizes a proprietary player called Milestone.  As a result, the Government's available options for

---

[28]     During the consult with Nauta's counsel, the Government requested that he advise if the information provided did not resolve his difficulty.  Exhibit G at 1.  The Government has heard nothing since.

production were limited by the original source's information technology systems and data management practices.  The Government produced both the proprietary player and the video files in the same format that they were received.  The only intervening step was the standard practice of compressing the footage to facilitate containerizing the individual files and confirming via hash verification that all footage the Government obtained was produced.  The defendants' attempt to equate the standard practice of compressing files with deliberately altering those files to render them "unviewable" is misleading and baseless.  Second, the Government's history of prompt responsiveness in helping counsel navigate any technical problems, including making FBI technical support available and providing laptops to counsel, belies the defendants' characterization of the Government as delaying or impeding counsel's ability to view the footage.

The Government has produced the CCTV footage in an accessible format and has also taken several additional steps to facilitate ease of review for defense counsel, all of whom are able to access and view the footage.  Accordingly, the Court should deny as moot the defendants' unsupported request for an order compelling production of the CCTV footage in an accessible format.

### F.  Defendants' Request for Unredacted Discovery of Materials Should Be Denied

In a footnote at the end of the defendants' motion is a broad request to compel the Government to produce "unredacted copies of discovery previously produced to Defendants in redacted form." ECF No. 262 at 63 n.24.  Redactions to the discovery in this case were made for information such as the FBI's case file number, the email addresses of FBI employees, classification markings that no longer applied to now-unclassified documents, and other similarly non-discoverable information.  None of the redactions contains *Brady*, *Giglio*, or Rule 16 material.

The defendants have not articulated why redactions in particular documents contain information that is materially helpful to the defense, as required by the case law. *Jordan*, 316 F.3d

at 1250; *United States v. Gatewood*, No. 11-CR-08074, 2012 WL 2286999, at *2 (D. Ariz. June 18, 2012) ("Defendant has made no argument that he requires any specific portions of the redacted information.  If Defendant can specify what information he needs and can provide a reason that it is material to his case, the Court might order disclosure. . . . Defendant has no general right to unredacted discovery . . ."); *United States v. Hasan-Hafez*, No. 16-CR-221, 2017 U.S. Dist. LEXIS 211562, at *7 (S.D.N.Y. July 20, 2017) ("Beyond his bare assertion that the redacted material must be relevant because it is redacted, [the defendant] offers no cognizable basis for his complaint.  He is not entitled to unredacted witness statements and reports at this time—aside from those portions which may constitute *Brady* material []—and his requests for unredacted materials . . . are denied.").  Their request, accordingly, should be denied.

### G.  Defendants Nauta and De Oliveira's Requests for Disclosure of Non-classified Discovery Should be Denied as Moot

In the defendants' classified supplement, counsel for defendants Nauta and De Oliveira move to compel the Government to produce in unclassified discovery unclassified information that was produced in classified discovery.  *See* Classified Supp. at 37-46.  That request should principally be denied as moot because the Government has already produced such material, despite the fact that such evidence is not relevant to Nauta and De Oliveira.  The examples they provide were in fact produced in unclassified discovery and are equally accessible to their clients—with the exception of one two-page document, discussed below.

The first such example is search warrant photos.  As the Government explained in an unclassified filing, ECF No. 199 at 5, it produced in classified discovery a disc containing 501 photographs from the execution of the search warrant at Mar-a-Lago, which included about 456 unclassified photographs that had already been provided in unclassified discovery.  The photographs that Nauta and De Oliveira complain were "inexplicabl[y]" not produced in

unclassified discovery, DSC_0038.jpg and DSC_0059.jpg, in fact appear at USA-00042896 and USA-00042917, respectively, in the Government's first unclassified production.

Nauta and De Oliveira also claim they are entitled to the unclassified portions of classified transcripts. The Government conducted 20 interviews during which classified information was reviewed or discussed, many of which were audio-recorded. These interviews did not include discussions about Nauta's or De Oliveira's conduct and are irrelevant to them because they are not charged with unlawful retention of national defense information. Nevertheless, in unclassified discovery, the Government has produced or will soon produce unclassified portions of the classified transcripts to Nauta and De Oliveira.

Nauta and De Oliveira spend more than two pages in the classified supplement quoting from interviews of a retired Navy admiral and a former Trump Administration official, arguing that those interview materials should be available in unclassified discovery. But the interview of the retired admiral has been available to them since last summer, as specifically explained to counsel in a September 28, 2023 discovery letter. The same letter explained that although the interview transcript for the former Trump Administration official is classified, the associated FBI 302 is not, and had already been produced in unclassified discovery. The Government is providing unclassified portions of that interview transcript as well.

Finally, the Government has already produced in unclassified discovery documents previously produced in classified discovery that are unclassified, or that the relevant equity holders have determined no longer need to be protected and have declassified. *See* ECF No. 235 at 1. That material includes four of the five documents that Nauta and De Oliveira list in their table at pages 45-46 of the classified supplement:

| Classified Bates | Unclassified Bates |
|---|---|
| 1975 | USA-01285944–USA-01285945 |
| 1977 | USA-01285946–USA-01285957 |
| 1990 | USA-01285959–USA-01285960 |
| 1992 | USA-01285961–USA-01285972 |

The Government informed defense counsel in a December 6, 2023 discovery letter that it was producing in unclassified discovery material previously produced in classified discovery.[29]  The defendants fail to acknowledge these productions in their motion.

