UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 23-80101-CR-CANNON(s)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | **Filed *Ex Parte*, *In Camera*, and** |
| DONALD J. TRUMP, | ) | **Under Seal with the Classified** |
| WALTINE NAUTA, and | ) | **Information Security Officer** |
| CARLOS DE OLIVEIRA, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S UNCLASSIFIED BRIEF REGARDING ITS CLASSIFIED *EX PARTE*, *IN CAMERA*, UNDER SEAL MOTIONS FOR AN ORDER PURSUANT TO CIPA SECTION 4 AND FED. R. CRIM. P. 16(d)(1) WITH RESPECT TO DEFENDANTS NAUTA AND DE OLIVEIRA**

### I.  Introduction

On December 6, 2023, the Government filed with the Classified Information Security Officer ("CISO") Motions and supporting materials *ex parte*, *in camera*, and under seal pursuant to CIPA Section 4 and Rule 16(d)(1) related to Defendants Waltine Nauta and Carlos De Oliveira, because an adversarial or public proceeding would result in the unauthorized disclosure of classified information. The Government now files this brief reflecting portions of the December 6, 2023 motions that can be filed publicly without disclosing classified information.

These motions seek three forms of relief as to the two defendants: (1) deleting nearly all of the approximately 5,000 pages of classified discovery as to them and withholding the motions and the supporting declarations and exhibits from both them and their cleared counsel; (2) deferring production to them personally of any classified

materials the Government will seek to offer in evidence at trial until after the conclusion of proceedings under CIPA Section 6; and (3) providing redacted and substituted versions of three categories of classified information to cleared counsel only and deleting a fourth category in its entirety from all parties.[1]

Defendants Nauta and De Oliveira have requested access to all the classified discovery. These materials contain some of the country's most sensitive national security secrets. Nauta and De Oliveira do not possess a security clearance, and De Oliveira never has. Moreover, they have been charged with serious offenses that bear directly on their integrity and trustworthiness. These facts standing alone should end any inquiry into their entitlement to this information.

But even more, Nauta and De Oliveira have no need to know the substance of any classified documents in this prosecution and thus should not be given access to any of them, apart from Nauta's entitlement to any documents seized from him and, for both defendants, those that will be trial exhibits. The remaining materials are in no way germane to any of the charges they face. The superseding indictment accuses these defendants of conspiring to obstruct, and obstructing, compliance with a grand jury subpoena requiring production of all documents bearing classification markings in Trump's custody and a second grand jury subpoena seeking production of certain video surveillance footage from Trump's residence and club at Mar-a-Lago. Nauta is also charged with making false statements to the Federal Bureau of Investigation ("FBI") about the location and movement of boxes at Mar-a-Lago that were later found to contain

---

[1] The Government contemporaneously filed an *Ex Parte*, *In Camera*, Under Seal CIPA Section 4 Motion related to defendant Donald J. Trump (hereinafter, "Trump Section 4 Motion").

hundreds of documents with classification markings. At most, at this stage of the proceedings, Nauta and De Oliveira are entitled to confirmation that the documents were indeed marked classified. In this regard, they stand in contrast to their co-defendant Trump, who, in addition to being charged with obstruction offenses, is charged with thirty-two counts of willfully retaining national defense information ("NDI") in violation of 18 U.S.C. § 793. As to defendant Trump, whether each document underlying these counts contains NDI is an essential element of the § 793 charges he faces, rendering the content of those documents material as to him. It is because of those charges that there is classified discovery in this case and that the volume of discovery is several thousand pages. But all that information is almost entirely irrelevant with respect to Nauta and De Oliveira and (apart from trial exhibits and anything seized from the defendant) is outside the Government's discovery obligations under Rule 16(a)(1)(E).

In order to ensure an efficient trial of this case, under the Court's CIPA Section 3 protective order, Nauta's and De Oliveira's counsel have been granted access to all of the classified discovery. Counsel's ability to review these materials more than protects Nauta's and De Oliveira's due process rights. The Court should maintain the status quo as set forth in the protective order with respect to Nauta's and De Oliveira's access to classified discovery.[2]

---

[2] The Government maintains, as set forth previously, ECF No. 162, that this matter should be addressed pursuant to CIPA Section 3 because CIPA Section 3 rather than Section 4 governs protective orders that provide for disclosure of classified information to defense counsel but restrict access by individual defendants. Nonetheless, the Government files this Section 4 motion to comply with the Court's Order, ECF No. 202.

With respect to Nauta's and De Oliveira's cleared counsel separately, as noted above, this motion also concerns four categories of classified information that are in the Government's possession.

The Government is filing with the Classified Information Security Officer ("CISO") or his designee this Motion and supporting materials *ex parte*, *in camera*, and under seal pursuant to CIPA Section 4 and Rule 16(d)(1), because an adversarial or public proceeding would result in the unauthorized disclosure of classified information. As discussed at greater length below in Section III.A.1., an *ex parte, in camera* procedure is appropriate under CIPA to protect classified information. *See United States v. Campa*, 529 F.3d 980, 995 (11th Cir. 2008). The *ex parte* procedure is necessary in the particular circumstances of this case because, as discussed in Section IV., *infra*, the classified information included in that section of the motion addressing withholdings from Nauta and De Oliveira, as well as the supporting declarations, go beyond the classified information that Nauta's and De Oliveira's cleared counsel have received in discovery and have a need-to-know. Moreover, the information discussed in Section V., *infra*, is information that the Government seeks to withhold from cleared counsel as well as Nauta and De Oliveira, and allowing cleared counsel or any defendant to see the motion or supporting declarations would defeat its purpose. *See Campa*, 529 F.3d at 955.

