**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

UNITED STATES OF AMERICA,               **Case No. 23-80101-CR**
                                        **CANNON/REINHART**
vs.

DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

                 Defendants.
_____

**DEFENDANTS' MOTIONS TO COMPEL DISCOVERY**

**INTRODUCTION** ................................................................................................................. 1

**BACKGROUND** ................................................................................................................... 5

    I.    Pre-Indictment Investigative Activities ........................................................... 5

        A.    Early Indications Of NARA Bias ......................................................... 5

        B.    The Biden Administration Weaponizes The PRA ................................ 6

        C.    The Transfer Of The 15 Boxes To NARA ............................................ 7

        D.    The White House Instructs NARA To Contact Prosecutors ................. 7

        E.    NARA's Sham "Referral" ..................................................................... 8

        F.    DOJ's Claim Of Urgency Relating To Damage Assessments ............ 10

    II.    Procedural History .......................................................................................... 11

**DISCUSSION** ..................................................................................................................... 12

    I.    The Court Should Reject The Prosecution's Narrow Definition Of The Prosecution Team 12

        A.    Applicable Law ................................................................................... 13

            1.    Prosecution Team Scope Under *Brady* .................................. 14

            2.    "Control" Under Rule 16 .......................................................... 15

            3.    Case File Reviews ..................................................................... 16

        B.    The Prosecution Team Includes Agencies And Attorneys That Participated In The Investigation ...................................................................................... 17

            1.    NARA .......................................................................................... 17

            2.    The Intelligence Community ..................................................... 19

            3.    The White House ........................................................................ 21

            4.    The Department of Justice ........................................................ 22

            5.    The Special Counsel's Office .................................................... 25

            6.    FBI Headquarters: The Counterintelligence Division ............ 26

            7.    The Secret Service ..................................................................... 27

        C.    The Special Counsel's Office Has An Affirmative Duty To Search For Discoverable Evidence .......................................................................................... 28

    II.    The Special Counsel's Office Must Be Compelled To Comply With Their Discovery Obligations ..................................................................................................... 30

        A.    Applicable Law ................................................................................... 31

            1.    "Favorable" Evidence Under *Brady* ..................................... 31

            2.    "Material" Evidence Under Rule 16 ......................................... 33

        B.    Improper Coordination With NARA To Abuse The Grand Jury Process .................. 34

            1.    Background ................................................................................. 34

2.  Discussion ....................................................................................................... 36

C.  The Attempt To Retroactively Terminate President Trump's Security Clearance And Related Disclosures ....................................................................................................... 38

1.  Background ..................................................................................................... 38

2.  Discussion ....................................................................................................... 40

D.  Use Of Secure Facilities At President Trump's Residences ....................................... 42

1.  Background ..................................................................................................... 42

2.  Discussion ....................................................................................................... 43

E.  Evidence Of Bias And Investigative Misconduct ...................................................... 43

1.  Special Counsel Coordination With The Biden Administration............................. 45

2.  Biden Administration Coordination With Georgia Prosecutors ............................ 47

3.  Intelligence Community Bias .......................................................................... 48

4.  NARA Bias And Improper Coordination .......................................................... 50

5.  Other Prosecution Team Bias ......................................................................... 51

6.  Production Of All Correspondence And/Or Communications Concerning Counsel 53

F.  Production Of All Correspondence And/Or Communications Concerning The Search Of Mar-A-Lago ....................................................................................................... 55

G.  Production Of CCTV Video Footage ......................................................................... 56

**CONCLUSION** .......................................................................................................... **64**

## INTRODUCTION

President Donald J. Trump respectfully submits this memorandum, and the accompanying Classified Supplement, in support of Defendants' motions for an order regarding the scope of the prosecution team and to compel the Special Counsel's Office to produce certain discoverable materials.[1]

The Special Counsel's Office has disregarded basic discovery obligations and DOJ policies in an effort to support the Biden Administration's egregious efforts to weaponize the criminal justice system in pursuit of an objective that President Biden cannot achieve on the campaign trail: slowing down President Trump's leading campaign in the 2024 presidential election.  The patent absurdity of the Office's efforts is illustrated by the fact that, while working toward a historic landslide victory in the Iowa caucuses yesterday, President Trump was also preparing to bring to Your Honor's attention today the record of misrepresentations and discovery violations that have marred this case from the outset and illustrate that the Office has disregarded fundamental fairness and its legal obligations in favor of partisan election interference.

New evidence, obtained via requests pursuant to the Freedom of Information Act ("FOIA"), reveals that politically motivated operatives in the Biden Administration and the National Archives and Records Administration ("NARA") began this crusade against President Trump in 2021.  There are 22 FOIA releases from DOJ and NARA attached as exhibits to this brief.  Nearly all of these exhibits, though heavily redacted based on FOIA rules that have no application in a criminal case, represent discovery violations in which the Special Counsel's Office

---

[1] Pursuant to the Court's January 12, 2024 Order, Defendants President Trump, Waltine Nauta, and Carlos De Oliveira are submitting a single consolidated unclassified brief in support of these motions.  *See* ECF No. 258.  The combined numbers of pages in this unclassified brief and the Classified Supplement are well below the page counts allotted by the Court for this purpose.

failed to produce documents that support arguments and positions the defense has articulated since at least October 2023.

The FOIA releases, coupled with other evidence scattered throughout more than 1.2 million pages of discovery, reflect close participation in the investigation by NARA and Biden Administration components such as the White House Counsel's Office, as well as senior officials at DOJ and FBI.  These revelations are disturbing but not surprising.  The Biden Administration leaked to the *New York Times* in April 2022 President Biden's view that President Trump "should be prosecuted."  The Attorney General then proudly announced in August 2022 that he took the extraordinary step of "personally" approving the raid at Mar-a-Lago.  However, the details reflected in the FOIA releases add force to President Trump's long-held position regarding the scope of the prosecution team.  Thus, these materials should have been disclosed by the Office, in unredacted form, at the outset of the case.

The parties' dispute regarding the scope of the prosecution team also extends to the Intelligence Community and the National Security Council.  In this regard, the Special Counsel's Office would have the Court believe that the prosecutors have only dealt with these agencies at arms' length.  Evidence relating to extensive coordination during the classification review process puts the lie to these claims.  Equally telling, in submissions to Your Honor in August and September 2022, DOJ asserted in *Trump v. United States* that the Intelligence Community was "closely interconnected with," and "cannot readily be separated from," the investigation.  Again, the Office's position is disturbing but not surprising.  The prosecutors cannot escape those representations here.

These issues are central to the instant motion because the Special Counsel's Office is seeking to avert its eyes from exculpatory, discoverable evidence in the hands of the senior officials

at the White House, DOJ, and FBI who provided guidance and assistance as this lawless mission proceeded, and the agencies that supported the flawed investigation from its inception such as NARA, the Office of the Director of National Intelligence ("ODNI"), and other politically-charged components of the Intelligence Community.  As discussed below, even the Department of Energy has taken up the Biden Administration's mantle by seeking in June 2023 to terminate President Trump's active security clearance, which is a highly inconvenient fact relative to the Office's allegation of "unauthorized" access to classified information under 18 U.S.C. § 739(e), and modifying and amending agency records that support President Trump's defense.

No defendant is required to predict every form of exculpatory, discoverable evidence that exists.  It is incumbent upon the Special Counsel's Office to collect and produce such materials based on a fair, judicially enforced definition of the prosecution team.  However, to be clear, the record discussed below strongly supports the existence of additional evidence of bias and political animus that is central to the defense of this case and must be produced promptly.  This includes evidence of collusion between the Office and the White House, DOJ, FBI, and NARA to use the Presidential Records Act ("PRA") as a law enforcement tool, and to abuse grand jury procedures, in violation of due process, other constitutional rights, and the executive privilege.  The Office must produce other evidence of bias, including (1) any communications with members, relatives, or associates of the Biden Administration; (2) communications between members of the Biden Administration and the Fulton County District Attorney's Office during the course of the investigation that led to this case, including but not limited to records relating to meetings involving Nathan Wade that are substantiated by legal invoices appended to congressional filings; and (3) evidence relating to analytic bias harbored by the Intelligence Community that President

Trump will use to impeach positions that are relevant to § 793(e)'s requirement relating "national defense" information, or "NDI," as discussed below and in the Classified Supplement.

The essential premise of the Classified Supplement is that neither President Trump nor any other party to this action is required to accept the *ipse dixit* of the Special Counsel's Office or the biased Intelligence Community regarding the alleged sensitivities associated with the documents and information at issue in this case. The Office's own conduct belies these claims. For example, the Office has suggested that documents reflecting the timing and content of the President's Daily Brief ("PDB") on a given day are among the Intelligence Community's crown jewels. *E.g.*, Superseding Indictment, ECF No. 85 ¶ 20; CIPA § 10 Notice at 2, 4. In fact, there are detailed descriptions of PDBs delivered to President Trump on the CIA's public website,[2] which are based on the same types of information—including directly attributed quotes—from the same witnesses that the Office speaks about in hushed tones and seeks to relegate to SCIFs.

Moreover, as explained in today's separate opposition to the Office's CIPA § 4 motion, prosecutors and witnesses repeatedly ignored the so-called "need to know" requirement during the investigation to share literal "war stories" that have no relevance to the issues in this case. The Court should not condone that behavior by permitting the Office to invoke the "need to know" requirement to withhold discoverable information from the defendants. Therefore, as discussed in the Classified Supplement, President Trump will continue to oppose *ex parte* proceedings under CIPA that serve as a fraught opportunity for the Office to push inaccurate and untested narratives about this case, and we will contest in pretrial motions and at trial meritless claims regarding NDI, classification status, the significance of portion marks, and other alleged sensitivities. The Special

---

[2] *See, e.g.*, JOHN L. HELGERSON, GETTING TO KNOW THE PRESIDENT 242-43, 263-67 (4th ed. 2021), *available at* https://www.cia.gov/static/Chapter-9-Getting-to-Know-the-President-Fourth-Edition.pdf.

Counsel's Office must make additional disclosures—promised long ago—regarding these issues and the witnesses they will rely on at trial to try to substantiate their position.

Accordingly, for the reasons set forth below, the Court should conduct fact-finding on any disputed facts relating to the scope of the prosecution team, enter an order resolving the parties' dispute on that issue, and order the Special Counsel's Office to produce the requested discovery.

## BACKGROUND

I.   **Pre-Indictment Investigative Activities**

A.  **Early Indications Of NARA Bias**

Almost as soon as President Trump left office, NARA started to work with the White House Office of Records Management ("WH-ORM") on exaggerated claims related to records handling under the PRA.  On May 5, 2021, less than five months after the end of President Trump's term, NARA General Counsel Gary Stern sent an internal email attaching a draft letter to President Trump's PRA representatives. Ex. 1. Stern noted that he "had several conversations" with WH-ORM's ▮Per. 40▮, and that ▮Per. 40▮ had "raised some of these concerns directly with David [Ferriero, NARA's Archivist]." *Id.* at USA-00383564.  Stern's draft conceded that "things were very chaotic, *as they always are* in the course of a one-term transition," and he acknowledged that "the transfer of the Trump electronic records is still ongoing and won't be complete for *several more months*." *Id.* at USA-00383565 (emphasis added); *see also* Ex. 2 at USA-00813152 (NARA employee explaining to FBI that "[i]t is not uncommon that PRA material collection extends past the close of any presidential administration," sometimes "well after the close of any given presidential administration").  However, in early June 2021, during ongoing good-faith efforts by President Trump's PRA representatives to address issues raised by NARA, Ferriero declared: "I am out of patience." Ex. 3 at USA-00383594.

In an August 30, 2021 email, Ferriero threatened one of President Trump's PRA representatives that he was "assuming" an alleged—and non-existent—"24 boxes" of records "have been destroyed" and that he was "obligated to report it to the Hill, DOJ, and the White House." Ex. 4 at USA-00359483. On September 1, 2021, Stern circulated a "letter that we could consider sending to the Attorney General about missing Trump Records." Ex. 5; *see also* Ex. 2 at USA-00813153 (" Per. 21 and Per. 53 began drafting the DOJ referral letter during the first week of September, 2021."). Stern's email stated that he had "informally reached out to DOJ counsel about this issue," and that "WH Counsel is now also aware of the issue, and has asked that I keep them in the loop to the extent that we make any reference to [WH-ORM]." Ex. 5 at USA-00383606.

### B. The Biden Administration Weaponizes The PRA

In late-September 2021, without disclosing that NARA had already drafted a referral letter and contacted DOJ, Deputy White House Counsel Jonathan Su asked one of President Trump's PRA representatives to permit Per. 40 to access notes from the Trump administration relating to records handling. *See* Ex. 6 at USA-00383679. Su then intervened when Stern offered to provide a copy of the notes to President Trump's PRA representative: "[C]ould we discuss the process before anything is provided to him?" *Id.* at USA-00383678. Stern agreed to coordinate on this issue with the Biden Administration, but informed Su that the request was atypical; "normally, we would have to provide the records to him per the notification/review process, before we could provide anything to you." *Id.* Two days later, Stern assured Su that the PRA representative "ha[d] not asked to see these records." *Id.* at USA-00383677.

On October 5, 2021, Stern sent an internal email describing a strategy to "time" NARA's public communications with Congress in order to prejudice President Trump. Ex. 7 at USA-

00383681.  Stern's email attached a "draft letter to the Hill re social media records," which he proposed to "run . . . past WH Counsel" before notifying President Trump.  *Id.*  Three days later, the Biden Administration instructed NARA to reject President Trump's assertion of executive privilege and to disclose records to the Select Committee to Investigate the January 6th Attack on the United States Capitol (the "J6 Committee").  *See* Exs. 8, 9.[3]

### C.  The Transfer Of The 15 Boxes To NARA

On December 30, 2021, one of President Trump's PRA representatives notified NARA that, in response to NARA's requests, there were boxes available for pickup at Mar-a-Lago (the "15 Boxes").  NARA caused the 15 Boxes to be transported from Florida to Washington, D.C., on January 18, 2022.  *See* Ex. 10.  In response to an internal NARA email claiming that some of the materials contained classification markings, then-Deputy Archivist Deborah Steidel Wall excitedly revealed her bias to like-minded colleagues by responding "I volunteer!" to help review the remaining items.  *Id.* at USA-00383792.

