Ex. 1



## NATIONAL ARCHIVES

████████ Per. 53 ████████ @nara.gov>

## .issing Trump Records
1 message

**GaryM Stern** <████████@nara.gov>
To: David Ferriero <████████@nara.gov>, "Wall, Debra" <████████@nara.gov>, " Per. 53 "
████████@nara.gov>, Per. 48 " <
Cc: Per. 21

Wed, May 5, 2021 at 9:48 AM

fyi, Per. 21 and I have had several conversations with Per. 40 since the end of the Trump Administration about various paper records that he believes were not transferred to us Per. 40 has also raised some of these concerns directly with David). Attached is the text of an email I am planning to send to the Trump PRA reps ( Per. 38, Per. 33, Per. 47 ) seeking their assistance in accounting and transferring them to us.

Please review and let us know if you have any questions or comments or would like to discuss further.

Also, we are still working through various problems with social media records, and at some point will need to raise them also with the Trump reps.

Thanks,
Gary

Gary M. Stern
General Counsel
National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740
████████ (office)
████████ (fax)
████████@nara.gov





NATIONAL ARCHIVES

📘 🐦 ▶️ 📌 ⓟ

📄 **Trump Transition Issues.2.docx**
16K

Subject to Protective Order

USA-00383564

Draft

Dear XX:

As the EOP continues to transfer the electronic Trump Presidential records into our custody, we have come upon several problems that we need your help in resolving. We have already been working with Scott to address various issues with respect to capturing Presidential records on social media accounts; his assistance has been very helpful, although some problems remain that will likely require further follow up with you.

We are now also aware that certain paper/textual records cannot be accounted for. We therefore need your immediate assistance to ensure that NARA receives all Presidential records as required by the Presidential Records Act.

For example, the original correspondence between President Trump and North Korean Leader Kim Jong-un were not transferred to us; it is our understanding that in January 2021, just prior to the end of the Administration, the originals were put in a binder for the President, but were never returned to the Office of Records Management for transfer to NARA. It is essential that these original records be transferred to NARA as soon as possible.

Similarly, the letter that President Obama left for President Trump on his first day in office has not been transferred; since that letter was received by President Trump after he became President, it is considered a Presidential record – all of the other Presidential Libraries maintain the original copy of similar letters, and it is necessary that it be provided to us as well.

It is also our understanding that roughly two dozen boxes of original Presidential records were kept in the Residence of the White House over the course of President Trump's last year in office and have not been transferred to NARA, despite a determination by Pat Cipollone in the final days of the Administration that they need to be.

We know things were very chaotic, as they always are in the course of a one-term transition. This is why the transfer of the Trump electronic records is still ongoing and won't be complete for several more months. But it is absolutely necessary that we obtain and account for all original Presidential records that may still be in the physical custody of President Trump.

Please let us know how we can resolve these issues.

Thanks,

USA-00383565

Ex. 2

FD-302 (Rev. 5-8-10)



UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry     02/18/2022

### DOCUMENT RESTRICTED TO CASE PARTICIPANTS

This document contains information that is restricted to case participants.

On February 11, 2022, ▮▮▮▮ Per. 53 ▮▮▮▮▮, date of birth (DOB)
▮▮▮▮▮▮, Social Security Number SSN: ▮▮▮▮▮▮, telephone numbers:
▮▮▮▮▮   ▮▮▮▮▮, email address:
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮, was interviewed telephonically by Federal
Bureau of Investigation (FBI) Special Agents (SA) FBI 2 and FBI 11
▮▮▮▮▮. After being advised of the identity of the interviewing Agents
and the nature of the interview, Per. 53 provided the following information:

The interviewing agents advised Per. 53 this interview ("the interview")
sought Per. 53 's voluntary cooperation in the FBI's fact-finding efforts.
Per. 53 acknowledged the interview was voluntary. Per. 53 was advised of the
penalties, to include criminal liability, should he not be truthful at any
time throughout the interview. Per. 53 understood his obligation not to
disclose information discussed to an outside party until and/or unless
expressly permitted by the FBI, and agreed to abide by the same.

Per. 53 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮.

Per. 53 and NARA staff maintain working relationships with the White
House Office of Records Management ("WORM"). Per. 53 and NARA's General
Counsel, Gary STERN, share a primary point of contact at WORM in WORM's
▮▮▮▮▮▮▮ Per. 40 .

Prior to the interview, Per. 53 consulted with STERN about the parameters

UNCLASSIFIED//FOUO

| | | |
|---|---|---|
| Investigation on | 02/11/2022 | at Washington, District Of Columbia, United States (Phone) |
| File # | ▮▮▮▮▮▮▮▮▮ | Date drafted 02/12/2022 |
| by | FBI 2, FBI 11 | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

USA-00813151

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//FOUO

(U) Interview of [Per. 53]

Continuation of FD-302 of [Per. 53] , On 02/11/2022 , Page 2 of 7

for discussing the materials NARA received recently (discussed in further detail below), which included likely classified documents, without triggering the obligation to notify the record holder and the incumbent United States President of the inquiry. [Per. 53] was advised and agreed not to disclose content of the classified documents to the interviewing agents.

Around the same time [Per. 53] consulted STERN regarding the above parameters, [Per. 53] reviewed his official NARA email account. [Per. 53] refreshed his recollection of the events surrounding his knowledge of the boxes reported to include materials subject to the Presidential Records Act ("PRA") which were to be transported from Mar-A-Lago in Palm Beach, Florida, to the National Archives in Washington, District of Columbia ("PRA records"). Prior to said e-mail review, [Per. 53] remembered first being made aware of the PRA records during September 1 – 8, 2021. After said e-mail review, [Per. 53] noticed he was party to emails specific to the PRA records which dated from May 1 – 15, 2021. [Per. 53] offered to provide copies of his emails to the FBI.

[Per. 53] was aware of general concerns [Per. 40] and WORM had with tracking, retaining, and preserving PRA material during the TRUMP Administration; however, such concerns are not unique to the TRUMP administration. Keeping track of the universe of PRA materials produced during any US presidential administration is a cumbersome and ongoing process. Decades of learning, experience, and technological advancements improve WORM's and NARA's role in dealing with PRA material throughout its existence. During the waning days of any US presidential administration, WORM and NARA often scramble to transfer relevant PRA material from various facilities, both in the White House, and elsewhere and this process often extends beyond the transfer of administrations. It is not uncommon that PRA material collection extends past the close of any presidential administration, including PRA material discovered by White House officials or staff, Executive Branch officials, and family members/associates of the President/President's staff, well after the close of any given presidential administration.

[Per. 53] understood there were key documents from the TRUMP Administration responsive to the PRA which had not yet been received by NARA. [Per. 53] knew these key documents fell into three general categories of PRA materials: 1) the letter left on the Resolute Desk at the White House from former US President Barack OBAMA to incoming US President Donald TRUMP; 2) Head of State correspondence with North Korea; and 3) a map used by TRUMP during a televised briefing on Hurricane DORIAN.

UNCLASSIFIED//FOUO

Subject to Protective Order

USA-00813152

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//FOUO

(U) Interview of ▓▓▓▓ Per. 53 ▓▓▓▓

Continuation of FD-302 of Per. 53 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ , On 02/11/2022 , Page 3 of 7

During the waning days of the TRUMP presidential administration, Per. 40 expressed concerns to NARA Archivist, David FERRIERO, and Deputy Archivist, Deborah Steidel WALL, that PRA material existed in the White House residence which had not been taken to WORM. These records included approximately two dozen (24) boxes. Per. 40 purported the contents to be newspaper clippings and magazine articles. Before the transition of administrations on January 21, 2021, Per. 40 emphasized to White House Counsel that WORM needed to collect the materials in the boxes from the White House residence prior to the outgoing administration's departure from White House grounds, colloquially referred to as the pack-out period.

STERN contacted at least one representative of former President Donald TRUMP (TRUMP) named ▓▓▓▓ Per. 27 ▓▓▓▓ . Per. 53 noted his May 2021 emails relayed information Per. 40 received from a personal representative of former President TRUMP, possibly Per. 27 . Sometime before May 2021, Per. 27 initially informed Per. 40 that TRUMP had no missing PRA materials. However, on or about May 18, 2021, a TRUMP personal representative told Per. 40 that TRUMP staffers had located the North Korea correspondence in Florida and were still looking for more records.

In early September 2021, STERN had not received any boxes or PRA materials from Per. 27 , a senior personal representative of former President TRUMP, ▓▓ Per. 38 ▓▓ , or any other representative(s) of former President TRUMP. STERN approached Per. 53 to formally draft a letter to DOJ raising concerns about PRA material from the TRUMP administration which remained unaccounted for by NARA.

In Per. 53 years of experience at ▓▓▓ , Per. 53 understood NARA never had to make such a referral to DOJ ("the DOJ referral") to accomplish such an ask. Per. 53 wanted to be sure that the three categories of PRA materials were not in NARA's holdings prior to drafting the DOJ referral. Per. 53 turned to NARA's ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Per. 21 ▓▓▓▓ , in order to conduct pointed searches and double check if NARA's holdings catalogued receipt of material from the aforementioned three categories. Per. 21 and Per. 53 began drafting the DOJ referral letter during the first week of September, 2021. Around the same time, STERN communicated with personal representatives of TRUMP and mentioned the DOJ referral as a way to pressure them to transfer the boxes or any outstanding material subject to the PRA to NARA.

On or about September 4, 2021 STERN forwarded an email to Per. 53 and FERRIERO where Per. 27 asked about twelve boxes containing newspapers,

UNCLASSIFIED//FOUO

Subject to Protective Order

USA-00813153

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//FOUO

(U) Interview of ██████ Per. 53 ██████

Continuation of FD-302 of ██ Per. 53 ██ , On 02/11/2022 , Page 4 of 7

magazines, and various articles potentially responsive to PRA and that said material were located in Florida. There was subsequent discussion about what constituted presidential records versus personal records.

In late December, 2021, a personal representative of TRUMP, █ Per. 1 █ ████████, emailed STERN informing STERN that TRUMP staffers found approximately twelve boxes of material that could be subject to the PRA including the North Korea correspondence, the OBAMA letter and the DORIAN poster. █ Per. 1 █ provided ██ Per. 34 ██ as the point of contact for logistics and further coordination with NARA.

██ Per. 53 ██ recalled the three main representatives from former president TRUMP's office to be ██ Per. 47, Per. 38, Per. 1 ██ ████. █ Per. 53 █ never had direct contact with any representative of former President TRUMP.

On or near January 4, 2022, ██ Per. 53 ██ remembers discussing various options for transport of potential PRA material from Florida to NARA's Headquarters office at 700 Pennsylvania Avenue, NW, in Washington DC (NARA HQ) with NARA's Office of Business Support Services (BSS). █ Per. 53 █'s discussions involving transport options may have included STERN as well as NARA's █████████ ████████████████, █████████████, ████████████, ████████████████; NARA office telephone ████████████), ████'s Deputy, ████████████ (████████████████; NARA office telephone ████── ███), and ██ Per. 21 ██. Not having received a fulsome description of the contents of the boxes, ██ Per. 53 ██ wanted to ensure the boxes were shipped in the most secure manner feasible and reasonable. ██ Per. 53 ██ was not involved in the particular logistical details as he deferred to BSS to execute on the shipping arrangements and NARA's ultimate receipt.

██ Per. 53 ██ did inquire about options to use the United States Department of Defense (DOD) to secure any materials as NARA used DOD on a separate presidential records consolidation project. ██ Per. 53 ██ reasoned that, since NARA did not know the contents of the boxes, NARA needed to move the boxes as if the boxes contained classified records. ██ Per. 53 ██ clarified he had no reason to believe, at said time, there were classified records in the PRA. ██ Per. 53 ██'s thought process was more in terms of maintaining a tight chain of custody and ensuring secure transport.

██ Per. 53 ██ did not recall any other relevant discussions on the PRA material from Florida until on or near January 17, 2022. STERN called ██ Per. 53 ██ on January 17, 2022 to relay that NARA contracted with a company NARA has used for PRA material transport in the past, United Van Lines.  Additionally,

UNCLASSIFIED//FOUO

USA-00813154

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//FOUO

(U) Interview of ███████ Per. 53 ███████

Continuation of FD-302 of  Per. 53  , On  02/11/2022 , Page  5 of 7

United Van Lines had dispatched a truck and its driver to transport boxes
from Mar-a-lago to NARA HQ. STERN added that the driver and truck were in or
near Mar-a-lago transferring fifteen banker boxes with material Per. 1 had
collected for NARA's receipt. STERN did not convey to Per. 53 the identities
of the driver nor the individuals present with the same fifteen banker
boxes. The next thing Per. 53 remembered hearing was that Per. 21 confirmed
receipt of fifteen banker boxes at NARAHQ on or near January 18, 2022.

Per. 21 wrote an email to Per. 53 , STERN, and Per. 21 's boss, Per. 48 ,
on or near January 18, 2022 relaying that Per. 21 conducted a cursory review
of the material the driver had turned over to him [ Per. 21 ] earlier that same
day ("the January 18, 2022 email"). The January 18, 2022 email also
described Per. 21 's cursory review of the materials. Per. 21 noted all the
material found in the boxes to be disorganized in appearance. Per. 21 noted
the preponderance of the material contained in the boxes were newspapers and
magazines. Per. 21 also pointed out the boxes contained what appeared to
Per. 21 to be original records responsive to all three aforementioned
categories of PRA material, as well as some documents recognizable to Per. 21
as containing US Government classified information.

Per. 53 knows it is not uncommon for NARA to receive materials, over
time, from senior US Government leaders which contain some level of
classified materials and information. A number of factors made the
classified material Per. 21 described in the fifteen banker boxes different
from other instances of which Per. 21 has specific knowledge and experience:
1) historically, the classified material is dated, not so contemporary or
close-to-present-day as Per. 21 indicated were contained in the fifteen
banker boxes; 2) historically, the classified information is very sparse,
not as many items as Per. 21 indicated were in the fifteen banker boxes; 3)
the level of sensitivity associated with the historically recovered
classified material was not as high as what Per. 21 indicated some of the
material in the fifteen banker boxes to be; and 4) the classified materials
historically recovered are not from the most recent former President of the
United States.

Per. 53 is not sure where the records contained in the fifteen banker
boxes were stored before NARA's receipt. Per. 53 assumed the records
contained in the fifteen boxes were housed in spaces owned and maintained by
TRUMP and TRUMP's staff since the TRUMP administration's pack-up from the
White House and prior to Per. 21 's receipt. Per. 53 does not know if TRUMP's
property in Mar-a-Lago has a Sensitive Compartmented Information Facility
(SCIF) or a facility accredited to store classified material by a valid USG

UNCLASSIFIED//FOUO

Subject to Protective Order

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//FOUO

(U) Interview of ▮▮▮ Per. 53 ▮▮▮

Continuation of FD-302 of ▮ Per. 53 ▮ _____ , On 02/11/2022 , Page 6 of 7

authority.

As of February 11, 2022, NARA had not inventoried the contents of the 15 boxes, and ▮ Per. 53 ▮ had not seen the contents of the same.

▮ Per. 53 ▮ is concerned there may be additional outstanding material from the TRUMP administration subject to PRA. ▮ Per. 53 ▮'s concerns are rooted in the general lack of confidence the representatives of former President TRUMP gave to STERN and ▮ Per. 53 ▮ since the end of the TRUMP administration. ▮ Per. 53 ▮ was disquieted to hear from STERN that TRUMP representatives initially denied possessing any PRA material. ▮ Per. 53 ▮ believes the representatives of former President TRUMP only began searching for PRA records in earnest after STERN and ▮ Per. 53 ▮ talked over the possibility of NARA submitting a referral to DOJ. ▮ Per. 53 ▮ remains concerned about the varying numbers of boxes, ranging from twenty-four to twelve to ultimately fifteen boxes, as a lack of positive control of the PRA. ▮ Per. 53 ▮ is not aware of any TRUMP representatives communicating or attempting to communicate any reassurance of a comprehensive or methodical search for potential PRA materials.

After ▮ Per. 21 ▮ noted what appeared to ▮ Per. 21 ▮ as still-relevant US Government classified material placed in no particular order amid newspapers and magazines within the fifteen boxes, ▮ Per. 53 ▮ is dubious that any measures of commensurate control and security were taken by representatives of former President TRUMP and/or TRUMP staffers for any length of time since leaving secured space in the White House.

After ▮ Per. 21 ▮'s report of classified material, ▮ Per. 53 ▮ and STERN consulted with Jonathan SU, current Deputy White House Counsel, White House. On or about January 21, 2021, SU referred STERN and ▮ Per. 53 ▮ to Department of Justice Associate Deputy Attorney General Emily LOEB and Associate Deputy Attorney General David NEWMAN. On January 22, 2021 STERN and ▮ Per. 53 ▮ conducted a phone call with LOEB and NEWMAN. On January 24, 2021 Newman instructed NARA to refer the matter to their Office of the Inspector General (IG) and the Office of the Director of National Intelligence (ODNI) IG. NEWMAN also provided DOJ contacts Jay BRATT, Chief of the National Security Division, and Corey AMUNDSON, Chief of the Public Integrity Division.

STERN notified both NARA IG and ODNI IG. They had additional conversations with BRATT and AMUNDSON regarding next steps. ▮ Per. 53 ▮ stated he was concerned about pending special access requests and the need to conduct a detailed inventory. The next ▮ Per. 53 ▮ heard was from the FBI.

UNCLASSIFIED//FOUO

Subject to Protective Order

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//FOUO

(U) Interview of █████ Per. 53 ████████

Continuation of FD-302 of  Per. 53 _____ , On  02/11/2022 , Page  7 of 7

In addition to himself and the interviewing agents, █Per. 53█ believes the following people have been informed by NARA of NARA's receipt of the fifteen boxes and that some of the boxes contained what NARA believes to be US classified material:

- █Per. 21█ , ████████████████████████████ , ████ ;
- █Per. 48█ , ██████████████ NARA;
- Gary STERN, Office of General Counsel, NARA;
- David FERRIERO, United States Archivist, NARA;
- Deborah Steidel WALL, United States Deputy Archivist, NARA;
- █Per. 40█ , ████████████ ;
- ██████████████ , Inspector General (IG) and Staff, NARA;
- Michael ATKINSON, IG and Staff, Office of the Director of National Intelligence (ODNI);
- Jay BRATT, Chief of the National Security Division, DOJ;
- Corey AMUNDSON, Chief of the Public Integrity Division, DOJ;
- Emily LOEB, Associate Deputy Attorney General, DOJ;
- David NEWMAN, Associate Deputy Attorney General, DOJ; and
- Jonathan SU, current Deputy White House Counsel, White House.

█Per. 53█ is available for contact in the future.

Original agent notes from the interview are maintained in the attached 1A.

UNCLASSIFIED//FOUO

USA-00813157

# Ex. 3



Per. 53                    @nara.gov>

## : Need for Assistance re Presidential Records

ı message

**David Ferriero** <          @nara.gov>                                    Wed, Jun 9, 2021 at 5:47 PM
To: GaryM Stern <          @nara.gov>
Cc: "Wall, Debra" <          @nara.gov>, '  Per. 53  ' <          @nara.gov>, '  Per. 48  '
<          @nara.gov>, '  Per. 21  '

This doesn't address the 24 missing boxes.  I am out of patience.

David

David S. Ferriero
Archivist of the United States
700 Pennsylvania Avenue, NW
Washington, DC  20408-0001

www.archives.gov

On Wed, Jun 9, 2021, 5:24 PM GaryM Stern <          @nara.gov> wrote:
fyi, I spoke with  P. 47  on Monday, and he assured me that he is seriously working on this issue and expects to be able to get to a resolution relatively soon.

Thanks,
Gary

Gary M. Stern
General Counsel
National Archives and Records Administration
8601 Adelphi Road
College Park, MD  20740
          (office)
          (fax)
          @nara.gov



NATIONAL ARCHIVES

--------- Forwarded message ---------
From:  Per. 47
Date: Tue, Jun 8, 2021 at 7:42 PM
Subject: Re: Need for Assistance re Presidential Records
To: GaryM Stern <          @nara.gov>
Cc:  Per. 21  |                    Per. 38                    Per. 33

Gary, as we discussed yesterday, we will work with  P. 21  on arrangements for the North Korea materials. We are continuing to look into the other two categories of documents and will get back to you with more information soon.

Subject to Protective Order                                                        USA-00383594

Thanks,
P. 47

---

**From:** GaryM Stern < ██████ @nara.gov>
**Sent:** Wednesday, May 26, 2021 3:59 PM
**To:** Per. 47 ████
**Cc:** Per. 21 ████ ████ Per. 38 ████ ████ ; Per. 33 ████
████

**Subject:** Re: Need for Assistance re Presidential Records

P. 47, P. 21 will coordinate with you on arranging for transfer of the North Korea records.

Please let me know as soon as you can the status of the other records that we have raised. It is vitally important that we account for them, and any other Presidential records that may still be outside of our possession, as quickly as possible.

Thanks,
Gary

Gary M. Stern
General Counsel
National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740
████ (office)
████ (fax)
████ @nara.gov

NATIONAL
ARCHIVES

On Tue, May 18, 2021 at 4:19 PM Per. 47 ████ wrote:
Hi P. 21. The correspondence is at the Florida office.

Get Outlook for iOS

---

**From:** Per. 21 ████
**Sent:** Tuesday, May 18, 2021 4:11:00 PM
**To:** Per. 47 ████
**Cc:** GaryM Stern < ████ @nara.gov>; Per. 38 ████ ████ Per. 33 ████
████

**Subject:** Re: Need for Assistance re Presidential Records

P. 47

Do you have this correspondence at the office in Alexandria? If so, we can pick them up. If not, we'll need to discuss some other options.

P. 21

On Tue, May 18, 2021 at 3:46 PM P. 47 ████ ████ wrote:
Gary,

Subject to Protective Order

USA-00383595

We have the original North Korea correspondence available to send to you. Please let me know the best arrangements to get this to you.

I'm checking on the other items and will circle back with you on those.

Thanks,
P. 47

---

**From:** GaryM Stern <​          ​@nara.gov>
**Sent:** Thursday, May 6, 2021 3:16 PM
**To:** Per. 38          ; Per. 33                    Per. 47

**Cc:** Per. 21
**Subject:** Need for Assistance re Presidential Records

P. 38, P. 33, P. 47

As the EOP continues to transfer the electronic Trump Presidential records into our custody, we have come upon several problems that we need your help in resolving. We have already been working with P. 47 to address various issues with respect to capturing Presidential records on social media accounts; his assistance has been very helpful, although some problems remain that will likely require further follow up with you.

There are also now certain paper/textual records that we cannot account for. We therefore need your immediate assistance to ensure that NARA receives all Presidential records as required by the Presidential Records Act.

For example, the original correspondence between President Trump and North Korean Leader Kim Jong-un were not transferred to us; it is our understanding that in January 2021, just prior to the end of the Administration, the originals were put in a binder for the President, but were never returned to the Office of Records Management for transfer to NARA. It is essential that these original records be transferred to NARA as soon as possible.

Similarly, the letter that President Obama left for President Trump on his first day in office has not been transferred; since that letter was received by President Trump after his term commenced, it is a Presidential record – note that all of NARA's other Presidential Libraries maintain the original copy of similar letters, and it is necessary that this one be provided to us as well.

It is also our understanding that roughly two dozen boxes of original Presidential records were kept in the Residence of the White House over the course of President Trump's last year in office and have not been transferred to NARA, despite a determination by Per. 37 in the final days of the Administration that they need to be. I had also raised this concern with P. 47 during the final weeks.

We know things were very chaotic, as they always are in the course of a one-term transition. This is why the transfer of the Trump electronic records is still ongoing and won't be complete for several more months. But it is absolutely necessary that we obtain and account for all original Presidential records.

Please let us know as soon as you can how we can get these issues resolved.

Thanks,
Gary
          (cell)

Gary M. Stern
General Counsel
National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740
          (office)
          (fax)
          @nara.gov

Subject to Protective Order

USA-00383596

Ex. 4

Message

| | |
|---|---|
| **From:** | █████ Per. 27 ███████████ |
| **Sent:** | 8/30/2021 1:51:58 PM |
| **To:** | David Ferriero [███████████@nara.gov] |
| **Subject:** | Re: NARA documents |

███████████

On Mon, Aug 30, 2021 at 1:51 PM David Ferriero <███████████@nara.gov> wrote:
Best number to call?

On Mon, Aug 30, 2021 at 1:39 PM █ Per. 27 ████ <████████@gmail.com> wrote:
To my knowledge, Nothing has been destroyed. Give me a call at your convenience. Thanks █P. 27█

Sent from my iPhone

On Aug 30, 2021, at 1:01 PM, David Ferriero <████████@nara.gov> wrote:

█ P. 27 █

As you have seen in the press, the House has requested records.  Our ability to respond requires access to the 24 boxes which have yet to be accounted for.  At this point, I am assuming that they have been destroyed.  In which case, I am obligated to report it to the Hill, DOJ, and the White House.

David

On Tue, Aug 17, 2021 at 8:58 PM █ Per. 27 █████████ wrote:
David.  I will check in the am on this

Sent from my iPhone

On Aug 17, 2021, at 2:41 PM, David Ferriero <████████@nara.gov> wrote:

Following up.  Any news from Palm Beach?  And no sign of the Obama letter.

David

On Fri, Jul 30, 2021 at 2:59 PM █ Per. 27 █████████ wrote:
David. █ Per. 27 █ here.  If you could call me.  I understand we have a need for additional federal records to be transferred and █ Per. 38 █ has enlisted my help.  I want to understand the scope of the request from you. Thanks █P. 27█ ████████

Sent from my iPhone

Confidential Treatment Requested
Subject to Protective Order

--
David S. Ferriero
Archivist of the United States
700 Pennsylvania Avenue NW
Washington, DC 20408-0001
█████████████

www.archives.gov

--
David S. Ferriero
Archivist of the United States
700 Pennsylvania Avenue NW
Washington, DC 20408-0001
█████████████

www.archives.gov

--
David S. Ferriero
Archivist of the United States
700 Pennsylvania Avenue NW
Washington, DC 20408-0001
█████████████

www.archives.gov

Confidential Treatment Requested
Subject to Protective Order

Ex. 5


## NATIONAL ARCHIVES

Per. 53     ████████ @nara.gov>

---

# ✓aft Letter to AG re Missing Trump Records
1 message

**GaryM Stern** ‹ ████ @nara.gov›
To: David Ferriero ‹ ████ @nara.gov›, "Wall, Debra" ‹ ████ l@nara.gov›, " Per. 53 ████ @nara.gov›
          Wed, Sep 1, 2021 at 6:01 PM

Attached is a draft letter that we could consider sending to the Attorney General about missing Trump records. It focuses only on the paper records that we believe to be missing (subject to confirmation that they were not unknowingly sent to us). Also, I have now informally reached out to DOJ counsel about this issue.

Also attached is the list of issues that we discovered with respect to social media records, essentially the result of the Trump WH's failure to capture them through the use of third-party archiving tools. I do not think that these problems are something that the AG/DOJ can deal with, but it could be appropriate to report them to Congress -- especially since the January 6 Committee has specifically requested Trump's Tweets from the day of January 6, and our official collection does not include any possible deleted tweets (although it is possible that there were no such tweets from that day).

As I have already noted, Trump's Rep Per. 38 has asked that I discuss this with him later this week. In addition, WH Counsel is now also aware of the issue, and has asked that I keep them in the loop to the extent that we make any reference to the White House Office of Records Management.

I am happy to discuss further how best to address these issues.

Thanks,
Gary

'ary M. Stern
General Counsel
National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740
████ (cell)
████ (office)
████ (fax)
████ @nara.gov


## NATIONAL ARCHIVES



---

**2 attachments**

📄 **AG Letter re Missing Trump Records.docx**
19K

📄 **Problems with Trump Presidential Records on Social Media Platforms.docx**
16K

Subject to Protective Order        USA-00383606

**DRAFT: Attorney Client/Attorney Work Product**

The Honorable Merrick Garland
Attorney General
U.S. Department of Justice
Washington, DC

Dear General Garland:

I write pursuant to my authority as Archivist of the United States to seek your assistance for the recovery of Presidential records that may have been unlawfully removed from U.S. Government custody or possibly destroyed in violation of the Presidential Records Act (PRA), 44 U.S.C. Chapter 22.

The PRA establishes that "[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records; and such records shall be administered in accordance with the provisions of this chapter." 44 U.S.C. § 2202. The PRA further establishes that, "[u]pon the conclusion of a President's term of office . . ., the Archivist of the United States shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President." *Id.* § 2203(g)(1).

The PRA has no explicit provision on how I should address concerns about suspected removal or destruction of Presidential records. I am, therefore, exercising my discretion to follow the process established for me under the Federal Records Act (FRA), which authorizes me to "request the Attorney General to initiate" an action "for the recovery of records unlawfully removed and for other redress provided by law." 44 U.S.C. § 2905(a). The same provision states that I "shall notify the Congress when such a request has been made."

When President Trump left office on January 20, 2021, the National Archives and Records Administration (NARA) assumed full legal custody of all Trump Administration Presidential records. However, given the volume and complexity of the records, the vast majority of which exist in a multitude of electronic formats, and the controversy concerning the election results, it has taken through the summer of 2021 to complete the physical transfer of virtually all of the records from the White House complex and White House data centers to NARA's archival facilities and cloud-hosted data center. In the course of this process, we have become aware that a small number of Trump Presidential paper records were not transferred to NARA, as follows:

- Approximately 24 boxes of paper records that were maintained by President Trump in the White House Residence. During the final days of the Trump Administration, the Chief of Staff and the Counsel to the President had determined that these boxes needed to be transferred to the White House Office of Records Management so that they could be transferred to NARA, but such transfer never took place. We requested that the Office of President Trump search for these records, and have been informed that they could not be located.

                                                    USA-00383607

**DRAFT: Attorney Client/Attorney Work Product**

- The original letter that President Obama left for President Trump on his first day in office. Since that letter was received by President Trump after his term commenced, it is a Presidential record – note that all of NARA's other Presidential Libraries maintain the original copy of similar letters, and it is necessary that this one be provided to us as well. We requested that the Office of President Trump search for this record, and to date it has not been located.

- The original poster board of the path of Hurricane Dorian that President Trump marked up with a sharpie. It was recalled from the White House Office of Records Management prior to the end of the Administration, but was never returned for transfer to NARA. We requested that the Office of President Trump search for this record, and to date it has not been located.

Accordingly, I am hereby requesting your assistance in recovering these missing Presidential records, along with any other original Presidential records from the Trump Administration that may subsequently be identified and located.

Please note that the original correspondence between President Trump and North Korean Leader Kim Jong-un was also missing. However, in response to our request to search for these records, the Office of President Trump has found them in Mara Lago, FL and will be returning them to NARA.

My General Counsel will follow up with your staff to determine the best way to address this issue.

Sincerely,

USA-00383608

### Problems with Trump Presidential Records on Social Media Platforms

- Deleted Tweets from @realDonaldTrump Twitter account.  In March 2017, NARA advised the Trump White House that it should capture and preserve all tweets that the President posts in the course of his official duties, including those that are subsequently deleted, as Presidential records, and NARA was informed by White House officials that they were, in fact, doing so. Since the end of the administration, we learned the White House stopped using an automated tool to capture deleted Tweets in April 2020, and Twitter was unable to provide them to us after the fact.  Accordingly, we were unable to obtain a complete set of these Presidential records from the White House.  We are considering utilizing what was collected by non-governmental sources as an adjunct to our archival collection.

    - In addition, no steps were taken to capture deleted content from any Trump Administration social media records other than @realDonaldTrump until the Administration procured a third party social media archiving tool in February 2018. After that, use of the tool was widespread but not timely. For example, most accounts were eventually enrolled but may have been active for weeks, months, or years prior to enrollment, during which time deleted content was not captured.

- The third party tool used to capture social media content from Twitter, Instagram, and Facebook included the ability to capture direct messages on the platforms. The Administration opted to not enable capture of direct messages, but was unable to report whether direct messaging was used on any of the platforms by the account holders.

- SnapChat was used by the Trump Administration (realdonaldtrump and whitehouse), which advised they were capturing content posted to the platform. NARA reviewed the transferred social media records and has not located any SnapChat content. SnapChat ultimately banned President Trump from the platform and it is not possible to see any previous content. SnapChat advised NARA that the Trump administration used the White House account approximately five times during four years. However, the realdonaldtrump account was used regularly. News reports indicate the account had 1.5 million followers on the platform. It is not known whether direct messaging was enabled on the account.

- NARA identified seven Twitter accounts which we believe contain PRA records but were not captured by the Trump Administration. NARA obtained the publicly available tweets at the end of the administration through a third party to supplement its archival collection. These include accounts from Andrew Giuliani, Chad Gilmartin, Ivanka Trump, Kayleigh McEnany, Kellyanne Conway, Mark Meadows, and Peter Navarro.

- The Trump Administration advised NARA that two social media accounts it believed should be treated as containing PRA content were not enrolled in their third party archiving tool and could not be retroactively enrolled. These accounts were Donald J.

---

Subject to Protective Order

Trump on Facebook and @realDonaldTrump on Instagram. NARA endeavored to work with Facebook to obtain access to the accounts but was never able to do so.

Subject to Protective Order

USA-00383610

Ex. 6

   ███ Per. 53 ███   ████@nara.gov>

## Fwd: [EXTERNAL] Re: call
1 message

**GaryM Stern** <████@nara.gov>                                                Thu, Sep 30, 2021 at 11:38 AM
To: David Ferriero <████@nara.gov>
Cc: "Wall, Debra" <████@nara.gov>, ███ Per. 53 ████ @nara.gov>

fyi, per chain below, WHCO is now ready to set up a call to discuss the Trump boxes.  Not sure yet when it will take place, but possibly next week.

Thanks,
Gary

Gary M. Stern
General Counsel
National Archives and Records Administration
8601 Adelphi Road
College Park, MD  20740
████ (cell)
████ (office)
████ (fax)
████@nara.gov



NATIONAL
ARCHIVES

---------- Forwarded message ---------
From: **Su, Jonathan C. EOP/WHO** <████@who.eop.gov>
Date: Thu, Sep 30, 2021 at 10:23 AM
Subject: RE: [EXTERNAL] Re: call
To: GaryM Stern <████@nara.gov>

Hi Gary:  Looks like we're in a position to set up the call below.  How about I reach back out to ▓P.38 and go from there?

**From:** GaryM Stern <████@nara.gov>
**Sent:** Tuesday, September 28, 2021 4:21 PM
**To:** Su, Jonathan C. EOP/WHO <████@who.eop.gov>
**Subject:** Re: [EXTERNAL] Re: call

Jonathan, I thought I'd check back in to see when and how you want to proceed re meeting with ▓ P. 38, P. 27, P. 40 ▓ , and NARA to discuss the Trump boxes?

Thanks,

Subject to Protective Order                                        USA-00383676

Gary

Gary M. Stern

General Counsel
National Archives and Records Administration

8601 Adelphi Road

College Park, MD  20740

███████  (cell)

███████ (office)

███████  (fax)

███████@nara.gov

On Fri, Sep 17, 2021 at 2:32 PM Su, Jonathan C. EOP/WHO <███████@who.eop.gov> wrote:

Thanks

**From:** GaryM Stern <███████@nara.gov>
**Sent:** Friday, September 17, 2021 2:05 PM
**To:** Su, Jonathan C. EOP/WHO <███████@who.eop.gov>
**Subject:** Re: [EXTERNAL] Re: call

fyi, ████ so far has not asked to see these records.

Gary M. Stern

General Counsel
National Archives and Records Administration

8601 Adelphi Road

College Park, MD  20740

███████  (cell)

███████  (office)

███████  (fax)

███████@nara.gov

Subject to Protective Order                                                                    USA-00383677

On Wed, Sep 15, 2021 at 3:22 PM Su, Jonathan C. EOP/WHO <███████@who.eop.gov> wrote:

Ok thanks.

**From:** GaryM Stern <███████@nara.gov>
**Sent:** Wednesday, September 15, 2021 3:21 PM
**To:** Su, Jonathan C. EOP/WHO <███████@who.eop.gov>
**Subject:** Re: [EXTERNAL] Re: call

Sure. Keep in mind that, normally, we would have to provide the records to him per the notification/review process, before we could provide anything to you.

Thanks,

Gary

Gary M. Stern

General Counsel
National Archives and Records Administration

8601 Adelphi Road

College Park, MD 20740

████████ (cell)

████████ (office)

████████ (fax)

████████@nara.gov

On Wed, Sep 15, 2021 at 3:18 PM Su, Jonathan C. EOP/WHO <███████@who.eop.gov> wrote:

If [2.38] does request the records, could we discuss process before anything is provided to him?

**From:** GaryM Stern <███████@nara.gov>
**Sent:** Wednesday, September 15, 2021 3:11 PM
**To:** Su, Jonathan C. EOP/WHO <███████@who.eop.gov>

Subject to Protective Order

USA-00383678

Cc: ██ Per. 38
Subject: Re: [EXTERNAL] Re: call

**P. 38** we will treat this as a pre-clearance of the request, so will plan to provide the responsive records directly to
the WH.  Let me know if you want us to provide you a copy set as well?

Thanks,

Gary

Gary M. Stern

General Counsel
National Archives and Records Administration

8601 Adelphi Road

College Park, MD  20740

██████        (cell)

██████        (office)

██████        (fax)

██████@nara.gov

On Wed, Sep 15, 2021 at 2:44 PM Su, Jonathan C. EOP/WHO <███████@who.eop.gov> wrote:

Thanks very much.

From: Per. 38                    @gmail.com>
Sent: Wednesday, September 15, 2021 2:43 PM
To: Per. 38          @gmail.com>
Cc: Su, Jonathan C. EOP/WHO <.███████@who.eop.gov>; Gary Stern <███████@nara.gov>
Subject: [EXTERNAL] Re: call

Jonathan, in connection with our call yesterday, fine for Per. 40   to get his own documents from NARA so
that he can check his notes for a call with me and Per. 27  re the boxes that were in the residence.

I'm copying Gary Stern so he sees this directly.

Thanks,

Subject to Protective Order                                    USA-00383679

P. 38

Sent from my iPhone

On Sep 14, 2021, at 3:07 PM, Per. 38 ██████ @gmail.com> wrote:

I just tried you. I should be available until 4:15 if you get a chance to call back -- after that I"m tied up until around 7:30.

On Tue, Sep 14, 2021 at 2:11 PM Su, Jonathan C. EOP/WHO ‹██████ @who.eop.gov> wrote:

Hi P. 38 Could you give me a call at ██████ when you have a chance – no rush. Thanks.

Jonathan C. Su

Deputy Counsel to the President

The White House

████████

████████

Subject to Protective Order

USA-00383680

Ex. 7


NATIONAL ARCHIVES

Per. 53 | @nara.gov>

## ‹e: Trump boxes
1 message

**GaryM Stern** < @nara.gov>                                          Tue, Oct 5, 2021 at 5:50 PM
To: Debra Wall < l@nara.gov>
Cc: David Ferriero < @nara.gov>, Per. 53 @nara.gov>

There is still no set time for the call with Per. 27 , et al.

In the meantime, here is a draft letter to the Hill re the social media records. Once you have reviewed, I would like to run it past WH Counsel, and also let the Trump reps know that this is what we plan to do (which, ideally, we could do on the Per. 27 call).

W Report on Problems with Trump Presidential Reco...

Release of this letter can then be timed with our public release of the Trump social media records (which have descriptive notes that discuss these deficiencies), as well as our release to the 1/6 Committee of responsive tweets on the day of January 6.

Let me know if you have any questions, comments, and edits.

Thanks,
Gary

Gary M. Stern
General Counsel
National Archives and Records Administration
8601 Adelphi Road
College Park, MD  20740
(cell)
(office)
(fax)
@nara.gov


NATIONAL ARCHIVES

f ⊙ ⚹ t ℗

On Fri, Sep 17, 2021 at 5:31 PM GaryM Stern < @nara.gov> wrote:
FYI, we provided P. 40 with the records he needed, and I have followed up with Jonathan Su, to make clear that David and I should be on the call with Per. 27 and P. 40 , so that we can all hear and understand the varying stories at the same time. Accordingly, the call is likely to take place after I get back from leave on 9/28.

Thanks,
Gary

Gary M. Stern
General Counsel
National Archives and Records Administration
8601 Adelphi Road
College Park, MD  20740

Subject to Protective Order                          USA-00383681

[BLACK REDACTION] (office)
(fax)
@nara.gov





On Wed, Sep 15, 2021 at 5:05 PM GaryM Stern < [BLACK REDACTION] @nara.gov> wrote:
Correct, we cannot go to DOJ while we are engaged in ongoing discussions with the White House and the Trump reps, which could help to clarify, if not actually resolve, the issue.

We can address the social media issues on a separate track, which we should do in parallel with two related actions: 1) responding to the 1/6 Committees requests for Trump's 1/6 tweets; and 2) our plans to post in early October the Trump social media PRA records that we did receive from the WH.

Thanks,
Gary

Gary M. Stern
General Counsel
National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740
[BLACK REDACTION] (cell)
(office)
(fax)
@nara.gov



On Wed, Sep 15, 2021 at 11:28 AM Debra Wall < [BLACK REDACTION] @nara.gov> wrote:
So that means we are holding off on a DOJ letter? What about Congress re the social media issues? Thanks.

On Wed, Sep 15, 2021 at 11:15 AM GaryM Stern < [BLACK REDACTION] @nara.gov> wrote:
The call took place last week, which served to get Deputy WH Counsel Jonathan Su up to speed on the issue and the dispute over whether there are 12 or 24 boxes. this week Jonathan told me that they are open to having Per. 40 participate in a meeting with Per. 27 and P. 38 and possibly Per. 14 [BLACK REDACTION] who was P. 40 principal source. Accordingly, they need access to P. 40 notes from the last administration, which we now hold -- so they will be making a special access request.

Let me know if you have any questions.

Thanks,
Gary

Gary M. Stern
General Counsel
National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740

Subject to Protective Order

USA-00383682

(cell)
(office)
(fax)
@nara.gov



On Wed, Sep 8, 2021 at 8:35 AM GaryM Stern < ████████ @nara.gov> wrote:
The meeting with Jonathan and █.█ is set for tomorrow at 3:30, right after our meeting with Ron and Dana. Assuming the first meeting is not canceled once again, I will join Jonathan in his office. Then we'll see whether and how we can resolve this issue.

Thanks,
Gary

Gary M. Stern
General Counsel
National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740
(cell)
(office)
(fax)
@nara.gov



On Sat, Sep 4, 2021 at 4:39 PM GaryM Stern < ████████ @nara.gov> wrote:
Also meant to say that I plan to share the list of social media issues with █.█ as well.
Thanks

Gary M. Stern
General Counsel
National Archives and Records Administration

On Sat, Sep 4, 2021, 4:24 PM David Ferriero < ████████ @nara.gov> wrote:
Thanks,

David

David S. Ferriero
Archivist of the United States
700 Pennsylvania Avenue, NW
Washington, DC 20408-0001

www.archives.gov

On Sat, Sep 4, 2021, 12:31 PM GaryM Stern < ████████ @nara.gov> wrote:

Subject to Protective Order                                            USA-00383683

Late yesterday I spoke with  ▮Per. 38▮, the Trump PRA Rep, who had caught up with ▮Per. 27▮. He asked where the number 24 boxes came from, because he said that ▮P. 27▮ said that they had found 12 boxes in Florida, which consisted entirely of news clippings, which they considered non-record, and that they were not aware of any other boxes, and that, under no circumstances, has anything been destroyed. I explained that our information came from the WH Office of Records Management, which was based on their experience and efforts throughout the administration to keep track of all records that were "seen by the President."

In order to try to clear up the confusion and disconnect over this issue, he proposed that we have a meeting/call next week with ▮P. 27▮, David, him, me, and ▮Per. 40▮, if possible. We both understood that we would have to coordinate with WH Counsel concerning any involvement by ▮P. 40▮. Accordingly, I then spoke with Jonathan Su, Deputy Counsel to the President, to let him know about ▮P. 38▮ proposal. Jonathan proposed that he, ▮P. 38▮ and I have a meeting/call early next week to figure out the best way to work through this issue and ascertain the facts. I expect we will have that call on Tuesday or Wednesday, after which we can figure out next steps.

▮P. 38▮ was also completely unaware of the issues we have with Twitter and other social media records. Those issues were mostly handled by ▮Per. 47▮, another WH lawyer and now Trump Rep, until the last days of the administration. I gave ▮P. 38▮ a brief update of what we know so far.

Let me know if you have any questions or would like to discuss further.

Thanks,
Gary

Gary M. Stern
General Counsel
National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740
███████ (cell)
███████ (office)
███████ (fax)
███████@nara.gov

NATIONAL
ARCHIVES

On Fri, Sep 3, 2021 at 3:25 PM Debra Wall <███████@nara.gov> wrote:
Ditto

On Fri, Sep 3, 2021 at 1:41 PM GaryM Stern <███████@nara.gov> wrote:
Agree

Gary M. Stern
General Counsel
National Archives and Records Administration

On Fri, Sep 3, 2021, 1:23 PM David Ferriero <███████@nara.gov> wrote:
Sufficient.

Thanks

David

David S. Ferriero
Archivist of the United States
700 Pennsylvania Avenue, NW

Subject to Protective Order

USA-00383684

Washington, DC 20408-0001

███████

www.archives.gov

On Fri, Sep 3, 2021, 1:15 PM ▊Per. 53▊ <███████@nara.gov> wrote:
I think that this is sufficient at this point. Thoughts?

▊P. 53▊

---------- Forwarded message ---------
From: ▊Per. 21▊ <███████@nara.gov>
Date: Fri, Sep 3, 2021 at 1:11 PM
Subject: Trump boxes
To: ▊Per. 53▊ | ███████@nara.gov>
Cc: ▊Per. 48▊ | ███████@nara.gov>

▊P. 53▊:

I think we have completed the search to the best of our ability. I have listed 33 NSC boxes at the end of this email out of an abundance of caution because they are tagged as POTUS. I think it is very unlikely that these are relevant to our search. But let me know if you want me to ask Bill and David to search these boxes.

▊P. 21▊

1. NARA only picked up boxes from the following:
   a. ORM, NSC, WHCA (video tapes), OA (backup tapes), WHMO (flags), and OPC (Correspondence - delivered by RDS)
   b. Only ORM and NSC would have the type of records for which we are looking.
   c. ORM is 99.9% sure they did not pick up the boxes in question. We have put eyes on all boxes from ORM that were coded as too late to file. Nothing seems relevant
   d. NSC did not pick up any boxes from the Residence and the records that they picked up from the West Wing did not seem out of the ordinary.

2. Searches of the following terms on the outside of the ORM and NSC boxes identify no relevant hits.
   a. Residence
   b. Third
   c. 3rd
   d. Floor
   e. Second
   f. 2nd
   g. Donald Trump
   h. POTUS (with the exception of NSC files below)
   i. Oval Office
   j. Dorian
   k. Parade
   l. Personal

Subject to Protective Order

USA-00383685

m. Mar-a-lago
n. Maralago
o. Florida
p. Military
q. Tower
r. Bedminster
s. NYC
t. New York

NSC boxes with "POTUS" as staff name

| naranumber | staff_name | sub_office |
|---|---|---|
| NSC 1210 | POTUS | |
| NSC 1444 | POTUS | |
| NSC 1513 | POTUS | 2020 Policy General 1-720 |
| NSC 1514 | POTUS | 2017-2020 DC Meetings DC4500001-20 |
| NSC 1515 | POTUS | 2017-2020 DC Meetings DC4500021-42 |
| NSC 1516 | POTUS | 2017-2020 DC Meetings DC4500200-230 |
| NSC 1517 | POTUS | 2020 Policy General 766-1584 |
| NSC 1518 | POTUS | 2017-2020 DC Meetings DC4500613-65 |
| NSC 1520 | POTUS | 2020 Policy General 1584-1947 |
| NSC 1521 | POTUS | 2017-2020 DC Meetings DC4500066-82 |
| NSC 1522 | POTUS | 2017-2020 DC Meetings DC4500254-273 |
| NSC 1523 | POTUS | 2020 Policy General 1974-2290 |
| NSC 1524 | POTUS | 2017-2020 DC Meetings DC00083-104 |
| NSC 1525 | POTUS | 2017-2020 DC Meetings DC4500274-295 |
| NSC 1527 | POTUS | 2020 Policy General 2337-2705 |
| NSC 1528 | POTUS | 2017-2020 DC Meetings DC4500105-123 |
| NSC 1529 | POTUS | 2017-2020 DC Meetings DC4500296-314 |
| NSC 1530 | POTUS | 2020 Policy General 2705-3198 |
| NSC 1531 | POTUS | 2017-2020 DC Meetings DC4500124-143 |
| NSC 1532 | POTUS | 2017-2020 DC Meetings DC4500315-338 |
| NSC 1533 | POTUS | 2020 Policy General 3200-3531 |

Subject to Protective Order USA-00383686

| NSC 1534 | POTUS | 2017-2020 DC Meetings DC4500144-174 |
| NSC 1535 | POTUS | 2017-2020 DC Meetings DC4500339-End |
| NSC 1536 | POTUS | 2020 Policy General 3531-End |
| NSC 1537 | POTUS | 2017-2020 DC Meetings DC4500176-199 |
| NSC 1538 | POTUS | 2017-2020 PC Meetings PC45000109-133 |
| NSC 1540 | POTUS | 2017-2020 PC Meetings PC4500001-23 |
| NSC 1541 | POTUS | 201-2020 PC Meetings PC45000091-108 |
| NSC 1543 | POTUS | 2017-2020 PC Meetings PC4500067-90 |
| NSC 1544 | POTUS | 2017-2020 PC Meetings DC4500157-172 |
| NSC 1545 | POTUS | 2017-2020 PC Meetings PC4500042-66 |
| NSC 1547 | POTUS | 2017-2020 PC Meetings PC4500024-41 |
| NSC 1556 | POTUS | |

--

Per. 21 ███████████

National Archives and Records Administration
700 Pennsylvania Avenue, NW
Washington, DC 20408-0001
████████ (c)
████████@nara.gov

Subject to Protective Order                                                                 USA-00383687

DRAFT

Dear [Member]:

I write to you pursuant to my authority under section 2203(e) of the Presidential Records Act (PRA), as amended (44 U.S.C. 2201-2209), which establishes that I may "request the advice" of the appropriate committees of the House and the Senate when I consider that a proposed disposal of Presidential records by the incumbent President "may be of special interest to the Congress" or that "consultation with the Congress regarding the disposal of these particular records is in the public interest." While this provision specifically applies to disposals proposed by the incumbent President, the National Archives and Records Administration (NARA) has always interpreted it to apply to disposals of Presidential records of which I was not informed.

Under the PRA, all Presidential records automatically transfer to NARA's legal custody when the President leaves office. With respect to the Trump Presidential records, the legal transfer took place on January 20, 2021. However, it is not uncommon for there to be a delay before NARA takes physical custody of all of the records. The complex technical work needed to transfer hundreds of terabytes of electronic records, coupled with a one-term transition, meant that the physical transfer could not be completed between the Presidential election and Inauguration Day. It took until August 2021 for NARA to receive the vast majority of Trump Presidential electronic records, with a few outstanding data sets still to be transferred.

Included among the Trump Presidential electronic records are those created on social media platforms. NARA recognizes that social media records are a relatively recent phenomenon, that capturing records on social media platforms is an evolving process, and that different platforms pose different issues with respect to how records are defined and managed.

By this letter, I am advising you that the Trump Administration did not fully capture, and therefore NARA did not receive, all of the Presidential records created by President Trump and White House staff that were posted on social media platforms, as summarized in more detail below:

- Early in the Trump Administration, questions were raised about President Trump's use of his personal Twitter account to conduct official government business and whether deleted tweets were being captured and preserved as Presidential records. In March 2017, NARA advised the Trump Administration that it should capture and preserve as Presidential records all tweets that the President posts in the course of his official duties, whether on his personal @realDonaldTrump account or on the official @POTUS account, including those tweets that were subsequently deleted. As I reported in a March 30, 2017, letter to Senators Claire McCaskill and Tom Carper, NARA was "informed by White House officials that they [were], in fact, doing so."

1

Subject to Protective Order

USA-00383688

**DRAFT**

Since the end of the administration, we have learned that the White House initially used a manual process to capture tweets that were deleted from @realDonaldTrump and @POTUS by copying them from non-governmental organizations that were capturing them, such as Propublica and Factba.se. The White House did not begin using the vendor ArchiveSocial to automate the capture of tweets and other social media records in real-time until January 2018. Moreover, @realDonaldTrump was not enrolled until August 2018 and the tool stopped capturing @realDonaldTrump in April 2020. The official @POTUS was enrolled in February 2018 and remained connected throughout the rest of the administration.

When properly implemented, ArchiveSocial captures all versions of content as it appears on the platforms, along with any changes, such as deleted or edited content, changes to an account profile, and direct or private messages. However, it cannot capture such changes retroactively. If a social media account is not enrolled or subsequently becomes disconnected from ArchiveSocial, any changes, including deleted or modified posts, cannot be captured.

The Twitter account @realDonaldTrump was disconnected from ArchiveSocial in April 2020. A key feature of ArchiveSocial is that it sends automated alerts to the account owners/system administrators every three to five days to remind them to reconnect any disconnected accounts. The tool also displays information about the account status in the dashboard. It appears that Trump Administration officials failed to respond to these frequent and repeated alerts and never re-enrolled that account.

When White House officials brought this problem to our attention near the end of the administration, Twitter had permanently suspended @realDonaldTrump. NARA contacted Twitter directly to ask if it retained the account data between April 20th and the account's suspension. Twitter provided us with a copy of the available account data. However, it did not include previously deleted tweets, which are not retained by the company. Accordingly, we were unable to obtain a complete set of these Presidential records from the Trump Administration or Twitter. While we do have access to copies of deleted tweets collected by other non-governmental sources, we do not consider them as official Presidential records and cannot ensure the completeness of their captured account data.

- The Trump White House did not take any steps to capture deleted content from any Trump Administration social media account other than @realDonaldTrump or @POTUS prior to enrolling them with ArchiveSocial. As with @realDonaldTrump, many other Trump Administration social media accounts were not enrolled until the summer or fall of 2018, even though these accounts were active for over a year prior to enrollment, during which time deleted or modified Presidential record content was not captured. Other accounts were not enrolled until just prior to the end of the administration.

- The ArchiveSocial tool included the ability to capture direct messages that may have been used on the platforms, but the Trump Administration opted not to enable capture of direct

2

Subject to Protective Order                                                    USA-00383689

DRAFT

messages, and was unable to report whether direct messaging was actually used on any of the platforms by the account holders.

- NARA identified seven Twitter accounts that we think contain presidential record information, but were not captured by the Trump Administration. These accounts belonged to Andrew Giuliani, Chad Gilmartin, Ivanka Trump, Kayleigh McEnany, Kellyanne Conway, Mark Meadows, and Peter Navarro. After the end of the administration, NARA obtained the publicly available tweets from these accounts in order to supplement its archival collection.

- In January 2021, administration officials advised NARA that two social media accounts they thought contained Presidential record content were not enrolled in ArchiveSocial and could not be retroactively enrolled as they had been suspended by the platforms. These accounts were Donald J. Trump on Facebook and @realDonaldTrump on Instagram. NARA endeavored to work with Facebook, which operates Instagram, to obtain access to the accounts, but Facebook was not able to provide access.

- SnapChat was used by the Trump Administration (@realdonaldtrump and @whitehouse), which advised NARA that it was capturing content posted to the platform. NARA reviewed the transferred social media records and has not located any SnapChat content. SnapChat ultimately banned President Trump from the platform, and it is not possible to see any previous content. SnapChat advised NARA that the Trump Administration used the @whitehouse account approximately five times during four years. However, the administration regularly used the @realdonaldtrump account. News reports indicate that the account had 1.5 million followers on the platform. We do not know whether direct messaging was enabled on the account. We are not able to determine to what extent @realdonaldtrump SnapChat contained unique Presidential records as compared to content duplicative from other platforms, or purely campaign related information, which would not have been a Presidential record.

Your staff should feel free to contact my General Counsel, Gary M. Stern, if you have questions or would like to discuss this issue further.

Sincerely,

3

Subject to Protective Order                                                                        USA-00383690

Ex. 8

**THE WHITE HOUSE**
WASHINGTON

October 8, 2021

David Ferriero
Archivist of the United States
National Archives and Records Administration
700 Pennsylvania Ave., N.W.
Washington, D.C., 20408

Dear Mr. Ferriero,

I write in response to your notification of September 8, 2021, regarding a set of documents requested by the House Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Documents"), and provided to the White House for review pursuant to the Presidential Records Act. After my consultations with the Office of Legal Counsel at the Department of Justice, President Biden has determined that an assertion of executive privilege is not in the best interests of the United States, and therefore is not justified as to any of the Documents.

As President Biden has stated, the insurrection that took place on January 6, and the extraordinary events surrounding it, must be subject to a full accounting to ensure nothing similar ever happens again. Congress has a compelling need in service of its legislative functions to understand the circumstances that led to these horrific events. The available evidence to date establishes a sufficient factual predicate for the Select Committee's investigation: an unprecedented effort to obstruct the peaceful transfer of power, threatening not only the safety of Congress and others present at the Capitol, but also the principles of democracy enshrined in our history and our Constitution. The Documents shed light on events within the White House on and about January 6 and bear on the Select Committee's need to understand the facts underlying the most serious attack on the operations of the Federal Government since the Civil War.

These are unique and extraordinary circumstances. Congress is examining an assault on our Constitution and democratic institutions provoked and fanned by those sworn to protect them, and the conduct under investigation extends far beyond typical deliberations concerning the proper discharge of the President's constitutional responsibilities. The constitutional protections of executive privilege should not be used to shield, from Congress or the public, information that reflects a clear and apparent effort to subvert the Constitution itself.

Case 1:21-cv-02769-TSC  Document 21-1  Filed 10/30/21  Page 39 of 57
Case 9:23-cr-80101-AMC  Document 469-1  Entered on FLSD Docket 04/22/2024  Page 44 of
USCA Case #21-5254     Document #1922635     Filed: 11/16/2021   Page 158 of 287

The President's determination applies solely to the Documents as described herein, which were provided to the White House on September 8, 2021. We continue to review materials you provided to the White House after that date and will respond at an appropriate time.

We understand that the former President believes that executive privilege should be asserted with respect to a subset of the Documents. When you notify us of such an assertion, we will respond accordingly.

Sincerely,

Dana A. Remus
*Counsel to the President*

WHITE HOUSE COUNSEL'S OFFICE
1650 PENNSYLVANIA AVENUE NW, WASHINGTON, DC 20502
WHITEHOUSE.GOV

Ex. 9

**THE WHITE HOUSE**
WASHINGTON

October 8, 2021

David Ferriero
Archivist of the United States
National Archives and Records Administration
700 Pennsylvania Ave., N.W.
Washington, D.C., 20408

Dear Mr. Ferriero,

I write in response to your communication of October 8, 2021, informing us that former President Trump has asserted executive privilege with regard to a subset of documents requested by the House Select Committee to Investigate the January 6th Attack on the United States Capitol, and requesting President Biden's views. President Biden has considered the former President's assertion, and I have engaged in additional consultations with the Office of Legal Counsel at the Department of Justice. For the same reasons described in my earlier letter, the President maintains his conclusion that an assertion of executive privilege is not in the best interests of the United States, and therefore is not justified as to any of the documents provided to the White House on September 8, 2021. Accordingly, President Biden does not uphold the former President's assertion of privilege.

The President instructs you, in accord with Section 4(b) of Executive Order 13489, to provide the pages identified as privileged by the former President to the Select Committee. In light of the urgency of the Select Committee's need for the information, the President further instructs you to provide those pages 30 days after your notification to the former President, absent any intervening court order.

Sincerely,

Dana A. Remus
*Counsel to the President*

160

WHITE HOUSE COUNSEL'S OFFICE
1650 PENNSYLVANIA AVENUE NW, WASHINGTON, DC 20502
WHITEHOUSE.GOV

Ex. 10



**NATIONAL ARCHIVES**

Per. 53 ◄ ████████@nara.gov>

## Re: Trump boxes

1 message

**Debra Wall** <████████@nara.gov>                    Wed, Jan 19, 2022 at 8:52 AM
To:  Per. 53 ████████ <████████@nara.gov>
Cc: David Ferriero <████████@nara.gov>

I volunteer!

On Wed, Jan 19, 2022 at 8:25 AM Per. 53 ████████ <████████@nara.gov> wrote:
    I have asked P. 21 to gain item-level control ASAP and have offered him cleared staff from other offices if need be.

On Wed, Jan 19, 2022 at 8:13 AM David Ferriero <████████@nara.gov> wrote:
    How did they get here??

On Wed, Jan 19, 2022 at 8:09 AM Per. 53 ████████ <████████@nara.gov> wrote:
    The materials from FL arrived last night.  Below is P. 21 quick assessment.

    --------- Forwarded message ---------
    From: Per. 21
    Date: Tue, Jan 18, 2022 at 11:37 PM
    Subject: Trump boxes
    To: Per. 53 ████████,  Per. 48 ████████ <████████@nara.gov>, GaryM Stern
    <████████@nara.gov>

    All:

    We received 15 bankers boxes and the weather map.  My plan was to glance into each box before I shelved it so I
    could give y'all a high level overview.  As I fanned through the pile of newspapers at the top of the first box, I found
    several unfoldered classified docs in between some of the newspapers.  So I took all the boxes to the SCIF.  The
    first box I picked up in the SCIF had a newspaper on top that was post 1/20/2021.  At that point I decided to take a
    closer look in each box to see if there are other issues that you three, David, and Deb might want to know about
    sooner than later.  There may be others I didn't notice, but here is an overview.

    -The majority of the material consists of newspapers, magazines and printed news articles.

    -The majority of the items are not in folders--just piled in the boxes.  Some boxes seem to have things from the
    same time period.  Others have documents from multiple years.  There is no information written on the boxes to
    provide any context.  And I wasn't joking about the classified docs just showing up in the midst of a stack of
    newspapers.  The lack of any organization was consistent throughout the boxes.

    -Thankfully we got more than newspapers and magazines.  There are plenty of original Presidential records in
    there, and many contain Trump handwriting.

    -There was one accordian folder in the mess so it stood out.  It contained, among other things, the Obama letter
    and North Korea correspondence.  We need to verify that all of the correspondence is there.  But I think we are in
    good shape.

    -There are a lot of classified records.  The majority of those are head of state briefing papers and briefing cards and
    most of those are in folders or clipped together.  But the folders are scattered throughout the boxes, not filed
    together.  Other classified documents are on a range of topics and more often than not are just loose in the boxes.
    I saw several docs that I think are PDBs.  I also found an incredibly sensitive SAP document.

    - Except for a number of  presidential daily schedules scattered throughout the boxes, the unclassified docs don't
    seem to focus on any one issue.  I did see some material related to 1/6 and COVID.  And at close glance I believe
    one of the classified docs is responsive to a third Congressional request.  So we will need to review all of these
    boxes.

Subject to Protective Order                                                                    USA-00383792

-As I mentioned, very little of this material is in folders. But about half of one box is filled with a stack of folders, the vast majority of which are the same color and type. Many have a note from the staff secretary clipped to the front that states the topic of the document that is in the folder. Intermixed with these are some folders that have the note attached to the folder, but the folder is empty. And there are quite a few folders with no note and no doc. They look like the other folders and are in the same stack. So it is likely those once had notes and docs. Maybe those items were sent to ORM. There are also about 20ish folders scattered throughout the boxes that contain printouts of photos from random events. There are also numerous chunks of unfoldered photos in several boxes. And then there are a handful of empty folders that are identified as coming from the Photo Office and likely contained those photos.

-I think one entire box is post presidential, but there are some items without dates and there could be some pre January 20 docs that I missed. I'll need to go back through it to verify. But without a doubt the vast, vast majority is post presidential. I also ran across small amounts of post presidential material in at least two other boxes. I noticed some of the newspapers were from this fall, so this isn't just a box that was created in February 2021 and was mistakenly stored with the boxes from the residence. So it is clear that some of the boxes were created or altered after the administration.

-There are also a good number of personal/political (non-PRA) docs scattered throughout a few of the boxes. Most relate to the 2020 election.

-Finally, I have the impression that most of this material is from 2020 and 2019. I need to take another look to see if that is actually true, but if it is that might open up questions about when they started creating these boxes of random stuff.

Let me know if there is something of particular interest you want us to explore before we begin to do a detailed inventory.

P. 21

--

Per. 21

█████ ████████

National Archives and Records Administration
700 Pennsylvania Avenue, NW
Washington, DC 20408-0001
████████ (c)
██████@nara.gov

--

David S. Ferriero
Archivist of the United States
700 Pennsylvania Avenue NW
Washington, DC 20408-0001
T:███████ F:███████
www.archives.gov

Subject to Protective Order USA-00383793

Ex. 11



NATIONAL ARCHIVES

Per. 53    <██████████@nara.gov>

## Fwd: Trump boxes

message

Per. 53    <██████@nara.gov>    *IG*                    Tue, Jan 25, 2022 at 3:57 PM
To: Brett Baker <██████@nara.gov>

---------- Forwarded message ---------
From: Per. 21 ████
Date: Tue, Jan 18, 2022 at 11:37 PM
Subject: Trump boxes
To: Per. 53 ████████<██████@nara.gov>, Per. 48 ████<██████@nara.gov>, GaryM Stern
<██████████v>

All:

We received 15 bankers boxes and the weather map. My plan was to glance into each box before I shelved it so I could give y'all a high level overview. As I fanned through the pile of newspapers at the top of the first box, I found several unfolded classified docs in between some of the newspapers. So I took all the boxes to the SCIF. The first box I picked up in the SCIF had a newspaper on top that was post 1/20/2021. At that point I decided to take a closer look in each box to see if there are other issues that you three, David, and Deb might want to know about sooner than later. There may be others I didn't notice, but here is an overview.

-The majority of the material consists of newspapers, magazines and printed news articles.

-The majority of the items are not in folders--just piled in the boxes. Some boxes seem to have things from the same time period. Others have documents from multiple years. There is no information written on the boxes to provide any context. And I wasn't joking about the classified docs just showing up in the midst of a stack of newspapers. The lack of any organization was consistent throughout the boxes.

-Thankfully we got more than newspapers and magazines. There are plenty of original Presidential records in there, and many contain Trump handwriting.

-There was one accordian folder in the mess so it stood out. It contained, among other things, the Obama letter and North Korea correspondence. We need to verify that all of the correspondence is there. But I think we are in good shape.

-There are a lot of classified records. The majority of those are head of state briefing papers and briefing cards and most of those are in folders or clipped together. But the folders are scattered throughout the boxes, not filed together. Other classified documents are on a range of topics and more often than not are just loose in the boxes. I saw several docs that I think are PDBs. I also found an incredibly sensitive SAP document.

- Except for a number of presidential daily schedules scattered throughout the boxes, the unclassified docs don't seem to focus on any one issue. I did see some material related to 1/6 and COVID. And at close glance I believe one of the classified docs is responsive to a third Congressional request. So we will need to review all of these boxes.

-As I mentioned, very little of this material is in folders. But about half of one box is filled with a stack of folders, the vast majority of which are the same color and type. Many have a note from the staff secretary clipped to the front that states the topic of the document that is in the folder. Intermixed with these are asome folders that have the note attached to the folder, but the folder is empty. And there are quite a few folders with no note and no doc. They look like the other folders and are in the same stack. So it is likely those once had notes and more often than not are just loose in the boxes. Maybe those items were sent to ORM. There are also about 20ish folders scattered throughout the boxes that contain printouts of photos from random events. There are also numerous chunks of unfoldered photos in several boxes. And then there are a handful of empty folders that are identified as coming from the Photo Office and likely contained those photos.

-I think one entire box is post presidential, but there are some items without dates and there could be some pre January 20 docs that I missed. I'll need to go back through it to verify. But without a doubt the vast, vast majority is post presidential. I also ran across small amounts of post presidential material in at least two other boxes. I noticed some

Subject to Protective Order                                                                          USA-00383800

2/15/2...

of the newspapers were from this fall, so this isn't just a box that was created in February 2021 and was mistakenly stored with the boxes from the residence.  So it is clear that some of the boxes were created or altered after the administration.

-There are also a good number of personal/political (non-PRA) docs scattered throughout a few of the boxes.  Most relate to the 2020 election.

-Finally, I have the impression that most of this material is from 2020 and 2019.  I need to take another look to see if that is actually true, but if it is that might open up questions about when they started creating these boxes of random stuff.

Let me know if there is something of particular interest you want us to explore before we begin to do a detailed inventory.

P. 21

--

Per. 21

National Archives and Records Administration
700 Pennsylvania Avenue, NW
Washington, DC 20408-0001
(c)

Subject to Protective Order

USA-00383801

Ex. 12

**From:** (b)(3), (b)(6), (b)(7)(c) [REDACTED]
**Sent time:** 01/26/2022 08:04:05 AM
**To:** John Simms [REDACTED]
**Cc:** Jason Metrick [REDACTED]; Brett Baker [REDACTED]; Thomas A Monheim [REDACTED]
**Subject:** RE: Request for a meeting regarding potential high level spillage

Good Morning,

Tom has time tomorrow at 0800 or 1:30 to join via Google Meet.

---

**From:** Thomas A Monheim [REDACTED (b)(6), (b)(7)(C), (b)(3)]
**Sent:** Wednesday, January 26, 2022 7:51 AM
**To:** John Simms [REDACTED]  (b)(3), (b)(6), (b)(7)(c)
**Cc:** Jason Metrick [REDACTED]; Brett Baker [REDACTED]; [REDACTED]
**Subject:** Re: Request for a meeting regarding potential high level spillage

(b)(3), (b)(6), (b)(7)(c)

Oops, sorry. Further evidence of why I need [REDACTED] help.

Since I will be working in the office today, I think we would need to just do a teleconference. I will be working from home tomorrow and could do Google meet. My days are fairly full but [REDACTED] can make some time by rearranging meetings if necessary. Thanks.  (b)(3), (b)(6), (b)(7)(c)

---

**From:** "John Simms" [REDACTED]
**Date:** Wednesday, January 26, 2022 at 6:26:14 AM
**To:** "Thomas A Monheim" [REDACTED (b)(6), (b)(7)(C), (b)(3)]
**Cc:** "Jason Metrick" [REDACTED], "Brett Baker" [REDACTED]
**Subject:** Re: Request for a meeting regarding potential high level spillage

Sir,
(b)(3), (b)(6), (b)(7)(c)

I did not see [REDACTED] email address anywhere, could you please forward it to me, or this email to them? Our agency uses Google Meet and I can send out an invite if that works for you. Our IG has a meeting 8:30 to 12:10, but he said he could make it work if the only time you could meet was in that block. Please just let me know if Google Meet works and what time could work for you. Thank you, sir.

Respectfully,

John Simms
Counsel to the Inspector General
Office of Inspector General
National Archives and Records Administration
[REDACTED (b)(6), (b)(7)(C)]

**CAUTION!** This message may contain Controlled Unclassified Information (CUI) that requires safeguarding or dissemination controls, in part because it may contain information protected by the attorney-client, attorney work product, deliberative process, or other privilege; Inspector General Protected information (PRIIG); Investigation information (INV); General Law Enforcement information (LEI); Law Enforcement - Communications (LCOMM); privacy information; and/or information exempted from release under the Freedom of Information Act or Privacy Act. Do not disseminate without the approval of the NARA IG. If received in error, please notify the sender by reply e-mail and delete all copies of this message.

---

On Tue, Jan 25, 2022 at 6:56 PM Thomas A Monheim [REDACTED (b)(6), (b)(7)(C), (b)(3)] wrote:

Yes, I can make time.
(b)(3), (b)(6), (b)(7)(c)

[REDACTED] (copied) can help facilitate, thanks.

**From:** "John Simms" [REDACTED]
**Date:** Tuesday, January 25, 2022 at 5:06:51 PM

OIG000080

**To:** Thomas, Jonathan M (b) (6), (b) (7)(C), (b)(6)

**Cc:** "Jason Metrick" <(b) (6), (b) (7)(C) >, "Brett Baker" (b) (6), (b) (7)(C) >

**Subject:** Request for a meeting regarding potential high level spillage

Sir,

Our agency just gave us a quick brief on what appears to be a very high level potential spillage and records management issue. When they notified the DoJ the office of the Deputy Attorney General told them to contact us and your office. Do you have some time tomorrow or the next day to meet virtually? Please let us know.

Respectfully,

John Simms
Counsel to the Inspector General
Office of Inspector General
National Archives and Records Administration
(b) (6), (b) (7)(C)

**CAUTION!** This message may contain Controlled Unclassified Information (CUI) that requires safeguarding or dissemination controls, in part because it may contain information protected by the attorney-client, attorney work product, deliberative process, or other privilege; Inspector General Protected information (PRIIG); Investigation information (INV); General Law Enforcement information (LEI); Law Enforcement - Communications (LCOMM); privacy information; and/or information exempted from release under the Freedom of Information Act or Privacy Act. Do not disseminate without the approval of the NARA IG. If received in error, please notify the sender by reply e-mail and delete all copies of this message.

Ex. 13

## John Simms

| | |
|---|---|
| **From:** | Windom, Thomas (USADC) (b) (6), (b) (7)(C) |
| **Sent:** | Tuesday, February 1, 2022 11:49 AM |
| **To:** | (b) (6), (b) (7)(C) |
| **Cc:** | Jason Metrick |
| **Subject:** | RE: [EXTERNAL] Fwd: Issue re Potential Destruction of Presidential Records |

Sure thing
tw

**From:** (b) (6), (b) (7)(C)
**Sent:** Tuesday, February 1, 2022 11:40 AM
**To:** Windom, Thomas (USADC) (b) (6), (b) (7)(C)
**Cc:** Jason Metrick (b) (6), (b) (7)(C)
**Subject:** [EXTERNAL] Fwd: Issue re Potential Destruction of Presidential Records

Hi Thomas,

Might we have a moment to discuss the below matter concerning (b) (5)    with you tomorrow as well?

Thanks,

(b) (6), (b) (7)(C)

Special Agent in Charge
NARA-OIG
(b) (6), (b) (7)(C)


INSPECTOR GENERAL SENSITIVE INFORMATION

This email including any attachments is intended only for authorized recipients.  Recipients may not further disseminate this information without the express permission of the sender or other Office of the Inspector General personnel.  This email may contain Inspector General sensitive information that is confidential, sensitive, work product, attorney-client privileged, or protected by Federal law, including protection from public disclosure under the Freedom of Information Act (FOIA), *5 U.S.C. § 552*.  Accordingly, the use, dissemination, distribution or reproduction of this information to or by unauthorized or unintended recipients may be unlawful.  If you have received this email in error, please notify us immediately by return email, and destroy all copies of the email received in error.


**From:** GaryM Stern <garym.stern@nara.gov>
**Sent:** Friday, January 28, 2022 6:08:33 PM
**To:** Brett Baker (b) (6), (b) (7)(C) ; Jason Metrick (b) (6), (b) (7)(C) ; Simms, John (b) (6), (b) (7)(C)
**Cc:** Bosanko, William <william.bosanko@nara.gov>
**Subject:** Issue re Potential Destruction of Presidential Records

1

OIG000054





Please let us know if you think this is a matter that warrants further consideration (b) (5), (b) (7)(A)

Thanks,
Gary

Gary M. Stern
General Counsel
National Archives and Records Administration
8601 Adelphi Road
College Park, MD  20740
(b) (6)  (cell)
301-837-3026 (office)
301-837-0293 (fax)
garym.stern@nara.gov



2

OIG000055

Ex. 14

| From: | John Hamilton <john.hamilton@nara.gov> |
|---|---|
| Sent time: | 02/09/2022 02:25:05 PM |
| To: | Ferriero, David <david.ferriero@nara.gov>; Wall, Debra <debra.wall@nara.gov>; Bosanko, William <william.bosanko@nara.gov>; Stern, GaryM <garym.stern@nara.gov>; John Valceanu <john.valceanu@nara.gov>; Stanwich, Maria <maria.stanwich@nara.gov>; NARA Executive Secretariat <ExecSec@nara.gov>; Donius, Susan <susan.donius@nara.gov>; Laster, John <john.laster@nara.gov> |
| BCc: | ▮(b) (6)▮ @nara.gov |
| Subject: | Fwd: Letter for The Honorable David S. Ferriero, Archivist of the United States, National Archives and Records Administration |
| Attachments: | 2022-02-09.CBM to Ferriero-NARA re Trump Mar-a-Lago.pdf |

Here is the letter we knew was coming.....I have acknowledged our receipt of this letter.

John

---------- Forwarded message ---------
From: (b) (6)  < (b) (6) >
Date: Wed, Feb 9, 2022 at 2:17 PM
Subject: Letter for The Honorable David S. Ferriero, Archivist of the United States, National Archives and Records Administration
To: john.hamilton@nara.gov <john.hamilton@nara.gov>, garym.stern@nara.gov <garym.stern@nara.gov>, congress.affairs@nara.gov <congress.affairs@nara.gov>
Cc: (b) (6) < (b) (6) >, (b) (6) < (b) (6) >, (b) (6)
< (b) (6) >, (b) (6) < (b) (6) >, (b) (6)
< (b) (6) >, (b) (6) < (b) (6) >

Hello—

Please see the attached letter from Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform, for The Honorable David S. Ferriero, Archivist of the United States, National Archives and Records Administration.

Please acknowledge receipt of the letter.  Thank you.

Sincerely,

(b) (6)

Staff Assistant | Committee on Oversight & Reform

Chairwoman Carolyn B. Maloney

(b) (6)

--
John O. Hamilton
Director of Congressional Affairs

15B000116

National Archives and Records Administration
700 Pennsylvania Avenue, NW
Washington, DC 20408-0001
PH: 202-357-6832
Cell: (b) (6)
Fax: 202-3575959

15B000117

2022-02-09.CBM to Ferriero-NARA re Trump Mar-a-Lago.pdf

ONE HUNDRED SEVENTEENTH CONGRESS

CAROLYN B. MALONEY, NEW YORK
CHAIRWOMAN

JAMES COMER, KENTUCKY
RANKING MINORITY MEMBER

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND REFORM
2157 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6143

MAJORITY  (202) 225-5051
MINORITY  (202) 225-5074
https://oversight.house.gov

February 9, 2022

The Honorable David S. Ferriero
Archivist of the United States
National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740-6001

Dear Mr. Ferriero:

The Committee is seeking information about the 15 boxes of presidential records that the National Archives and Records Administration (NARA) recently recovered from former President Trump's Mar-a-Lago residence.  I am deeply concerned that these records were not provided to NARA promptly at the end of the Trump Administration and that they appear to have been removed from the White House in violation of the Presidential Records Act (PRA).  I am also concerned by recent reports that while in office, President Trump repeatedly attempted to destroy presidential records, which could constitute additional serious violations of the PRA.

The PRA preserves the records made by a sitting president, while giving legal ownership of those records to the American people.[1]  Congress enacted the PRA in response to President Nixon's attempts to destroy presidential records during the Watergate scandal.

President Trump is required not only to preserve presidential records, but to turn them over to the National Archives at the end of his presidential term.  The PRA specifically states:

Upon the conclusion of a President's term of office, or if a President serves consecutive terms upon the conclusion of the last term, **the Archivist of the United States shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President**.[2]

On February 7, 2022, the *Washington Post* reported that former President Trump improperly removed 15 boxes of records from the White House and transported them to his Mar-a-Lago residence.  These boxes reportedly contained correspondence and letters from world leaders, including correspondence with North Korean leader Kim Jong-un, and a letter President

---

[1] *See* 44 U.S.C. §§ 2201–2209.

[2] 44 U.S.C. § 2203(g)(1) (emphasis added).

15B000118

2022-02-09-CBM to Ferriero-NARA re Trump Mar-a-Lago.pdf

The Honorable David S. Ferriero
Page 2

Obama left for his successor.[3]  The records recovered from Mar-a-Lago also reportedly include several newspaper clippings.  A previous Committee investigation revealed that President Trump wrote notes on press clippings, which could mean that even those clippings were likely presidential records.[4]

On February 5, 2022, it was reported that while in office, former President Trump "tore up briefings and schedules, articles and letters, memos both sensitive and mundane."[5]

Removing or concealing government records is a criminal offense punishable by up to three years in prison.  Former National Security Advisor Sandy Berger, for example, was prosecuted for taking classified documents from NARA.[6]  Former President Trump and his senior advisors must also be held accountable for any violations of the law.  Republicans in Congress obsessively investigated former Secretary of State Hillary Clinton for her use of a private email server for official communications.  Former President Trump's conduct, in contrast, involves a former president potentially violating a criminal law by intentionally removing records, including communications with a foreign leader, from the White House and reportedly attempting to destroy records by tearing them up.

In order for the Committee to examine the extent and impact of former President Trump's violations of the PRA, please provide responses to the following requests by February 18, 2022:

1.     Did NARA ask the representatives of former President Trump about missing records prior to the 15 boxes being identified?  If so, what information was provided in response?

2.     Has NARA conducted an inventory of the contents of the boxes recovered from Mar-a-Lago?

3.     Please provide a detailed description of the contents of the recovered boxes, including any inventory prepared by NARA of the contents of the boxes.  If an inventory has not yet been completed, please provide an estimate of when such an inventory will be completed.

---

[3] *National Archives Had to Retrieve Trump White House Records from Mar-a-Lago,* Washington Post (Feb. 7, 2022) (online at www.washingtonpost.com/politics/2022/02/07/trump-records-mar-a-lago/).

[4] Committee on Oversight and Reform, *Press Release:  Committee Chairs Release New Documents Showing Mar-a-Lago Trio Violated Transparency Law and Improperly Influenced Veterans Policies Under President Trump* (Sept. 27, 2021) (online at https://oversight.house.gov/news/press-releases/committee-chairs-release-new-documents-showing-mar-a-lago-trio-violated).

[5] *"He Never Stopped Ripping Things Up":  Inside Trump's Relentless Document Destruction Habits*, Washington Post (Feb. 5, 2022) (online at www.washingtonpost.com/politics/2022/02/05/trump-ripping-documents).

[6] *See e.g.*, National Archives and Records Administration, *Notable Thefts from the National Archives* (online at www.archives.gov/research/recover/notable-thefts html) (accessed Feb. 8, 2022).

15B000119

The Honorable David S. Ferriero
Page 2

4. Are the contents of the boxes of records recovered by NARA undergoing a review to determine if they contain classified information?  If so, who is conducting that review and has any classified information been found?

5. Is NARA aware of any additional presidential records from the Trump Administration that may be missing or not yet in NARA's possession?

6. What efforts has NARA taken, and is NARA taking, to ensure that any additional records that have not been turned over to NARA are not lost or destroyed?

7. Has the Archivist notified the Attorney General that former President Trump removed presidential records from the White House?  If not, why not?

8. Is NARA aware of presidential records that President Trump destroyed or attempted to destroy without the approval of NARA?  If so, please provide a detailed description of such records, the actions taken by President Trump to destroy or attempt to destroy them, and any actions NARA has taken to recover or preserve these documents.

The Committee on Oversight and Reform is the principal oversight committee of the House of Representatives and has broad authority to investigate "any matter" at "any time" under House Rule X.  In addition, House Rule X states that the Committee on Oversight and Reform has jurisdiction to "study on a continuing basis the operation of Government activities at all levels, including the Executive Office of the President."

An attachment to this letter provides additional instructions for responding to the Committee's request. If you have any questions regarding this request, please contact the Oversight Committee staff at (202) 225-5051.

Thank you for your prompt attention to this matter.

Sincerely,

Carolyn B. Maloney
Chairwoman

Enclosure

cc:     The Honorable James Comer, Ranking Member

15B000120

**<u>Responding to Oversight Committee Document Requests</u>**

1.  In complying with this request, produce all responsive documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf.  Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.  Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Committee.

3.  In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.  The Committee's preference is to receive documents in electronic form (i.e., CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions.

5.  Documents produced in electronic format should be organized, identified, and indexed electronically.

6.  Electronic document productions should be prepared according to the following standards:

    a.  The production should consist of single page Tagged Image File ("TIF"), files accompanied by a Concordance-format load file, an Opticon reference file, and a file defining the fields and character lengths of the load file.

    b.  Document numbers in the load file should match document Bates numbers and TIF file names.

    c.  If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

    d.  All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

        BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD,

2022-02-09.CBM to Ferriero-NARA re Trump Mar-a-Lago.pdf

INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

7.  Documents produced to the Committee should include an index describing the contents of the production.  To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

8.  Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

9.  When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

10.  The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

11.  The pendency of or potential for litigation shall not be a basis to withhold any information.

12.  In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

13.  Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

14.  If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date.  An explanation of why full compliance is not possible shall be provided along with any partial production.

15.  In the event that a document is withheld on the basis of privilege, provide a privilege log containing the following information concerning any such document:  (a) every privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the privilege(s) asserted.

16.  If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control.

17.  If a date or other descriptive detail set forth in this request referring to a document is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

15B000122

18. This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

19. All documents shall be Bates-stamped sequentially and produced sequentially.

20. Two sets of each production shall be delivered, one set to the Majority Staff and one set to the Minority Staff.  When documents are produced to the Committee, production sets shall be delivered to the Majority Staff in Room 2157 of the Rayburn House Office Building and the Minority Staff in Room 2105 of the Rayburn House Office Building.

21. Upon completion of the production, submit a written certification, signed by you or your counsel, stating that:  (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and (2) all documents located during the search that are responsive have been produced to the Committee.

## **Definitions**

1. The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including, but not limited to, the following:  memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise.  A document bearing any notation not a part of the original text is to be considered a separate document.  A draft or non-identical copy is a separate document within the meaning of this term.

2. The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases,  electronic

3

15B000123

message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, or otherwise.

3.  The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope.   The singular includes plural number, and vice versa.  The masculine includes the feminine and neutral genders.

4.  The term "including" shall be construed broadly to mean "including, but not limited to."

5.  The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments,  branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6.  The term "identify," when used in a question about individuals, means to provide the following information:  (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7.  The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8.  The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9.  The term "individual" means all natural persons and all persons or entities acting on their behalf.

15B000124

Ex. 15



NATIONAL
ARCHIVES

| Per. 53 | | @nara.gov> |

## I re NARA & "Trump Boxes"

1 message

| Per. 53 | < | @nara.gov> | Wed, Feb 9, 2022 at 3:01 PM |
To:  @usdoj.gov,  @usdoj.gov
Cc: "Stern, GaryM" <  @nara.gov>

Good afternoon.  Gary and I wanted to be certain you were aware of the attached, which we just received.

Thanks,

Per. 53

📄 **2022-02-09.CBM to Ferriero-NARA re Trump Mar-a-Lago.pdf**
    245K

Subject to Protective Order

USA-00383814

CAROLYN B. MALONEY, NEW YORK
CHAIRWOMAN

ONE HUNDRED SEVENTEENTH CONGRESS

JAMES COMER, KENTUCKY
RANKING MINORITY MEMBER

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY (202) 225-5051
MINORITY (202) 225-5074
https://oversight.house.gov

February 9, 2022

The Honorable David S. Ferriero
Archivist of the United States
National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740-6001

Dear Mr. Ferriero:

The Committee is seeking information about the 15 boxes of presidential records that the National Archives and Records Administration (NARA) recently recovered from former President Trump's Mar-a-Lago residence. I am deeply concerned that these records were not provided to NARA promptly at the end of the Trump Administration and that they appear to have been removed from the White House in violation of the Presidential Records Act (PRA). I am also concerned by recent reports that while in office, President Trump repeatedly attempted to destroy presidential records, which could constitute additional serious violations of the PRA.

The PRA preserves the records made by a sitting president, while giving legal ownership of those records to the American people.[1] Congress enacted the PRA in response to President Nixon's attempts to destroy presidential records during the Watergate scandal.

President Trump is required not only to preserve presidential records, but to turn them over to the National Archives at the end of his presidential term. The PRA specifically states:

Upon the conclusion of a President's term of office, or if a President serves consecutive terms upon the conclusion of the last term, **the Archivist of the United States shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President**.[2]

On February 7, 2022, the *Washington Post* reported that former President Trump improperly removed 15 boxes of records from the White House and transported them to his Mar-a-Lago residence. These boxes reportedly contained correspondence and letters from world leaders, including correspondence with North Korean leader Kim Jong-un, and a letter President

---

[1] *See* 44 U.S.C. §§ 2201–2209.

[2] 44 U.S.C. § 2203(g)(1) (emphasis added).

Subject to Protective Order

USA-00383815

The Honorable David S. Ferriero
Page 2

Obama left for his successor.[3]  The records recovered from Mar-a-Lago also reportedly include several newspaper clippings.  A previous Committee investigation revealed that President Trump wrote notes on press clippings, which could mean that even those clippings were likely presidential records.[4]

On February 5, 2022, it was reported that while in office, former President Trump "tore up briefings and schedules, articles and letters, memos both sensitive and mundane."[5]

Removing or concealing government records is a criminal offense punishable by up to three years in prison.  Former National Security Advisor Sandy Berger, for example, was prosecuted for taking classified documents from NARA.[6]  Former President Trump and his senior advisors must also be held accountable for any violations of the law.  Republicans in Congress obsessively investigated former Secretary of State Hillary Clinton for her use of a private email server for official communications.  Former President Trump's conduct, in contrast, involves a former president potentially violating a criminal law by intentionally removing records, including communications with a foreign leader, from the White House and reportedly attempting to destroy records by tearing them up.

In order for the Committee to examine the extent and impact of former President Trump's violations of the PRA, please provide responses to the following requests by February 18, 2022:

1.  Did NARA ask the representatives of former President Trump about missing records prior to the 15 boxes being identified?  If so, what information was provided in response?

2.  Has NARA conducted an inventory of the contents of the boxes recovered from Mar-a-Lago?

3.  Please provide a detailed description of the contents of the recovered boxes, including any inventory prepared by NARA of the contents of the boxes.  If an inventory has not yet been completed, please provide an estimate of when such an inventory will be completed.

---

[3] *National Archives Had to Retrieve Trump White House Records from Mar-a-Lago,* Washington Post (Feb. 7, 2022) (online at www.washingtonpost.com/politics/2022/02/07/trump-records-mar-a-lago/).

[4] Committee on Oversight and Reform, *Press Release:  Committee Chairs Release New Documents Showing Mar-a-Lago Trio Violated Transparency Law and Improperly Influenced Veterans Policies Under President Trump* (Sept. 27, 2021) (online at https://oversight.house.gov/news/press-releases/committee-chairs-release-new-documents-showing-mar-a-lago-trio-violated).

[5] *"He Never Stopped Ripping Things Up": Inside Trump's Relentless Document Destruction Habits,* Washington Post (Feb. 5, 2022) (online at www.washingtonpost.com/politics/2022/02/05/trump-ripping-documents).

[6] *See e.g.,* National Archives and Records Administration, *Notable Thefts from the National Archives* (online at www.archives.gov/research/recover/notable-thefts.html) (accessed Feb. 8, 2022).

Subject to Protective Order

The Honorable David S. Ferriero
Page 2

4.    Are the contents of the boxes of records recovered by NARA undergoing a review to determine if they contain classified information? If so, who is conducting that review and has any classified information been found?

5.    Is NARA aware of any additional presidential records from the Trump Administration that may be missing or not yet in NARA's possession?

6.    What efforts has NARA taken, and is NARA taking, to ensure that any additional records that have not been turned over to NARA are not lost or destroyed?

7.    Has the Archivist notified the Attorney General that former President Trump removed presidential records from the White House? If not, why not?

8.    Is NARA aware of presidential records that President Trump destroyed or attempted to destroy without the approval of NARA? If so, please provide a detailed description of such records, the actions taken by President Trump to destroy or attempt to destroy them, and any actions NARA has taken to recover or preserve these documents.

The Committee on Oversight and Reform is the principal oversight committee of the House of Representatives and has broad authority to investigate "any matter" at "any time" under House Rule X. In addition, House Rule X states that the Committee on Oversight and Reform has jurisdiction to "study on a continuing basis the operation of Government activities at all levels, including the Executive Office of the President."

An attachment to this letter provides additional instructions for responding to the Committee's request. If you have any questions regarding this request, please contact the Oversight Committee staff at (202) 225-5051.

Thank you for your prompt attention to this matter.

Sincerely,

*Carolyn B. Maloney*

Carolyn B. Maloney
Chairwoman

Enclosure

cc:    The Honorable James Comer, Ranking Member

Ex. 16

| From: | William Bosanko <william.bosanko@nara.gov> |
|---|---|
| Sent time: | 02/09/2022 03:03:55 PM |
| To: | John Hamilton <john.hamilton@nara.gov> |
| Cc: | Ferriero, David <david.ferriero@nara.gov>; Wall, Debra <debra.wall@nara.gov>; Stern, GaryM <garym.stern@nara.gov>; John Valceanu <john.valceanu@nara.gov>; Stanwich, Maria <maria.stanwich@nara.gov>; NARA Executive Secretariat <ExecSec@nara.gov>; Donius, Susan <susan.donius@nara.gov>; Laster, John <john.laster@nara.gov> |
| BCc: | (b) (6) @nara.gov |
| Subject: | Re: Letter for The Honorable David S. Ferriero, Archivist of the United States, National Archives and Records Administration |

Thanks John.  Gary and I have alerted NARA OIG, ODNI OIG, and DOJ.

Jay

On Wed, Feb 9, 2022 at 2:25 PM John Hamilton <john.hamilton@nara.gov> wrote:

Here is the letter we knew was coming.....I have acknowledged our receipt of this letter.

John

---------- Forwarded message ---------
From: (b) (6) <(b) (6)>
Date: Wed, Feb 9, 2022 at 2:17 PM
Subject: Letter for The Honorable David S. Ferriero, Archivist of the United States, National Archives and Records Administration
To: john.hamilton@nara.gov <john.hamilton@nara.gov>, garym.stern@nara.gov <garym.stern@nara.gov>, congress.affairs@nara.gov <congress.affairs@nara.gov>
Cc: (b) (6) <(b) (6)>, (b) (6) <(b) (6)>, (b) (6) <(b) (6)>, (b) (6) <(b) (6)>, (b) (6) <(b) (6)>, (b) (6) <(b) (6)>

Hello—

Please see the attached letter from Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform, for The Honorable David S. Ferriero, Archivist of the United States, National Archives and Records Administration.

Please acknowledge receipt of the letter.  Thank you.

Sincerely,

(b) (6)

Staff Assistant | Committee on Oversight & Reform

Chairwoman Carolyn B. Maloney

(b) (6)

--
John O. Hamilton
Director of Congressional Affairs
National Archives and Records Administration
700 Pennsylvania Avenue, NW
Washington, DC 20408-0001
PH: 202-357-6832
Cell: (b) (6)
Fax: 202-3575959

15B000126

Ex. 17

## John Simms

| | |
|---|---|
| **From:** | Keller, John (CRM) (b) (6), (b) (7)(C) |
| **Sent:** | Thursday, February 10, 2022 1:52 PM |
| **To:** | (b) (6), (b) (7)(C) |
| **Cc:** | Jason Metrick; Bratt, Jay (NSD) |
| **Subject:** | RE: [EXTERNAL] Re: Issue re Potential Destruction of Presidential Records |
| **Signed By:** | (b) (6), (b) (7)(C) |

Thank you for the email, (b) (6), (b) (7)(C) and Jason.  I appreciated you taking the time to discuss these matters in more detail in our virtual meeting this afternoon. (b) (5), (b) (7)(A)

Please do not hesitate to reach out to discuss these or related matters further.

-John


John D. Keller
Principal Deputy Chief
Public Integrity Section
United States Department of Justice
1301 New York Ave. NW | Washington, D.C. 20350
(b) (6), (b) (7)(C) (Desk) | (b) (6), (b) (7)(C) (Cell)


**From:** (b) (6), (b) (7)(C)
**Sent:** Wednesday, February 9, 2022 5:07 PM
**To:** Keller, John (CRM (b) (6), (b) (7)(C)
**Cc:** Jason Metrick (b) (6), (b) (7)(C)
**Subject:** Fwd: [EXTERNAL] Re: Issue re Potential Destruction of Presidential Records

Mr. Keller,

(b) (5), (b) (6), (b) (7)(C), (b) (7)(A)



(b)(5), (b)(6), (b)(7)(C), (b)(7)(A)

(b) (5), (b) (6), (b) (7)(C), (b) (7)(A)

(b) (5), (b) (6), (b) (7)(C), (b) (7)(A)

Respectfully,

(b) (6), (b) (7)(C)

Special Agent in Charge
NARA-OIG

(b) (6), (b) (7)(C)

**INSPECTOR GENERAL SENSITIVE INFORMATION**

This email including any attachments is intended only for authorized recipients. Recipients may not further disseminate this information without the express permission of the sender or other Office of the Inspector General personnel. This email may contain Inspector General sensitive information that is confidential, sensitive, work product, attorney-client privileged, or protected by Federal law, including protection from public disclosure under the Freedom of Information Act (FOIA), *5 U.S.C. § 552*. Accordingly, the use, dissemination, distribution or reproduction of this information to or by unauthorized or unintended recipients may be unlawful. If you have received this email in error, please notify us immediately by return email, and destroy all copies of the email received in error.

Ex. 18

**From:** "Keller, John (CRM)" <█████████@usdoj.gov>
**To:** ████████████ <█████████@nara.gov>
**Cc:** Jason Metrick <█████████@nara.gov>, "Bratt, Jay (NSD)" <█████████@usdoj.gov>
**Subject:** RE: [EXTERNAL] Re: Issue re Potential Destruction of Presidential Records
**Date:** Thu, 10 Feb 2022 18:51:34 +0000
**Importance:** Normal

---

Thank you for the email, █████ and Jason.  I appreciated you taking the time to discuss these matters in more detail in our virtual meeting this afternoon.  Based on the allegations as set forth below and as supplemented by our virtual meeting, Matters 1, 2, and 3 are not matters for which PIN would open a criminal investigation at this time.  If you develop additional evidence related to these allegations, especially as to the contents of the underlying documents or any evidence of obstruction of justice, please revisit these matters with PIN.  Because PIN is not opening a criminal investigation, there is nothing that we would presently issue to compel █████ to return records in his possession, but there may be civil process that could be pursued as referenced in your email below.

This determination is limited to the Public Integrity Section.  I have copied the Chief of the Counterintelligence and Export Control Section of the National Security Division, Jay Bratt, as he has also been involved in ongoing consults regarding these allegations.  I understand that the Counterintelligence Division of FBI is also assessing these allegations.  Jay may be able provide additional thoughts and help facilitate coordination and deconfliction with the FBI.

Please do not hesitate to reach out to discuss these or related matters further.

-John

John D. Keller
Principal Deputy Chief
Public Integrity Section
United States Department of Justice
1301 New York Ave. NW | Washington, D.C. 20350
████████ (Desk) | ████████ (Cell)

---

**From:** ████████████ <█████████@nara.gov>
**Sent:** Wednesday, February 9, 2022 5:07 PM
**To:** Keller, John (CRM) <J████████@usdoj.gov>
**Cc:** Jason Metrick <█████████@nara.gov>
**Subject:** Fwd: [EXTERNAL] Re: Issue re Potential Destruction of Presidential Records

Mr. Keller,

I am referred to you by Mr. Windom, and I hope you are able to assist us with determining the best course of action.  I have prepared a synopsis of three separate matters recently referred to my office, which I hope you find useful in sorting through the three distinct matters and hopefully aid in a discussion.  I understand that NARA's General Counsel has engaged PIN independently, but in accordance with our practices, we are consulting with you from a law enforcement oversight perspective.  I appreciate that this is a unique situation, and my hope is we can discuss further at your convenience.

USA-00309423

Synopsis:

NARA OIG is in receipt of three referrals from NARA's General Counsel (NGC), and seek prosecutorial guidance from your office. Specifically, the matters alleged the following:

1. President Donald Trump/Trump Administration failed to transfer presidential records to NARA as required by the Presidential Records Act (PRA), NARA subsequently retrieved 15 boxes of records from Mar-a-Lago that contained highly classified information that were not properly handled stored (potential classified information spillage and a violation of additional laws), and NARA remained concerned that additional presidential records may be in Mar-a-Lago.



NGC and NARA OIG are independent entities of NARA, and it was further agreed that notifications to DOJ would proceed as necessary and according to each entity's independent roles.

## Matter 1: Classified Records from Mar-a-Lago

NARA OIG collected the following information concerning this matter and is providing it to DOJ for informational purposes:

- In accordance with the PRA, presidential records are required to be preserved and transferred to NARA at the end of the Administration's term. In this instance, the records should have been transferred to NARA in January 2021.

- NGC engaged officials from the Trump Administration on several occasions to coordinate the transfer of missing presidential records, and in mid-January 2022, NARA arranged for the transport from the Trump Mar-a-Lago property in Florida to NARA. NGC understood that Trump representatives identified 12 boxes of records. However, NARA was provided with 15 boxes of records. NGC further reported to NARA OIG that they believe there are more missing records located at Mar-a-Lago, and they continue to engage Trump representatives to search for and identify additional presidential records. A review and inventory of the records remains ongoing.

- On January 18, 2022, NARA's White House Liaison Division Director, reported that a preliminary review of the records revealed the boxes were filled with newspapers, magazines, printed news articles, photos, miscellaneous print-outs, notes, presidential correspondence, personal and post-presidential records, and "a lot of classified records." Of most significant concern was that highly classified records were unfoldered, intermixed with other records, and otherwise unproperly identified.

- On January 25, 2022, NARA OIG received information from NGC after their consultation with DOJ [ADAG David Newman (DOJ – ODAG), who referred NGC to Chief Jay Bratt (DOJ – NSD) and Chief Corey Amundson (DOJ – PIN)]. DOJ recommended that NGC notify NARA OIG and the Intelligence Community (IC) OIG. After receiving the information from NGC, NARA OIG contacted IC OIG and it was decided that IC OIG would further review this matter and would continue to coordinate with NGC and NARA OIG as necessary. Additionally, IC OIG requested that NGC and NARA OIG ensure DOJ was updated.

Subject to Protective Order

- On February 8, 2022, NARA OIG learned that NGC further consulted with Chief Bratt and Chief Amundson.

- This matter remains under review by IC OIG.

- On February 9, 2022, NARA received a Congressional Inquiry concerning this matter from the Committee on Oversight and Reform. (Available upon request)

Subject to Protective Order



NARA OIG appreciates PIN's review of these matters, seeks prosecutorial guidance and a determination if PIN is interested in pursuing these matters, and working with NARA OIG in our law enforcement oversight role to investigate the facts of these matters further.

Respectfully,

███████████████

*(she/her/hers)*
Special Agent in Charge
NARA-OIG
o:  ███████████
m:  ███████████

**INSPECTOR GENERAL SENSITIVE INFORMATION**

This email including any attachments is intended only for authorized recipients. Recipients may not further disseminate this information without the express permission of the sender or other Office of the Inspector General personnel. This email may contain Inspector General sensitive information that is confidential, sensitive, work product, attorney-client privileged, or protected by Federal law, including protection from public disclosure under the Freedom of Information Act (FOIA), *5 U.S.C. § 552*. Accordingly, the use, dissemination, distribution or reproduction of this information to or by unauthorized or unintended recipients may be unlawful. If you have received this email in error, please notify us immediately by return email, and destroy all copies of the email received in error.

---------- Forwarded message ---------
From: **Windom, Thomas (USADC)** <███████████@usdoj.gov>
Date: Tue, Feb 8, 2022 at 3:52 PM
Subject: RE: [EXTERNAL] Re: Issue re Potential Destruction of Presidential Records

Subject to Protective Order

To: ████████ <████████@nara.gov>
Cc: Jason Metrick <████████@nara.gov>

Hi ████ – just got off the phone with one of the deputy chiefs in PIN. Apparently someone from NARA already has reached out to PIN Principal Deputy John Keller. Sounds like this happened within the last few days. I didn't get the name of who from NARA reached out, and I don't know the content of the conversation. Perhaps it makes sense for you to reach out to John directly, or ask around to see who reached out to him and what was discussed?

John's email is ████████@usdoj.gov and his phone numbers are below.

John D. Keller
Principal Deputy Chief
Public Integrity Section
United States Department of Justice
1301 New York Ave. NW | Washington, D.C. 20350
████████ (Desk) | ████████ (Cell)

Thanks!
tw

---

**From:** ████████ <████████@nara.gov>
**Sent:** Tuesday, February 8, 2022 12:42 PM
**To:** Windom, Thomas (USADC) ████████usa.doj.gov>
**Cc:** Jason Metrick <████████@nara.gov>
**Subject:** Re: [EXTERNAL] Re: Issue re Potential Destruction of Presidential Records

Thank you.

████████
*(she/her/hers)*
Special Agent in Charge
NARA-OIG
o: ████████
m: ████████

**INSPECTOR GENERAL SENSITIVE INFORMATION**

This email including any attachments is intended only for authorized recipients. Recipients may not further disseminate this information without the express permission of the sender or other Office of the Inspector General personnel. This email may contain Inspector General sensitive information that is confidential, sensitive, work product, attorney-client privileged, or protected by Federal law, including protection from public disclosure under the Freedom of Information Act (FOIA), *5 U.S.C. § 552.* Accordingly, the use, dissemination, distribution or reproduction of this information to or by unauthorized or unintended recipients may be unlawful. If you have received this email in error, please notify us immediately by return email, and destroy all copies of the email received in error.

On Tue, Feb 8, 2022 at 9:27 AM Windom, Thomas (USADC) <████████@usdoj.gov> wrote:

Hi ████ – thanks for the email. I haven't had a chance to discuss internally yet. But I have reached out to PIN to find a contact for you. I hope to hear back shortly. Thanks!
tw

**From:** ███████ <███████@nara.gov>
**Sent:** Monday, February 7, 2022 2:09 PM
**To:** Windom, Thomas (USADC) <███████@usa.doj.gov>
**Cc:** Jason Metrick ███████@nara.gov>
**Subject:** [EXTERNAL] Re: Issue re Potential Destruction of Presidential Records

Hi Thomas,

My office has received additional referrals from NARA alleging various potential violations of the Presidential Records Act in addition to the matter we briefly discussed last week. I know you mentioned doing some more research, but in light of additional information (torn records, missing records, and official emails sent from a personal account and not properly preserved), I thought it made more sense to consult PIN on the various issues. Have you been in contact with anyone at PIN, or do you have a direct POC we can reach out to?

I know you are busy, and appreciate your assistance.

Thanks,

███████
*(she/her/hers)*
███████
**NARA-OIG**
o: ███████
m: ███████

**INSPECTOR GENERAL SENSITIVE INFORMATION**

This email including any attachments is intended only for authorized recipients. Recipients may not further disseminate this information without the express permission of the sender or other Office of the Inspector General personnel. This email may contain Inspector General sensitive information that is confidential, sensitive, work product, attorney-client privileged, or protected by Federal law, including protection from public disclosure under the Freedom of Information Act (FOIA), *5 U.S.C. § 552.* Accordingly, the use, dissemination, distribution or reproduction of this information to or by unauthorized or unintended recipients may be unlawful. If you have received this email in error, please notify us immediately by return email, and destroy all copies of the email received in error.

On Tue, Feb 1, 2022 at 11:40 AM ███████ <███████@nara.gov> wrote:

Hi Thomas,

Might we have a moment to discuss the below matter concerning the destruction of Presidential records with you tomorrow as well?

Thanks,

███████
*(she/her/hers)*
███████
**NARA-OIG**
o: ███████
m: ███████

                    USA-00309428

**INSPECTOR GENERAL SENSITIVE INFORMATION**

This email including any attachments is intended only for authorized recipients.  Recipients may not further disseminate this information without the express permission of the sender or other Office of the Inspector General personnel.  This email may contain Inspector General sensitive information that is confidential, sensitive, work product, attorney-client privileged, or protected by Federal law, including protection from public disclosure under the Freedom of Information Act (FOIA), *5 U.S.C. § 552.* Accordingly, the use, dissemination, distribution or reproduction of this information to or by unauthorized or unintended recipients may be unlawful.  If you have received this email in error, please notify us immediately by return email, and destroy all copies of the email received in error.

Subject to Protective Order

USA-00309429

Ex. 19

FD-1057 (Rev. 5-8-10)

# FEDERAL BUREAU OF INVESTIGATION

## Electronic Communication

**Title:** ██████ Summary of document information      **Date:** 02/24/2022
provided by NARA

**From:** WASHINGTON FIELD

████ **Contact:** ███████ FBI 27 ███████, ███████

**Approved By:** A/SSA FBI 9

**Drafted By:** ████ FBI 27 ████████

DECLASSIFIED BY: NSICG ████
ON 06-05-2023

This Redacted Version Only

**Case ID #:** ████████ ████ PLASMIC ECHO; Mishandling of
Classified or National Defense
Information; UNKNOWN SUBJECT; SENSITIVE
INVESTIGATIVE MATTER
SENSITIVE INVESTIGATIVE MATTER

### DOCUMENT RESTRICTED TO CASE PARTICIPANTS

This document contains information that is restricted to case participants.

**Synopsis:** ██████ Summary of document information provided by NARA by
email on February 24, 2022

**Reference:** ██████████ Serial 8

**Details:**

████ The following summary is based on an initial review of
documents by the National ████ and Records Administration (NARA)
provided to FBI on February 24, 2022 (serialized separately).

████ 106 classified documents were found totaling 767 pages.

Title: ███████████   Summary of document information provided by NARA
Re: ████████████   02/24/2022

███████   Classified documents were found in twelve of the fifteen boxes.

███████   Dates provided ranged from 2/19/2019 to 11/13/2020.

███████   Document descriptions included: Agenda, Backgrounder, Briefing, Card, Chart, Decision Memo, Graph, Map, Memo, Notes, NSC, NSC Note Card, Overview, Photo, Policy Paper, Presentation, Profile, Readahead, Report, Slide, Schedule.

███████   Classification markings included: C, S, S/FRD, S/HCS, S/NATO, S/NF, S/SAR, S/SCI, TS, TS/HCS, TS/HCS/SCI, TS/SAP, TS/SCI.

███████   The following information is taken from ICD 710 and the Intelligence Community Markings System Register and Manual, 30 August 2019:

| Abbreviation | Description | Note |
|---|---|---|
| C | Confidential | Unauthorized disclosure reasonably national security |
| S | Secret | Unauthorized disclosure reasonably to national security |
| TS | Top Secret | Unauthorized disclosure reasonably grave damage to national security |
| FRD | Formerly Restricted Data | Governed by the Atomic Energy Act |
| HCS | HUMINT Control System | HCS is an SCI control system that i |
| NATO | NATO Classification Markings | Contains NATO information |
| NF | NOFORN | Not Releasable to Foreign Nationals |
| SAR | Special Access Required | Marking indicates the specific SAP |
| SCI | Sensitive Compartmented Information | Handled within formal access contro |
| SAP | Special Access Program | SAP denotes classified information protection |

◆◆

███████████
2

Subject to Protective Order                              USA-00941304

Ex. 20

**FBI 11** **. (WF) (FBI)**

| | |
|---|---|
| **From:** | Per. 53 < @nara.gov> |
| **Sent:** | Thursday, February 24, 2022 9:41 AM |
| **To:** | FBI 11 . (WF) (FBI); FBI 2 (WF) (FBI); Riedlinger, Anthony T. (WF) (FBI); FBI 9 (WF) (FBI) |
| **Cc:** | Stern, GaryM |
| **Subject:** | [EXTERNAL EMAIL] - Subset of NARA Inventory |
| **Attachments:** | Subset of Inventory.pdf |

Good-morning.  Please see the attached (1 file) for three tables summarizing the marked, classified national security information found during our inventory.  In short, we identified 106 documents that total 767 pages.

I will note that in addition to the collateral classified and the SAP and SCI, we identified FRD which implicates the Atomic Energy Act, as amended, and NATO, which implicates treaty obligations.

Please let us know of any questions.

Thanks,



1

USA-00940472

Ex. 21

**Subset of NARA Produced Inventory – 02/24/2022**

Table 1

| Classification | Documents | Pages | Boxes |
|---|---|---|---|
| Confidential | 40 | 156 | 1-3,5-10,12,13,15 |
| Secret | 32 | 349 | 1-3,6-10, 12 |
| S/FRD | 3 | 57 | 6 |
| S/HCS | 2 | 22 | 1-2 |
| S/NATO | 1 | 1 | 6 |
| S/NF | 2 | 10 | 3,7 |
| S/SAR | 1 | 1 | 2 |
| S/SCI | 2 | 31 | 8 |
| Top Secret | 11 | 54 | 3,6,7,9,10,15 |
| TS/HCS | 1 | 1 | 1 |
| TS/HCS/SCI | 2 | 8 | 12,15 |
| TS/SAP | 1 | 6 | 3 |
| TS/SCI | 8 | 71 | 1,2,7,9 |
| **Total** | **106** | **767** | |

Table 2

| Box # | Documents | Pages |
|---|---|---|
| 1 | 10 | 77 |
| 2 | 9 | 57 |
| 3 | 11 | 49 |
| 4 | 0 | 0 |
| 5 | 2 | 17 |
| 6 | 10 | 79 |
| 7 | 10 | 66 |
| 8 | 10 | 51 |
| 9 | 5 | 10 |
| 10 | 21 | 269 |
| 11 | 0 | 0 |
| 12 | 10 | 76 |
| 13 | 4 | 9 |
| 14 | 0 | 0 |
| 15 | 4 | 7 |
| | **106** | **767** |

Subject to Protective Order

Table 3

| Item No. | Doc. Description | Date | Pages | Classification |
|---|---|---|---|---|
| 2 | Briefing | 7/7/2020 | 19 | S/HCS |
| 19 | Memo | 6/17/2020 | 1 | TS/HCS |
| 50 | Briefing | 7/22/2020 | 2 | C |
| 51 | Briefing | 7/22/2020 | 14 | S |
| 58 | Briefing | 1/8/2020 | 3 | C |
| 59 | Briefing | 1/8/2020 | 6 | TS/SCI |
| 109 | Map | 11/2020 | 1 | TS/SCI |
| 110 | Map | 11/2020 | 1 | C |
| 111 | Photo | 11/2020 | 1 | S |
| 116 | Decision Memo | 11/13/2020 | 29 | TS/SCI |
| 9 | Briefing | 7/8/19 | 3 | S/HCS |
| 19 | Backgrounder | 7/10/19 | 1 | S |
| 24 | Backgrounder | 7/19/19 | 18 | S |
| 36 | Briefing | n.d. | 3 | C |
| 55 | Overview | 10/25/19 | 1 | S/SAR |
| 93 | Backgrounder | 2/21/19 | 12 | S |
| 94 | Readahead | 2/21/19 | 17 | TS/SCI |
| 95 | Graph | 6/19/19 | 1 | TS/SCI |
| 104 | Map | 5/19/19 | 1 | TS/SCI |
| 32 | Report | 11/6/19 | 1 | S/NF |
| 36 | Note | n.d. | 1 | C |
| 69 | Briefing | 5/20/19 | 4 | TS |
| 72 | Briefing | 5/18/19 | 2 | S |
| 100 | Memo | 2019 | 6 | TS/SAP |
| 116 | Briefing | 6/18/19 | 4 | TS |
| 129 | Chart | 5/20/19 | 1 | TS |
| 157 | Notes | n.d. | 13 | C |
| 158 | Briefing | 6/10/19 | 13 | S |
| 161 | Note | n.d. | 2 | C |
| 163 | Note | n.d. | 2 | C |
| 22 | Policy Paper | n.d. | 16 | C |
| 112 | Profile | n.d. | 1 | C |
| 4 | Briefing | n.d. | 5 | C |
| 34 | Briefing | n.d. | 1 | C |
| 66 | Graphs | 5/14/19 | 3 | TS |

USA-00941300

| Item No. | Doc. Description | Date | Pages | Classification |
|---|---|---|---|---|
| 92 | Briefing | n.d. | 1 | C |
| 121 | Slide | 11/14/19 | 1 | S/NATO |
| 123 | Agenda | 11/13/19 | 5 | S |
| 139 | Briefing | 7/24/19 | 6 | S |
| 153 | Briefing | 11/12/19 | 5 | S/FRD |
| 154 | Agenda | 11/12/19 | 27 | S/FRD |
| 156 | Agenda | 11/12/19 | 25 | S/FRD |
| 22 | Note | 4/26/20 | 4 | C |
| 23 | Briefing | 4/24/19 | 3 | TS |
| 42 | Note | n.d. | 1 | C |
| 43 | Agenda | 4/29/20 | 9 | S/NF |
| 99 | Briefing | 4/28/20 | 2 | TS |
| 104 | Note | n.d. | 1 | C |
| 130 | Agenda | 4/24/20 | 12 | S |
| 131 | Note | 4/24/20 | 15 | TS/SCI |
| 132 | Note | 4/24/20 | 15 | S |
| 134 | Note | n.d. | 4 | C |
| 19 | Map | 2/19/19 | 1 | S/SCI |
| 20 | Map | 2/19/19 | 1 | S |
| 42 | Readahead | 9/4/20 | 30 | S/SCI |
| 43 | Card | n.d. | 2 | C |
| 46 | Card | n.d. | 2 | C |
| 50 | Card | n.d. | 2 | S |
| 51 | Card | n.d. | 2 | C |
| 54 | Card | n.d. | 3 | C |
| 60 | NSC Note Card | n.d. | 2 | S |
| 76 | NSC Note Card | n.d. | 6 | C |
| 24 | Briefing | 5/12/20 | 2 | TS |
| 31 | Briefing | n.d. | 1 | C |
| 48 | Presentation | n.d. | 3 | S |
| 67 | Note | 5/15/20 | 1 | TS/SCI |
| 155 | Briefing | n.d. | 3 | C |
| 24 | NSC | n.d. | 2 | C |
| 59 | Briefing | 6/30/20 | 1 | TS |
| 69 | Briefing | 7/16/20 | 7 | S |
| 71 | Briefing | 7/17/20 | 13 | TS |
| 72 | Briefing | n.d. | 2 | S |
| 107 | Briefing | 4/18/20 | 11 | S |
| 108 | Briefing | 4/17/20 | 13 | C |
| 117 | Briefing | n.d. | 16 | S |

Subject to Protective Order

| Item No. | Doc. Description | Date | Pages | Classification |
|---|---|---|---|---|
| 120 | Briefing | n.d. | 4 | C |
| 122 | Briefing | n.d. | 20 | TS |
| 123 | Briefing | n.d. | 15 | S |
| 131 | Briefing | n.d. | 2 | C |
| 134 | Briefing | 5/22/20 | 37 | S |
| 136 | Briefing | 7/10/2020 | 17 | S |
| 138 | Briefing | 6/23/20 | 22 | S |
| 139 | Briefing | 3/5/20 | 16 | S |
| 140 | Briefing | n.d. | 5 | S |
| 147 | Briefing | 6/29/20 | 12 | C |
| 148 | Briefing | 6/23/20 | 27 | S |
| 150 | Briefing | 6/5/20 | 13 | S |
| 153 | Briefing | 6/2/20 | 14 | S |
| 3 | Briefing | 3/7/20 | 2 | C |
| 4 | Schedule | 3/6/20 | 15 | S |
| 14 | Briefing | 3/3/20 | 4 | C |
| 15 | Agenda | 3/2/20 | 16 | C |
| 16 | Briefing | 3/2/20 | 6 | S |
| 17 | Agenda | 3/2/20 | 6 | TS/HCS/SCI |
| 25 | Briefing | 3/3/20 | 4 | C |
| 26 | Agenda | 3/3/20 | 13 | S |
| 76 | Briefing | 3/3/20 | 4 | C |
| 77 | Agenda | 3/3/20 | 6 | S |
| 3 | Briefing | n.d. | 3 | C |
| 15 | Briefing | n.d. | 2 | C |
| 16 | Briefing | n.d. | 2 | C |
| 36 | Briefing | n.d. | 2 | C |
| 14 | Briefing | 3/26/2019 | 1 | TS |
| 41 | Briefing | n.d. | 2 | C |
| 43 | Briefing | n.d. | 2 | C |
| 74 | Briefing | 3/19/2019 | 2 | TS/HCS/SCI |
| | | | 767 | |

USA-00941302

Ex. 22

**MONDAY, FEB 28**



**Oliver Potts**  Feb 28, 2022, 3:19 PM

hi Jay...any headway on getting WH to consider fate of the books with us?



**William Bosanko**  Feb 28, 2022, 3:20 PM                              ⋮

None - the 15 boxes from mar-a-lago have consummed all of our discussions

DO you have bullets or something I can crib from to send an email



**Oliver Potts**  Feb 28, 2022, 3:21 PM

definitely...will send

**William Bosanko**  Feb 28, 2022, 3:21 PM

Thx!  That will help

Ex. 23

**From:** "Bratt, Jay (NSD)" <████@usdoj.gov>
**To:** "'Evan Corcoran'" <████@silvermanthompson.com>
**Cc:** "'Jennifer Little'" <████@jllaw.com>
**Subject:** RE: Presidential Records - Introduction
**Date:** Fri, 29 Apr 2022 14:37:14 -0000
**Importance:** Normal
**Inline-Images:** image001.jpg

---

Evan:

Before our call, I'd like to offer some thoughts for your consideration.

As I am sure you are aware, following multiple granted extension requests, there is a 5pm deadline today for any privilege assertions relating to documents in the fifteen boxes of materials that your client and his representatives turned over to NARA earlier this year. I realize you have just begun your representation in this matter, but I wanted to give you some information for your awareness as you decide any next steps.

There are important national security interests in the FBI and others in the Intelligence Community getting access to these materials. According to NARA, among the materials in the boxes are over 100 documents with classification markings, comprising more than 700 pages. Some include the highest levels of classification, including Special Access Program (SAP) materials. Access to the materials is not only necessary for purposes of our ongoing criminal investigation, but the Executive Branch must also conduct an assessment of the potential damage resulting from the apparent manner in which these materials were stored and transported and take any necessary remedial steps. Accordingly, we are seeking immediate access to these materials so as to facilitate the necessary assessments that need to be conducted within the Executive Branch.

I look forward to speaking later.

Jay

**From:** Evan Corcoran <████@silvermanthompson.com>
**Sent:** Friday, April 29, 2022 9:58 AM
**To:** Bratt, Jay (NSD) ████@usdoj.gov>
**Cc:** Jennifer Little <███@jllaw.com>
**Subject:** [EXTERNAL] RE: Presidential Records - Introduction

Jay:

No problem.

I look forward to connecting at noon.

Best regards,

Evan

**From:** Bratt, Jay (NSD) <████@usdoj.gov>
**Sent:** Friday, April 29, 2022 9:51 AM
**To:** Evan Corcoran <████@silvermanthompson.com>
**Cc:** Jennifer Little <███@jllaw.com>
**Subject:** RE: Presidential Records - Introduction

Evan:

I again need to push our call. May we speak at noon? I will call you at the number you previously gave me and lock it in with a calendar invite. I really appreciate your patience.

Thanks.

Jay

**From:** Evan Corcoran <████@silvermanthompson.com>
**Sent:** Thursday, April 28, 2022 6:20 PM
**To:** Bratt, Jay (NSD) <████@usdoj.gov>
**Cc:** Jennifer Little <███@jllaw.com>
**Subject:** [EXTERNAL] RE: Presidential Records - Introduction

Subject to Protective Order

Jay:

No problem.

I know that you have a lot on your plate in ordinary times, and these are not ordinary times.

10 am tomorrow works great.

Best regards,

Evan

Mobile ▇▇▇▇▇▇

---

**From:** Bratt, Jay (NSD) <▇▇▇▇@usdoj.gov>
**Sent:** Thursday, April 28, 2022 6:17 PM
**To:** Evan Corcoran <▇▇▇@silvermanthompson.com>
**Cc:** Jennifer Little <▇▇@jllaw.com>
**Subject:** RE: Presidential Records - Introduction

Evan:

My apologies again. I'm still not going to be able to speak. Would 10 tomorrow morning work?

Thanks.

Jay

---

**From:** Evan Corcoran ▇▇▇▇▇@silvermanthompson.com>
**Sent:** Thursday, April 28, 2022 4:51 PM
**To:** Bratt, Jay (NSD) <▇▇▇▇@usdoj.gov>
**Cc:** Jennifer Little <▇▇@jllaw.com>
**Subject:** [EXTERNAL] RE: Presidential Records - Introduction

Great.

Any time after 5 pm is fine.

Hopefully before 6:30 pm, just because we have another call on this matter at time.

---

**From:** Bratt, Jay (NSD) <▇▇▇▇@usdoj.gov>
**Sent:** Thursday, April 28, 2022 2:53 PM
**To:** Evan Corcoran <▇▇▇▇@silvermanthompson.com>
**Cc:** Jennifer Little <▇▇@jllaw.com>
**Subject:** RE: Presidential Records - Introduction

Evan:

My apologies for not responding sooner. I've been tied up most of the day and will remain so until about 5. I'll let you know when I've freed up.

Jay

---

**From:** Evan Corcoran <▇▇▇▇@silvermanthompson.com>
**Sent:** Thursday, April 28, 2022 12:05 PM
**To:** Bratt, Jay (NSD) <▇▇▇▇@usdoj.gov>
**Cc:** Jennifer Little <▇▇@jllaw.com>
**Subject:** [EXTERNAL] Presidential Records - Introduction

Jay:

I hope that you are well.

Wanted to see if you were available today at some point in the 3 pm to 4 pm range for an introductory call. We can do a call-in number, or you can call my cellphone if you wish – ▇▇▇▇▇. If that does not work, please let me know a good time for you and I can re-arrange some things so that we can speak. I would like to include Jennifer Little on the call as well.

I have been retained by President Donald J. Trump in connection with an executive privilege review of certain Presidential records.

With best regards,

Evan

**M. Evan Corcoran**
Partner
**SILVERMAN**
**THOMPSON**
Silverman Thompson Slutkin White

---

Subject to Protective Order                                                                USA-00309420

400 East Pratt Street
Baltimore, Maryland 21202
direct ███████████ | main ███████████ | fax ███████████
███████ @silvermanthompson.com | www.silvermanthompson.com

USA-00309421

Ex. 24



Archivist *of the*
United States

May 10, 2022

Evan Corcoran
Silverman Thompson
400 East Pratt Street
Suite 900
Baltimore, MD 21202
*By Email*

Dear Mr. Corcoran:

I write in response to your letters of April 29, 2022, and May 1, 2022, requesting that the National Archives and Records Administration (NARA) further delay the disclosure to the Federal Bureau of Investigation (FBI) of the records that were the subject of our April 12, 2022 notification to an authorized representative of former President Trump.

As you are no doubt aware, NARA had ongoing communications with the former President's representatives throughout 2021 about what appeared to be missing Presidential records, which resulted in the transfer of 15 boxes of records to NARA in January 2022. In its initial review of materials within those boxes, NARA identified items marked as classified national security information, up to the level of Top Secret and including Sensitive Compartmented Information and Special Access Program materials. NARA informed the Department of Justice about that discovery, which prompted the Department to ask the President to request that NARA provide the FBI with access to the boxes at issue so that the FBI and others in the Intelligence Community could examine them. On April 11, 2022, the White House Counsel's Office—affirming a request from the Department of Justice supported by an FBI letterhead memorandum—formally transmitted a request that NARA provide the FBI access to the 15 boxes for its review within seven days, with the possibility that the FBI might request copies of specific documents following its review of the boxes.

Although the Presidential Records Act (PRA) generally restricts access to Presidential records in NARA's custody for several years after the conclusion of a President's tenure in office, the statute further provides that, "subject to any rights, defenses, or privileges which the United States or any agency or person may invoke," such records "shall be made available . . . to an incumbent President if such records contain information that is needed for the conduct of current business of the incumbent President's office and that is not otherwise available." 44 U.S.C. §

2205(2)(B). Those conditions are satisfied here. As the Department of Justice's National Security Division explained to you on April 29, 2022:

> There are important national security interests in the FBI and others in the Intelligence Community getting access to these materials. According to NARA, among the materials in the boxes are over 100 documents with classification markings, comprising more than 700 pages. Some include the highest levels of classification, including Special Access Program (SAP) materials. Access to the materials is not only necessary for purposes of our ongoing criminal investigation, but the Executive Branch must also conduct an assessment of the potential damage resulting from the apparent manner in which these materials were stored and transported and take any necessary remedial steps. Accordingly, we are seeking immediate access to these materials so as to facilitate the necessary assessments that need to be conducted within the Executive Branch.

We advised you in writing on April 12 that, "in light of the urgency of this request," we planned to "provid[e] access to the FBI next week," i.e., the week of April 18. *See* Exec. Order No. 13,489, § 2(b), 74 Fed. Reg. 4,669 (Jan. 21, 2009) (providing a 30-day default before disclosure but authorizing the Archivist to specify "a shorter period of time" if "required under the circumstances"); *accord* 36 C.F.R. § 1270.44(g) ("The Archivist may adjust any time period or deadline under this subpart, as appropriate, to accommodate records requested under this section."). In response to a request from another representative of the former President, the White House Counsel's Office acquiesced in an extension of the production date to April 29, and so advised NARA. In accord with that agreement, we had not yet provided the FBI with access to the records when we received your letter on April 29, and we have continued to refrain from providing such access to date.

It has now been four weeks since we first informed you of our intent to provide the FBI access to the boxes so that it and others in the Intelligence Community can conduct their reviews. Notwithstanding the urgency conveyed by the Department of Justice and the reasonable extension afforded to the former President, your April 29 letter asks for additional time for you to review the materials in the boxes "in order to ascertain whether any specific document is subject to privilege," and then to consult with the former President "so that he may personally make any decision to assert a claim of constitutionally based privilege." Your April 29 letter further states that in the event we do not afford you further time to review the records before NARA discloses them in response to the request, we should consider your letter to be "a protective assertion of executive privilege made by counsel for the former President."

The Counsel to the President has informed me that, in light of the particular circumstances presented here, President Biden defers to my determination, in consultation with the Assistant Attorney General for the Office of Legal Counsel, regarding whether or not I should uphold the former President's purported "protective assertion of executive privilege." *See* 36 C.F.R. § 1270.44(f)(3). Accordingly, I have consulted with the Assistant Attorney General for the Office of Legal Counsel to inform my "determination as to whether to honor the former President's claim of privilege or instead to disclose the Presidential records notwithstanding the claim of privilege." Exec. Order No. 13,489, § 4(a).

The Assistant Attorney General has advised me that there is no precedent for an assertion of executive privilege by a former President *against an incumbent President* to prevent the latter from obtaining from NARA Presidential records belonging to the Federal Government where "such records contain information that is needed for the conduct of current business of the incumbent President's office and that is not otherwise available." 44 U.S.C. § 2205(2)(B).

To the contrary, the Supreme Court's decision in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977), strongly suggests that a former President may not successfully assert executive privilege "against the very Executive Branch in whose name the privilege is invoked." *Id.* at 447-48. In *Nixon v. GSA*, the Court rejected former President Nixon's argument that a statute requiring that Presidential records from his term in office be maintained in the custody of, and screened by, NARA's predecessor agency—a "very limited intrusion by personnel in the Executive Branch sensitive to executive concerns"—would "impermissibly interfere with candid communication of views by Presidential advisers." *Id.* at 451; *see also id.* at 455 (rejecting the claim). The Court specifically noted that an "incumbent President should not be dependent on happenstance or the whim of a prior President when he seeks access to records of past decisions that define or channel current governmental obligations." *Id.* at 452; *see also id.* at 441-46 (emphasizing, in the course of rejecting a separation-of-powers challenge to a provision of a federal statute governing the disposition of former President Nixon's tape recordings, papers, and other historical materials "within the Executive Branch," where the "employees of that branch [would] have access to the materials only 'for lawful Government use,'" that "[t]he Executive Branch remains in full control of the Presidential materials, and the Act facially is designed to ensure that the materials can be released only when release is not barred by some applicable privilege inherent in that branch"; and concluding that "nothing contained in the Act renders it unduly disruptive of the Executive Branch").

It is not necessary that I decide whether there might be *any* circumstances in which a former President could successfully assert a claim of executive privilege to prevent an Executive Branch agency from having access to Presidential records for the performance of valid executive functions. The question in this case is not a close one. The Executive Branch here is seeking access to records belonging to, and in the custody of, the Federal Government itself, not only in order to investigate whether those records were handled in an unlawful manner but also, as the National Security Division explained, to "conduct an assessment of the potential damage resulting from the apparent manner in which these materials were stored and transported and take any necessary remedial steps." These reviews will be conducted by current government personnel who, like the archival officials in *Nixon v. GSA*, are "sensitive to executive concerns." *Id.* at 451. And on the other side of the balance, there is no reason to believe such reviews could "adversely affect the ability of future Presidents to obtain the candid advice necessary for effective decisionmaking." *Id.* at 450. To the contrary:  Ensuring that classified information is appropriately protected, and taking any necessary remedial action if it was not, are steps essential to preserving the ability of future Presidents to "receive the full and frank submissions of facts and opinions upon which effective discharge of [their] duties depends." *Id.* at 449.

Because an assertion of executive privilege against the incumbent President under these circumstances would not be viable, it follows that there is no basis for the former President to make a "protective assertion of executive privilege," which the Assistant Attorney General

informs me has never been made outside the context of a congressional demand for information from the Executive Branch. Even assuming for the sake of argument that a former President may under some circumstances make such a "protective assertion of executive privilege" to preclude the Archivist from complying with a disclosure otherwise prescribed by 44 U.S.C. § 2205(2), there is no predicate for such a "protective" assertion here, where there is no realistic basis that the requested delay would result in a viable assertion of executive privilege against the incumbent President that would prevent disclosure of records for the purposes of the reviews described above. Accordingly, the only end that would be served by upholding the "protective" assertion here would be to delay those very important reviews.

I have therefore decided not to honor the former President's "protective" claim of privilege.  *See* Exec. Order No. 13,489, § 4(a); *see also* 36 C.F.R. 1270.44(f)(3) (providing that unless the incumbent President "uphold[s]" the claim asserted by the former President, "the Archivist discloses the Presidential record"). For the same reasons, I have concluded that there is no reason to grant your request for a further delay before the FBI and others in the Intelligence Community begin their reviews. Accordingly, NARA will provide the FBI access to the records in question, as requested by the incumbent President, beginning as early as Thursday, May 12, 2022.

Please note that, in accordance with the PRA, 44 U.S.C. § 2205(3), the former President's designated representatives can review the records, subject to obtaining the appropriate level of security clearance. Please contact my General Counsel, Gary M. Stern, if you would like to discuss the details of such a review, such as you proposed in your letter of May 5, 2022, particularly with respect to any unclassified materials.

Sincerely,

DEBRA STEIDEL WALL
Acting Archivist of the United States

Ex. 25



**TODD BLANCHE**
Todd.Blanche@blanchelaw.com
(212) 716-1250

October 9, 2023

<u>Via Email</u>
Jay Bratt
Julie Edelstein
David Harbach
Senior Assistant Special Counsels
950 Pennsylvania Avenue NW
Room B-206
Washington, D.C. 20530

      **Re:**     **<u>United States v. Donald J. Trump, No. 23 Cr. 80101 (AMC)</u>**

Dear Mr. Bratt, Ms. Edelstein, and Mr. Harbach:

     We write on behalf of President Trump, pursuant to Rule 16(a)(1)(E), *Brady*, and *Giglio*, to request the documents and information set forth below. In light of the current motions schedule, we respectfully request a response no later than October 16, 2023.

     **I.**    **Background**

     Each of the Requests set forth below calls for production of documents irrespective of their classification level. As used herein, the term "documents" includes (i) all communications, including memoranda, reports, letters, notes, emails, text messages, and other electronic communications; (ii) hard copies and electronically stored information, whether written, printed, or typed; and (iii) all drafts and copies.

     The Requests call for specified documents in the possession of the prosecution team. For the avoidance of doubt, based on our review of discovery to date, the term "prosecution team" means:

- All personnel of the Special Counsel's Office, irrespective of an assignment to a particular investigation or matter;

- The following components of the Department of Justice: Office of the Attorney General, Office of the Deputy Attorney General, Office of Legal Counsel, National Security Division, Public Integrity Section, and the United States Attorney's Office for the District of Columbia;

- The National Archives and Records Administration, including but not limited to NARA's General Counsel's Office, Office of the Inspector General, and White House Liaison Division;

October 9, 2023
Page 2

- Members of the Intelligence Community, as that term is defined in 50 U.S.C. § 3003(4), including ODNI and the IC's Office of the Inspector General;

- In addition to those components of the FBI that are a part of the IC, the FBI's Washington Field Office and Miami Field Division; and

- The White House Counsel's Office.

Please let us know if you disagree about our inclusion of any particular agency or component in the definition of the prosecution team.

**II.    Requests**

1.    Please provide all documents relating to security clearances, read-ins to compartmented programs, non-disclosure agreements, and training relating to the handling of classified information that were signed by or provided to President Trump at any time before, during, or after his time as President of the United States.

2.    With respect to the search warrant executed at Mar-a-Lago, please provide the following:

   a.    All documents relating to the planning and execution of the search, including all sketches;

   b.    All documents relating to personnel present for the search, including sign-in logs; and

   c.    The complete version of the photo log from the search.

3.    Please provide the FBI's "database inventory of the classified documents" and a list of the "FBI-assigned index code[s]" used during the investigation, including the production number of each document listed in the "database" and "index."  (*See* USA-00941764).

4.    Please provide all communications relating to concurrences obtained to use documents during witness interviews.

5.    For each search warrant obtained in connection with the investigation, please identify the "scoped" returns seized pursuant to the warrant by the Special Counsel's Office or DOJ.

6.    Please disclose all steps taken by the FBI's Computer Analysis Response Team (CART) and Multimedia Exploitation Unit (MXU) in connection with CCTV from Mar-a-Lago, including the use of any software to expedite the review.

October 9, 2023
Page 3

7.      Please disclose all steps taken by Deloitte in connection with the investigation, including but not limited to the processing, handling, and review of evidence and other case-related data.

8.      Please identify by production number the documents referenced in the FBI FD-1057, titled "Corrections to Classification of Evidence Items" and bearing production number USA-00950313.

9.      Please describe the scope and basis of the FBI's declassification of certain case-related records on or about June 5, 2023.  (*See, e.g.*, USA-00940000 ("Declassified By: NSICG ███████ On 06-05-2023")).

10.     Please provide a description of the following documents, including the author of the document, when the document was created, and the purpose of the document:

        a.      USA-00940116;
        b.      USA-00940123;
        c.      USA-00940131;
        d.      USA-00940152;
        e.      USA-00940156;
        f.      USA-00940295;
        g.      USA-00940301;
        h.      USA-00940303;
        i.      USA-00941498 – 00941500; and
        j.      USA-00941506 – USA-00941509.

11.     Please provide the enclosures and/or attachments referenced in the following FBI documents:

        a.      USA-00950276;
        b.      USA-00950280;
        c.      USA-00939793;
        d.      USA-00940081;
        e.      USA-00940220;
        f.      USA-00940221;
        g.      USA-00940230;
        h.      USA-00940232;
        i.      USA-00940236;
        j.      USA-00940242;
        k.      USA-00940248;
        l.      USA-00940271;
        m.      USA-00940410;
        n.      USA-00940420;
        o.      USA-00940422;
        p.      USA-00940470;
        q.      USA-00940473;

October 9, 2023
Page 4

| | |
|---|---|
| r. | USA-00940477; |
| s. | USA-00940486; |
| t. | USA-00940490; |
| u. | USA-00940492; |
| v. | USA-00940497; |
| w. | USA-00940533; |
| x. | USA-00940539; |
| y. | USA-00940550; |
| z. | USA-00940555; |
| aa. | USA-00940557; |
| bb. | USA-00940659; |
| cc. | USA-00940737; |
| dd. | USA-00940752; |
| ee. | USA-00940762; |
| ff. | USA-00940765; |
| gg. | USA-00940904; |
| hh. | USA-00940912; |
| ii. | USA-00941287; |
| jj. | USA-00941309; |
| kk. | USA-00941316; |
| ll. | USA-00941325; |
| mm. | USA-00941327; |
| nn. | USA-00941352; |
| oo. | USA-00941451; |
| pp. | USA-00941784; |
| qq. | USA-00941967; |
| rr. | USA-00942279; |
| ss. | USA-00942366; |
| tt. | USA-00942518; |
| uu. | USA-00943088; |
| vv. | USA-00944069; and |
| ww. | USA-00944317. |

12.     For the period from January 20, 2021 to the present, please provide all communications by or including any NARA personnel relating to:

a.     The collection of records from President Trump and any other members of President Trump's administration;

b.     NARA's practices under, and application of, the Presidential Records Act with respect to President Trump, other members of President Trump's administration, and former presidents and other members of those presidents' administrations; and

c.     NARA's historical practices with respect to the collection of records from former presidents and other members of those presidents' administrations.

October 9, 2023
Page 5

13.     Please identify all instances in which NARA has referred a matter to any other federal agency, including but not limited to DOJ, FBI, or a member of the IC (including IC-OIG) pursuant to 44 U.S.C. § 2112(c), 44 U.S.C. § 2905(a), or any other authority.

14.     Please provide all documents relating to decisions pursuant to 44 U.S.C. § 2205(2), including documents relating to:

        a.     The FBI's April 4, 2022 request to DOJ for "coordination with White House Counsel on this matter" (USA-00940483);

        b.     The "past practice" referenced in the FBI's April 4, 2022 memorandum (*id.*); and

        c.     "[T]he incumbent President's request" referenced in the FBI's April 4, 2022 memorandum (USA-00940484).

15.     Please provide all documents relating to the "authority obtained by the Department of Justice" for the FBI's May 16, 2022 "operation" at NARA.  (USA-00940546).

16.     With respect to the November 22, 2022 memorandum from the FBI to NARA's General Counsel bearing production number USA-00940729:

        a.     Please explain the basis for the redaction of the first paragraph of the memorandum; and

        b.     Please provide or identify all materials that NARA provided in response to the November 22, 2022 request, including (i) "All records or information demonstrating a declassification decision by the 45th Presidential Administration," (ii) "Initial and periodic training for handling classified information for all White House personnel during the 45th Presidential Administration," (iii) "Signed classified non-disclosure agreements for all White House personnel during the 45th Presidential Administration," and (iv) "Initial and periodic training for handling classified information for all White House personnel during the 45th Presidential Administration."

17.     Please provide all documents relating to the January 26, 2023 video conference between the Special Counsel's Office and NARA General Counsel Gary Stern, including but not limited to any recording of the video conference itself and notes and memoranda relating to "compliance considerations."  (USA-00941291).

18.     With respect to the meeting on or about May 4, 2023 between the Special Counsel's Office, FBI, and NARA General Counsel Gary Stern:

        a.     Please identify by production number the "81 unclassified documents responsive to Grand Jury Subpoena 42-0064" that were discussed during the meeting (USA-00943085); and

Blanche Law PLLC
99 Wall Street, Suite 4460 | New York, NY 10005
(212) 716-1250 | www.BlancheLaw.com

b.      Please provide all documents relating to the discussion of "multiple legal options relating to potential additional NARA records, that would ensure proper protocol . . ." (*id.*).

19.     Please provide all documents relating to the February 2022 "Congressional Inquiry" to NARA referenced in the email bearing production number USA-00309425.

20.     Please provide all documents stored in the FBI's Guardian system relating to this case, including but not limited to:

a.      Communications and submissions from or relating to NARA; and

b.      FBI communications regarding the status of any open Guardian leads and matters related to the investigation.

21.     Please provide all documents relating to Hillary Clinton's mishandling of classified information while serving as Secretary of State between 2009 and 2013, including all documents reflecting assessments of any damage to national security interests and/or spills of classified information.

22.     Please provide all documents relating to James Comey's mishandling of classified information relating to meetings with President Trump in 2017 Mr. Comey was serving as FBI Director, including all documents reflecting assessments of any damage to national security interests and/or spills of classified information.

23.     Please provide all documents relating to the July 15, 2021 *New Yorker* article titled "Letter From Biden's Washington: 'You're Gonna Have a Fucking War': Mark Milley's Fight To Stop Trump From Striking Iran," including all documents reflecting assessments of any damage to national security interests and/or spills of classified information.  (USA-00370509).

24.     Please provide descriptions of all classified documents, and all documents bearing classification markings, that were seized or otherwise collected from Mike Pence, Joseph Biden, and any other current or former elected federal official between January 2021 and the present.

25.     Please provide all documents relating to briefings—including briefings by DOJ, FBI, and ODNI—to the Senate Intelligence Committee and the so-called "Gang of Eight"[1] regarding documents collected from Mike Pence and Joseph Biden, any other current or former elected federal official.

26.     With respect to the February 28, 2023 "briefing" and related "G of 8" review referenced in the discovery, please disclose the following:

---

[1] For purposes of this Request, "Gang of Eight" refers to one or more of Senator Chuck Schumer, Senator Mitch McConnell, Senator Mark Warner, Senator Marco Rubio, Representative Kevin McCarthy, Representative Hakeem Jeffries, Representative Mike Turner, and Representative Jim Himes.

October 9, 2023
Page 7

    a.   The substance of the "Member's interests articulated at the February 28 briefing" (USA-00941832);

    b.   The documents included in "tranche 1" and "tranche 2" of the review and the corresponding production numbers (USA-00941831); and

    c.   All documents reflecting communications and interactions between members of the prosecution team and the Office of Congressional Affairs (*see* USA-00941829).

27.     Please provide a description of the FBI investigation identified using the FBI "Special Case Code" ███████ and its connection to this case. (*See* USA-00941747, USA-00941750).

28.     Please provide all documents regarding the establishment of secure facilities at Mar-a-Lago and President Trump's Bedminster residence, including communications with or regarding the White House Military Office or ███ Per. 46 ███

29.     Please provide all documents relating to the handling, storage, and classification status of the recordings and other materials provided to the Special Counsel's Office and/or DOJ by ███ Per. 43 ███ (including through ███ Per. 43 ███ counsel).

30.     Please provide all records relating to the classification and declassification processes referenced by General Mark Milley during his November 2021 testimony before the U.S. House Select Committee on the January 6 Attack. (*See* Tr. 169 ("I classified the document at the beginning of this process . . . . We can get this stuff properly processed and unclassified.")).

31.     Please disclose all documents relating to the alleged statements attributed to President Trump on or about June 3, 2022 in the email thread bearing production number USA-00940265.

32.     Please disclose how the Special Counsel's Office plans to address the witness-advocate problems arising from the following:

    a.   Mr. Bratt's presence during the alleged statements attributed to President Trump on or about June 3, 2022; and

    b.   The presence of ███████████ ███ Per. 6 ███ and ███ P. 23 ███ ███ at Mar-a-Lago during the execution of the search warrant on or about August 8, 2022.

33.     Please provide all documents relating to the call on or about August 3, 2022 between DOJ and FBI during which, according to the August 4, 2022 email from FBI ██ FBI 10 ██ ███ bearing production number USA-00940276, the following occurred:

Blanche Law PLLC
99 Wall Street, Suite 4460 | New York, NY 10005
(212) 716-1250 | www.BlancheLaw.com

October 9, 2023
Page 8

  a. George Toscas stated "that 'he frankly doesn't give a damn about the optics" of the anticipated search at Mar-a-Lago;

  b. It was acknowledged that Mr. Bratt "has built an antagonistic relationship with FPOTUS's attorney over the service of the Grand Jury Subpoena"; and

  c. "DOJ said" that "DOJ contact with ▮ Per. 18 ▮ just prior to the execution of the warrant will not go well."

34. With respect to Special Agent ▮ FBI 19 ▮ August 9, 2022 email bearing production number USA-00940286:

  a. Please disclose, and provide all documents regarding, the "additional detail WRT to FLOTUS" referenced by Special Agent ▮FBI 19▮; and

  b. Please disclose, and provide all documents regarding, the basis for Special Agent ▮FBI 19▮'s assertion that President Trump "maintain[s] a [SCIF] with him";

  c. Please disclose, and provide all documents regarding, the communications referenced in the following assertion by Special Agent ▮FBI 19▮ "This tenet of the case has been discussed repeatedly and with DOJ."

35. With respect to the instruction by Ms. Edelstein to FBI personnel on or about December 9, 2022 to not create an FBI FD-302 report relating to a conversation with counsel for ▮ Per. 34 ▮ please provide the following:

  a. A description of the basis for Ms. Edelstein's instruction;

  b. All notes and communications reflecting or relating to the instruction; and

  c. All notes and communications relating to conversations with ▮ Per. 34 ▮ counsel.

36. Please disclose any other instances in which an attorney participating in the investigation instructed or authorized investigative personnel not to create reports or other documentation relating to case-related communications and interviews.

37. Please provide all documents, including but not limited to internal emails and court filings, relating to the Rule 6 violation during the February 2023 grand jury testimony of ▮P. 44▮ ▮.

38. With respect to your representations to the Court regarding current compliance with Rule 16 and *Brady*, please confirm that you have conducted a case-file review consistent with Justice Manual § 9-5.002.

Blanche Law PLLC
99 Wall Street, Suite 4460 | New York, NY 10005
(212) 716-1250 | www.BlancheLaw.com

October 9, 2023
Page 9

39.     With respect to your representation to the Court that "all" witness statements have been produced, please confirm that your review of materials potentially subject to the Jencks Act and *Giglio* has included all electronic facilities used by each witness, including both classified and unclassified email accounts, classified and unclassified chat and messaging programs, personal email accounts, personal phones, and personal messaging apps.

We expect to submit additional questions and requests on a rolling basis.  Please let us know if you would like to discuss any of these issues.

Respectfully Submitted,

*/s/ Todd Blanche*
Todd Blanche
Emil Bove
Stephen Weiss
Blanche Law PLLC

Christopher M. Kise
Chris Kise & Associates, P.A.

*Attorneys for Donald J. Trump*

Cc:     Sasha Dadan
        Stanley Woodword
        *Counsel for Waltine Nauta*
        (Via Email)

        John Irving
        Larry Murrell
        *Counsel for Carlos De Oliveira*
        (Via Email)

Ex. 26



**TODD BLANCHE**
Todd.Blanche@blanchelaw.com
(212) 716-1250

November 1, 2023

<u>Via Email</u>
Jay Bratt
Julie Edelstein
David Harbach
Senior Assistant Special Counsels
950 Pennsylvania Avenue NW
Room B-206
Washington, D.C. 20530

  **Re:**   **United States v. Donald J. Trump, No. 23 Cr. 80101 (AMC)**

Dear Mr. Bratt, Ms. Edelstein, and Mr. Harbach:

  We write on behalf of President Trump, pursuant to Rule 16(a)(1)(E), *Brady*, and *Giglio*, to request the documents and information set forth below.

 **I.**   **Background**

  Each of the Requests set forth below calls for production of documents irrespective of their classification level. As used herein, the term "documents" includes (i) all communications, including memoranda, reports, letters, notes, emails, text messages, and other electronic communications; (ii) hard copies and electronically stored information, whether written, printed, or typed; and (iii) all drafts and copies.

  The Requests call for specified documents in the possession of the prosecution team, as we defined that term in our October 9, 2023 letter.

 **II.**   **Requests**

  1.   Please provide all documents—including all drafts and all communications—relating to the June 28, 2023 memorandum bearing production number USA-01116848, including:

    a.   The "Information provided by the Office of Environment, Health, Safety and Security (EHSS) and documents reviewed by the Office of General Counsel," as referenced in the June 28, 2023 memorandum; and

    b.   Any documents relating to "amend[ing]" or "modif[ying] President Trump's "active Q clearance," as referenced in the June 28, 2023 memorandum.

November 1, 2023
Page 2

2.      Please provide all documents relating to policies, procedures, practices, and determinations under Section 145 of the Atomic Energy Act of 1954 and Department of Energy Redelegation Order No. 00-002.18 with respect to presidents who held office prior to President Trump.

3.      Please provide all documents from the Department of Energy's Central Personnel Clearance Index relating to President Trump, including documents reflecting President Trump's listed status as of January 21, 2021, August 8, 2022, and June 8, 2023.

4.      Please provide all documents from the Department of Energy's Central Action Tracking System relating to President Trump, including documents reflecting President Trump's listed status as of January 21, 2021, August 8, 2022, and June 8, 2023.

5.      Please provide all documents from the Scattered Castles database relating to President Trump, including documents reflecting President Trump's listed status as of January 21, 2021, August 8, 2022, and June 8, 2023.

6.      Please provide all files from the Joint Personnel Adjudication System relating to President Trump, including documents reflecting President Trump's listed status as of January 21, 2021, August 8, 2022, and June 8, 2023.

7.      Please provide all documents relating to the February 28, 2022 meeting between NARA personnel and staff from Congresswoman Carolyn Maloney and/or the House Committee on Oversight and Reform.

8.      Please provide all documents—including all drafts and all communications—relating to the May 10, 2022 letter from Debra Steidel Wall to Evan Corcoran bearing production number USA-00820773.

9.      Please provide all documents relating to:

       a.      Audits, assessments, analyses, after-action reports, and any similar document reviewing or analyzing the collection of records from administrations prior to President Trump's first presidency by NARA or pursuant to the Presidential Records Act.

       b.      NARA OIG Report No. 20-AUD-03, titled "Audit of NARA's Classified Information Systems."

       c.      NARA OIG Report No. 19-MA-05, titled "Management Alert – Classified Systems Lack Proper Authorization to Operate."

       d.      NARA OIG Report No. 19-R-11, titled "Accessioning Expected Records."

       e.      NARA OIG Report No. 18-AUD-04, titled "Office of the Federal Register's Administration of the Electoral College Process."

Blanche Law PLLC
99 Wall Street, Suite 4460 | New York, NY 10005
(212) 716-1250 | www.BlancheLaw.com

November 1, 2023
Page 3

      f.     NARA OIG Report No. 16-06, titled "Re-issued Audit of NARA's Preparation and Planning for the Receipt of President Obama's Administration's Records and Artifacts."

      g.     NARA OIG Management Letter No. 14-02, titled "Untimely Notification Hinders OIG's Ability to Investigate Potential Theft and Places NARA Holdings at Risk."

      h.     NARA OIG Report No. 12-15, titled "Audit of NARA's Classified Systems."

      i.     NARA OIG Report No. 09-07, titled "Omission of Classified Electronic Records From the Executive Office of the President System."

10.     Please provide all documents relating to theft, retention, and/or possession of classified materials by Samuel R. Berger, including all documents relating to *United States v. Berger*, No. 05 Mag. 175 (D.D.C.).

11.     Please provide all documents relating to theft, retention, and/or possession of classified materials by ███████████████, including documents relating to efforts by NARA to collect classified materials from ██████.

12.     Please provide all documents relating to DOJ's replevin action against ████ ██████, captioned ████████████████████████.

13.     Please provide all documents relating to the "assessment" referenced in the email bearing production number USA-00950576.

14.     Please provide all documents relating to the "prior phone conversations" referenced in the email bearing production number USA-00950536.

15.     Please provide the "excellent minutes of all White House meetings" relating to President Trump and his administration referenced in the email bearing production number USA-01284402.

16.     Please provide the attachment referenced in the email bearing production number USA-01284389, which appears to have been titled "AG Letter re Missing Trump Records.docx."

17.     Please provide the "List of Records" referenced in the email bearing production number USA-01284431.

18.     Please provide the PowerPoint file referenced in the document bearing production number USA-01285195.

19.     Please identify by production number the FBI materials referenced, but obscured by redactions, in the report bearing production number USA-01116961, which "serves to correct an error."

Blanche Law PLLC
99 Wall Street, Suite 4460 | New York, NY 10005
(212) 716-1250 | www.BlancheLaw.com

November 1, 2023
Page 4

20.     Please identify the legal authority, if any, used to collect the NARA records beginning at production number USA-01123490.

21.     Please identify the basis for the redactions in the document bearing production number USA-00942878.

22.     Please provide the enclosures and/or attachments referenced in the following FBI documents:

      a.      USA-00942455;
      b.      USA-00942459;
      c.      USA-00942461;
      d.      USA-00942467;
      e.      USA-00942490;
      f.      USA-00942492;
      g.      USA-00942496;
      h.      USA-00942518;
      i.      USA-00942590;
      j.      USA-00942598;
      k.      USA-00942677;
      l.      USA-00942279;
      m.      USA-00942331;
      n.      USA-00942893;
      o.      USA-00944069;
      p.      USA-00944317;
      q.      USA-00944408;
      r.      USA-00944516;
      s.      USA-00944564;
      t.      USA-00950135;
      u.      USA-00944025;
      v.      USA-00944317;
      w.      USA-00944408;
      x.      USA-00944516;
      y.      USA-00950276;
      z.      USA-00950279;
      aa.      USA-00950280;
      bb.      USA-00950280;
      cc.      USA-00950283;
      dd.      USA-01123456;
      ee.      USA-01123461;
      ff.      USA-01123463;
      gg.      USA-01123466;
      hh.      USA-01275216;
      ii.      USA-01275217; and
      jj.      USA-01275284.

November 1, 2023
Page 5

        We expect to submit additional questions and requests on a rolling basis.  Please let us know if you would like to discuss any of these issues.

Respectfully Submitted,

*/s/ Todd Blanche*
Todd Blanche
Emil Bove
Stephen Weiss
Blanche Law PLLC

Christopher M. Kise
Chris Kise & Associates, P.A.

*Attorneys for Donald J. Trump*

Cc:    Sasha Dadan
       Stanley Woodword
       *Counsel for Waltine Nauta*
       (Via Email)

       John Irving
       Larry Murrell
       *Counsel for Carlos De Oliveira*
       (Via Email)

Ex. 27



**U.S. Department of Justice**

Special Counsel's Office

October 16, 2023

Todd Blanche, Esq.
Emil Bove, Esq.
Stephen Weiss, Esq.
Blanche Law
*Via email*

Chris Kise, Esq.
Chris Kise & Associates, P.A.
*Via email*

  Re: *United States v. Donald J. Trump, et al.*, Case No. 23-CR-80101(s)

Dear Counsel:

  We write in response to your discovery letter, dated October 9, 2023, which makes 39 discovery requests, some of which include multiple sub-parts. Many of your requests call for information that has already been produced, and in instances where they call for specific documents that we have already produced, we identify the documents for you by Bates number. Many other requests are follow-up questions regarding documents that we have produced far in excess of our discovery obligations. *See, e.g.*, USA-0000941498-00941509 (documents related to the FBI's review of CCTV footage; defense has equal access to the footage); USA-00940248 (documenting the conversion of the FBI's investigation into what the FBI terms a "full investigation"); USA-0090483-USA-00940484 (documenting a request from FBI to DOJ for assistance); USA-00941747-USA-00941749 (email chain regarding overtime approval for FBI agents); USA-00941912-USA-00941913 (report and notes regarding a conversation with counsel to discuss compliance with a grand jury subpoena that issued the same day). That we have exceeded our discovery obligations by no means obligates the Government to produce additional information that is not discoverable. To the extent that we are producing any additional information to you in response to the discovery requests in your October 9, 2023 letter, we do so notwithstanding the Government's belief that such production exceeds its current discovery obligations.

  Regarding the query at the outset of your letter, we disagree with how you define the prosecution team. Your definition is overly broad. The prosecution team consists of the prosecutors of the Special Counsel Office and law enforcement officers of the Federal Bureau of Investigation (FBI) who are working on this case, including members of the FBI's Washington Field Office and Miami Field Division. The prosecution team does not include agencies and components whose personnel are not working on this case. For that reason, as we stated in response to your prior question about the scope of the prosecution team, the National Archives and Records Administration (NARA), the U.S. Secret Service, and the White House are not part of the

prosecution team.  (*See* Letter dated September 22, 2023.)  Likewise, and in response to the specifics of your query in this letter, the prosecution team does not consist of the components of the Department of Justice you have listed; the components of NARA you have listed; members of the Intelligence Community (IC), as that term is defined in 50 U.S.C. § 3003(4), including the Office of the Director of National Intelligence and the IC's Office of the Inspector General; nor the White House Counsel's Office.

We respond to your requests below using the numbering from your letter.

1. The Government has already produced all responsive material to which the defense is entitled.

2. The Government has already produced all responsive material to which the defense is entitled.  For example, the Government produced photographs from the search warrant (*see* USA-00042639-USA-00043193 and Classified Discovery Production 3) and sketches from the search (USA-00042655-USA-00042656).  Nonetheless, we are producing with this letter at USA-0128517-USA-01285194 and USA-01285286-USA-01285306 two additional documents relating to the planning of the search warrant and a photo log.

3. The Government provided as Exhibit A to its October 6, 2023 classified letter accompanying Classified Discovery Production 3 a spreadsheet that provides information related to this request.

4. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

5. This information has been provided to counsel in the source logs the Government has attached to each of its unclassified discovery productions.  Nonetheless, the Government provides below the Bates range for the scoped returns provided to the defense in this case:

- Carlos De Oliveira Google
  - USA-01117024 – USA-01122372
  - USA-01125563 – USA-01125896
- Carlos De Oliveira Mobile
  - USA-00402920 – USA-00413873
- Carlos De Oliviera Verizon
  - USA-01115989 – USA-01116024
- ▓▓Per. 10▓▓ Adobe Cloud
  - USA-00413874 – USA-00415925
- ▓▓Per. 10▓▓ Laptop
  - USA-00415926 – USA-00416468
  - USA-00950779 – USA-00958027
- Mar-a-Lago
  - USA-00337507 – USA-00359428
- ▓▓Per. 34▓▓ Laptop

- o USA-00416469 – USA-00447955
- **Per. 34** Microsoft
  - o USA-00447956 – USA-00492117
- **Per. 34** Mobile
  - o USA-00492118 – USA-00509692
- Save America Thumb Drive
  - o USA-00509693 – USA-00513545
- Walt Nauta Google
  - o USA-00513546 – USA-00544136
- Walt Nauta iCloud
  - o USA-00544137 – USA-00637698
- Walt Nauta Microsoft
  - o USA-00637699 – USA-00650801
- Walt Nauta Verizon
  - o USA-00788381 – USA-00788430
- Walt Nauta iPhone 12
  - o USA-00792879 – USA-00798834
  - o USA-01125897 – USA-01208507
- Walt Nauta iPhone 13
  - o USA-00798835 – USA-00800019
  - o USA-01208508 – USA-01260871

6. The request for "steps" taken by law enforcement does not call for material that is discoverable under Rule 16 of the Federal Rules of Criminal Procedure. The Government has produced all CCTV obtained in its investigation (in unclassified Productions 1 & 3) and certain information concerning the processing of CCTV. *See, e.g.*, USA-00940440-USA-00940441; USA-00940610-USA-00940611; USA-00941377- USA-00941382; USA-00950299-USA-00950301; and USA-01116828.

7. The request for "steps" taken by Deloitte does not call for material that is discoverable under Rule 16. The Government has produced all material to which the defense is entitled in this regard.

8. The referenced documents were produced to you at the following Bates ranges:
   - 1B1: USA-00042144
   - 1B3: USA-00042197-USA-00042199
     - o Although this form indicates it is for 1B23, the item at issue was referred to as 1B3 prior to the form being declassified.
   - 1B13: USA-00042152-USA-00042154
   - 1B14: USA-00042155-USA-00042157
   - 1B16: USA-00042160-USA-00042162
   - 1B12: USA-00042149-USA-00042151
   - 1B2: USA-00042176-USA-00042179
   - 1B64: USA-00042583-USA-00042585

9.  Your request does not call for material that is discoverable under Rule 16.  Nonetheless, we hereby inform you that pursuant to FBI policy, certain documents were classified due to their association with this case and/or file type, although the contents of the documents themselves were not classified.  The FBI declassified such documents in anticipation of the Government seeking an indictment in this case to facilitate the production of the documents in discovery.

10.  The request calls for material that is not discoverable under Rule 16, such as a "description" of and the "purpose" of documents.  The Government has produced all material to which the defense is entitled regarding these documents.  Nonetheless, we hereby inform you that documents referenced in 10a. through 10h. relate to inventories of the boxes seized at Mar-a-Lago on August 8, 2022, pursuant to a court-authorized search warrant.  On June 21, 2023, the Government informed defense counsel that they could contact the Government to arrange for inspection of unclassified items seized at Mar-a-Lago on August 8, 2022.  *See* ECF No. 30.  The Government hereby further informs you that the documents referenced in 10.i. through 10.j. are draft documents related to the FBI's review of CCTV footage.

11.  The responses to the multiple sub-parts of your request are provided below.

    a.  Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.  We have conducted a review of notes from meetings with the Intelligence Community.  All discoverable information was provided to you with Classified Discovery Production 3, and no information from these notes was deemed discoverable.

    b.  Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.  We have conducted a review of notes from meetings with the Intelligence Community.  All discoverable information was provided to you with Classified Discovery Production 3, and no information from these notes was deemed discoverable.

    c.  The attachments were provided to you at USA-00816009-USA-00816126 and USA-00825340-USA-00825476.

    d.  We are producing with this letter at USA-01285201-USA-01285206 the inventory of the documents the Government obtained on June 3, 2023, in response to a May 11, 2023 grand jury subpoena.  The documents themselves were provided to you in Classified Discovery Production 1.

    e.  The referenced letter was provided to you at USA-00944017-USA-00944020.  It is also publicly available at

    https://www.archives.gov/files/foia/wall-letter-to-evan-corcoran-re-trump-boxes-05.10.2022.pdf

f.  The inventory was provided to you at USA-00940767-USA-00940822.  The subset of the NARA inventory was provided to you at USA-00940823-00940826.  We are producing with this letter at USA-01285223-USA-01285282 unredacted versions of both inventories.

g.  The referenced enclosed items were provided to you at:

1. Item 33 Box A-33: USA-00940156-USA-00940163
2. Item 32 Box A-13: USA-00940166-USA-00940171
3. Item 31 Box A-43: USA-00940311-USA-00940315
4. Item 30 Box A-26: USA-00940131-USA-00940135
5. Item 28 Box A-73 and Item 29 Box A-14: USA-00940152- USA-00940155
6. Item 27 Box A-71: USA-00940140-USA-00940141
7. Item 26 Box A-42: USA-00940317-USA-00940349
8. Item 25 Box A-41: USA-00940164-USA-00940165
9. Item 24 Box A-40: USA-00940301-USA-00940302
10. Item 23 Box A-39: USA-00940357-USA-00940361
11. Item 20 Box A-22: USA-00940306-USA-00940310
12. Item 19 Box A-23: USA-00940173-USA-00940176
13. Item 18 Box A-35: USA-00940303-USA-00940305
14. Item 17 Box A-32: USA-00940350-USA-00940351
15. Item 16 Box A-30: USA-00940123-USA-00940128
16. Item 15 Box A-28: USA-00940352-USA-00940356
17. Item 14 Box A-27: USA-00940368-USA-00940373
18. Item 13 Box A-18: USA-00940142-USA-00940151
19. Item 12 Box A-17: USA-00940295-USA-00940300
20. Item 11 Box A-16 USA-00940374-USA-00940383
21. Item 10 Box A-15: USA-00940116-USA-00940122
22. Item 9 Box A-12: USA-00940177-USA-00940186
23. Item 8 Box A-1: USA-00940362-USA-00940367
24. Item 5: USA-00940136-USA-00940139
25. Item 4: USA-00940187-USA-00940198
26. Item 2: USA-00940199-USA-00940212
27. Item 1, 3, 6, 7: USA-00940316
28. Evidence Report for Case: USA-00940234-USA-00940235

h.  The referenced enclosure is duplicative of g above.

i.  The enclosure was provided to you at USA-00940839-USA-00940841.

j.  The enclosed logs were provided to you at USA-00042642-USA-00042647 and USA-00042649.  The enclosed sketches were provided to you at USA-00042655-USA-00042656.  The enclosed CD contents were provided to you at USA-00042657 and USA-00042658-USA-00042659.

k.   Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

l.   Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

m.  We are producing with this letter at USA-01285209-USA-01285215 the enclosure.

n.   We are producing with this letter at USA-01285307-USA-01285309 the scanned versions of the hard-copy documents that were attached to the specified form.

o.   The attachments were provided to you at USA-00940423-USA-00940441.

p.   The enclosures were provided to you at USA-00940472 and USA-00940823-USA-00940826.  We are producing with this letter at USA-01285216-USA-01285219 an unredacted version of the subset of the inventory.

q.   We are producing with this letter at USA-01285220-USA-01285222 the referenced notes.

r.   Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

s.   The enclosures were provided to you at USA-00940487-USA-00940489 and USA-00800183-USA-00800201.

t.   The referenced recording was provided to you at USA-00815949.

u.   The referenced notes were provided to you at USA-00800202-USA-00800209.

v.   The brief inventory was provided to you at USA-00940823-00940826.  The detailed inventory was provided to you at USA-00940767-USA-00940822.  We are producing with this letter at USA-01285223-USA-01285282 unredacted versions of both inventories.

w.  We are producing to you in classified discovery at classified Bates Numbers 5372-5386 the notes.

x.   The referenced notes were produced to you at USA-00814513-USA-00814520.

y.   The email relaying the classified document counts was provided to you at USA-00940953-USA-00940958.  We are producing with this letter the spreadsheet at USA-01285283.

6

z.   The referenced maps/diagrams were produced to you at USA-00042657 and USA-00042658-USA-00042659.

aa. It is unclear what you are seeking in this request, but to the extent that you are seeking the boxes seized during the search warrant, they are available for your inspection.

bb. The referenced recording was provided to you at USA-00819446.

cc.  The referenced documents were provided to you in classified discovery at classified Bates numbers 0220-0225.

dd. The items provided to the Government by Trump's attorney on January 5, 2023, are available for inspection.

ee.  We are producing with this letter at USA-01285207 the referenced email.

ff.  The inventory was provided to you at USA-00940767-USA-00940822.  The subset of the NARA inventory was provided to you at USA-00940823-00940826.  We are producing with this letter at USA-01285223-USA-01285282 unredacted versions of both inventories.

gg. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

hh. The contents of the referenced logbooks were provided to you at USA-00788281-USA-00788364.

ii.   The referenced certification was provided to you at USA-00805544.

jj.   The referenced interview materials were provided to you at USA-00820233-USA-00820236 and USA-00824954-USA-00824957.

kk. The agents notes and the recording from this interview were provided to you at USA-00815848-USA-00815855 and USA-00815677, respectively.

ll.   We are producing with this letter at USA-01285208 the referenced notes.

mm.      The referenced notes were provided to you at USA-00826230-USA-00826237.

nn. We are producing with this letter at USA-01285195-USA-01285199 the enclosed email.

oo. The enclosures were provided to you at USA-00941453 and USA-941454.  The referenced "Google Map Print Out" was provided to you at USA-00750358-USA-00750359.  As explained in the letter accompanying unclassified Production 2, the relevant contents of the referenced hard drive were provided to you at USA-00958032-USA-01115988.

pp. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

qq. The referenced email correspondence was provided to you at USA-00942009-USA-00942010.

rr.  The referenced materials provided by Mr. ▮Per. 18▮ were provided to you at USA-00041491-USA-00041510.

ss.  The enclosed certification and exhibits were provided to you at USA-00387555-USA-00387566;  USA-00651017-USA-00651020;  USA-00651021-USA-00651044;  USA-00651045-USA-00651050; and USA-00651051-USA-00651065.

tt.  Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

uu. The referenced transcript was provided to you at USA-00810700-USA-00810803.  The remainder of your request does not appear to call for the production of information to which the defense is entitled.  Please explain the defense's theory of discoverability.

vv. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

ww.         We are producing with this letter at USA-01285171-USA-01285172 the referenced email correspondence.

12. The Government has already produced all responsive material to which the defense is entitled.  As we have conveyed, NARA is not part of the prosecution team, and we have produced all discoverable materials the Government obtained from NARA in its investigation of this matter.  (*See* Letter dated September 22, 2023.)

13. The request for "identif[ication]" of NARA referrals does not call for material that is discoverable under Rule 16.  We have produced all materials to which you are entitled regarding NARA and this matter.  Please explain your theory of discoverability regarding NARA referrals in connection with other matters.

14. The Government has already produced all responsive material to which the defense is entitled.

15. The Government has already produced all responsive material to which the defense is entitled.

16.   The responses to the multiple sub-parts of your request are provided below.

    a.   We are producing with this letter at USA-01285284-USA-01285285 the document with the first paragraph unredacted.

    b.   The Government has provided to you the materials at USA-00383394-USA-00383403, USA-00383404, USA-01261484-USA-01261485, USA-01261486-USA-01261487, USA-01261498, USA-01261548-USA-01261550, and USA-00383405-464.

17. The Government has already produced all responsive material to which the defense is entitled.

18. The responses to the multiple sub-parts of your request are provided below.

    a.   The documents at issue are the same documents provided to you listed at 16.b., above.

    b.   The Government has already produced all responsive material to which the defense is entitled.

19. The Government has already produced all responsive material to which the defense is entitled.

20. The Government has already produced all responsive material to which the defense is entitled.

21. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

22. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

23. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

24. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

25. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

26. The Government has already produced all responsive material to which the defense is entitled.

27. Your request for a "description" of the FBI investigation addressed at USA-00941747-USA-00941749 and USA-00941750-USA-00941752 does not call for material that is discoverable under Rule 16.  In any event, you are not entitled to material about other FBI investigations.

28. The Government has already produced all responsive material to which the defense is entitled.

29. The Government has already produced all responsive material to which the defense is entitled.

30. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

31. The Government has already produced all responsive material to which the defense is entitled.

32. Your request does not call for material that is discoverable under Rule 16.

33. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

34. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

35. As you know, an FBI FD-302 report memorializes an interview.  The December 9, 2022 conversation was not an interview, but a conversation with counsel related to a grand jury subpoena that issued the same day.  The Government was not under any obligation to memorialize the conversation because no discoverable information was provided, yet the FBI did so, and even though not discoverable, the Government provided to counsel the memorialization (USA-0041912-USA-0041913).  The responses to the multiple sub-parts of your request are provided below.

    a.   The request does not call for material that is discoverable under Rule 16.

    b.   The Government has already produced all responsive material to which the defense is entitled.

    c.   The Government has already produced all responsive material to which the defense is entitled.

36. Your request for "other instances" does not call for material that is discoverable under Rule 16. In any event, the Government has already produced all material to which the defense is entitled relating to this request.

37. Your request does not appear to call for the production of material to which the defense is entitled. Please explain the defense's theory of discoverability.

38. As we have stated, we are in compliance with our discovery obligations. We are also aware of, and will comply with, our continuing duty to disclose newly discovered additional information required by this Court's Standing Discovery Order, Rule 16(c) of the Federal Rules of Criminal Procedure, *Brady*, *Giglio*, *Napue*, and the obligation to assure a fair trial.

39. As we have stated, we are in compliance with our discovery obligations. We are also aware of, and will comply with, our continuing duty to disclose newly discovered additional information required by this Court's Standing Discovery Order, Rule 16(c) of the Federal Rules of Criminal Procedure, *Brady*, *Giglio*, *Napue*, and the obligation to assure a fair trial.

Yours truly,

JACK SMITH
Special Counsel

By:   *s/ Julie A. Edelstein*
Julie A. Edelstein
Senior Assistant Special Counsel

Jay I. Bratt
Counselor to the Special Counsel

David V. Harbach, II
Assistant Special Counsel

cc: Stanley Woodward, Esq.
Brand Woodward Law
*Via email*

Sasha Dadan, Esq.
Dadan Law Firm, PLLC
*Via email*

John Irving, Esq.
E & W Law
*Via email*

Larry Donald Murrell, Jr., Esq.
*Via email*

11

Ex. 28



**U.S. Department of Justice**

Special Counsel's Office

October 30, 2023

Todd Blanche, Esq.
Emil Bove, Esq.
Stephen Weiss, Esq.
Blanche Law
*Via email*

Chris Kise, Esq.
Chris Kise & Associates, P.A.
*Via email*

Re:     *United States v. Donald J. Trump, et al.*, Case No. 23-CR-80101(s)

Dear Counsel:

We write in response to your classified discovery letter, dated October 19, 2023, which the Classified Information Security Officer (CISO) delivered to us at the end of the day on Friday, October 20. Although our letter refers to classified material, this letter on its own is unclassified because it does not reveal the substance of that material. If the information in this letter is used in a way that reveals the substance of classified information, that use must be consistent with the CIPA Section 3 protective order. Your letter makes 43 discovery requests, some of which include multiple sub-parts. Many of your requests call for information that has already been produced, and in instances where they call for specific documents that we have already produced, we identify the documents for you by Bates number. To the extent that we are producing any additional information to you in response to the discovery requests in your October 19, 2023 letter, we do so notwithstanding the Government's belief that such production exceeds its current discovery obligations.

As we explained in our October 16, 2023 response to your October 9 discovery letter, we disagree with the overly broad way you define the prosecution team. We respond to your requests below using the numbering from your letter.

1. The Government has already produced all responsive material to which the defense is entitled. To the extent you are requesting publicly available information, that information is equally accessible to the defense, and your request does not call for information that is discoverable under Rule 16. To the extent that you are requesting information related to the actions of any U.S. government personnel, your request does not appear to call for the production of material to which the defense is entitled; please explain the defense's theory of discoverability. In addition, we note that your requests are broader in most instances than the information in the charged documents and that the portions of the charged documents you appear to reference in your requests at 1e., 1f., 1i., 1j., 1k., 1l., and 1y. are not—as we informed you in our CIPA

Section 10 notice—portions of the documents that we will rely on at trial to establish the national defense element at trial.

2. As this request refers to topics identified in Request 40, and we do not see a list of topics identified in Request 40, we do not understand your request.

3. As the first part of your request refers to topics identified in Request 40, and we do not see a list of topics identified in Request 40, we do not understand the first part of your request. Nevertheless, as this request calls for information that is equally accessible to the defense, your request does not call for material that is discoverable under Rule 16.

4. The Government has already produced all responsive material to which the defense is entitled.

5. The responses to the multiple sub-parts of your request are provided below.

    a. The referenced documents were provided to you at classified Bates numbers 0006-0007.

    b. The referenced document is not in the possession of the prosecution team.

    c. The referenced documents were provided to you at classified Bates numbers 0186-0197.

    d. The referenced document was provided to you at classified Bates numbers 0186-0197.

    e. The referenced document was provided to you at classified Bates numbers 0186-0197.

    f. The referenced document was provided to you at classified Bates number 2198.

    g. The referenced document was provided to you at classified Bates number 2198.

    h. The referenced document was provided to you at classified Bates number 0013.

    i. The referenced document is not in the possession of the prosecution team.

    j. The referenced document was provided to you at classified Bates number 2196.

    k. The referenced document was provided to you at classified Bates numbers 948-951.

    l. The referenced document was provided to you at classified Bates number 956.

    m. The referenced document was provided to you at classified Bates numbers 958-959.

n.  The referenced document was provided to you at classified Bates number 956.

o.  Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

p.  The referenced document was provided to you at classified Bates number 0272.

q.  The referenced document was provided to you between classified Bates numbers 1915-1963.

r.  The referenced documents were provided to you between classified Bates numbers 1915-1963.

s.  The referenced document was provided to you at classified Bates number 2196.

t.  The referenced document was provided to you at classified Bates number 2196.

u.  The referenced documents were provided to you between classified Bates numbers 1915-1963.

v.  The referenced documents were provided to you between classified Bates numbers 1915-1963.

w.  The referenced documents were provided to you between classified Bates numbers 1915-1963.

x.  The referenced documents were provided to you between classified Bates numbers 1915-1963.

y.  The referenced document was provided to you at classified Bates number 0006.

z.  The referenced document was provided to you at classified Bates numbers 5427-5431.

aa.  Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.  In addition, any records in the possession of NARA are available to Trump and his Presidential Records Act representatives.

bb.  We are uncertain as to the scope of the materials you are requesting, but in any event, your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.  In addition, any records in the possession of NARA are available to Trump and his Presidential Records Act representatives.

cc. We are uncertain as to the scope of the materials you are requesting, but in any event, your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.  In addition, any records in the possession of NARA are available to Trump and his Presidential Records Act representatives.

dd. The referenced document was provided to you at classified Bates number 0005.

ee. The referenced documents were provided to you at classified Bates numbers 0006-0007.

ff. The referenced document was provided to you at classified Bates numbers 5427-5431.

gg. The referenced document was provided to you at classified Bates numbers 5427-5431.

hh. The referenced documents were provided to you at classified Bates numbers 0001 and 0013.

6. The referenced document is not in the possession of the prosecution team.  Although the document at classified Bates number 0003 was seized during the August 8, 2022 execution of the court-authorized search warrant, the referenced attachment was not.

7. The referenced documents are not in the possession of the prosecution team.

8. We provided to you at classified Bates range 3842-3878 documents related to Count 27.  We have identified an additional three-page document responsive to your request.  It will be produced in a forthcoming classified discovery production.

9. We are uncertain as to the scope of the materials you are requesting, but in any event, your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.   In addition, any records in the possession of NARA are available to Trump and his Presidential Records Act representatives.

10. The Government has already produced all responsive material to which the defense is entitled.

11. The Government has already produced all responsive material to which the defense is entitled.

12. The Government has already produced all responsive material to which the defense is entitled.

13. The defense is equally capable of matching produced photographs to produced documents.  Nonetheless, the Government provides below the classified Bates number for each document depicted in a photograph on Disc 003:

| Photograph number on Disc 003 | Classified Bates number for document |
|---|---|
| 1038 | 0240 |
| 1039 | 0240 |
| 1040 | 0240 |
| 1041 | 0238 |
| 1042 | 0237 |
| 1043 | 0014 |
| 1044 | 0014 |
| 1045 | 0014 |
| 1046 | 0236 |
| 1047 | 0236 |
| 1048 | 0236 |
| 1051 | 2202 |
| 1052 | 0241 |
| 1053 | 0241 |
| 1054 | 0234 |
| 1055 | 0234 |
| 1059 | 2201 |
| 1060 | 2201 |
| 1063 | 0232 |
| 1064 | 0232 |
| 1067 | 0231 |
| 1068 | 0231 |
| 1069 | 0231 |
| 1070 | 0230 |
| 1071 | 0230 |
| 1072 | 0229 |
| 1073 | 0229 |
| 1074 | 2205 |
| 1075 | 2205 |
| 1076 | 0252 |
| 1077 | 2206 |
| 1078 | 2206 |
| 1079 | 0242 |
| 1080 | 0242 |
| 1081 | 0272 |
| 1082 | 0272 |
| 1083 | 0245 |
| 1084 | 0251 |
| 1085 | 0250 |
| 1086 | 0249 |
| 1087 | 0248 |
| 1088 | 0246 |
| 1089 | 0247 |

14. The Government has already produced all responsive material to which the defense is entitled.

15. No responsive documents are within the possession of the prosecution team.

16. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

17. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

18. Your request for us to "identify" documents does not call for material that is discoverable under Rule 16 of the Federal Rules of Criminal Procedure.  Nonetheless, the Government informs you that the Government submitted all documents with classification markings that were stored at Mar-a-Lago for a classification review (although not necessarily the process described in the materials at classified Bates numbers 3522-3538, as the Government is uncertain as to what "process" you are intending to refer).

19. The Government has already produced all responsive material to which the defense is entitled.

20. To the extent you are referring to communications related to the classification reviews conducted regarding documents at issue in this case, the Government has already produced all responsive material to which the defense is entitled.  To the extent that you are referring to communications unrelated to this case, your request does not appear to call for the production of material to which the defense is entitled; please explain the defense's theory of discoverability.

21. The referenced email was provided to you at classified Bates numbers 3982-3984.

22. The Government has already produced all responsive material to which the defense is entitled.

23. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

24. Your request for us to "identify" documents does not call for material that is discoverable under Rule 16 of the Federal Rules of Criminal Procedure.

25. The Government has already produced all responsive material to which the defense is entitled.

26. The attachments were provided to you at classified Bates numbers 0295 (Enclosure 1); 0240 (Enclosure 2); 0241 (Enclosure 3); 2275 (Enclosure 4); 0237 (Enclosure 5); and 0230 (Enclosure 6).

27. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.  Nonetheless, the Government provided at classified Bates range 3842-3878 documents related to Count 27, which is described in the document at classified Bates range 3076-3077 as "Document 3."

28. Standing alone, the email at classified Bates number 3080 is unclassified and may be handled as such.  However, the document described in the email is classified, and if the email is associated with the classified document in a way that reveals anything about the content of the classified document, the email must also be handled in accordance with the CIPA Section 3 protective order.

29. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

30. No documents responsive to your request exist.

31. The "Attachment" was provided to you at classified Bates numbers 3157-3158.

32. The attachments were provided to you at classified Bates numbers 0008, 0252, 0005, 0263, 5424, and 2199.

33. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

34. The responses to the multiple sub-parts of your request are provided below.

   a. The Government has already produced all responsive material to which the defense is entitled.

   b. Your request for us to "identify" documents does not call for material that is discoverable under Rule 16 of the Federal Rules of Criminal Procedure.  Nonetheless, we inform you that all the documents the Government recovered from Mar-a-Lago—through Trump's January 2022 production to NARA, through the June 3, 2022 subpoena response, and through the August 8, 2022 search warrant—were among the documents considered in the Initial Assessment.

   c. The request to "identify" information does not call for material that is discoverable under Rule 16 of the Federal Rules of Criminal Procedure.  Nonetheless, we inform you that the three referenced criminal investigations include this investigation and two others.

   d. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

   e. The request to "identify" information does not call for material that is discoverable under Rule 16 of the Federal Rules of Criminal Procedure.  Nonetheless, we inform you the referenced documents relate to one of the other criminal investigations, not this one.

35. The Government has already produced all responsive material to which the defense is entitled.

36. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

37. Your request to "describe" "investigative steps" does not call for material that is discoverable under Rule 16 of the Federal Rules of Criminal Procedure.

38. The Government has already produced all responsive material to which the defense is entitled. In particular, if an attachment matches a document stored at Mar-a-Lago later recovered by the Government, the document has been produced.

39. The email cited at classified Bates number 4003 does not appear to be truncated or cut off, and as a result, the Government is not sure to what email threads you are referring.  Please clarify your request.

40. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

41. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

42. It is not clear to what materials you are referring in this request, but to the extent that responsive materials are in the prosecution team's possession, the Government has already produced all responsive material to which the defense is entitled.

43. The Government has already produced all responsive material to which the defense is entitled.

Yours truly,

JACK SMITH
Special Counsel


By:     *s/ Julie A. Edelstein*
Julie A. Edelstein
Senior Assistant Special Counsel

Jay I. Bratt
Counselor to the Special Counsel

David V. Harbach, II
Assistant Special Counsel

cc: Stanley Woodward, Esq.
Brand Woodward Law
*Via email*

Sasha Dadan, Esq.
Dadan Law Firm, PLLC
*Via email*

John Irving, Esq.
E & W Law
*Via email*

Larry Donald Murrell, Jr., Esq.
*Via email*

Ex. 29



**U.S. Department of Justice**

Special Counsel's Office

---

November 8, 2023

Todd Blanche, Esq.
Emil Bove, Esq.
Stephen Weiss, Esq.
Blanche Law
*Via email*

Chris Kise, Esq.
Chris Kise & Associates, P.A.
*Via email*

Re:   *United States v. Donald J. Trump, et al.*, Case No. 23-CR-80101(s)

Dear Counsel:

We write in response to your discovery letter, dated November 1, 2023, which makes 22 discovery requests, some of which include multiple sub-parts. Many of your requests call for information that has already been produced, and in instances where they call for specific documents that we have already produced, we identify the documents for you by Bates number.

In addition, in the email accompanying your discovery letter, you informed us that the bracketed references to Request 40 in your October 19 letter were in error, and you intended those requests to refer to the list in Request 1. As a result of that clarification, we inform you that our response to your second request in that letter is that we have already provided all responsive material to which the defense is entitled, and the response to your third request in that letter remains the same—that is, as this request calls for information that is equally accessible to the defense, your request does not call for material that is discoverable under Rule 16. You also asked us to provide a disc with an electronic copy of the classified index that we produced to the Atkins SCIF on October 19. We will provide to the CISO the electronic copy for delivery to the SCIF.

We respond to your requests below using the numbering from your letter, defining the prosecution team as we set forth in our October 16 letter.

1.  The Government has already produced all responsive material to which the defense is entitled.

2.  Your request does not appear to call for the production of material to which the defense is entitled. Please explain the defense's theory of discoverability.

3.  No such documents are in the possession of the prosecution team (except to the extent that previously produced material is considered responsive).

4.  No such documents are in the possession of the prosecution team (except to the extent that previously produced material is considered responsive).

5.  The responsive documents in the prosecution team's possession were provided to you at USA-00950293-USA-00950295.

6.  No such documents are in the possession of the prosecution team.

7.  There are no responsive documents in the possession of the prosecution team.

8.  The Government has already produced all responsive material to which the defense is entitled.

9.  There are no responsive documents in the possession of the prosecution team.

10. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

11. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

12. Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

13. The Government has already produced all responsive material to which the defense is entitled.  In particular, the Government produced a risk assessment at classified Bates numbers 3513-3521.

14. The Government has already produced all responsive material to which the defense is entitled.

15. The referenced document is not in the possession of the prosecution team.  In addition, any such records in the possession of NARA are available to Trump and his Presidential Records Act representatives.

16.  The referenced attachment was provided to you at USA-00383607-USA-00383608.

17. The referenced "List of Records" was provided to you at USA-00417576.

18. The referenced PowerPoint was provided to you at USA-00370431-USA-00370442.

19. The communication at USA-01116961 corrects an error related to USA-00940226-USA-00940229.  The serial regarding evidence obtained from NARA was provided to you at USA-00940073-USA-00940076, which further contained an enclosure provided to you at USA-00940077-USA-00940078.  The serial regarding the search warrant was provided to you at USA-00940244-USA-00940246.

20. Your request to "identify" a "legal authority" used to collect records does not call for material that is discoverable under Rule 16.

21. Your request to "identify" a "basis" for redactions does not call for material that is discoverable under Rule 16.

22. The responses to the multiple sub-parts of your request are provided below.

   a.  Your request for the referenced email that contains additional identifying information for ▉Per. 25▉ does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.  The "[s]earcher-produced documents and bank statements" were provided to you at USA-00323231-USA-00323235,   USA-00323241-USA-00323247,   and   USA-00950688.

   b.  Your request for email correspondence between SCO and FBI regarding toll records analysis does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.  The Government has produced to you the toll records it obtained through its investigation.

   c.  Your request for email correspondence does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.  The referenced review of flight records was produced to you at USA-00943187-USA-00943190.

   d.  Your request for the CD itself and the enclosed email does not appear to call for the production of material to which the defense is entitled.  The subpoena returns referenced in USA-00942467-USA-00942468 were produced to you at USA-00327602-USA-00332914.

   e.  The referenced enclosure was provided to you at USA-00941524-00941548.

   f.  The attached notes were provided to you at USA-00942495, and an email concerning ▉Per. 7▉ phone models was provided to you at USA-00943186.  The remainder of your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

   g.  Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

h.   Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.  The Government has produced to you all CCTV footage obtained in its investigation.

i.   The " Per. 26 docs" were provided to you at USA-00327578-00327594.  The referenced audio recordings were provided to you at USA-00327595-USA-00327599, and the email (without attachment) was provided to you at USA-00942598.

j.   Your request for notes does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.  As noted in our response to 22.i., the audio recordings were provided to you at USA-00327595-USA-00327599.   The notes were also memorialized in the document provided to you at USA-00942590-USA-00942597.

k.   Screenshots of the text message communications between SA FBI 40 and Mr. Per. 41 were provided to you at USA-00947652-USA-00947658.  The remainder of your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

l.   The enclosures were provided to you at USA-00041226 and USA-00041491-USA-00041510.

m.   Mr. Per. 18 's January 6, 2023 production was provided to you at USA-00041228-USA-00041244 and USA-00041682-USA-00041788.

n.   The materials produced by Mr. Per. 11 were provided to you at USA-00029416-USA-00035761.   The remainder of your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

o.   Your request for email correspondence does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.  The Government has provided to you the toll records it obtained through its investigation, including the toll records related to Mr. Per. 54 , Mr. Per. 29 and Mr. Nauta.

p.   The referenced correspondence was provided to you at USA-01285171-USA-01285172.

q.   The enclosed FD-597 Receipt for Property form was provided to you at USA-00944411.  The enclosed FD-1004 Chain of Custody form was provided to you at USA-00944410.  The enclosed email communications were provided to you at USA-00941938-USA-00941948.

r.   The Government has produced all responsive material to which the defense is entitled.  The Government produced responsive material at USA-01285174-USA-01285194, USA-01285173, and USA-00940557.

s.   The enclosures aside from the email notification were provided to you at USA-00944567-USA-00944572.  The description of Enclosure 1 was labeled "July 1, 2021" in error and should instead read "July 24, 2021" as referenced elsewhere in the form. Your request for the email notification to DOJ does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

t.   The enclosed notes were provided to you at USA-00950138.

u.   The Government has produced all responsive material to which the defense is entitled.  Specifically, the Government has produced the underlying documents related to Mr. ███Per. 18███ at USA-00944026-USA-00944027, USA-00804663-USA-00804825, USA-00805861-USA-00806075, USA-00807756-USA-00807847, USA-00821698-USA-00821753, USA-00814510-USA-00814512, USA-00827493 - USA-00827509, USA-00821779-USA-00821941, USA-00809172-USA-00809418, and USA-00820082-USA-00820136.

v.   Your request is a duplicate of your request at 22p.  Please see our response to 22p., above.

w.   Your request is a duplicate of your request at 22q.  Please see our response to 22q., above.

x.   Your request is a duplicate of your request at 22r.  Please see our response to 22r., above.

y.   Your request is a duplicate of request 11a. in your October 9, 2023 letter.  Please see our October 16, 2023 response.

z.   The notes referenced in this request are the same notes requested in request 11a. in your October 9, 2023 letter.  Please see our October 16, 2023 response.

aa. Your request is a duplicate of request 11b. in your October 9, 2023 letter.  Please see our October 16, 2023 response.

bb. Your request is a duplicate of your request at 22aa. and request 11b. in your October 9, 2023 letter.  Please see our October 16, 2023 response.

cc. The notes referenced in this request are the same notes requested in your requests at 22.aa. and 22bb. and request 11b. in your October 9, 2023 letter.  Please see our October 16, 2023 response.

dd. The documents produced by Ms. ▆Per. 19▆ were provided to you at USA-01116964-USA-01117020.

ee. The referenced notes and exhibits were provided to you at USA-01261092-USA-01261095.

ff. The referenced materials related to Ms. ▆Per. 8▆ interview were provided to you at USA-01261169-USA-01261200.

gg. The referenced materials related to Mr. ▆Per. 42▆ interview were provided to you at USA-01261275-USA-01261283.

hh. Your request for the SAC's email providing concurrence to record the referenced interview does not appear to call for the production of material to which the defense is entitled. Please explain the defense's theory of discoverability.

ii. Your request for the SAC's email providing concurrence to record the referenced interview does not appear to call for the production of material to which the defense is entitled. Please explain the defense's theory of discoverability.

jj. The documents produced in response to the referenced subpoena were provided to you at USA-00383394-USA-00383562.

Yours truly,

JACK SMITH
Special Counsel

By:    *s/ Julie A. Edelstein*
Julie A. Edelstein
Senior Assistant Special Counsel

Jay I. Bratt
Counselor to the Special Counsel

David V. Harbach, II
Assistant Special Counsel

cc: Stanley Woodward, Esq.
Brand Woodward Law
*Via email*

Sasha Dadan, Esq.
Dadan Law Firm, PLLC
*Via email*

John Irving, Esq.
E & W Law
*Via email*

Larry Donald Murrell, Jr., Esq.
*Via email*

Ex. 30



**U.S. Department of Justice**

Special Counsel's Office

November 8, 2023

Todd Blanche, Esq.
Emil Bove, Esq.
Stephen Weiss, Esq.
Blanche Law
*Via email*

Chris Kise, Esq.
Chris Kise & Associates, P.A.
*Via email*

  Re: *United States v. Donald J. Trump, et al.*, Case No. 23-CR-80101(s)

Dear Counsel:

  We write in response to your classified discovery letter, dated October 31, 2023, which the Classified Information Security Officer (CISO) delivered to us on November 1. Although our letter refers to classified material, this letter on its own is unclassified because it does not reveal the substance of that material. If the information in this letter is used in a way that reveals the substance of classified information, that use must be consistent with the CIPA Section 3 protective order. Your letter makes six discovery requests, some of which include multiple sub-parts.

  We respond to your requests below using the numbering from your letter.

1. The Government has already produced all responsive material to which the defense is entitled. The Government also notes that the identification number referenced in your request 1a. does not appear on the document at classified Bates number 2219.

2. The referenced document was provided to you on Disc_004, in the folder titled "1B8 Laptop"; the document is page 497 of file titled "2018 Dailys Part 1 (01.02.18 – 06.29.18) Combined.pdf."

3. Your request does not appear to call for the production of material to which the defense is entitled. Please explain the defense's theory of discoverability.

4. The Government has already produced all responsive material to which the defense is entitled. In particular, the Government provided to you at classified Bates range 2969-3462 documents related to the classification review process.

5.  Your request for us to "describe" the "classification review" process does not call for material that is discoverable under Rule 16 of the Federal Rules of Criminal Procedure.   The Government reiterates that it provided to you at classified Bates range 2969-3462 documents related to the classification review process.

6.  Your request does not appear to call for the production of material to which the defense is entitled.  Please explain the defense's theory of discoverability.

Yours truly,

JACK SMITH
Special Counsel

By:     *s/ Julie A. Edelstein*
        Julie A. Edelstein
        Senior Assistant Special Counsel

        Jay I. Bratt
        Counselor to the Special Counsel

        David V. Harbach, II
        Assistant Special Counsel

cc: Stanley Woodward, Esq.
Brand Woodward Law
*Via email*


Sasha Dadan, Esq.
Dadan Law Firm, PLLC
*Via email*

John Irving, Esq.
E & W Law
*Via email*

Larry Donald Murrell, Jr., Esq.
*Via email*

Ex. 31

FD-1036 (Rev. 10-16-2009)

# FEDERAL BUREAU OF INVESTIGATION

**Import Form**

**Form Type:** EMAIL - Email          **Date:** 03/30/2022

**Title:** ███████ Department of Justice (DOJ) Attorney General (AG)
approval for conversion to Full Investigation

**Approved By:** SSA ███ FBI 19 ███

<span style="background:yellow">DECLASSIFIED BY: ███ ███
ON 06-05-2023</span>
<span style="background:yellow">**This Redacted Version Only**</span>

**Drafted By:** ███ FBI 21A ███

**Case ID #:** ███ ████ ████ PLASMIC ECHO; Mishandling of
Classified or National Defense
Information; UNKNOWN SUBJECT; SENSITIVE
INVESTIGATIVE MATTER
SENSITIVE INVESTIGATIVE MATTER

### DOCUMENT RESTRICTED TO CASE PARTICIPANTS

This document contains information that is restricted to case participants.

**Synopsis:** ███████ This email conveys Department of Justice (DOJ)
Attorney General (AG) approval for conversion to a Full Investigation. A
digital copy of the signed memorandum will be included in the attached
1A.

**Enclosure(s):** Enclosed are the following items:
1. ███ Memorandum

◆◆

Ex. 32

ON 06-05-2023

This Redacted Version Only

| From: | FBI 19 |
| To: | FBI 21A |
| Subject: | FW: AG Signature - Plasmic Echo LHM converting the assessment to a full investigation --- ███ |
| Date: | Wednesday, March 30, 2022 9:13:30 AM |
| Attachments: | image_114658.pdf |

Sent for Approval for RECORD//Sentinel Case TRANSITORY RECORD / WORK RELATED EMAIL

For the main file

-----Original Message-----
From: ██ Per. 9 ██ (OGC) (FBI) ████████
Sent: Monday, March 28, 2022 12:40 PM
To: ██ FBI 10 ██ (WF) (FBI) ████████; ██ FBI 19 ██ (WF) (FBI)

Subject: AG Signature - Plasmic Echo LHM converting the assessment to a full investigation ---
████████

TRANSITORY RECORD

██ F 10 ██ and ██ F 19 ██ –

Attached is the LHM signed by the AG. Once the DD signs in Sentinel, which also signifies the Director's approval, this will need to be serialized to the case file as we've discussed.

██ P. 9 ██

██ Per. 9 ██

████████████

Office of the Deputy Director

Federal Bureau of Investigation

O: ████████████

C: ████████████

████████████████

████████████████

Ex. 33

**DECLASSIFIED BY**
**06-06-2023**
**This redaction version only.**

| | |
|---|---|
| **From:** | FBI 19 ███ (WF) (FBI) |
| **To:** | ████ (WF) (FBI) |
| **Subject:** | FW: Update from Interview today _PLASMIC ECHO --- ████ |
| **Date:** | Thursday, May 19, 2022 12:55:07 PM |

Classification:
DELIBERATIVE PRO█████████████CUMENT
===================================================

For the Sub-Coord



**From:** FBI 19 ██ (WF) (FBI)
**Sent:** Thursday, May 19, 2022 11:50 AM
**To:** ███ FBI 39 ███ (MM) (FBI) ███████; FBI 15
(MM) (FBI) ██████; FBI 25 ██ (MM) (FBI) < ████;
████████ ████
**Cc:** ██ FBI 11 ██ (WF) (FBI) █████ FBI 21 A ██ (WF)
(FBI) ███ FBI 9 ██ (WF) (FBI) ████; FBI 10 ██ (WF)
(FBI) ████ >; FBI 26 ██ (CD) (FBI) ████;
FBI 21 B) (FBI) █████; FBI 30 ██ (CD) (FBI) < ████
**Subject:** Update from Interview today _PLASMIC ECHO --- █████

Classification:
DELIBERATIVE PRO█████████████CUMENT
===================================================
TRANSITORY RECORD
Good Morning ██ FBI 25 ██, ██ FBI 8 ██, ██ FBI 15 and SA FBI 39 ██,

Thank you so much for your hospitality and assistance to date on captioned matter. This is a
beautiful place.
You have been added the main case and 302 sub-files ████████

Please see the highlights below from our interview yesterday and current updates. Additionally,
allow me to e-introduce the WFO Team so you know who is who moving forward.



████████
██ FBI 10 ██
██ FBI 19 ██
Case Agents: SAs FBI 21 A ██, █ FBI 11 ██ and FBI 9 ██

**Yellow highlights denote updates after 5pm, yesterday:**

From the interview of ██ Per. 34 ██, the FBI and DOJ learned the following: 302 is in work.

- The interview took place at an office space ████████████;
- The interview started at/around 9:55am and ended at/around 12:55pm
- Mr. Bratt, SAs F. 21A and FBI 11 then returned to the West Palm Beach RA and briefed

██ FBI 19 ██. Also present telephonically for this briefing were ████ █ FBI 10 █ and DAG George Toscas;

- Witness appeared nervous, but was cooperative and forthcoming. ██ was able to provide some timelines and dates, but unable to provide specific dates for some questions.

General Takeaways

- ████████████████████████████████████████████████████████████
  ████████████████████████████████████████;

- ████████████████████████████████████████████████████████████
  ████████████████████████████████████; witness described these as white banker boxes with blue stripes and some cardboard printer/paper boxes;

- ████████████████████████████████████████████████████████████████
  ████████████████████████████████;

- ████████████████████████████████████████;

- ████████████████████████████████████████████████████████████████
  ████████████████████████████████████;

- ████████████████████████████████████████████████
  ████████████████████;

- ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████;

- ████████████████████████████████████████████████████████████████
  ████████████████████;

- ████████████████████████████████████████████████████
  ████████████████████████████;

- ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████;

- ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████████
  ████████████████████;

- ████████████████████████████████████████████████████
  ████████████;

- ████████████████████████████████████████████████████
  ████████;

- ████████████████████████████████████████████████████████████
  ████████████████████████████████████;

- ████████████████████████████████████████████████████████████
  ████████████;

- ████████████████████████████████████████████████████████████
  ████████████████████████████████████ (NARA review team has seen a similar document matching description);

- ████████████████████████████████████████████████████████████
  ████████████████████████.



- Witness provided leads for interviews ▓▓▓ Per. 19, Per. 4 ▓▓▓ (GJS in hand)

Next Steps and Updates in the Past 24 Hours:
- We have contacted Walt Nauta for an interview. After initially agreeing to speak to us this evening at the WPBRA; he has retained an attorney and this interview will be postponed;
- Search Warrant PC is being collated by Case Agents, should it become necessary
- Service of GJS for MAL employee/witness ▓▓ Per. 4 ▓▓ served at 5:47pm on 5/18
- Service of GJS for MAL employee/witness ▓▓ Per. 19 ▓▓ not yet served after several attempts to contact her via phone and at her residence
  - This GJS is being forwarded to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ , of the local US Secret Service office. He has graciously offered to try to serve the GJS to Ms. ▓ P. 19 ▓ at MAL;
- An Interview of ▓ Per. 22 ▓ will be conducted 5/26/2022;
- Interview of ▓ Per. 3 ▓ , ▓▓▓▓▓▓▓▓▓▓▓ (scheduled to be interviewed in WFO AOR in two weeks)
- An EC requesting declassification of the existence of this case is in work presently, should we need it (pending SW)

To Determine:
- If Venue will be established
- FBI Logistics of box collection whether SW or GJS answer via ▓ Per. 18 ▓ /FPOTUS reps; coord with USSS, etc.

Thank you,
▓ P. 19 ▓

================     ====================
Classification: ▓▓▓▓▓▓▓▓▓▓▓▓▓

Subject to Protective Order

Ex. 34

**Olsen, Matthew (NSD)**

| | |
|---|---|
| **Subject:** | Search Warrant Discussion |
| **Location:** | FBIHQ **(b)(7)(E) per FBI** |
| **Start:** | Monday, August 1, 2022 10:30 AM |
| **End:** | Monday, August 1, 2022 11:15 AM |
| **Show Time As:** | Tentatively accepted |
| **Recurrence:** | (none) |
| **Meeting Status:** | Not yet responded |
| **Organizer:** | Olsen, Matthew (NSD) |
| **Required Attendees:** | Newman, David A. (ODAG); Bratt, Jay (NSD); Toscas, George (NSD); Jones, Jason Allen (OGC) (FBI); Kohler, Alan E. Jr. (CD) (FBI); Riedlinger, Anthony T. (WF) (FBI); D'Antuono, Steven Michael (WF) (FBI) |
| **Optional Attendees:** | Freedman, Brett (NSD); **(b)(6),(b)(7)(C) per NSD** (NSD) |

01715-03354

Ex. 35

DECLASSIFIED BY:
ON 06- Case 9:23-cr-80101-AMC   Document 469-1   Entered on FLSD Docket 04/22/2024   Page 172 of
This redacted version only                                315

From: ░░FBI 19░ (WF) (FBI)
To:                   (WF) (FBI)
Subject: FW: Plasmic Echo Search Warrant ---
Date: Thursday, August 04, 2022 9:10:20 AM

Classification ▓▓▓▓▓▓

Send to sub-COORD
Thank you

-----Original Message-----
From: ░FBI 10░ (WF) (FBI)
Sent: Thursday, August 04, 2022 9:03 AM
To: ░FBI 19░ (WF) (FBI)
Subject: FW: Plasmic Echo Search Warrant ---

Classification: ▓▓▓▓▓▓

Please add to file.

From: ░FBI 10░ (WF) (FBI)
Sent: Thursday, August 04, 2022 8:53 AM
To: Riedlinger, Anthony T. (WF) (FBI)                         ; D'Antuono, Steven Michael (WF)
(FBI)
Subject: Plasmic Echo Search Warrant ---

Classification: ▓▓▓▓▓▓

Good morning, I have a request ahead of the warrant operation planned for Monday.

Because the search warrant operational plan has contact with FPOTUS's attorney as the first step, I'd respectfully
request that the contact be handled by FBI, not by DOJ. As the ▓▓▓▓ who will be responsible for the execution of
the warrant, this first contact will set the tone for the day. The FBI intends for the execution of the warrant to be
handled in a professional, low key manner, and to be mindful of the optics of the search. Safety of the search team
is always of a concern during any such operation. Since we heard Mr. Toscas say yesterday in the call that "he
frankly doesn't give a damn about the optics" and Mr. Bratt already has built an antagonistic relationship with
FPOTUS's attorney over the service of the Grand Jury subpoena, I think it is more than fair to say that the DOJ
contact with ░Per. 18░ just prior to the execution of the warrant will not go well. DOJ said as much yesterday. I
also think that it is fair to say that if FBI calls, having in mind officer safety, to optics of the search, and the desire to
conduct this search in a professional and low key manner, there is a far better chance that the execution will go more
smoothly and we may actually gain some measure of cooperation, which could go some way to resolving the
mishandling of classified records investigation that is being conducted. I understand that this request may not go

well at DOJ, however, it is FBI serving and executing the search and it will be our personnel who will have to deal with the reaction to that first contact.

Please let me know what you think.

**FBI 10**

████████████████████████

████████████████████████

FBI Washington Field Office

████████ (Office) | ████████ (Cell)

═══════════════════════════════════════════════

Classification: ████████████

═══════════════════════════════════════════════

Classification: ████████████

═══════════════════════════════════════════════

Classification: ████████████

Ex. 36

**From:**       Newman, David A. (ODAG)
**Subject:**    Judicia Watch Motion
**To:**         Toscas, George (NSD); (b)(6),(b)(7)(C) per NSD (NSD)
**Sent:**       August 10, 2022 2:12 PM (UTC-04:00)
**Attached:**   Judicia-Watch-Motion-to-Unsea-Search-Warrant-08332.pdf

FYI.

Document ID: 0.7.500.34946

**From:**       Atkinson, Lawrence (ODAG)
**Subject:**    Fwd: Can you send me the itigation fi ed this morning?
**To:**         (b)(6),(b)(7)(C) per NSD  (NSD)
**Sent:**       August 10, 2022 2:12 PM (UTC-04:00)
**Attached:**   Judicia -Watch-Motion-to-Unsea -Search-Warrant-08332.pdf

Begin forwarded message:

**From:** "Evers, Austin (ODAG)" <(b) (6)
**Date:** August 10, 2022 at 2:10:41 PM EDT
**To:** "Atkinson, Lawrence (ODAG)" <(b) (6)
**Subject: RE: Can you send me the litigation filed this morning?**

**From:** Atkinson, Lawrence (ODAG) <(b) (6)
**Sent:** Wednesday, August 10, 2022 2:10 PM
**To:** Evers, Austin (ODAG) <(b) (6)
**Subject:** Can you send me the litigation filed this morning?

01715-00212

Ex. 37

**From:**      Evers, Austin (ODAG)
**Subject:**   Motion
**To:**        Newman, David A. (ODAG); Loeb, Emi y M. (ODAG)
**Sent:**      August 10, 2022 11:12 AM (UTC-04:00)
**Attached:**  Judicia -Watch-Motion-to-Unsea -Search-Warrant-08332.pdf

**Austin R. Evers**
Office of the Deputy Attorney General
U.S. Department of Justice
(b) (6)          (m)
(b) (6)          (o)

01715-00201

Ex. 38

**From:** Toscas, George (NSD)
**Subject:** FW: [EXTERNAL] RE: today's events
**To:** Osen, Matthew (NSD); (b)(6) per NSD (NSD); Newman, David A. (ODAG) (b)(6) per NSD (NSD)
**Sent:** August 12, 2022 1:17 PM (UTC-04:00)

**From:** Bratt, Jay (NSD) (b)(6) per NSD
**Sent:** Friday, August 12, 2022 1:15 PM
**To:** Toscas, George (NSD) (b)(6) per NSD >; Gonzalez, Juan Antonio (USAFLS) (b)(6) per EOUSA usa.doj.gov>
**Cc:** (b)(6) per NSD (NSD) (b)(6) per NSD
**Subject:** Fwd: [EXTERNAL] RE: today's events

Begin forwarded message:

> **From:** Evan Corcoran (b) (6)
> **Date:** August 12, 2022 at 2:11:25 PM ADT
> **To:** "Bratt, Jay (NSD)" (b)(6) per NSD   James Trusty <(b) (6)   (b)(6) per NSD
> (NSD)" (b)(6) per NSD
> **Subject:** [EXTERNAL] RE: today's events

See below.

Thank you.

**From:** Bratt, Jay (NSD (b)(6) per NSD
**Sent:** Friday, August 12, 2022 7:55 AM
**To:** James Trusty (b) (6)   >; (b)(6) per NSD (NSD) (b)(6) per NSD
**Cc:** Evan Corcoran (b) (6)
**Subject:** RE: today's events

Jim/Evan:

In light of President Trump's statement last night on his social media platform that he wouldn't oppose the release of the court documents and encouraged their "immediate release," may we represent to the court that you have confirmed that this constitutes non-opposition/consent to the motion? YES If so, I think that also would obviate the need for a call at 2. AGREED. Thanks.

Jay

**From:** James Trusty (b) (6)
**Sent:** Thursday, August 11, 2022 4:10 PM
**To:** Bratt, Jay (NSD) (b)(6) per NSD   (b)(6) per NSD (NSD) (b)(6) per NSD
**Cc:** Evan Corcoran (b) (6)
**Subject:** [EXTERNAL] today's events

Jay   can we have a call with you and (b)(6) per NSD at 4:30? 5? Later?

Jim

James Trusty | Ifrah Law PLLC | 1717 Pennsylvania Ave. N.W. Suite 650 | (b) (6)

01777-00043

Ex. 39

| | |
|---|---|
| **From:** | Bratt, Jay (NSD) |
| **Subject:** | Re: CNN - Mar-a-Lago CCTV Footage |
| **To:** | Rosse o, Luis (PAO) |
| **Cc:** | Toscas, George (NSD); Pietranton, Ke sey (PAO); (b)(6),(b)(7)(C) per NSD (NSD); Iverson, Dena (PAO); (b)(6),(b)(7)(C) per NSD (NSD); (b)(6),(b)(7)(C) per NSD (NSD); Co ey, Anthony D. (PAO); Atkinson, Lawrence (ODAG); Newman, David A. (ODAG); O sen, Matthew (NSD); (b)(6),(b)(7)(C) per NSD (NSD); Mi er, Marsha (ODAG) |
| **Sent:** | August 17, 2022 7:28 PM (UTC-04:00) |

We did. This was in the call (b)(6), (7)(C), 7(E) per FBI and I had with Evan Corcoran before the search. It is standard for

(b)(6), (7)(C), 7(E) per FBI

On Aug 17, 2022, at 7:19 PM, Rossello, Luis (PAO) <Luis.Rossello@usdoj.gov> wrote:

Got a call from Evan. As Jay says, Trump team is still weighting the release. Per Evan, some say it will energize base, others say not a good look for FPOTUS to have it out there.

CNN is working on a story that Jay requested Trump team to turn off the cameras and they refused.

Sent from my iPhone

On Aug 17, 2022, at 7:04 PM, Bratt, Jay (NSD) <(b)(6),(b)(7)(C) per NSD wrote:

CNN is saying FPOTUS is still weighing whether to release the footage.

On Aug 17, 2022, at 7:03 PM, Toscas, George (NSD) <(b)(6),(b)(7)(C) per NSD wrote:

Marshall, Matt, and (b)(6),(b)(7)(C) per NSD

On Aug 17, 2022, at 6:59 PM, Pietranton, Kelsey (PAO) <Kelsey.Pietranton@usdoj.gov> wrote:

Plus Anthony and Luis, and ODAG for awareness. Standby.

**From:** (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD
**Sent:** Wednesday, August 17, 2022 6:57 PM
**To:** Iverson, Dena (PAO) <Dena.I.DeBonis@usdoj.gov>; Pietranton, Kelsey (PAO) <Kelsey.Pietranton@usdoj.gov>; Toscas, George (NSD) <(b)(6),(b)(7)(C) per NSD Bratt, Jay (NSD) <(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD (NSD)

01715-01050

**(b)(6),(b)(7)(C) per NSD**

**Subject:** CNN - Mar-a-Lago CCTV Footage
**Importance:** High

Good evening all,

I just received a call from our case agents at FBI, and apparently the Bureau has been given a heads-up by CNN that CNN has CCTV footage from Mar-a-Lago (presumably of agents executing the search) that they may air as soon as tonight **(b)(5) per NSD**

I have no further info on what, specifically, CNN has. But **(b)(5) per NSD**

(b)(6),(b)(7)(C) per NSD

Trial Attorney
Counterintelligence and Export Control Section
National Security Division, U.S. Department of Justice
Washington, D.C. 20530
**(b)(6),(b)(7)(C) per NSD**

Ex. 40

| | |
|---|---|
| **From:** | Newman, David A. (ODAG) |
| **Subject:** | RE: CNN - Mar-a-Lago CCTV Footage |
| **To:** | Mi er, Marsha  (ODAG); Toscas, George (NSD) |
| **Cc:** | Rosse o, Luis (PAO); Bratt, Jay (NSD); Pietranton, Ke sey (PAO); (b)(6),(b)(7)(C) per NSD (NSD); Iverson, Dena (PAO); (b)(6),(b)(7)(C) per NSD (NSD); (b)(6),(b)(7)(C) per NSD (NSD); Co ey, Anthony D. (PAO); Atkinson, Lawrence (ODAG); O sen, Matthew (NSD); (b)(6),(b)(7)(C) per NSD (NSD) |
| **Sent:** | August 17, 2022 8:15 PM (UTC-04:00) |

George and I agree. (b) (5)

---

**From:** Miller, Marshall (ODAG) <(b) (6)
**Sent:** Wednesday, August 17, 2022 8:15 PM
**To:** Toscas, George (NSD) <(b)(6),(b)(7)(C) per NSD
**Cc:** Rossello, Luis (PAO) <Luis.Rossello@usdoj.gov>; Bratt, Jay (NSD) <(b)(6),(b)(7)(C) per NSD Pietranton, Kelsey (PAO) <Kelsey.Pietranton@usdoj.gov>; (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD Iverson, Dena (PAO) <Dena.I.DeBonis@usdoj.gov>; (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD Coley, Anthony D. (PAO) <(b) (6)  Atkinson, Lawrence (ODAG) <(b) (6)  Newman, David A. (ODAG) <(b) (6)  Olsen, Matthew (NSD) <(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD
**Subject:** Re: CNN - Mar-a-Lago CCTV Footage

Just wondering if (b) (5) .

Sent from my iPhone

On Aug 17, 2022, at 8:06 PM, Toscas, George (NSD) <(b)(6),(b)(7)(C) per NSD wrote:

(b)(5) per NSD

. Thanks.

On Aug 17, 2022, at 7:47 PM, Miller, Marshall (ODAG) <(b) (6)  wrote:

(b) (5)

?

---

**From:** Toscas, George (NSD) <(b)(6),(b)(7)(C) per NSD
**Sent:** Wednesday, August 17, 2022 7:22 PM
**To:** Rossello, Luis (PAO) <Luis.Rossello@usdoj.gov>
**Cc:** Bratt, Jay (NSD) <(b)(6),(b)(7)(C) per NSD Pietranton, Kelsey (PAO) <Kelsey.Pietranton@usdoj.gov>; (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD Iverson, Dena (PAO) <Dena.I.DeBonis@usdoj.gov>; (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD Coley, Anthony D. (PAO) <(b) (6)  Atkinson, Lawrence (ODAG) <(b) (6)  Newman, David A. (ODAG) <(b) (6)  Olsen, Matthew (NSD) <(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD Miller, Marshall (ODAG) <(b) (6)
**Subject:** Re: CNN - Mar-a-Lago CCTV Footage

We're waiting to hear back from FBIHQ on their recommended approach. (b) (5)



On Aug 17, 2022, at 7:19 PM, Rossello, Luis (PAO) <Luis.Rossello@usdoj.gov> wrote:

Duplicative Records

Ex. 41

**From:** Toscas, George (NSD)
**Subject:** Re: CNN - Mar-a-Lago CCTV Footage
**To:** Mi er, Marsha (ODAG)
**Cc:** Rosse o, Luis (PAO); Bratt, Jay (NSD); Pietranton, Ke sey (PAO); (b)(6),(b)(7)(C) per NSD (NSD); Iverson, Dena (PAO); (b)(6),(b)(7)(C) per NSD (NSD); (b)(6),(b)(7)(C) per NSD (NSD); Co ey, Anthony D. (PAO); Atkinson, Lawrence (ODAG); Newman, David A. (ODAG); O sen, Matthew (NSD); (b)(6),(b)(7)(C) per NSD (NSD)
**Sent:** August 17, 2022 8:16 PM (UTC-04:00)

Yes. Handling that now.

On Aug 17, 2022, at 8:14 PM, Miller, Marshall (ODAG) <(b) (6)                    wrote:

Duplicative Records

Ex. 42

**From:** Coey, Anthony D. (PAO)
**Subject:** Re: CNN - Mar-a-Lago CCTV Footage
**To:** Bratt, Jay (NSD)
**Cc:** Rosse o, Luis (PAO); Toscas, George (NSD); Pietranton, Ke sey (PAO); ███(b)(6),(b)(7)(C) per NSD███ (NSD); Iverson, Dena (PAO); ███(b)(6),(b)(7)(C) per NSD███ (NSD); ███(b)(6),(b)(7)(C) per NSD███ (NSD); Atkinson, Lawrence (ODAG); Newman, David A. (ODAG); O sen, Matthew (NSD); ███(b)(6),(b)(7)(C) per NSD███ (NSD); Mi er, Marsha  (ODAG)
**Sent:** August 17, 2022 10:13 PM (UTC-04:00)

Thanks, Jay. Sending now…

On Aug 17, 2022, at 9:59 PM, Bratt, Jay (NSD) <███(b)(6),(b)(7)(C) per NSD███ wrote:

I am good with this.  Thanks.

**From:** Coley, Anthony D. (PAO) <███(b) (6)███
**Sent:** Wednesday, August 17, 2022 9:48 PM
**To:** Bratt, Jay (NSD) <███(b)(6),(b)(7)(C) per NSD███ Rossello, Luis (PAO) <Luis.Rossello@usdoj.gov>
**Cc:** Toscas, George (NSD) <███(b)(6),(b)(7)(C) per NSD███ Pietranton, Kelsey (PAO) <Kelsey.Pietranton@usdoj.gov>; ███(b)(6),(b)(7)(C) per NSD███ (NSD) <███(b)(6),(b)(7)(C) per NSD███ Iverson, Dena (PAO) <Dena.I.DeBonis@usdoj.gov>; ███(b)(6),(b)(7)(C) per NSD███ (NSD) <███(b)(6),(b)(7)(C) per NSD███ ███(b)(6),(b)(7)(C) per NSD███ (NSD) <███(b)(6),(b)(7)(C) per NSD███ Atkinson, Lawrence (ODAG) <███(b) (6)███ Newman, David A. (ODAG) <███(b) (6)███ Olsen, Matthew (NSD) <███(b)(6),(b)(7)(C) per NSD███ ███(b)(6),(b)(7)(C) per NSD███ (NSD) <███(b)(6),(b)(7)(C) per NSD███ Miller, Marshall (ODAG) <███(b) (6)███
**Subject:** RE: CNN - Mar-a-Lago CCTV Footage



**From:** Bratt, Jay (NSD) <███(b)(6),(b)(7)(C) per NSD███

01715-01069

**Sent:** Wednesday, August 17, 2022 8:59 PM
**To:** Rossello, Luis (PAO) <Luis.Rossello@usdoj.gov>
**Cc:** Toscas, George (NSD) <(b)(6),(b)(7)(C) per NSD Pietranton, Kelsey (PAO) <Kelsey.Pietranton@usdoj.gov>; (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD Iverson, Dena (PAO) <Dena.I.DeBonis@usdoj.gov>; (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD Coley, Anthony D. (PAO) <(b) (6) Atkinson, Lawrence (ODAG) <(b) (6) Newman, David A. (ODAG) <(b) (6) Olsen, Matthew (NSD) <(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD Miller, Marshall (ODAG) <(b) (6)
**Subject:** Re: CNN - Mar-a-Lago CCTV Footage

After consultations with George and David, I just sent the attached to Evan Corcoran and Alan Garten, general counsel for the Trump Organization.

> On Aug 17, 2022, at 8:18 PM, Rossello, Luis (PAO) <Luis.Rossello@usdoj.gov> wrote:
>
> https://www.cnn.com/2022/08/17/po t cs/trump-re ease-surve ance-footage-fb -mar-a- ago/ ndex.htm
>
> Sent from my iPhone
>
>> On Aug 17, 2022, at 7:19 PM, Rossello, Luis (PAO) <Luis.Rossello@usdoj.gov> wrote:

**Duplicative Records**

Ex. 43

**From:** Newman, David A. (ODAG)
**Subject:** 08.17.22 Letter
**To:** Toscas, George (NSD)
**Sent:** August 17, 2022 8:50 PM (UTC-04:00)
**Attached:** 08.17.22 Letter .docx

Draft version for editing

Ex. 44

**From:** Newman, David A. (ODAG)
**Subject:** Letter
**To:** Bratt, Jay (NSD)
**Cc:** Toscas, George (NSD)
**Sent:** August 17, 2022 8:48 PM (UTC-04:00)
**Attached:** Letter -- 08.17.22.pdf

See attached PDF.  This letter reflects the concerns shared with us this evening from FBI about threats and safety to their personnel.  FBI leadership is grateful for the willingness to send this letter.  I know you've been in touch with George about this letter   and appreciate your reviewing and sending.

--David

Ex. 45

**From:**    Bratt, Jay (NSD)
**Subject:**    FW: News Media intervention in Trump v. United States, No. 22-civ-81294
**To:**    Gonzalez, Juan Antonio (USAFLS)
**Cc:**    [(b)(6),(b)(7)(C) per NSD] (NSD); Toscas, George (NSD); Newman, David A. (ODAG)
**Sent:**    August 30, 2022 9:59 AM (UTC-04:00)

Tony:

I don't think (b) (5)

Thoughts (including those cc'd)?

Jay

---

**From:** Mark R. Caramanica <mcaramanica@tlolawfirm.com>
**Sent:** Tuesday, August 30, 2022 9:54 AM
**To:** Gonzalez, Juan Antonio (USAFLS) [(b)(6) per EOUSA]@usa.doj.gov>; Bratt, Jay (NSD) <[(b)(6),(b)(7)(C) per NSD]
**Cc:** Dana J. McElroy <DMcElroy@tlolawfirm.com>
**Subject:** [EXTERNAL] News Media intervention in Trump v. United States, No. 22-civ-81294

Dear Messrs. Gonzalez and Bratt:

      On behalf of a news media coalition (comprising many of the same entities who intervened before Judge Reinhart regarding the search warrant materials), we plan to file a motion today to intervene in this matter as well.  We will be opposing any sealing of records filed under seal pursuant to the Court's August 27, 2022 order (ECF No. 29). Please let us know your position on: 1) intervention and 2) whether the United States will oppose unsealing of those records.   We are happy to discuss if you'd like.

Thank you.

-Mark Caramanica



**Mark R. Caramanica**

60 South Boulevard
Tampa, FL 33606

**ph:** 8 3 984 3060   **direct** [(b)(6)]
**fax:** 8 3 984 3070   **toll free:** 866 395 7 00
www.tlolawfirm.com

**Tampa   South Florida**

**To upload large documents, please click here**



**CONFIDENTIALITY NOTICE:** The nfo mat on conta ned n th s ema message s ntended fo the pe sona and conf dent a use of the ec p ent(s) des gnated above  Th s message may conta n nfo mat on that s p v eged, conf dent a and exempt f om d sc osu e unde app cab e aw and any unautho zed o nadve tent use, ece pt, d sc osu e, d ssem nat on, o d st but on of such nfo mat on sha not wa ve any such p v ege  If you a e not an ntended ec p ent of th s message, and/o you have ece ved th s message n e o , then p ease not fy the sende at (8 3) 984-3060 Any unautho zed and/o un ntended ev ew, use, d ssem nat on, d st but on, o ep oduct on of th s message, o any of the nfo mat on conta ned n t, s st ct y p oh b ted

Ex. 46

**From:**       Bratt, Jay (NSD)
**Subject:**    Fwd: from counsel for Media Intervenors/search warrant matter
**To:**         Coley, Anthony D. (PAO); Rosselo, Luis (PAO)
**Cc:**         Olsen, Matthew (NSD); Toscas, George (NSD); Newman, David A. (ODAG)
**Sent:**       August 24, 2022 7:30 PM (UTC-04:00)

FYI


Begin forwarded message:


**From:** "Gonzalez, Juan Antonio (USAFLS)" <span style="background:black;color:white">(b)(6) per EOUSA</span>@usa.doj.gov>
**Date:** August 24, 2022 at 7:27:23 PM EDT
**To:** "Tobin, Charles D." <TobinC@ballardspahr.com>
**Cc:** "Bratt, Jay (NSD)" <<span style="background:black;color:white">(b)(6),(b)(7)(C) per NSD</span>
**Subject: RE: from counsel for Media Intervenors/search warrant matter**



Hi Chuck,

Sorry for the delay getting back to you but I have been tied up today.  We are planning to follow the Court's order and file our pleadings under seal.  We do not intend to make a public filing however, the Judge may want to make public specific parts of our pleading.

Regards,

Tony

*Juan Antonio Gonzalez*
United States Attorney
Southern District of Florida
99 NE 4th Street
Miami, Florida 33132
305-961-9100



**From:** Tobin, Charles D. <TobinC@ballardspahr.com>
**Sent:** Wednesday, August 24, 2022 8:44 AM
**To:** Gonzalez, Juan Antonio (USAFLS <span style="background:black;color:white">(b)(6) per EOUSA</span>@usa.doj.gov>
**Subject:** [EXTERNAL] from counsel for Media Intervenors/search warrant matter

Good morning, Tony, I hope you remain well.  I wanted to check on the government's plans for tomorrow's noon filing, per the Court's order.

We presume the government will file two versions of the legal memorandum containing its arguments for the continued sealing of portions of the search warrant affidavit   one version sealed, the other a redacted public version.  If you would confirm, we would appreciate it.  Thank you.

Chuck

**Charles D. Tobin**

1909 K Street, NW, 12th F oor
Wash ngton, DC 20006-1157
(b) (6)          d rect
202.661.2299 fax

tob nc@ba ardspahr.com

www.ba ardspahr.com

01715-01506

Ex. 47

**From:** (b)(6) David Newman
**Subject:** Re: Activity in Case 9:22-mj-08332-BER USA v. Sealed Search Warrant Order
**To:** Osen, Matthew (NSD)
**Cc:** Miller, Marsha (ODAG)
**Sent:** August 22, 2022 8:32 AM (UTC-04:00)
**Attached:** Order on Motions to Unseal.pdf

Thanks. (b) (5)
.

A credit to Jay and the briefing team.

On Aug 22, 2022, at 2:22 PM, Olsen, Matthew (NSD) <(b)(6),(b)(7)(C) per NSD> wrote:

Forwarding the court's order (b) (5) .

-Matt

Get Outlook for iOS

**From:** Bratt, Jay (NSD) <(b)(6),(b)(7)(C) per NSD>
**Sent:** Monday, August 22, 2022 8:12:30 AM
**To:** Olsen, Matthew (NSD) <(b)(6),(b)(7)(C) per NSD> (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD>
**Cc:** Toscas, George (NSD) <(b)(6),(b)(7)(C) per NSD> (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD>
**Subject:** FW: Activity in Case 9:22-mj-08332-BER USA v. Sealed Search Warrant Order

**From:** Bratt, Jay (NSD)
**Sent:** Monday, August 22, 2022 8:12 AM
**To:** Gonzalez, Juan Antonio (USAFLS) <(b)(6) per EOUSA @usa.doj.gov>; (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD> Toscas, George (NSD) <(b)(6),(b)(7)(C) per NSD> Wu, Jason (USAFLS) <JWu@usa.doj.gov>; (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD> (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD> (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD> (b)(6),(b)(7)(C) per NSD Gilbert, Karen (USAFLS) (b)(6) per EOUSA @usa.doj.gov>; Thakur, Michael (USAFLS) (b)(6) per EOUSA @usa.doj.gov>; Smith, Jeffrey (NSD) <Jeffrey.Smith5@usdoj.gov>
**Subject:** RE: Activity in Case 9:22-mj-08332-BER USA v. Sealed Search Warrant Order

Thanks, Tony. For those without immediate PACER access, I'm attaching a pdf of the order.

**From:** Gonzalez, Juan Antonio (USAFLS) (b)(6) per EOUSA @usa.doj.gov>
**Sent:** Monday, August 22, 2022 8:03 AM
**To:** (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD> Toscas, George (NSD) <(b)(6),(b)(7)(C) per NSD> Wu, Jason (USAFLS) <JWu@usa.doj.gov>; Bratt, Jay (NSD) <(b)(6),(b)(7)(C) per NSD> (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD> (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD> (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD> (b)(6),(b)(7)(C) per NSD Gilbert, Karen (USAFLS) (b)(6) per EOUSA @usa.doj.gov>; Thakur, Michael (USAFLS) (b)(6) per EOUSA usa.doj.gov>
**Subject:** Fwd: Activity in Case 9:22-mj-08332-BER USA v. Sealed Search Warrant Order

This is a very well written order. Clearly written for the media/public and not really for the lawyers. Contains nothing new.

Tony

Juan A. Gonzalez
U.S. Attorney
Southern District of Florida

Begin forwarded message:

> **From:** cmecfautosender@flsd.uscourts.gov
> **Date:** August 22, 2022 at 7:49:38 AM EDT
> **To:** flsd_cmecf_notice@flsd.uscourts.gov
> **Subject: Activity in Case 9:22-mj-08332-BER USA v. Sealed Search Warrant Order**

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* There is no charge for viewing opinions.**

**U.S. District Court**

**Southern District of Florida**

**Notice of Electronic Filing**

The following transaction was entered on 8/22/2022 at 7:48 AM EDT and filed on 8/22/2022
**Case Name:**        USA v. Sealed Search Warrant
**Case Number:**      9:22-mj-08332-BER
**Filer:**
**Document Number:** 80

**Docket Text:**
**ORDER as to Sealed Search Warrant, memorializing and supplementing oral rulings at August 18, 2022, hearing. Signed by Magistrate Judge Bruce E. Reinhart** *See attached document for full details.* **(BER)**

**9:22-mj-08332-BER-1 Notice has been electronically mailed to:**

Andrea Flynn Mogensen     andrea@sarasotacriminallawyer.com, records@flcga.org

Carol Jean LoCicero     clocicero@tlolawfirm.com, nparsons@tlolawfirm.com, tgilley@tlolawfirm.com

Charles David Tobin     tobinc@ballardspahr.com, baileys@ballardspahr.com, LitDocket_East@ballardspahr.com, relyear@ballardspahr.com, tom.winter@nbcuni.com, tranp@ballardspahr.com

Dana Jane McElroy     dmcelroy@tlolawfirm.com, bbrennan@tlolawfirm.com,

tgilley@tlolawfirm.com

Deanna Kendall Shullman    dshullman@shullmanfugate.com, abeene@shullmanfugate.com, pleadings@shullmanfugate.com

Elizabeth Seidlin-Bernstein    SeidlinE@ballardspahr.com

Eugene Branch Minchin    mminchin@shullmanfugate.com, abeene@shullmanfugate.com, pleadings@hullmanfugate.com

James Calvin Moon    jmoon@melandbudwick.com, ltannenbaum@ecf.courtdrive.com, ltannenbaum@melandbudwick.com, mrbnefs@yahoo.com, phornia@ecf.courtdrive.com

Juan Antonio Gonzalez , Jr    juan.antonio.gonzalez@usdoj.gov, CaseView.ECF@usdoj.gov, USAFLS-HQDKT@usdoj.gov, wanda.hubbard@usdoj.gov

L. Martin Reeder , Jr    martin@athertonlg.com, e-service@athertonlg.com, tracey@athertonlg.com

Mark Richard Caramanica    mcaramanica@tlolawfirm.com, bbrennan@tlolawfirm.com, dlake@tlolawfirm.com

Michael Bekesha    mbekesha@judicialwatch.org

Nellie Linn King    Nellie@CriminalDefenseFla.com, Anne@CriminalDefenseFla.com

Paul J. Orfanedes    porfanedes@judicialwatch.org

Rachel Elise Fugate    rfugate@shullmanfugate.com, abeene@shullmanfugate.com, pleadings@shullmanfugate.com

**9:22-mj-08332-BER-1 Notice has not been delivered electronically to those listed below and will be provided by other means. For further assistance, please contact our Help Desk at 1-888-318-2260.:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID 1105629215 [Date 8/22/2022] [FileNumber 22486292-0] [871089e550bf8eb1e2cd0a56c1dbe293e7a4e8c2a152333ba4038c98a2a03dc029 0d29a9487297d1a12d777aed57e6465d3bab491d96394fdfa6ea1519956518]]

01715-01144

Ex. 48

**From:** Evers, Austin (ODAG)
**Subject:** Re: time-sensitive (b) (5) questions
**To:** Newman, David A. (ODAG)
**Cc:** Lederman, Martin (OLC); Schroeder, Christopher H. (OLC); Atkinson, Lawrence (ODAG)
**Sent:** August 31, 2022 7:27 AM (UTC-04:00)

A relevant question is (b) (5)

Austin R. Evers
(b) (6)         (m)

On Aug 31, 2022, at 7:11 AM, Newman, David A. (ODAG) < (b) (6)         wrote:

Thank you, Marty. Let me read these and circle back.

On Aug 31, 2022, at 6:40 AM, Lederman, Martin (OLC) < (b)(6) per OLC         >
wrote:

David: For purposes of your forthcoming call with Gary, note that he has also reached out to



(b)(5) per OLC

(b)(5) per OLC

(b)(5) per OLC

After your call, we should discuss ASAP (i) whether we in OLC should have any follow-up
conversations with Gary concerning (b)(5) per OLC

Thanks very much.

Marty Lederman
Deputy Assistant Attorney General
Office of Legal Counsel

Department of Justice
(b)(6) per OLC (cell)
(office)

**From:** Lederman, Martin (OLC)
**Sent:** Monday, August 29, 2022 3:23 PM
**To:** Newman, David A. (ODAG) <(b) (6) (b)(6) per OLC (OLC) > Schroeder, Christopher H. (OLC)
**Cc:** Evers, Austin (ODAG) <(b) (6) Atkinson, Lawrence (ODAG) <(b) (6)
**Subject:** Re: time-sensitive (b) (5) questions

Gary pinged me again.  Everyone ok with me conveying our current view?

Sent from my iPhone



Duplicative Records

Ex. 49

**From:** Lederman, Martin (OLC)
**Subject:** Re: time-sensitive ██(b) (5)██ questions
**To:** Evers, Austin (ODAG)
**Cc:** Newman, David A. (ODAG); Schroeder, Christopher H. (OLC); Atkinson, Lawrence (ODAG)
**Sent:** August 29, 2022 3:38 PM (UTC-04:00)

Ok, but if there's a way to settle on it today, that'd be great.  I suppose that in the meantime I could simply tell Gary that we are considering the question.

Sent from my iPhone

On Aug 29, 2022, at 3:26 PM, Evers, Austin (ODAG) <██(b) (6)██ wrote:

Please hold ██(b) (5)██

**From:** Lederman, Martin (OLC) ██(b)(6) per OLC██
**Sent:** Monday, August 29, 2022 3:23 PM
**To:** Newman, David A. (ODAG) <██(b) (6)██ Schroeder, Christopher H. (OLC) ██(b)(6) per OLC██
**Cc:** Evers, Austin (ODAG) <██(b) (6)██ Atkinson, Lawrence (ODAG) <██(b) (6)██
**Subject:** Re: time-sensitive ██(b) (5)██ questions

Gary pinged me again.  Everyone ok with me conveying our current view?

Sent from my iPhone

On Aug 29, 2022, at 9:13 AM, Lederman, Martin (OLC) <██(b)(6) per OLC██ wrote:

I agree, too.  And I'll add this:



01715-02258



How does that sound?  Should I ██████ (b) (5) ████████████████████████
████████ ?

Marty Lederman
Deputy Assistant Attorney General
Office of Legal Counsel
Department of Justice
██(b)(6) per OLC██ (cell)
██(b)(6) per OLC██ (office)

**From:** Newman, David A. (ODAG) <██(b) (6)████████████
**Sent:** Monday, August 29, 2022 8:42 AM
**To:** Schroeder, Christopher H. (OLC) <██(b)(6) per OLC████████; Lederman, Martin (OLC) ██(b)(6) per OLC██>
**Cc:** Evers, Austin (ODAG) <██(b) (6)████████ Atkinson, Lawrence (ODAG) <██(b) (6)██
**Subject:** RE: time-sensitive ██(b) (5)██ questions

Thanks, Chris.  That makes sense ██(b) (5)██
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████████.

**From:** Schroeder, Christopher H. (OLC) <██(b)(6) per OLC████████
**Sent:** Monday, August 29, 2022 8:15 AM
**To:** Lederman, Martin (OLC) ██(b)(6) per OLC████████; Newman, David A. (ODAG) <██(b) (6)██
**Cc:** Evers, Austin (ODAG) <██(b) (6)████████ Atkinson, Lawrence (ODAG) <██(b) (6)██
**Subject:** RE: time-sensitive ██(b) (5)██ questions

On the question of ██(b)(5) per OLC██████████████, my first instinct is ██(b)(5) per OLC██
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████



**From:** Lederman, Martin (OLC) ▮(b)(6) per OLC▮
**Sent:** Sunday, August 28, 2022 11:23 PM
**To:** Newman, David A. (ODAG) ▮(b) (6)▮
**Cc:** Schroeder, Christopher H. (OLC) ▮(b)(6) per OLC▮ Evers, Austin (ODAG) ▮(b) (6)▮ Atkinson, Lawrence (ODAG) ▮(b) (6)▮
**Subject:** RE: time-sensitive ▮(b) (5)▮ questions

**▮(b)(5) per OLC▮**

Marty Lederman
Deputy Assistant Attorney General
Office of Legal Counsel
Department of Justice
▮(b)(6) per OLC▮ (cell)
▮(b)(6) per OLC▮ (office)

**From:** Newman, David A. (ODAG) ▮(b) (6)▮
**Sent:** Sunday, August 28, 2022 11:19 PM
**To:** Lederman, Martin (OLC) ▮(b)(6) per OLC▮
**Cc:** Schroeder, Christopher H. (OLC) ▮(b)(6) per OLC▮ Evers, Austin (ODAG) ▮(b) (6)▮ Atkinson, Lawrence (ODAG) ▮(b) (6)▮
**Subject:** Re: time-sensitive ▮(b) (5)▮ questions

Thank you. I appreciate the update. I will connect tomorrow with this group and others to discuss further. In the meantime, I do not thin (b) (5)



On Aug 28, 2022, at 11:15 PM, Lederman, Martin (OLC)
(b)(6) per OLC          wrote:

Gary Stern called today to raise a question or two (b)(5) per OLC
.

(b)(5) per OLC

Gary is interested to know what DOJ's view is on (b)(5) per OLC

I mentioned these questions briefly to Rush this afternoon. Our first order of business, I believe, is (b)(5) per OLC

One other thing to note: (b)(5) per OLC

(b)(5) per OLC

.

I'll be on the road much of tomorrow (Monday), but could talk if necessary.

Thanks.

Marty Lederman
Deputy Assistant Attorney General
Office of Legal Counsel
Department of Justice
(b)(6) per OLC (cell)
(b)(6) per OLC (office)

01715-02262

Ex. 50

DECLASSIFIED
ON 06-05-2023

This Redacted Version Only



**U.S. Department of Justice**

Federal Bureau of Investigation

In Reply. Please Refer to LHM: CDIIU-0134-22

April 4, 2022

To:   Jay Bratt
      Chief
      Counterintelligence and Export Control Section
      National Security Division
      U.S. Department of Justice

From:   FBI 26

        Counterintellig
        Federal Bureau of Investigation

Subj:   ▮▮▮▮▮ Request for access to the contents of fifteen boxes of presidential records
received by the National Archives and Records Administration in February 2022.

▮▮▮▮▮ Assistance is requested from the National Archives and Records Administration
(NARA) to review records in its possession related to a referral sent to the Department of Justice
(DOJ) in February 2022. Among other information, NARA related these boxes contained
unclassified and classified documents and arrived in their possession on or around January 18,
2022.

▮▮▮▮▮ In order to facilitate the review of the records currently in NARA's possession, the
FBI seeks DOJ assistance to coordinate this request with NARA. Section 2205(20)(b) of Title 44
of the United States Code permits an incumbent President to seek access to presidential records
otherwise restricted from public access "if such records contain information that is needed for the
conduct of current business of the incumbents President's office." Consistent with past practice,
the FBI requests DOJ coordination with White House Counsel on this matter.

Page **1** of **2**

███████FBI personnel accessing the requested records will have the proper clearances to facilitate the review of the same. Further, to allow the FBI to maintain the records, the FBI requests NARA retain the originals and provide copies of all records within seven (7) days from the date of the incumbent President's request.

███████The FBI appreciates NARA's assistance in this matter. The FBI Counterintelligence Division points of contact for this matter are  FBI 38 ███ ███ ███████and FBI 30 ███████ ███ ███

Page **2** of **2**

USA-00940484

Ex. 51

FD-302 (Rev. 5-8-10)





## FEDERAL BUREAU OF INVESTIGATION

DECLASSIFIED BY: NSICG
CN 06-05-2023
This redaction version only.

Date of entry ___08/17/2022___

### DOCUMENT RESTRICTED TO CASE PARTICIPANTS

This document contains information that is restricted to case participants.

A search warrant, 22-mj-8332-BER, issued in the United States District Court for the Southern District of Florida on August 5, 2022, was executed at 1100 South Ocean Boulevard, Palm Beach, Florida 33480 at 10:33 AM on August 8, 2022.

Prior to the Federal Bureau of Investigation (FBI) team's entry onto the MAL premises, FBI leadership informed and coordinated with local United States Secret Service (USSS) leadership. Local USSS facilitated entry onto the premises, provided escort and access to various locations within, and posted USSS personnel in locations where the FBI team conducted searches.

Department of Justice (DOJ) and FBI personnel onsite consisted of:

- Four (4) FBI Washington Field Office (WFO) personnel
- One (1) FBI Headquarters (HQ) personnel
- Twenty-five (25) FBI Miami Field Office (MM) personnel
- One (1) DOJ Counterintelligence and Export Control Section (CES) attorney
- One (1) United States Attorneys Office (USAO) Southern District of Florida (SDFL) attorney

The timeline for the events are as follows, all times are approximate:

- August 8, 2022
  - 0859 - FBI team entered the Mar-a-Lago (MAL) premises
  - 0901 - Entry photographs of exterior initiated
  - 0914 - Telephonic contact with attorney Per. 18 attempted
  - 0936 - Telephonic contact established with Per. 18



| | | |
|---|---|---|
| Investigation on | 08/08/2022 at | Palm Beach, Florida, United States (In Person) |
| File # | | Date drafted 08/09/2022 |
| by | FBI 21 A | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Subject to Protective Order

USA-00940244

FD-302a (Rev. 5-8-10)

(U//FOUO) Search of Mar-a-Lago premises on
Continuation of FD-302 of ___August 8, 2022_____ , On _08/08/2022_ , Page _2 of 3_

- 1013 - CCTV activated on MAL premises
- 1033 - Search of MAL initiated
- 1055 - Entry photographs resumed
- 1055 - Filter Team review of "45 Office" initiated
- 1333 - USAO SDFL approves FBI entry in "45 Office" safe
- 1404 - FBI successfully access safe via technical means
- 1423 - Exit photos of "45 Office" initiated
- 1633 - Search of MAL premises concluded
- 1819 - Receipt for Property provided to Attorney ██ Per. 12 ██
- 1839 - FBI exits MAL premises
- 1952 - Seized evidence arrived at MM
- 2018 - Seized evidence secured in MM temporary storage

- August 9, 2022
  - 0708 - Seized evidence removed from MM temporary storage
  - 0713 - Convoy briefing provided by MM SWAT Team Leader
  - 0754 - Seized evidence departed MM
  - 0834 - Seized evidence arrived at Fort Lauderdale-Hollywood International Airport (FLL)
  - 0835 - Seized evidence loaded on aircraft
  - 0849 - Aircraft departs FLL
  - 1100 - Aircraft arrives at Reagan International Airport (DCA)
  - 1115 - MM Filter Team Lead transfers potentially privileged seized evidence to WFO Filter Team
  - 1120 - Seized evidence depart DCA
  - 1150 - Seized evidence arrived at WFO

A total of forty-five (45) pieces of evidence, comprised of boxes and sets of miscellaneous documents, were seized from the premises described in Attachment A. Thirty-nine (39) of the boxes and/or sets of documents contained comingled items described in Attachment B. Six (6) of the boxes and/or sets of documents contained potentially privileged items comingled with items described in Attachment B. On August 10, 2022 upon further review by FBI WFO, one (1) box was determined to contain potentially privileged information and was provided to the WFO Filter Team.

Storage Room:

- Ten (10) boxes which contained classified marked physical document
- Five (5) boxes which contained both potentially privileged items co-mingled with items in Attachment B

Subject to Protective Order

USA-00940245

FD-302a (Rev. 5-8-10)

(U//FOUO) Search of Mar-a-Lago premises on
Continuation of FD-302 of August 8, 2022 , On 08/08/2022 , Page 3 of 3

- Eleven (11) boxes which contained non-classified marked items in
  Attachment B

"45 Office" Staff Room/Anteroom:

- One (1) box which contained both potentially privileged items co-
  mingled with items in Attachment B
- Two (2) boxes which contained non-classified marked items in
  Attachment B
- Two (2) individual physical documents which contained non-
  classified marked items in Attachment B

"45 Office" Private Office adjacent to Staff Room:

- One (1) individual physical document which contained non-classified
  marked items in Attachment B
- One (1) individual classified marked physical document

"45 Office" Private Office's closet:

- One (1) box which contained classified marked physical documents

 The following items will be maintained in the attached 1A:

- Three (3) signed FD-597 documents
- Three (3) SD cards
- One (1) Map of MAL premises

Subject to Protective Order

Ex. 52

**DECLASSIFIED BY: NSICG**
**ON 06-06-2023**
**This redaction version only.**

| | |
|---|---|
| **From:** | FBI 19 (WF) (FBI) |
| **To:** | (WF) (FBI) |
| **Subject:** | FW: PE Updates --- |
| **Date:** | Monday, June 06, 2022 10:22:48 AM |

Classification:
================================                 ====================

GM! For the sub-COORD file

**From:** FBI 10 (WF) (FBI)
**Sent:** Friday, June 3, 2022 11:52 AM
**To:** FBI 21B (CD) (FBI)                ; FBI 26 (CD) (FBI)
Ronnow, Kurtis (CD) (FBI)                ; Kohler, Alan
E. Jr. (CD) (FBI)                ; Riedlinger, Anthony T. (WF) (FBI)

**Cc:** FBI 19 . (WF) (FBI)                FBI 38 (CD) (FBI)

**Subject:** RE: PE Updates ---

Classification:
================================                 ====================

Preliminary update from FBI 9 ....

They met with the attorney, and FPOTUS came out, greeted them, and made statements about
being transparent and open, then departed.
Agents asked to see where the documents had been stored and were shown the room by the
attorney, who stated FPOTUS consented.
Agents observed the room, quickly counted approximately 50 boxes and the room and boxes
comported to the photo we had.
The documents they were given were in one redweld folder, all of which fits in a courier bag.
They were told that the review for the classified requested in the subpoena was conducted
yesterday and the FPOTUS was consulted and agreed to the return.
There should be more later when the agents return to the RA.

In other news, an attorney for Per. 34 called DOJ separately this morning and mentioned
that people were in the room and going through boxes yesterday, so that appears to match what
occurred.

**From:** FBI 21B (CD) (FBI)
**Sent:** Friday, June 03, 2022 12:01 PM
**To:** FBI 26 . (CD) (FBI)                >; Ronnow, Kurtis (CD) (FBI)
                ; Kohler, Alan E. Jr. (CD) (FBI)                ; Riedlinger,

                                    USA-00940265

Anthony T. (WF) (FBI) ███████████   █ FBI 10 █ (WF) (FBI)
███████ ;
**Cc:** █ FBI 19 █ (WF) (FBI) ███████████████ █ FBI 38 █ (CD) (FBI)
███████████

**Subject:** RE: PE Updates --- ██████████

Classification: ██████████████████
=================                    =====================

Good morning all,

I will be relaying updates from █ FBI 19 █ and █ FBI 10 █ as the day progresses.

11:50am
- ████████████████ is in touch with █ Per. 18 █ directly to ensure proper access for █ Per. 18 █ and our team to MAL
- Team is in rental car and are proceeding to meet location to be led onto MAL.

11:25am
- Flight landed after a further delay mid-flight.

10:25am
- █ FBI 19 █ introduced ████ █ FBI 8 █ and █ F █ 9 █ via email to ████████████ for coordination. ████ did this after confirmation ████ spoke to USSS ██████ ██ USSS escort onto MAL is not required however this was done out of abundance of caution. Additionally, Mr. ████ confirmed FPOTUS will not depart MAL for another 90-120 minutes.
- █ FBI 10 █ notified WFO's OPA rep they have two agents going to MAL, in the chance there's any coverage or questions, even though most likely the inquires would go to MM or HQ first.

9:05AM
- Bratt, █ F. 9 █ and █ FBI 11 █ are wheels up, ETA is 10:47am. Bratt called █ Per. 18 █ to notify him of their delay.

8:20AM
- Jay Bratt, SA █ FBI 9 █ and SA █ FBI 11 █ are now delayed until 0830am for take-off, arriving at 10:50am. From there, they will meet up with MM Agents and make their way to meet Mr. █ Per. 18 █.
- WFO has requested MM conduct loose surveillance on FPOTUS's plane to determine if boxes are loaded onto the plane.

█ FBI 21B █

████████████████
Counterintelligence Division
Global Section |FBIHQ 4848
████████ (desk) | ████████ (cell)

=====================================================

Classification: ███████████████

================   ====================
Classification: ███████████████

================   ====================
Classification: ███████████████

================   ====================
Classification: ███████████████

================   ====================
Classification: ███████████████

================   ====================
Classification: ███████████████

================   ====================
Classification: ███████████████

================   ====================
Classification: ███████████████

Subject to Protective Order

Ex. 53

**From:** ████ FBI 9 (WF) (FBI)
**To:** ████ FBI 14 ████ (WF) (FBI)
**Subject:** FW: PE Updates --- ████
**Date:** Monday, August 01, 2022 10:44:46 AM

████████████████████  =====================

-----------------------
SA ████ FBI 9 ████
WFO ███
██████ Desk
████ Cell
████ Secure

**From:** ████ FBI 19 ████ (WF) (FBI) < ████████ >
**Sent:** Friday, June 03, 2022 3:15 PM
**To:** ████ FBI 21B ████ (CD) (FBI) ████████ >; ████ FBI 10 ████ (WF) (FBI)
████████ ; ████ FBI 26 ████ (CD) (FBI) ████████ ; Ronnow,
Kurtis (CD) (FBI) ████████ ; Kohler, Alan E. Jr. (CD) (FBI)
████████ >; Riedlinger, Anthony T. (WF) (FBI) ████████ >;
████ FBI 33 ████ (OGC) (FBI) ████
**Cc:** ████ FBI 38 ████ (CD) (FBI) ████████ ████ FBI 9 ████ (WF) (FBI)
████████ >; ████ FBI 11 ████ , (WF) (FBI) ████████ >; ████ ,
████ FBI 21A ████ (WF) (FBI) ████████ >
**Subject:** RE: PE Updates --- ████

████████████

================================================
Good Afternoon HQ,

████ The following is the breakdown of classified documents identified in the FBI/WF
Inventory of the redweld folder provided to this morning. These numbers represent word and large-
print documents, such as maps and graphics.

- (17) Top Secret documents, totaling (22) pages
- (16) Secret documents, totaling (23) pages
- (5) Confidential documents, totaling (6) pages

████ **Classified Totals:** (38) documents, (51) pages

- (11) unclassified/unmarked documents, totaling (20) pages

████ **Unclassified Totals**: (11) documents, (20) pages



Victim Agencies Identified in this inventory:

Sub-G and other caveats identified in this inventory:

- RSEN (Risk Sensitive)
- 
- 

Separately, the FISUR conducted by FBI MM this afternoon did not yield any evidence of large scale box movement at or around the aircraft headed to Bedminster, NJ.

FBI MM and FBI WF have made aware their Offices of Public Affairs with respect to this morning's interaction with persons associated with Mar-a-Lago. The FBI Case Team is documenting their operational activity and hope to board a return flight at 7pm this evening, weather permitting. Arrangements for proper transport of classified materials are in place. USSS and FBI MM were great partners.

Thank you, standing by for questions.

19

-----Original Message-----
From: **FBI 21B** (CD) (FBI) <
Sent: Friday, June 03, 2022 2:00 PM
To: **FBI 10** (WF) (FBI)                          ; **FBI 26**          (CD) (FBI)
<                          >; Ronnow, Kurtis (CD) (FBI) <                          Kohler, Alan E. Jr. (CD) (FBI) <                          ; Riedlinger, Anthony T. (WF) (FBI)
<                          >; **FBI 33**          (OGC) (FBI) <                          >
Cc: **FBI 19**          (WF) (FBI) <                          >; **FBI 38**          (CD) (FBI)
<
Subject: RE: PE Updates ---

=======================================================

Good afternoon all,

I will be relaying updates from ███ FB█ 19 ███ and ███ FBI 10 ███ as the day progresses.

1:50pm

· Due to safety concerns in the MM AOR related to an inbound tropical storm, no afternoon call will be held.  WFO will continue to update.

1:20pm

· Document inventory/review started by WFO Team at WPBRA/SCIF at 1:17pm

12:50pm

Preliminary update from SA ██ F. 9 ██.... Via ███ FBI 10 ███ last email

· They met with the attorney, and FPOTUS came out, greeted them, and made statements about being transparent and open, then departed.

· Agents asked to see where the documents had been stored and were shown the room by the attorney, who stated FPOTUS consented.

· Agents observed the room, quickly counted approximately 50 boxes and the room and boxes comported to the photo we had.

· The documents they were given were in one redweld folder, all of which fits in a courier bag.

· They were told that the review for the classified requested in the subpoena was conducted yesterday and the FPOTUS was consulted and agreed to the return.

· There should be more later when the agents return to the RA.

Subject to Protective Order

·   In other news, an attorney for ███Per. 34███ called DOJ separately this morning and mentioned that people were in the room and going through boxes yesterday, so that appears to match what occurred.

11:50am

·   ████████████████████████ is in touch with ██Per. 18██ directly to ensure proper access for ██Per. 18██ and our team to MAL

·   Team is in rental car and are proceeding to meet location to be led onto MAL.

11:25am

·   Flight landed after a further delay mid-flight.

10:25am

·   ██FBI 19██ introduced ██FBI 8██ and ██FBI 9██ via email to ████████████████ ████ for coordination.  She did this after confirmation ████ spoke to USSS ████████ ████.  USSS escort onto MAL is not required however this was done out of abundance of caution.  Additionally, Mr.████ confirmed FPOTUS will not depart MAL for another 90-120 minutes.

·   ██FBI 10██ notified WFO's OPA rep they have two agents going to MAL, in the chance there's any coverage or questions, even though most likely the inquires would go to MM or HQ first.

9:05AM

·   Bratt ██F. 9██ and ██FBI 11██ are wheels up, ETA is 10:47am.  Bratt called ██Per. 18██ to notify him of their delay.

8:20AM

USA-00940956

· Jay Bratt, ▉FBI 9▉ and ▉FBI 11▉ are now delayed until 0830am for take-off, arriving at 10:50am. From there, they will meet up with MM Agents and make their way to meet Mr. ▉Per. 18▉.

· WFO has requested MM conduct loose surveillance on FPOTUS's plane to determine if boxes are loaded onto the plane.

**FBI 21B**

▉▉▉▉▉▉▉▉

Counterintelligence Division

Global Section |FBIHQ 4848

▉▉▉ (desk) | ▉▉▉ (cell)

=====================================================
▉▉▉▉▉▉▉▉

=====================================================
▉▉▉▉▉▉▉▉

=====================================================
▉▉▉▉▉▉▉▉

=====================================================
▉▉▉▉▉▉▉▉

=====================================================
▉▉▉▉▉▉▉▉

Subject to Protective Order

Subject to Protective Order

USA-00940958

Ex. 54

UNCLASSIFIED//FOR OFFICIAL USE ONLY



**U.S. Department of Justice**

Federal Bureau of Investigation

In Reply, Please Refer to LHM: CDIIU-0033-23

VIA SECURE EMAIL

November 22, 2022

To:  Gary M. Stern
     General Counsel
     National Archives and Records Administration

From:  FBI 35

     Counterintelligence Division
     Federal Bureau of Investigation

Subj: (U//FOUO) Federal Bureau of Investigation (FBI) Request for Information (RFI)

(U//FOUO) RESTRICTIONS ON USE: This Letterhead Memorandum contains sensitive investigative information. It should be handled with particular attention to compartmentation and need-to-know. To avoid possible compromise of the relevant investigation, and to protect other important Executive Branch interests, any action taken in response to the information below or with respect to the documents referenced in this letter – and in particular any consideration of providing the information or documents outside the Executive Branch – should be coordinated in advance with the Federal Bureau of Investigation.

(U//FOUO) The Federal Bureau of Investigation (FBI) Washington Field Office (WFO) respectfully requests the assistance from the National Archives and Records Administration (NARA) to provide the FBI access to the following information:

**This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.**

Page **1** of **2**

Classified By: █████████
Derived From: FBI NSICG
Declassify On: 20471231

UNCLASSIFIED//FOR OFFICAL USE ONLY

USA-01285284

UNCLASSIFIED//FOR OFFICAL USE ONLY

- All records or information demonstrating a declassification decision by the 45th Presidential Administration
- Initial and periodic training for handling classified information for all White House personnel during the 45th Presidential Administration
- Signed classified non-disclosure agreements for all White House personnel during the 45th Presidential Administration
- Initial and periodic PRA training records for all White House personnel during the 45th Presidential Administration

(U//FOUO) The information being sought by the FBI is related to the referral from NARA sent to the Department of Justice (DOJ) in February referencing presidential records.

(U//FOUO) The FBI appreciates NARA's assistance in this matter. The FBI Counterintelligence Division point of contact for this matter is ███ FBI 30 ███████ ████████ ███ ████████ The FBI Washington Field Office points of contact are Assistant Special Agent in Charge ██ FBI 10 ███████ ████████ and ██ FBI 19 ████ ███████████

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Page **2** of **2**

UNCLASSIFIED//FOR OFFICAL USE ONLY

Subject to Protective Order

Ex. 55

FD-1057 (Rev. 5-8-10)

## FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** ▮▮▮▮ Conference between US Department of Justice and National Archives and Records Administration          **Date:** 01/30/2023

**CC:** FBI 21 A
FBI 9

**From:** WASHINGTON FIELD

**Contact:** FBI 2 ,

**Approved By:** FBI 19

**Drafted By:** FBI 2

**Case ID #:** ▮▮▮▮▮▮   Grand Jury subfile

**Synopsis:** ▮▮▮▮ The purpose of this EC is to document a 26 January 2023 conference call between US DOJ and US NARA attorneys.

**Reference:** ▮▮ WF-3560824-302 Serial 10

**Details:**

(U//LES)  On 26 January 2023, United States (US) Department of Justice (DOJ) Chief of Counterintelligence and Export Control Section (CES) Jay Bratt, and Deputy Chief of DOJ CES, Julie Edelstein, hosted a conference call with US National Archives and Records Administration (NARA) General Counsel, Gary STERN, via a video-teleconference (VTC) capable application.  Also present during the conference was FBI Special Agent (SA) FBI 2  and acting Director of NARA's ▮▮▮▮

Title: ███████████ Conference between US Department of Justice and
National Archives and Records Administration
Re: ███████████████, 01/30/2023

Division, ███████████████.

(U//LES)  The conference centered on NARA's process and compliance with
Federal Grand Jury Subpoena #42-64 (GJS42-64); specifically, GJS42-64's
scope, timeline, and notification process.

(U//LES)  Also discussed were compliance considerations borne of NARA's
statutory obligations under the Presidential Records Act (PRA); Federal
record-keeping stipulations; NARA's accommodation processes; and the
volume, classification, and diversity of sources as applied to various
requests outlined in GJS42-64's Attachment A.

███████████  Lastly, STERN planned to confirm for DOJ the method by which
applicable records covered by GJS42-64 bearing classification markings
were segregated from those with no such markings.

◆◆

Subject to Protective Order                                    USA-00941292

Ex. 56



Jack Smith
Special Counsel

_950 Pennsylvania Avenue, N.W._
_Washington, D.C. 20530_

February 13, 2023

**By Email**

Gary M. Stern
General Counsel
National Archives and Records Administration

  **Re: Grand Jury Subpoena**

Dear Mr. Stern:

  This is to confirm our prior phone conversations in which we agreed to narrow Request Number 8 in the January 23, 2023 grand jury subpoena to require production only of the original documents with classification markings that were in the fifteen boxes that former President Trump provided to NARA on January 17, 2022. We further agreed that, at the conclusion of this matter, we will return the originals to NARA. If at any point beforehand there is some subset of these documents we are able to return, we will do so. Please advise who the point of contact is for the FBI to collect these materials.

  In addition, we agreed that, for purposes of Request Number 10, the date range for responsive items begins on August 25, 2022.

  Please let me know if you have any questions.

       Sincerely,

       JACK SMITH
       Special Counsel

By: _Jay I. Bratt_
   Jay I. Bratt
   Counselor to the Special Counsel

Ex. 57

- 1 of 2 -

FD-302 (Rev. 5-8-10)



UNCLASSIFIED//FOUO

FEDERAL BUREAU OF INVESTIGATION

Date of entry     05/07/2023

**DOCUMENT RESTRICTED TO CASE PARTICIPANTS**

This document contains information that is restricted to case participants.

**FEDERAL GRAND JURY INFORMATION**

This document contains Federal Grand Jury information and would reveal the strategy or direction of the investigation, the nature of the evidence produced before the grand jury, the views expressed by members of the grand jury, or any other matters which have occurred, which are occurring, or which are likely to occur before the grand jury. The information may not be disclosed, within or outside the FBI, except, as provided for in Federal Rule of Criminal Procedure 6(e)(3): (1) to an attorney for the government for use in performing that attorney's duty, or, at the direction of an attorney for the government; (2) to any government personnel — including those of a state, state subdivision, Indian tribe, or foreign government — that an attorney for the government considers necessary to assist in performing that attorney's duty to enforce federal criminal law; (3) to an attorney for the government for the use in enforcing 12 U.S.C. § 1833a or any civil forfeiture provision of Federal law; (4) to another federal grand jury; (5) pursuant to Rule 6(e)(3)(D) (regarding the disclosure of foreign intelligence, counterintelligence, or foreign intelligence information); (6) or as authorized by the court.

On May 4, 2023, Federal Bureau of Investigation Special Agent (SA) ███████ FBI 40 , SA ███ FBI 7 ███████, Department of Justice (DOJ) Assistant Special Counsel (ASC) Jay Bratt, and ASC David Raskin, met with National Archives and Records Administration (NARA) General Counsel Gary Stern at NARA, 700 Pennsylvania Ave. NW, Washington, D.C. 20408.

Stern provided approximately 81 unclassified documents responsive to Grand Jury Subpoena 42-0064, which referenced declassification. Upon further review, 15 documents were flagged of interest for potential production by NARA to DOJ. No documents were removed from NARA's building on May 4, 2023. Stern will provide copies of the 15 flagged documents by early week of May 8, 2023.

Bratt, Raskin, and Stern discussed multiple legal options relating to potential additional NARA records, that would ensure proper protocol and

UNCLASSIFIED//FOUO

| | | | |
|---|---|---|---|
| Investigation on | 05/04/2023 | at | Washington, District Of Columbia, United States (In Person) |

File # ████████████                                                    Date drafted  05/05/2023

by   FBI 40, FBI 7 ████████████

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Subject to Protective Order                                                      USA-00943085

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of (U//FOUO) Meeting with Gary Stern, NARA , On 05/04/2023 , Page 2 of 2

lead to timely production of the documents in question.

UNCLASSIFIED//FOUO

Subject to Protective Order

Ex. 58

Gary Stern
D Raskin
J. Bratt

FBI 7
FBI 40

document
NARA review.

- 81 docs Privilege concern    unclass
- 
- regarding mention of declassification

- 19 docs already in DOJ/FBI possesion
   Durham Inv.
   Crossfire Hurricane

- Discussion Gary Stern + Jay Bratt on the procedures
   if priv. is asserted
   - GJ vs normal process
   i.e. Motion to compell

- number declass
                          NARA
                          GJ
   15/81 flagged for use/production

Tory
· Reps Jim Trusty, Evan Corcoran

Ex. 59

**Department of Energy**

Washington, DC 20585

CUI / PII

MEMORANDUM

TO:         ██ Per. 51 ██
            ████████

            OFFICE OF ENVIRONMENT, HEALTH, SAFETY AND
            SECURITY

FROM:       ██ Per. 50 ██          ████  Digitally signed by
            ████████████████  ████        Per. 50
                                          Date: 2023.06.28
            OFFICE OF THE GENERAL COUNSEL 10:16:16 -04'00'

            ████████████████

SUBJECT:    Review of Q Clearance Access Granted under Section 145 b. of
            the Atomic Energy Act, 42 U.S.C. § 2165

By this memorandum, the Office of General Counsel advises you that, as a matter of law, the Q clearance granted to Donald J. Trump on February 9, 2017, terminated, by the conditions of the original grant, upon completion of Mr. Trump's term as President of the United States at 12:00 PM on January 20, 2021. As such, any current entry in the Department of Energy's Central Personnel Clearance Index (CPCI) and the Clearance Action Tracking System (CATS), reflecting an active Q clearance for Mr. Trump, based upon the February 9, 2017, authorization must be immediately amended. These systems must be promptly modified to reflect the terminated status of Mr. Trump's Q clearance.

Information provided by the Office of Environment, Health, Safety and Security (EHSS) and documents reviewed by the Office of General Counsel, together, present the following facts: Mr. Trump was granted a Q clearance pursuant to a February 9, 2017, memorandum from the then current Associate Undersecretary for Environment, Health, Safety and Security to the Director of Office of Headquarters Security Operations. *See, Memorandum attached.* Pursuant to REDELEGATION ORDER NO. 00-002.18, Section 1.7 August 14, 2014, the Associate Undersecretary at the time had been delegated "all authorities vested in the Secretary under Section 145 of the Atomic Energy Act of 1954, as amended, including the authority to make determinations pursuant to Section 145 b. permitting an individual access to Restricted Data prior to completion of the background investigation required by Section 145 b., if such access is clearly consistent with the national interest." On February 9, 2017, the CPCI and CATS systems were updated to reflect the fact that Mr. Trump had been granted a Q clearance pursuant to Section 145 b.

CUI / PII

USA-01116848

CUI / PII

of the Atomic Energy Act, 42 U.S.C. 2165. Since that date, the CPCI and CATS entries have not been further updated or amended with respect to Mr. Trump's Q clearance.

Upon examination, the Office of General Counsel has determined that the grant of the clearance, as provided in the February 9, 2017, memorandum was made explicitly upon the basis that Mr. Trump was to "be authorized access to such Restricted Data (RD) as may be required in connection *with his current duties.*" *See, February 9, 2017, memorandum (emphasis added).* Additionally, the determination that such a grant was clearly consistent with the national interest, as required by Section 145.b. of the Atomic Energy Act, that supported the February 9, 2017, memorandum granting access explicitly states, "Under the provisions of Section 145.b. of the Atomic Energy Act of 1954, as amended, determination is made that granting access to such Restricted Data as may be required by Donald J. Trump *in connection with his duties as President of the United States* is clearly consistent with the national interest." *See, February 9, 2017, Determination attachment to February 9, 2017, memorandum (emphasis added).*

Based on these facts, the Office of General Counsel advises that the original grant of access, and the statutorily required determination that such grant be clearly consistent with the national interest, was based solely upon, and limited to, Mr. Trump's need to conduct his duties as President of the United States. Those duties ceased on January 20, 2021, at the conclusion of his term as President of the United States. When those duties ceased, the determination pursuant to Section 145 b. of the Atomic Energy Act, and the terms of the February 9, 2017 grant, no longer remained effective. Because Mr. Trump's Q clearance was based solely on this authorization, and the authorization was based solely on the individual serving in the position at the time, at the end of Mr. Trump's term, the basis for Mr. Trump's Q clearance no longer applied and therefore required that this clearance be terminated.

Please amend CATS and CPCI entries in accordance with the advice provided in this memorandum. You may include this memorandum in the personnel security file.

If you have any questions concerning this action, please contact me.

Attachment

CUI / PII

Subject to Protective Order



## Department of Energy
### Washington, DC 20585

FEB 0 9 2017

MEMORANDUM FOR    **Per. 32**

OFFICE OF HEADQUARTERS SECURITY OPERATIONS
OFFICE OF ENVIRONMENT, HEALTH, SAFETY AND
SECURITY

FROM:    **Per. 28**
ASSOCIATE UNDER SECRETARY FOR

SUBJECT:    Access to Restricted Data for President Donald J. Trump

The Office of Environment, Health, Safety and Security is requesting that Donald J. Trump be authorized access to Restricted Data in connection with his duties as President of the United States.

Pursuant to Section 145.b. of the Atomic Energy Act of 1954, as amended, President Trump may be authorized access to such Restricted Data as may be required in connection with his current duties. The access authorization approved under Section 145.b. precludes the conduct of a background investigation for elected officials in this case.

The attached determination is forwarded for your decision. Please return this memorandum and attachment to this office for further processing subsequent to your decision.

Attachment

---

**OFFICIAL USE ONLY**

<u>May</u> be exempt from public release under the Freedom of Information Act (5 U.S.C. 552), exemption number and category: <u>7, Law Enforcement</u>
Department of Energy review required before public release
Name/Org: **Per. 32** , AU-40   Date: February 9, 2017
Guidance (if applicable): _____

---

OFFICIAL USE ONLY

Subject to Protective Order

USA-01116850

**DETERMINATION**

Under the provisions of Section 145.b. of the Atomic Energy Act of 1954, as amended, determination is made that granting access to such Restricted Data as may be required by Donald J. Trump in connection with his duties as President of the United States is clearly consistent with the national interest.

APPROVED:     Per. 32

DISAPPROVED:     _____

DATE:     FEBRUARY 09, 2017

OFFICIAL USE ONLY

Ex. 60

FD-1036 (Rev. 10-16-2009)

UNCLASSIFIED//FOUO

OFFICIAL RECORD

# FEDERAL BUREAU OF INVESTIGATION

### Import Form

**Form Type:** OTHER - Other        **Date:** 06/15/2023

**Title:** (U) Negative Scattered Castles Check

**Approved By:** SSA ███ FBI 19 ██

**Drafted By:** FBI 9 ███

**Case ID #** ███████████ (U//FOUO) UNCLASSIFIED ANALYSIS

**Synopsis:** (U) The SCATTERED CASTLES check run on 6/14/2023 for Former President Donald J. Trump was negative. The negative result is Unclassified//For Official Use Only.

♦♦

UNCLASSIFIED//FOUO

Ex. 61

FD-302 (Rev. 5-8-10)



UNCLASSIFIED//LES

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry _____04/10/2023_____

(U) On March 31, 2023 Federal Bureau of Investigation (FBI) Washington Field Office (WFO) Special Agent (SA) ▉▉FBI 9▉▉ and SA ▉▉▉▉ ▉▉FBI 29▉▉ participated in an interview of ▉▉Per. 46▉▉, date of birth ▉▉▉▉▉, ▉▉▉, social security account number ▉▉▉▉▉▉. Present for the interview were Counsel to the Special Counsel Jay Bratt, White House Counsel ▉▉▉▉, and White House Counsel ▉▉▉▉. ▉▉Per. 46▉▉ was advised of the identities of the interviewing attorney and agents, and the voluntary nature of the interview. ▉▉Per. 46▉▉ was provided a Title 18 U.S.C. 1001 warning. After acknowledging her understanding of the same, ▉▉Per. 46▉▉ provided the following information:

(U) Since ▉▉▉▉, ▉▉Per. 46▉▉ has served as ▉▉▉▉▉▉▉▉▉▉▉▉▉▉. ▉▉Per. 46▉▉ previously served ▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉. ▉▉Per. 46▉▉ attained this position after qualifying as a ▉▉▉▉▉▉▉▉▉▉▉▉. ▉▉Per. 46▉▉ first ▉▉▉▉▉▉▉▉▉ in ▉▉▉.

(U) ▉▉Per. 46▉▉ is very familiar with the requirements for handling, storing, and transmitting classified information. ▉▉Per. 46▉▉' training and experience has included ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.

(U)                      Per. 46
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. Despite initial expectations that Trump Tower would be the primary Second Residence, FPOTUS did not spend much time there. FPOTUS spent far more time at his Bedminster and Mar-a-Lago residences. ▉▉Per. 46▉▉ traveled frequently to Mar-a-Lago during this time to perform ▉▉▉ duties.

(U) ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. For permanent locations such as Bedminster, Trump Tower, and Mar-a-Lago, this involved the semi-permanent installation of communications infrastructure such as secure Internet and telephone

UNCLASSIFIED//LES

| | | |
|---|---|---|
| Investigation on | 03/31/2023 at | Washington, District Of Columbia, United States (In Person) |
| File # | ▉▉▉▉▉▉▉▉▉▉▉▉ | Date drafted 03/31/2023 |
| by | ▉▉FBI 9▉▉   ▉▉FBI 29▉▉ ▉▉▉▉ | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//LES

Continuation of FD-302 of (U//FOUO) Interview of ███ Per. ███ 46 ███ , On 03/31/2023 , Page 2 of 5

lines. This infrastructure remained in place in these locations throughout the President's term, whether or not the President was physically at the location. The actual communications assets themselves, such as the secure phones, shredders, and safes, were only installed when the President travelled to the location. Once the visit was over, the communications assets would be unplugged and secured.



### (U) Mar-a-Lago

(U) Temporary secure spaces were frequently used at Mar-a-Lago as there was no permanent SCIF at Mar-a-Lago proper. Outside of the Mar-a-Lago property, on the residential street adjacent to Mar-a-Lago, were two houses that were rented by the General Services Administration (GSA) and designated as support houses. The first was the White House Military Office (WHMO) House, which was occupied by the Military Emergency Action Team. The WHMO House did not have a SCIF but secure phones were installed during each Presidential visit to Mar-a-Lago. The ███████████, which was a few doors down from the WHMO House, did have an accredited SCIF and was used to securely store communications assets between visits. The assets, including secure phones, shredders, and safes, were all moved into a locked and alarmed security cage at the conclusion of a visit.

(U) Per. 46 could not recall the addresses of the two support houses but believed she could located that information. Access to the two support houses was controlled by two security check points on the road. It was necessary to establish the WHMO and ████ support houses off of Mar-a-Lago property as there had to be separation between the military's operations and the private residence.

UNCLASSIFIED//LES

Subject to Protective Order

USA-00819430

UNCLASSIFIED//LES

Continuation of FD-302 of (U//FOUO) Interview of **Per.** **46** , On 03/31/2023 , Page 3 of 5

(U) At the conclusion of every visit, the site was cleared of all secure communications assets and classified materials. If any classified materials were found they would have been brought back to Washington, DC and provided to the military aides. **Per. 46** could not recall classified materials ever having been found at one of FPOTUS' residences. **Per. 46** explained would conduct a "plain-sight" search for any assets or materials. They might open a folder on a desk, but they would not open drawers or boxes. **Per. 46** recalled opening one folder on a desk and finding a profile for a potential new hire.

(U) **Per. 46** was not aware of any other locations at Mar-a-Lago that were authorized to host classified discussions and/or store classified information. At the conclusion of FPOTUS' administration, all equipment and infrastructure lines were removed from Mar-a-Lago. The uninstallation began on or about January 1, 2021 and was complete by January 20, 2021. **Per. 46** is not aware of any locations at Mar-a-Lago that are currently authorized to discuss or store classified information. **Per. 46** is also not aware of any asks from FPOTUS to establish such locations post-Presidency.

(U) **Per. 46** was last at Mar-a-Lago during Christmas 2020 and New Year's 2021.

**(U) Bedminster**



UNCLASSIFIED//LES

Subject to Protective Order

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//LES

████████████████████

Continuation of FD-302 of  (U//FOUO) Interview of ███ ▮ 46          . On 03/31/2023 . Page  4 of 5

(U) Similar to Mar-a-Lago, all secure assets were stored in a locked and armed cage at the conclusion of the site visit. At the end of the administration all secure assets and infrastructure lines were uninstalled by January 20, 2021.

### (U) Trump Tower

(U) FPOTUS' residence at Trump Tower is located on the ████ Floor. Upon exiting the elevator, FPOTUS' residence could be found by █████████████ ████████████████. On the same floor, left of the residence, was a private apartment that was rented for use by the █████████████████ █████████. Secure infrastructure lines were installed in both FPOTUS' residence and the ████ apartment. The USSS installed an Operations Center ████████████████████. The USSS point of contact in New York was █████████████.

(U) There was no SCIF at Trump Tower, but tents were used to establish temporary secure spaces and there were shredders and safes. Counter-measures would be executed at FPOTUS' residence if there was classified information FPOTUS wanted to review or discuss. Secure phones were brought in for classified calls.

(U) All secure assets were stored in a locked and armed cage at the conclusion of each site visit. At the end of the administration all secure assets and infrastructure lines were uninstalled by January 20, 2021.

(U) None of the three second residences - Mar-a-Lago, Bedminster, or Trump Tower - were authorized for the storage of classified information when FPOTUS was not there.

### (U) Other Locations

(U) Per. 46 was not aware of any other FPOTUS properties, such as Scotland, having SCIFs or permanent secure infrastructure.

(U) For all other trips, ████ would contract the installation of the secure infrastructure lines and then bring all the secure assets. For CONUS trips ████ would start the contracted installs approximately one week prior, and for OCONUS trips, approximately two weeks prior. Per. 46 referred to ████'s function on OCONUS trips as a "geek squad" and a "moving company." For OCONUS trips ████ would rely on mission partners and all offices would be set up in █████████████.

(U) Per. 46 could not recall seeing boxes at any of FPOTUS' second

UNCLASSIFIED//LES

Subject to Protective Order                                                          USA-00819432

FD-302a (Rev. 5-8-10)

UNCLASSIFIED//LES

Continuation of FD-302 of (U//FOUO) Interview of ██ Per. ██ 46 ██ , On 03/31/2023 , Page 5 of 5

residences. Per. 46 described FPOTUS as being "very neat" and "meticulous." Per. 46 was not involved with the pack-out from the White House at the end of FPOTUS' administration as she was stationed in New Jersey during this time.

The original agent notes and a copy of the interview preparation materials will be maintained in the attached physical 1A.

UNCLASSIFIED//LES

Subject to Protective Order

USA-00819433

Ex. 62

# Garland Faces Growing Pressure as Jan. 6 Investigation Widens

The inquiry is a test for President Biden and Attorney General Merrick B. Garland, who both came into office promising to restore the Justice Department's independence.

  

By Katie Benner, Katie Rogers and Michael S. Schmidt

April 2, 2022

WASHINGTON — Immediately after Merrick B. Garland was sworn in as attorney general in March of last year, he summoned top Justice Department officials and the F.B.I. director to his office. He wanted a detailed briefing on the case that will, in all likelihood, come to define his legacy: the Jan. 6 assault on the Capitol.

Even though hundreds of people had already been charged, Mr. Garland asked to go over the indictments in detail, according to two people familiar with the meeting. What were the charges? What evidence did they have? How had they built such a sprawling investigation, involving all 50 states, so fast? What was the plan now?

The attorney general's deliberative approach has come to frustrate Democratic allies of the White House and, at times, President Biden himself. As recently as late last year, Mr. Biden confided to his inner circle that he believed former President Donald J. Trump was a threat to democracy and should be prosecuted, according to two people familiar with his comments. And while the president has never communicated his frustrations directly to Mr. Garland, he has said privately that he wanted Mr. Garland to act less like a ponderous judge and more like a prosecutor who is willing to take decisive action over the events of Jan. 6.

Speaking to reporters on Friday, Mr. Garland said that he and the career prosecutors working on the case felt only the pressure "to do the right thing," which meant that they "follow the facts and the law wherever they may lead."

Still, Democrats' increasingly urgent calls for the Justice Department to take more aggressive action highlight the tension between the frenetic demands of politics and the methodical pace of one of the biggest prosecutions in the department's history.

"The Department of Justice must move swiftly," Representative Elaine Luria, Democrat of Virginia and a member of the House committee investigating the riot, said this past week. She and others on the panel want the department to charge Trump allies with contempt for refusing to comply with the committee's subpoenas.

"Attorney General Garland," Ms. Luria said during a committee hearing, "do your job so that we can do ours."

This article is based on interviews with more than a dozen people, including officials in the Biden administration and people with knowledge of the president's thinking, all of whom asked for anonymity to discuss private conversations.

In a statement, Andrew Bates, a White House spokesman, said the president believed that Mr. Garland had "decisively restored" the independence of the Justice Department.

"President Biden is immensely proud of the attorney general's service in this administration and has no role in investigative priorities or decisions," Mr. Bates said.

A Justice Department spokesman declined to comment.

The Jan. 6 investigation is a test not just for Mr. Garland, but for Mr. Biden as well. Both men came into office promising to restore the independence and reputation of a Justice Department that Mr. Trump had tried to weaponize for political gain.

For Mr. Biden, keeping that promise means inviting the ire of supporters who say they will hold the president to the remarks he made on the anniversary of the assault on the Capitol, when he vowed to make sure "the past isn't buried" and said that the people who planned the siege "held a dagger at the throat of America."



President Biden and Mr. Garland are managing a relationship between the White House and the Justice Department unlike any other in American history.   Doug Mills/The New York Times

Complicating matters for Mr. Biden is the fact that his two children are entangled in federal investigations, making it all the more important that he stay out of the Justice Department's affairs or risk being seen as interfering for his own family's gain.

The department is investigating whether Ashley Biden was the victim of pro-Trump political operatives who obtained her diary at a critical moment in the 2020 presidential campaign, and Hunter Biden is under federal investigation for tax avoidance and his international business dealings. Hunter Biden has not been charged with a crime and has said he handled his affairs appropriately.

Justice Department officials do not keep Mr. Biden abreast of any investigation, including those involving his children, several people familiar with the situation said. The cases involving Hunter Biden and Ashley Biden are worked on by career officials, and people close to the president, including Dana Remus, the White House counsel, have no visibility into them, those people said.

Still, the situation crystallizes the delicate ground that Mr. Biden and Mr. Garland are navigating.

When it comes to Jan. 6, Justice Department officials emphasize that their investigation has produced substantial results already, including more than 775 arrests and a charge of seditious conspiracy against the leader of a far-right militia. More than 280 people have been charged with obstructing Congress's duty to certify the election results.

And federal prosecutors have widened the investigation to include a broad range of figures associated with Mr. Trump's attempts to cling to power. According to people familiar with the inquiry, it now encompasses planning for pro-Trump rallies ahead of the riot and the push by some Trump allies to promote slates of fake electors.



The Justice Department's Jan. 6 inquiry has led to more than 775 arrests. More than 280 people have been charged with obstructing Congress's duty to certify the election results.  Erin Schaff/The New York Times

The Justice Department has given no public indication about its timeline or whether prosecutors might be considering a case against Mr. Trump.

The House committee investigating the Jan. 6 attack can send criminal referrals to the Justice Department, but only the department can bring charges. The panel is working with a sense of urgency to build its case ahead of this year's midterm elections, when Republicans could retake the House and dissolve the committee.

Mr. Biden, a longtime creature of the Senate, is aghast that people close to Mr. Trump have defied congressional subpoenas and has told people close to him that he does not understand how they think they can do so, according to two people familiar with his thinking.

Mr. Garland has not changed his approach to criminal prosecutions in order to placate his critics, according to several Justice Department officials who have discussed the matter with him. He is regularly briefed on the Jan. 6 investigation, but he has remained reticent in public.

"The best way to undermine an investigation is to say things out of court," Mr. Garland said on Friday.

Even in private, he relies on a stock phrase: "Rule of law," he says, "means there not be one rule for friends and another for foes."

He did seem to acknowledge Democrats' frustrations in a speech in January, when he reiterated that the department "remains committed to holding all Jan. 6 perpetrators, at any level, accountable under law."

Quiet and reserved, Mr. Garland is well known for the job he was denied: a seat on the Supreme Court. President Barack Obama nominated him in March 2016 after the death of Justice Antonin Scalia, but Senate Republicans blockaded the nomination.

Mr. Garland's peers regard him as a formidable legal mind and a political centrist. After graduating from Harvard Law School, he clerked for a federal appeals court judge and Justice William J. Brennan Jr. of the Supreme Court before becoming a top official in the Justice Department under Attorney General Janet Reno. There, he prosecuted domestic terrorism cases and supervised the federal investigation into the Oklahoma City bombing.

His critics say that his subsequent years as an appeals court judge made him slow and overly deliberative. But his defenders say that he has always carefully considered legal issues, particularly if the stakes were very high — a trait that most likely helped the Justice Department secure a conviction against Timothy J. McVeigh two years after the Oklahoma City attack.

During the presidential transition after the 2020 election, Mr. Biden took his time mulling over candidates to be attorney general, according to a senior member of the transition team. He had promised the American people that he would reestablish the department as an independent arbiter within the government, not the president's partisan brawler.

In meetings, the incoming president and his aides discussed potential models at length: Did Mr. Biden want a strong personality in the job, like Eric H. Holder Jr., who held the post under Mr. Obama? The relatively quick consensus was no.

Did he want someone who would be seen as a political ally? Some in his circle suggested that might be a good model to follow, which is why former Senator Doug Jones of Alabama, a longtime friend of Mr. Biden's, was once on his shortlist.

But in the end, Mr. Biden went with Mr. Garland, who had a reputation for being evenhanded and independent.

Despite Mr. Biden's private frustrations with the attorney general, several people who speak regularly to the president said he had praised Mr. Garland as among the most thoughtful, moral and intelligent people he had dealt with in his career.

The two men did not know each other well when Mr. Biden selected him for the job. Mr. Garland had a closer relationship with Ron Klain, Mr. Biden's chief of staff, than he did with the incoming president.

Mr. Garland is well known for the job he was denied: a seat on the Supreme Court. Kenny Holston for The New York Times

Officials inside the White House and the Justice Department acknowledge that the two men have less contact than some previous presidents and attorneys general, particularly Mr. Trump and his last attorney general, William P. Barr.

Some officials see their limited interactions as an overcorrection on the part of Mr. Garland and argue that he does not need to color so scrupulously within the lines. But it may be the only logical position for Mr. Garland to take, particularly given that both of Mr. Biden's children are involved in active investigations by the Justice Department.

The distance between the two men is a sharp departure from the previous administration, when Mr. Trump would often call Mr. Barr to complain about decisions related to his political allies and enemies. Such calls were a clear violation of the longtime norms governing contact between the White House and the Justice Department.

Mr. Biden, a former chairman of the Senate Judiciary Committee, came to his job as president with a classical, post-Watergate view of the department — that it was not there to be a political appendage.

Still, there is unrelenting pressure from Democrats to hold Mr. Trump and his allies accountable for the violence that unfolded at the Capitol on Jan. 6. While there is no indication that federal prosecutors are close to charging the former president, Mr. Biden and those closest to him understand the legal calculations. What Mr. Garland is confronting is anything but a normal problem, with enormous political stakes ahead of the next presidential election.

There is unrelenting pressure from Democrats to hold former President Donald J. Trump and his allies accountable for the violence that unfolded at the Capitol on Jan. 6.
Audra Melton for The New York Times

Federal prosecutors would have no room for error in building a criminal case against Mr. Trump, experts say, given the high burden of proof they must meet and the likelihood of any decision being appealed.

A criminal investigation in Manhattan that examined Mr. Trump's business dealings imploded this year, underscoring the risks and challenges that come with trying to indict the former president. The new district attorney there, Alvin Bragg, would not let his prosecutors present a grand jury with evidence that they felt proved Mr. Trump knowingly falsified the value of his assets for undue financial gain.

One of the outside lawyers who oversaw the case and resigned in protest wrote in a letter to Mr. Bragg that his decision was "a grave failure of justice," even if he feared that the district attorney's office could lose.

At times, Mr. Biden cannot help but get drawn into the discourse over the Justice Department, despite his stated commitment to stay away.

In October, he told reporters that he thought those who defied subpoenas from the House committee investigating the Jan. 6 attack should be prosecuted.

"I hope that the committee goes after them and holds them accountable criminally," Mr. Biden said. When asked whether the Justice Department should prosecute them, he replied, "I do, yes."

The president's words prompted a swift statement from the agency: "The Department of Justice will make its own independent decisions in all prosecutions based solely on the facts and the law. Period. Full stop."

**Katie Benner** covers the Justice Department. She was part of a team that won a Pulitzer Prize in 2018 for public service for reporting on workplace sexual harassment issues. More about Katie Benner

**Katie Rogers** is a White House correspondent, covering life in the Biden administration, Washington culture and domestic policy. She joined The Times in 2014. More about Katie Rogers

**Michael S. Schmidt** is a Washington correspondent covering national security and federal investigations. He was part of two teams that won Pulitzer Prizes in 2018 — one for reporting on workplace sexual harassment and the other for coverage of President Trump and his campaign's ties to Russia. More about Michael S. Schmidt

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Pressure on Garland as Jan. 6 Inquiry Expands

Ex. 63

ONE HUNDRED EIGHTEENTH CONGRESS

# Congress of the United States
## House of Representatives

COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–6906
judiciary.house.gov

January 12, 2024

Mr. Nathan J. Wade, Esq.
Nathan J. Wade, P.C. Attorney at Law
d/b/a Wade & Campbell Firm
1827 Powers Ferry Road
Building 25, Suite 100
Atlanta, GA 30339

Dear Mr. Wade:

The Committee on the Judiciary continues to conduct oversight of politically motivated prosecutions by state and local officials. Based on recent reports, we believe that you possess documents and information about the coordination of the Fulton County District Attorney's Office (FCDAO) with other politically motivated investigations and prosecutions and the potential misuse of federal funds. Accordingly, we ask for your cooperation with our oversight.

On August 14, 2023, with your assistance, Fulton County District Attorney Fani T. Willis indicted a former President of the United States and current declared candidate for that office.[1] According to a recent court filing, you have been paid more than $650,000—at the rate of $250 per hour—to serve as an "Attorney Consultant" and later a "Special Assistant District Attorney" in the unprecedented investigation and prosecution of the former President and other former federal officials.[2] This filing also alleges that while receiving a substantial amount of money from Fulton County, you spent extravagantly on lavish vacations with your boss, Ms. Willis.[3]

Although Ms. Willis has so far refused to cooperate with our oversight of the FCDAO's coordination with other politically motivated prosecutions, invoices that you submitted for payment by the FCDAO, and made public as part of this court filing, highlight this collusion. This new information appears to substantiate our concerns that Ms. Willis's politicized

---

[1] Indictment, *Georgia v. Donald John Trump, et al.*, No. 23SC188947 (Aug. 14, 2023, Fulton Co. Sup. Ct.).

[2] Defendant Michael Roman's Motion to Dismiss Grand Jury Indictment as Fatally Defective and Motion to Disqualify the District Attorney, Her Office and the Special Prosecutor from Further Prosecuting this Matter at 11, *Georgia v. Donald John Trump, et al.*, No. 23SC188947 (Jan. 8, 2024, Fulton Co. Sup. Ct.) ("Roman Motion").

[3] *Id.* at 26-27.

Mr. Nathan J. Wade, Esq.
January 12, 2024
Page 2

prosecution, including the decision to convene a special purpose grand jury, was aided by partisan Democrats in Washington, D.C.[4] For example:

- In April 2022, you billed $6,000 for 24 hours of "[t]eam meeting; Conf w/Jan 6; Research legal issues to prep intev" from April 18 to 22.[5]

- In May 2022, you billed $2,000 for eight hours of "travel to Athens; conf. with White House Counsel" on May 23, 2022.[6]

- In that same invoice, you billed another $2,000 for eight hours of "team meeting; Conf w/Jan 6; SPGJ witness prep" on May 31, 2022.[7]

- In September 2022, you billed $6,000 for 24 hours of "[w]itness [i]nterviews; conf call DC; team meeting" from September 7 to 9.[8]

- In November 2022, you billed $2,000 for eight hours of "Jan 6 meeting and Atty conf." on November 16.[9]

- In that same invoice, you billed another $2,000 for eight hours of "[i]nterview with DC/White House" on November 18.[10]

The FCDAO reportedly compensated you using a concoction of comingled funds, including monies confiscated or seized by the FCDAO and monies directed from Fulton County's "general" fund.[11] The Committee has information that the FCDAO received approximately $14.6 million in grant funds from the Department of Justice between 2020 and 2023[12] and, given the enormous legal fees you have billed to the FCDAO, there are open questions about whether federal funds were used by the FCDAO to finance your prosecution. In fact, on one day—November 5, 2021—you billed taxpayers for 24 hours of legal work, attesting that you worked all day and night without break on a politically motivated prosecution.

A recent news report corroborates your coordination with partisan Democrats, explaining that you and FCDAO staff "quietly met" with the partisan January 6 Committee, which allowed

---

[4] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Dist. Att'y Fani T. Willis, Fulton Co. Dist. Att'y's Off. (Dec. 5, 2023) ("December Letter").

[5] *Id.* at Ex. F (invoice #6).

[6] *See id.* at Ex. F (invoice #8); Josh Boswell, *Invoices from lawyer 'lover' hired by Fani Willis to prosecute Donald Trump in election interference case show he had TWO 8-hour meetings with the Biden White House counsel*, DAILYMAIL.COM (Jan. 9, 2024).

[7] Roman Motion, *supra* note 2, Ex. F (invoice #8).

[8] *Id.* at Ex. F (invoice #12).

[9] *Id.* at Ex. H (invoice #14).

[10] *See* Roman Motion at Ex. F, Boswell, *supra* note 6.

[11] Roman Motion at 13-16.

[12] Letter from Fani T. Willis to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary at Ex. E (Sept. 7, 2023).

Mr. Nathan J. Wade, Esq.
January 12, 2024
Page 3

you to review information they had gathered.[13] *Politico* reported that the partisan January 6 Committee provided Ms. Willis's prosecution a "boost" as she prepared to convene a special grand jury and even "helped prosecutors prepare for interviews with key witnesses."[14] The same article suggests that the partisan January 6 Committee provided you access to records it withheld from other law-enforcement entities and even other Members of Congress.[15]



The Committee has serious concerns about the degree of improper coordination among politicized actors—including the Biden White House—to investigate and prosecute President Biden's chief political opponent. This new information released recently only reinforces the Committee's concerns about politically motivated prosecutions by state and local officials. To advance our oversight, we ask that you please produce the following documents and information for the period of November 1, 2021, to the present:

---

[13] Betsy Woodruff, et al., *Jan. 6 committee helped guide early days of Georgia Trump probe*, Politico (Jan. 10, 2024).
[14] *Id.*
[15] *Id.*

Mr. Nathan J. Wade, Esq.
January 12, 2024
Page 4

1. All documents and communications in your possession between or among the Fulton County District Attorney's Office, including yourself, and the U.S. Department of Justice and its components, including but not limited to Special Counsel Jack Smith, referring or relating to the Fulton County District Attorney's Office's investigation of President Trump;

2. All documents and communications in your possession between or among the Fulton County District Attorney's Office, including yourself, and the Executive Office of the President, including but not limited to the White House Counsel's Office, referring or relating to the Fulton County District Attorney's Office's investigation of President Trump;

3. All documents and communications in your possession between or among the Fulton County District Attorney's Office, including yourself, and the partisan January 6 Select Committee referring or relating to the Fulton County District Attorney's Office's investigation of President Trump;

4. All notes, memoranda, documents, or other material in your possession referring or relating to your meetings, conferences, phone calls, or other interactions with the U.S. Department of Justice, the Executive Office of the President, or the partisan January 6 Select Committee;

5. All invoices, including credit card statements and individualized reimbursement requests, submitted by you or your law partners to the Fulton County District Attorney's Office relating to its investigation of President Trump; and

6. All contracts and financial arrangements between you and the Fulton County District Attorney's Office relating to its investigation of President Trump.

Please provide this information as soon as possible but not later than 10:00 a.m. on January 26, 2024.

Pursuant to Rule X of the Rules of the House of Representatives, the Committee has jurisdiction over criminal justice matters in the United States.[16] If you have any questions about this request, please contact Committee staff at (202) 225-6906. Thank you for your prompt attention to this matter.

Sincerely,

*Jim Jordan*

Jim Jordan
Chairman

---

[16] Rules of the House of Representatives, R. X, 118th Cong. (2023).

Mr. Nathan J. Wade, Esq.
January 12, 2024
Page 5


cc:     The Honorable Jerrold L. Nadler, Ranking Member

Ex. 64

UNCLASSIFIED

January 6, 2021

United States Senate
Select Committee on Intelligence
Washington, DC 20510-6475

RE: SSCI #2020-3029

Dear Acting Chairman Rubio and Vice Chairman Warner,

(U) This letter responds to your letter to me of October 29, 2020, asking for an independent review of possible instances of politicization of intelligence. The letter transmits my findings, which are laid out more fully in the attached report. I am prepared to provide a classified briefing to discuss the findings in more detail.

(U) The United States is in a hyperpartisan state, unlike any in recent memory. The country is divided along political, ideological, and racial lines to the point where civil discourse has become difficult if not impossible. The polarized atmosphere has threatened to undermine the foundations of our Republic, penetrating even into the Intelligence Community. Though, as intelligence professionals, we have the ethical responsibility to remain unbiased and objective in our work, we are human beings and can still feel the pressures from society and our political leaders. Pressures from our political leaders have sometimes placed demands on us that have translated into what might seem like bias or a loss of objectivity. In most cases, what we see is the entire system responding to and resisting pressures from outside, rather than attempts to politicize intelligence by our leaders or analysts.

(U) In this environment, characterized by unintentional loss of objectivity, there have been a few incidents where we documented where individuals, or groups of individuals, taking willful actions that – whatever their motivations – had the effect of politicizing intelligence, hindering objective analysis, or injecting bias into the intelligence process. This report lays out the evidence for these instances.

(U) The bottom-line-up-front answers to your questions are:

(U) **Have ODNI-published products adhered to Analytic Standards?** YES, within the scope of the tradecraft review explained below.

(U) **Have ODNI officials politicized or attempted to politicize intelligence, exercised or attempted to exercise undue influence on the analysis, production, or dissemination process of ODNI-published intelligence products related to election security?** YES, in some cases as documented below.

(U) **Have definitions or analytic tradecraft been altered, misapplied, or applied inconsistently on these products?** YES, in some cases as documented below.

(U) **Has ODNI followed standard procedure for the drafting, editing, approval, and dissemination of analytic products related to election interference?** NO, not in all cases, as documented below.

UNCLASSIFIED

(U) By taking on board this report, the Intelligence Community recognizes where we have not met our responsibilities for objective intelligence. By taking up the recommendations detailed in Appendix I, the Intelligence Community shows that it is already taking steps to correct where we lost our focus on objectivity in the past and will work to ensure that it does not happen again.

Sincerely,

Dr. Barry A. Zulauf,

IC Analytic Ombudsman,

Office of the Director of National Intelligence

## (U)  Independent IC Analytic Ombudsman's on Politicization of Intelligence

### (U) Authorities

(U) As the Intelligence Community (IC) Analytic Ombudsman, IRTPA Section 1020 grants me the authority to counsel, conduct arbitration, offer recommendations, and, as appropriate, initiate inquiries into real or perceived problems of analytic tradecraft or politicization, biased reporting, or lack of objectivity in intelligence analysis. For definitions of these standards, see Annex II.  In his appointment letter to me, DNI Ratcliffe conveyed his personal commitment to the Ombudsman's obligation to provide an independent avenue for analysts to pursue unbiased analysis. Even the perception that intelligence is being politicized can undermine the trust that the American people have placed in the work of the Intelligence Community. Accordingly, what follows is my independent review and recommendations as the IC Analytic Ombudsman.

### (U) Altered, Misapplied or Inconsistent Analytic Tradecraft or Definitions

(U) My review, conducted in response to IC complaints regarding the election threat issue, surfaced a number of examples of altered tradecraft and misapplied or inconsistent definitions. Due to varying collection and insight into hostile state actors' leadership intentions and domestic election influence campaigns, the definitional use of the terms "influence" and "interference" and associated confidence levels are applied differently by the China and Russia analytic communities. A formal definition document, *Lexicon for Russian Influence Efforts (U//FOUO)*, was published by the NIC in June 2017, however there is no parallel document for China, and it seems that the Russia document is not widely known across IC agencies, at least not outside the election threat community. The terms were applied inconsistently across the analytic community. Failing to explain properly these definitions is inconsistent with Tradecraft Standards 1, 2, and 6.

(U)  Given analytic differences in the way Russia and China analysts examined their targets, China analysts appeared hesitant to assess Chinese actions as undue influence or interference. These analysts appeared reluctant to have their analysis on China brought forward because they tended to disagree with the Administration's policies, saying in effect, I don't want our intelligence used to support those policies.  This behavior would constitute a violation of Analytic Standard B:  Independent of Political Considerations (IRTPA Section 1019).  On the other hand, Russia analysts assessed that there was clear and credible evidence of Russian election influence activities.  They said IC management slowing down or not wanting to take their analysis to customers, claiming that it was not well received, frustrated them.  Analysts saw this as suppression of intelligence, bordering on politicization of intelligence from above. At a minimum, it is a violation of the Analytic Standard for Timeliness. ODNI leaders were focusing on presenting intelligence as part of a story arc, highlighting significant trends in a way the customers could consume, rather than reporting each individual item.  The incongruity between leaders' and analysts' perceptions might not have occurred if there had been more consistent and transparent communication about analytic differences.

(U) ODNI officials engaging with policymakers said that these customers did notice the result, particularly differences in the volume, frequency, and confidence levels of the intelligence coming from the China and Russia analytic communities on activities that, from their perspective, were very similar in their potential effects. These differences were not intentional, but a result of different collection and analysis rhythms and interpretations by analysts that do not cross-pollinate between regional issues. Subtle differences in analytic concepts, and their inconsistent application did, therefore, make a difference in how customers consumed the intelligence. Some customers were able to perceive differences in tradecraft and definitions: they asked hard questions, leading to greater scrutiny within the IC as leaders suggested changes in an attempt to make the intelligence more consistent and, in some cases, more palatable to customers. IC leaders were not consistently transparent with the workforce about some of these probably justified changes.

(U) According to interviews with NIC officials, policymakers were probably not aware of the behind-the-scenes machinations of the production and dissemination processes. These foundational analytic shortcomings contributed to instances of, and led to other instances of, at least the perceived politicization of intelligence, needlessly long review times, and differences between analytic conclusions in public statements on the one hand and established IC positions on the other. None of this happened in a vacuum, but the dispute appears to have largely begun with misapplied or inconsistent analytic definitions.

(U) [*Ombudsman Comment: Classified details on this issue can be provided at the request of the committee.*]

### (U) Dissonance between Public Statements and IC Coordinated Assessments

(U) After conducting a thorough review I found several incidents where there were attempts to politicize intelligence. The most egregious example is the talking points provided alongside the written introductory statement delivered by, but not written by, National Counterintelligence and Security Center (NCSC) Director Bill Evanina on 10 March 2020.  Evanina also issued a 24 July ODNI public statement on foreign election interference/influence, and a 7 August press release [for both of which, the intelligence information came from the NIC].  Analysts also referred to statements by the DNI in an 8 October article published in The Hill. These statements left the impression that "the IC thinks…" when, in fact what was stated was actually, according to analysts, a "gross misrepresentation" of established IC views. According to the Director of NCSC, when asked about the IC assessments shared in his March statement and August press release, he said that he assumed they represented coordinated IC views, because NIC and other ODNI officials gave them to him and portrayed them as such. They in fact did not represent fully coordinated IC views, as discussed below.

 (U) The March 10 Talking Points were drafted presumably by ODNI staff, however I was not able to find one individual who admitted to writing them. Most officials say (in the passive voice) "they were drawn from" existing reporting, albeit selectively, and were "shaped by other ODNI officials and the Ambassador [meaning A/DNI Grenell]."  The main drafters were not analysts, which was probably a major contributing factor to the perceived difference between the

talking points and the established IC view. Analysts point out that there were substantive differences between the Talking Points and what the IC actually thought. Emails show that those who drew up the talking points did partially coordinate them and were informed of analysts' concerns with them, but did not completely consider the concerns in the final version. There was widespread reluctance among intelligence professionals to deliver them. This reluctance on the part of seasoned IC officers should have been a red flag, but did not stop the statement from being issued.

(U) [*Ombudsman Comment: Classified details on this issue can be provided at the request of the committee.*]

### (U) Not Following Standard Procedure for Drafting, Editing, Approval, and Dissemination

(U) Following the March Talking Points, I have identified a long story arc of – at the very least – perceived politicization of intelligence. Guidelines on special review procedures relating to election security products were promulgated by ODNI and CIA leadership, but according to interviews it appears not all analysts and managers were aware of them. Interviewees commented, if there are such guidelines they are not well promulgated. They may be known to other analysts. Three different NIC products demonstrate the overall pattern of perceived politicization stemming from the inconsistent application of definitions as outlined above. There was a neglect or refusal to re-coordinate changes, adopt alternative analyses, and include dissent language, as well as leadership's failure to communicate clearly and directly to analysts the reasoning for those changes on a consistent basis.

(U) A NIC Memo (NICM) published in May 2020 suffered from a severe slowdown and major changes to coordinated assessments in the drafting, review, and approval process. CIA analysts noted that they and a wide range of IC analysts participated fully in the early analytic work leading up to this NICM, including in the analytic line review. They feel that the first drafts of the NICM followed the general agreement of the community. Then a revised draft came back from NIC review as substantially changed, leading with intelligence gaps that seemed to undermine the threat assessment. The draft led with intelligence gaps and "buried the lead" regarding what the IC does know about election security threats. The then-NIC Chair, immediately before becoming the Principal Executive, crafted this language. In a follow-up interview, the PE stated that he did this because it was good tradecraft to lay out the analytic environment, including what is not known.

(U) Subsequently, the draft was held up by A/DNI Grenell for weeks before publication, and underwent what appears to be politically motivated editing. Analysts recounted that the NIC and DNI's changes were not fully re-coordinated with the community. The result was a final product whose delayed publication meant it diverged sharply from the up-to-date IC view communicated in other product lines. I have e-mail exchanges to document this delay, allusions to political repercussions, and frustration from intelligence professionals with the delay. These actions constitute a violation of the Analytic Standard for Timeliness, and Tradecraft Standard 7.

(U) According to interviews, the established practice does not include the DNI actively participating in the review chain for NIC Memos or Assessments. As a political appointee, there

is a potential conflict of interest. As DNI Ratcliffe has stated, on the other hand, just because it is unusual to have DNI involvement in the review of these products does not mean it is necessarily wrong to do so. According to tradecraft standards, the DNI like any IC employee, has the right to an analytic conclusion, and provided it is supported by the intelligence. The DNI should also, when speaking publicly, adhere to good tradecraft and clearly delineate when they are sharing their own personal views versus when they are communicating a coordinated intelligence community assessment. To do otherwise would be a violation of Tradecraft Standard 3.

(U) [*Ombudsman Comment: I have not interviewed A/DNI Grenell or his staff who have departed ODNI. They are no longer under my purview as Analytic Ombudsman.*]

(U) In the August NICA, there were analytic lines from the Annual Threat Assessment (ATA – originally drafted in early 2020) which were technically accurate but not as current as what the IC had published over the previous six months in other product lines. Instead of allowing the most current IC-coordinated NICA language to drive this alignment, previously IC-coordinated ATA language was used without a re-coordination, at the instruction of the A/NIC Chair. Analysts claim that NIC leadership consistently watered down conclusions during a drawn-out review process, boosting the threat from China and making the threat from Russia sound "not too controversial."

(U) NIC officials pointed to ODNI senior officials as intervening in the changes to conclusions, saying that they were overly sensitive to political customers who saw the dissonance between China and Russia reporting and the inconsistent application of definitions. DNI Ratcliffe just disagreed with the established analytic line on China, insisting 'we are missing China's influence in the US and that Chinese actions ARE intended to affect the election. DNI Ratcliffe wrote as much in his Wall Street Journal op-ed. Ultimately the DNI insisted in putting material on China in, and was aware analysts disagreed and probably still disagree. As a result, the final published NICA, analysts felt, was an outrageous misrepresentation of their analysis. DNI Ratcliffe states, "I know my conclusions are right, based on the intelligence that I see." As the DNI states, "Many analysts think I am going off the script. They don't realize that I did it based on the intelligence."

(U) Two NIOs wrote a NIC Alternative Analysis Memo (NIC AOA Memo) in October 2020, which expressed alternative views on potential Chinese election influence activities. These alternative views met with considerable organizational counter pressure, which we will address later in this report. ODNI has to ensure that alternative views are expressed, even when they differ from the majority. A healthy challenge culture in the IC can foster differences of analytic views and ensure that they are shared in intelligence products, consistent with IRTPA Section 1017. In my discussions with him, DNI Ratcliffe agreed with the concerns expressed in the Alternative Analysis Memo, and was aware that most analysts did not hold that view. Not to include all intelligence would also be a violation of the IRTPA Analytic Standard D, to be "Based on All Available Sources of Intelligence."

(U) Ombudsmen from CIA, NSA, and ODNI report the widely shared perspective among IC analysts that analysis on foreign election interference was delayed, distorted, or obstructed out of concern over policymaker reactions or for political reasons, which in their view constitutes

politicization. These Ombudsmen agree, whether through application of highly stringent coordination and review practices or deliberate temporizing, there is a discernible pattern of delay on IC analytic production on election threat reporting. There is an inherent danger in even the perception that intelligence products were changed for political purposes. The perception of politicization undermined analysts' willingness to come forward with alternatives. This is a violation of Tradecraft Standard 4 and IRTPA Section 1017.

(U) [*Ombudsman Comment: Classified details on this issue can be provided at the request of the committee.*]

### (U) Undue Influence on Analysis, Production, and Dissemination

(U) There were strong efforts to suppress analysis of alternatives (AOA) in the August NICA, and associated IC products, which is a violation of Tradecraft Standard 4 and IRTPA Section 1017. NIC officials reported that CIA officials rejected NIC coordination comments and tried to downplay analysis of alternatives in their own production during the drafting of the NICA. According to NIOs and Directors, CIA management contacted the A/NIC Chair and NIOs to suppress the NIC from caveating analytic judgments that were downplayed due to concerns about policy. As a result, these NIC officials felt the only avenue to express alternative views was via the NIC AOA Memo they authored in October 2020. During the drafting of the NIC AOA Memo, CIA management again contacted the A/NIC Chair and other NIOs on joint duty assignment from CIA (who would eventually have to return to their home agency), pressuring them to withdraw their support of the NIC AOA Memo in an attempt to suppress it. This was seen by NIOs as politicization from below, just as the A/DNI's push to bring forward evidence of what the Chinese are or were doing without apparently being supported by intelligence available to all analysts "must be politicization from above," according to an ODNI official. Politicization may be in the eye of the beholder, but my objective and independent view is that there was politicization from above and below.

(U) The NIOs and Directors faced opposition getting their views on election interference across. It is difficult to have a healthy analytic conversation in a confrontational environment. ODNI and the IC agencies involved in analysis of election interference at first failed in allowing for a challenge culture where analysis of alternatives is required and dissents are encouraged as healthy analytic tradecraft. Such actions amount to exercise, or at least the attempt to exercise, undue influence on intelligence, which is a violation of Tradecraft Standard 4. ODNI and the NIC did, to their credit, ensure that the analysis of alternatives piece and other related intelligence was published.

(U) [*Ombudsman Comment: Classified details on this issue can be provided at the request of the committee.*]

### (U) Tradecraft Review

(U) Pursuant to your letter, I asked for products produced between January and October 2020 to be evaluated for compliance with Analytic Tradecraft Standards by the ODNI's Analytic Integrity and Standards Division (AIS) in exactly the same manner as any other product would

be evaluated pursuant to IRTPA Section 1019. We found no evidence of lack of objectivity or politicization of intelligence. Indications of politicization would come out in the inquiry focused on the editing, review, and coordination behind the scenes of the final products.

## (U) Historical Context

(U) Recent history gives an example of how politicization of intelligence can undermine the intelligence analysis process. Politicization of election security intelligence this year echoes the events surrounding the writing of Secretary of State Colin Powell's UN Speech to make the case to go to war with Iraq in 2003. In this historic example, politicians and political appointees had also made up their mind about an issue and spent considerable time pressuring analysts and managers to prove their thesis to the American public, with little regard for analytic tradecraft.

(U) The difference this time – with the accusations of politicization of intelligence in 2020 -- is that analysts remember what happened in 2003. Intelligence based on bias and subjected to undue influence led to a war. In this case, analysts have reacted strongly to what they see as history repeating itself. Analysts may have lost their own objectivity because they felt they had to fight to ensure the intelligence information they provided was not misconstrued, misused, or ignored. Analysts should not be put in this position. The DNI and other ODNI senior officials must stay above the fray and protect the integrity, timeliness and objectivity of intelligence by fostering a challenge culture in which differences of analytic opinion are shared without organizational suppression or fear of retribution. The IC must produce objective intelligence and communicate it clearly to customers; however customers might use or mis-use it for policy purposes with which analysts or IC leaders may or may not agree.

## (U) Conclusion

(U) Looking back over the past year, it is evident that what began as mischaracterization of IC analytic assessments by ODNI officials escalated into an ongoing widespread perception in the workforce about politicization and loss of analytic objectivity throughout the community on the topics of Russian and Chinese election influence and interference. Politicization need not be overt to be felt. This report documents the reality of both attempts to politicize and perception of politicization of intelligence.

(U) No ODNI official has stated that reviews or edits of election threat intelligence were phrased in a way that was explicitly political in nature. Rather, from the ODNI leadership perspective, officials were seeking a way to deliver intelligence in a way that the Trump Administration would consume it. Top ODNI officials faced enormous pressure to balance between IC assessments and customers' demands. This pressure filtered back down the chain and analysts perceived their work as being politicized, in contravention to the Analytic Standards for Objectivity and avoiding political considerations, in order to make intelligence more palatable to senior customers. Their response to the perceived – and sometimes real – attempts at politicization reflected a loss of analytic objectivity. When analysts face perceived politicization, they have recourse to report their concerns to the Ombudsman just as they have the obligation to continue to produce timely, accurate, objective intelligence with no regard for political considerations.

(U) If our political leaders in the White House and Congress believe we are withholding intelligence because of organizational turf wars or political considerations, the legitimacy of the Intelligence Community's work is lost. Intelligence officers, even those at the highest levels, cannot allow political considerations to influence analysis, and must stand as a bulwark against all political pressures, even if the cost is that senior customers do not like what the intelligence community assesses. As PE Neil Wiley has stated (and I paraphrase), *intelligence is the only great function of state that does not come to top decision makers with an agenda, wanting something. The purpose of intelligence is to provide objective, unbiased, and policy-neutral assessments. We are, perhaps, most important to decision makers when we bring to them the bad news, or what they don't want to hear. This is an ethical challenge to intelligence professionals, and sometimes demands moral courage to carry out. Other institutions are inherently political and are much less likely to bring bad news. If we lose that objectivity, or even are perceived to have lost it, we have endangered the entire reason for us to exist.*

(U) Finally, IC officials, whether politically appointed or not, must not make statements that, implied or directly attributed, communicate the IC's analytic views when they are in fact not representative of the IC's analytic line of argument. There must be a clear distinction between the actual intelligence, the IC's analytic assessments and judgments, and personal or political opinions. DNI Ratcliffe pointed out that "objectivity needs to be on both sides of the debate. When senior leaders ask questions about analytic products that does not mean that is politicization." The IC needs to foster a stronger challenge culture to allow for alternative views and "make the IC better at what it does."

(U) This report has presented the findings of my independent Ombudsman review, in response to your letter. I have appended a set of recommendations at Annex I, based on those findings, pursuant to my authority under IRTPA Section 1020, which I have given to ODNI management to take for action. I have provided definitions in Annex II and a scope note in Annex III.

## ANNEX I

### (U) Recommendations

(U) ODNI recognizes the analytic tradecraft deficiencies related to intelligence products on election interference. These recommendations have been accepted by the DNI, and ODNI is already taking steps and is prepared to take further steps to remedy the process, communication, and education failures that led to this ombudsman complaint.

- (U) Reinforce through direct leadership communications from ODNI to the workforce as a whole, and from agency heads to all IC agencie,s the importance of protecting analytic integrity and a renewed commitment to analytic objectivity and avoiding politicization in both policy and practice. Reinforce adherence to analytic tradecraft as spelled out in IRTPA Section 1019.
- (U) This issue has created across the workforce, in several agencies, skepticism and mistrust among analysts and line managers directed at agency and IC leaders. Take steps to rebuild trust through more direct leadership communication and transparency. When departing from established practices, ensure consistency in decision making that adheres to established analytic tradecraft standards, best practices, and guidelines for production and dissemination on this topic. Avoid verbal instructions, such as, "ODNI says to do it this way." Adhere to clear and defensible written instructions, and provide timely, direct, and specific feedback. Help the analytic workforce understand the balance between discretion required for this topic and the need to warn. Ensure that these guidelines and practices are written, widely disseminated, and understood. Analysts may assume that changes must be politically motivated. Better leadership communications will clarify when changes are being made NOT for political or policy reasons.
- (U) Foster a collaboration culture across the IC analytic community that expressly supports analyses of alternatives and encourages dissent when appropriate as required in IRTPA, Section 1017. Publish a memo to IC and ODNI senior leaders, managers, and analysts reminding them that when fundamental disagreements to analytic judgments exist across agencies or analytic units, the solution is to write a product that clearly articulates those disagreements, to include dissenting language and analysis of alternatives. Backchannel intimidation tactics between analysts, managers, and/or senior leadership to suppress dissenting views must be expressly forbidden.
- (U) Use the Analytic Ombudsman to sponsor dialogues between analytic elements and leadership where needed to facilitate direct communication and transparency. The Ombudsman's statutory role in IRTPA Section 1020 is to help resolve differences before they become problems.
- (U) Mandate analyst exchanges between regional election security units within agencies (e.g., Russian election security analysts spend time working with China election security analysts and vice versa) in order to facilitate the exchange of methodologies and analytic practice with the aim of providing more consistent analytic definitions across topics at the strategic level. These analytic exchanges can clarify what has been seen as inconsistent application of definitions and analytic models.

- (U) Redouble analytic objectivity and tradecraft standards training efforts for three customer categories: new analyst training, refresher training for managers and analysts, and executive-level training. 1) Analysis 101 was once mandatory, but agencies resisted in favor of their own training. Clearly, the training going on now has been insufficient to inculcate good tradecraft – leading to this issue. This course already exists, and is overseen by the Analytic Ombudsman; 2) require an analytic standards and objectivity course prerequisite as part of completing the IC Advanced Analyst Program (ICAAP). Such a requirement will provide in-service training on analytic standards for senior analyst and managers of analysts, to better enable them to recognize and mitigate problems with objectivity and politicization. Courses already exist, that just have to be recognized within and overseen by ICAAP; 3) Provide for one expert on analytic tradecraft and objectivity to create and oversee an executive training course on analytic objectivity and tradecraft standards.
- (U) Hold IC agencies to account for improving tradecraft issues found by ODNI's assessments of analytic tradecraft conducted by AIS – and where possible by agencies own tradecraft evaluation efforts. ODNI will work through the National Intelligence Analysis Board (NIAB) to improve analytic tradecraft across the IC.

## **ANNEX II:**

### **(U) Definitions:  What we mean when we say**

(U) Mandated by Section 1019 of the Intelligence Reform and Terrorism Prevention Act (IRTPA), the IC Analytic Standards guide analytic production, speak directly to the integrity of the analytic *process* that lies behind the disseminated analytic product, and to the *value* of that product to the consumer. Below are Intelligence Community Directive 203 definitions of these terms; my comments add context for this case.

   a) **(U) Objective**: Analysts must perform their functions with objectivity and with awareness of their own assumptions and reasoning. They must employ reasoning techniques and practical mechanisms that reveal and mitigate bias. Analysts should be alert to influence by existing analytic positions or judgments and must consider alternative perspectives and contrary information. Analysis should not be unduly constrained by previous judgments when new developments indicate a modification is necessary. *Ombudsman Comment: In this letter I refer to this standard and violations thereof in terms of analytic objectivity and bias.*
   - **(U) Bias:** According to the late Dick Heuer in Psychology of Intelligence Analysis, bias in intelligence is a fundamental limitation of human mental processes. These limitations cause people to employ various simplifying strategies and rules of thumb to ease the burden of mentally processing information to make judgments and decisions. In ordinary life, these simple rules of thumb are often useful in helping us deal with complexity and ambiguity. In intelligence analysis, however, bias lead to predictably faulty analytic judgments and the inability to provide objective analysis to consumers of intelligence.
   b) **(U) Independent of political consideration**: Analytic assessments must not be distorted by, nor shaped for, advocacy of a particular audience, agenda, or policy viewpoint. Analytic judgments must not be influenced by the force of preference for a particular policy. *Ombudsman Comment: In this letter I refer to this standard and violations thereof in terms of politicization and distortion.*
   c) **(U) Timely**: Analysis must be disseminated in time for it to be actionable by customers. Analytic elements have the responsibility to be continually aware of events of intelligence interest, of customer activities and schedules, and of intelligence requirements and priorities, in order to provide useful analysis at the right time. *Ombudsman Comment: In this letter I refer to this standard and violations thereof in terms of excessively delayed review times.*
   d) **(U) Based on all available sources of intelligence information**: Analysis should be informed by all relevant information available. Analytic elements should identify and address critical information gaps and work with collection activities and data providers to develop access and collection strategies. *Ombudsman Comment: In this letter I refer to this standard and violations thereof in terms of analytic tradecraft.*
   e) **(U) Implements and Exhibits Analytic Tradecraft Standards**: The nine standards as further spelled out in ICD 203, are -

1. Properly Describes the Quality and Credibility of Underlying Sources, Data, and Methodologies
2. Properly Expresses and Explains Uncertainties Associated With Major Analytic Judgments
3. Properly Distinguishes Between Underlying Intelligence Information and Analysts' Assumptions and Judgments
4. Incorporates Analysis of Alternatives
5. Demonstrates Customer Relevance and Addresses Implications
6. Uses Clear and Logical Argumentation
7. Explains Change to or Consistency of Analytic Judgments
8. Makes Accurate Judgments and Assessments
9. Incorporates Effective Visual Information Where Appropriate

## **ANNEX III**

### **(U) Scope Note**

(U) I completed a comprehensive review and ascertained accusations and documentation of attempts to alter a range of analytic products for reasons that do not follow good tradecraft. Prior to receipt of the letter, I already had begun a review based on perceived problems with politicization and violations of analytic tradecraft that were brought to my attention by Ombudsmen in three IC agencies.

(U) While Ombudsmen from other agencies do not report to me in my statutory role as ODNI Ombudsman, several of us met and conferred on these complaints and agree that aspects of these concerns fall within the IC definition of politicization. The concerns conveyed to us represent widely held views among IC officers engaged on the election threat issue and point to broadly perceived, and probably some actual instances of, politicized intelligence relating to foreign interference in US elections.

(U) I conducted listening sessions with the analysts and managers from CIA, NSA, other agencies, NIC, PDB, and ODNI leadership to obtain information surrounding the complaints filed. Some interview subjects requested anonymity, which I granted, as a condition for their sharing documentation or comments. Others asked to be identified. I also conducted confidential interviews with a number of senior IC leaders connected with this issue. I have not interviewed individuals outside the IC.

UNCLASSIFIED

## DIRECTOR OF NATIONAL INTELLIGENCE
WASHINGTON, DC

SUBJECT:      Views on Intelligence Community Election Security Analysis

REFERENCE:   Intelligence Community Assessment: Foreign Threats to the 2020 U.S. Elections

From my unique vantage point as the individual who consumes all of the U.S. government's most sensitive intelligence on the People's Republic of China, I do not believe the majority view expressed by Intelligence Community (IC) analysts fully and accurately reflects the scope of the Chinese government's efforts to influence the 2020 U.S. federal elections.

The IC's Analytic Ombudsman issued a report, which I will reference several times below, that includes concerning revelations about the politicization of China election influence reporting and of undue pressure being brought to bear on analysts who offered an alternative view based on the intelligence. The Ombudsman's report, which is being transmitted to Congress concurrently with this Intelligence Community Assessment (ICA), also delves into a wider range of election security intelligence issues that I will not focus on here. However, the specific issues outlined below with regard to China reporting are illustrative of broader concerns. It is important for all IC leaders to foster a culture within the Community that encourages dissenting views that are supported by the intelligence. Therefore, I believe it is incumbent upon me in my role as the Director of National Intelligence to lead by example and offer my analytic assessment, alongside the majority and minority views. This letter was prepared in consultation with the Ombudsman to ensure that I am accurately articulating his findings and presenting them in their proper context.

The majority view expressed in this ICA with regard to China's actions to influence the election fall short of the mark for several specific reasons.

Analytic Standard B requires the IC to maintain "independence of political considerations." This is particularly important during times when the country is, as the Ombudsman wrote, "in a hyper partisan state." However, the Ombudsman found that:

> "China analysts were hesitant to assess Chinese actions as undue influence or interference. These analysts appeared reluctant to have their analysis on China brought forward because they tend to disagree with the administration's policies, saying in effect, I don't want our intelligence used to support those policies. This behavior would constitute a violation of Analytic Standard B: Independence of Political Considerations (IRTPA Section 1019)."

Furthermore, alternative viewpoints on China's election influence efforts have not been appropriately tolerated, much less encouraged. In fact, the Ombudsman found that:

UNCLASSIFIED

UNCLASSIFIED

SUBJECT:     Views on Intelligence Community Election Security Analysis

"There were strong efforts to suppress analysis of alternatives (AOA) in the August [National intelligence Council Assessment on foreign election influence], and associated IC products, which is a violation of Tradecraft Standard 4 and IRTPA Section 1017. National Intelligence Council (NIC) officials reported that Central Intelligence Agency (CIA) officials rejected NIC coordination comments and tried to downplay alternative analyses in their own production during the drafting of the NICA."

Additionally, the Ombudsman found that CIA Management took actions "pressuring [analysts] to withdraw their support" from the alternative viewpoint on China "in an attempt to suppress it. This was seen by National Intelligence Officers (NIO) as politicization," and I agree. For example, this ICA gives the false impression that the NIO Cyber is the only analyst who holds the minority view on China. He is not, a fact that the Ombudsman found during his research and interviews with stakeholders. Placing the NIO Cyber on a metaphorical island by attaching his name alone to the minority view is a testament to both his courage and to the effectiveness of the institutional pressures that have been brought to bear on others who agree with him.

Intelligence Reform and Terrorism Prevention Act (IRTPA) Analytic Standard D requires that coordinated analytic products be "based on all available sources of intelligence." However, because of the highly compartmented nature of some of the relevant intelligence, some analysts' judgements reflected in the majority view are not based on the full body of reporting. Therefore the majority view falls short of IRTPA Analytic Standard D.

Tradecraft Standard 1 requires the analytic community to be consistent in the definitions applied to certain terminology, and to ensure that the definitions are properly explained. Having consumed election influence intelligence across various analytic communities, it is clear to me that different groups of analysts who focus on election threats from different countries are using different terminology to communicate the same malign actions. Specifically, definitional use of the terms "influence" and "interference" are different between the China and Russia analytic communities. The Analytic Ombudsman found that:

"Terms were applied inconsistently across the analytic community... Given analytic differences in the way Russia and China analysts examined their targets, China analysts appeared hesitant to assess Chinese actions as undue influence or interference."

As a result, similar actions by Russia and China are assessed and communicated to policymakers differently, potentially leading to the false impression that Russia sought to influence the election but China did not. This is inconsistent with Tradecraft Standard 1.

In the Ombudsman's report, he accurately acknowledged my commitment "to provide an independent avenue for analysts to pursue unbiased analysis." My approach here is not without precedent. In 1962, a National Intelligence Estimate stated that the Soviet Union was unlikely to place missiles in Cuba. Then-CIA Director John McCone forcefully disagreed with the analysts,

2

UNCLASSIFIED

UNCLASSIFIED

SUBJECT:    Views on Intelligence Community Election Security Analysis

and later ordered the U-2 reconnaissance flights that discovered that missiles had in fact been deployed.

   In that same spirit, I am adding my voice in support of the stated minority view -- based on all available sources of intelligence, with definitions consistently applied, and reached independent of political considerations or undue pressure -- that the People's Republic of China sought to influence the 2020 U.S. federal elections, and raising the need for the Intelligence Community to address the underlying issues with China reporting outlined above.

_____          _____
John Ratcliffe                                           Date   January 7, 2021

3

UNCLASSIFIED

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE
DIRECTOR OF THE NATIONAL COUNTERINTELLIGENCE AND SECURITY CENTER
WASHINGTON, DC

NCSC-21-007
January 7, 2021

The Honorable Marco Rubio
Acting Chairman
Select Committee on Intelligence
United States Senate
Washington, DC 20510

The Honorable Mark Warner
Vice Chairman
Select Committee on Intelligence
United States Senate
Washington, DC 20510

Dear Acting Chairman Rubio and Vice Chairman Warner:

I am writing to inform you that I am appalled by the findings contained in the January 6, 2021 letter to you from Intelligence Community (IC) Analytic Ombudsman Dr. Barry Zulauf regarding possible politicization of intelligence in connection with the 2020 U.S. elections.

I was appointed to my current role in June 2014 by Director of National Intelligence (DNI) James Clapper under the Obama Administration. In 2017, I was asked to remain in this position by DNI Dan Coats under the Trump Administration. I was later nominated and became the first Senate-confirmed Director of the National Counterintelligence and Security Center (NCSC). I am humbled by and proud of the bipartisan support I received during my confirmation process.

As a 24-year career law enforcement and intelligence officer who was assigned to oversee the IC's election security threat briefings in May 2020, it was vital for myself and other IC leaders to have complete trust and confidence in the intelligence we received so we could convey it objectively and without fear or favor to policymakers and the public. It is disheartening to hear that I may have been provided intelligence that was disputed by some when I was communicating with Congress and the American public about threats to the 2020 elections.

Going forward, we must ensure without fail that IC leaders can have complete faith in the intelligence they deliver to policymakers. We must also ensure that analysts are afforded the space and independence necessary to provide unbiased and objective assessments to IC leaders. I will yield to the incoming IC leadership and analytical leaders in the community to make the necessary modifications and cultural changes required to achieve this state.

For context, I feel obligated to set forth the facts surrounding some of the assertions in Dr. Zulauf's January 6, 2021 letter to you. Specifically, Dr. Zulauf alleged: "After conducting a thorough review, I found several incidents where there were attempts to politicize intelligence. The most egregious example is the talking points provided alongside the written introductory statement delivered by, but not written by, National Counterintelligence and Security Center (NCSC) Director Bill Evanina on 10 March 2020."

SUBJECT: Acting Chairman Rubio and Vice Chairman Warner

The facts of this matter are as follows:

- On Tuesday, March 10, 2020, Acting DNI Richard Grenell was scheduled to testify on election security at classified all-Senate and all-House briefings. Senior ODNI officials had been preparing testimony, Q&A and related talking points for Acting DNI Grenell for several days before the hearing.

- Less than 24 hours before the scheduled hearings, I was informed by Deputy DNI Beth Sanner that I would be testifying at the briefings, not Acting DNI Grenell. This came as a surprise to me because IC election security issues, at the time, were primarily the purview of the ODNI Election Threats Executive, not the NCSC. Nevertheless, I agreed to testify and was provided a written script to read for the classified briefings.

- The script was provided to me by the ODNI Election Threats Executive and other senior ODNI officials. I used these materials in the classified Senate and House briefings, trusting and believing they reflected the coordinated views of the IC because they had been provided to me by the DNI's top intelligence advisor, ODNI's top election threat executive and senior career intelligence officials.

- After the hearing, the ODNI posted on its public website a "Handout on Foreign Threats to U.S. Elections for Congressional Members" on March 10, 2020. I had absolutely no role in crafting these public talking points, nor were they issued under my name.

The IC Analytic Ombudsman further asserted in his letter that public statements on election security I issued on July 24, 2020 and August 7, 2020, were, according to some analysts, a "gross misrepresentation" of established IC views. The facts of this matter are as follows:

- After I was assigned in May 2020 to oversee the IC's election security threat briefings, I issued two formal, written statements to the public. In both my July 24, 2020 and August 7, 2020 public statements, I described foreign threats to the U.S. election based exclusively on language and threat information provided to me by Deputy DNI Sanner, the ODNI Election Threat Executive, the Chair of the National Intelligence Council, and other career intelligence officials representing the spectrum of IC agencies.

- Furthermore, the underlying threat language of both statements was drawn directly from the draft IC Annual Threat Assessment, which represented the coordinated views of the IC. In addition, the threat language was coordinated with and agreed to by senior officials at CIA and other IC agencies before its public release.

Throughout the election security briefing process, which included more than 20 briefings to members of Congress, the Trump and Biden campaigns, as well as the RNC and DNC, I

SUBJECT: Acting Chairman Rubio and Vice Chairman Warner

trusted and relied on upon the foreign threat language provided to me by senior intelligence experts from across the IC. I ensured these briefings were consistent and uniform regardless of the audience, and I accurately conveyed what I believed to be the established IC analytic lines at the time my statements were issued.

Throughout my career at FBI, CIA and NCSC, I have spoken truth to power, no matter the consequences and without regard to politics. I have never politicized intelligence during my career and any suggestion I would is a personal affront to me. Despite the Congressional and public criticism that came with the job of leading the IC's election security threat briefings and informing Americans of threats to their elections in a hyper-partisan environment, I have proudly maintained my integrity throughout the entire process.

Notwithstanding the findings of the IC Analytic Ombudsman, I am proud of the work of the IC and all our federal, state and local partners in keeping foreign adversaries from interfering in the 2020 U.S. elections. It is critical that the IC maintain a significant role in future efforts to secure U.S. elections against foreign threats. The integrity of the analytic process and product must be the bedrock of these efforts.

Sincerely,

William R. Evanina

Ex. 65

UNCLASSIFIED

DIRECTOR OF NATIONAL INTELLIGENCE
WASHINGTON, DC

SUBJECT:          Views on Intelligence Community Election Security Analysis

REFERENCE:     Intelligence Community Assessment: Foreign Threats to the 2020 U.S.
                        Elections

From my unique vantage point as the individual who consumes all of the U.S.
government's most sensitive intelligence on the People's Republic of China, I do not believe the
majority view expressed by Intelligence Community (IC) analysts fully and accurately reflects
the scope of the Chinese government's efforts to influence the 2020 U.S. federal elections.

The IC's Analytic Ombudsman issued a report, which I will reference several times
below, that includes concerning revelations about the politicization of China election influence
reporting and of undue pressure being brought to bear on analysts who offered an alternative
view based on the intelligence.  The Ombudsman's report, which is being transmitted to
Congress concurrently with this Intelligence Community Assessment (ICA), also delves into a
wider range of election security intelligence issues that I will not focus on here.  However, the
specific issues outlined below with regard to China reporting are illustrative of broader concerns.
It is important for all IC leaders to foster a culture within the Community that encourages
dissenting views that are supported by the intelligence.  Therefore, I believe it is incumbent upon
me in my role as the Director of National Intelligence to lead by example and offer my analytic
assessment, alongside the majority and minority views.  This letter was prepared in consultation
with the Ombudsman to ensure that I am accurately articulating his findings and presenting them
in their proper context.

The majority view expressed in this ICA with regard to China's actions to influence the
election fall short of the mark for several specific reasons.

Analytic Standard B requires the IC to maintain "independence of political
considerations."  This is particularly important during times when the country is, as the
Ombudsman wrote, "in a hyper partisan state."  However, the Ombudsman found that:

> "China analysts were hesitant to assess Chinese actions as undue influence or
> interference. These analysts appeared reluctant to have their analysis on China brought
> forward because they tend to disagree with the administration's policies, saying in effect,
> I don't want our intelligence used to support those policies.  This behavior would
> constitute a violation of Analytic Standard B: Independence of Political Considerations
> (IRTPA Section 1019)."

Furthermore, alternative viewpoints on China's election influence efforts have not been
appropriately tolerated, much less encouraged. In fact, the Ombudsman found that:

UNCLASSIFIED

UNCLASSIFIED

SUBJECT:    Views on Intelligence Community Election Security Analysis

"There were strong efforts to suppress analysis of alternatives (AOA) in the August [National intelligence Council Assessment on foreign election influence], and associated IC products, which is a violation of Tradecraft Standard 4 and IRTPA Section 1017. National Intelligence Council (NIC) officials reported that Central Intelligence Agency (CIA) officials rejected NIC coordination comments and tried to downplay alternative analyses in their own production during the drafting of the NICA."

Additionally, the Ombudsman found that CIA Management took actions "pressuring [analysts] to withdraw their support" from the alternative viewpoint on China "in an attempt to suppress it. This was seen by National Intelligence Officers (NIO) as politicization," and I agree. For example, this ICA gives the false impression that the NIO Cyber is the only analyst who holds the minority view on China. He is not, a fact that the Ombudsman found during his research and interviews with stakeholders. Placing the NIO Cyber on a metaphorical island by attaching his name alone to the minority view is a testament to both his courage and to the effectiveness of the institutional pressures that have been brought to bear on others who agree with him.

Intelligence Reform and Terrorism Prevention Act (IRTPA) Analytic Standard D requires that coordinated analytic products be "based on all available sources of intelligence." However, because of the highly compartmented nature of some of the relevant intelligence, some analysts' judgements reflected in the majority view are not based on the full body of reporting. Therefore the majority view falls short of IRTPA Analytic Standard D.

Tradecraft Standard 1 requires the analytic community to be consistent in the definitions applied to certain terminology, and to ensure that the definitions are properly explained. Having consumed election influence intelligence across various analytic communities, it is clear to me that different groups of analysts who focus on election threats from different countries are using different terminology to communicate the same malign actions. Specifically, definitional use of the terms "influence" and "interference" are different between the China and Russia analytic communities. The Analytic Ombudsman found that:

"Terms were applied inconsistently across the analytic community… Given analytic differences in the way Russia and China analysts examined their targets, China analysts appeared hesitant to assess Chinese actions as undue influence or interference."

As a result, similar actions by Russia and China are assessed and communicated to policymakers differently, potentially leading to the false impression that Russia sought to influence the election but China did not. This is inconsistent with Tradecraft Standard 1.

In the Ombudsman's report, he accurately acknowledged my commitment "to provide an independent avenue for analysts to pursue unbiased analysis." My approach here is not without precedent. In 1962, a National Intelligence Estimate stated that the Soviet Union was unlikely to place missiles in Cuba. Then-CIA Director John McCone forcefully disagreed with the analysts,

2

UNCLASSIFIED

SUBJECT:    Views on Intelligence Community Election Security Analysis

and later ordered the U-2 reconnaissance flights that discovered that missiles had in fact been deployed.

In that same spirit, I am adding my voice in support of the stated minority view -- based on all available sources of intelligence, with definitions consistently applied, and reached independent of political considerations or undue pressure -- that the People's Republic of China sought to influence the 2020 U.S. federal elections, and raising the need for the Intelligence Community to address the underlying issues with China reporting outlined above.

John Ratcliffe

January 7, 2021

Date

3

UNCLASSIFIED

Ex. 66

FD-1057 (Rev. 5-8-10)

UNCLASSIFIED//FOUO

OFFICIAL RECORD

## FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:**  (U//FOUO) ██ Per. 49 ██' Contact with ██ Per. 5 ██     **Date:**   01/31/2023
██ and Stanley Woodward

**CC:**  ████

**From:**   COUNTERINTELLIGENCE
██████████████
████████

        **Contact:**   ██████████████

**Approved By:**  SIA ████████

**Drafted By:**   ████████

**Case ID #:**   ████████   (U//FOUO) Grand Jury subfile

#### FEDERAL GRAND JURY INFORMATION

This document contains Federal Grand Jury information and would reveal the strategy or direction of the investigation, the nature of the evidence produced before the grand jury, the views expressed by members of the grand jury, or any other matters which have occurred, which are occurring, or which are likely to occur before the grand jury. The information may not be disclosed, within or outside the FBI, except, as provided for in Federal Rule of Criminal Procedure 6(e)(3): (1) to an attorney for the government for use in performing that attorney's duty, or, at the direction of an attorney for the government; (2) to any government personnel — including those of a state, state subdivision, Indian tribe, or foreign government — that an attorney for the government considers necessary to assist in performing that attorney's duty to enforce federal criminal law; (3) to an attorney for the government for the use in enforcing 12 U.S.C. § 1833a or any civil forfeiture provision of Federal law; (4) to another federal grand jury; (5) pursuant to Rule 6(e)(3)(D) (regarding the disclosure of foreign intelligence, counterintelligence, or foreign intelligence information); (6) or as authorized by the court.

**Synopsis:**  (U//FOUO) On 30 January 2023, Special Counsel's office asked the writer to provide contact between x7100 and additional witnesses. This electronic communication is to document the writer's response to Special Counsel's request.

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

Title: (U//FOUO) ▓Per. 49▓' Contact with ▓Per. 5▓ and Stanley Woodward

Re: ▓▓▓▓▓▓▓▓▓▓    01/31/2023

**Reference:** ▓▓▓▓▓▓▓▓▓▓ Serial 156

**Enclosure(s):** Enclosed are the following items:
1. (U//FOUO) ▓Per. 49▓ Tolls with ▓P. 5▓ and SW
2. (U//FOUO) SCO's Request

**Details:**
(U//FOUO) As referenced in ▓▓▓▓▓▓▓▓ serial 156, the FBI obtained ▓Per. 49▓' ▓▓▓▓▓▓▓▓▓▓ toll records dating back to January 2021. ▓▓▓▓ conducted a review of ▓▓▓ and provided Special Counsel's office its findings. This electronic communication documents contact between ▓Per. 49▓ and two additional witnesses, ▓Per. 5▓▓ and Stanley Woodward ▓▓▓▓▓▓▓▓. The relevant tolls are attached to this EC as a 1A.

**(U//FOUO)** ▓▓▓▓ **Contact with** ▓Per. 5▓

(U//FOUO) WFO ▓▓▓ s review of ▓Per. 49▓ and ▓Per. 5▓'s interactions identified the following:

- (U//FOUO) First contact occurred on 20 April 2021. (▓Per. 5▓ *called* ▓Per. 49▓)
- (U//FOUO) ▓Per. 49▓ and ▓Per. 5▓ communicate significantly more via phone calls compared to text messages. *(Note: AT&T records provided records sent via SMS/MMS. If a user uses Apple's iMessage, these messages will not appear on AT&T toll records.)*
- (U//FOUO) Between April 2021 to May 2021, ▓Per. 49▓ and ▓Per. 5▓ were in contact almost every two weeks.
- (U//FOUO) After four months of no contact, ▓Per. 49▓ and ▓Per. 5▓ were in contact several times a week from 23 September 2021 to 18 October 2021. After, ▓Per. 49▓ and ▓Per. 5▓ had no contact until 10 November 2021. From 10 November 2021 to 18 November 2021, they had four interactions.
- (U//FOUO) In December 2021, ▓Per. 49▓ and ▓Per. 5▓ had two longer phone calls. On 15 December 2021, they had a 15-minute call and on 29 December 2021, they had a nine-minute call. After this contact, ▓Per. 49▓ and ▓Per. 5▓ did not interact until March 2022.
- (U//FOUO) Since 10 March 2022, and up to 24 November 2022, ▓Per. 49▓ and ▓Per. 5▓ were in contact almost daily.
- (U//FOUO) The five longest conversations occurred on 5/2/22; 10/02/22; 11/9/22; 9/25/22; 7/30/22.

**(U//FOUO)** ▓Per. 49▓' **Contact with Stanley Woodward**

UNCLASSIFIED//FOUO

2

UNCLASSIFIED//FOUO

Title:  (U//FOUO) ███Per. 49███ ' Contact with ███Per. 5███ and Stanley Woodward

Re: ██████████ 01/31/2023

(U//FOUO) WFO ████ 's review of ██Per. 49██ and Woodward's interactions identified the following:

- (U//FOUO) Four total interactions and all of the interactions were phone calls. These interactions occurred on 9/8/22; 9/9/22; 10/25/22; 11/4/22.
- (U//FOUO) The longest interaction occurred on 9/9/22.

◆◆

UNCLASSIFIED//FOUO

3

Subject to Protective Order

Ex. 67

1

2

3

4

5

6                         RECORDED INTERVIEW BETWEEN

7                 ASSISTANT SPECIAL COUNSEL DAVID RASKIN,

8         SENIOR ASSISTANT SPECIAL COUNSEL JULIE EDELSTEIN,

9                 ASSISTANT SPECIAL COUNSEL MARIA VENTO,

10                 FBI  SPECIAL  AGENT  ████FBI 21A████,

11                 FBI  SPECIAL  AGENT  ████FBI 20████,

12         ███████,  ████████████,  and  ███Per. 49███

13

14                       File: 230222_001.mp3

15

16                    Date: February 22, 2023

17

18

19

20

21

22

23

24

25

Subject to Protective Order                                    USA-00827517

302

```
 1    (00:43:54)

 2              ██  Per. 49 :  -- lawyer and said, oh my gosh, I just

 3    got a call from the FBI what do I do?  And he found -- he

 4    called    Per. 16    who was a ███████████████████████████,

 5    who served -- he was a ██████████████████████ as I

 6    understand it and ████████████████████.  And he said

 7    I'll, I'll find  Per. 34  a lawyer but it started with  Per. 1  and

 8    then it went to -- so they -- it's very individual,

 9    depending upon what -- which of the things they were being

10    contacted about, who they were -- does that -- do I answer

11    you?

12              MS. EDELSTEIN:  Yeah.  I'm curious how some of the

13    other lawyers were, were located in this case as well.

14              ██  Per. 49 :  Okay.  So I'm doing this from memory,

15    so  Per. 16 , ██████████, Woodward --

16              MS. EDELSTEIN:  Does someone recommend Woodward?

17              ██  Per. 49 :  Yes.  ██████████, who was ██████████

18    ██████████  at the time but very much in the Trump family

19    was one of the early people called and ██████ (ph.) --

20    don't remember her last name -- the minority counsel in the

21    house recommended Stanley for ██████ and ██████ was very happy

22    with his lawyer.  And so when they -- I don't remember what

23    the circumstances were because  P. 13  had been involved in so

24    much -- but when   Per. 13   needed counsel,  Per. 1  said you

25    should talk to Stanley Woodward.
```

Subject to Protective Order

USA-00827548

Ex. 68

```
 1

 2

 3

 4

 5

 6                    RECORDED INTERVIEW BETWEEN

 7           ASSISTANT SPECIAL COUNSEL DAVID RASKIN,

 8            FBI SPECIAL AGENT    FBI 18     ,

 9            FBI SPECIAL AGENT    FBI 3    ,

10      Per. 49    ,               and

11

12             File: 230407_0923.MP3

13                   23407_1028.MP3

14                   23407_1219.MP3

15                   23407_1329.MP3

16

17             Date:  April 7, 2023

18

19

20

21

22

23

24

25
```

Subject to Protective Order

1   (00:35:48)

2          MR. RASKIN:  -- vet Carlos before getting a

3   lawyer.  And by that I mean finding out sort of what the guy

4   is going to say, or what kind of guy he is --

5          ███ Per. 49:  Oh, no.

6          MR. RASKIN:  -- or whether he's --

7          ███ Per. 49:  I already knew HIM

8          MR. RASKIN:  You knew --

9          ███ Per. 49:  Carlos.  I've been around Carlos a

10  lot.

11         MR. RASKIN:  But perhaps, okay, so this is August,

12  you know, this is, you know, perhaps not in this context.  I

13  mean, yeah, it's one thing to know whether he can reliably,

14  you know, get the grill to where the President wants the

15  grill.  It's another thing --

16         ███ Per. 49:  Which is how I knew him.

17         MR. RASKIN:  And I'm not, don't take this as a

18  suggestion, but I'm ███ Per. 49 , I'm paying for lawyers

19  here, there and everywhere, yeah, I know Carlos is the

20  maintenance guy at Mar-a-Lago.  But like I don't want to pay

21  for a guy's lawyer if he's going to like, you know, sink the

22  ship.  Like if he's going to be the guy who like undoes the

23  former President of the United States, I'd like to know that

24  before I'm the one who cuts his lawyer's check.  Is that

25  something --

Subject to Protective Order                                    USA-00828051

```
 1   (00:36:56)
 2            ███ Per. 49:   I cannot say this equivocally enough,
 3   unequivocally enough, that is not so.
 4            MR. RASKIN:   Yeah.
 5            ███ Per. 49:   Not so.
 6            MR. ███:   It's all the more reason to get a
 7   lawyer.
 8            MR. RASKIN:   And why are you so sure about that?
 9            ███ Per. 49:   Because I have been cognizant since
10   the beginning, ish, I don't know exactly what date, that it
11   was important that we not, we being me mainly, we not value
12   somebody's knowledge or testimony as it relates to whether
13   we provided them counsel.  And somebody that close to the
14   President would, that would be even more important to me.
15            MR. RASKIN:   Basically what I think you're saying
16   is in ████████████████████████████████████████████████,
17   it is not your job to assess the nature of their potential
18   statements or testimony in making a decision about whether
19   to get them a lawyer, it's irrelevant?
20            ███ Per. 49:   Not only is it not my job, I'm very
21   cognizant that I should not.
22            MR. RASKIN:   You've made a point not to do that?
23            ███ Per. 49:   Yes.
24            MR. RASKIN:   And the reason you're so adamant that
25   that type of thing that I suggested didn't happen is it --
```

Subject to Protective Order                                          USA-00828052

Ex. 69

Previously Filed
Under Seal

Ex. 70

DECLASSIFIED BY: ▮▮▮
ON 06-0▮Case 9:23-cr-80101-AMC   Document 469-1   Entered on FLSD Docket 04/22/2024   Page 310 of
This redacted version only                                      315



**From:** FBI 19 ▮▮ (WF) (FBI)
**To:** ▮▮▮ (WF) (FBI)
**Subject:** FW: TEAM LEAD Thread, 8/8/22
**Date:** Tuesday, August 09, 2022 2:43:21 PM

To ▮▮▮ file

**From:** FBI 10 (WF) (FBI) ▮▮▮
**Sent:** Tuesday, August 9, 2022 11:00 AM
**To:** ▮▮ FBI 39 ▮▮ (MM) (FBI) ▮▮ FBI 8 ▮▮
(MM) (FBI) ▮▮▮; FBI 12 (MM) (FBI) ▮▮ FBI 19 ▮▮
(WF) (FBI) ▮▮▮ FBI 34 (MM) (FBI) ▮▮ FBI 23 ▮▮
(MM) (FBI) ▮▮▮; FBI 1 ▮▮ MM) (FBI) ▮▮▮
**Subject:** Re: TEAM LEAD Thread, 8/8/22

I just wanted to extend my thanks again for everyone's help yesterday. We could not have asked for anything more. We'll done by all of you and your teams.

▮▮ FBI 10 ▮▮

▮▮▮▮▮

FBI/Washington Field Office

**From:** ▮▮ FBI 39 ▮▮ (MM) (FBI) ▮▮▮
**Sent:** Monday, August 8, 2022 10:35:04 PM
**To:** ▮▮ FBI 8 ▮▮, (MM) (FBI) ▮▮▮; FBI 12 ▮▮ (MM) (FBI)
▮▮▮; FBI 19 ▮▮ (WF) (FBI) ▮▮▮ FBI 34 ▮▮ (MM) (FBI)
▮▮▮; FBI 10 ▮▮ (WF) (FBI) ▮▮▮; FBI 23 ▮▮ (MM) (FBI)
▮▮▮; FBI 1 ▮▮ (MM) (FBI) ▮▮▮
**Subject:** Re: TEAM LEAD Thread, 8/8/22

All,

Please let me know if I'm missing anyone that was present today.

Command
▮▮ FBI 8 ▮▮
▮▮ FBI 10 ▮▮

WFO Case Team
▮▮ FBI 19 ▮▮
SA▮ FBI 21A
SA▮ FBI 9

▮▮▮▮▮

▮▮ FBI 39 ▮▮
SA▮ FBI 1



SA ███ FBI 28 ███
SA ███ FBI 31 ███
SA ███ FBI 22 ███

Filter team:
███ ███ FBI 12 ███
SA ███ FBI 17 ███
SA ███ FBI 36 ███
SA ███ FBI 13 ███
SA ███ FBI 5 ███

███ search team:
SA ███ FBI 6 ███
SA ███ FBI 4 ███

ERT
███ ███ FBI 37 ███
SA ███ FBI 34 ███
SA ███ FBI 23 ███
SA ███ FBI 32 ███
SA ███ FBI 24 ███

SA ███ FBI 16 ███

Auditor, ███

FBIHQ PM
███ FBI 30 ███

DOJ
Per. 23
Per. 6

Get some rest and take care,

███ FBI 39 ███

**From:** ███ FBI 39 ███ (MM) (FBI) ███
**Sent:** Monday, August 8, 2022 4:56:52 PM
**To:** ███ FBI 8 ███ (MM) (FBI) ███ FBI 12 ███ (MM) (FBI)
███ FBI 19 ███ (WF) (FBI) ███ FBI 34 ███ (MM) (FBI)

Subject to Protective Order

USA-00940280



**Subject:** Re: TEAM LEAD Thread, 8/8/22

Please send anyone not actively working to the ballroom. Considering releasing some team members.

**From:** ████ FBI 39 ████ (MM) (FBI) ████
**Sent:** Monday, August 8, 2022 4:33:26 PM
**To:** ████ FBI 8 ████ (MM) (FBI) ████ ; ████ FBI12 ████ (MM) (FBI)
████ ; ████ FBI 19 ████ (WF) (FBI) ████ FBI 34 ████ (MM) (FBI)
████ ; ████ FBI 10 ████ (WF) (FBI) ████ >; ████ FBI 1 ████ (MM) (FBI)
████ ; ████ FBI 23 ████ (MM) (FBI) ████
**Subject:** Re: TEAM LEAD Thread, 8/8/22

Residence is complete.

**From:** ████ FBI 39 ████ (MM) (FBI) ████
**Sent:** Monday, August 8, 2022 2:07:37 PM
**To:** ████ FBI 8 ████ (MM) (FBI) ████ ; ████ FBI 12 ████ (MM) (FBI)
████ FBI 19 ████ (WF) (FBI) ████ FBI 34 ████ (MM) (FBI)
████ > ████ FBI 10 ████ (WF) (FBI) ████ ; ████ FBI 1 ████ (MM) (FBI)
████ ; ████ FBI 23 ████ (MM) (FBI) ████
**Subject:** Re: TEAM LEAD Thread, 8/8/22

We are wrapping up the office. About to move to residence. Let your teams know.

**From:** ████ FBI 8 ████ (MM) (FBI) ████
**Sent:** Monday, August 8, 2022 1:04:15 PM
**To:** ████ FBI 12 ████ (MM) (FBI) ████ FBI 39 ████ (MM) (FBI)
████ ; ████ FBI 19 ████ (WF) (FBI) ████ FBI 34 ████ (MM)
(FBI) ████ ; ████ FBI 10 ████ (WF) (FBI) ████ ; ████ FBI 1 ████ (MM)
(FBI) ████ FBI 23 ████ (FBI) ████
**Subject:** Re: TEAM LEAD Thread, 8/8/22

TTA is on scene and standing by in vehicle until needed.

████ FBI 8 ████
████

**From:** ████ FBI 12 ████ (MM) (FBI) ████
**Sent:** Monday, August 8, 2022 11:35:08 AM
**To:** ████ FBI 39 ████ (MM) (FBI) ████ FBI 8 ████
(MM) (FBI) ████ ; ████ FBI 19 ████ . (WF) (FBI) ████ FBI 34 ████
████ (MM) (FBI) ████ FBI 10 ████ (WF) (FBI) ████ FBI 1
(MM) (FBI) ████ FBI 23 ████ ████ \>

**Subject:** Re: TEAM LEAD Thread, 8/8/22

Filter team is working at office location. F. 36 has been sent to the first location. Do you need further assistance?



FBI 12
FBI Miami,
(w)
(c)

**From:** FBI 39 (MM) (FBI)
**Sent:** Monday, August 8, 2022 11:00:45 AM
**To:** FBI 8 (MM) (FBI) ; FBI 19 (WF) (FBI)
FBI 12 (MM) (FBI) ; FBI 34 (MM) (FBI)
FBI 10 (WF) (FBI) FBI 1 (MM) (FBI)
; FBI 23 (MM) (FBI)
**Subject:** Re: TEAM LEAD Thread, 8/8/22

Filter team has begun in second location. The order was switched to begin at second location instead of first.



**From:** FBI 8 (MM) (FBI)
**Sent:** Monday, August 8, 2022 10:56:58 AM
**To:** FBI 39 (MM) (FBI) FBI 19 (WF)
(FBI) FBI 12 (MM) (FBI) FBI 34 (MM) (FBI)
FBI 10 (WF) (FBI) FBI 1 (MM) (FBI)
; FBI 23 (MM) (FBI)
**Subject:** Re: TEAM LEAD Thread, 8/8/22

Need one free body back outside please



FBI 8

**From:** FBI 39 (MM) (FBI)
**Sent:** Monday, August 8, 2022 10:33:05 AM
**To:** FBI 8 (MM) (FBI) FBI 19 (WF) (FBI)
FBI 12 (FBI) FBI 34
; FBI 10 (WF) (FBI) ; FBI 1 (MM) (FBI)
>; FBI 23 (MM) (FBI)
**Subject:** Re: TEAM LEAD Thread, 8/8/22

We are beginning the search.

**From:** FBI 39 (MM) (FBI)
**Sent:** Monday, August 8, 2022 10:29:48 AM



**To:** ██ FBI 8 ██ (MM) (FBI) ████████ ; ██ FBI 19 ██ (WF) (FBI)
████████ FBI 12 (MM) (FBI) ████ ; ██ FBI 34 ██ (MM) (FBI)
██ ; ██ FBI 10 (WF) (FBI) ████ FBI 1 (MM) (FBI)
████ ; ██ FBI 23 ██ (MM) (FBI) ████ >
**Subject:** Re: TEAM LEAD Thread, 8/8/22

Please share with the group, CCTV is back on.

**From:** ████ FBI 39 ████ (MM) (FBI) ████████
**Sent:** Monday, August 8, 2022 9:52:05 AM
**To:** ██ FBI 8 ██ (MM) (FBI) ████ ; ██ FBI 19 ██ (WF) (FBI)
████ FBI 12 (MM) (FBI) ████ ; ██ FBI 34 ██ (MM) (FBI)
██ FBI 10 (WF) (FBI) ████ FBI 1 (MM) (FBI)
████ FBI 23 ██ (MM) (FBI) ████
**Subject:** Re: TEAM LEAD Thread, 8/8/22

Follow up call with the attorneys at 10am. We are working on CCTV. Standby.

**From:** ██ FBI 8 ██ (MM) (FBI) ████ >
**Sent:** Monday, August 8, 2022 9:36:40 AM
**To:** ██ FBI 19 ██ (WF) (FBI) ████ FBI 39 ████ (MM) (FBI)
████ FBI 12 ██ (MM) (FBI) ██ ; ██ FBI 34 ██ (MM) (FBI)
██ FBI 10 (WF) (FBI) ████ ; ██ FBI 1 ██ (MM) (FBI)
< ████ FBI 23 ██ (MM) (FBI) ████
**Subject:** Re: TEAM LEAD Thread, 8/8/22

On phone with attorney.  Stand by

██ FBI 8 ██
████

**From:** ██ FBI 19 ██ (WF) (FBI) ████
**Sent:** Monday, August 8, 2022 9:14:39 AM
**To:** ████ FBI 39 ████ (MM) (FBI) ██ ; ██ FBI 12 ██ (MM) (FBI)
██ ; ██ FBI 34 ██ (MM) (FBI) ██ ; ██ FBI 8 ██ (MM)
(FBI) ████ FBI 10 ██ (WF) (FBI) ████ FBI 1 ██ (MM)
(FBI) ████ ; ██ FBI 23 ██ . (MM) (FBI) ████
**Subject:** Re: TEAM LEAD Thread, 8/8/22

All,

We have called the attorney, no answer.  An email is being sent now....per ██ FBI 8 ██ , please
stay flexible.

Thank you

Subject to Protective Order



**From:** `FBI 19` (WF) (FBI) ▮
**Sent:** Monday, August 8, 2022, 7:41 AM
**To:** `FBI 39` (MM) (FBI) ▮ ; `FBI 12` (MM) (FBI) ▮ ; `FBI 34` (MM) (FBI) ▮ ; `FBI 8` (MM) (FBI) ▮ ; `FBI 10` (WF) (FBI) ▮ ; `FBI 1` (MM) (FBI) ▮
**Subject:** Re: TEAM LEAD Thread, 8/8/22

Adding SA `FBI 1` ▮
Removing SA ▮

Thank you,
`FBI 19`

---

**From:** `FBI 19` . (WF) (FBI) ▮
**Sent:** Monday, August 8, 2022, 7:36 AM
**To:** `FBI 19` (WF) (FBI) ▮ `FBI 39` (MM) (FBI) ▮ >; `FBI 12` (MM) (FBI) ▮ ; `FBI 34` (MM) (FBI) ▮ ; ▮ . (MM) (FBI) ▮ `FBI 8` W. (MM) (FBI) ▮ `FBI 10` (WF) (FBI) ▮
**Subject:** TEAM LEAD Thread, 8/8/22

Good Morning,

This is the thread we will use for today's operation. This is an internal thread only.

Thank you,
`FBI 19`