UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 23-80101-CR-CANNON-REINHART

UNITED STATES OF AMERICA,

    *Plaintiff,*

v.

DONALD J. TRUMP, et al.,

    *Defendants.*

**SUPPLEMENTAL BRIEF FOR FORMER ATTORNEYS GENERAL
EDWIN MEESE III AND MICHAEL B. MUKASEY, LAW PROFESSORS
STEVEN CALABRESI AND GARY LAWSON, AND CITIZENS UNITED
AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT TRUMP'S
MOTION TO DISMISS [ECF NO. 326]**

Pursuant to this Court's Order of May 29, 2024 [ECF No. 588], former United States Attorneys General Edwin Meese III and Michael B. Mukasey, Law Professors Steven Calabresi and Gary Lawson, Citizens United, and Citizens United Foundation, submit this supplemental brief as *amici curiae* regarding the illegality of Jack Smith's appointment as Special Counsel under the Appointments Clause in Article II of the Constitution.

Smith's arguments to this Court fail to address the fundamental problems identified by Trump's counsel and *amici* here. First, it is clear that the position Smith holds was designed during a time when the Executive Branch gave little to no thought to the Appointments Clause. But even so, nearly all the special prosecutors appointed during the past 40 years—aside from Smith and Robert Mueller—have been lawfully appointed pursuant to that Clause because they were already serving as Senate-confirmed U.S. Attorneys. Second, notwithstanding Smith's arguments, his

office is not properly "established by law," as that phrase was understood during the Founding era. Third, this case reconfirms Justice Jackson's reasoning on the importance of Senate confirmation, and why the position of Special Counsel poses far too much danger to escape the accountability protected by proper application of the Appointments Clause. All this reaffirms that Smith's appointment is unconstitutional.

I. **HISTORY SHOWS THAT SPECIAL COUNSEL-TYPE APPOINTMENTS GENERALLY DO NOT SUFFER FROM THE SAME CONSTITUTIONAL INFIRMITY AS SMITH'S APPOINTMENT.**

Contrary to Smith's attempt to portray the authority underlying his appointment as supported by longstanding precedent, in fact the legal basis for his appointment is a vestigial holdover of a bygone jurisprudential era. And that legal flaw likely went unaddressed because, with only one exception, each special prosecutor for more than forty years before Smith's appointment was in fact duly authorized by statute.

The pertinent history begins in 1974 when, without examining the requirements imposed by the Appointments Clause, the Supreme Court in *U.S. v. Nixon* briefly mentioned that the Attorney General had appointed a special prosecutor in that case, and the Court did not indicate disapproval of that method of appointment. *See United States v. Nixon*, 418 U.S. 683, 694–95 (1974). But the question presented in the *Nixon* case did not include the Appointments Clause, nor did a single statement in that decision suggest any contemplation of the pertinent constitutional requirements imposed by that Clause. *See id.*

It was not until two years later that the Supreme Court inaugurated the modern era of Appointments Clause analysis in *Buckley v. Valeo*, 424 U.S. 1, 124–37 (1976) (per curiam). And the Court has continued to develop that area of law, most recently in *Lucia v. SEC*, 585 U.S. 237 (2018), and *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020). Suffice it to say that, today, the Supreme Court takes the Appointments Clause far more seriously than it did in 1974.

2

From 1978 through 1999, moreover, special prosecutors (called Independent Counsels) were appointed under a *statutory* provision to an office that the Supreme Court upheld as an inferior officer in *Morrison v. Olson*, 487 U.S. 654 (1988). But that statute, which is not the basis for Smith's appointment, no longer exists, and *Morrison* is therefore not controlling here.

From 1999 until the present—with only one exception (Robert Mueller)—every special prosecutor (now called Special Counsel) who was appointed under the Reno Regulations was a United States Attorney, and as such was a Senate-confirmed presidential appointee who held office pursuant to the statute creating the position of United States Attorney. Those appointments were perfectly legal under the Appointments Clause, as the designation of "Special Counsel" merely added an item to the portfolio of a principal officer whose appointment conformed to every requirement of the Appointments Clause.

Accordingly, after *Nixon* and until this case (and the Mueller case) there was never any occasion to consider the constitutional implications of vesting such enormous power in someone whose position was never created by an Act of Congress, and who never received their appointment by action of the President and the consent of the Senate.[1] In short, the idea of a chief prosecutor not authorized by a clear statutory provision or with the approval of the Senate is a jurisprudential dinosaur, and should be declared extinct.

