**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CR-CANNON(s)**

**UNITED STATES OF AMERICA**,

       Plaintiff,

v.

**DONALD J. TRUMP,**
**WALTINE NAUTA, and**
**CARLOS DE OLIVEIRA,**

       Defendants.

_____/

**GOVERNMENT'S RESPONSE IN OPPOSITION TO**
**DEFENDANT DONALD J. TRUMP'S MOTION TO DISMISS BASED ON**
**SPOLIATION OF EVIDENCE IN VIOLATION OF DUE PROCESS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

    I.     Trump's Familiarity with His Boxes and the Packout of the White House ............ 3

    II.    The Contents of the Boxes Shifted During Moves at Mar-a-Lago ........................ 3

    III.   The Plan to Seize Entire Boxes and the Pre-search Instructions to the Filter
         Team ................................................................................................................. 4

    IV.   Execution of the Search Warrant .......................................................................... 6

         A.    Filter Team Search of the Storage Room ..................................................... 7

         B.    Review of Storage Room Boxes Cleared by the Filter Team. .................... 9

         C.    Search of the 45 Office. .......................................................................... 10

         D.    Transport of Items to Washington, D.C. .................................................. 11

    V.    Scanning the Box Contents for the Special Master Litigation ............................ 12

APPLICABLE LAW .......................................................................................................... 13

DISCUSSION .................................................................................................................... 15

    I.     Trump Fails to Establish Constitutional Materiality ........................................... 16

         A.    Trump Fails to Show that the Exact Ordering of Documents Within
             Boxes Possessed an Exculpatory Value ................................................... 16

         B.    A Defense Focused on Document Order Within a Box Could Not
             Have Been Apparent to the Filter Team. ................................................... 19

          C.    Trump Has Ample Alternative Means to Make the Same Point. ............. 23

    II.    Trump Fails to Show Bad Faith .......................................................................... 24

    III.   Trump Has Not Identified Any Case Finding a Due Process Violation on
         Similar Facts ..................................................................................................... 25

    IV.   Trump's Claims About Discovery Violations Are Meritless ............................... 27

CONCLUSION .................................................................................................................. 30

**INTRODUCTION**

Defendant Trump does not offer the Court a single case at any level, at any time, from anywhere in the country, in which the disruption of the precise order of documents gathered in the execution of a search warrant provided support for a spoliation claim. In the roughly four decades since the Supreme Court set the applicable standard, the Eleventh Circuit has never found that a defendant's due process rights were violated by the government's loss or destruction of evidence. Despite this Trump asks this Court not only to be the first to find spoliation on such benign facts, but also to employ the most drastic sanction available—dismissal of the superseding indictment. His motion is meritless, and the Court should reject it.

Trump personally chose to keep documents containing some of the nation's most highly guarded secrets in cardboard boxes along with a collection of other personally chosen keepsakes of various sizes and shapes from his presidency—newspapers, thank you notes, Christmas ornaments, magazines, clothing, and photographs of himself and others. At the end of his presidency, he took his cluttered collection of keepsakes to Mar-a-Lago, his personal residence and social club, where the boxes traveled from one readily accessible location to another—a public ballroom, an office space, a bathroom, and a basement storage room. After they landed in stacks in the storage room, several boxes fell and splayed their contents on the floor; and boxes were moved to Trump's residence on more than one occasion so he could review and pick through them.

Against this backdrop of the haphazard manner in which Trump chose to maintain his boxes, he now claims that the precise order of the items within the boxes when they left the White House was *critical* to his defense, and, what's more, that FBI agents executing the search warrant in August 2022 should have known that. But neither the law nor the facts provide any basis whatsoever for the Court to find bad faith or spoliation in the unsurprising reality that the order of

some of the items may have shifted since then. To the contrary, the FBI agents who conducted the search did so professionally, thoroughly, and carefully under challenging circumstances, particularly given the cluttered state of the boxes and the substantial volume of highly classified documents Trump had retained.

Importantly, at every stage the agents have maintained the integrity of each container in which the evidence was found, that is, box-to-box integrity. As a result, Trump, in fact, has all of the evidence he needs to make the arguments he has identified in his motion. For example, he suggests (for the first time) that he may wish to argue that the classified documents were buried in the boxes and hard to see, or that the placement of classified documents near dated items shows that they were placed in the box long ago and may have been forgotten. But because the overall contents of each box have not changed, Trump can argue both of those things and has everything he needs to do so. Nothing has been lost, much less destroyed, and there has been no bad faith.

These defenses Trump now puts forth can be added to a list of other evolving, unsupported, and inconsistent explanations for his possession of classified documents at Mar-a-Lago. Over many months, Trump has claimed, among other things, that he deliberately declassified the documents, that the FBI planted them, and that he intentionally selected and sent the documents to Mar-a-Lago as his "personal records." *See* ECF No. 327 at 4, 6; https://truthsocial.com/@realDonaldTrump/posts/109710600348047764 (Aug. 10, 2022). These explanations have nothing to do with the precise order of items within his boxes. And this is confirmed by the fact that in the year that has passed since indictment, Trump's counsel have not once asked to review the boxes themselves. Trump did not assert any argument stemming from the precise order of the documents until filing this motion in 2024, and yet he claims (ECF No. 612 at 17) that its importance should have been "manifest" to the FBI filter agents who conducted

the search in 2022.  The Court should see Trump's newly invented explanations and his motion for what they are—his latest unfounded accusations against law enforcement professionals doing their jobs.  The Court should deny the motion because it is profoundly flawed on the law as well as incomplete and misleading on the facts, which is where the Government begins.

## BACKGROUND

### I.      Trump's Familiarity with His Boxes and the Packout of the White House

According to several personnel who worked closely with Trump at the White House, Trump routinely used cardboard boxes as a storage system for documents he accumulated, and he was very familiar with his boxes' contents.  ECF No. 85 ¶ 2, Ex. 1 at ¶ 28, Ex. 2.  Trump's detailed familiarity with the contents of the boxes prompted some of his staff to call them the "Beautiful Mind" boxes, referring to the film of the same title about genius mathematician John Nash.  Ex. 2. At the end of his presidency, these boxes that he accumulated and stored in his bedroom and elsewhere in the White House residence were shipped to Mar-a-Lago, as were numerous other boxes that were packed in connection with the move out of the White House.  ECF No. 85 ¶ 25. According to staff who were involved in packing those boxes for the move, Trump was personally involved in the packing process.  *Id.*

### II.      The Contents of the Boxes Shifted During Moves at Mar-a-Lago

Because the boxes were a mix of items and contained many small, loose materials and papers of various sizes and shapes, items within them necessarily shifted around anytime they were moved.  Between November 2021 and January 2022, Nauta and Trump Employee 2 brought several boxes to Trump's residence for him to review.  *Id.* ¶ 39.  In the midst of that process, on December 7, 2021, Nauta found at least four boxes in the storage room that had fallen, with their contents strewn on the floor.  Ex. 3.  Nauta texted Trump Employee 2, "I opened the door and

found this," then attached two photographs he took of the spill.  *Id*.; ECF No. 85 ¶ 32.  Trump

Employee 2 replied, "Oh no oh no," and "I'm sorry potus had my phone."  *Id.*  One of those boxes

depicted in the spill photos contained a classified record that the FBI subsequently recovered in

the storage room from box A-35; that document underlies Count 8 of the superseding indictment.

