**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CR-CANNON**

**UNITED STATES OF AMERICA**,

        Plaintiff,

vs.

**WALTINE NAUTA**, and
**CARLOS DE OLIVEIRA**,

        Defendants.

_____/

**ORDER DENYING NON-PARTY MOTIONS TO INTERVENE**

**THIS CAUSE** comes before the Court upon the following two Non-Party Motions to Intervene to Seek Rescission of the Court's January 21, 2025, Order Enjoining Release of Volume II of the Special Counsel's Final Report [ECF Nos. 717, 721]. The first Motion is filed by American Oversight, a "non-partisan nonprofit committed to promoting transparency and ensuring accountability of government officials" [ECF No. 717 p. 1 ("American Oversight Motion")]. The second Motion is filed by the Knight First Amendment Institute, a "non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, policy analysis, and public education" [ECF No. 721 p. 1 ("Knight First Amendment Institute Motion")]. These Non-Parties seek to intervene in this closed criminal action to cause public release of Volume II of the Special Counsel's Final Report, the work product of a prosecutor appointed and funded in violation of the Appointments and Appropriations Clauses of the United States Constitution [ECF No. 672]. *See* U.S. Const. Art. II, § 2, cl. 2; Art. I, § 9, cl. 7.

The Motions are opposed by the United States, Waltine Nauta, and Carlos De Oliveira [ECF Nos. 739, 740]. President Donald Trump also opposes the Motions as amicus curiae in his individual capacity [ECF Nos. 755, 759].

Upon review of the Motions, Responses, and Replies [ECF Nos. 717, 721, 739, 740, 745, 746], and fully advised in the premises, the Motions to Intervene are **DENIED**. The Court's January 21, 2025, Order is addressed in a separate order to follow, directed to the parties in this action.

## RELEVANT BACKGROUND

The Court recounts the relevant background of this closed criminal case only as necessary to resolve the instant motions.

1. In July 2024, this Court dismissed the Superseding Indictment in this case against all three defendants based on the unlawful appointment of Special Counsel Jack Smith, in violation of the Appointments Clause [ECF No. 672 ("Dismissal Order")].[1] The Special Counsel appealed that Dismissal Order as to all three defendants [ECF No. 673] but then moved to dismiss the appeal as to Donald J. Trump only, without prejudice, following the results of the 2024 Presidential Election [ECF No. 677; *see* 11th Cir. No. 24-12311 (Doc. 79)]. The Special Counsel maintained his appeal as to Waltine Nauta and Carlos De Oliveira [ECF No. 677 p. 1].

2. In early January 2025, weeks before the presidential transition—and with the criminal appeal as to Nauta and De Oliveira still pending before the Eleventh Circuit—the Special Counsel accelerated efforts to prepare and finalize a Final Report on his investigation and

---

[1] Special Counsel Smith's use of a permanent indefinite appropriation also violated the Appropriations Clause, U.S. Const. Art. I, § 9, cl. 7, but the Court had no occasion to address the proper remedy for that violation given the dismissal on Appointments Clause grounds [ECF No. 672 p. 1].

2

work in this case, for transmission to then-Attorney General Garland by January 7, 2025, and release to Congressional leadership by January 10, 2025 [ECF No. 679 pp. 6–7; ECF No. 680 ("Government's Notice"); ECF No. 685 p. 2].[2]

3. In response, Nauta and De Oliveira moved for emergency injunctive relief, both in this Court and in the Eleventh Circuit, to preclude transmission and release of the Final Report ("Emergency Motion") [ECF No. 679]. The Emergency Motion cited the unconstitutional appointment and funding of the Special Counsel and the corresponding *ultra vires* nature of the Special Counsel's preparation and transmission of the Final Report [ECF No. 679]. The Emergency Motion also relied on Nauta and De Oliveira's rights to due process and a fair trial; the importance of maintaining grand jury secrecy and affording a process for review of such material, *see* Fed. R. Crim. P. 6(e); the prohibitions on release of information as outlined in Local Rule 77.2(a); and various other arguments related to, *inter alia*, undue prejudice to presumptively innocent defendants caused by disclosure of a prosecutorial discovery material subject to a Rule 16 protective order; still-contested assertions of attorney-client privileged material contained within Volume II; and the Department of Justice's Justice Manual, *see* Department of Justice, Justice Manual §§ 1-7.610 (2018) ("Concerns of Prejudice"), 1-7.600 ("Release of Information in Criminal, Civil, and Administrative Matters–Non-Disclosure") [ECF No. 679; *see* ECF No. 27 (protective order); ECF No. 681].