The only item from the defendants' table that was not produced in unclassified discovery is a November 29, 2017 email.  That two-page email, while marked unclassified, was not produced in unclassified discovery because it has no independent relevance apart from its connection to the broader 60-page package of classified material in which it is included.  Despite having seen this two-page email in classified discovery, counsel for Nauta and De Oliveira offer no explanation for why it would be material to their defense—which is unsurprising since their clients are not charged with unlawful retention of national defense information.  Accordingly, the Court should deny Nauta and De Oliveira's request for this email and deny the remainder of their requests on this score as moot.

**CONCLUSION**

For all of these reasons, the Court should defendants' motions to compel in their entirety.

---

[29]   In an email on December 8, the Government assisted the defense in correlating the productions by noting that the Bates numbers from the classified production were still visible on many of the documents produced in unclassified discovery, and by providing a list of corresponding Bates numbers for those documents where such numbers were not visible.

Respectfully submitted,

JACK SMITH
Special Counsel
N.Y. Bar No. 2678084

By:     /s/ *David V. Harbach, II*
        David V. Harbach, II
        Assistant Special Counsel
        Special Bar ID #A5503068
        950 Pennsylvania Avenue, N.W.
        Washington, D.C. 20530

        Jay I. Bratt
        Counselor to the Special Counsel
        Special Bar ID #A5502946

February 2, 2024

## Appendix: Table of Defense Requests

| | Request |
|---|---|
| | ***"Improper Coordination with NARA to Abuse the Grand Jury Process"*** |
| 1.A | "[Disclose] all reports, notes, and communications concerning the production of documents by NARA to DOJ, FBI, or the Special Counsel's Office and the decision to issue grand jury subpoenas to NARA during the course of those events." (ECF No. 262 at 36) |
| 1.B | "[I]dentify and disclose the '81' documents referenced in Exhibits 57 and 58, as well as the subset of '19 docs already in DOJ/FBI possession' and the '15/81 flagged for use/NARA GJ production.'" (ECF No. 262 at 38) |
| | ***"The Attempt to Retroactively Terminate President Trump's Security Clearances"*** |
| 2.A | "[P]roduce documents and communications relating to [the decision in DOE's memorandum], the drafting of the memorandum, any coordination with other members of the prosecution team on this issue, and the transmission of the memorandum to the prosecution team." (ECF No. 262 at 36) |
| 2.B | "[D]isclose how the Energy Department has handled and documented the clearances of prior presidents." (ECF No. 262 at 41) |
| 2.C | "[P]roduce all records relating to President Trump, including any modified or amended records, from the Energy Department's Central Personnel Clearance Index and Clearance Action Tracking System." (ECF No. 262 at 42) |
| | ***"Use of Secure Facilities at President Trump's Residences"*** |
| 3 | "[D]isclose all evidence relating to what the [Government] previously described to the Court as 'temporary secure locations' at Mar-a-Lago, Bedminster, and Trump Tower and related SCIFs at 'offsite locations.'" (ECF No. 262 at 42) |
| | ***"Evidence of Bias and Investigative Misconduct"*** |
| 4.A | "[Produce] any communications between members of the prosecution team and members, relatives, or associates of President Biden concerning the investigation . . . ." (ECF No. 262 at 47) |
| 4.B | "[P]roduce any documents further reflecting this coordination [between the Biden Administration and Georgia prosecutors]." (ECF No. 262 at 48) |
| 4.C | "[P]roduce all of the underlying materials relating to the congressional submissions by Ratcliffe and Dr. Zulauf." (ECF No. 262 at 50) |

| | |
|---|---|
| 4.D | "[C]ollect from NARA and produce documents and communications relating to the following [nine] specific topics." (ECF No. 262 at 51) |
| 4.E | "[P]roduce documents and communications reflecting bias and/or political animus toward President Trump by members of the prosecution team." (ECF No. 262 at 51–52) |
| 4.F | "[Produce] communications concerning Mr. Woodward, including communications about Mr. Woodward's August 24, 2022, interaction with Mr. Bratt." (ECF No. 262 at 55) |
| | ***"Production of all Correspondence and/or Communications Concerning the Search of Mar-a-Lago"*** |
| 5 | "[S]earch for and produce all correspondence about the search of Mar-a-Lago on August 8, 2022." (ECF No. 262 at 56) |
| | ***"Production of CCTV Video Footage"*** |
| 6 | "[Produce] CCTV footage in a manner that is readily accessible to defense counsel." (ECF No. 262 at 63) |
| | ***Uncategorized*** |
| 7 | "[P]roduce unredacted copies of discovery previously produced to Defendants in redacted form."  (ECF No. 262 at 63 n.24) |
| 8 | Produce in unclassified discovery information that was previously produced in classified discovery.  (Classified Supp. at 37-46) |

**CERTIFICATE OF SERVICE**

I hereby certify that on February 2, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which in turn serves counsel of record via transmission of Notices of Electronic Filing.

/s/ *David V. Harbach, II*
David V. Harbach, II