Based on these submissions, the Government requests that the Court, pursuant to CIPA Section 4 and Rule 16(d)(1): (1) conduct an *ex parte, in camera* review of the Government's submission; (2) issue a classified, *ex parte* Order authorizing the Government not to disclose certain classified materials described more specifically below in Sections IV. and V., because this information is not exculpatory, relevant and helpful

to the defense, or essential to a fair determination of the case, *see Roviaro v. United States*, 353 U.S. 53 (1957), and *United States v. Yunis*, 867 F.2d 617, 620 (D.C. Cir. 1989) (proposed order attached as **Exhibit D**); (3) issue an unclassified Order in the form provided herein (proposed order attached as **Exhibit E**); and (4) order that the entire text of this Motion, and the accompanying exhibits, shall not be disclosed to the defense and shall be sealed and preserved in the Court's records to be made available for all future review of these proceedings. As discussed more fully below, good cause exists to protect these materials from discovery, because the disclosure of the materials would cause exceptionally grave or serious damage to the national security of the United States.[3]

Section II. below provides background information to place the requests in this Motion in context for the Court and assist the Court in making the requisite determinations under *Roviaro* and *Yunis*. Section III. explains the legal grounds for the requests set forth in this Motion and the accompanying proposed Orders. Section IV. applies the law to the relevant facts with respect to Nauta's and De Oliveira's access to classified discovery and counsel's access to that portion of the filing and the relevant supporting materials. Section V. applies the law to the relevant facts with respect to deletions from discovery as to Nauta's and De Oliveira's counsel and to them.

---

[3] As discussed below, Rule 16(d) of the Federal Rules of Criminal Procedure authorizes the Court, for good cause, to deny, restrict, or defer discovery. Section 4 of CIPA further permits the Court, upon a sufficient showing by the Government, to authorize the Government to "delete specified items of classified information" from discovery.

## II. Factual Background

### A.    The Indictment

On June 27, 2023, a grand jury in this district returned a superseding indictment against the defendants, in which Trump was charged with, *inter alia*, 32 counts of willful retention of national defense information, in violation of Title 18, United States Code, Section 793(e). ECF No. 85. While Trump is charged with violating 18 U.S.C. § 793 by unlawfully retaining documents relating to the national defense, Nauta and De Oliveira are not. Nauta and De Oliveira are charged with conspiring to hide records from a grand jury—documents with classification markings and Mar-a-Lago security camera footage—and making false statements about their conduct. *See* Superseding Indictment ¶¶95, 99, 101, 103, 105, 112, 114, 116, 120.

As described in the Indictment, Nauta was a member of the United States Navy stationed as a valet during Trump's presidency who, beginning in August 2021, became an executive assistant in The Office of Donald J. Trump and served as Trump's personal aide or "body man." *Id.* ¶9. Between November 2021 and January 2022, Nauta and another Trump employee, at Trump's direction, brought boxes from a storage room at Mar-a-Lago to Trump's residence for Trump to review. *Id.* ¶39. On one occasion in December 2021, Nauta found several of Trump's boxes spilled on the floor of the storage room and took a photograph of the spilled box, in which a document with classified information is visible. *Id.* ¶32. In January 2022, Nauta and another Trump employee gathered 15 boxes from Trump's residence, loaded the boxes in Nauta's car, and took them to a commercial truck for delivery to the National Archives and Records Administration ("NARA"). When interviewed by the FBI in May 2022, Nauta made

false statements about this conduct. *Id.* ¶48. For example, he falsely stated that he was not aware of Trump's boxes being brought to Trump's residence for Trump's review before Trump provided the 15 boxes to NARA even though Nauta had personally moved many of the boxes from the storage room to Trump's residence. *Id.* Nauta falsely stated that he did not know how the boxes that he (and the other employee) brought from Trump's residence to the commercial truck for delivery to NARA had gotten to Trump's residence. *Id.* Nauta feigned ignorance to the FBI on these topics while claiming to be honest; when asked whether he knew where Trump's boxes had been stored before they were in Trump's residence and whether they had been in a secure or locked location, Nauta falsely responded, "I wish, I wish I could tell you. I don't know. I don't—I honestly just don't know." *Id.*

As also described in the Indictment, beginning in January 2022, De Oliveira was employed as the property manager at The Mar-a-Lago Club; prior to holding that position, he was a valet there. *Id.* ¶10. De Oliveira did not serve in Trump's Administration (nor has never worked for the United States Government or held a security clearance). On May 11, 2022, a grand jury in the District of Columbia issued a subpoena (the "May 11 Subpoena") to The Office of Donald J. Trump requiring the production of all documents with classification markings in Trump or his Office's possession, custody, or control. *Id.* ¶53. On June 2, "Trump Attorney 1" conducted a review of boxes in the Mar-a-Lago storage room for documents responsive to the May 11 Subpoena. *Id.* ¶59. Between May 23 and June 2, Nauta moved approximately 64 boxes from the Mar-a-Lago storage room to Trump's residence, and on the morning of June 2, Nauta and De Oliveira brought to the storage room approximately 30 boxes. *Id.* ¶63.