### D.  The White House Instructs NARA To Contact Prosecutors

In an effort to cover up evidence of biased participation in the investigation by the Biden Administration, the Special Counsel's Office has falsely claimed that NARA independently referred this matter to DOJ on February 9, 2022.  *See, e.g.*, Superseding Indictment, ECF No. 85 ¶ 50 ("On February 9, 2022, NARA referred the discovery of classified documents in TRUMP's

---

[3] Under the PRA, access to "presidential records" is restricted for several years after a president leaves office.  *See* 44 U.S.C. § 2204.  The PRA establishes exceptions to the restricted-access period, which can come in the form of "special access requests" from Congress or law enforcement. *See id.* § 2205(2).  NARA provides notice of such requests to the impacted executive to allow the official to invoke any available "rights, defenses, or privileges," such as the executive privilege.  *Id.*

boxes to the Department of Justice for investigation.").[4]  However, the evidence demonstrates that

Su—on behalf of the Biden Administration—referred NARA to DOJ on January 21, 2022.

According to an FBI report, Stern and █████ Per. 53 █████, also of NARA, "consulted" with Su

in late-January 2021.  Ex. 2 at USA-00813156.  During the consult, Su "referred STERN and

█████ Per. 53 █████ to Department of Justice Associate Deputy Attorney General Emily LOEB and

Associate Deputy Attorney General David NEWMAN."  *Id.*  On January 24, 2022, Loeb and

Newman instructed █████ Per. 53 █████ and Stern "to refer the matter to their Office of the Inspector General"

("NARA-OIG") and "the Office of the Director of National Intelligence (ODNI) IG."  *Id.*

"NEWMAN also provided DOJ contacts Jay BRATT, Chief of the National Security Division,

and Corey AMUNDSON, Chief of the Public Integrity Section."  *Id.*  █████ Per. 53 █████ and Stern "had

additional conversations with BRATT and AMUNDSON regarding next steps."  *Id.*

### E.  NARA's Sham "Referral"

On January 25, 2022—acting on instructions from the White House and DOJ—NARA sent

information regarding the 15 Boxes to NARA-OIG.  Ex. 11.  On the same day, NARA-OIG wrote

to Thomas Monheim, the Inspector General of the Intelligence Community, that "[o]ur agency just

gave us a quick brief on what appears to be a very high level potential spillage and records

management issue."  Ex. 12 at OIG000081 (FOIA).[5]  Three days later, in an apparent effort to

paper the file, Stern sent NARA-OIG an email with the subject line "[i]ssue re Potential

---

[4] *Accord* 9/12/23 Tr. at 13 (Court: "I do have a question. This case, the criminal investigation
began when, Mr. Bratt?" // Bratt: "So the referral from NARA came in early February of 2022.");
ECF No. 48 at 5, *Trump v. United States*, 22 Civ. 81924 (S.D. Fla.) (defining the "NARA Referral"
as a February 9, 2022 email from the "Special Agent in Charge of NARA's Office of the Inspector
General sent a referral . . . to the Department of Justice").

[5] Exhibits denoted "FOIA" have been publicly released by DOJ and/or NARA in response to FOIA
requests.

Destruction of Presidential Records." Ex. 13 (FOIA). The document has not been produced in discovery, but NARA's heavily redacted FOIA-released version of the email reveals that it ended, "Please let us know if you think this is a matter that warrants further consideration." *Id.* at OIG000055. In fact, Stern had already communicated with the White House Counsel's Office and DOJ about the "matter" and believed very much that it "warrant[ed] further consideration" for criminal prosecution.

On February 1, NARA-OIG forwarded Stern's email to Thomas Windom—now an Assistant Special Counsel who has appeared in the District of Columbia prosecution of President Trump (the "D.C. Case")—and asked to "discuss the below matter . . . ." *Id.* at OIG000054. On February 9, the date on which the Special Counsel's Office has claimed the referral was made by NARA-OIG, the following events occurred:

- 2:17 pm: The House Committee on Oversight and Reform requested information from NARA regarding the 15 Boxes. Ex. 14 (FOIA).

- 3:01 pm: Per. 53 —not NARA-OIG—forwarded the congressional inquiry to Bratt and Amundson. Ex. 15.

- 3:03 pm: Bosanko sent an internal email indicating that he and Stern had "alerted NARA OIG, [the Office of the Director of National Intelligence] OIG, and DOJ." Ex. 16 (FOIA).

- 5:07 pm: NARA-OIG sent a new sham referral to John Keller of DOJ's Public Integrity Section. Ex. 17 at OIG000043-46 (FOIA); *see also* Ex. 18 at USA-00309423-26.

NARA-OIG claimed in the 5:07 p.m. email that Stern had "independently" "engaged" the Public Integrity Section, which is a component of DOJ prosecutors, and purported to be seeking guidance "from a law enforcement oversight perspective." Ex. 18 at USA-00309423.[6] In

---

[6] Contrary to this evidence, NARA has claimed to Congress that there was "no connection" between the Oversight Committee's inquiry and the sham referral, and that these events were "[w]holly separate and distinct." Letter from Debra Steidel Wall, Acting Archivist of the United States, to Ranking Members James Comer and Jim Jordan, U.S. House of Representatives (Oct.

response, Keller directed NARA-OIG to contact Bratt.  *Id.*  Keller wrote that Bratt had "been involved in ongoing consults regarding these allegations," and noted that "the Counterintelligence Division of FBI is also assessing these allegations."  *Id.*

On February 11, 2022, the FBI interviewed ▇Per. 53▇ .  *See* Ex. 2.  ▇Per. 53▇ told the FBI that he and Stern had "consulted" on "discussing the materials NARA received recently" in the 15 Boxes, "without triggering the obligation to notify the record holder," *i.e.*, President Trump, pursuant to the PRA.  *Id.* at USA-00813151-52.  In order to avoid that obligation under the PRA, the FBI "advised" ▇Per. 53▇ "not to disclose content of the classified documents to the interviewing agents."  *Id.* at USA-00813152.  However, on February 24, 2022, ▇Per. 53▇ provided the FBI with purported inventories from the 15 Boxes.  Exs. 19, 20, 21.  In a text message four days letter, Bosanko explained that "the 15 boxes from mar-a-lago have consumed [sic] all of our discussions" with the White House.  Ex. 22 (FOIA).

### F.  DOJ's Claim Of Urgency Relating To Damage Assessments

In March 2022, Attorney General Merrick Garland authorized DOJ and the FBI to open a criminal investigation targeting President Trump.  Although NARA and NARA-OIG had been providing DOJ and the FBI information relating to the 15 Boxes since January 2022, the White House Counsel's Office did not seek President Trump's permission under the PRA to grant the FBI access to the 15 Boxes until April 2022.  On April 29, 2022, as President Trump and his representatives considered the request, Bratt asserted to President Trump's attorney that:

---

25, 2022), *available at* https://www.archives.gov/files/foia/wall-response-to-10.14.2022-comer-jordan-letter.10.25.2022.pdf.  In support of those assertions, notwithstanding the above-described communications between NARA and NARA-OIG on February 9, 2022, NARA suggested to the Committee that the claimed separation between the inquiry and the purported referral is supported by the fact that the Committee's letter "did not copy NARA OIG."  *Id.*

> Access to the materials is not only necessary for purposes of our ongoing criminal investigation, *but the Executive Branch must also conduct an assessment of the potential damage* resulting from the apparent manner in which these materials were stored and transported and take any necessary remedial steps.

Ex. 23 at USA-00309419 (emphasis added).  Wall, by then NARA's Acting Archivist, parroted that claim in a May 10, 2022 letter to President Trump's attorney declaring that NARA would disclose the records over President Trump's objection.  Ex. 24 (FOIA).  To date, the Special Counsel's Office has produced no such damage assessment.  *See* Classified Supplement Part 6.

In the May 10, 2022 letter, Wall invoked 44 U.S.C. § 2205(2)(B), declaring that the FBI's access to the 15 Boxes was "needed for the conduct of current business" of President Biden.  Ex. 24 at 1.  Wall also wrote that President Biden had "defer[red]" to NARA's "determination" to overrule President Trump's invocation of executive privilege after having been "advised" by an "Assistant Attorney General" to take that position.  *Id.* at 2-3.

On June 3, 2022, President Trump's attorneys turned over records bearing classification markings during a meeting at Mar-a-Lago.  On August 8, 2022, acting on the explicit authorization from the Biden Administration's Attorney General, the FBI raided Mar-a-Lago.  Additional investigative steps are discussed below in connection with specific discovery requests.

## II.   Procedural History

In late-September 2023, President Trump informed the Court that the Special Counsel's Office was not in compliance with its discovery obligations and sought corresponding adjournments of the existing schedule.  ECF No. 160 at 2.  The deficiencies, which are ongoing, included a failure to produce materials that are subject to *Brady* and Rule 16(a)(1) and outstanding witness-related materials pursuant to the Jencks Act and *Giglio* on the timeframe that the Office agreed to last summer.  *E.g.*, ECF No. 30 at 2 (June 21, 2023 submission committing to producing "all" witness statement "promptly").

11

In an effort to address these issues without the need for judicial intervention, President Trump sent a series of classified and unclassified discovery requests to the Special Counsel's Office on October 9, Ex. 25; October 19, Classified Supp. Ex. 44; October 31, Classified Supp. Ex. 45; and November 1, 2023, Ex. 26.  The Office responded to the requests by letters dated October 16, Ex. 27; October 30, Ex. 28; and November 8, 2023, Exs. 29, 30.  Although the prosecutors produced some additional materials, they rejected most of the requests.[7]

During a meet-and-confer call on January 10, 2024, we disclosed core defense themes that support the remaining requests.  The Special Counsel's Office has not revised its responses or provided additional information since the call.

## DISCUSSION

**I.   The Court Should Reject The Prosecution's Narrow Definition Of The Prosecution Team**

At the core of the pending discovery disputes is the failure of the Special Counsel's Office to acknowledge the consequences for discovery of prosecutors' extensive coordination and resource sharing with the White House, senior officials at DOJ and FBI, and numerous agencies in the Intelligence Community and other parts of the government.  The Office cannot reap the benefits of these coordinated activities while ignoring exculpatory information and other discoverable evidence in the same offices.  Therefore, the Court must reject the Office's position that the prosecution team is limited to "the prosecutors . . . and law enforcement officers of the [FBI] . . . who are working on this case, including members of the FBI's Washington Field Office and Miami Field Division."  Ex. 27 at 1.

---

[7] The Special Counsel has yet to produce to defense counsel forensic images of the devices it obtained during the course of its investigation despite having provided such devices to Deloitte for processing in or around March of 2023 according to request for non-FBI processing submitted to the FBI pursuant to Digital Evidence Policy Guide Section 4.3.9.  *See* USA-00941365.

The resolution of this issue has important ramifications for discovery during the remainder of the case. The Office must conduct the case file reviews mandated by the Justice Manual based on a complete definition of a prosecution team. The prosecutors must address President Trump's discovery requests from that perspective as well, which they have not yet done. *See, e.g.*, Ex. 28 ¶¶ 5(b), 5(i), 6-7, 15 (responding to defense requests by claiming materials not possessed by prosecution team). These reviews and responses must include pertinent data from the classified systems used by the agencies, including the classified email accounts used by the prosecutors and their associates that are described in Part 1 of the Classified Supplement. By virtue of the Office's access to the agencies' files, the prosecutors must conduct a thorough review for *Giglio* and Jencks Act material before offering trial testimony from one of the agency's employees—productions the Office promised long ago for every witness. As we have noted in filings since September 2023, responsive materials may ultimately need to be addressed through additional rounds of CIPA practice, but that is no surprise given the subject matter of this case.

Finally, in light of the material evidence uncovered through FOIA, but hidden by the Special Counsel's Office, the Court should reject any opposition to this motion that lacks a sworn declaration providing assurances that the Office has reviewed and disclosed all communications and evidence that is relevant to the issues of coordination, resource sharing, and investigative alignment that govern the scope of the prosecution team based on the authorities set forth below. Given the Office's misrepresentations to date, nothing less would ensure a just result at this critical juncture of the case.

### A. Applicable Law

"Criminal discovery is not a game. It is integral to the quest for truth and the fair adjudication of guilt or innocence." *Taylor v. Illinois*, 484 U.S. 400, 419 (1988) (Brennan, J., dissenting). "[A] prosecutor may not sandbag a defendant by the simple expedient of leaving

13

relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial." *United States v. Marshall*, 132 F.3d 63, 69 (D.C. Cir. 1998) (cleaned up); *see also United States v. Bhutani*, 175 F.3d 572, 577 (7th Cir. 1999) ("The government cannot with its right hand say it has nothing while its left hand holds what is of value." (cleaned up)).

### 1. Prosecution Team Scope Under *Brady*

"[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  Thus, "[u]nder *Brady*, prosecutors have an affirmative duty to reveal any "evidence [that] is material either to guilt or to punishment." *Smith v. Sec'y, Dep't of Corr.*, 2006 WL 4495336, at *2 (11th Cir. Dec. 27, 2006) (per curiam); *see also United States v. Safavian*, 233 F.R.D. 12, 17 (D.D.C. 2005) (reasoning that prosecutors have an "affirmative duty" to "search possible sources of exculpatory information," which includes an obligation "to cause files to be searched that are not only maintained by the prosecutor's or investigative agency's office, but also by other branches of government closely aligned with the prosecution." (cleaned up)).