## II. SMITH CANNOT DENY THAT, IN 1791, "ESTABLISHED BY LAW" IN THE APPOINTMENTS CLAUSE MEANT ESTABLISHED BY CONGRESSIONAL STATUTE.

As to the proper application of the Appointments Clause, Smith's brief does not attempt to rebut *amici*'s point that the phrase "and which shall be established by law" in that Clause refers to

---

[1] Indeed, *amici*'s research indicates that, from 1937 until *Buckley* in 1976, the Supreme Court invalidated few statutes and executive actions on separation-of-powers grounds. Instances like the *Steel Seizure* case, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), were exceedingly rare. Thus, despite the vital role that separation of powers plays in our constitutional government, and especially its role in protecting individual liberty, during those years the Supreme Court did not examine those issues with the care that it does today.

a statute enacted by Congress. *See* Gary Lawson & Christopher D. Moore, *The Executive Power of Constitutional Interpretation*, 81 IOWA L. REV. 1267, 1315 (1996). And for good reason: No fewer than fourteen provisions in the original Constitution use "law" in this fashion.[2] *Amici* cited that fact in their Brief in Support of Motion to Dismiss the Indictment, [ECF No. 364-1 at 5], and Smith does not even attempt to rebut *amici*'s presentation.

      Moreover, an examination of the Framers' history confirms that the power to create federal officer positions is specifically situated in the Necessary and Proper Clause, U.S. CONST. art. I, § 8, cl. 18. *See* Gary Lawson & Patricia B. Granger, *The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause*, 43 DUKE L.J. 267, 270–71 (1993); *see also* E. Garrett West, Note, *Congressional Power Over Office Creation*, 128 YALE L.J. 166, 170 n.8, 177–83 (2018). And the powers provided by that Clause are properly exercised only when Congress passes legislation that is then signed by the President. *See, e.g.*, *United States v. Comstock*, 560 U.S. 126, 136–37 (2010). Accordingly, it cannot be seriously debated that, under the Constitution's original meaning, "Congress has the *exclusive* constitutional power to create federal offices." Calabresi & Lawson, *supra*, at 101.

      As one of many examples, when Elbridge Gerry suggested during the Constitutional Convention adding to the Necessary and Proper Clause the phrase "that no officer shall be app[ointe]d but to offices created by the Constitution or by law," the addition was narrowly (6-5) defeated only because it was "unnecessary." 2 RECORDS OF THE FEDERAL CONVENTION OF 1787, at 442 (Max Farrand ed., Yale Univ. Press 1911), *available at* https://tinyurl.com/4jpxdfun. And

---

[2] *See id.* at 1315 n.225 (discussing U.S. CONST. art. I, § 2, cl. 3; *id.* art. I, § 4, cl. 1; *id.* art. I, § 4, cl. 2; *id.* art. I, § 6, cl. 1; *id.* art. I, § 7, cl. 2; *id.* art. I, § 8, cl. 15; *id.* art. I, § 8, cl. 18; *id.* art. I, § 9, cl. 3; *id.* art. I, § 9, cl. 7; *id.* art I, § 10, cl. 1; *id.* art. II, § 2, cl. 2; *id.* art. III, § 2, cl. 1; *id.* art. IV, § 1; *id.* art. VI, § 2. *Amici*'s *Notre Dame Law Review* article cites still more scholarship on this point. *See* Steven G. Calabresi & Gary Lawson, *Why Robert Mueller's Appointment as Special Counsel Was Unlawful*, 95 NOTRE DAME L. REV. 87, 100–01 (2019).

*Buckley* finally gave effect to the critical separation-of-powers rule that the only branch that can create an office—Congress—is also the only branch that cannot fill that office. *See* 424 U.S. at 124–37. Thus, every officer appointed in the Executive Branch that does not arise directly from the Constitution must be the product of at least two of the three branches working in concert.