*See* Ex. 4 (depicting box A-35 in the storage room on August 8, 2022, approximately eight months

after Nauta discovered the spilled boxes depicted in Exhibit 3).  On January 15, 2022, before Nauta

and Trump Employee 2 released the 15 boxes Trump had decided to turn over to the National

Archives and Records Administration ("NARA"), they consolidated the contents of some boxes.

Ex. 5.  Between May 24 and June 1, 2022, Nauta moved approximately 64 boxes from the storage

room to Trump's residence.  ECF No. 85 ¶ 59.  On May 30, the following text exchange took place

between Nauta and a Trump family member:

> Trump family member: "Good afternoon Walt, Happy Memorial Day! I saw you
> put boxes to Potus room.  Just FYI and I will tell him as well: Not sure how many
> he wants to take on Friday on the plane.  We will NOT have a room for them.  Plane
> will be full with luggage.  Thank you!"
>
> Nauta: "Good Afternoon Ma'am [Smiley Face Emoji] Thank you so much.  I think
> he wanted to pick from them.  I don't imagine him wanting to take the boxes.  He
> told me to put them in the room and that he was going to talk to you about them."

*Id.* ¶ 59.  On June 2, Nauta and De Oliveira moved approximately 30 boxes from Trump's

residence into the storage room.  *Id.* ¶ 62.  And on June 2, Trump Attorney 1 reviewed the boxes

in the storage room, himself searching for documents with classification markings.  *Id.* ¶ 65.

### III.    **The Plan to Seize Entire Boxes and the Pre-search Instructions to the Filter Team**

On August 5, 2022, the Government obtained a warrant to search Mar-a-Lago and seize

classified documents and government records, "along with any containers/boxes (including any

other contents) in which such documents are located." *See* Ex. 1, at Attachment B.  As described

in the search warrant affidavit, *id.* at ¶¶ 82-84, the FBI planned to use as part of the search protocol

a Filter Team[1] whose purpose was to search the premises to identify any potentially attorney-client privileged material, so that the agents investigating the case ("Case Team") would not be exposed to potentially privileged documents.  On August 7, the day before the search, a DOJ attorney sent a memorandum to the FBI, explaining the protocol for the Filter Team.  ECF No. 612-1 at USA-01291482.  Members of the Filter Team received a briefing and a copy of the memorandum before the search.  *Id.*  According to those instructions, if the Filter Team came across any potentially privileged materials, the entire box (or other container) holding those potentially privileged materials was to be segregated away from access by any member of the Case Team, and set aside for later, more-thorough inspection by filter agents in the Washington Field Office ("WFO").  Thus, the warrant and the protocol contemplated two scenarios in which an entire box would be seized.  First, if the Filter Team encountered potentially privileged material in a box, the Filter Team would seize and segregate the box for later inspection.  Second, if the Filter Team cleared a box—that is, reviewed it and found no privileged materials—it would pass the box to the Case Team, who would review the box for documents with classification markings and seize any box containing such materials.

But what if a box contained *both* potentially privileged material and documents with classification markings?  In that case, the memo provided particularized instructions as follows:

> If, during the search of the 45 Office,[2] the filter team identifies a document marked as classified that is comingled in a container with potentially privileged materials, the filter team should document the location of the classified document, photograph it and the location where it was found, including with the comingled documents

---

[1] The search warrant affidavit refers to this group as the "Privilege Review Team."

[2] As reflected in the search warrant affidavit, it was initially contemplated that the Filter Team's searching role would be limited to the 45 Office, as that was where it was reasonably expected there might be attorney-client privileged materials.  At the search, however, it was decided to deploy the Filter Team in all locations searched.

and container, and then provide the classified document to the case team so that it can be handled appropriately.

ECF No. 612-1 at USA-01291483.  However, during the search at Mar-a-Lago the Filter Team never identified a document marked as classified comingled in a container with potentially privileged materials.[3]

## IV.    Execution of the Search Warrant

At or about 8:59 a.m. on August 8, 2022, the FBI team entered the Mar-a-Lago premises. Ex. 6 at USA-00940244.   At approximately 9:14 a.m., DOJ attorney Bratt attempted unsuccessfully to reach Trump Attorney 1 by phone.  At approximately 9:36 a.m., Bratt spoke by telephone with Trump Attorney 1.  At approximately 9:55 a.m., the CCTV servers were turned off to prevent recording, at the request of the FBI, out of concern for agent safety.  Ex. 7 at USA-00813916.  At approximately 10:20 a.m.,[4] recording resumed, at the direction of Trump attorneys. But during the time the recording function was off, the cameras continued to display a live feed, and some Trump Organization personnel who had access to the network feed monitored it live. Ex. 7 at USA-00813861.  At approximately 10:33 a.m., the FBI initiated the search.  Ex. 6 at USA-00940244.[5]

---

[3] As discussed below, after the boxes were delivered to Washington, D.C., a filter agent from the FBI's WFO discovered one document with classification markings among the boxes the Mar-a-Lago Filter Team had segregated.

[4] The CCTV footage produced in discovery establishes both the 9:55 a.m. and 10:20 a.m. approximate times.

[5] The Government has produced in discovery evidence that (1) the reason for the FBI's request that CCTV recording be turned off was a concern for agent safety; (2) Trump personnel were aware of it; (3) the CCTV cameras continued to broadcast live while recording was suspended; and (4) in fact, the CCTV was recording again, at Trump Organization attorneys' request, well before the search began.  Accordingly, Trump's suggestion, ECF No. 612 at 12-13,

A.      **Filter Team Search of the Storage Room.**

Four Filter Team agents were involved in reviewing boxes in the storage room: FBI Special Agents 5, 13, 17, and 36 ("FBI ##").  FBI 41 entered the storage room first to confirm that there was no potentially privileged material in plain view, which there was not.  At that point, a photographer took an initial set of photos of the storage room.  Exhibit 4 is one of those photos. After the initial photos were taken, members of the Evidence Response Team ("ERT") labeled all of the boxes in the storage room with unique identifiers, before a single box was opened.  A photographer then took photos of the boxes as labeled.  *Id.*

FBI 5 then joined FBI 36 and the two began the filter review of the storage room boxes, and remained in the storage room for that purpose, in part to ensure that Case Team members would not be exposed to potentially privileged information.  ECF No. 612-11 at USA-01291468. The remaining Filter Team agents were working in the 45 Office (discussed below) and came to the storage room later.  Each of the agents worked on one box at a time and ensured that no materials from one box ended up in another box.  *Id.* (FBI 36 ensured that everything from a box went back into the same box); *id.* at USA-01291473 (FBI 5 searched one box at a time and there was no chance documents from one box ended up in another); *id.* at USA-01291472 (FBI 13 searched one box at a time, and box-to-box integrity was a priority); ECF No. 612-12 at USA-01291476 (FBI 17 worked on one box at a time and his/her best recollection is that moving documents between boxes did not happen).