4. The Emergency Motion did not attach any part of the Final Report or quote from its contents, as neither Nauta nor De Oliveira (nor Trump) had been given authority to retain the report or reproduce any part of it [*see* ECF No. 714 p. 6].

---

[2] The Special Counsel provided defense counsel for Nauta and De Oliveira limited-access review of the Final Report between January 3–6, 2025, as a courtesy, with strict limitations [ECF No. 679 pp. 6–7, 13–15; ECF No. 690 p. 10 n.3; ECF No. 681 p. 10].

5. To preserve the status quo pending the Eleventh Circuit's consideration of the analogous Emergency Motion, the Court temporarily enjoined release of the Final Report outside the Department of Justice [ECF No. 682]. Soon after, the Eleventh Circuit denied Defendants' parallel Emergency Motion and dismissed as moot the United States' appeal of this Court's already expired temporary injunction, *see* 11th Cir. 24-12311 (Docs. 100-2, 104)—leading to continued litigation in this Court on release of the Final Report.

6. Following clarification from the United States regarding the two volumes comprising the Final Report [ECF Nos. 680, 692], this Court entered an order: (1) denying Defendants' Motion to bar release of Volume I concerning the "Election Interference" Case in D.C., in keeping with the scope of this Court's authority and the confines of the Dismissal Order; (2) setting a hearing and briefing schedule for resolution of Defendants' Emergency Motion as to Volume II concerning the "Classified Documents" matter litigated in this Court; and (3) temporarily enjoining the Department of Justice and its officers/employees, etc., from releasing or sharing Volume II (and any information contained therein) outside the Department of Justice pending expedited consideration and resolution of the Emergency Motion [ECF No. 697].

7. More activity followed, including furious, close-to-midnight litigation regarding the imminent release of Volume I [ECF Nos. 696, 700, 701]—which the Court ultimately resolved by denying President-Elect Trump's Motion to Intervene as to Volume I and permitting expiration of the temporary injunction on release of Volume I on January 14, 2025 [ECF No. 702; *see* ECF No. 704, 706].

8. With Volume I released, the Court received expedited briefing on the United States' request to release Volume II to Congressional Leadership pending ongoing criminal proceedings against Nauta and De Oliveira [ECF Nos. 697, 698, 703, 705, 710, 711, 712,

4

713].³ Neither party attached Volume II to any filing related to the Emergency Motion or otherwise quoted from it.

9. To facilitate the Court's review of the Emergency Motion, the Court directed the United States, prior to the hearing, to submit a copy of Volume II for *ex parte*, *in camera* review [ECF No. 705]. The United States complied under protest, agreeing that public disclosure of Volume II was unwarranted given the ongoing criminal proceeding as to Nauta and De Oliveira—but nevertheless insisting upon immediate disclosure to four members of Congressional leadership [ECF Nos. 703, 708; *see* ECF No. 714 p. 5 n.8].

10. A public hearing on the Emergency Motion took place on January 17, 2025, with a brief, sealed follow-up session to hear from the parties in an attempt to understand the extent of grand jury material contained within Volume II [ECF No. 713 (minute entry); ECF Nos. 672–673].⁴ ⁵ Volume II was not made a part of the record during the non-evidentiary hearing or moved into evidence as an exhibit by either party.

11. On January 21, 2025, the Court granted Defendants' Emergency Motion as to Volume II and denied without prejudice President-Elect Trump's Motion to Intervene (but allowed his participation as amicus) [ECF No. 714 ("January 21, 2025 Order")]. In doing so, the Court noted various troubling aspects of the Attorney General's unprecedented insistence

---

³ Special Counsel Smith withdrew as counsel in this action prior to the hearing, having "referred" the case to the United States Attorneys' Office for the Southern District of Florida, and then officially withdrew from the Department on January 10, 2025 [ECF No. 714 p. 3 n.5].