Later that month, on Friday, June 24—the same date as the issuance of a grand jury subpoena for security camera footage at Mar-a-Lago—Nauta changed his weekend travel plans, and on June 25, he traveled from New Jersey (where Trump was residing at that time) to Mar-a-Lago. *Id.* ¶¶77, 81. Nauta provided inconsistent explanations to his colleagues for his sudden travel to Florida. *Id.* ¶79. He informed one person that he would not be traveling to Florida because he had a family emergency, using "shushing" emojis; claimed to a Secret Service agent that he had to check on a family member in Florida; and after he arrived in Florida, he told the same Secret Service agent that he was in Florida for work. *Id.* Prior to Nauta traveling from New Jersey to Mar-a-Lago, De Oliveira told a valet, "Trump Employee 5," that Nauta was coming to Mar-a-Lago but that Nauta wanted his trip to remain a secret. *Id.* ¶¶77, 81. During Nauta's Florida trip, De Oliveira approached the Director of Information Technology ("IT") at The Mar-a-Lago Club, "Trump Employee 4," and De Oliveira told the IT Director that "the boss" wanted the server (relating to camera footage) deleted. *Id.* ¶84. Nauta met with De Oliveira before and after that conversation. *Id.* ¶¶82, 86. The Indictment nowhere alleges that De Oliveira was aware of the contents of the boxes he moved.

### III. Legal Standards Governing CIPA

CIPA governs how federal courts address and process pretrial matters concerning the discovery, admissibility, and use of classified information in criminal cases. *See United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1363 (11th Cir. 1994). CIPA's fundamental purpose is to "'harmonize a defendant's right to obtain and present exculpatory material upon his trial and the government's right to protect classified material in the national interest.'" *United States v. Pappas*, 94 F.3d 795, 799 (2d Cir.

1996) (quoting *United States v. Wilson*, 571 F. Supp. 1422, 1426 (S.D.N.Y. 1983)).  By its plain terms, CIPA "'evidence[s] Congress's intent to protect classified information from unnecessary disclosure at any stage of a criminal trial'" while simultaneously ensuring that a defendant's right to present evidence in his defense is not compromised. *United States v. Apperson*, 441 F.3d 1162, 1192 n.8 (10th Cir. 2006) (quoting *United States v. O'Hara*, 301 F.3d 563, 568 (7th Cir. 2002)).

"CIPA was not, however, intended to expand the traditional rules of criminal discovery under which the government is not required to provide criminal defendants with information that is neither exculpatory nor, in some way, helpful to the defense." *United States v. Varca*, 896 F.2d 900, 905 (5th Cir. 1990); *see also United States v. Jordan*, 316 F.3d 1215, 1250 (11th Cir. 2003) (under Rule 16, a document or tangible item in the Government's possession need not be disclosed unless the defendant demonstrates it is material to the preparation of his defense by making "a specific request for the item together with an explanation of how it will be helpful to the defense") (internal quotations omitted).   CIPA creates no new rule of evidence regarding admissibility; rather, the statute mandates procedures accommodating the Government's privilege in classified information. *See Yunis*, 867 F.2d at 623; *see also United States v. Johnson*, 139 F.3d 1359, 1365 (11th Cir. 1998); *United States v. Mejia*, 448 F.3d 436, 455 (D.C. Cir. 2006); *Baptista-Rodriguez*, 17 F.3d at 1363-64.

### A.   Federal Law Permits the Government To Move *Ex Parte, In Camera* for an Order Restricting Discovery

Pursuant to CIPA Section 4 and Rule 16(d)(1), the Government requests that the Court conduct an *ex parte, in camera* review of the Government's submission. Rule 16(d)(1) provides that "[a]t any time, the court may, for good cause, *deny, restrict, or defer* discovery or inspection, or grant other appropriate relief," and that "[t]he court may permit a party to show good cause by a written statement that the court will inspect ex parte" (emphasis added). *See also United States v. Innamorati*, 996 F.2d 456, 487 (1st Cir. 1993).

Congress also provided a mechanism in CIPA for the Government to move *ex parte* and *in camera* for permission to restrict discovery of classified information. The purpose of CIPA is "to protect classified information from unnecessary disclosure at any stage of a criminal trial." *O'Hara*, 301 F.3d at 568. Specifically, among other things, CIPA Section 4 provides:

> The court may permit the United States to make a request for [relief from discovery] in the form of a written statement to be inspected by the court alone. If the court enters an order granting relief following such an ex parte showing, the entire text of the statement of the United States shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.

18 U.S.C. App. 3 § 4. CIPA Section 4 was enacted to "clarify[ ] the court's powers under Federal Rule of Criminal Procedure 16(d)(1) . . . because some judges have been reluctant to use their authority under the rule." S. Rep. No. 96-823, at 6 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 4294, 4299-4300.

Courts have consistently upheld the *ex parte* and *in camera* nature of motions under Rule 16(d)(1) and CIPA Section 4. *See Campa*, 529 F.3d at 995 ("The right that

section four confers on the government would be illusory if defense counsel were allowed to participate in section four proceedings because defense counsel would be able to see the information that the government asks the district court to keep from defense counsel's view."); *see also Mejia*, 448 F.3d at 459 (approving CIPA Section 4 *ex parte* hearing); *O'Hara*, 301 F.3d at 567-68 (district court properly conducted *ex parte, in camera* review to determine whether classified information was discoverable); *United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988) (*ex parte* proceedings concerning national security information are appropriate under CIPA § 4); *United States v. Pringle*, 751 F.2d 419, 427-28 (1st Cir. 1984).

CIPA Section 4 requires no particular showing before the Court may grant a request to proceed *ex parte* and *in camera*. *See Sarkissian*, 841 F.2d at 965-66; *Pringle*, 751 F.2d at 425-27. In addition, courts have recognized that although Rule 16(d)(1) and CIPA Section 4 speak only of the Government submitting a written statement, "*ex parte, in camera* hearings in which the government counsel participates to the exclusion of defense counsel are part of the process that the district court may use," particularly "if the court has questions about the confidential nature of the information or its relevancy." *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1261 (9th Cir. 1998); *see Campa*, 529 F.3d at 994-95.