Thus, "the government may not leave evidence in the hands of a third party to avoid disclosure." *United States v. McGowan*, 552 F. App'x 950, 953 (11th Cir. 2014).  "[B]ecause the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure." *United States v. Agurs*, 427 U.S. 97, 108 (1976).

> Prosecutors are encouraged to err on the side of inclusiveness when identifying the members of the prosecution team for discovery purposes.  Carefully considered efforts to locate discoverable information are more likely to avoid future litigation over *Brady* and *Giglio* issues and avoid surprises at trial.

Justice Manual § 9-5.002.

"The Eleventh Circuit follows the 'prosecution team standard,' which considers the relationship between the government entity and the prosecutor's office, looking at the nature of the assistance provided and the extent of cooperation on a particular investigation." *United States v. Saab Moran*, 2022 WL 4291417, at *3 (S.D. Fla. Sept. 15, 2022) (cleaned up).  The prosecution team includes entities that (1) "collaborate extensively" with the prosecution, *United States v. Naranjo*, 634 F.3d 1198, 1212 (11th Cir. 2011); (2) are "closely aligned with the prosecution," *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992); (3) "functioned as agents of the federal government under the principles of agency law," *United States v. Antone*, 603 F.2d 566, 570 (5th Cir. 1979); or (4) are "important to the investigation and to the evidence presented at trial," *United States v. Bryant*, 2016 WL 8732411, at *23 (S.D. Fla. Oct. 27, 2016), *report and recommendation adopted*, 2016 WL 8737353.  The Justice Manual requires attention to the following additional considerations:

- "Whether the agency played an active role in the prosecution, including conducting . . . or searches, . . . developing prosecutorial strategy, [or] participating in targeting discussions . . . .";

- "Whether the prosecutor knows of and has access to discoverable information held by the agency";

- "Whether the prosecutor has obtained other information and/or evidence from the agency"; and

- "The degree to which decisions have been made jointly regarding civil, criminal, or administrative charges."

Justice Manual § 9-5.002

## 2.  "Control" Under Rule 16

"Rule 16 is a discovery rule designed to protect defendants by compelling the prosecution to turn over to the defense evidence material to the charges at issue." *Yates v. United States*, 574

U.S. 528, 539 (2015).   Evidence that is within the prosecution's "control" and "material to preparing the defense" is subject to disclosure under Rule 16(a)(1)(E)(i).   *See* Local Rule 88.10(a).

"[C]ourts have found that the 'possession, custody, or control of the government' requirement includes materials in the hands of a governmental investigatory agency closely connected to the prosecutor." *United States v. Jordan*, 316 F.3d 1215, 1249 (11th Cir. 2003) (citing *United States v. Scruggs*, 583 F.2d 238, 242 (5th Cir. 1978)).   "The language and the spirit of the Rule are designed to provide to a criminal defendant, in the interest of fairness, the widest possible opportunity to inspect and receive such materials in the possession of the government as may aid him in presenting his side of the case." *United States v. Poindexter*, 727 F. Supp. 1470, 1473 (D.D.C. 1989).   "The 'control' prong of the Rule 16 test generally focuses on the fairness to the defendants rather than the semantics of whether or not the prosecutors actually hold the evidence at the time that it should be produced." *United States v. Archbold-Manner*, 581 F. Supp. 2d 22, 24 (D.D.C. 2008).

### 3.   Case File Reviews

"It is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all members of the prosecution team."   Justice Manual § 9-5.001; *see also United States v. Jain*, 2020 WL 6047812, at *4 (S.D.N.Y. Oct. 13, 2020) (reasoning that "[a] more thorough review of the case file by the new case agent would have revealed the existence of" undisclosed discoverable information "sooner").   "This search duty also extends to information prosecutors are required to disclose under Federal Rules of Criminal Procedure 16 and 26.2 and the Jencks Act."   Justice Manual § 9-5.002.

"The investigative agency's entire investigative file, including documents such as FBI Electronic Communications (ECs), inserts, emails, etc. should be reviewed for discoverable information." *Id.*   "Substantive case-related communications," which "may be memorialized in

emails, memoranda, or notes," "should be reviewed carefully to determine whether all or part of a communication (or the information contained therein) should be disclosed." *Id.*

### B. The Prosecution Team Includes Agencies And Attorneys That Participated In The Investigation

Personnel from the agencies discussed below are part of the prosecution team for purposes of the discovery obligations of the Special Counsel's Office under *Brady*, *Giglio*, Rule 16(a)(1)(E), and the Jencks Act.

#### 1. NARA

NARA is part of the prosecution team in this case because of the agency's participation in significant investigative steps, such as the collection and review of the 15 Boxes, and its close coordination with DOJ, FBI, and the White House. *See Saab Moran*, 2022 WL 4291417, at *5 (reasoning that the prosecution team includes "organizations and/or their subparts [that] collaborated with the prosecutors in this case to procure [defendant's] indictment"); *see also United States v. Bingert Sturgeon*, 2023 WL 3203092, at *4 (D.D.C. May 2, 2023) (reasoning that agency was part of prosecution team because of, *inter alia*, "extensive cooperation with the U.S. Attorney's office in gathering evidence for this case"). As the Special Counsel's Office conceded in the District of Columbia,[8] this includes NARA-OIG, which participated in the investigation by at least the time of the February 9, 2022 sham referral email, Ex. 17 at OIG000043-46 (FOIA), and in subsequent communications with the FBI and others.

---

[8] ECF No. 166-7 at 2, *United States v. Trump*, No. 23 Cr. 257 (D.D.C. Nov. 27, 2023) ("[L]aw enforcement agencies that worked on the investigation leading to this case were the Federal Bureau of Investigation; the Department of Justice Office of the Inspector General (DOJ OIG); the National Archives Inspector General (NARA OIG); and the United States Postal Inspection Service (USPIS).").

As discussed in more detail in the Background section above, NARA—including its White House Liaison Division—worked closely with the Biden Administration's WH-ORM dating back to January 2021. By at least the fall of 2021, NARA's General Counsel had "informally reached out to DOJ" and "WH Counsel." Ex. 5 at USA-00383606. In January 2022, NARA communicated with White House Counsel and senior DOJ officials regarding the 15 Boxes, and then acted at the direction of those components by providing details to NARA-OIG, the Inspector General of the Intelligence Community, and the FBI. *See* Ex. 2 at USA-00813156; Ex. 12 at OIG000081 (FOIA).

In February 2022, NARA-OIG contacted Assistant Special Counsel Thomas P. Windom, among others, because by that time NARA-OIG was already working with Windom on a related investigation of President Trump. Ex. 13 at OIG000054 (FOIA). About a week later, following a congressional inquiry relating to the 15 Boxes, NARA-OIG sent the sham referral to the Public Integrity Section. *See* Ex. 17 at OIG000043-46 (FOIA); Ex. 18 at USA-00309423-26.

One of the first steps investigative steps taken by the FBI appears to have been the interview of ▮▮▮ Per. 53 ▮▮▮. *See* Ex. 2. Prior to the interview, ▮ Per. 53 ▮ and Stern hatched a plot to provide information to the FBI about the 15 Boxes without "triggering the obligation" to notify President Trump. *Id.* at USA-00813151-52.[9] ▮ Per. 53 ▮ described this plan to the FBI, and the FBI agreed with the approach. *Id.* Wall's May 10, 2022 letter is further evidence that NARA must be considered part of the prosecution team. *See* Ex. 24 (FOIA). The letter confirmed that NARA was rejecting President Trump's PRA-related objections based on coordination with, and advice from, the Biden Administration and DOJ. *Id.* at 2-3.

---

[9] The partisan gamesmanship by NARA reflected in this report, as well as other documents, puts the lie to NARA's public claim in April 2023 that "NARA does not consider itself to be involved in the work of, or investigations by, the requestors." Media Alert, Statement on PRA Special Access Requests, National Archives (Apr. 12, 2023), https://www.archives.gov/press/press-releases/2023/nr23-013.

At this time, the evidence of NARA's coordination and assistance to the investigation arises largely from FOIA releases. The releases strongly suggest that any factfinding on this issue, in the form of testimony or documents, will further support President Trump's position. *See United States v. Griggs*, 713 F.2d 672, 674 (11th Cir. 1983) ("[T]here is some merit to the contention that, if the arguably exculpatory statements of witnesses discussed supra were in the prosecutor's file and not produced, failure to disclose indicates the 'tip of an iceberg' of evidence that should have been revealed under *Brady*."). However, the current record is more than sufficient to demonstrate that the Special Counsel's Office cannot pretend that it lacks access to NARA's files for purposes of *Brady*, Rule 16, *Giglio*, and the Jencks Act.

### 2. The Intelligence Community

The prosecution team includes the Intelligence Community agencies and components that participated in the investigation, such as during classification reviews and damage assessments. This includes the Office of the Director of National Intelligence and the agencies identified in paragraph 22 of the Indictment as "equity" holders of some of the documents at issue: the Central Intelligence Agency, the Defense Department, the National Security Agency, the National Geospatial Intelligence Agency, the National Reconnaissance Office, the Department of Energy, and the Statement Department. *See Saab Moran*, 2022 WL 4291417, at *4 ("[T]he 'prosecution team' must be understood in the context of, and measured against, [defendant's] indictment."); *Bingert Sturgeon*, 2023 WL 3203092, at *3 (rejecting prosecution's "more restrictive standard . . . that in order to be considered an arm of the government for purposes of this case, the USSS would need to be the law enforcement agency that *investigated* the charged crimes, which was in fact the FBI").

Though the Special Counsel's Office has suppressed these communications, we know from FOIA releases that NARA started to coordinate with the Inspector General of the Intelligence

Community by January 25, 2022. Ex. 12 at OIG000080-81 (FOIA). Moreover, for the reasons

set forth in Part 4 of the Classified Supplement, the Intelligence Community's participation in the

classification-review process warrants inclusion within the prosecution team for purposes of

discovery obligations. So too does the access to Intelligence Community holdings by the Special

Counsel's Office discussed in Part 1 of the Classified Supplement.

DOJ's discussions of its "interconnected" work with the Intelligence Community in *Trump*

*v. United States*, No. 22 Civ. 81294, are telling concessions on this issue. For example, in an

August 30, 2022 filing, DOJ explained that

> DOJ and the Office of the Director of National Intelligence ("ODNI") are currently
> facilitating a classification review of these materials, and ODNI is leading an
> Intelligence Community assessment of the potential risk to national security that
> would result from the disclosure of these materials.

ECF No. 48 at 19-20, No. 22 Civ. 81294.[10] In a September 8, 2022 motion for a stay pending

appeal, DOJ argued:

> [T]he ongoing Intelligence Community ("IC") classification review and [damage]
> assessment are *closely interconnected with—and cannot be readily separated
> from*—areas of inquiry of DOJ's and the FBI's ongoing criminal investigation, as
> further explained in the attached Declaration of Alan E. Kohler, Jr., Assistant
> Director of the FBI's Counterintelligence Division.

ECF No. 69 at 12, No. 22 Civ. 81294 (emphasis added); *see also id.* at 3 (arguing that "[t]he

Intelligence Community's review and assessment cannot be readily segregated from [DOJ's] and

[FBI's] activities in connection with the ongoing criminal investigation").

DOJ also acknowledged that the classification reviews were conducted "under the

supervision of the Director of National Intelligence." ECF No. 48 at 28, No. 22 Civ. 81294. FBI

---

[10] As discussed in Part 6 of the Classified Supplement, it is far from clear what "ongoing"
"assessment" DOJ was referring to in that submission given the discovery that has been produced
to date.

Assistant Director Kohler confirmed this point, noting that the Office of the Director of National Intelligence had "agreed to oversee and help coordinate [with the FBI] the ongoing classification review." ECF No. 69-1 ¶ 7, No. 22 Civ. 81294. He added that "the IC assessments *will necessarily inform the FBI's criminal investigation*, including subsequent investigative steps that might be necessary." *Id.* ¶ 9 (emphasis added).

DOJ doubled down on these positions in its reply submission:

> [T]he IC's intelligence classification review and national security assessment—which the Court sought to allow to continue in recognition of the vital interests at stake—*are closely linked to its criminal investigation*, and therefore cannot proceed effectively while the injunction remains in place.

ECF No. 88 at 7, No. 22 Civ. 81294 (emphasis added). Because these assertions were accurate and are borne out by even the incomplete discovery that has been produced thus far, the discovery obligations of the Special Counsel's Office extend to the files of the Intelligence Community.

### 3. The White House

The prosecution team includes at least the National Security Council, which is part of the White House's Executive Office of the President, the White House Counsel's Office, and WH-ORM.

As discussed in Part 1 of the Classified Supplement, the National Security Council is part of the prosecution team based on the same rationales that apply to the Intelligence Community. The Council was responsible for the creation and handling of many of the documents at issue, and the Special Counsel's Office will be required to rely on personnel from the National Security Council at trial to demonstrate that the documents it authored are classified and constitute information "relating to the national defense" ("NDI") under 18 U.S.C. § 793(e).