Acting pursuant to its office-creating power, moreover, Congress has created many offices within the Department of Justice (DOJ). *See* 28 U.S.C. §§ 503 (Attorney General), 504 (Deputy Attorney General), 504a (Associate Attorney General), 505 (Solicitor General), 506–507a (Assistant Attorneys General), 541(a) (United States Attorneys), and the heads of various DOJ components, *see* Calabresi & Lawson, *supra*, at 102–03. And, for a time, Congress (as noted previously) authorized an officer called an Independent Counsel. 28 U.S.C. §§ 49, 592–93.

But the only officer-creating statutory provision authorizing the Attorney General to appoint an officer is a provision specifically governing the Bureau of Prisons (BOP): "The Bureau of Prisons shall be in charge of a director appointed by and serving directly under the Attorney General. The Attorney General may appoint such additional officers and employees as he deems necessary." 18 U.S.C. § 4041. And that provision obviously covers BOP only, not other DOJ components.

Smith doesn't dispute this, but instead claims that the power for his appointment lies in other provisions. But, as *amici* and Trump's counsel have already explained, none of those provides the kind of general officer-creating authority for DOJ as a whole that § 4041 provides for BOP. And none of the provisions Smith cites provides the kind of general officer-creating authority that Congress has bestowed on *other* Department heads, Department-wide, in their general organic statutes. *Amici* have previously referenced those statutes. *Compare* ECF No. 364-

5

1 at 14; *see also* Calabresi & Lawson, *supra*, at 117.  No such statute covers DOJ beyond its BOP component.

But if Smith's argument were correct, then § 4041 would violate the canon against surplusage, because Smith's purported statutory authorities would give the Attorney General plenary officer-creating power *anywhere* within DOJ, including the authority to create BOP officers without § 4041.  *See Chickasaw Nation v. United States*, 534 U.S. 84, 93 (2001).  And that power would then extend throughout the entire DOJ.  That would be an enormous elephant crammed into such a tiny mousehole.

Smith's broader argument suffers from the same flaw as his original brief:  His dearth of evidence regarding original meaning, alongside his failure to reconcile his citations of century-old legislative history with the Supreme Court's post-*Buckley* Appointments Clause jurisprudence.

Instead, Smith's brief goes on at length about what some congressional staffers thought in the early 1900s when writing reports never voted upon by Congress and never signed by any President, and what he claims the practice was in a bygone era when federal prosecutors had a fraction of the power they now possess.  *See* ECF No. 374 at 12–14.[3]  And he seeks judicial support in a Second Circuit case decided in 1975—a year *before* the Supreme Court's landmark *Buckley* decision.  *See id.* at 12–13 (citing *In re Persico*, 522 F.2d 41 (2d Cir. 1975)).  Those non-binding authorities cannot overcome the extensive evidence of the Appointments Clause's original public meaning—which makes clear that the Attorney General lacks the authority, on his own, to appoint

---

[3] Those reports were written when the scope of federal power was a shadow of what it has been since the New Deal, with its enormous expansion of federal power under the Commerce Clause, *see Wickard v. Filburn*, 317 U.S. 111 (1942), and Spending Clause, *see United States v. Butler*, 297 U.S. 1 (1936), coupled with the advent of the Federal Government's national security apparatus, Intelligence Community, and federal law enforcement, *see, e.g.*, National Security Act of 1947, Pub. L. No. 80-253, 61 Stat. 495, all fueled by an exponential increase in the size of the federal budget.

a federal officer with the kind of prosecutorial power wielded by Mr. Smith. *See* [ECF No. 326] at 2–6; [ECF No. 364-1] at 4–16.

### III. THIS CASE REAFFIRMS JUSTICE JACKSON'S INSIGHTS ON WHY SUCH VAST PROSECUTORIAL POWER REQUIRES BOTH A DULY ENACTED STATUTE AND SENATE CONFIRMATION.

This conclusion finds additional support in insights offered eighty years ago by Attorney General Robert Jackson.

1. Speaking to the Nation's Federal District Attorneys—which was the previous name of the office now called United States Attorney—future-Justice Jackson reasoned:

> It would probably be within the range of that exaggeration permitted in Washington to say that assembled in this room is one of the most powerful peace-time forces known to our country. The prosecutor has more control over life, liberty, and reputation than any other person in America. His discretion is tremendous. He can have citizens investigated and, if he is that kind of person, he can have this done to the tune of public statements and veiled or unveiled intimations. Or the prosecutor may choose a more subtle course and simply have a citizen's friends interviewed.