However, once agents saw the state in which Trump kept his boxes, it became apparent that maintaining the exact order of all documents and items within the boxes was nigh impossible

---

that the FBI's "efforts to turn off CCTV during the search ... is relevant to the application of the good-faith doctrine" is at best disingenuous, and at worst deliberately misleading.

given the variety of document shapes and sizes (newspapers, photographs, magazines, loose cards and notes, envelopes, etc.), and the presence of other non-documentary items like clothing, framed pictures, and other keepsakes.  Despite that, the agents did the best they could under the circumstances.  *See* ECF No. 612-11 at USA-01291468; *id.* at USA-01291473; *id.* at USA-01291472; ECF No. 612-12 at USA-01291476.

In keeping with the protocol, when any of the Filter Team agents came across a potentially privileged document in a box, the entire box was set aside and quarantined from the Case Team. At no point did any of the Filter Team agents come across a box that contained both potentially privileged documents and documents marked classified, which would have triggered the above-referenced instruction in the filter memo.  If a box was clear of potentially privileged material, the Filter Team released the box to the Case Team for further searching.[6]

It was not the Filter Team's responsibility to locate documents marked classified, but if they came across any during their review for potentially privileged materials, they typically alerted the Case Team to make sure any such documents were not missed.  The Filter Team agents varied in their practice of how they did so.  *See, e.g.*, ECF No. 612-11 at USA-01291468 (FBI 36 left the document in place, released the box to the Case Team, and sometimes informed them orally that material marked classified was in the box), *id.* at USA-01291472 (FBI 13 believes that s/he extracted documents with classified markings s/he found and placed them on top of the stacked documents in the box, so that the Case Team could more easily locate them), *id.* at USA-01291474 (FBI 5 did his/her best to identify where the documents marked classified were in the box, while

---

[6] If a box obviously contained neither potentially privileged material nor any materials subject to seizure under the warrant, the box was set to one side in the storage room and not seized or further searched.

maintaining the order of the documents in the box as best as s/he could).  None of the Filter Team agents inserted placeholder pages where any documents marked classified were located; that was done by the Case Team/ERT.

Despite the state of the contents of the boxes, documents with classification markings were easily noticeable to the Filter Agents.  *Id.* at USA-01291468 (agent "shocked" when saw classified material, and "undoubtedly clear" when did so), *id.* at USA-01291471 ("obvious" that document was marked classified), *id.* at USA-01291474 ("very obvious" when agent found classified).

The Filter Team set aside six boxes (five from the storage room, and one containing items seized from a desk drawer in the 45 Office) that contained potentially privileged material.  ECF No. 612-1 at USA-01291488.  Those boxes were documented separately from the other boxes, transported separately to overnight storage in Miami, and flown to Washington in an area of the aircraft separate from the other boxes.  *Id.*

### B.   Review of Storage Room Boxes Cleared by the Filter Team.

Outside the storage room, a team of agents and ERT members set up a workspace to conduct substantive review of the boxes that the Filter Team cleared and released to them.  Box-to-box integrity was preserved during this process, and item order within a box was preserved as well as the contents of the box and circumstances would permit.  If a team member located a document bearing classification markings that was subject to seizure, they removed the document, segregated it, recorded the box in which it was found, and replaced it with a placeholder sheet (the "initial placeholder sheet") where the classified document was removed.  They used preprinted classified cover sheets for the initial placeholder sheets until they ran out of them, having not anticipated finding so many classified documents.  At that point, the team began using blank sheets of paper with handwritten annotations to identify the document.  The information generally

included the document title, classification level, a description of the subject matter, document identification numbers, and/or dates in the document. Some of these descriptions of the documents may themselves be classified, or may be classified in conjunction with the classification markings.[7]

As part of the processing of seized documents marked classified, ERT photographed the documents (with appropriate cover sheets added by FBI personnel) next to the box in which they were located. The photographs attached as Exhibit 8 are examples.

### C.    Search of the 45 Office.

The 45 Office consisted of the "ante room," where Trump staff members had desks (Room B); Trump's office (Room C); a closet attached to Trump's office (Room F); and two bathrooms (Rooms D and E). Ex. 9. Entry photos were taken of the ante room, Trump's office, and both bathrooms. *Id.* Filter Team agents then discovered in the closet a blue, covered, leatherbound box full of various papers, including numerous newspapers, newspaper clippings, magazines, note cards of various sizes, presidential correspondence, empty folders, and loose cover sheets for classified information, as well as documents marked classified. Ex. 10. FBI 13 conducted the privilege review of this box, with some brief assistance from FBI 5. ECF No. 612-11 at USA-01291471. FBI 13 was careful to return all items to the box after reviewing them, but did not maintain the order of the items. *Id.* at USA-01291472; Ex. 11 at USA-01291691. FBI 13 found no potentially privileged materials in the box. ECF No. 612-1 at USA-01291485. After FBI 13 placed all of the contents of the blue box back in the box, an ERT photographer took photos of the blue box with the cover off. Ex. 12. FBI 13 alerted the Case Team that s/he had found documents marked classified, and after s/he completed his/her privilege review, two Case Team agents

---

[7] On June 20, 2024, the Government produced in classified discovery the initial placeholder sheets. *See* ECF No. 634.

reviewed the box and found numerous documents with classification markings, some of which had classification cover sheets already attached, as well as loose classification cover sheets. The Case Team agents seized the documents marked classified (as well as any cover sheets already attached) and segregated them. As they extracted the seized documents, they inserted placeholder sheets where they found them.

> ### D.    Transport of Items to Washington, D.C.

As previously recounted *supra*, *see* ECF No. 522 at 6-7, the FBI flew all of the seized boxes to Washington, D.C. the day after the search and brought them to WFO. Shortly thereafter, the FBI created an index of the documents with classification markings obtained from Mar-a-Lago, listing them by title and assigning an alphabetical code to identify each, starting with "a," "b," "c," and so on.[8]

After the boxes were transported to Washington, the filter agents at WFO found a document with classification markings (code wwww) in box A-14 before clearing the box for Case Team review. Ex. 14. The filter agent removed and segregated the document and memorialized the box from which the document was removed, but not its location within the box. *Id.* The Case Team therefore put a placeholder sheet at the top of the box when preparing it for scanning. Document wwww underlies Count 4 of the superseding indictment.