⁴ The transcript of the public hearing is not on the docket because no party ordered it, but any party can order the transcript of the public hearing it in the normal course. No party objected to the Court's brief sealed hearing, which was announced publicly in advance and accompanied by judicial findings [ECF No. 697 p. 3 n.4; ECF No. 706].

⁵ During the January 17, 2025, hearing, government counsel was "unable to answer whether the Department has foreclosed reinitiating criminal charges against President-Elect Trump after he leaves office" [ECF No. 714 p. 11 n.15].

on release of a Special Counsel report to Congress pending a finding of guilt and/or conclusion of criminal proceedings [ECF No. 714]. These included (1) the lack of any "valid justification for the purportedly urgent desire to release to members of Congress case information" [ECF No. 714 p. 11]; (2) the importance of safeguarding the due process of the accused [ECF No. 714 p. 11]; (3) the absence of any enforceable means to ensure confidentiality if released as requested [ECF No. 714 p. 12]; and (4) the unexplained inconsistency between the Department's position and the directives in the Justice Manual not to disclose substantive case information in a criminal case except "'as appropriate in the proceeding or in an announcement after a finding of guilt'" [ECF No. 714 p. 12 (quoting Justice Manual § 1-7.610)]. Ultimately, without addressing Defendants' argument regarding the *ultra vires* nature of Volume II given Special Counsel's unconstitutional appointment and funding—an issue on appeal to the Eleventh Circuit at that time—the Court enjoined release of Volume II, noting as follows:

> Whether measured against the traditional factors pertinent to a civil injunction as framed incorrectly by the Department or treated properly as an exercise of supervisory control over the flow of substantive, nonpublic information to protect Defendants' rights in a criminal case, the balancing of harms and interests yields a clear and decisive answer in the present posture. Release of Volume II to Congress under the proposed conditions—without any enforcement mechanism to prevent public dissemination, and without any valid countervailing reason justifying a break from traditional norms—presents a substantial and unacceptable risk of prejudice to Defendants.

[ECF No. 714 pp. 12–13].

12. In the same January 21, 2025, Order, the Court required the parties, within thirty days "after conclusion of all appellate proceedings and/or continued proceedings in this Court, to submit a joint status report advising of their position on this Order, consistent with any

remaining Rule 6(e) challenges or other claims or rights concerning Volume II, as permitted by law."[6]

13. The Special Counsel's appeal of the Dismissal Order remained pending before the Eleventh Circuit until February 11, 2025, when the Eleventh Circuit, on motion by the United States to dismiss with prejudice, dismissed the appeal as to Nauta and De Oliveira [ECF No. 716; *see* 11th Cir. No. 24-12311 (D.E. 111)].

14. The instant Motions to Intervene followed soon after the Eleventh Circuit's dismissal of the pending appeal [ECF Nos. 717, 721], and became fully ripe on March 31, 2025, with additional filings [ECF Nos. 726, 728, 735, 736, 737, 739, 740].

15. On November 3, 2025, following related petitions for writs of mandamus, the Eleventh Circuit held the petitions in abeyance for sixty days to permit this Court to fully resolve the Motions to Intervene. *See* 11th Cir. Nos. 25-13400, 13403.

**LEGAL STANDARDS ON INTERVENTION AND JUDICIAL RECORDS**

Unlike the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure do not provide for a non-party to intervene in a criminal proceeding. *See United States v. Ruan*, 814 F. App'x 439, 442 (11th Cir. 2020) (citing *United States v. Kollintzas*, 501 F.3d 796, 800 (7th Cir. 2007)); *United States v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008). The absence of such a procedural mechanism accords with the rule that private parties lack standing to intervene in the prosecution of another. *See Linda R. S. v. Richard D. and Texas*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *see also United States v. Alcatel-Lucent France, SA*, 688 F.3d 1301, 1307 (11th Cir. 2012) (holding a third party lacked standing to appeal a sentence); *United States v. Laraneta*, 700 F.3d 983, 986 (7th Cir.

---

[6] The parties since have filed the Joint Status Report, in which they oppose any order directing release of Volume II and make additional requests and observations [ECF No. 738 pp. 3–8].