Significantly, even if defense counsel hold appropriate security clearances, it "does not mean that [they are] entitled to access the government's classified filings." *United States v. Sedaghaty*, 728 F.3d 885, 909 (9th Cir. 2013). Classified information may be disclosed only to individuals who both possess the requisite clearance and have a need-to-know the information at issue. *See* Executive Order 13526, §§ 4.1(a) and

6.1(dd); *Trump v. United States*, No. 22-13005, 2022 WL 4366684, at *8 (11th Cir. Sept. 21, 2022) ("[A] person may have access to classified information only if, among other requirements, he 'has a need-to-know the information.'") (quoting Exec. Order 13526 § 4.1(a)(3)); *United States v. Asgari*, 940 F.3d 188, 191 (6th Cir. 2019) (Government may keep classified information from defense counsel with a security clearance); *United States v. Daoud*, 755 F.3d 479, 484-85 (7th Cir. 2014); *Sedaghaty*, 728 F.3d at 908–09; *Mejia*, 448 F.3d at 458; *El Badrawi v. Dep't of Homeland Security*, 596 F. Supp. 2d 389, 400 (D. Conn. 2009).

Likewise, although the defendant may be entitled to notice when the Government initiates CIPA proceedings under Section 4 or 6, there is "no due process right to receive a description of materials in the government's possession that are not discoverable." *Sedaghaty*, 728 F.3d at 909 (citing *Mejia*, 448 F.3d at 458). A defendant, however, may be permitted to file his own *ex parte* submission outlining his theory of the defense to aid the court in the review of any classified materials. *See Sedaghaty*, 728 F.3d at 906 n.10; *see also United States v. Amawi*, 695 F.3d 457, 469 (6th Cir. 2012).[4]

---

[4] CIPA's legislative history also makes clear that Congress viewed the *ex parte* nature of the proceeding to be important. As the record of the House of Representatives reveals, "since the government is seeking to withhold classified information from the defendant, an adversary hearing with defense knowledge would defeat the very purpose of the discovery rules." H.R. Rep. No. 96-831, Pt. 2 at 27 n.22 (1980). The same is true with respect to Rule 16(d)(1): "it would defeat the purpose of the protective order if the government were required to make its showing in open court. The problem arises in its most extreme form where matters of national security are involved." Rule 16 Advisory Committee Notes, 1966 Amendments, Subdivision (e).

**B.      The Executive Branch Has Sole Authority To Classify Information**

The Executive Branch has a "'compelling interest' in withholding national security information from unauthorized persons in the course of executive business." *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988) (quoting *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980)). As the Supreme Court has repeatedly stressed, courts have been "reluctant to intrude upon the authority of the Executive in . . . national security affairs." *Id.* at 530; *see also Center for Nat'l Sec. Studies v. United States Dep't of Justice*, 331 F.3d 918, 926-27 (D.C. Cir. 2003). Accordingly, courts have recognized that the determination of whether to classify information, and the proper classification thereof, is a matter committed solely to the Executive Branch: "[T]he government . . . may determine what information is classified.  A defendant cannot challenge this classification. A court cannot question it." *United States v. Smith*, 750 F.2d 1215, 1217 (4th Cir. 1984), *rev'd on other grounds*, 780 F.2d 1102 (4th Cir. 1985) (*en banc*); *see also United States v. Rosen*, 520 F. Supp. 2d 786, 801 (E.D. Va. 2007) ("[I]t is not for the court to review and second guess the government's decision to classify a document or information; that decision is committed to the sole discretion of the Executive Branch.") (citing *United States v. Moussaoui*, 382 F.3d 453, 470 (4th Cir. 2004)).

**C.      The Government's Classified Information Privilege Can Preclude Discovery of Otherwise Relevant Evidence**

The Government has a common-law privilege in classified information similar to that relating to confidential informants. *See Roviaro*, 353 U.S. 53; *see also United States v. Flores*, 572 F.3d 1254, 1265 (11th Cir. 2009) (applying *Roviaro* standard and affirming Government's privilege relating to identity of confidential informants). In *Roviaro*, the

13

defendant sought the identity of a confidential informant discussed in the indictment. 353 U.S. at 64. The Supreme Court recognized the Government's privilege in protecting the identity of confidential informants, but held that "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60-61. The Court explained that determining whether the privilege should be breached ultimately

> calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Id.* at 62.

The standard articulated in *Roviaro* has been applied to cases involving classified information. *See Yunis*, 867 F.2d at 622-23. In *Yunis*, which involved the hijacking of an international flight, the D.C. Circuit held that classified information may be withheld from discovery unless it is both relevant and "helpful to the defense of the accused . . . ." *Id.* at 623. At issue in *Yunis* were audio recordings of the defendant's conversations with an undercover law enforcement asset—some of which were relevant to the charges at issue. The Government produced some of the statements and moved under CIPA to withhold others. The *Yunis* court allowed the Government to withhold from discovery some of the recorded conversations under Rule 16(d)(1) and CIPA Section 4, applying the *Roviaro* standard:

> [C]lassified information is not discoverable on a mere showing of theoretical relevance in the face of the government's classified

14

information privilege . . . [T]he threshold for discovery in this context . . . requires that a defendant seeking classified information, like [the] defendant seeking the informant's identity in *Roviaro*, [be] entitled only to information that is at least "helpful to the defense of the accused."