The White House Counsel's Office and WH-ORM are part of the prosecution team because they repeatedly supported the investigative activities of DOJ, FBI, and NARA. *See Strickler v.*

*Greene*, 527 U.S. 263, 275 n.12 (1999) (reasoning that the "prosecutor is responsible for any favorable evidence known to the others acting on the government's behalf in the case" (cleaned up)).  In September 2021, NARA General Counsel Stern discussed records-related concerns based on reports from WH-ORM with Su, Deputy White House Counsel.  Su proposed a meeting with one of President Trump's PRA representatives to "work through this issue and ascertain the facts." Ex. 7 at USA-00383683-84.  Two weeks later, Stern again brought Su "up to speed."  *Id.* at USA-00383682.  In January 2022, Su advised Stern and Per. 53 on how to route NARA's referral to DOJ.  Ex. 2 at USA-00813156.  In February 2022, Bosanko wrote to a colleague that NARA's communications with the White House had been consumed by issues relating to the 15 Boxes.  *See* Ex. 22 (FOIA).  In NARA's May 10, 2022 letter, the Acting Archivist, Wall, disclosed that she was acting based in part on communications with "[t]he Counsel to the President."  Ex. 24 at 2 (FOIA).  Although the Biden Administration clearly took steps to create a false appearance of separation from the investigation that it was driving, these White House components cannot escape the import of these activities for purposes of the prosecution-team analysis.  The Special Counsel's Office must produce discoverable information from the White House's files.

### 4.  The Department of Justice

The prosecution team includes senior DOJ officials at the Office of the Attorney General, the Office of the Deputy Attorney General, the Office of Legal Counsel, and the National Security Division, as well as personnel from the U.S. Attorney's Office for the Southern District of Florida ("USAO-SDFL") who participated in the investigation—including former Acting U.S. Attorney Juan Antonio Gonzalez.

Following NARA consults to DOJ dating back to at least September 2021, *see* Ex. 5 at USA-00383606, Principal Deputy Assistant Attorney General David Newman and Associate

Deputy Attorney General Emily Loeb instructed NARA on communications with NARA-OIG and the Office of the Director of National Intelligence in January 2022.  *See* Ex. 2 at USA-00813156. In March 2022, the Attorney General personally authorized the FBI to investigate President Trump.  Exs. 31, 32.  NARA's May 10, 2022 letter overruling President Trump's objection to providing the 15 Boxes to the FBI was based in part on "a request from the Department of Justice" and "consultation with the Assistant Attorney General for the Office of Legal Counsel."  Ex. 24 at 1-2 (FOIA).  Just over a week later, Deputy Assistant Attorney General George Toscas participated in a debriefing relating to a witness interview in connection with the investigation.  *See* Ex. 33 at USA-00940262.

The Attorney General "personally approved" the search warrant relied on in connection with the August 8, 2022 Mar-a-Lago raid.[11]  Prior to that extraordinary step, on August 1, 2022, senior DOJ officials met with FBI leadership at "FBIHQ" for a "Search Warrant Discussion."  Ex. 34 (FOIA).  DOJ participants in the meeting included Assistant Attorney General Matthew Olsen, Newman, Toscas, and Bratt.  At the time, Bratt was the Chief of the DOJ's National Security Division's Counterintelligence and Export Control Section.

On August 3, 2022, Toscas and Bratt participated in a follow-up call with agents from the FBI's Washington Field Office regarding the warrant.  *See* Ex. 35 at USA-00940276.  According to an email regarding the call, Toscas stated "that 'he frankly doesn't give a damn about the optics'" of the unprecedented raid, and the group discussed how "Bratt already has built an antagonistic relationship with FPOTUS's attorney . . . ."  *Id.*

---

[11] Attorney General Merrick Garland Delivers Remarks, U.S. Dep't of Justice (Aug. 11, 2022), https://www.justice.gov/opa/speech/attorney-general-merrick-garland-delivers-remarks.

On August 10, 2022, Newman and Toscas, as well as Rush Atkinson, Austin Evers, and Loeb from the Office of the Deputy Attorney General, reviewed a motion by Judicial Watch to unseal the search warrant.  Exs. 36 (FOIA), 37 (attachment omitted) (FOIA).  Two days later, Toscas and Bratt kept Olsen, Newman, and Gonzalez apprised of developments in that litigation by forwarding communications with President Trump's attorneys.  Ex. 38 (FOIA).

On August 17, 2022, Bratt communicated with Olsen, Newman, Toscas, Gonzalez, and several attorneys from the Office of the Deputy Attorney General regarding Bratt's instruction to "turn off the cameras" prior to the raid.  Ex. 39 at 01715-01050 (FOIA); *see also* Ex. 40 at 01715-01058 (Newman conveying that he and Toscas "agree[d]" with a proposed course of action) (FOIA); Ex. 41 at 01715-01061 (Toscas writing that he was "[h]andling that now") (FOIA).  On the night of August 17, Bratt sent a letter to President Trump's attorneys about safety concerns relating to alleged video of the raid, which was drafted "[a]fter consultations with George [Newman] and David [Toscas]."  Ex. 42 at 01715-01070 (FOIA); *see also* Ex. 43 (Newman sending Toscas "[d]raft version for editing") (FOIA); Ex. 44 (Newman confirming that Bratt had been "in touch with George [Toscas] about this letter") (FOIA).

Later in August 2022, Bratt and Gonzalez coordinated with Newman and Toscas regarding media unsealing requests relating to the warrant.  Ex. 45 (FOIA); Ex. 46 at 01715-01505 (FOIA).  Following a hearing and ruling on the motion, Bratt and Gonzalez sent the order to, among others, Olsen, Toscas, and Marshall Miller from the Office of the Deputy Attorney General, and AUSAs from the USAO-SDFL who subsequently joined the Special Counsel's Office.  Ex. 47 (FOIA); *see also* Ex. 48 at 01715-02311 (FOIA).

On August 28, 2022, NARA General Counsel Stern contacted Martin Lederman of DOJ's Office of Legal Counsel with "time-sensitive . . . questions."  Ex. 49 at 01715-02260-62 (FOIA).

Like many of the others, the communications released pursuant to FOIA—but not produced in discovery—are heavily redacted.  It is nevertheless clear that Stern was "interested to know DOJ's view" on "a question or two," which Lederman discussed with Atkinson from the Office of the Deputy Attorney General and then passed on to Newman, Evers, and others.  *Id.*

In sum, senior DOJ officials regularly participated in and consulted on key decisions during the investigation, including the opening of the investigation, advice and counsel to NARA, the decision to raid Mar-a-Lago, deliberations with FBI regarding warrant execution, and post-warrant litigation.  Based on those activities, these officials' components within DOJ are part of the prosecution team, and the Special Counsel's Office must collect and produce discoverable information from their files.

### 5.  The Special Counsel's Office

The prosecution team is not limited to attorneys at the Special Counsel's Office who consider themselves to be "working on this case." Ex. 27 at 1.  Pursuant to Attorney General Garland's Order No. 5559-2022, the Special Counsel's Office has conducted broad investigations that gave rise to this case and to the other lawless charges in the D.C. Case.  In accordance with that Order, the Office did not silo its investigative activities or its personnel during the investigations, and it should not be permitted to do so now for purposes of discovery.  *See Giglio v. United States*, 405 U.S. 150, 154 (1972) ("The prosecutor's office is an entity and as such it is the spokesman for the Government."); *United States v. Dimas*, 3 F.3d 1015, 1018 n.1 (7th Cir. 1993) ("Knowledge of *Brady* material may be imputed between prosecutors in the same office.").

For example, the Special Counsel's Office used the same grand jury in this District for matters relating to both cases.  Assistant Special Counsel John Pellettieri has appeared on behalf of the Office in this case and in the D.C. Case.  In February 2022, NARA-OIG first contacted

Windom about the investigation.  Windom is now a Senior Assistant Special Counsel ("SASC") who appearance on behalf of the Office in the D.C. Case.  However, dating back to the June 2022 interview of ████████ Per. 40 ████████, Windom participated in approximately 29 of the interviews described in discovery in this case.  On the other hand, Bratt participated in 10 of the interviews that have been produced in discovery in the D.C. Case.  Collectively, these considerations reveal that there is no principled basis for limiting the scope of the prosecution team to attorneys at the Office deemed to be "working on the case."  Discovery obligations and case-file reviews must cover all of the Office's personnel.

### 6.  FBI Headquarters: The Counterintelligence Division

Nor is the FBI contingent of the prosecution team limited to agents from the Washington and Miami Field Offices.  *See* Ex. 27 at 1.  Rather, the prosecution team includes personnel from the Counterintelligence Division of the FBI's headquarters.

On February 9, 2022, a supervisor from DOJ's Public Integrity Section informed NARA that "the Counterintelligence Division of FBI is also assessing these allegations."  Ex. 18 at USA-00309423.  In April 2022, the Counterintelligence Division—not the Field Offices—sought "DOJ assistance to coordinate" with NARA, including "DOJ coordination with White House Counsel," regarding access to the 15 Boxes.  Ex. 50 at USA-00940483.

Beginning in approximately June 2022, as discussed in the Classified Supplement, the Counterintelligence Division played a central role in classification reviews.  FBI participants at the above-described "Search Warrant Discussion" on August 1, 2022, included not only personnel from the FBI's Washington Field Office but Assistant Director Kohler, who leads the FBI's Counterintelligence Division.  *See* Ex. 34 (FOIA).

At least one agent from "FBI Headquarters" participated in the raid at Mar-a-Lago, along with agents from the FBI's Washington and Miami Field Offices and attorneys from the National Security Division and the USAO-SDFL.  Ex. 51 at USA-00940244.  Later that month when participants in the investigation grew concerned that video of the raid would be released, DOJ "wait[ed] to hear back from FBIHQ on their recommended approach."  Ex. 40 at 01715-01058. Finally, as noted above, in September 2022, FBI Assistant Director Kohler submitted a declaration in support of a DOJ motion in *Trump v. United States*, No. 22 Civ. 81294 (ECF No. 69-1). Accordingly, because the FBI's Counterintelligence Division was central to several key steps in the investigation, it is part of the prosecution team.

### 7.  The Secret Service

The Secret Service is part of the prosecution team because agents worked closely with the FBI during at least two important points.

First, the Secret Service coordinated with the FBI in connection with the June 3, 2022 meeting at Mar-a-Lago, which was also attended by Bratt.  Ex. 52.  The Secret Service escorted government participants on to the premises, and Secret Service leadership communicated with President Trump's attorney "to ensure proper access . . . ."  *Id.* at USA-00940266.  Following the meeting, an FBI agent wrote in an email that "USSS and FBI [Miami] were great partners."  Ex. 53 at USA-00940954.

Second, the Secret Service worked with the FBI during the August 8, 2022 Mar-a-Lago raid.  Specifically, the FBI "informed and coordinated with local United States Secret Service (USSS) leadership" at that time.  Ex. 51 at USA-00940244.  "Local USSS facilitated entry onto the premises, provided escort and access to various locations within, and posted USSS personnel in locations where the FBI team conducted searches."  *Id.*

### C.  The Special Counsel's Office Has An Affirmative Duty To Search For Discoverable Evidence

The Special Counsel's Office has an affirmative obligation to collect and produce discoverable evidence in the possession of the entire prosecution team.  Because of the evidence of coordination with the Intelligence Community and the Office's related assertions in *Trump v. United States*, the Court need not address whether, pursuant to the Justice Manual and as in other cases, the Office must utilize the Prudential Search Request process.  *See* Justice Manual § 9-90.210; *see also, e.g.*, *Saab Moran*, 2022 WL 4291417, at *3; *United States v. Doe No. 2*, 2009 WL 10720338, at *3 (S.D. Fla. Oct. 23, 2009).[12]  That is because the Office's obligations are basic applications of actual- and constructive-possession principles under *Brady* and Rule 16(a)(1)(E) in light of the extensive coordination established by the record.

"[T]here is no suggestion in *Brady* that different 'arms' of the government, particularly when so closely connected as this one for the purpose of the case, are severable entities."  *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973).  The coordination and sharing between the Special Counsel's Office and these agencies "suggests that the government declining to search for and produce potentially material documents . . . would clearly conflict with the purpose and spirit of the rules governing discovery in criminal cases."  *United States v. Sheppard*, 2022 WL 17978837, at *11 (D.D.C. Dec. 28, 2022) (cleaned up); *see also United States v. Bases*, 549 F.

---

[12] *Accord United States v. Raymond*, 2023 WL 7611601, at *2 (D.D.C. Nov. 14, 2023) ("The Government's prudential review uncovered a number of classified records that may qualify as *Brady*, *Giglio*, or Jencks material."); *United States v. Kuciapinski*, 2022 WL 3081928, at *6 (D. Colo. Aug. 3, 2022) ("[DOJ's] Counterintelligence and Export Control Section made a Prudential Search Request with the federal agencies . . . controlling the discovery that [defendant] requested in his Motion for Specific Discovery."); *United States v. Bagcho*, 151 F. Supp. 3d 60, 67 (D.D.C. 2015) (noting prosecution's pre-trial "search of agency records"); *United States v. Kim*, 2013 WL 3866542, at *3 (D.D.C. July 24, 2013) (noting that the prosecution "has searched for documents or information concerning any formal criminal investigation of unauthorized disclosures of national defense information" by potential alternate perpetrators).

Supp. 3d 822, 828 (N.D. Ill. 2021) ("[S]imply because the DOJ conducted some parts of the investigation on its own does not erase its joint and coordinated activities with the CFTC in others."); *Archbold-Manner*, 581 F. Supp. 2d at 24 ("The fact that the evidence was originally seized by Colombian authorities is insufficient for the government to avoid Rule 16.").

 In *United States v. Libby*, the court held that the prosecution team included the Office of the Vice President and the CIA because that Special Counsel's Office had "sought and received a variety of documents" from those agencies, which were "closely aligned with the prosecution." 429 F. Supp. 2d 1, 11 (D.D.C. 2006).  The court held that it "would clearly conflict with the purpose and spirit of the rules governing discovery in criminal cases" to

> permit the Office of Special Counsel access to a plethora of documents from the OVP and CIA, which are likely essential to the prosecution of this case, but leave other documents with these entities that are purportedly beyond the Special Counsel's reach, but which are nonetheless material to the preparation of the defense.