Robert H. Jackson, U.S. Att'y Gen., Address at the Second Annual Conference of United States Attorneys: The Federal Prosecutor 1 (Apr. 1, 1940), *available at* https://tinyurl.com/2s4dmdsz.

Exploring the various specific powers of a United States Attorney, Justice Jackson added:

> The prosecutor can order arrests, present cases to the grand jury in secret session, and on the basis of his one-sided presentation of the facts, can cause the citizen to be indicted and held for trial. He may dismiss the case before trial, in which case the defense never has a chance to be heard. Or he may go on with a public trial. If he obtains a conviction, the prosecutor can still make recommendations as to sentence, as to whether the prisoner should get probation or a suspended sentence, and after he is put away, as to whether he is a fit subject for parole.

*Id.*

The Attorney General and future Justice concluded by explaining why anyone exercising such enormous federal power requires presidential appointment and Senate confirmation:

> Because of this immense power to strike at citizens, not with mere individual strength, but with all the force of government itself, the post of Federal District Attorney from the very beginning has been *safeguarded by presidential appointment, requiring confirmation of the Senate of the United States*. You are

7

>thus required to win an expression of confidence in your character by both the legislative and the executive branches of the government before assuming the responsibilities of a federal prosecutor.

*Id.* at 2 (emphasis added).

For all the reasons that Justice Jackson articulated with respect to U.S. Attorneys, Smith exercises the power of a principal officer, as they do, and as such requires both the personal nomination of the President, and the support of a majority of the Senate. Smith has neither.

2. But that is not all. Under Smith's claim of statutory power under 28 U.S.C. §§ 515 and 533, and perhaps the other provisions he discusses, an Attorney General could create an entire shadow government within the Department of Justice. For every position established by Congress, the Attorney General could invoke his power to create a new officer who would report exclusively to him, implanting that new officer alongside—or perhaps even with supervisory authority over—each officer Congress authorized. The obvious answer to such a dystopian and frightening version of the Nation's top domestic law enforcement agency is that Congress created a much different structure, one that answers to the American people through their elected lawmakers and their elected President. That is the face of democratic accountability. But Smith's argument claims that the Attorney General has unchecked unilateral power to set all that at naught.

Indeed, as two of the present *amici* have previously observed, "[o]ne shudders to think what abuses might have been condoned in the McCarthy era if Attorneys General had unlimited and unchecked power to create inferior officer special counsels." Calabresi & Lawson, *supra*, at 94. And it is precisely to avoid such terrible abuses of power that "United States Attorneys have always, throughout all 230 years of American history, required nomination by the President and confirmation by the Senate." *Id.* at 95.

8

Moreover, recent history shows that persons with Smith's title (or its Independent Counsel predecessor) could pursue a former senior agency official, White House officers, a President's son, and lower-ranking persons as well. But, by pursuing a former President of the United States who is currently the leading candidate to become the next President of the United States, Smith's prosecution here shows that he wields the power to profoundly alter the trajectory of a presidential election, and with it the destiny of the Nation. He is thus one of the most powerful officials in the entire United States Government. The idea that he can exercise that enormous power without Senate confirmation is intolerable, and even worse, the idea that he can do so without holding an office created by Congress is unthinkable.

## CONCLUSION

That reality is compounded by the obvious ease with which this problem could have been avoided: As suggested by Justice Jackson's observations, Attorney General Garland could have appointed a Special Counsel who is already a United States Attorney, duly appointed to that office by the President with the advice and consent of the Senate. That simple step would have avoided not only the serious constitutional problem that has now been thrust upon this Court, but also any delays occasioned by the present, well-founded motion to dismiss.

For these reasons, and those stated in *amici*'s opening brief, the Motion to Dismiss the Indictment should be granted.

June 11, 2024                                     Respectfully submitted,

                                                               */s/ Edward H. Trent*
GENE C. SCHAERR*
EDWARD H. TRENT (FSB #957186)
JUSTIN A. MILLER**
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
etrent@schaerr-jaffe.com
jmiller@schaerr-jaffe.com

*Counsel for Amici Curiae*

*Admitted pro hac vice*
***Pro hac vice** application forthcoming*

10

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of June, 2024, I caused a true and correct copy of the foregoing to be served via ECF on all parties and counsel of record in this matter.

*/s/ Edward H. Trent*
Edward H. Trent