On August 29, 2022, after the filter agents at WFO had completed their more thorough privilege review and released box 4 to the Case Team,[9] agents discovered two additional

---

[8] Ex. 13 identifies which boxes contained the various alphabetically coded documents.

[9] Box 4 contained items found in a Trump staffer's desk in the 45 Office ante room. Those materials were seized and boxed by the Filter Team onsite because they contained potentially privileged information.

documents with classification markings inside (codes zzzz and aaaaa).  Neither of these documents is charged in the superseding indictment.

The documents underlying the charges in Counts 1-21 of the superseding indictment were found across seven boxes seized during the search,[10] as follows:

| Counts | 1, 2, 3 | 4 | 5, 6 | 7 | 8 | 9, 10, 11 | 12-21 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Box | 2 | A-14 | A-16 | A-28 | A-35 | A-42 | A-73 |

## V.    Scanning the Box Contents for the Special Master Litigation

Several weeks later, the FBI used an outside vendor to scan the contents of the boxes, as this Court ordered in *Trump v. United States*, Case No. 22-81294-CIV-CANNON (Sep. 29, 2022), ECF No. 125 at 3.  FBI agents were present for the scanning process and ensured that the boxes remained secure.  ECF No. 612-4.  Scanning personnel were instructed to "[s]can all documents in the order they appear in the box." Ex. 15 at USA-01291257.  Prior to initiating the scanning process, the FBI replaced the initial placeholder sheets with classification cover sheets at the appropriate level, with a handwritten notation of the FBI's alphabetical index code (the "new placeholder sheets").  The FBI did this to avoid providing any classified information to uncleared parties or scanning classified information to unclassified systems, while still enabling identification of the document at issue.  When making these substitutions, the FBI was able (with one exception not relevant here[11]) to ascertain the classified document to which the initial

---

[10] The documents underlying Counts 22 through 32 were not recovered during the search.

[11] The initial placeholder sheets that were put in Box A-15, unlike most of the others, included only the classification level and the number of pages.  Because of the large number of documents with classification markings (32) in box A-15, which were found in a binder of information and therefore similar in nature, it was not possible for the FBI to determine from the initial placeholder sheets which removed documents corresponded to which classified document.  In this instance, therefore, the FBI left the initial handwritten placeholder sheets within the binder to denote the places within the binder where the documents with classification markings

placeholder sheet corresponded, and simply swapped the new placeholder sheet for the initial placeholder sheet, in the same spot.  *See* ECF No. 522 at 7.

**APPLICABLE LAW**

To establish a due process violation based on the destruction or loss of evidence, a criminal defendant must make two showings.  *See United States v. Wilchcombe*, 838 F.3d 1179, 1191-92 (11th Cir. 2016); *United States v. Revolorio-Ramo*, 468 F.3d 771, 774 (11th Cir. 2006).  First, he "'must show that the evidence was likely to significantly contribute to his defense.'"  *Wilchcombe*, 838 F.3d at 1191 (quoting *Revolorio-Ramo*, 468 F.3d at 774).  "'To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'"  *Revolorio-Ramo*, 468 at 774 (quoting *California v. Trombetta*, 467 U.S. 479, 489 (1984)); *see United States v. Brown*, 9 F.3d 907, 910 (11th Cir. 1993) (per curiam).  Evidence fails to meet this constitutional-materiality standard if, among other things, it "would have, at best, bolstered an existing argument" that can still be presented to the jury through other means, "rather than enabling the defense to present argument not otherwise available."  *Revolorio-Ramo*, 468 F.3d at 774-75.

Second, "[t]he defendant must also demonstrate that the government acted in bad faith."  *Wilchcombe*, 838 F.3d at 1192; *see Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004) (per curiam); *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *United States v. Lanzon*, 639 F.3d 1293, 1300-1301 (11th Cir. 2011).  "[R]equiring a defendant to show bad faith on the part of the police both

---

were found.  The FBI provided this binder for scanning at the top of the box.  In addition, the FBI placed in the box 32 new placeholder sheets representing the 32 documents with classification markings in the binder.  It placed them where the binder was within the box when the investigative team obtained it.  None of the 32 documents is charged.

limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Youngblood*, 488 U.S. at 58. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.* at 56 n.*; *see Davis v. Sellers*, 940 F.3d 1175, 1189 (11th Cir. 2019).

Trump resists the applicability of the bad-faith requirement by relying (ECF No. 612 at 14-17) on cases involving the failure to disclose material exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). To be sure, "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. But that principle necessarily depends on the court's ability to confidently evaluate the evidence's materiality, which will rarely if ever be possible with a claim predicated on unpreserved evidence. *See Trombetta*, 467 U.S. at 486 ("Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed."). Here, for example, Trump's motion makes no claim about what the order of documents *actually* showed, instead relying entirely on speculation of what it *might have* shown. As such, his claim must be analyzed under the *Youngblood* framework, in which bad faith is required. *See Wilchcombe*, 838 F.3d at 1191-92; *Lanzon*, 639 F.3d at 1300-01; *Revolorio-Ramo*, 468 F.3d at 774; *Brown*, 9 F.3d at 910; *accord United States v. Perry*, 92 F.4th 500, 513 (4th Cir. 2024); *United States v. Greenberg*, 835 F.3d 295, 303-05 (2d Cir. 2016); *McCarthy v. Pollard*, 656 F.3d 478, 485 (7th Cir. 2011). Indeed, the Eleventh Circuit has held that even the lesser

remedy of a spoliation instruction requires a showing of bad faith—if such an instruction can ever permissibly be given in a criminal case at all, a question that the court has reserved. *United States v. Fey*, 89 F.4th 903, 914 (11th Cir. 2023). It follows that the far more extreme remedies that Trump seeks—dismissal and suppression—based on spoliation necessarily require a showing of bad faith.

## **DISCUSSION**

Any defendant claiming a due process violation as a result of alleged spoliation must satisfy the substantial burden of showing both constitutional materiality and bad faith. In the roughly four decades since *Trombetta* and *Youngblood*, the Eleventh Circuit has never found that a defendant's due process rights were violated by the government's destruction or loss of evidence.[12] Here, Trump has failed to make either showing necessary to establish a due process violation, and he cites no case finding spoliation in circumstances anywhere close to this case, where nothing has