2012) (disallowing intervention by crime victims in district court). It also reflects, more generally, judicial caution against expansion of non-party intervention in criminal cases. *United States v. Couch*, 906 F.3d 1223, 1227 (11th Cir. 2018) (permitting intervention in criminal forfeiture proceedings to claim statutory interest in forfeited property tied to criminal proceeding itself); *Ruan*, 814 F. App'x at 442 ("Absent a procedural mechanism for intervention, we analyze the participatory rights of non-parties to criminal proceedings in light of the statutes governing those proceedings."); *United States v. Crawford Enters., Inc.*, 735 F.2d 174, 176 (5th Cir. 1984) (allowing person adversely affected by disclosure of grand jury material to intervene in pending criminal case to bar release of grand jury material to other parties).

Despite the cabined nature of nonparty intervention in criminal cases, the law is settled that "[t]he press has standing to intervene in actions to which it is otherwise not a party in order to petition for access to court proceedings and records." *Petition of Trib. Co.*, 784 F.2d 1518, 1521 (11th Cir. 1986). In *Petition of Tribune Company*, for example, the Eleventh Circuit permitted a newspaper publisher to intervene after a criminal trial to seek access to transcripts of *in camera* bench conferences held during the trial—although it ultimately affirmed the district court's nondisclosure decision, citing the "'scrupulous protection'" to be given to *in camera* inspections and to the confidential nature of the materials discussed during the disputed conferences. *Id.* at 1522 (quoting *United States v. Nixon*, 418 U.S. 683, 714 (1974)). Likewise, in *United States v. Valenti*, 987 F.2d 708 (11th Cir. 1993), the Eleventh Circuit authorized a newspaper's request to intervene to obtain transcripts of closed bench conferences and to challenge the district court's "dual-docketing system" as a violation of the qualified right of access to criminal proceedings. *Id.* at 715. Through these decisions, and others, the Eleventh Circuit has emphasized the presumption

in favor of open access to judicial proceedings and judicial records—a presumption rooted in both the common law and the First Amendment, to varying degrees.[7]

Importantly, however, when a prospective intervenor seeks material under a theory of access to "judicial records," as is the case here, courts need not allow non-party intervention to vindicate such an interest if the material sought is not properly considered a "judicial record" to begin with. Thus, courts must "distinguish between those items which may properly be considered public or judicial records and those that may not; the media and public presumptively have access to the former, but not to the latter." *Chicago Trib. Co.*, 263 F.3d at 1311; *Press-Enter. Co.*, 478 U.S. at 8–9 (emphasizing presumptive openness of criminal proceedings and calling for assessment of "experience and logic" to determine "whether the place and process [like trials, preliminary hearings, and jury selection] have historically been open to the press and general public").

To determine whether a given item qualifies as a "judicial record" subject to the public right of access, the Eleventh Circuit has offered substantial guidance, much of it categorical. *See Callahan v. United Network for Organ Sharing*, 17 F.4th 1356, 1362 (11th Cir. 2021). For starters, "documents collected during discovery" and "discovery motions," like motions to compel discovery, are not "judicial records." *Anderson*, 799 F.2d at 1441 ("[D]ocuments collected during

---

[7] *See, e.g.*, *Press-Enter. Co. v. Superior Ct.*, 478 U.S. 1, 8 (1986); *Press-Enter. Co. v. Superior Ct.*, 464 U.S. 501, 508 (1984) ("Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569–571 (1980))); *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) (discussing qualified common law right "to inspect and copy public records and documents, including judicial records and documents." (footnotes omitted)); *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1028 (11th Cir. 2005) ("The press and public enjoy a qualified First Amendment right of access to criminal trial proceedings."); *Perez-Guerrero v. U.S. Atty. Gen.*, 717 F.3d 1224, 1235 (11th Cir. 2013) ("We have discretion to determine which portions of the record should be placed under seal, but our discretion is guided by the presumption of public access to judicial documents.") (first citing *Craig v. Harney*, 331 U.S. 367, 374 (1947); and then citing *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001)).

discovery are not "judicial records.'"); *Chicago Tribune*, 263 F.3d at 1311 (referencing the "unique function discovery serves in modern proceedings"); *F.T.C. v. AbbVie Prods. LLC*, 713 F.3d 54, 63 (11th Cir. 2013).  This is because "[d]iscovery is neither a public process nor typically a matter of public record," and "[h]istorically, discovery materials were not available to the public or press." *Anderson*, 799 F.2d at 1441.  Accordingly, "[c]ourts generally should not permit public access to discovery materials that are not filed with substantive motions because discovery is 'essentially a private process' meant to 'assist trial preparation.'"  *Comm'r, Ala. Dep't of Corr. V. Advance Loc. Media, LLC*, 918 F.3d 1161, 1167 (11th Cir. 2019) (quoting *Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986)); *Chicago Tribune*, 263 F.3d at 1312–13 (differentiating between "material filed with discovery motions and material field in connection with more substantive motions").