*Id.* at 623 (quoting *Roviaro*, 353 U.S. at 60-61); *see also id.* at 625 (noting that "relevant and helpful" phrase was the preferred articulation of the term "materiality," also used in *Roviaro*).

Before ruling on the relevance or helpfulness of the discovery sought by the defense, the *Yunis* court held that the Government had a colorable claim that the discovery sought contained classified information. *Id.* at 623. In so holding, the *Yunis* court found the Government had an interest in protecting not only the contents of the conversations, but also the sources and methods used to collect them. *Id.* (citing *CIA v. Sims*, 471 U.S. 159, 175 (1985)). The *Yunis* court noted that disclosure of the mere fact that certain conversations were recorded could reveal classified information about the United States' "intelligence-gathering capabilities." *Id.* Specifically, the *Yunis* court recognized that—as in cases where the United States invokes its informant privilege— much of the Government's national security interest "lies not so much in the contents of the [Rule 16] conversations, as in the time, place, and nature of the government's ability to intercept the conversations at all." *Id.*; *see also United States v. Felt*, 491 F. Supp. 179, 183 (D.D.C. 1979) ("Protection of sources, not information, lies at the heart of the claim [of privilege] by the Attorney General."). The *Yunis* court noted that details revealed in the surveillance "would make all too much sense to a foreign counter-intelligence specialist who could learn much about this nation's intelligence-gathering capabilities

from what these documents [withheld from discovery] revealed about sources and methods." *Yunis*, 867 F.2d at 623.

### IV. The Government Should Be Permitted to Withhold from Defendants Themselves Nearly All Classified Discovery Produced to Nauta's and De Oliveira's Counsel

The Government has produced the same classified discovery to counsel for Nauta and De Oliveira as it has produced to counsel for Trump, and it has allowed Trump to access all of the classified discovery. Nauta and De Oliveira are not similarly situated to Trump in multiple material respects, however, and this discovery was almost entirely produced to counsel for Nauta and De Oliveira in excess of the Government's discovery obligations, as further explained below.[5] With the limited exceptions noted below, the Government has determined that this information is not discoverable to Nauta and De Oliveira. *See Campa*, 529 F.3d at 995 ("Ordinarily, the government alone determines whether material in its possession must be turned over to a defendant."). Nonetheless, because the Government has made this information available to Nauta's and De Oliveira's counsel (in excess of its discovery obligations), and this Court has ordered that any request by the Government "to delete specified items of classified discovery from any Defendant" "shall be made in the form of a pre-trial motion under Section 4," *see* ECF No. 202 at 2, the Government is including this information in its motion.

---

[5] The Government has provided to the defense with each discovery production a letter including the statement that "[t]he production of non-discoverable material does not obligate the Government to provide other non-discoverable material." Not only is this statement an accurate reflection of the Government's discovery obligations, but the Government should not be disincentivized to provide broad discovery by being ordered to provide non-discoverable material to additional individuals merely because it has exceeded its obligations to counsel.

### A. Other Than the Documents that the Government Will Use at Trial, and for Nauta, an Item Found on his Devices, None of the Classified Discovery is Discoverable to Nauta and De Oliveira Under Rule 16(a)(1)(E)

Rule 16(a)(1)(E) addresses the discovery of documents and tangible objects. Under sub-provision (i), an item "need not be disclosed unless the defendant demonstrates that it is material to the preparation of his defense." *Jordan*, 316 F.3d at 1250-51 (concluding that defense was not entitled to agent interview notes under Rule 16). The defendant has the burden of showing that his requested discovery is material. *United States v. Buckley*, 586 F.2d 498, 506 (5th Cir. 1978).[6] A "conclusory argument that the requested item is material to the defense" is not sufficient to compel disclosure. *Jordan*, 316 F.3d at 1250. "There must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." *United States v. Ross*, 511 F.2d 757, 763 (5th Cir. 1975). Such evidence must relate to "a defense on the merits to the criminal charge itself." *United States v. Armstrong*, 517 U.S. 456, 463 (1996) (finding that Rule 16 gives authority to "defendants to examine Government documents material to the preparation of their defense against the Government's case in chief, but not to the preparation of selective-prosecution claims"). Even when a portion of internal government documents is discoverable under Rule 16, "this rationale does not consequently render such documents discoverable in their entirety." *United States v. Hasan*, 747 F. Supp. 2d 642, 681 (E.D. Va. 2010) (citing *United States v. Lewis*, 35 F.3d 148, 150-52 (4th Cir. 1993)).

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.

Moreover, a "defendant's right to discover exculpatory evidence [under *Brady v. Maryland*, 373 U.S. 83 (1963)] does not include the unsupervised right to search through the [government's] files," *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987), nor does the right require the prosecution to deliver its entire file to the defense. *See United States v. Agurs*, 427 U.S. 97 (1976); *see also United States v. Doe*, No. 98-00721-CR-LENARD/GARBER, 2009 U.S. Dist. LEXIS 143390, at *11-12 (S.D. Fla. Oct. 23, 2009) (concluding, in a case involving transmission of NDI, that a "Magistrate Judge's Order exceeds the scope of *Brady* by requiring the Government to produce all damage assessments, regardless of whether or not they are favorable to the defendants, and is thus clearly erroneous" and that "*Brady* does not require the Government to submit an affidavit or otherwise verify what efforts were undertaken to locate documents requested by the defense").