*Id.  Libby* involved one of "several courts [that] have noted that a prosecutor who has had access to documents in other agencies in the course of his investigation cannot avoid his discovery obligations by selectively leaving the materials with the agency once he has reviewed them." *United States v. Poindexter*, 727 F. Supp. 1470, 1478 (D.D.C. 1989); *see also United States v. Giffen*, 379 F. Supp. 2d 337, 343 (S.D.N.Y. 2004) ("Documents that the Government has reviewed or has access to must be provided to aid a defendant in preparing his defense.").

The prosecutors in *Oseguera Gonzalez* recognized a similar obligation.  There, in a case involving alleged violations of the Foreign Narcotics Kingpin Act investigated by the Drug Enforcement Administration, the prosecutors reviewed records at the Treasury Department's Office of Foreign Assets Control ("OFAC").  507 F. Supp. 3d 137, 169-170 (D.D.C. 2020).  The prosecutors did so

29

> to determine whether they contained any evidence that would be discoverable under Rule 16 or as impeachment or exculpatory material . . . including classified and privileged material to the extent that they exist . . . and . . . produced documents to the defendant in discovery that the government obtained through that review.

*Id.* at 170 (cleaned up); *see also* ECF No. 80, *United States v. Griffith*, No. 20 Cr. 15 (S.D.N.Y. Dec. 29, 2020) ("Defendant's motion to compel discovery of material in the possession of OFAC is GRANTED to the extent that the government is directed to conduct a review of material in the possession of OFAC for the period from October 24, 2019 to the present that is related to Mr. Griffith's prosecution; the government shall disclose any materials that must be disclosed to the defendant consistent with the government's obligations.").

"[B]urdensomeness," "logistical difficulty," and "concerns about confidentiality and the privacy rights of others" do not "trump the right of one charged with a crime to present a fair defense." *United States v. O'Keefe*, 2007 WL 1239204, at *2 (D.D.C. Apr. 27, 2007). In *O'Keefe*, the court ordered the prosecutors to search seven consular facilities at cities in Canada and Mexico for evidence that was material to defenses relating to visa applications. *Id.* at *3. The court required the searches to cover the files of "consulate secretaries and non-U.S. citizen employees," and to include "memoranda, letters, e-mails, faxes and other correspondence." *Id.* The reviews were undoubtedly onerous, but nevertheless necessary to ensure a just. So too here, in this case of scope and significance chosen by the Special Counsel's Office.

## II.   The Special Counsel's Office Must Be Compelled To Comply With Their Discovery Obligations

President Trump has made a series of specific discovery requests for discoverable materials that support anticipated pretrial motions and trial defenses that he is seeking to develop. *See Saab Moran*, 2022 WL 4291417, at *3 (reasoning that it "[f]oreclosing that defense now—before [defendant] has had an opportunity to establish it—would simply be unjust" (cleaned up)). While

wrongly rejecting most of those requests, the Special Counsel's Office has offered only vague and unsupported claims that it is "in compliance" with its discovery obligations, "aware of" those obligations, and "will comply" with them.  Ex. 27 at 11; *see also* ECF No. 187 at 1 ("The Government has complied with (and exceeded) its discovery obligations to date . . . .").

The record proves otherwise.  *See United States v. Naegele*, 468 F. Supp. 2d 150, 152 n.2 (D.D.C. 2007) ("[N]ow that the Court realizes that its view of *Brady* and the government's have not been consistent for many years, it no longer accepts conclusory assertions by the Department of Justice that it 'understands' its *Brady* obligations and 'will comply' or 'has complied' with them.").  Moreover, whereas in the D.C. Case the Office at least claimed to have "proceeded consistently" with the Justice Manual,[13] the Office has not made that assertion in this case.  They could not credibly do so based on this record.  Accordingly, the Court should compel the Office to provide materials in the possession of the prosecution team that are responsive to the requests below and in the Classified Supplement.

### A.  Applicable Law

### 1.  "Favorable" Evidence Under *Brady*

*Brady* "rests upon an abhorrence of the concealment of material arguing for innocence by one arguing for guilt."  *United States v. Ramirez*, 513 F.2d 72, 78 (5th Cir. 1975).  "[T]here is an obligation on the part of the prosecution to produce certain evidence actually or constructively in its possession or accessible to it in the interests of inherent fairness."  *Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir. 1975).

The issue of whether evidence is "favorable" under *Brady* is a "relatively low hurdle."  *United States v. Wasserman*, 2024 WL 130807, at *6 (M.D. Fla. Jan. 11, 2024).

---

[13] ECF No. 65 at 13 n.2, *United States v. Trump*, No. 23 Cr. 257 (D.D.C. Oct. 2, 2023).

> The meaning of the term "favorable" under *Brady* is not difficult to discern.  It is any information in the possession of the government—broadly defined to include all Executive Branch agencies—that relates to guilt or punishment and that tends to help the defense by either bolstering the defense case or impeaching potential prosecution witnesses.  It covers both exculpatory and impeachment evidence.

*United States v. Safavian*, 233 F.R.D. 12, 16-17 (D.D.C. 2005); *see also United States v. Rodriguez*, 2011 WL 666136, at *2 (S.D. Fla. Feb. 13, 2011) ("[T]he defense is entitled to any information from a witness that is exculpatory in the sense that the defense may want to elicit testimony from the witness to contradict another government witness."); Local Rule 88.10(c) (requiring disclosures "of all information and material known to the government which may be favorable to the defendant on the issues of guilt or punishment").

 "[B]ecause the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure." *United States v. Agurs*, 427 U.S. 97, 108 (1976); *see also United States v. Bundy*, 968 F.3d 1019, 1033 (9th Cir. 2020) (reasoning that "[t]he retrospective definition of materiality is appropriate only in the context of appellate review," and "trial prosecutors must disclose favorable information without attempting to predict whether its disclosure might affect the outcome of the trial." (cleaned up)); Justice Manual § 9-5.001(C) ("[T]his policy requires disclosure by prosecutors of information beyond that which is 'material' to guilt . . . .").

"A prosecutor must disclose information that is inconsistent with any element of any crime charged against the defendant or that establishes a recognized affirmative defense . . . ."  Justice Manual § 9-5.001(C)(1).  "[T]he disclosure requirement of this section applies to information regardless of whether the information subject to disclosure would itself constitute admissible evidence."  *Id.* § 9-5.001(C)(3).  These disclosure requirements apply "regardless of whether the

prosecutor believes such information will make the difference between conviction and acquittal of the defendant for a charged crime." *Id.* § 9-5.001(C)(1).

> It is demonstrably not the responsibility of a prosecutor to test the credibility or trustworthiness of an exculpatory statement given by a witness or to weigh that statement against their assessment of the inculpatory evidence in the case. It is their responsibility to disclose exculpatory evidence promptly no matter what they may think of its reliability or trustworthiness."

*United States v. Sutton*, 2022 WL 2383974, at *4 (D.D.C. July 1, 2022).

## 2. "Material" Evidence Under Rule 16

Evidence that is "material to preparing the defense" is subject to disclosure under Rule 16(a)(1)(E)(i). The language of the materiality requirement "indicates that the drafters of the rule recognized the government's *Brady* obligation." *Jordan*, 316 F.3d at 1250 n.74. Thus, "[t]he 'materiality standard' is 'not a heavy burden,' and 'evidence is material as long as there is a strong indication that it will 'play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.'" *Wasserman*, 2022 WL 17324426, at *3 (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)).

Rule 16(a)(1)(E) "is not necessarily limited to preparation for trial defenses." *United States v. Singleton*, 2023 WL 2164588, at *3 (S.D. Fla. Feb. 13, 2023) (report and recommendation). Evidence can be "material" in "several ways: by preparing a strategy to confront the damaging evidence at trial; by conducting an investigation to attempt to discredit that evidence; or by not presenting a defense which is undercut by such evidence." *United States v. Marshall*, 132 F.3d 63, 68 (D.C. Cir. 1998). The Rule also "permits discovery to determine whether evidence in a particular case was obtained in violation of the Constitution and is thus inadmissible." *United States v. Soto-Zuniga*, 837 F.3d 992, 1001 (9th Cir. 2016).

The prosecution "cannot take a narrow reading of the term 'material' in making its decisions on what to disclose under Rule 16." *O'Keefe*, 2007 WL 1239204, at *2. "[B]urdensomeness," "logistical difficulty," and "concerns about confidentiality and the privacy rights of others" do not "trump the right of one charged with a crime to present a fair defense." *Id.* "The language and the spirit of the Rule are designed to provide to a criminal defendant, in the interest of fairness, the widest possible opportunity to inspect and receive such materials in the possession of the government as may aid him in presenting his side of the case." *United States v. Poindexter*, 727 F. Supp. 1470, 1473 (D.D.C. 1989).

## B.  Improper Coordination With NARA To Abuse The Grand Jury Process

Consistent with the September 15, 2021 request by the White House Counsel's Office to "discuss process before anything [was] provided" to President Trump's PRA representatives, Ex. 6 at USA-00383678, the record suggests that the Special Counsel's Office coordinated with NARA to use one or more pretextual grand jury subpoenas as an investigative tool designed to circumvent PRA procedures.  The coordination is further evidence of NARA's role on the prosecution team, and the Office should be required to make further disclosures regarding these issues because they support President Trump's arguments relating to violations of due process and the PRA.

### 1.  Background

On November 22, 2022, the FBI's Counterintelligence Division sent a memorandum to NARA's General Counsel seeking "access to . . . information" relating to declassification decisions, training on classified information handling and the PRA, and "signed non-disclosure agreement." Ex. 54.  It is not clear how NARA responded to the request, but eventually the Special Counsel's Office issued at least one grand jury subpoena with overlapping requests.

During a call on January 26, 2023, the Special Counsel's Office, FBI, and NARA discussed a grand jury subpoena. Ex. 55.  The FBI's report relating to the call indicates that the group

discussed NARA's "process and compliance" with the subpoena, the "notification process," and "compliance considerations." *Id.* at USA-00941292. On February 13, Bratt sent a letter to Stern, NARA's General Counsel, that referenced a January 23 subpoena, the January 26 call, and an "agree[ment] to narrow Request Number 8 in the January 23, 2023 grand jury subpoena to require production only of the original documents with classification markings that were in the fifteen boxes that former President Trump provided to NARA on January 17, 2022." Ex. 56.

On May 4, 2023, a similar cast of personnel from the Office, FBI, and NARA gathered for a meeting regarding a subpoena. Ex. 57. The report relating to the meeting states NARA General Counsel Gary Stern

> provided 81 unclassified documents in response to Grand Jury Subpoena 44-0064, which referenced declassification. Upon further review, 15 documents were flagged of interest for potential production by NARA to DOJ. No documents were removed from NARA's building on May 4, 2023. Stern will provide copies of the 15 flagged documents by early week of May 8, 2023.

*Id.* The report also states that the group discussed "multiple legal options relating to potential additional NARA records, that would ensure proper protocol and lead to timely production of the documents in question." *Id.* at USA-00943085-86.

A set of notes relating to the May 4, 2023 meeting shed additional light on the discussion. Ex. 58. The notes suggest that 19 of the responsive documents related to the "Durham Inv[estigation]" and "Crossfire Hurricane," and that those documents were "already in DOJ/FBI possession." *Id.* The notes contain the following additional entries:

- "[N]unez declass," *id.*, which appears to be a reference to former Representative Devin Nunes.[14]

---

[14] *See* Nunes Statement on Release of HPSCI Memo, House Permanent Select Committee on Intelligence (Feb. 2, 2018), https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=856.

- "Discussion Gary Stern & Jay Bratt on the procedures if priv. is asserted – GJ vs normal process i.e. motion to compel[]."

- "15/81 flagged for use/NARA GJ production."

*Id.*

## 2. Discussion

The Special Counsel's Office should be required to make additional disclosures regarding the foregoing sequence of events, including all reports, notes, and communications concerning the production of documents by NARA to DOJ, FBI, or the Special Counsel's Office and the decision to issue grand jury subpoenas to NARA during the course of those events. *See* Local Rule 88.10(g) (requiring preservation of "all rough notes").

It is clear from the record that the Special Counsel's Office did not need to use grand jury subpoenas to obtain records from NARA in 2023. *See United States v. (Under Seal)*, 714 F.2d 347, 349 (4th Cir. 1983) (reasoning that the "grand jury serves an independent investigatory function" and "practices which do not aid the grand jury in its quest for information bearing on the decision to indict are forbidden"). NARA had "consulted" DOJ by September 2021. Ex. 2. By February 2022, NARA had started to voluntarily produce materials to DOJ and the FBI. These materials included a large volume of internal emails provided to the FBI by ▮▮Per. 53▮▮ on or about February 15, as well as an inventory relating to the 15 Boxes. In April and May 2022, the prosecution and NARA rushed President Trump's PRA representatives to respond to the access request relating to the 15 Boxes so that NARA could give the FBI unfettered access to its contents. Ex. 23 at USA-00309419; Ex. 24 (FOIA). The FBI's November 2022 memorandum seeking voluntary assistance from NARA is further proof that all parties understood that compulsory process was unnecessary. *See* Ex. 50.

Some references in the reports and notes suggest that the prosecution team was strategizing on how best to transfer records from the Trump Administration while providing minimal notice under the PRA. *See United States v. Goldstein*, 989 F.3d 1178, 1202 (11th Cir. 2021) ("A due process problem might arise in the context of parallel investigations if the two government arms collude in bad faith to deprive the defendant of his constitutional rights . . . [in a manner that] involves 'affirmative misrepresentations' or 'trickery or deceit . . . .'"); *United States v. Stringer*, 535 F.3d 929, 940 (9th Cir. 2008) ("A government official must not affirmatively mislead the subject of parallel civil and criminal investigations into believing that the investigation is exclusively civil in nature and will not lead to criminal charges." (cleaned up)); *United States v. Gertner*, 65 F.3d 963, 971 (1st Cir. 1995) ("We take no pleasure in upholding a finding that government actors constructed a pretext to avoid due compliance with statutorily prescribed requirements."). Thus, the requested document disclosures—as opposed to post-hoc justifications from the Office—are necessary to shed light on entries reflecting discussion of, for example: (1) "compliance considerations," Ex. 55 at USA-00941292; (2) "multiple legal options relating to potential additional NARA records," Ex. 57 at USA-00943085; and (3) "procedures if priv. is asserted – GJ vs normal process i.e. motion to compel[]," Ex. 58.