---

[12] *See United States v. Gunn*, No. 22-11858, 2023 WL 4195675 (11th Cir. June 27, 2023) (per curiam); *United States v. Confer*, No. 20-13890, 2022 WL 951101, at *5 (11th Cir. Mar. 30, 2022) (per curiam); *United States v. Pineda Castro*, 795 F. App'x 635, 653 (11th Cir. 2019) (per curiam); *Davis*, 940 F.3d at 1188-89; *United States v. Garcia-Solar*, 775 F. App'x 523, 531 (11th Cir. 2019) (per curiam); *United States v. Hernandez*, 864 F.3d 1292, 1306-07 (11th Cir. 2017); *Wilchcombe*, 838 F.3d at 1192; *United States v. White*, 660 F. App'x 779, 783-84 (11th Cir. 2016) (per curiam); *United States v. Gayle*, 608 F. App'x 783, 790 (11th Cir. 2015) (per curiam); *United States v. Cruz*, 508 F. App'x 890, 901 (11th Cir. 2013) (per curiam); *Lanzon*, 639 F.3d at 1300-01; *United States v. O'Neil*, 436 F. App'x 960, 964 n.2 (11th Cir. 2011); *United States v. McCray*, 345 F. App'x 498, 501 (11th Cir. 2009) (per curiam); *United States v. Bryant*, 334 F. App'x 259, 264 (11th Cir. 2009) (per curiam); *United States v. Derosa*, 544 F. App'x 830, 834 (11th Cir. 2013) (per curiam); *United States v. Price*, 298 F. App'x 931, 937 (11th Cir. 2008); *United States v. Pina-Suarez*, 280 F. App'x 813, 819-20 (11th Cir. 2008) (per curiam); *United States v. Lindsey*, 482 F.3d 1285, 1293-94 (11th Cir. 2007); *United States v. McClymont*, 216 F. App'x 968, 970 (11th Cir. 2007) (per curiam); *Revolorio-Ramo*, 468 F.3d at 774-75; *United States v. Roberson*, 195 F. App'x 902, 904 (11th Cir. 2006) (per curiam); *Brown*, 9 F.3d at 910; *James v. Singletary*, 957 F.2d 1562, 1567 n.4 (11th Cir. 1992).

been destroyed and the claim is based only on agents not maintaining the precise order of documents in a box *whose ownership is uncontested*.

## I.      Trump Fails to Establish Constitutional Materiality

The agents' inability to preserve the precise ordering of the contents found within each box does not satisfy the "standard of constitutional materiality," because (1) the precise ordering of contents within a box does not "possess an exculpatory value"; (2) even if it did, that value was not "apparent before the evidence was destroyed"; and (3) the evidence was not "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Revolorio-Ramo*, 468 F.3d at 774 (quotation marks omitted).

### A.      Trump Fails to Show that the Exact Ordering of Documents Within Boxes Possessed an Exculpatory Value.

Trump has not shown that the precise ordering of the documents within a box "was likely to significantly contribute to his defense," *Trombetta*, 467 U.S. at 488, or that it "possess[ed] an exculpatory value." *Revolorio-Ramo*, 468 F.3d at 774. Trump's claim bears no resemblance to the paradigmatic cases involving the destruction of evidence. In most cases, the defendant at least articulated a theory for how the spoliated or destroyed evidence, if preserved, could have exonerated him. *See, e.g.*, *Youngblood*, 488 U.S. at 55-56 (defendant claimed that "properly preserved semen samples could have produced results that might have completely exonerated" him); *Davis*, 940 F.3d at 1187-89 (defendant claimed that forensic evidence that had been destroyed, including fingerprint cards, would have "identif[ied] the 'actual' murderer"); *Hernandez*, 864 F.3d at 1305-06 (defendant claimed that the Coast Guard sank a boat that, if not destroyed, would have shown that defendant was engaged in commercial fishing rather than drug trafficking); *Revolorio-Ramo*, 468 F.3d at 774-75 (similar); *Lindsey*, 482 F.3d at 1293 & n.8 (defendant claimed that police destroyed a fingerprint card that "may have provided some

exculpatory evidence for the jury to conclude that someone other than Defendant placed the gun in the vehicle").

Here, by contrast, no physical evidence has been destroyed, and Trump does not and could not contend that the precise ordering of documents within boxes that he unquestionably possessed and were filled with his belongings could exonerate him.  Instead, he appears to offer two theories (ECF No. 612 at 16-20) for how the location within a given box of documents with classification markings could provide marginal support for a knowledge-based defense at trial.  First, he speculates (ECF No. 612 at 19-20) that if documents marked classified "were not positioned in visible locations at the tops of boxes," that could support a claim that he may have simply overlooked such documents.  Second, he suggests (ECF No. 612 at 20) that if documents marked classified were found in close proximity to "items such as newspapers and letters dated long before" his term of office ended, that could support an inference that he may have placed them in boxes years before and therefore forgotten that some of the nation's most sensitive secrets were in the boxes before he sent them to Mar-a-Lago.  But any difference in "value" to the defense as a result of the Filter Agents' inability to maintain precise order within a box is only a question of degree—and a slight degree at that, because box-to-box integrity has been preserved.[13]

Trump's filings in the Special Master litigation also undermine the position he takes here.  There, Trump argued that "personal documents, photographs, and items such as clothing are by definition not 'contraband' and thus may not be lawfully seized," *Trump v. United States*, 9:22-

---

[13] Trump also complains, ECF No. 612 at 7 n.4, that the Government has not addressed whether the 15 boxes that were returned to NARA are "intact."  As the Government has repeatedly advised Trump, those boxes are equally available to him as to the Government.  Moreover, Nauta and Trump Employee 2's consolidation of those boxes—after Trump reviewed them but before they were released—means that whether they remained "intact" since arriving at NARA is beside the point, at least as far as Trump's claimed knowledge defense is concerned.

cv-81294-AMC, ECF No. 1 at 12, and that any such items that were seized must be returned, *Trump*, ECF No. 28 at 8-9.  His position there—that the Constitution *prohibited* agents from seizing or retaining any documents not marked classified—cannot be reconciled with his current claim that the Constitution *required* the agents not only to seize all non-classified documents in proximity to the classified documents, but to retain them in precisely the intra-box order in which they were found.  Indeed, if the agents had followed the procedures that Trump claimed at the time were constitutionally required—taking only the classified documents and leaving everything else behind—there could well be no evidence of which documents were in the same box with a particular classified document, much less evidence of whether a particular document or personal effect was one inch or two inches away from a classified document.

The fact is, the Constitution neither requires nor forbids agents to seize documents that are in close proximity to evidence falling within the scope of a search warrant, and instead affords a "practical margin of flexibility," *United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir. 1982), to agent decisionmaking, depending on such circumstances as the place to be searched, the crime under investigation, and the scope of the warrant.  In some cases, for example, agents may choose to "remove intact files, books, and folders when a particular document within the file was identified as falling within the scope of the warrant," *id.* at 1353; *see United States v. Smith*, 459 F.3d 1276, 1292-93 (11th Cir. 2006); *United States v. Tamura*, 694 F.2d 591, 595-96 & n.2 (9th Cir. 1982); *United States v. Beusch*, 596 F.2d 871, 877 (9th Cir. 1979), or may remove materials whose evidentiary value can only be ascertained "through the careful analysis and synthesis of a large number of documents," *United States v. Schandl*, 947 F.2d 462, 465-66 (11th Cir. 1991); *see Wuagneux*, 683 F.2d at 1349.  In other cases, by contrast, agents may choose to remove only those specific documents that appear on their face to fall within the warrant's scope or satisfy the plain-

view exception to the Fourth Amendment, leaving all other documents behind.  *See, e.g.*, *United States v. Slocum*, 708 F.2d 587, 602 (11th Cir. 1983); *United States v. Sawyer*, 799 F.2d 1494, 1509 (11th Cir. 1986).  Indeed, this latter, more-selective approach is regarded as the "general rule" governing the execution of search warrants.  *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983); *Tamura*, 694 F.2d at 595-96.  But because the selective removal of responsive documents is at least permitted, and often required, it follows that there is no constitutional rule mandating agents to preserve the precise ordering of whatever documents were near the responsive documents at the time of the search.  Indeed, it is telling that in the hundreds, if not thousands, of cases in which agents seize documents under a warrant—sometimes seizing entire files containing responsive documents, other times seizing only directly responsive records within those files— Trump is unable to cite a single case suggesting that a selective seizure or one in which the order of files or documents was to some extent not preserved constituted "spoliation."[14]