By contrast, discovery material filed in connection with substantive pretrial motions that require "judicial resolution of the merits"—like a motion to dismiss and its attachments—*does* trigger the common-law right of access, regardless of whether the substantive pretrial motion is deemed "dispositive" or not.  *Id.* at 1312; *AbbVie Prods. LLC*, 713 F.3d at 63 (explaining exemption of discovery motions and discovery from public access as compared to "materials that invoke 'judicial resolution of the merits,' such as complaints, motions to dismiss, or motions for summary judgment" (quoting *Chicago Tribune*, 263 F.3d at 1312)); *Callahan v. United Network for Organ Sharing*, 17 F.4th 1356, 1362 (11th Cir. 2021).  Accordingly, "[al]though discovery materials do not automatically qualify as judicial records subject to the common-law right of access, they take on that status once they are filed in connection with a substantive motion." *Callahan*, 17 F.4th at 1362.

Ultimately, the Eleventh Circuit has "consistently rejected any test that would make a document's status as a judicial record dependent upon whether it played a discernible role in the resolution of the case" or that would require figuring out "the actual role the document played."

*Id.* (internal quotation marks omitted) (describing such a "functional approach" as a "distort[ion]" of Eleventh Circuit caselaw). "What matters is how the document was used by the parties—to support an argument before the court—and not whether the court itself used the document to resolve that argument." *Id.* at 1363. Nor is it dispositive to the judicial-record inquiry whether the item is formally filed on the docket. *Comm'r, Ala. Dep't of Corr.*, 918 F.3d at 1166. Again, the focus remains on whether the material in question was "submitted by litigants" for "judicial resolution of the merits" in a substantive motion. *Id.* (internal quotation marks omitted); *Chicago Tribune Co.*, 263 F.3d at 1312, 1315 (subjecting material submitted by parties in connection with summary-judgment motion in civil case to common law right of access); *Callahan*, 17 F.4th at 1363 (emphasizing "commitment to the principle that public access is presumed for documents 'filed with pretrial motions that require judicial resolution of the merits of an action'" (quoting *Comm'r, Ala. Dep't of Corr.*, 918 F.3d at 1167)).

## DISCUSSION

Before the Court are two Motions to Intervene by nonparties in this closed criminal case, one filed by American Oversight [ECF No. 717], and the other filed by Knight First Amendment Institute [ECF No. 721]. The American Oversight Motion relies on its "federal rights under FOIA [Freedom of Information Act]" as a basis to intervene to seek rescission of the Court's Order Enjoining Release of Volume II, without reference to the common law or the First Amendment [ECF No. 717 p. 6; ECF No. 746].[8] The First Knight Motion also relies on the Freedom of Information Act but asserts, in addition, a right of access under the common law and the First Amendment [ECF No. 721 p. 2; *see* ECF No. 745 p. 1].

---

[8] American Oversight materially expanded its theory in its Petition for Mandamus, relying for the first time on the common law and First Amendment right of access. *See* 11th Cir. No. 25-13400 (Doc. 1, Petition for Mandamus pp. 28–32).

All of the former or current parties to this action—the United States, Donald Trump, Waltine Nauta, and Carlos De Oliveira—oppose intervention on various grounds [ECF Nos. 738, 739, 740, 753, 755].[9] As relevant to the intervention question specifically, they emphasize that no authority permits third-party intervention in criminal cases to assert a FOIA interest raised in another forum [ECF No. 739 p. 7 ("[P]rospective intervenors fail to cite a single case in support of the proposition that an unrelated third party has standing to intervene in a closed criminal case in order to facilitate their FOIA litigation in another district."); ECF No. 740 p. 6 ("Yet, American Oversight and Knight Institute fail to cite a case in which a district court has allowed a third party to intervene in a criminal case to contest an order that might have some secondary or collateral implications for that party's FOI claims in another lawsuit.")]. They also challenge the notion, implicit in the Knight First Amendment Motion, that Volume II qualifies as "judicial record" to which the common law and/or the First Amendment even applies [ECF No. 740 pp. 7–12; ECF No. 739 pp. 11–14].