The classified information at issue here, with the two exceptions noted below, is not discoverable to Nauta and De Oliveira. While much of the classified discovery is material to Trump's defense, as the Government will be seeking to prove that Trump illegally retained NDI, it is not material to the preparation of Nauta's or De Oliveira's defense. *See Armstrong*, 517 U.S. at 463; *Jordan*, 316 F.3d at 1250. None of the offenses charged against Nauta or De Oliveira requires proof that any of the documents stored at Mar-a-Lago contained NDI. Whether the documents contained NDI is not pertinent to whether Nauta and De Oliveira participated in a collective effort to help Trump "keep classified documents he had taken with him from the White House" and "hide and conceal them from a federal grand jury." *Id.* ¶96. Indeed, the grand jury subpoena that Nauta and De Oliveira are accused of obstructing sought the return of

documents "bearing classification markings," and did not require the documents to be NDI or properly classified. *Id.* ¶¶97, 53.

Moreover, defense counsel is not prohibited from sharing with Nauta and De Oliveira unclassified information about the classified documents. The only arguably relevant aspects of the classified documents to Nauta and De Oliveira are where they were found and the fact that they bear classification markings—unclassified facts that counsel may share with their clients. For example, the Government has alleged in the indictment the number of documents with classification markings that the Government recovered from Trump. *See, e.g., id.* ¶8. Cleared counsel can verify for Nauta and De Oliveira whether the documents it has viewed reflect classification markings as alleged in the indictment.

The only exceptions to the above with respect to Rule 16(a)(1)(E) are the documents found on Nauta's devices (for Nauta only) and the evidence that the Government will present to the jury. First, the Government obtained through search warrants two of Nauta's electronic devices and communications stored in his iCloud account. On one of Nauta's cell phones, the Government found two images of boxes spilled in the storage room at Mar-a-Lago. *See* Superseding Indictment ¶32. In one of the images, a portion of the document charged in Count 8, including classified information, is visible. *See id.* This classified image is discoverable to Nauta under Rule 16(a)(1)(E)(iii) because it was "obtained from" him. Fed. R. Crim. P. 16(a)(1)(E)(iii). As contemplated in the protective order (*see* ECF No. 151), the Government specified in its letters accompanying its first and third productions of classified discovery that the

classified image (electronic version and printout), as well as the document charged in Count 8, could be disclosed to Nauta.

Second, the classified information that the Government intends to use in its case-in-chief at trial against any of the three defendants is discoverable under Rule 16(a)(1)(E)(ii) as to all of them. *See, e.g., United States v. O'Keefe*, No. 06-CR-0249, 2007 WL 1239207, at *2 (D.D.C. Apr. 27, 2007). The Government need not provide that discovery to the defendants personally, however, until the form and manner of its use at trial is determined. *See United States v. Abu Ali*, 528 F.3d 210, 245 (4th Cir. 2008) ("A defendant's right to see the evidence that is tendered against him *during* trial, however, does not necessarily equate to a right to have classified information disclosed to him *prior* to trial."). Specifically, the form and manner of the presentation of most classified evidence will not be finalized until the completion of the Section 6 litigation next year. Because extremely grave or serious damage could result from the premature disclosure of the information, as described below, the Court should authorize the Government to withhold the information from discovery until closer to trial, and in any event, after the conclusion of the CIPA Section 6 proceedings. Such a deferral of discovery is expressly contemplated by Rule 16. *See* Fed. R. Crim. P. 16(d) ("At any time the court may, for good cause, deny, restrict, or *defer* discovery . . . .) (emphasis added).

### B. Even if the Classified Information at Issue Were Somehow Discoverable as to Nauta and De Oliveira Under Rule 16(a)(1)(E), the Court Should Authorize the Government To Withhold it from Them Personally Because it Is Not Relevant and Helpful

"CIPA authorizes district courts to limit access to classified information to persons with a security clearance as long as the application of this requirement does not

deprive the defense of evidence that would be useful to counter the government's case or to bolster a defense." *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 122 (2d Cir. 2008) (citations and internal quotation marks omitted).  The courts that have considered whether it poses a constitutional issue to afford cleared defense counsel access to classified information, while withholding it from their client-defendant, have held that it does not.  *See id.*; *see also, e.g.*, *United States v. Moussaoui*, 591 F.3d 263, 289-90 (4th Cir. 2010); *United States v. Hausa*, 232 F. Supp. 3d 257, 264 (E.D.N.Y. 2017).  In deciding whether to restrict a criminal defendant's access to discovery that the Government has provided defense counsel, a court "must determine whether the criminal defendant's interest in the information at issue outweighs the government's interest in withholding it." *In re Terrorist Bombings*, 552 F.3d at 124; *see United States v. Rezaq*, 156 F.R.D. 514, 525 (D.D.C. 1994) ("[T]he need to protect sensitive information clearly outweighs defendant's need to know all of that information personally when it would not contribute to his effective defense.  Under such circumstances, limiting disclosure to defendant's counsel is warranted under Rule 16 and Section 3 of CIPA, and it does not violate defendant's constitutional rights."); *see also United States v. Al Fawaaz*, No. S7 98-CR-1023, 2014 WL 6997604, at *1-*4 (S.D.N.Y. Dec. 8, 2014) (denying defendant's motion to modify Section 3 protective order to permit counsel to disclose to defendant various classified materials).[7]

---

[7] *See also United States v. Truong Dinh Hung*, 667 F.2d 1105, 1108 (4th Cir. 1981) (finding no prejudice to espionage defendants who did not receive access to Jencks Act material during post-conviction motion to vacate); *cf. Abu Ali*, 528 F.3d at 254 ("A defendant and his counsel, if lacking in the requisite security clearance, must be excluded from hearings to determine what classified information is material and whether substitutions crafted by the government suffice to provide the defendant adequate means