Finally, the notes from the May 4, 2023 meeting suggest that the Special Counsel's Office instructed NARA not to provide certain of the 81 documents that NARA had determined were responsive to the purported grand jury subpoena. *See* Ex. 57 at USA-00943085. That request supports President Trump's position that the Office's relationship with NARA is anything but arms' length, which is why, as discussed above, NARA must be considered part of the prosecution team. In addition, any instruction by the Office to withhold otherwise-responsive records is also probative of an abuse of the grand jury process. *See United States v. Calk*, 87 F.4th 164, 186 (2d

Cir. 2023) ("[C]ourts may not ignore possible abuse of the grand jury process, as the grand jury is not meant to be the private tool of a prosecutor." (cleaned up)).  Moreover, DOJ's instruction to withhold certain of the documents would be even more problematic if any of those materials were favorable to President Trump and have not been produced.  For all of these reasons, the Office should be required to identify and disclose the "81" documents referenced in Exhibits 57 and 58, as well as the subset of "19 docs already in DOJ/FBI possession" and the "15/81 flagged for use/ NARA GJ production."  *Id.*

### C.  The Attempt To Retroactively Terminate President Trump's Security Clearance And Related Disclosures

In June 2023, after the Office filed the lawless charges in this case, the Department of Energy purported to retroactively terminate President Trump's security clearance.  The Office must make further disclosures regarding the circumstances of that decision, as they are probative of President Trump's bias defense, and potential motions regarding spoliation of evidence relating to database records that previously reflected the clearance.  Records reflecting that President Trump possessed an active security clearance in 2023 are also discoverable because they are relevant to the issue of whether any possession of allegedly unclassified documents in 2021 and 2022 was "unauthorized," as alleged in the § 793(e) charges in the Superseding Indictment.  More broadly, all records relating to President Trump's security clearances and training are relevant to the Office's allegations regarding "unauthorized" possession and "willful[]" conduct under § 793(e).

#### 1.  Background

On August 15, 2023, the Special Counsel's Office disclosed an exculpatory Department of Energy memorandum relating to President Trump's security clearance.  The memorandum was signed on June 28, 2023, weeks after the Office filed the Indictment but more than a month before

it was produced.  It is unclear from the discovery how and to whom the memorandum was transmitted to the prosecution team.

In the memorandum, the Energy Department's Assistant General Counsel disclosed that the agency's Central Personnel Clearance Index and Clearance Action Tracking System "reflect[ed] an active Q clearance" for President Trump.  Ex. 59 at USA-01116848.  Based on "[i]nformation provided by the Office of Environment, Health, Safety and Security (EHSS) and documents reviewed by the Office of the General Counsel," the Assistant General Counsel instructed that the relevant systems "be immediately amended" and "promptly modified to reflect the terminated status of [President] Trump's Q clearance."  *Id.*  The Energy Department concluded that these steps were appropriate "as a matter of law" based on a retroactive interpretation of the terms of President Trump's clearance.  *Id.*

After locating this memorandum interspersed with the huge volume of discovery, President Trump requested additional disclosures relating to the Energy Department's determination and other security clearance issues.  The Office declined to provide any additional information.  To date, the productions of the Special Counsel's Office concerning these issues appear to have been limited to a June 15, 2023 FBI document reporting that "[t]he SCATTERED CASTLES check run on 6/14/2023 for Former President Donald J. Trump was negative."  Ex. 60.  According to Intelligence Community Policy Guidance § 704.5, Scattered Castles is the "the program name for the IC security clearance repository for all clearance and access determinations."[15]  Section 704.5(g) requires that certain historical clearance records be maintained.  The Defense Department

---

[15] Intelligence Community Personnel Security Database Scattered Castles, Intelligence Community Policy Guidance 704.5, Office of the Director of National Intelligence, *available at* https://www.dni.gov/files/documents/ICPG/ICPG-704-5-IC_Personnel_Security_Database_Scattered_Castles_2020-02-25.pdf (last visited Jan. 15, 2024).

also maintains a Defense Information System for Security, which was known as the Joint Personnel Adjudication System during the Trump Administration.[16]  It does not appear that the Office has produced any records, or confirmation of the lack of relevant records, from that system.

## 2.  Discussion

All information concerning President Trump's security clearances, read-ins, and related training is discoverable in light of President Trump's bias and due process defenses, as well as the allegations in the § 793(e) charges relating to "unauthorized" and "willful[]" possession.  *See United States v. Morison*, 844 F.2d 1057, 1071 (4th Cir. 1988) ("An act is done willfully if it is done voluntarily and intentionally and with the specific intent to do something that the law forbids. That is to say, with a bad purpose either to disobey or to disregard the law.").[17]  This includes, where applicable, the failure to maintain formal documentation and training that is typically required, which could support a good-faith belief that possession was authorized because such formalities had previously been dispensed with.  *See United States v. Larrahondo*, 885 F. Supp. 2d 209, 218 (D.D.C. 2012) ("[U]nder *Brady*, the government has an obligation to turn over material information that would undermine the evidence it intends to admit at trial."); *see also United States v. Hitselberger*, 991 F. Supp. 101, 106 (D.D.C. 2013) (discussing relevance of training); *United*

---

[16] Defense Information System for Security (DISS), Defense Counterintelligence and Security Agency, https://www.dcsa.mil/Systems-Applications/Defense-Information-System-for-Security-DISS (last visited Jan. 15, 2024).

[17] In *Morison*, the Fourth Circuit discussed a related instruction regarding whether information is "relating to the national defense," *i.e.*, the NDI Element of § 793(e) discussed in the Classified Supplement.  *See* 844 F.2d at 1071-72.  The approved instruction on the NDI Element required that information from the photographs at issue in *Morison* be (1) "closely held," and (2) "potentially damaging to the United States or might . . . useful to an enemy of the United States." *Id.*  President Trump will establish in pretrial motions, motions *in limine*, and proposed jury instructions that the Court should provide a similar instruction on the NDI Element under the unique circumstances of this case.

*States v. Kiriakou*, 898 F. Supp. 2d 921, 925 (E.D. Va. 2012) (noting probative value of "a government employee trained in the classification system").  Although potential sources of such information include the "Scattered Castles," the "Defense Information System for Security," and/or the "Joint Personnel Adjudication System," it is incumbent on the Office—not the defense—to locate these materials within the prosecution team or confirm their nonexistence.

The Special Counsel's Office must also make additional disclosures regarding the Department of Energy's memorandum.  On its face, the document supports President Trump's defenses regarding, *inter alia*, bias in the Intelligence Community and due process violations arising from improper coordination.  *See United States v. Edwards*, 887 F. Supp. 2d 63, 68 (D.D.C. 2012) ("It is not for the prosecutor to decide not to disclose information that is on its face exculpatory based on an assessment of how that evidence might be explained away or discredited at trial, or ultimately rejected by the fact finder." (cleaned up)); *United States v. Stevens*, 2008 WL 8743218, at *5 n.1 (D.D.C. Dec. 19, 2008) ("Obviously, a statement may be exculpatory and subject to disclosure to the defense, even if the government believes the statement is untrue . . . .").  Weeks after the Office filed the Indictment, the Energy Department sought to "modif[y]" the inconvenient truth that the agency possessed records showing that President Trump still maintained a security clearance.  In order to permit President Trump to prepare his defenses and present them to the jury, the Office must produce documents and communications relating to that decision, the drafting of the memorandum, any coordination with other members of the prosecution team on this issue, and the transmission of the memorandum to the prosecution team.  In order to permit President Trump to further substantiate his defense relating to Intelligence Community bias, the Office should be required to disclose how the Energy Department has handled and documented the clearances of prior presidents.

41

At minimum, a valid security clearance undercuts that allegation.  President Trump's "Q clearance" relates most specifically to the "Undated" document charged in Count 19 bearing a "Former Restricted Data" marking, and we expect that it will serve as a basis for a motion to dismiss at the appropriate time.  ECF No. 85 at 35.  However, evidence of post-presidential possession of a valid security clearance between 2021 and 2023 also supports potential arguments, which President Trump is entitled to explore based on existing evidence, concerning good-faith and non-criminal states of mind relating to possession of classified materials.  Accordingly, the Office should be required to produce all records relating to President Trump, including any modified or amended records, from the Energy Department's Central Personnel Clearance Index and Clearance Action Tracking System.

### D.  Use Of Secure Facilities At President Trump's Residences

The Special Counsel's Office should be required to disclose all evidence relating to what the Office previously described to the Court as "temporary secure locations" at Mar-a-Lago, Bedminster, and Trump Tower and related SCIFs at "offsite locations."  9/12/23 Tr. 12-13. Evidence relating to these facilities is discoverable because it refutes the Office's assertions concerning the lack of security at Mar-a-Lago and is also relevant to the § 793(e) allegations concerning "unauthorized" possession" and "willful[]" conduct.

### 1.  Background

The Secret Service and the White House Communications Agency ("WHCA") made arrangements at Mar-a-Lago, Bedminster, Trump Tower, and elsewhere for President Trump to review and discuss classified information.  *See* Classified Supp. Part 8.  A Non-Commissioned Officer who previously worked at the WHCA explained that "his involved the semi-permanent installation of communications infrastructure such as secure Internet and telephone lines," which "remained in place in these locations throughout the President's term."  Ex. 61 at USA-00819429.

The witness referred to these installations as "temporary secure spaces," or "tents," and explained that they were used "frequently at Mar-a-Lago." *Id.* at USA-00819430.

## 2. Discussion

President Trump will dispute at trial the contentions by the Special Counsel's Office that Mar-a-Lago was not secure and that there was a risk that materials stored at those premises could be compromised. These contentions by the Office are foreshadowed by the Superseding Indictment, which emphasizes the facility's commercial success in an effort to suggest that President Trump endangered national security by using it. *See, e.g.*, ECF No. 85 ¶¶ 11-12 (describing "25 guest rooms," "hundreds of members, and 150 social events" between January 2021 and August 2022). Moreover, in response to the Office's allegation that the Secret Service "was not responsible for the protection of TRUMP's boxes or their contents," *id.* ¶ 13, President Trump is entitled to present evidence regarding steps the Secret Service took to secure the residences, such as during and after his successful run in the 2016 election. This evidence is discoverable irrespective of whether President Trump was personally aware of these steps at the time they were taken. *See United States v. Safavian*, 233 F.R.D. 12, 18 (D.D.C. 2005) (reasoning that "[s]imply because the e-mails themselves were not sent to or received by [defendant] . . . does not mean that they are not material to the preparation of a defense" because such documents "may very well include information helpful to the defendant in finding witnesses or documents that could support his contention").

## E.  Evidence Of Bias And Investigative Misconduct

President Trump is entitled to disclosures regarding the issues set forth below, which support his defense relating to the politically motivated and biased nature of the investigation that led to the pending charges.

The requested materials are discoverable because they support pretrial motions under the Sixth Amendment, due process principles, and other constitutional limitations on governmental conduct during a criminal investigation. *See United States v. Cizkowski*, 492 F.3d 1264, 1270 (11th Cir. 2007) ("Outrageous government conduct occurs when law enforcement obtains a conviction for conduct beyond the defendant's predisposition by employing methods that fail to comport with due process guarantees."); *see also United States v. Goldstein*, 989 F.3d 1178, 1202 (11th Cir. 2021) (describing potential "due process problem" where "two government arms collude in bad faith to deprive the defendant of his constitutional rights").

The materials are also subject to the *Brady* obligations of the Special Counsel's Office because the requested information that can be used to "attack[] the reliability of the investigation" and argue that it was "shoddy." *Kyles v. Whitley*, 514 U.S. 419, 442 n.13, 446 (1995); *Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1353 (11th Cir. 2011) (reasoning that "the strategies, tactics, and defenses that the defense could have developed and presented to the trier of fact" included impeaching the "lead detective" in order to "*impugn*[] . . . *the character of the entire investigation*"); *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (holding that *Brady* required disclosure of evidence that could be used in "discrediting, in some degree, of the police methods employed in assembling the case against him").[18]

Attacking the politically motivated nature of a case is one permissible form of impeachment at trial. *See United States v. Eley*, 723 F.2d 1522, 1526 (11th Cir. 1984) (trial defense "that the Department of Justice and all law enforcement officers had set out to convict a man they

---

[18] *Accord Bagcho*, 151 F. Supp. 3d at 70 ("Impeachment evidence can be damaging when it allows defense counsel to attack the reliability of an investigation."); *United States v. Quinn*, 537 F. Supp. 2d 99, 116 (D.D.C. 2008) (holding that *Brady* required disclosure of evidence that would support a "pointed attack on the government's investigation" and "uncritical reliance" on an informant).

knew to be innocent"); *United States v. Cole*, 41 F.3d 303, 311 (7th Cir. 1994) (trial defense seeking "inference of politically motivated investigation and charges"); *United States v. Chavez-Vernaza*, 844 F.2d 1368, 1371-72 (9th Cir. 1987) (trial defense that "consisted of challenges to the credibility of government witnesses and in allegations that the government was politically motivated in bringing the prosecution against him").

For example, President Biden's unprecedented and politically motivated abuse of President Trump's executive privilege—in response to inquiries from the J6 Committee, *see* Exs. 8, 9, and in the subsequent purported delegation of that decision to NARA as reflected in the May 10, 2022 letter, Ex. 24—is central to these issues.  *See Trump v. Thompson*, 142 S. Ct. 680 (2022) ("A former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his Presidency, even if the current President does not support the privilege claim. Concluding otherwise would eviscerate the executive privilege for Presidential communications.") (Kavanaugh, J.).  Therefore, the Special Counsel's Office should be required to disclose the materials described below.