### B.    A Defense Focused on Document Order Within a Box Could Not Have Been Apparent to the Filter Team.

Trump's claim (ECF No. 612 at 17) that "it was manifest that the location of allegedly classified documents within the boxes . . . would play a significant role in [his] defense against any future charges" is both conclusory and false.  Even if the ordering of documents within a box could possess some marginal exculpatory value, that value was hardly "apparent" at the time of

---

[14] Trump contends (ECF No. 612 at 18) that there is "tremendous irony" in the Government's citation of *Wuagneux* during the Special Master litigation.  But nothing in *Wuagneux* supports Trump's position.  There, an agent explained that "whole files were kept intact so that the agents could identify where individual documents came from and where they belonged if, as was occasionally the case, the document was ordered returned to the files after review."  683 F.2d at 1353.  But nothing in the agent's testimony or the Eleventh Circuit's opinion attaches any practical or constitutional significance to a document's precise placement *within* a file.  And such a rule would be contrary to the "practical margin of flexibility" that the Eleventh Circuit recognizes, *id.* at 1349.

the search.  *See Revolorio-Ramo*, 468 F.3d at 774.  Even now, the notion that Trump's trial defense will focus on his supposed ignorance that the boxes seized from Mar-a-Lago contained documents marked classified is highly questionable.   Throughout this litigation, he has taken positions premised on precisely the opposite claim: that he is entitled to dismissal because he made a conscious decision as president to designate classified documents as personal records and transfer them from the White House to Mar-a-Lago.  *See* ECF No. 324 at 16 ("President Trump's decision to designate records as personal and cause them to be removed from the White House plainly constitutes an official act within the 'outer perimeter' of the president's official duties."); ECF No. 327 at 6 ("The PRA also precludes judicial review of the President's recordkeeping practices and decisions, including President Trump's decision to designate materials as Personal Records." (quotation marks omitted).

And before he latched onto the PRA as a defense, Trump made public statements that he had made a decision to declassify the documents, further casting doubt on the viability or predictability of a defense that he was ignorant of the boxes' contents.  For example, on August 12, 2022, four days after the search, Trump posted[15] on Truth Social:

> Number one, ***it was all declassified***. Number two, they didn't need to "seize" anything.  They could have had it anytime they wanted without playing politics and breaking into Mar-a-Lago.

Similar statements continued in the weeks that followed.  In a September 21, 2022, interview,[16] Trump stated:

> **Trump**:      ***I did declassify.***
>
> **Interviewer**:   OK. Is there a process – what was your process to declassify?

---

[15] https://truthsocial.com/@realDonaldTrump/posts/108811278444540886.

[16] https://www.foxnews.com/video/6312698126112 at 00:16.

**Trump**:         There doesn't have to be a process, as I understand it.  You know, there's – different people say different things, but as I understand there doesn't have to be.  If you're the president of the United States, you can declassify just by saying, it's declassified.  Even by thinking about it, ***because you're sending it to Mar-a-Lago or to wherever you're sending it.***  And there doesn't have to be a process. There can be a process, but there doesn't have to be.  ***You're the president, you make that decision.***  So when you send it, it's declassified.  We – ***I declassified everything***.

The undisputed facts further undercut his claim that the precise order of documents had material exculpatory value that should have been obvious to the Filter Team.  There is no question that these were Trump's boxes, and no one else's.  He collected their contents over time, he decided what was to be included, he kept them in his bedroom at the White House, he controlled their whereabouts, he helped pack some of them for Mar-a-Lago, he had them delivered to Mar-a-Lago, he directed Mar-a-Lago employees in mid-2021 to fix up the storage room so his boxes could be moved there, and agents searched them in the basement of his residence.  And it is not as though agents discovered items in the boxes plainly belonging to someone else.  To the contrary, the agents found boxes full of keepsakes valuable only to Trump.  In short, there is no reason to believe—and certainly no reason it should have been apparent to the agents—that Trump might claim the precise proximity of one document to another within a given box would be relevant, much less crucial, to a trial defense that Trump did not know what was in his boxes, with his other belongings.

Furthermore, this is not a case where reams of identically-sized documents were stacked neatly in file folders or redwelds, arrayed perfectly within a box.  To anyone other than Trump, the boxes had no apparent organization whatsoever.  The boxes contained all manner of items, including, for example, papers of varying sizes, from folded large-format items to tiny notes; clothing; picture frames; shoes; magazines; newspapers; newspaper clippings; correspondence;

greeting cards; binders; and Christmas ornaments.  The photographs attached as Exhibits 3, 8, and 16 provide a sense of the variety of items in the boxes.  The notion that the precise ordering of materials within these boxes possessed any exculpatory value that would be apparent to the Filter Team when they opened the boxes is absurd.

Trump's arguments in the Special Master litigation also undermine his position on this point.  There, he argued that "fundamental fairness" required the agents to "identify from what locations each box of documents was seized; whether these boxes were at the location or were boxes that the agents brought with them and filled; whether other items were contained in those boxes; whether confidential labels were based upon labels imprinted on the documents themselves, and whether the return label was the result of a review (of presumptively privileged executive communications) to make that determination."  *Trump*, ECF No. 1 at 20.  Notably absent from that list was any suggestion that fundamental fairness required the agents to preserve the precise order of documents within a given box.

Of course, at trial the Government will bear the burden of proving Trump's knowledge that he possessed the documents with classification markings, and Trump can argue that he lacked such knowledge.  The point here is simply that in assessing the significance to his defense of the order of materials in the boxes, as well as whether any exculpatory value was apparent at the time of the search, Trump's having taken positions in this litigation and made public statements contrary to his now-proffered defense weighs against his current claim that the precise order of documents in the boxes would have any materiality to his defense, let alone apparent exculpatory value at the time of the search.