Upon careful review of the Motions and the related filings, and fully advised in the premises, the Court sees no basis to authorize nonparty intervention in this closed criminal proceeding—either on the unprecedented and unsupported theory of FOIA access or on the flawed assumption that Volume II qualifies as a judicial record triggering the common law or First Amendment right of access.

**I.    Prospective Intervenors' statutory FOIA interest does not provide a basis to authorize intervention in this criminal case**.

The Court begins with the FOIA theory, raised by both prospective intervenors [ECF No. 717 pp. 1–2, 5–7; ECF No. 721 pp. 7–9]. As best the Court can discern, the argument proceeds like this: we have rights under FOIA to seek nonexempt information that we believe is being

---

[9] President Trump was authorized to participate as amicus curiae in opposing the Motions to Intervene [ECF Nos. 755, 759].

improperly withheld by a federal government agency, *see* 5 U.S.C. § 552; we have tried to exercise those rights by, in the case of American Oversight, initiating a FOIA suit in the United States District Court for the District of Columbia to obtain Volume II, *see* D.D.C. Case No. 25–383, or in the case of Knight First Amendment, by submitting requests for Volume II to the Department of Justice [ECF No. 721 pp. 22–35]; we have been unsuccessful in those efforts because the January 21, 2025, Order bars release of Volume II outside the Department of Justice, *see Am. Oversight v. U.S. Dep't of Just.*, 779 F. Supp. 3d 40, 48 (D.D.C. 2025) (citing *GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.*, 445 U.S. 375, 384–86 (1980)); our FOIA rights are therefore "implicated" by the January 21, 2025, Order; and that means we should be permitted to intervene in this action to assert the FOIA interests we have advanced in other fora.

This theory of FOIA intervention in a criminal case is unsupported in law and unprecedented in scope. To begin, "prospective intervenors fail to cite a single case in support of the proposition that an unrelated third party has standing to intervene in a closed criminal case in order to facilitate their FOIA litigation in another district" [ECF No. 739 p. 7; *see* ECF No. 740 p. 6 ("Yet, American Oversight and Knight Institute fail to cite a case in which a district court has allowed a third party to intervene in a criminal case to contest an order that might have some secondary or collateral implications for that party's FOI claims in another lawsuit.")]. This is a telling and unsurprising comment on prospective intervenors' FOIA theory—which defies the limits of third-party intervention in criminal cases. As noted, recognizing the absence of a procedural mechanism for nonparty intervention, courts have proceeded with caution in this area—authorizing intervention to protect *against* disclosure of protected information by affected persons with obvious legal interests, to seek forfeiture under statutes governing the criminal proceeding itself, and to vindicate the common law and First Amendment right of access to judicial proceedings and court records. *See Couch*, 906 F.3d 1227; *Ruan*, 814 F. App'x at 442 ("Absent a

procedural mechanism for intervention, we analyze the participatory rights of non-parties to criminal proceedings in light of the statutes governing those proceedings."); *Crawford Enters., Inc.*, 735 F.2d at 176; *Feeney*, 641 F.2d at 824.  But never has nonparty intervention in a criminal case been allowed merely on the theory that a prospective intervenor has a statutory right somewhere that is "implicated" by a ruling in the criminal case.  Indeed, if that were the rule, any party seeking to obtain public records through a civil FOIA suit in another forum (or via FOIA requests to the Department of Justice) conceivably could attain party status in a criminal case to pursue that FOIA interest.  Yet no court has endorsed such a view.[10]  Nor is it even clear that FOIA litigants have ever attempted that type of criminal-case-intervention strategy before now.  In the end, while prospective intervenors may not fully admit the implications of their theory of FOIA intervention, their proposal is unsupported in law; disregards the limits of intervention in criminal cases; and risks havoc in criminal proceedings through FOIA-interested parties.