The classified discovery the Government has produced falls under nine categories: (1) classified documents that were stored at Mar-a-Lago (and photographs and scans including the documents); (2) classified notes and an email exchange; (3) documents obtained from NARA; (4) documents related to the original classification authority ("OCA") review performed regarding the documents stored at Mar-a-Lago; (5) documents related to specific indictment counts; (6) After-Action Reports; (7) documents related to interviews (i.e., interview transcripts, audio recordings of interviews, agent notes, interviews exhibits, and FBI interview reports); (8) a risk assessment prepared by the Office of the Director of National Intelligence ("ODNI") related to three federal criminal investigations, including this investigation (hereinafter, "ODNI Risk Assessment"); and (9) publicly available materials related to the charged documents (hereinafter, "Open-Source Materials"), which are classified in the context of this case. For the reasons that follow, with respect to each of these categories, the classified information is not relevant to Nauta and De Oliveira, and it would not be helpful for them to personally review the classified materials the Government seeks to withhold. Moreover, the Government's national security interest in non-disclosure outweighs the defendants' interest in the materials.

The Government addresses these categories of information in turn, identifying the documents falling under each category by their classified Bates range or disc number. The full set of the Government's discovery, including each of these pages and the five classified discs (or a subset requested by the Court) can be made available for this Court's review at the Court's convenience on a read-and-return basis. Additionally for

---

of presenting a defense and obtaining a fair trial.").

the Court's convenience, the Government is attaching as **Exhibits 9 and 10** charts that list the documents comprising the Government's classified discovery by Bates or disc number and identify the declaration addressing the document. Exhibit 9 addresses the documents stored at Mar-a-Lago categorically, whereas Exhibit 10 addresses them individually.[8] The declarations supporting this portion of the motion properly assert the classified information privilege for the documents and information that are the subject of this portion of the motion.

### 1. Classified Documents that Were Stored at Mar-a-Lago

The Government produced to cleared counsel the classified documents stored at Mar-a-Lago at classified Bates numbers 0001-0811, 2194-2408, 3905-3922, 5401-5341 and 5569.[9] In addition, the Government produced electronically photographs or scans that were classified because they included documents (or portions thereof) that were stored at Mar-a-Lago. First, the Government produced on Disc 002 photographs that

---

[8] As reflected in Exhibits 9 and 10, the Government is not asserting the classified information privilege over approximately 700 pages of the 5,568 pages previously produced in classified discovery. Some of these documents are FBI-generated documents, for which the FBI has determined that although they were properly classified at the time, they no longer need to be and have been declassified. Other documents were stored at Mar-a-Lago, and equity holders have determined that they no longer need to be protected through classification and have been declassified. Although these documents are not discoverable to Nauta and De Oliveira under Rule 16(a)(1)(E), *see* Part IV.A., *supra*, on December 6, 2023, the Government nonetheless produced in unclassified discovery the documents over which it is not asserting the privilege (aside from classification cover sheets).

[9] The documents that were stored at Mar-a-Lago include documents Trump provided to NARA on January 17, 2022; documents Trump's attorney provided to the FBI on June 3, 2022; documents recovered from Mar-a-Lago on August 8, 2022; and a small number of other documents. *See* Trump Section 4 Motion at II.B.

were taken during the execution of the August 8, 2022 search warrant.[10]   Second, Disc

003 included 43 photographs of documents that Trump's former counsel turned over to

the FBI on June 3, 2022, in response to a grand jury subpoena.   Third, the Government

produced on Disc 004 the spilled box images from Nauta's device and account, and a

duplicate of the image, which appeared on another individual's device because Nauta

texted them to her.[11]   A printout of the photograph found on Nauta's device showing

spilled boxes in the Mar-a-Lago storage room was also produced (at classified Bates

number 1545).   This category is intended to encompass all of these items—documents

stored at Mar-a-Lago and the items classified because they include depictions of those

documents.

It would not be helpful to their defense for Nauta and De Oliveira at this time to

personally review the contents of the classified documents stored at Mar-a-Lago.   For the

reasons discussed in Section IV.A., *supra*, the documents are not material to the charges

against them, and defense counsel can share with them unclassified information about the

documents, such as the fact of classification markings.   To the extent that the contents of

the documents could be relevant to evaluating the strength of the Government's case

against co-defendant Trump, Nauta's and De Olivera's input would not be helpful to their

counsel in making that assessment.   They have no relevant legal training or experience.

In fact, De Oliveira has never possessed a security clearance.   Moreover, Nauta has

---

[10] As described in an unclassified filing, this disc contains two metadata files and 501
photographs from the execution of the search warrant, and about 456 unclassified
photographs on this disc were produced in the Government's first production of
unclassified discovery.   ECF No. 199 at 5.

[11] These are the only files on Disc 004 that have not been made available to De Oliveira.
All files on Disc 004 are available to Nauta.

professed to have limited knowledge about classification markings and not to know the contents of the documents that Trump handled during his presidency. He also stated that he had "no idea" what the PDB "can consist of" or the contents of the boxes that were stored at Mar-a-Lago.

In situations like this—when a defendant cannot meaningfully interpret or identify classified documents—courts presume that counsel are qualified to make assessments about the strength of the Government's case and allowing the defendant personal access to the classified information is unnecessary. *See, e.g., In re Terrorist Bombings*, 552 F.3d at 123-128 (rejecting defendant's argument that his rights were violated by a "mandatory clearance requirement" that "placed off-limits to him 'important evidence which could not adequately be interpreted by counsel alone'"); *Moussaoui*, 591 F.3d 362, 289-90 (4th Cir. 2010) (rejecting defendant's argument that he had been deprived of his Sixth Amendment right to discuss evidence with his counsel); *Hausa*, 232 F. Supp. 3d at 264 (rejecting defendant's argument that his due process rights were violated because he was personally denied access to evidence that only he could explain to counsel).