### 1.  Special Counsel Coordination With The Biden Administration

Communications with prosecution team members regarding the underlying investigation by members, relatives, or associates of the Biden Administration are discoverable because they support President Trump's defense regarding the politically motivated nature of the prosecution. *See Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation *or the decision to charge the defendant*, and we may consider such use in assessing a possible *Brady* violation." (emphasis added)).

In April 2022, the *New York Times* reported that, "as recently as late last year, Mr. Biden confided to his inner circle that he believed former President Donald J. Trump was a threat to

democracy and should be prosecuted, according to two people familiar with his comments."  Ex. 62 at 1.  The article also indicated that Biden had "said privately that he wanted [the Attorney General] to act less like a ponderous judge and more like a prosecutor who is willing to take decisive action . . . ."  *Id.*

On November 9, 2022, Biden was much less private.  At a press conference, Biden stated: "we just have to demonstrate that he will not take power—if we—if he does run.  I'm making sure he, under legitimate efforts of our Constitution, does not become the next President again."[19]  On November 15, President Trump announced that he would run for a second term as President.  On November 18, Biden's Justice Department appointed Jack Smith to oversee this case.

This sequence of events supports President Trump's defense that the charges against him are politically motivated.  Many of the actions by the Special Counsel's Office—and in particular their efforts to rush to trial based on misrepresentations about discovery and an unprecedented schedule in this case and the D.C. Case on behalf of the Biden Administration—fly in the face of Justice Manual § 9-85.500.  This provision was promulgated in August 2022, just months before Jack Smith was put in place, and provides:

**Actions that May Have an Impact on an Election**

Federal prosecutors and agents may never select the timing of any action, including investigative steps, criminal charges, or statements, for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party. Such a purpose is inconsistent with the Department's mission and with the Principles of Federal Prosecution. See § 9-27.260. Any action likely to raise an issue or the perception of an issue under this provision requires consultation with the Public Integrity Section, and such action shall not be taken if the Public Integrity Section advises that further consultation is required with the Deputy Attorney General or Attorney General.

---

[19]  Remarks by President Biden in Press Conference, The White House (Nov. 9, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/11/09/remarks-by-president-biden-in-press-conference-8 [hereinafter November 9, 2022 Biden Remarks].

Justice Manual § 9-85.500.  The conduct of the Office in this case plainly violates § 9-85.500 and would, under normal circumstances, be "inconsistent with the Department's mission."  *Id*.  But these are not normal circumstances.  President Biden has all but admitted that through leaks to the *New York Times* and his November 2022 press statement, and the Attorney General has acknowledged that he "personally" authorized his investigation and approved the raid on Mar-a-Lago.

Given these circumstances, any communications between members of the prosecution team and members, relatives, or associates of President Biden concerning the investigation are discoverable because they support President Trump's defense that this prosecution is improper and politically motivated.  The Special Counsel's Office must review the electronic communications of all prosecution team members and produce any such documents.  *See* Justice Manual § 9-5.002(B) ("[A]ll potentially discoverable material within the custody or control of the prosecution team should be reviewed.").

## 2.  Biden Administration Coordination With Georgia Prosecutors

Relatedly, communications between the Biden Administration and prosecutors in Georgia regarding any of the pending prosecutions of President Trump are similarly supportive of President Trump's political bias defense and must be disclosed.

A January 12, 2024 congressional inquiry and other sources indicate that such materials exist.  *See* Ex. 63.  Specifically, Congress sent a letter to "Attorney Consultant" and "Special Assistant District Attorney" Nathan Wade regarding documents suggesting that Wade helped coordinate with the Biden Administration in 2022.  One of Wade's invoices indicates that he devoted eight hours to a "conf. with White House Counsel" on May 23, 2022.  *Id.* at 2.  The meeting occurred within weeks of the *New York Times* reporting on President Biden's leaked

statement that President Trump "should be prosecuted," Ex. 62 at 1, and around the same time that Jonathan Su, from the White House Counsel's Office, was working with NARA to manipulate the PRA in an effort to disclose records to the FBI and the January 6th Committee.

Another of Wade's invoices indicates that he spent eight hours in an "Interview" with "DC/White House" on November 18, 2022.  Ex. 63 at 2.  That is the same day that the Attorney General issued the order appointing Jack Smith, just after President Trump formally announced his candidacy in the 2024 election and is within weeks of President Biden's public statement that he was "making sure" that President Trump "does not become the next President again."

Under these circumstances, evidence demonstrating that parts of the Biden Administration coordinated with Georgia prosecutors to file additional politically motivated charges—while the same White House Counsel's Office was coordinating with NARA during the investigation—supports President Trump's defense that the Biden Administration was coordinating behind the scenes to try to eliminate President Biden's leading political rival.  The Special Counsel's Office must produce any documents further reflecting this coordination.

### 3.  Intelligence Community Bias

Subjective assessments by the Intelligence Community concerning the documents at issue are central to this case.  The Special Counsel's Office will be required to present testimony from Intelligence Community witnesses regarding alleged sensitivities associated with the documents, classification status, and claims about potential harm from unauthorized disclosure.  One of the ways in which President Trump will challenge that testimony is by demonstrating that the

Intelligence Community has operated with a bias against him dating back to at least the 2019 whistleblower complaint relating to his call with Ukrainian President Volodymyr Zelenskyy.[20]

Evidence of such bias is subject to *Giglio* and must be disclosed. *See United States v. Bagley*, 473 U.S. 667, 676 (1985) ("[E]vidence that the defense might have used to impeach the Government's witnesses by showing bias or interest . . . . falls within the *Brady* rule."). This includes classified materials and supporting documentation relating to the January 6, 2021 submission to the Senate Select Committee on Intelligence by the Intelligence Community Analytic Ombudsman, Dr. Barry Zulauf. *See* Ex. 64. The public portion of Dr. Zulauf's submission responded in the affirmative to a question from the Committee regarding whether "[Office of the Director of National Intelligence] officials had politicized or attempted to politicize intelligence, exercised or attempted to exercise undue influence on the analysis, production, or dissemination process of [Office of the Director of National Intelligence]-published intelligence products related to election security." *Id.* at 1. Dr. Zulauf's submission stated that "the Intelligence Community recognizes where we have not met our responsibilities for objective intelligence." *Id.* at 2.

The following day, Director of National Intelligence John Ratcliffe submitted a related letter to Congress regarding analytic bias in the Intelligence Community's assessment of the 2020 election. *See* Ex. 65. Ratcliffe explained that "similar actions by Russia and China are assessed and communicated to policymakers differently," and suggested that "political considerations or undue pressure" had influenced an Intelligence Community assessment. *Id* at 2. Citing a dissenting view by a senior official from the Office of the Director of National Intelligence,

---

[20] *Whistleblower on Trump-Ukraine Contacts is a CIA Officer: Sources*, REUTERS (Sept. 26, 2020), https://www.reuters.com/article/idUSKBN1WB2VF.

Ratcliffe described "institutional pressures that have been brought to bear on others who agree with him." *Id.*  In particular, Ratcliffe emphasized Dr. Zulauf's finding that "CIA Management took actions 'pressuring [analysts] to withdraw their support' from the alternative viewpoint on China 'in an attempt to suppress it.'"  *Id.*

The Court should require the Special Counsel's Office to produce materials relating to the issues raised by Ratcliffe and Dr. Zulauf because it constitutes admissible impeachment of Intelligence Community witnesses.  *See United States v. Calle*, 822 F.2d 1016, 1021 (11th Cir. 1987) ("[E]vidence that happens to include prior misconduct still may be admissible when offered to show the witness' possible bias or self-interest in testifying.").  President Trump is entitled to evidence that CIA leadership pressured analysts to reach particular conclusions, which he can use to further develop this defense and cross-examine CIA witnesses as appropriate.  For example, while President Trump will move to preclude the Office's proffered expert testimony, evidence of this type of bias would be admissible impeachment should that motion be denied in whole or in part.  Therefore, the Office should be required to produce all of the underlying materials relating to the congressional submissions by Ratcliffe and Dr. Zulauf.

### 4.  NARA Bias And Improper Coordination

In pretrial motions and at trial, part of President Trump's defense will rely upon evidence that NARA established itself as an arm of the prosecution rather than a neutral collector of presidential records by [May 2021].  This issue is relevant to pretrial motions to dismiss based on violations of the PRA and President Trump's due process rights, and to the trial defenses discussed above relating to political motivations acted on by government officials that comprised their judgment and integrity.

Given these defenses, NARA's status as a member of the prosecution team, and the record evidence indicating that there are additional responsive materials, the Office should be required to collect from NARA and produce documents and communications relating to the following specific topics:

- President Trump's invocation of executive privilege in response to PRA access requests arising from inquiries by the J6 Committee, DOJ, and law enforcement;

- Consultations regarding President Trump with WH-ORM and the White House Counsel's Office;

- Referrals to prosecuting authorities, *see, e.g.*, Exs. 1, 11, 12 (FOIA), 13 (FOIA), 15, 18 at USA-00309423-26

- Efforts to "time" releases of documents concerning President Trump to achieve an agreed-upon objective, Ex. 7 at USA-00383681;

- Efforts to avoid "triggering" notice obligations to President Trump under the PRA, Ex. 2 at USA-00813152;

- Instructions or advice from the Biden Administration, prosecutors, or law enforcement to refrain from providing information or documents to President Trump and his representatives, *see* Ex. 6 at USA-00383678;

- Drafts of the May 10, 2022 letter in which NARA claimed that President Biden had delegated authority to the agency to reject President Trump's executive privilege, and it had consulted DOJ officials in connection with that process, Ex. 24 (FOIA);

- Advance knowledge of the August 8, 2022 raid at Mar-a-Lago; and

- Responses to requests for assistance and purported grand jury subpoenas relating to President Trump, *see* Part II.B, *supra.*

The Office's production of materials from NARA should include unredacted versions of communications that have been released by NARA pursuant to FOIA in redacted form.

### 5. Other Prosecution Team Bias

In light of President Trump's anticipated defenses, the Special Counsel's Office should also be required to produce documents and communications reflecting bias and/or political animus

toward President Trump by members of the prosecution team.  The record supporting this request includes:

- The August 4, 2022 FBI email memorializing the statement by Deputy Assistant Attorney General George Toscas "that 'he frankly doesn't give a damn about the optics'" of the unprecedented raid at Mar-a-Lago, Ex. 35 at USA-00940276

- The related comment in Exhibit 35 that Bratt had "built an antagonistic relationship" with President Trump's attorney, particularly given the anticipated litigation over the subsequent decision by the Special Counsel's Office to breach President Trump's privilege with that attorney, *see* ECF No. 248 at 2.

- The participation in the investigation of Austin Evers from DOJ's Office of the Deputy Attorney General—which was revealed by FOIA requests—given the bias reflected in Evers' work for a partisan advocacy group called American Oversight and his November 2020 comments to *The New Yorker* that (1) he had "litigation in the can" relating to the PRA, and (2) "[t]here are a lot of senior officials in the Trump Administration who have been relying on impunity to sleep well at night, and I think it will dawn on them over the coming days and weeks that the records they leave behind will be in the hands of people they do not trust, including career public servants."[21]

- The participation in the investigation of Martin Lederman from DOJ's Office of Legal Counsel—which was also revealed via FOIA—given Lederman's social media posts reflecting animus toward President Trump, which are still available.[22]

---

[21] Jill Lepore, *Will Trump Burn the Evidence?*, THE NEW YORKER (Nov. 16, 2020), https://www.newyorker.com/magazine/2020/11/23/will-trump-burn-the-evidence.

[22] Lederman's X account still includes biased posts from 2019 and 2020 that are highly critical of President Trump.  *See, e.g.*, @marty_lederman, X (Apr. 13, 2020, 9:12 PM), https://twitter.com/marty_lederman/status/1249868100855640065 (asserting falsely that President Trump would "assert dictatorial powers"); @marty_lederman, X (Nov. 3, 2019, 8:56 PM), https://twitter.com/marty_lederman/status/1191172269927743488 (supporting failed 2019 impeachment proceedings and referring falsely to "daily degradations of the office"); @marty_lederman, X (Oct. 23, 2019, 8:54 PM), https://twitter.com/marty_lederman/status/1187170575845937153 (declaring President Trump's "utter unfitness for office"); @marty_lederman, X (Oct. 8, 2019, 9:50 PM), https://twitter.com/marty_lederman/status/1181748733425397761 (referring to President Trump as "a man utterly, and indisputably, unfit to hold office").

**6. Production Of All Correspondence And/Or Communications Concerning Counsel**

As the Court is aware, "the classified-documents case against former President Donald J. Trump," has involved a number of, "attention-grabbing development[s], Mem. Op., *In re Press Application for Unsealing of In re Grand Jury Subpoena*, No. 42-gj-67 (Nov. 29, 2023), involving defense counsel. Largely, these were addressed in defense counsel's August 14, 2023, sealed submission to the Court, ECF No. 118, in response to the Court's August 7, 2023, Order requesting more information about the ███████████████████████████████████████████████

████████████████████████████████████████████████ ECF No. 101.

As if the events described in these filings were not enough, through discovery, defense counsel has learned that the Office's interest in Mr. Woodward's representation of Mr. Nauta (and others) involved both the subpoena of information concerning Mr. Woodward representations and the questioning witnesses about Mr. Woodward's representations.