### C.      Trump Has Ample Alternative Means to Make the Same Point.

Just as in *Revolorio-Ramo*, "[t]his case is not a situation where no evidence" about the state of the boxes is available to Trump to support a claim of unwitting possession.  468 F.3d at 774. Rather, to the extent that the precise ordering of the specific contents of each box constitutes "potentially exculpatory evidence" at all, it is merely evidence that "would have, at best, bolstered an existing argument that [can be] presented to the jury through the testimony of [witnesses], rather than enabling the defense to present argument not otherwise available."  *Id.*  As such, Trump has "reasonably available means" to him of "comparable evidence," *id.*, precluding a showing of constitutional materiality.  *See Trombetta*, 467 U.S. at 490 ("[T]he defendant retains the right to cross-examine the law enforcement officer who administered the Intoxilyzer test, and to attempt to raise doubts in the mind of the factfinder whether the test was properly administered."); *United States v. Taylor*, 312 F. Supp. 3d 170, 179 (D.D.C. 2018) ("At most, Taylor has shown that the investigation and documentation of what was found was incomplete.  That may form a basis for cross-examination of the government's witnesses, but it does not rise to the level of a due process violation.").

The evidence presented at trial will show that the classified documents charged in the superseding indictment were typically interspersed with newspaper clippings, other documents, and Trump's personal effects, in a generally disordered state to anyone other than Trump.  Trump is free "to cross-examine the law enforcement officers who viewed the contents of the [boxes]," *Revolorio-Ramo*, 468 F.3d at 774-75, and then argue to the jury that, because the classified documents may not have been immediately visible upon cursory examination, he might not have known they were there.  And to the extent a charged document's location in the same box as materials from a given timeframe might enable Trump to argue that such proximity supports an

inference that he placed the document into the box at around the same time, forgot about it, and therefore did not knowingly possess it at Mar-a-Lago, he remains free and able to do so, because box-to-box integrity has been preserved.

## II.    Trump Fails to Show Bad Faith

Trump also fails to make the requisite showing of bad faith.[17]  First, he argues several times that the Filter Team violated their instructions during the search at Mar-a-Lago.  *See, e.g.*, ECF No. 612 at 4, 13, 19, 21.  Not so.  Trump correctly quotes (ECF No. 612 at 4) the entire instruction he claims was violated, but then spends the rest of his brief pretending the phrase triggering the instruction (emphasized below) doesn't exist:

> ***If, during the search of the 45 Office, the filter team identifies a document marked as classified that is comingled in a container with potentially privileged materials***, the filter team should document the location of the classified document, photograph it and the location where it was found, including with the comingled documents and container, and then provide the classified document to the case team so that it can be handled appropriately.

As noted *supra*, during the search at Mar-a-Lago the Filter Team did not identify any document marked classified that was comingled in a container with potentially privileged materials.[18]

---

[17] "[A] showing of bad faith requires the government's conduct to reach the level of an 'intentional bad faith act.'"  *United States v. Londono*, No. 10-CR-20763, 2018 WL 706761, at *4 (S.D. Fla. Jan. 10, 2018) (quoting *Revolorio-Ramo*, 468 F.3d at 775).  "A showing of negligence, even gross negligence, is insufficient to establish bad faith."  *Id.* (citing cases).  As the Eleventh Circuit has explained, "'bad faith' 'is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; . . . it contemplates a state of mind affirmatively operating with furtive design or ill will.'"  *United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir. 1999) (quoting *Black's Law Dictionary* 139 (6th ed. 1990)).

[18] Trump's mischaracterizations do not end there.  He also claims that an August 9, 2022 email (*see* ECF No. 612-3) "illustrates" the FBI's "immediate concern about the Filter Team's failure to follow the instructions regarding documenting the location of seized items."  ECF No. 612 at 6-7.  Of course, the face of the email says nothing of the kind.  That is unsurprising, because

Similarly, Trump inaccurately criticizes the Filter Team for allegedly "disregarding" the order of the documents.  ECF No. 612 at 8 (Filter Team "made no effort" to preserve order of documents); *id.* at 10 ("the Filter Team did not even try to preserve the order of the documents"); *id.* at 20 (referring to the Filter Team's "disregard of the order of the documents during the raid"). But as Trump's exhibits themselves demonstrate, two Filter Team agents stated they kept the box contents in order to the best of their ability, one said it was not practical under the circumstances to maintain the order, and one said s/he was not focused on maintaining the order, but even if s/he had been, it would have been impossible to do so.  ECF No. 612-11.  That the agents did the best they could under the circumstances does not mean that they "made no effort" or "did not even try" to preserve the order of documents.  Trump has no evidence of bad faith.

### III.    Trump Has Not Identified Any Case Finding a Due Process Violation on Similar Facts

There does not appear to be any decision—and Trump certainly has not cited one—in which a court has ever found a due process violation under circumstances remotely similar to those here, where no physical evidence has been destroyed and the defendant's claim is based on the failure to preserve the precise ordering of documents within a container.  Trump instead relies (ECF No. 612 at 18-21) on a single district court decision in *United States v. Soriano*, 401 F. Supp. 3d 396 (E.D.N.Y. 2019), which (unlike in this case) involved the destruction not only of "the bulk

---

it has nothing to do with documenting the location of items seized during the August 8 search.  Rather, the email relates to FBI 19 asking FBI 17 to retrieve documents with classification markings from a witness who found them at Mar-a-Lago the day *after* the search.  As reflected in the email, FBI 5 assisted in doing so.  And as Trump knew when he made this allegation, this is detailed in a 302 (USA-00828648) from the Government's first discovery production, indicating that FBI 5 and another agent obtained the documents on August 9 and stating where the witness had found them.  Ex. 17 at USA-00828648.

of the relevant evidence," but the very evidence that spoke most directly to "the *only* issue for trial." *Id.* at 404.

In *Soriano*, a professional food courier arrived from Mexico with three checked duffle bags "filled with various packages containing perishable food items and other non-perishable goods she was transporting," *id.* at 398. In one of her checked bags, customs officers found two packages containing heroin, stored inside a container of mole sauce. *Id.* Two other packages containing heroin were found inside a plastic container of seasoning in her carry-on bag. *Id.* Upon arrest, Soriano claimed in an interview that others had packed the luggage and that she did not check inside the bags before departure. *Id.* After the interview, officers destroyed "all the contents of the three checked duffel bags," and the bags themselves. *Id.* at 398-99. "The only items the officers retained were the contraband, Ms. Soriano's carry-on bag, one empty plastic container and the paperwork recovered from Ms. Soriano's purse and carry-on bag." *Id.* at 399. The officers also "did not create an inventory or photograph Ms. Soriano's luggage as it was originally presented for inspection." *Id.* As a result, it was impossible to know whether the packages containing the contraband would have lent credence to the explanation that she gave the agents before the evidence was destroyed. *Id.* at 404.

*Soriano* might bear some relevance to this case if, counterfactually, the FBI had merely retained the recovered classified documents, destroyed the boxes themselves and all the other items found therein, failed to photograph any of the evidence before it was seized, and failed to inventory the destroyed items or to document the box from which each document marked classified was recovered. But the FBI did none of that here.