The Court recognizes that prospective intervenors have attempted, via separate litigation and agency efforts, to vindicate their FOIA interests and have been unsuccessful in those efforts due to the Department of Justice's compliance with the January 21, 2025, Order entered in this criminal case.  But that reality does not bestow upon them party status to pursue that FOIA interest in this separate criminal forum.  Nor is it a basis to judicially break open the limits on nonparty intervention in criminal cases, which, again, is not a mechanism recognized in the Federal Rules of Criminal Procedure.

---

[10] Knight Institute's citation to *La Rouche v. FBI*, 677 F.2d 256 (2d Cir. 1982), does not guide the outcome here, even if it were binding, because it is a civil case concerning intervention under Fed. R. Civ. P. 24(a)(2) [*see* ECF No. 745 p. 5].

## II. Prospective Intervenors lack a basis to intervene to seek access to Volume II because Volume II is not a judicial record under governing precedent.

The Court now turns to the second argument in support of nonparty intervention, raised by Knight First Amendment Institute only, and it concerns the public right of access to court records under the common law and the First Amendment [ECF No. 721].[11] This theory rests on the necessary assumption that Volume II is a "judicial document" or a "judicial record" subject to the public right of access under the common law and the First Amendment. It is not. No part of Volume II was attached by any party to a substantive motion for resolution on the merits. It was not admitted into evidence or attached as an exhibit to any motion or pleading. It was not filed on the docket (although failure to docket is not alone dispositive in the judicial-document query, to be sure). *And no defendant ever maintained Volume II or retained it for submission to this Court as part of their substantive motion*.[12] Likewise, counsel for the United States, in opposing the instant Motions, never reviewed Volume II [ECF No. 740 p. 9 n.4], and counsel for the United States during the proceedings on the Emergency Motion emphasized that review of the contents of Volume II was not necessary to decide the Emergency Motion [ECF No. 708 p. 1].

Equally importantly, Volume II contains large swaths of nonpublic discovery information (subject to a protective order) that is unattached to a substantive motion for judicial relief

---

[11] To the extent a court of higher review were to ascribe this theory of intervention to American Oversight, raised by American Oversight for the first time in a Petition for Writ of Mandamus, the analysis in this Order would apply equally to American Oversight.

[12] From January 3 through January 6, 2025, during the Special Counsel's finalization of efforts to transmit the Final Report to Attorney General Garland, defense counsel received very limited review of the Final Report under strict conditions barring reproduction or preservation, and effectively precluding substantive objections [*see* ECF No. 714 p. 6 ("Prior to his separation from the Department on January 10, 2025, Special Counsel Smith provided defense counsel with a limited and accelerated opportunity to review Volume II [ECF No. 690 p. 10 n.3; ECF No. 679 pp. 6–7; ECF No. 681 p. 10]. Among the Department's conditions for such review, defense attorneys were required to delete prior discovery productions of material protected by the protective order in this case. . . .")].

[ECF No. 714 ¶ 9; ECF No. 27].[13] This is significant under the binding Eleventh Circuit authorities cited above. *Supra* pp. 9–10. Pursuant to those authorities, discovery materials constitute judicial records only if filed by a party in connection with a pretrial motion "that require[s] judicial resolution of the merits." *Chicago Trib. Co*., 263 F.3d at 1312. Yet no party attached such discovery to the Emergency Motion or in opposition to it, as noted above, or in any of the many associated filings before the Court regarding the issues raised in the Emergency Motion [ECF Nos. 679, 690, 692, 699–701, 703, 708, 710–712]. Again, the Eleventh Circuit has made clear that courts should not permit public access to discovery materials that are not filed with substantive motions because discovery is "essentially a private process" meant to "assist trial preparation." *Anderson*, 799 F.2d at 1441. That principle holds here.[14]

Nor are prospective intervenors correct to suggest that the Court's *in camera* review of Volume II to facilitate its review of Defendants' Emergency Motion somehow converted Volume II into a "judicial document" [ECF No. 705 (directing government counsel to hand delivery Volume II to Chambers for *in camera* review)]. "It is elementary that *in camera* inspection of evidence is always a procedure calling for scrupulous protection against any release or publication

---

[13] [ECF No. 714 pp. 5–6 ("Volume II includes detailed and voluminous discovery information protected by the Rule 16(d)(1) Protective Order entered in this case [ECF No. 27]. Much of this information has not been made public in Court filings. It includes myriad references to bates-stamped information provided by the Special Counsel in discovery and subject to the protective order, including interview transcripts, search warrant materials, business records, toll records, video footage, various other records obtained pursuant to grand jury subpoena, information as to which President-Elect Trump has asserted the attorney-client privilege in motions in this proceeding [ECF No. 571 (sealed); ECF Nos. 641, 656], potential Rule 404(b) evidence, and other non-public information.")].