For these reasons, Nauta and De Oliviera do not need to personally review the documents stored at Mar-a-Lago to prepare their defense. And for the reasons that follow, any theoretical interest in their doing so is strongly outweighed by the Government's interest in withholding the material. *See In re Terrorist Bombings*, 552 F.3d at 124. As an initial matter, Nauta and De Oliveira do not have a security clearance or a need-to-know the classified information contained in the classified documents stored at Mar-a-Lago—or any other category of information that is the subject of this motion.

### 4. Classified Documents Related to the OCA Review

The documents from Mar-a-Lago that had classification markings or that the FBI identified as potentially classified were subject to an original classification authority review. Working in conjunction with ODNI, the FBI provided the documents to potential equity holders so that the potential equity holders could assess whether they in fact had equities in the document and so that an original classification authority could determine the proper classification level of the document. As part of this process, the FBI sent letterhead memoranda to the potential equity holders, and the potential equity holders responded in writing to the FBI regarding equities and classification levels. This correspondence was produced in classified discovery at classified Bates numbers 2969-3462 and 5531-5568.[12]

The classified documents related to the OCA process were provided to Nauta's counsel in excess of the Government's discovery obligations. Even if the fact that documents seized from Mar-a-Lago bear classification markings is relevant to Nauta and De Oliveira, whether those markings were proper or the reasons behind the markings are irrelevant. The classification of the charged documents is not an element of the crime even as to Trump; 18 U.S.C. § 793(e) criminalizes the unauthorized retention of documents "relating to the national defense" rather than classified documents.[13]

---

[12] Some of these documents have now been produced in unclassified discovery. *See* n. 8, *supra*; *see also* Exhibits 9 & 10.

[13] Although classification is not determinative, it is relevant to determining whether the documents Trump retained constitute NDI. *See Truong*, 629 F.2d at 918 ("Certainly the classification of the documents was relevant to the question of whether they related to the 'national defense.'"); *United States v. Rosen*, 240 F.R.D. 204, 206 (E.D. Va. 2007) ("'Information relating to national defense' is sometimes referred to herein as 'NDI.'

Moreover, it is well-settled that neither judicial review of nor defense challenges to classification decisions by Executive Branch officials are permitted. *See* Section III.B., *supra*. The classified materials related to the OCA process are therefore only of marginal relevance even as to Trump. For the same reasons that the documents stored at Mar-a-Lago would not be helpful to Nauta and De Oliveira personally, the documents related to verifying the relevant equity holders and correct classification of the documents stored at Mar-a-Lago are not helpful.

### 6. After-Action Reports

As part of his official duties as President, Trump received intelligence briefings from high-level U.S. Government officials, including a designated briefer, and a collection of classified intelligence from the U.S. Intelligence Community ("USIC") known as the "President's Daily Brief" ("PDB"). ECF No. 85 at 7. Trump's designated principal briefers were Edward (Ted) Gistaro (August or September 2016-May 2019) and Beth Sanner (May 2019-end of Administration). The After-Action Reports are emails, primarily written by Trump's PDB briefers, Gistaro and Sanner, documenting briefings of Trump.

### 7. Classified Documents Related to Interviews

The Government conducted 20 interviews during which classified information was reviewed or discussed. Some of these witness interviews were recorded; others were

---

This type of information includes most classified information."); *United States v. Rosen*, 445 F. Supp. 2d 602, 623 (E.D. Va. 2006) ("[A]lthough evidence that the information was classified is neither strictly necessary nor always sufficient to obtain a prosecution under § 793, the classification of the information by the executive branch is highly probative of whether the information at issue is 'information relating to the national defense . . . .'").

not.  The resulting memorialization of these interviews includes classified interview transcripts, classified audio recordings of interviews, classified agent notes, classified interview exhibits, and/or classified FBI interview reports.  Such materials were produced at classified Bates numbers 0812-1111, 1115-1162, 1165, 1172-1186, 1188-1451, 1546-1914, 2004-2193, 2409-2968, 5387-5400, 5432-5476, and on Discs 0001 and 0005 (with both discs containing classified interview recordings).

The witnesses were interviewed about Trump's handling of classified information and/or about documents that were stored at Mar-a-Lago.  These interviews did not include discussions about Nauta's and De Oliveira's conduct.  Accordingly, the interview material was provided to Nauta's and De Oliveira's counsel in excess of the Government's discovery obligations, and the defendants would not benefit from personally reviewing these materials.  Moreover, as the Government informed the defense in a September 28, 2023 discovery letter, it has provided in unclassified discovery several unclassified portions of interview transcripts or redacted 302s, which are available to all defendants.

### V. The Government Should Be Permitted to Withhold, Redact, or Substitute Certain Classified Information with Respect to Nauta's and De Oliveria's Counsel

### VI. Conclusion

For the reasons stated herein, the Government moves this Court to order the deletions and substitutions requested herein with respect to defendants Nauta and De Oliveira and their cleared counsel and grant the Government's Motion in its entirety.

Respectfully submitted,

JACK SMITH
SPECIAL COUNSEL

By:   */s/Jay I. Bratt*

Jay I. Bratt
Julie A. Edelstein
David Raskin
Brett C. Reynolds
U.S. Department of Justice
Special Counsel's Office