As early as January of 2023, Mr. Woodward is described by the Office as a "witness" in this investigation. Specifically, on January 30, 2023, FBI records reflect a request by the Office to review and summarize toll records of contacts between Mr. Woodward and ███ Per. 5 ███, on the one hand, and ███ Per. 49 ███, ████████████████████████████████,

Save America, on the other. Ex. 66. As this Court is no doubt aware, with respect to subpoenas for information concerning an attorney-client relationship, the Justice Manual advises:

> Because of the potential effects upon an attorney-client relationship that may result from the issuance of a subpoena to an attorney for information relating to the attorney's representation of a client, the Department exercises close control over . . . subpoenas to attorneys for information relating to the representation of clients.

Justice Manual § 9-13.410. Specifically, such subpoenas, "must first be authorized by the Assistant Attorney General or a Deputy Assistant Attorney General for the Criminal Division

before they may issue, unless the circumstances warrant application of . . ." an exception not relevant here. *Id.*

Here, **Per. 5** was counsel to Save America at the time **Per. 49** 's phone records were obtained. Nor is it clear that Office understood the scope of Mr. Woodward's representation with respect to Save America. In a voluntary interview with **Per. 49** in February of 2023 (after the review and summary of **Per. 49** 's contacts with Mr. Woodward), **Per. 49** is recounting how lawyers were chosen to represent witnesses in the Office's investigation. One telling colloquy proceeds as follows:

> SCO: Yeah. I'm curious how some of the other lawyers were, were located as well.
>
> **P. 49**: Okay. So I'm doing this from memory, so **Per. 16** , _____, Woodward –
>
> SCO: Does someone recommend Woodward?

Ex. 67 (excerpted).

So interested is the Office in Woodward's representation, they interrupt **Per. 49** as soon as his name is mentioned. Then, in a subsequent interview in April of 2023, **Per. 49** is asked about the retention of Mr. De Oliviera's counsel, John Irving. The Office observes, with respect to Mr. Irving's retention, "unlike Stanley Woodward, it wasn't like you were involved in picking a lawyer [but] turned it over to **Per. 5** ," and then later the Office's counsel surmises, with respect to **Per. 49** selection of counsel:

> [B]ut I'm **Per. 49** , I'm paying for lawyers here, there and everywhere, yeah, I know Carlos is the maintenance guy at Mar-a-Lago. But I want to pay for a guy's lawyer if he's going to like, you know, sink the ship. Like if he's going to be the guy who like undoes the former President of the United States, I'd like to know that before I'm the one who cuts his lawyer's check.

Ex. 68 (excerpted).

54

Although the Office may argue that neither Assistant Attorney General or Deputy Assistant Attorney General for the Criminal Division approval were required for its ███████ Per. 49 ████ ███████████ because it was not seeking information protected by the attorney-client privilege, their request that an FBI agent review ███ Per. 49 ███ phone records for that purpose, and their subsequent questioning of ██ Per. 49 ██ about that issue, belie any such suggestion. Considering all the facts and circumstances surrounding the Office's interactions with Mr. Woodward, including what has now been learned in discovery, it is clear the Office has long been interested in Mr. Woodward's representation. It is therefore likely that the Office is in possession of additional communications concerning Mr. Woodward, including communications about Mr. Woodward's August 24, 2022, interaction with Mr. Bratt. Because such communications would be material to the defense of this action, the Office should be compelled to produce the same or confirm, in writing, that no such materials exist.

### F. Production Of All Correspondence And/Or Communications Concerning The Search Of Mar-A-Lago

In its search of Mar-a-Lago, the Office searched President Trump's personal residence. When she testified before the Grand Jury, ███ FBI 39 █████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████ FBI 39 █████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

Ex. 69 at USA-00812500 (excerpted). The significance of this oversight by the Office in its search of Mar-a-Lago cannot be overstated. Specifically, one of the manner and means of the conspiracy with which the defendants are charged includes, "moving boxes of documents to conceal them

from Trump Attorney 1, the FBI, and the grand jury[.]"  Superseding Indictment at 39 ¶ 97(b), ECF No. 85 (emphasis added).  The only time the FBI searched for classified materials was during the August 8, 2022, search of Mar-a-Lago.  It follows, then, that the Office will attempt to argue that boxes of classified materials were moved in and around the President's residence for the purpose of concealing the same from the FBI during its search.  And the locked door the FBI inexplicably failed to search is critical to any such argument.

Moreover, we know from communications produced through discovery that FBI Agents were communicating throughout the search of Mar-a-Lago.  In an email sent to members of the FBI conducting the search, Agent ███ FBI 39 ███ writes at 2:07:37 PM, "We are wrapping up the office. About to move to residence.  Let your teams know."  Thereafter, at 4:33:26 PM, Agent ███ FBI 39 ███ writes, "Residence is complete."  And after the conclusion of the search, Agent ███ FBI 39 ███ writes at 10:35:04 PM that two attorneys with the Department of Justice were present for the search (both of whom would later join the Office).  Ex. 70 at USA-00940279-80.  It is inexplicable that members of the FBI (let alone the Office) would have no communications concerning the decision not to search an area of the President's residence – ███ FBI 39 ███████████████████████

███████████████████████████████████████████████████████

███████████████████  And such communications have infamously not been disclosed in recent high-profile cases.  Accordingly, the SCO should be compelled to search for and produce all correspondence about the search of Mar-a-Lago on August 8, 2022.

### G.  Production Of CCTV Video Footage

Central to the Special Counsel's prosecution of President Trump and Messrs. Nauta and De Oliviera is the allegation that the three conspired to hide classified documents from investigators.  Specifically, one of the manner and means of the conspiracy with which the defendants are charged includes, "moving boxes of documents to conceal them from Trump

Attorney 1, *the FBI*, and the grand jury[.]"  Superseding Indictment at 39 ¶ 97(b), ECF No. 85 (emphasis added) (Count 33).  The Superseding Indictment also alleges that President Trump and Mr. Nauta "misled Trump Attorney 1 by moving boxes that contained documents with classified markings so that Trump Attorney 1 would not find the documents and produce them to a federal grand jury."  *Id.* at ¶¶ 99, 101 (Counts 35 and 36); and that President Trump and Mr. Nauta, "hid. Concealed, and covered up from" the FBI and the grand jury, "[President Trump's] continued possession of documents with classified markings," *Id.* at ¶¶ 103, 105 (Counts 36 and 37).

This purported "concealment" allegedly occurred in May and June of 2022 when, in the days leading up to Trump Attorney 1's scheduled review of boxes in a storage room purportedly containing documents with classified markings, Mr. Nauta is alleged to have removed, "approximately 64 boxes from the storage room to [President Trump's] residence, and [Messrs. Nauta and De Oliviera] brought [returned] to the storage room only approximately 30 boxes."  *Id.* ¶ 63.  As evidence of the fact that Trump Attorney 1 did not review all the boxes purportedly containing documents with classified markings, the Special Counsel has alleged that when the storage room was inspected by Special Counsel attorney Jay Bratt on June 3, 2022, it differed in appearance from how the storage room was depicted in November of 2021.  *Id.* ¶ 40.  *See also In re Search Warrant*, Attachment A, No. 23-mj-8332-BER (S.D. Fl. Aug. 5, 2022) (describing how DOJ Counsel – Jay Bratt – were permitted access to the storage room and observed that fewer boxes were present than had been previously depicted).  Thereafter, the Superseding Indictment alleges, when the storage room was searched by the FBI on August 8, 2022, documents with classified markings were discovered that, the Superseding Indictment insinuates, were not present when Trump Attorney 1 searched the storage room in June of 2022 (of note, the Superseding Indictment does not allege that boxes of the type found in the storage room were recovered

anywhere other than in the storage room).   Therefore, critical to the defense of the Special Counsel's allegations is whether more boxes were removed from the storage room than were returned to the storage room prior to Trump Attorney 1's review of those boxes, and, assuming the documents with classified markings that were recovered by the FBI during its search of the storage room were moved to the storage room at some point between the June 3 review by Trump Attorney 1 and the August 8 search by the FBI, how, why, and who moved the boxes to the storage room during that time.   Put simply, the CCTV footage in this matter is central to the Special Counsel's prosecution and the defense thereto.   However, the Special Counsel's production of CCTV has been unworkable and precludes defense counsel from having meaningful access to this crucial discovery.

At the outset, in its initial production of discovery in this case, the Special Counsel produced roughly 80 terabytes of data consisting of the CCTV footage obtained in its investigation. In its July 6, 2023, cover letter accompanying the production, the Special Counsel indicated that the CCTV footage was contained in 21 separate folders, as depicted in the below excerpt of their correspondence:

| Folder | Description |
|--------|-------------|
| 1B1 | MAL CCTV |
| 1B14 | MAL CCTV |
| 1B15 | MAL CCTV |
| 1B17 | MAL CCTV |
| 1B18 | MAL CCTV |
| 1B19 | MAL CCTV |
| 1B2 | MAL CCTV |
| 1B20 | MAL CCTV |
| 1B21 | MAL CCTV |
| 1B22 | MAL CCTV |
| 1B23 | MAL CCTV |
| 1B29 | MAL CCTV |
| 1B3 | MAL CCTV |
| 1B30 | MAL CCTV |
| 1B31 | MAL CCTV |
| 1B32 | MAL CCTV |
| 1B33 | MAL CCTV |
| 1B6 | MAL CCTV |
| 1B7 | Life Storage CCTV |
| QWF5 | Jet Aviation CCTV |
| QWF7 | Life Storage CCTV |

Each of these folders contained hundreds of individual files that had been compressed using proprietary software, 7-Zip.[23]   Decompressing these folders required hundreds of hours.  Below is a screenshot of the extraction of folder "1B6" from October of 2023:

---

[23] https://www.7-zip.org/.



And below is a screenshot of the extraction of folder "1B18" from November of 2023:



Of note, defense counsel learned that these files were not produced to the Special Counsel's office in such a compressed format.  Rather, the Special Counsel compressed them and then produced them to defense counsel in a manner requiring hundreds of hours of extraction time before the video could be reviewed.

In addition, the Special Counsel's production included, "proprietary players produced by the camera system vendors . . . [and such video] will play exclusively in the player manufactured by the same company."  Upon extraction of the players, however, defense counsel continued to have issues playing the video.  Defense counsel for Mr. Nauta was not able to launch the proprietary video player at all.  Defense counsel encountered the below errors, which were shared with the Special Counsel on January 11, 2024, but to date has received no response.





Counsel for Mr. De Oliviera encountered similar issues. Initially, in November of 2023, the Special Counsel directed counsel for Mr. De Oliviera to consult tech support with Milestone, the company that created the software that captures CCTV footage at Mar-a-Lago. In turn, Milestone tech support advised defense counsel that the Special Counsel's production lacked required technical configuration files. When defense counsel advised the Special Counsel of this fact, the Special Counsel advised that: "The FBI also initially had difficulty viewing some videos" and advised that to make the video work, additional files would need to be copied in each of the individual folders (of which there are thousands) provided by the Special Counsel. Thus, from its initial receipt of the video that is crucial to the defense of this case, the Special Counsel was aware of issues viewing the video.

To that end, internal documentation of the Special Counsel's receipt and processing of the CCTV confirm that defense counsel was not provided with video that defense counsel can readily access. For example, in a Technical Report attached to an FBI FD-1036 dated September 8, 2022,

the FBI noted that, "Confirmation was received from the Multimedia Exploitation Unit (MXU) that the files for all uploaded cameras/facilities were received for transcoding and processing *into a viewable format for review*."  *See* USA-01286032 (emphasis added).

Accordingly, this Court should compel the production of CCTV footage in a manner that is readily accessible to defense counsel.  The government's obligation to produce exculpatory evidence is supplemented by Rule 16 of the Federal Rules of Criminal Procedure, which seeks to "prescribe the minimum amount of discovery to which the parties are entitled, and leaves intact a court's discretion to grant or deny the 'broader' discovery requests of a criminal defendant." *United States v. Jordan*, 316 F.3d 1215, 1249 n.69 (11th Cir. 2003) (internal quotation marks omitted) (citing Notes of Advisory Committee on 1974 Amendments to Federal Rules of Criminal Procedure, Fed. R. Crim. P. Rule 16).  It defies credulity to suggest that the Special Counsel has satisfied its burden by first altering the raw data it received and then knowingly producing it in a way that rendered unreviewable.  We know the Special Counsel has rendered the video viewable, because it included key sections of that video in its production of video to the defendants.  The Special Counsel should be required to produce all the video it obtained in this viewable format.[24]

---

[24] Defendants also respectfully request that the Court order the Special Counsel's Office to produce unredacted copies of discovery previously produced to Defendants in redacted form.  As the Court is aware, nothing in Rule 16 of the Federal Rules of Criminal Procedure authorizes the Office to unilaterally produce redacted material.  Rather, Rule 16 authorizes the Court to, "for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief."

## CONCLUSION

For the foregoing reasons, President Trump respectfully submits that the Court should: (1) following any necessary hearing to resolve factual disputes, issue an order setting the appropriate scope of the prosecution team in this case for purposes of the discovery obligations of the Special Counsel's Office, and (2) compel the Office to disclose the information requested in this brief and the accompanying Classified Supplement.

Dated: January 16, 2024

Respectfully submitted,

*/s/ Todd Blanche*
Todd Blanche (PHV)
toddblanche@blanchelaw.com
Emil Bove (PHV)
emil.bove@blanchelaw.com
BLANCHE LAW PLLC
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*/s/ Christopher M. Kise*
Christopher M. Kise
Florida Bar No. 855545
ckise@continentalpllc.com
CONTINENTAL PLLC
255 Alhambra Circle, Suite 640
Coral Gables, Florida 33134
(305) 677-2707

*Counsel for President Donald J. Trump*

## **CERTIFICATE OF SERVICE**

I, Christopher M. Kise, certify that on January 16, 2024, I electronically filed the foregoing

document with the Clerk of Court using CM/ECF.

_/s/ Christopher M. Kise_
Christopher M. Kise