Moreover, the destruction of evidence in *Soriano* bore "ample indications of bad faith," *id.* at 405, including the "complete and immediate destruction of the bulk of the relevant evidence";

26

approving the destruction immediately after an explanation from the defendant herself that showed why the destroyed evidence was valuable to her defense; destroying the evidence in violation of agency policy and without notice to the prosecutors; and failing to photograph or otherwise document the evidence that was destroyed. *Id.* at 404-05.[19]  Here, by contrast, the agents (1) did not destroy anything; (2) reasonably did not expect there to be exculpatory value in the precise order of items in boxes; (3) violated no policy or instructions whatsoever in carrying out the search; and (4) preserved box-to-box integrity and made reasonable, good-faith efforts to maintain the order of the materials within each box to the extent possible.  It also speaks volumes that the best case Trump can find to reason by analogy that the precise order of his own documents in his own boxes matters to his defense is a case involving an alleged drug courier's luggage and no documents whatsoever—let alone the order of the documents.  There is no comparison to *Soriano*, and Trump's reliance on it is unavailing.

## IV.    Trump's Claims About Discovery Violations Are Meritless

Trump concludes his motion with a series of baseless attacks on the Government's discovery productions and argues that they are "relevant to all of the bad-faith inquiries" in their pretrial motions, including this one.  Again, Trump is wrong on the facts and the law.  We answer his allegations below, but these issues do not relate to the inquiries for resolution of this motion: whether Trump has demonstrated (1) constitutional materiality to the precise order of the

---

[19] Even while finding "ample indications of bad faith," the Court in *Soriano* "question[ed] whether it makes any difference in this case whether we are addressing a colossal thoughtless blunder or if in fact there is reason to genuinely suspect motivation and deed."  *Soriano*, 401 F. Supp. 3d at 404-05.  To the extent that *Soriano* can be read to permit dismissal of an indictment on the basis of unpreserved evidence absent a showing of bad faith, it is inconsistent with binding precedent from the Eleventh Circuit.

documents within boxes that indisputably belonged to him, and (2) bad faith on the part of the Filter Team. *Wilchcombe*, 838 F.3d at 1191-92.

Trump begins by suggesting (ECF No. 612 at 22-23) that the Government has failed to comply with its discovery obligations as set forth in the Justice Manual. But the record makes clear that the Government takes those obligations very seriously and has more than satisfied them. As Justice Manual § 9-5.002(B) requires, the prosecutors have worked closely with the FBI to review the entire case file for discoverable materials, including investigative reports, witness interviews, electronic communications, inserts, emails, agent notes, and substantive case-related communications in whatever form. With respect to timing, Trump wrongly suggests that prosecutors breach the Justice Manual unless they review and identify every item that is potentially discoverable "at the outset of [the] case." ECF No. 612 at 23. To the contrary, the Justice Manual, the case law, and Rule 16(c), make clear that the Government's discovery obligations are continuing, and the Government has continued to review and produce additional materials as required, including potentially exculpatory information and early Jencks Act materials. The agent notes on which Trump relies here (ECF No. 612 at 23) were supposed to be on a disc whose contents were produced to the defense in February 2024—months before the defendants raised the precise ordering of the documents in the boxes as a defense—but the notes were not produced in the February production due to a technical problem in the file transfer process that was not discovered until May. In any event, after the defendants made their requests, the Government discovered the error and produced the notes well in advance of trial and in full compliance with the Government's obligations. *See* Justice Manual § 9-5.001(D) (requiring production of exculpatory information "in sufficient time to permit the defendant to make effective use of that material at trial" and "reasonably promptly after it is discovered.").

Trump's overreaching in his additional arguments betrays the weakness of his claims.  For example, Trump suggests (ECF No. 612 at 23) that there was some impropriety in potentially privileged materials being moved to the top of a box for filter agents in Washington to review.  But these were potentially *privileged* materials, not documents called for by the warrant—and as is readily apparent, the entire point of the Washington review was to more carefully evaluate any potentially privileged materials before any release to the Case Team.  As Trump well knows, there was nothing wrong with the Filter Team's actions in this respect, and certainly nothing exculpatory.

Trump also criticizes the Government (ECF No. 612 at 7-8) for "misrepresent[ing] to the Court that the order of the documents within each box was intact" and mentions statements by Government counsel at hearings on March 1 and April 12, 2024.  Neither was a deliberate misrepresentation—when the Government makes an inadvertent or unclear representation, it will correct or clarify the record, as it has done previously in this case.  As the Government reported itself to the Court, ECF No. 522 at 8 n.3, Government counsel was not aware at the April 12 hearing that the order of materials in some boxes had been disturbed after the scanning process. And with respect to the March 1 hearing, the Government did not intend its response to the Court's questions. as a categorical representation that the precise order of all items in the boxes had been preserved.

Perhaps realizing that he has no evidence of bad faith on the part of the agents, Trump also seizes on the Eleventh Circuit's noting in *Revolorio-Ramo* that there was "no allegation of official animus" to argue that any official animus he claims exists, from any source, is properly part of the bad-faith inquiry here, "should fact finding be necessary."  ECF No. 612 at 21.  In the first place, as briefed elsewhere, ECF No. 375 at 21-25, there is no evidence of "animus" or improper or

vindictive motivations by anyone, and certainly not by the agents who conducted the search. Second, as discussed elsewhere, in advance of the search and in consultation with prosecutors, the FBI made a careful plan for the entire operation, that included choosing a date when neither Trump nor his family would be in Florida, consulting Trump's counsel before the warrant was executed, and use of a Filter Team protocol. ECF No. 592 at 4; Ex. 1 at ¶¶ 81-84. The advance planning of these steps, their execution in fact, and the litany of additional protocols and precautions that were taken in connection with this search—labeling each and every box in the storage room prior to the search in order to be able to identify from which box each seized item came; employing later, off-site, careful review of potentially privileged materials before releasing any to the Case Team; preserving box-to-box integrity; and taking photographs of the searched areas both pre-search and post-search—are all utterly inconsistent with bad faith. In short, this search was conducted lawfully, professionally, efficiently, and respectfully. Trump proffers no evidence of bad faith, because there was none.

## CONCLUSION

For the foregoing reasons, Trump's motion should be denied without a hearing.

Respectfully submitted,

JACK SMITH
Special Counsel
N.Y. Bar No. 2678084

By:     /s/ *Jay I. Bratt*
        Jay I. Bratt
        Counselor to the Special Counsel
        Special Bar ID #A5502946
        950 Pennsylvania Avenue, N.W.
        Washington, D.C. 20530

        David V. Harbach, II
        Assistant Special Counsel
        Special Bar ID #A5503068

June 24, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which in turn serves counsel of record via transmission of Notices of Electronic Filing.

        /s/ *Jay I. Bratt*
        Jay I. Bratt