[14] The Court has assumed in this analysis that the Eleventh Circuit precedents governing the public right of access also apply with equal force to post-trial substantive motions; the key authorities in this area focus on pretrial and trial proceedings and the right of the press and public to gain access to such proceedings, without addressing the applicability of these doctrines to post-trial motions. There may be reasons to consider that question more closely, but no party has relied on that distinction, and it is not clear whether the post-trial nature of the Emergency Motion alters the legal inquiry in any respect.

of material not found by the court, at that stage, probably admissible in evidence and relevant to the issues of the trial for which it is sought." *Nixon*, 418 U.S. at 714. Likely because of that "scrupulous protection" given to *in camera* review, prospective intervenors offer no authority supporting the flawed suggestion that a court's mere *in camera* review of material, without a party filing the material as part of a substantive motion for resolution on the merits, transforms an otherwise non-judicial document into a judicial one.[15] Again, "[w]hat matters is how the document was used by the parties—to support an argument before the court—and not whether the court itself used the document to resolve that argument." *Callahan*, 17 F.4th at 1362–63 (rejecting "functional" approach in favor of "categorical" status as judicial records). And here, as the record makes obvious, no party attached Volume II to a substantive motion or sought to have it made part of the record on the Emergency Motion.[16] And never did the Court ever suggest, much less rule, that Volume II was admissible as evidence in the criminal case. *Nixon*, 418 U.S. at 714.

---

[15] Knight First Amendment cites *Comm'r, Ala. Dep't of Corr.*, 918 F.3d at 1168, to suggest that submission of a document *in camera* is sufficient to make a document a judicial record [*see* ECF No. 721 p. 11]. Nothing in that case suggests that mere *in camera* review of a document makes it a judicial document. To the contrary, the material in question in that case, although never formally filed with the court "under the rushed timeline" of an "approaching execution," *id.* at 1168, was subjected to expert testimony, debated during an *in camera* evidentiary hearing in connection with a summary judgment motion and a preliminary injunction motion filed by the parties, and possessed by the parties debating the legality of the protocol. *Id.* at 1164–65. None of these features is present here; defendants never had Volume II (and still do not have it); Volume II was never the subject of an evidentiary hearing or otherwise made an exhibit to a hearing; and Volume II certainly was not filed by the parties in connection with the Emergency Motion.

[16] The Court referenced Volume II briefly in a closed session following a public hearing on January 17, 2025, to better understand the scope of grand jury material potentially still contained within Volume II [ECF No. 713], but no party moved to make Volume II an exhibit to the hearing; there has been no challenge by any party or by the prospective intervenors to the Court's procedure on January 17, 2025; and the Motions to Intervene seek no relief beyond rescission of the January 21, 2025 Order [ECF Nos. 717, 721].

For all of these reasons, Volume II is not a judicial record subject to the common law or First Amendment right of access. Prospective intervenors therefore lack a basis to intervene in this criminal suit to obtain access to it or to seek rescission of a court order related to it.

## CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1. American Oversight's Motion to Intervene to Seek Dissolution of January 21, 2025, Order is **DENIED** [ECF No. 717].

2. Knight First Amendment's Motion to Intervene to Seek Rescission of January 21, 2025, Order is **DENIED** [ECF No. 721].

3. Nothing in this Order should be deemed to be inconsistent with Prospective Intervenors' right to challenge this Order on appeal.

4. This Order fully resolves the Motions to Intervene. American Oversight and Knight First Amendment lack a basis to intervene as parties in this action. Accordingly, no further analysis regarding the merits of releasing Volume II is warranted in this Order.

**ORDERED** in Chambers in Fort Pierce, Florida this 22nd day of December 2025.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record